WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
ANGÉLICA SALCEDA (SBN 296152)
asalceda@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Attorneys for Petitioners-Plaintiffs*
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
GENNA ELLIS BEIER (CA SBN 300505)
genna.beier@sfgov.org
EMILOU H. MACLEAN (CA SBN 319071)
emilou.maclean@sfgov.org
FRANCISCO UGARTE (CA SBN 241710)
francisco.ugarte@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: 415-553-9319
Fax:    415-553-9810

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUIZ TOVAR, LAWRENCE MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG,

            Petitioners-Plaintiffs,

v.

DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; NATHAN ALLEN, Warden of Mesa Verde Detention Facility,

            Respondents-Defendants.

Case No.

**CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1   BREE BERNWANGER* (NY SBN 5036397)          MARTIN S. SCHENKER (SBN 109828)
    bbernwanger@lccrsf.org                      mschenker@cooley.com
2   TIFANEI RESSL-MOYER (SBN 319721)            COOLEY LLP
    tresslmoyer@lccrsf.org                      101 California Street, 5th Floor
3   HAYDEN RODARTE (SBN 329432)                 San Francisco, CA  94111
    hrodarte@lccrsf.org                         Telephone: (415) 693-2000
4   LAWYERS' COMMITTEE FOR                      Facsimile: (415) 693-2222
    CIVIL RIGHTS OF
5   SAN FRANCISCO BAY AREA                      TIMOTHY W. COOK (Mass. BBO# 688688)*
    131 Steuart St #400                         tcook@cooley.com
6   San Francisco, CA 94105                     FRANCISCO M. UNGER (Mass. BBO#
    Telephone: (415) 814-7631                   698807)*
7                                               funger@cooley.com
                                                COOLEY LLP
8   JUDAH LAKIN (SBN 307740)                    500 Boylston Street
    judah@lakinwille.com                        Boston, MA 02116
9   AMALIA WILLE (SBN 293342)                   Telephone: (617) 937-2300
    amalia@lakinwille.com                       Facsimile: (617) 937-2400
    LAKIN & WILLE LLP
10  1939 Harrison Street, Suite 420
    Oakland, CA 94612
11  Telephone: (510) 379-9216
    Facsimile: (510) 379-9219
12
    JORDAN WELLS (SBN 326491)
13  jwells@aclusocal.org
    STEPHANIE PADILLA (SBN 321568)
14  spadilla@aclusocal.org
    AMERICAN CIVIL LIBERTIES UNION
15  FOUNDATION OF SOUTHERN CALIFORNIA
    1313 West Eighth Street
16  Los Angeles, CA 90017
    Telephone: (213) 977-9500
17  Facsimile: (213) 977-5297

18                        *Attorneys for Petitioners-Plaintiffs*
                      *Motion for Admission Pro Hac Vice Forthcoming*
19

20

21

22

23

24

25

26

27

28

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

1 **I.      INTRODUCTION**

2          1.       Defendant Immigration and Customs Enforcement (ICE) is holding Petitioners-

3 Plaintiffs (Plaintiffs) and a proposed class of similarly situated detainees in civil immigration

4 detention at Yuba County Jail (YCJ) and Mesa Verde ICE Processing Facility (Mesa Verde)

5 under extraordinarily dangerous conditions during the current COVID-19 pandemic. The only

6 effective means of preventing the spread of COVID-19 is social distancing—where people

7 remain at least six feet apart from each other. But conditions at YCJ and Mesa Verde render that

8 impossible. The detainees in these facilities live in crowded, shared spaces. Many sleep and

9 spend most waking hours within arm's reach of one another in assigned bunk beds in cramped

10 dormitories. They share dining areas, standing inches apart as they wait in line for food and then

11 sitting shoulder to shoulder as they eat on chairs that are bolted to the floor. They share

12 communal bathrooms and showers that are similarly congested, with toilet and shower stalls

13 that are well under six feet apart and separated only by thin dividers, and with adjacent sinks

14 that leave the detainees using them standing shoulder to shoulder. The toilets and showers,

15 moreover, are not disinfected after each use. Detainees have little access to essential hygiene

16 products such as hand sanitizer. ICE's failure to provide adequate hygiene—necessary to help

17 stem the transmission of COVID-19— risks exacerbating the health crisis COVID-19 will

18 inevitably cause if the facilities lack proper social distancing. Absent court intervention, the

19 detainees in these facilities are subjected to catastrophic risk. While certain individuals are at

20 higher risk of severe illness or death if they contract COVID-19, all members of the proposed

21 class are at risk of severe respiratory distress, damage to vital organs, and death.

22          2.       ICE has failed to respond appropriately to the pandemic. For weeks, amidst a

23 broad consensus of public health experts and while other law enforcement agencies released

24 massive numbers of people from detention to address the urgent need for social distancing, ICE

25 has largely refused to do the same. For example, the agency has actually increased the number

26 of civil immigration detainees at YCJ over the past two weeks. ICE continues to introduce new

27 detainees into both YCJ and Mesa Verde.

28

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

3.       The continued detention of putative class representatives such as Brenda Ruiz Tovar exemplifies ICE's dangerous course. Ms. Ruiz Tovar has prevailed against ICE in immigration court and been granted relief by an immigration judge—twice. She should be safely sheltering at home with her U.S.-citizen child and other family, but ICE insists on detaining her in an environment where social distancing is impossible. On behalf of all persons detained at YCJ and Mesa Verde, the putative class representatives respectfully request an order directing ICE to implement social distancing at YCJ and Mesa Verde, including releasing sufficient class members to make social distancing possible and halting the introduction of any new detainee absent a truly exigent justification.

4.       Defendants simultaneously have sought to prevent class members from advocating peacefully for their own safety, in violation of the First Amendment. In response to a hunger strike by class members seeking safer conditions at Mesa Verde, GEO Group, the for-profit ICE contractor that runs the facility, threatened to revoke their access to purchases from the commissary. This and other retaliation chilled the hunger strikers, many of whom suspended their participation in fear of Warden Nathan Allen following through on the threat. Plaintiffs seek declaratory and injunctive relief ordering Defendants to cease and prevent retaliation against peaceful advocacy in the facility. Plaintiffs also seek an order setting aside as unlawful an ICE policy that broadly bans ICE detainees' participation in any group demonstration.

5.       Facilities like YCJ and Mesa Verde are especially vulnerable to the explosive and lethal spread of COVID-19. As Judge Chesney recently found, detainees in YCJ and Mesa Verde "cannot practice meaningful social distancing in their respective detention facilities." *Bahena Ortuño v. Jennings*, No. 20-CV-2064-MMC, 2020 WL 1701724, at *6 (N.D. Cal. Apr. 8, 2020). In the same vein, another recent decision emphasized failures by ICE to take appropriate measures to make social distancing possible at Mesa Verde. *Bent v. Barr*, No. 19-cv-06123- DMR, 2020 WL 1812850, at *6 (N.D. Cal. Apr. 9, 2020) ("Although Respondents represent that they are following CDC guidelines, they make no representations that they have attempted to implement CDC recommendations on social distancing in detention facilities,

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1  including by staggering meal and recreation times, rearranging bunks and dining hall seating, or

2  minimizing the mixing of individuals from different housing units.").

3      6.      Around the country, carceral facilities where social distancing is not practicable

4  have taken substantial steps to reduce crowding. Where they have failed to do so in time, the

5  results have been devastating, with COVID-19 suddenly tearing through scores of prisoners,

6  yielding alarming rates of severe cases and fatalities. For example, at the Otay Mesa Detention

7  Center near San Diego, the virus has spread to half the facility and infected scores of detainees

8  and staff. Even in the midst of outbreaks at ICE detention facilities, ICE's acting director, a

9  defendant in this action, stated to a congressional committee on April 17 that the agency has no

10 existing plans to release additional detainees around the country.

11     7.      Short of effectuating a significant enough reduction in population levels at YCJ

12 and Mesa Verde, any remedial measures such as improved sanitation or hygiene will not be

13 sufficient to head off risks posed by the spread of COVID-19. As the CDC has warned,

14 COVID-19 presents a serious risk of widespread transmission via asymptomatic carriers who do

15 not demonstrate symptoms. Thus, screening and quarantine practices based on demonstrated

16 symptoms or on whether a new detainee has been in contact with a known carrier of the virus

17 are inadequate to contain the spread of the virus. Until conditions make comprehensive social

18 distancing possible, there will be no effective way to contain the transmission of COVID-19 in

19 these facilities.

20     8.      Given the population density inside YCJ and Mesa Verde and the practical

21 impossibility of achieving social distancing under current conditions, it is very likely that

22 hundreds of people inside YCJ and Mesa Verde, as well as many of the staff who work there,

23 will contract COVID-19. At least one in five of them will require hospitalization, and many will

24 likely perish under current conditions.

25     9.      Numerous courts have released individual habeas petitioners in the past four

26 weeks. But relief in such cases has fallen to a select number of immigrants with attorneys.

27 Meanwhile, the vast majority of YCJ and Mesa Verde detainees lack the resources to file

28

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

individual lawsuits. Even if they all could somehow sue, a piecemeal approach would be too slow to meet the emergency at hand, too disorganized to ensure an orderly process, and too resource-intensive to be sustainable. It would also fail to reckon with the broader issue at stake: namely, that it is unconstitutional for ICE to detain individuals in crowded detention facilities in the context of the current pandemic. ICE's patently inadequate response to the pandemic— including the glacially slow pace at which it is releasing detainees—endangers the lives of Plaintiffs by failing to protect them from contracting COVID-19. The resulting risk of harm is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). This class action is a superior mechanism for the Court to address the due process violation at hand and resolve class members' overlapping claims to relief.

10.     While social distancing is now ubiquitous in all corners of American society, and government authorities have been ordering reductions in prison and jail populations throughout the country, ICE's facilities remain an aberration. As district courts around the country have found in the past three weeks, ICE's continued detention of civil detainees where there is "potential exposure . . . to a serious, communicable disease" that is "very likely to cause a serious illness" violates the Due Process Clause. *Castillo v. Barr*, No. cv-20-00605 TJH (AFMX), 2020 WL 1502864, at *5 (C.D. Cal. Mar. 27, 2020) ("Civil detainees must be protected by the Government. Petitioners have not been protected. They are not kept at least 6 feet apart from others at all times."); *see also Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL 1429877, at *1 (9th Cir. Mar. 24, 2020) (*sua sponte* ordering immediate release of ICE detainee "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers"); *see also Ortuño*, 2020 WL 1701724, at *4 (holding that four individuals were likely to succeed that continued detention violated due process where they "cannot practice meaningful social distancing in their respective detention facilities"); *see also Bent*, 2020 WL 1812850, at *6  (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) ("[E]ven assuming that

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1    Respondents accurately describe Mesa Verde's current practices, these practices are inadequate

2    to ensure the 'safety and general wellbeing' of Mesa Verde detainees during the COVID-19

3    pandemic.").

4          11.    The present circumstances call for class treatment, in the interests of ICE

5    detainees as well as orderly and fair judicial administration. As District of Massachusetts Judge

6    William Young recently stated in certifying a facility-wide class of ICE detainees, all detainees

7    in a given facility share an interest in the "release [of] a critical mass of [d]etainees—such that

8    social distancing will be possible and all those held in the facility will not face a constitutionally

9    violative substantial risk of serious harm." *Savino v. Souza*, 20-cv-10617-WGY, 2020 WL

10   1703844 at *7 (D. Mass. Apr. 8, 2020). To date, Judge Young has ordered the release of at least

11   43 people and continues to oversee a process of reducing the population of the jail.

12         12.    This Court has the authority to order ICE to release as many class members as

13   necessary to guard against the spread of COVID-19 in Mesa Verde and YCJ and thereby

14   comply with the Fifth Amendment. Whether by setting a benchmark population limit during the

15   pandemic or—as the accompanying motion for a preliminary injunction proposes—by engaging

16   in expedited review of class members' plans to shelter upon release,[1] this Court should proceed

17   with all dispatch to order ICE to release enough class members to enable the necessary social

18   distancing. Furthermore, this Court should order ICE to abstain temporarily from introducing

19   any new detainees into the two facilities.

20   **II.    JURISDICTION AND VENUE**

21         13.    Jurisdiction is proper and relief is available pursuant to 28 U.S.C. § 1331 (federal

22   question), 28 U.S.C. § 1346 (original jurisdiction), 5 U.S.C. § 702 (waiver of sovereign

23   immunity), 28 U.S.C. § 2241 (habeas corpus jurisdiction), 28 U.S.C. §§ 2201-02 (declaratory

24

25   [1] This proposed truncated system for considering class members' claims for release is similar to one that has been
     in use for several weeks for ICE detainees in the District of Massachusetts. *See Savino*, 2020 WL 1703844. *See
26   also* In re Expedited Detention Hearing Procedures Effective April 7, 2020, Miscellaneous General Order 20-12
     (D. Alaska) (establishing expedited procedures for consideration motions for pretrial and presentence release based
27   on COVID- 19); Criminal Case Standing Order Re: Procedure for Review of Detention Orders in Light of
     Coronavirus Pandemic, M.J. Nat Cousins, Effective Mar. 16, 2020 (N.D. Cal.) (establishing expedited procedure
28   for any request to reopen a detention hearing on health grounds in light of COVID 19 pandemic).

relief); 28 U.S.C. § 1651 (All Writs Act); 28 U.S.C. § 1361 (mandamus); Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause); the Due Process Clause of the Fifth Amendment to the United States Constitution; the First Amendment to the United States Constitution; and Article III of the United States Constitution.

14.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(e), because at least one federal Defendant resides in this District. Venue is also proper under 28 U.S.C. § 2243 because the actual custodians of all Plaintiffs reside in this District.

III.     **PARTIES**

A.     **Plaintiffs**

15.     **Angel de Jesus Zepeda Rivas** is a 32-year-old man who has been detained by ICE at YCJ since November 21, 2019. He has a two-year-old U.S. citizen child with his long-term partner. Angel was diagnosed with type 2 diabetes in early 2019, and prior to arriving at YCJ, was taking medication to control the diabetes. During his time at YCJ, Angel has experienced worsening symptoms, including painfully swollen feet and legs and tingling and numbness throughout his body. Angel has recently been diagnosed with hypertension, and the shortness of breath and chest pain have led to a constant fear of a life-threatening health event. YCJ medical staff recently prescribed him medication for diabetes and hypertension, along with chronic headaches and severe allergies, but this treatment has failed to relieve the pain, swelling, and other symptoms.

16.     Angel was found to have reasonable fear of torture if returned to his native country, El Salvador, and is in withholding proceedings. As a teenager, he was targeted by the gangs and, when he refused to sell drugs for them, was sexually and physically assaulted. He has also been severely beaten by law enforcement in El Salvador. He is terrified to stay in YCJ, since he is unable to maintain a safe distance or protect himself from COVID-19, while sleeping in his bunk bed, standing in line for his medication and meals, or even while walking to see the medical staff at the facility. When he runs out of soap to wash his hands and clothes, Angel uses a chemical disinfectant, which burns his skin. Angel has experienced COVID-19 symptoms but

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

was not tested for coronavirus. If released, Angel will live with his partner's adult daughter in Oakland, California until he is past the COVID-19 incubation period and can return home to his own two-year-old daughter and partner.

17.     **Brenda Rubi Ruiz Tovar** is a 31-year-old Mexican national who has been detained by ICE at YCJ since October 2, 2018. She suffers from PTSD and Generalized Anxiety Disorder, stemming from childhood sexual abuse. Twice, she has won relief from deportation under the Convention Against Torture in immigration court. Each time, the Immigration Judge found that she met the high bar of showing it is more likely than not she will be tortured or killed in Mexico by or with the acquiescence of government actors. Each time, ICE has appealed the Judge's grant of protection. She remains in detention while her case is on appeal to the Board of Immigration Appeals (BIA) a second time. In the last twenty-plus months, Brenda has been separated from her family, including her 11-year-old U.S.-citizen son, throughout her removal proceedings.

18.     Brenda has suffered symptoms consistent with COVID-19 while at YCJ. After contact with a fellow detainee who was sick, she was quarantined for several days with two other women. Even while in quarantine, she was unable to maintain the recommended distance from her cellmate, and she was forced to clean a bathroom area covered in feces. She was tested for the flu, but never for COVID-19, and then reintegrated into the general population. If released, she will live with her parents in Fresno, California.

19.     **Lawrence Mwaura** is a 27-year-old man currently in civil detention at YCJ, where he has been since April 12, 2019. In 2002, he fled Kenya, fearing for his life. He was granted asylum in 2003 and became a permanent resident in 2006. His mother, brother, and sister are naturalized U.S. citizens, and his wife is a U.S. citizen. Lawrence is contesting a final order of removal before the Ninth Circuit, which has issued a stay preventing ICE from removing him.

20.     In March 2018, Lawrence contracted Valley Fever from mold spores in his lungs, causing him permanent scarring to his lungs, severe pain, and difficulty breathing. His

respiratory specialist told him his Valley Fever can return at any time and cause serious damage to his brain, nervous system, and skeletal system, including paralysis. Lawrence continues to experience difficulty breathing and lung pain in the cold, dusty confines of YCJ. Although his specialist told him he should have his blood cells checked every 90 days to monitor his immune system due to his Valley Fever, YCJ medical staff have not checked him in over four months. A psychiatrist at YCJ also informed Lawrence that he meets the criteria for Post-Traumatic Stress Disorder. Lawrence is terrified of staying in detention at YCJ due to the lack of social distancing and protective gear for detainees, constant movement of people into the facility, and Yuba officials' lack of policies to protect detainees from COVID-19 infection. If released, he would live at his family home with his wife in Burbank, California.

21. **Luciano Gonzalo Mendoza Jeronimo** is a 31-year-old Indigenous Mayan man and Guatemalan national currently in civil detention at YCJ, where he has been since February 2020. His wife and daughter are permanent residents and his youngest son is a U.S. citizen, born in Berkeley, California. Luciano fled Guatemala after he was beaten by the National Civil Police for refusing forcible recruitment. His wife was granted asylum and filed a petition on his behalf. However, because he had a prior order of removal in absentia, ICE arrested him and reinstated the prior order. He passed a reasonable fear screening test with an asylum officer and was placed in withholding-only proceedings.

22. Luciano fears contracting COVID-19 while at YCJ. Even though his pod is not completely full, he reports that it is not possible to consistently maintain six-feet of distance. If Luciano is released, he will return to his wife and children who are living in Oakland, California.

23. **Coraima Yaritza Sanchez Nuñez** is a 26-year-old Mexican national who has been in civil detention at Mesa Verde since April 2019. The United States is the only country she knows, having been brought here as an infant. She received Deferred Action for Childhood Arrivals ("DACA") when the program first began. As a DACA beneficiary, she worked as a full-time Lead Teller at Chase Bank for just under five years. She was detained by ICE in 2019,

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

the year after she lost her DACA protection. She is currently pursuing an appeal to the BIA. Her U.S.-citizen husband will be filing a Form I-130, Petition for Alien Relative, in order to begin the Immigrant Visa process on her behalf.

24.     Coraima has always suffered from asthma, a condition aggravated whenever she suffers from a cold or flu. She knows that her asthma puts her at a higher risk of suffering severe complications from COVID-19. She has participated in the hunger strike as Mesa Verde to convey through symbolic speech the inhumane conditions inside the facility—including not receiving antibacterial soap, cleaning supplies, and protective equipment—and to call for liberation from immigration detention. She felt very threatened by Defendants' threats of suspending her access to commissary, but she is even more worried about dying from COVID-19. If released, she will reunite with her husband and family, who all live in Sonoma, County, California.

25.     **Javier Alfaro** is a 39-year-old Salvadoran national who has been detained by ICE at Mesa Verde since January 14, 2020. Javier was granted Temporary Protected Status (TPS) in approximately 2001, and only when he was placed in removal proceedings did he learn it had expired. He was arrested by plainclothes ICE officers at the Fresno County Courthouse after a criminal court hearing he was required to attend. Since then, he has been separated from his wife and three U.S.-citizen children, ages 15, 8, and 10 months.

26.     Javier suffers from high cholesterol. For years, he has taken medication to lower his cholesterol and reduce the risk of associated heart problems. He worries for himself and for the safety of all detainees, because their ability to stay healthy is largely out of their control. He reports that, even within hours of a bed emptying in his 100-person dorm, a new detainee will arrive to fill it. If Javier is released, he will resume his life with his family in Mendota, California.

27.     **Dung Tuan Dang** is a 49-year-old Vietnamese national who has been detained by ICE at Mesa Verde since June 7, 2019. Dung's father was a U.S. soldier fighting in Vietnam, and his mother was a Vietnamese woman. His biological parents abandoned him, and he was

taken in by an adoptive Vietnamese family. He immigrated lawfully to the U.S. in 1989 under the Homecoming Act and has lived here continuously since then. Despite the fact that Dung was stoned, beaten, and forced into a labor camp as a child, the Immigration Judge found that he would not face the requisite level of risk if he were deported to Vietnam. His application for protection was denied and he was ordered removed. He is now appealing to the BIA. Even if his removal order becomes final, he is very unlikely to be deported to Vietnam because of a long-standing diplomatic agreement concerning Vietnamese nationals who entered the United States before July 12, 1995. In that event, it is likely he eventually will be entitled to release from detention if and when it becomes clear the detention serves no legitimate purpose.

28.     Dung has a latent tuberculosis infection, which puts him at an elevated risk of suffering severe complications from COVID-19. He is terrified to remain at a facility where social distancing is impossible. He participated in the hunger strike aimed to get public attention on the dangers of COVID-19 to himself and fellow detained individuals. If he is released, he will reunite with his adopted parents and siblings, who all live in San Jose, California.

**B.     Defendants**

29.     Respondent-Defendant David Jennings is the Acting Field Officer Director for the San Francisco Field Office of ICE and maintains his office in San Francisco, California, within this judicial district. The San Francisco Field Office is responsible for carrying out ICE's immigration detention operations at Mesa Verde and YCJ. Defendant Jennings is a legal custodian of Plaintiffs. He is sued in his official capacity.

30.     Respondent-Defendant Matthew T. Albence is the Deputy Director and Senior Official Performing the Duties of the Director of ICE. Defendant Albence is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants. Defendant Albence is a legal custodian of Plaintiffs. He is sued in his official capacity.

31.     Respondent-Defendant ICE is a federal law enforcement agency within the Department of Homeland Security. ICE is responsible for the criminal and civil enforcement of

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

immigration laws, including the detention and removal of immigrants. Enforcement and Removal Operations ("ERO"), a division of ICE, manages and oversees the immigration detention system. Defendant ICE is a legal custodian of Plaintiffs.

32.   Defendant GEO Group, Inc. is a private company that contracts with government entities to provide corrections officers and other detention-related services. It is headquartered in Boca Raton, Florida. GEO contracts with ICE to operate Mesa Verde.

33.   Defendant Nathan Allen is a GEO employee and the warden of Mesa Verde Detention Facility. He is sued in his official capacity.

## IV.   FACTUAL ALLEGATIONS

### A.   COVID-19 Poses Grave Risk of Harm, Including Serious Illness or Death.

34.   COVID-19 is a disease caused by a coronavirus that has reached pandemic status.

35.   As of April 19, 2020, COVID-19 has killed over 40,000 people in the United States, and more than 760,000 people in the United States have tested positive for the virus. The United States now has more confirmed cases than any other country in the world.

36.   As of the evening of April 17, 2020, there were ICE reports that there have been 124 confirmed cases of COVID-19 in its detention facilities, although it is important to note that this total reflects an extremely low percentage of testing.[2]

37.   People who contract severe cases of COVID-19 need intensive medical support, requiring highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians.

38.   COVID-19 infects people who come into contact with respiratory droplets that contain the coronavirus, such as those produced when an infected person coughs or sneezes. Such droplets can spread between people at distances of six feet. The virus that causes COVID-19 is highly contagious and can survive for long periods on inanimate surfaces, making it

---

[2] *ICE Guidance on COVID-19*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/covid19.

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

inevitable that the disease will spread among communities where it appears.

39.     COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 may also cause inflammation of the heart muscle. This is known as myocarditis; it can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.

40.     Emerging evidence also suggests that COVID-19 can trigger an over-response of the immune system, further damaging tissue and potentially resulting in widespread damage to the body's organs, including permanent injury to the kidneys and neurologic injury.

41.     The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 than from influenza.

42.     According to recent estimates, the fatality rate of people with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems. In the United States, approximately five percent of people with confirmed COVID-19 cases have died.[3] For people in the highest risk populations, the fatality rate of COVID-19 is about 15 percent.

43.     There is no known cure or treatment for COVID-19 at this time. The only way to protect people from grave illness and death is to prevent them from being infected with the coronavirus. Thus, the only known means of minimizing the risk of infection is social distancing, combined with rigorous sanitization practices.

**B.     Everyone Detained at Yuba County Jail and Mesa Verde Detention Facility is Vulnerable to Harm from COVID-19**

44.     Every adult faces grave risks of harm from COVID-19, not just those deemed particularly vulnerable. The CDC has reported that up to 20% of coronavirus hospitalizations in

---

[3] See Chris Mooney et al., *As U.S. Coronavirus Fatality Rate Rises to 5 Percent, Experts Are Still Trying to Understand How Deadly the Virus Is*, Washington Post, Apr. 17, 2020, https://www.washingtonpost.com/health/as-officials-plan-to-reopen-the-economy-a-key-unknown-remains-how-deadly-is-the-coronavirus/2020/04/17/0bd2f938-7e49-11ea-a3ee-13e1ae0a3571_story.html

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

the United States were of people under 44. And the WHO has reported that, globally, 10-15% of adults under 50 who contract COVID-19 suffer moderate to severe cases.

45.    Some young people who become seriously ill or die from COVID-19 have pre-existing medical conditions, but many do not. For example, in New York, 36 percent of people between 30 and 39 who died from the virus had no known pre-existing conditions.[4]

46.    Doctors and scientists do not yet know why some otherwise healthy young people are so susceptible to COVID-19. Some evidence suggests that exposure to larger viral loads—such as occurs with close, in-person interaction in enclosed spaces, at short distances—may lead to more serious infection.

47.    Preliminary data shows that Black and Hispanic people are twice as likely to die of COVID-19 as are white people. There is a significantly higher proportion of Black and Hispanic people at YCJ and Mesa Verde than in the broader American population.

48.    YCJ and Mesa Verde also include a disproportionate number of people at heightened risk for other reasons. The United States Centers for Disease Control and Prevention (CDC) and other experts have identified several particularly vulnerable groups, including older adults, people who are immunocompromised, and people with a variety of pre-existing medical conditions of any age, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis), diabetes, asthma, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (include sickle cell disease), inherited metabolic disorders, stroke developmental delay, pregnancy (current or recent), and obesity.

49.    A large percentage of the individuals at YCJ and Mesa Verde likely have these medical conditions because they are disproportionately indigent with little or no access to high-quality healthcare. In many cases, these individuals may not even be aware that they have relevant pre-existing conditions. Many class members likely have undiagnosed risk factors for

---

[4] *See* Chris Mooney, et al*., Hundreds of young Americans have now been killed by the coronavirus, data shows*, Washington Post, Apr. 8, 2020, https://www.washingtonpost.com/health/2020/04/08/young-people-coronavirus-deaths/.

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1  COVID-19.

2      50.    For people in the highest risk populations, the fatality rate of COVID-19 is about

3  15 percent.

4      **C.    Conditions at Mesa Verde Detention Facility and Yuba County Jail Create a Massive Risk of COVID-19 Infection.**

5

6      51.    The conditions at YCJ and Mesa Verde endanger the lives of all who are

7  detained there (as well as staff who work there).

8      52.    Because of the ease with which COVID-19 can spread via respiratory droplets

9  that move between people within six feet of each other and also through long-lasting

10  contamination of surfaces, enclosed group environments are especially prone to facilitating the

11  rapid spread of COVID-19.

12      53.    Enclosed group environments, like prisons, nursing homes, ships, and homeless

13  shelters, have become the epicenter of the most severe COVID-19 outbreaks. More than 700

14  people have tested positive on Rikers Island, which boasts one of the country's fastest rates of

15  transmission.[5] Prior to the Rikers outbreak, Cook County Jail in Chicago was considered the

16  "largest single point of infection in the U.S., with more than 500 people testing positive."[6] Ten

17  of the deadliest COVID-19 clusters in the country have occurred in nursing homes, and nearly

18  4,000 nursing home residents have died from the virus.[7] MSC South homeless shelter in San

19  Francisco has had largest reported outbreak in a single shelter in California, with 90 residents

20  and 10 staff members contracting the virus.[8] An ongoing nursing facility outbreak in Yolo

21  County—which is adjacent to Yuba County—has accounted for a third of the COVID-19 cases

22

23

24  [5] Asher Stockler, *More Than 700 people Have Tested Positive For Coronavirus On Rikers Island, Including Over 440 Staff*, Newsweek (Apr. 8, 2020), https://www.newsweek.com/rikers-island-covid-19-new-york-city-1496872

25  [6] Peter Weber, *COVID-19 is Spreading Fast in Nursing Homes, Homeless Shelters, Jails, and South Dakota*, The Week (Apr. 14, 2020), https://theweek.com/speedreads/908647/covid19-spreading-fast-nursing-homes-homeless-shelters-jails-south-dakota

26  [7] Danielle Ivory et al., *Coronavirus Outbreak at Virginia Nursing Home Spirals Out of Control as 45 Die*, The New York Times (Apr. 14, 2020), https://www.nytimes.com/2020/04/14/us/coronavirus-nursing-homes.html

27  [8] Vivian Ho, *'It could have been averted': How 92 residents at a San Francisco homeless shelter got Covid-19*, The Guardian (Apr. 15, 2020), https://www.theguardian.com/us-news/2020/apr/15/san-francisco-homeless-coronavirus-msc-shelter

28

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

in that county.[9] On the USS Theodore Roosevelt, 660 sailors have tested positive.[10] These group settings share fundamental—and dangerous—similarities to detention centers like YCJ and Mesa Verde: numerous people living in close proximity, staff that interacts with multiple individuals, and regular foot traffic in and out of the facility.

54.    In response to such outbreaks, jails in more than half of the states in the country have released thousands of people from criminal custody, acknowledging the grave threat that an outbreak in jails and detention centers poses.[11] As the court noted in *United States v. Garlock*, No. 18-CR-00418-VC-1 Cr. 418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020), "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided."

55.    YCJ and Mesa Verde are similarly dangerous enclosed environments. Detainees in YCJ and Mesa Verde live, sleep, and eat in close quarters. They have no ability to keep a safe distance from large groups or to avoid surfaces that countless others regularly contact. And they are subject to security measures that render "social distancing" impossible. These are ideal incubation conditions for the rapid spread of COVID-19.

56.    At Mesa Verde, all detainees live in four dormitories that hold up to 100 detainees. As of April 2, there were at least 76 men in at least one of the dorms. In these dormitories, detainees must share one large room for sleeping, eating, and socializing. Their beds are bunked and placed only a few feet apart. Scores of detainees in each dormitory must share a relatively small number of sinks, toilets, and showers.

57.    At YCJ, detainees live in a variety of housing units, each with its own alphabetical designation. There are four dorms (B, C, P, R) in which detainees sleep in bunk beds in close proximity to one another. The C and D dorms have 50 beds. Six other housing

---

[9] Michael McGough and Jason Pohl, *Woodland nursing home identified as site of 35-patient coronavirus outbreak*, Sacramento Bee (Apr. 17, 2020), https://www.sacbee.com/news/coronavirus/article241998491.html
[10] Ryan Pickrell, *Sweeping US navy testing reveals most aircraft carrier sailors infected with coronavirus had no symptoms*, Business Insider (Apr. 18, 2020), https://www.businessinsider.com/testing-reveals-most-aircraft0-carrier-sailors-coronavirus-had-no-symptoms-2020-4
[11] *Response to the COVID-19 pandemic*, Prison Policy Initiative (Apr. 16, 2020), https://www.prisonpolicy.org/virus/virusresponse.html

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

units (G, H, I, J, K, L) have bunk beds bolted to the wall and are separated from corridors by a set of bars with open space between the bars, so air flows freely between the cells and the corridors. The distance from top to bottom bunk throughout the facility is less than six feet. Several other housing units (D, E, F) involve two-person cells surrounding a common area where half of each unit's detainees are released at a time during the day. There are some two-person cells throughout the facility as well as administrative and medical segregation units.

58.   As of April 18, 2020, there were 157 ICE detainees at YCJ. This marks a net *increase* of seven ICE detainees at YCJ since April 2. During the same period, the YCJ population of criminal detainees decreased by several dozen. Thus, during the same period that Yuba County responded to COVID-19 by decreasing its population of criminal detainees, ICE made the same facility *more crowded* than it otherwise would have been.

59.   Food preparation and food service in both facilities is communal, with little opportunity for disinfection. Sinks, toilets, and showers are also shared. The showers are consistently dirty and infrequently sanitized.

60.   Staff members in the facilities arrive and leave on a shift basis, and there is limited ability to adequately screen staff for new, asymptomatic infection.

61.   Moreover, because detention facilities also limit access to items and services that are necessary to maintaining hygiene, such as hand sanitizer and clean clothes, the risk of disease spread is even higher. And typically, there is little instruction given to detainees regarding sanitation, including in response to the COVID-19 pandemic. At YCJ and Mesa Verde, detainees have not been provided with hand sanitizer. They have been instructed about the need for social distancing, but not provided with conditions in which it can be practiced.

62.   Staff members at YCJ and Mesa Verde are not systemically testing detainees or themselves for COVID-19. And the daily temperature test being administered at YCJ is not an adequate replacement for an actual COVID-19 test.

63.   Members of the proposed class have pleaded with Defendants in increasingly desperate ways. The conditions have become so dire that detainees at Mesa Verde organized a

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

hunger strike to call attention to the lack of hygiene products, dearth of proper testing, and continued foot traffic in and out of the facility.[12] The detainees also called on the Governor of California to help decrease the population inside Mesa Verde. Rather than provide safe conditions of confinement, GEO Group's warden and employees responded by threatening to withhold access to the commissary and directing racist taunts at detainees participating in the hunger strike.

64.     A judge within the Northern District just days ago found that conditions in YCJ and Mesa Verde make it ripe for the spread of COVID-19 and render social distancing impossible:

> [P]etitioners cannot practice meaningful social distancing in their respective detention facilities. Petitioners have offered evidence, undisputed by respondents, that detainees, both at Yuba and Mesa Verde, are kept in close proximity, i.e., less than six feet apart, not only when in their living quarters… but also during meals… and, at Yuba, when lining up for temperature checks as well.

*Bahena Ortuño*, 2020 WL 1701724, at *4.

65.     Dr. Robert Greifinger, a correctional health expert with over three decades of prisoner health care experience, attests that the crowded conditions at immigration detention centers like YCJ and Mesa Verde make one of the most vital preventive measures, social distancing, impossible.

66.     Experts predict that it is "perhaps inevitable" that COVID-19 will reach immigration detention facilities like YCJ and Mesa Verde, if it has not already.

67.     After reviewing the COVID-19 protocols announced by ICE, including the April 10 guidance, Dr. Greifinger concluded that the guidance is "deficient" and does not reflect the reality of the overcrowded conditions in immigration detention. Dr. Greifinger found that the most important mitigation measures for congregate facilities—social distancing and release—are neglected in the COVID-19 protocols. Social distancing is presented as "optional," and as Plaintiffs consistently report, is unacknowledged and non-existent at the facilities. While

---

[12] *See* Bob Egelko, *Coronavirus hunger strike at immigration lockup?  ICE says no, but California detainees say otherwise*, San Francisco Chronicle, Apr. 13, 2020, https://www.sfchronicle.com/news/article/Coronavirus-hunger-strike-at-immigration-lockup-15197579.php.

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

"release is the most important means of mitigating the spread of COVID-19 in ICE detention centers," Dr. Greifinger concluded that ICE presents "arbitrary" and "inadequate" goals with regard to release.

68.     Tellingly, the ICE guidance issued on April 10 acknowledges that the options to safeguard vulnerable detainees "depend on available space." The evidence at YCJ and Mesa Verde shows that the immigration facilities simply do not have that space, and therefore are incapable of protecting Plaintiffs and other detainees from the risks of COVID-19.

69.     Given the widespread shortage of COVID-19 testing in the United States, it is likely that detention facilities cannot conduct aggressive, widespread testing to identify all positive cases of COVID-19. In a context where wide-scale testing is unavailable, a lack of proven cases of COVID-19 is functionally meaningless in determining the risk of COVID-19 transmission within an institution.

70.     Defendants' lack of testing means they cannot adequately protect detainees, in part, because of the prevalence of asymptomatic spread. As the CDC has recognized, COVID-19 can be spread by people who are not showing symptoms. Indeed, as one example of the exponential rate of asymptomatic transmission, the Boston Health Care for the Homeless Program recently tested every resident at a Boston homeless shelter for coronavirus. Program doctors were "stunned" by the results: 146 of the 397 (36%) people tested were positive but asymptomatic.[13]

71.     Without a rigorous testing regime, it is impossible to conclude that COVID-19 has not already entered YCJ and Mesa Verde.

### D.     A Significant Population Reduction is Required to Ensure Reasonable Safety for Individuals at YCJ and Mesa Verde.

72.     Social distancing is required to prevent the widespread transmission of COVID-19.

---

[13] *See* John Karalis, *Coronavirus spread: Testing shows 'stunning' asymptomatic COVID-19 rate at Boston homeless shelter*, Masslive.com, Apr. 15, 2020 https://www.masslive.com/coronavirus/2020/04/coronavirus-spread-testing-shows-stunning-asymptomatic-covid-19-rate-at-boston-homeless-shelter.html.

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

73.    To achieve social distancing at YCJ and Mesa Verde, the detainee population must be significantly reduced.

74.    Reviewing current conditions at both facilities, Dr. Greifinger concluded that YCJ and Mesa Verde "are not prepared to prevent the spread of COVID-19, treat those who are most medically vulnerable, and contain any outbreak, and the risk of infectious spread at each of these facilities is very high." He concluded further that "[t]he facilities fail to meet minimally acceptable standards of social distancing, putting the residents at grave and unacceptable risk of pervasive infections, leading to serious illness and death. The only way to avoid these unacceptable risks is to materially reduce the population, implement social distancing as described herein, and ensure appropriate hygiene."

75.    It is not possible to achieve social distancing if more than one person is housed in each cell, or if beds in dorms are placed within less than 8-10 feet of each other. Nor can anyone share a bunk bed with another person under social distancing.

76.    The government's own subject matter experts have also called for ICE to release detainees to protect them. Nearly two months ago, Dr. Scott Allen and Dr. Josiah Rich, medical experts to DHS, warned the agency about the danger to detainees of rapid spread of COVID-19 in immigration detention facilities.

77.    In a whistleblower letter to Congress, Dr. Allen and Dr. Rich recommended that "[m]inimally, DHS should consider releasing all detainees in high risk medical groups such as older people and those with chronic diseases." They concluded that "acting immediately will save lives not of only those detained, but also detention staff and their families, and the community-at-large."

**E.    ICE Has Failed to Implement Adequate Measures to Contain the Risk of COVID-19 Transmission in its Facilities.**

78.    ICE has failed to adequately heed the imperative to reduce population levels in its facilities so that detainees are able to practice safe social distancing. Instead, ICE's response to the pandemic has been characterized by a business-as-usual approach. ICE has failed to

1  adequately reduce population levels in its facilities, just as it has failed to ensure the availability

2  of adequate hygiene products, sanitation, and medical care. Meanwhile, ICE has continued to

3  conduct its standard enforcement and detention operations, further increasing the risk of

4  COVID-19 transmission.

5      79.    From early on in California's state of emergency, ICE has resisted the need for

6  substantial adaptations to its operations to mitigate the spread of the virus. As Californians in

7  many cities began to shelter in their homes in compliance with public health directives on

8  March 16, 2020, ICE's Los Angeles Field Office executed pre-dawn raids to cram even more

9  immigrants into detention centers.[14] Following public outcry, ICE claimed it would modify its

10 enforcement efforts in apparent recognition of the need to protect public health, but declined to

11 suspend arrests.[15]

12     80.    The day after, however, in response to a lawsuit for the release of vulnerable ICE

13 detainees, the agency again demonstrated its failure to appreciate the threats posed by the

14 COVID-19 pandemic, insisting that "Plaintiffs' assertion that detention *per se* poses an

15 increased risk of health complications or death from COVID-19 is purely speculative."[16] The

16 agency has repeated this claim in defending subsequent lawsuits.

17     81.    On April 10, 2020, after weeks of defending itself against a tidal wave of

18 litigation, ICE issued a guidance document titled "COVID-19 Pandemic Response

19 Requirements." This document, however, falls well short of what is needed to protect the people

20 in ICE's custody. The document acknowledges the need for social distancing but sets an

21 arbitrary goal of reducing ICE facility populations to 75% of their capacities, a generic standard

22 that is devoid of any detailed analysis of relevant factors and that fails to account for variation

23 in facility design.

24

25

26 [14] Brittny Mejia, *With Masks at the Ready, ICE Agents Make Arrests on First Day of California Coronavirus
   Lockdown*, L.A. Times, Mar. 17, 2020, https://www.latimes.com/california/story/2020-03-17/for-ice-agents-its-
27 business-as-unusual-day-after-sweeping-coronavirus-order.
   [15] *ICE Guidance on COVID-19*, U.S. Custom and Immigration Enforcement, https://www.ice.gov/covid19.
28 [16] Defs.' Opp., *Dawson v. Asher*, No. 20-0409 (W.D. Wash. Mar. 18, 2020), ECF No. 28 at 8.

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

82.     Less than one week later, ICE undermined its limited April 10 guidance, when Acting Director Albence, a defendant in this action, stated to the congressional Committee on Oversight and Reform that "our review of our existing population has been completed" and that ICE has no existing plans to release additional detainees to slow the spread of the virus.

83.     ICE's head-in-the-sand response to the threats of this pandemic will prove deadly to people in immigration detention if it is not remedied through this Court's intervention.

84.     ICE has continued to introduce new detainees into both Mesa Verde and YCJ.

85.     Inside the facilities, moreover, immigrants say that ICE is not consistently taking even the less aggressive precautionary measures necessary to contain the transmission of COVID-19. Detainees at YCJ and Mesa Verde continue to report insufficient access to basic hygiene and sanitation products, and report that ICE is still not engaging in systematic testing for COVID-19.

86.     This echoes a concern of the two DHS experts, who say that "the track record of ICE facilities implementing [early screening, testing, isolation and quarantine] protocols historically has been inconsistent." Moreover, even if ICE was consistently taking these precautions, the experts have explained that such efforts "won't be enough" without rapidly 'releas[ing] those who do not pose an immediate danger to public safety."[17]

**F.     Plaintiffs' Hunger Strike to Advocate Peacefully for Measures Addressing the Dangerous Conditions at Mesa Verde.**

87.     Plaintiffs have grown increasingly fearful about their confinement conditions and increasingly desperate in their cries for help. At Mesa Verde, conditions have become so dire that a group of detainees engaged in a hunger strike to call attention to the hazardous conditions in the facility and Defendants' refusal to adequately protect them from contracting COVID-19.

---

[17] *See* Scott Allen, Josiah Rich & Mavis Nimoh, *We Must Release Prisoners to Lessen the Spread of Coronavirus*, Washington Post, Mar. 17, 2020, https://www.washingtonpost.com/opinions/2020/03/17/we-must-release-prisoners-lessen-spread-coronavirus/.

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1   88.     When conditions did not improve and Defendants continued to force Plaintiffs to

2   eat and live in unsafe settings, on April 9, 2020 Plaintiffs turned to a quintessential form of

3   symbolic speech: a hunger strike.

4   89.     Dozens of class members refused to eat in the dining hall. This peaceful

5   demonstration was designed to draw attention to Defendants' failure to implement safe social

6   distancing and other protective measures. Hunger strikers also addressed their message in part

7   to California Governor Gavin Newsom, seeking his assistance to reduce the population level at

8   the facility by instructing state and local agencies to decline ICE requests to refer and hold more

9   immigrants for placement inside ICE facilities. Many detainees refused to eat altogether; others

10  ate only products purchased from their commissary account that they could consume outside the

11  dining hall.

12  90.     Class Representative Coraima Sanchez Nunez was one of the first detainees to

13  engage in a hunger strike. Like her fellow hunger strikers, she engaged in her hunger strike for

14  the purpose of protesting the unsafe confinement conditions.

15  91.     As participation grew, and the media became aware of Plaintiffs' protest,

16  Defendants retaliated against the protesters. GEO and its employees threatened to cut access to

17  commissary items—food, shampoo, soap, and other personal hygiene products Plaintiffs

18  purchase with their own money—if the hunger strike continued.

19  92.     In attempting to thwart the hunger strike, Defendants acknowledged its purpose.

20  Indeed, members of the staff mocked protesting Plaintiffs. As one GEO employee stated, "I

21  don't know why you're starving yourself when ICE doesn't care what happens to you."

22  93.     Defendants' actions were brazen, callous, and unconstitutional. Rather than

23  implement social distancing or take other measures to protect detainees, Defendants threatened

24  to cut off access to personal food and hygiene products in the midst of a pandemic. Plaintiffs

25  were forced to choose between exercising their right to speech or maintaining their access to

26  essential commissary items.

27

28

1    94.    Defendants' actions had their desired chilling effect on Plaintiffs' exercise of

2    their First Amendment rights. As a result of Defendants' retaliation, many Plaintiffs stopped

3    their hunger strike.

4    95.    Hunger strikes are quintessential expressive conduct and symbolic speech. *Cf.*

5    *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 450 (1990) ("The passive

6    nonviolence of King and Gandhi are proof that the resolute acceptance of pain may

7    communicate dedication and righteousness more eloquently than mere words ever could.")

8    Plaintiffs' political messages are entitled to the highest protection under the First Amendment.

9    The retaliation by GEO and employees such as Warden Allan, ostensibly with ICE's

10   authorization, violates the fundamental protection against retaliation for expression.

11   96.    Moreover, this retaliatory response is authorized by an ICE policy that binds

12   contractors such as GEO and expressly calls for the facility to penalize "engaging in or inciting

13   a group demonstration." *See* 2011 Operations Manual, ICE Performance-Based National

14   Detention Standards, Section 3.1, available at https://www.ice.gov/doclib/detention-

15   standards/2011/3-1.pdf.

16   97.    Plaintiffs respectfully request this Court enjoin Defendants from any further

17   retaliation against Plaintiffs' constitutionally protected conduct.

18   98.    Moreover, Plaintiffs respectfully request this Court hold unlawful and set aside

19   ICE's unconstitutional policy of penalizing peaceful group demonstrations, so that Plaintiffs

20   may advocate for their rights and wellbeing without fear of being disciplined.

21   **V.    CLASS ALLEGATIONS**

22   99.    This case is ideally suited to class treatment. Attorneys' collective realization

23   that ICE is failing to release enough people from Mesa Verde and YCJ has understandably

24   resulted in the filing of multiple individual actions in the Northern District seeking the release

25   of their particular clients. Unrepresented individuals, however, continue to languish in these

26   facilities, fearing for their lives but lacking the wherewithal to sue ICE for their release. The

27   resource-intensive process of litigating multiple individual cases is not ideally suited to the

28

23

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

1   urgent situation at hand, where due process requires the swift but orderly release of significant

2   numbers of ICE detainees.

3       100.    This case is brought on behalf of a class consisting of all civil immigration

4   detainees at Mesa Verde and YCJ.

5       101.    Plaintiffs further propose two sub-classes defined as follows:

6           **Sub-Class 1**:  All civil immigration detainees at YCJ (the "YCJ Subclass").

7           **Sub-Class 2**:  All civil immigration detainees at Mesa Verde (the "Mesa Verde

8               Subclass").

9       102.    The proposed class and sub-classes satisfy the requirements of Rule 23(a)(1)

10  because they are sufficiently numerous so as to make joinder impracticable. There are more than

11  280 class members at Mesa Verde and approximately 150 detainees at YCJ. And Defendants

12  continue to funnel new detainees into these facilities. Joinder is also impracticable because

13  many in the proposed class are *pro se*, indigent, have limited English proficiency, and/or have a

14  limited understanding of the U.S. judicial system.

15      103.    The proposed class and sub-classes meet the commonality requirements of

16  Federal Rule of Civil Procedure 23(a)(2) because there are common questions of law and fact

17  affecting members of the proposed class, including "whether the government must modify the

18  conditions of confinement—or, failing that, release a critical mass of [d]etainees—such that

19  social distancing will be possible and all those held in the facility will not face a constitutionally

20  violative substantial risk of serious harm." *Savino*, 2020 WL 1703844 at *7.

21      104.    While some class members are healthier than others, they are all at grave risk of

22  contracting COVID-19. As another federal court held in provisionally certifying a nearly

23  identical class: It is a "troubling fact that even perfectly healthy detainees are seriously

24  threatened by COVID-19. To be sure, the harm of a COVID-19 infection will generally be more

25  serious for some petitioners than for others. Yet it cannot be denied that the virus is gravely

26  dangerous to all of us." *Id.*

27

28

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

1   105.   The proposed class and sub-classes meet the typicality requirement of Federal

2   Rule of Civil Procedure 23(a)(3) because the claims of the representative Plaintiffs are typical

3   of the claims of the class as a whole. Each named putative class representative has been harmed

4   by the same course of conduct as the rest of the class, namely ICE's decision to continue to

5   detain them in a setting that makes social distancing impossible. And each seeks similar relief as

6   the rest of the class.

7   106.   The proposed class and sub-classes meet the adequacy requirements of Federal

8   Rule of Civil Procedure 23(a)(4). Each putative class representative has committed to fairly and

9   adequately protecting the interests of the class and is aware of no conflict that would preclude

10   fair and adequate representation.

11   107.   Proposed class counsel are highly qualified to serve as class counsel and

12   collectively have extensive experience litigating class actions, immigration detention cases, and

13   First Amendment issues.

14   108.   Furthermore, Defendants' conduct has harmed all class members. An injunction

15   or declaration will provide relief on a class-wide basis.

16   **VI.   LEGAL FRAMEWORK**

17       **A.   Immigrant Detainees are Entitled to Constitutional Due Process Protections Against Exposure to Infectious Disease.**

18

19   109.   Whenever the government detains or incarcerates someone, it has an affirmative

20   duty to provide conditions of reasonable health and safety. As the Supreme Court has explained,

21   "when the State takes a person into its custody and holds him there against his will, the

22   Constitution imposes upon it a corresponding duty to assume some responsibility for his safety

23   and general well-being." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189,

24   199–200 (1989). As a result, the government must provide those in its custody with "food,

25   clothing, shelter, medical care, and reasonable safety." *Id*. at 200.

26   110.   Conditions that pose an unreasonable risk of future harm violate the Eighth

27   Amendment's prohibition on cruel and unusual punishment, even if that harm has not yet come

28

to pass. The Eighth Amendment requires that "inmates be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling*, 509 U.S. at 33 (quoting *DeShaney*, 489 U.S. at 200). Accordingly, "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Id.*

111. The Supreme Court has explicitly recognized that the risk of contracting a communicable disease may constitute such an "unsafe, life-threatening condition" that threatens "reasonable safety." *Id.*

112. These principles also apply in the context of immigration detention.

113. The constitutional protections afforded to immigration detainees are more comprehensive than those afforded to criminal defendants. Immigrant detainees, even those with prior criminal convictions, are *civil detainees* held pursuant to *civil* immigration laws. *Zadvydas v. Davis*, 533 U.S. 679, 690 (2001). Even those who in the past were convicted of crimes are solely being detained pursuant to their immigration status, having completed their criminal sentences. Because detained immigrants are civil detainees, their constitutional protections while in custody are derived from the Fifth Amendment. The Eighth Amendment prohibits punishment that is "cruel and unusual," whereas the Due Process Clause of the Fifth Amendment prohibits *any punishment at all.*

114. The Ninth Circuit has applied this principle to make clear that civil detainees, like Plaintiffs here, are entitled to conditions of confinement that are superior to those of convicted prisoners and to those of criminal pretrial detainees. *Jones v. Blanas*, 393 F.3d 918, 933-34 (9th Cir. 2004), *cert. denied*, 546 U.S. 820 (2005); *see also King v. Cty. of Los Angeles*, 885 F.3d 548, 557 (9th Cir. 2018) (finding presumption of punitive, and thus unconstitutional, treatment where conditions of confinement for civil detainees are similar to those faced by pre-trial criminal detainees).

115. Moreover, civil detainees like Plaintiffs need not show "deliberate indifference" to establish a constitutional violation. *Jones*, 393 F.3d at 934. Instead, a condition of

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

confinement for a civil immigration detainee violates the Constitution "if it imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *5 (D. Ariz. Nov. 18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017).

**B.    Defendants Are Violating Plaintiffs' Constitutional Due Process Rights.**

116.    The conditions described above are sufficient to demonstrate that Plaintiffs' constitutional due process rights are being violated. Keeping Plaintiffs detained in such close proximity to one another and without the sanitation necessary to combat the spread of the virus serves no legitimate purpose. Nor is detention under these circumstances rationally related to the enforcement of immigration laws. Finally, even if there were a legitimate purpose, it is clearly excessive in relation to that purpose and could be achieved by alternative and less harsh methods.

117.    It is important to note that ICE has a range of highly effective tools to ensure that individuals report for court hearings and other appointments. For example, ICE's conditional supervision program, ISAP (Intensive Supervision Appearance Program), relies on the use of electronic ankle monitors, biometric voice recognition software, unannounced home visits, employer verification, and in-person reporting to supervise participants. A government-contracted evaluation of this program reported a 99% attendance rate at all immigration court hearings and a 95% attendance rate at final hearings.

118.    Plaintiffs' due process rights are also being violated because their conditions of confinement place them at serious risk of being infected with COVID-19 and Defendants are being deliberately indifferent to this critical safety concern. Although Plaintiffs need not prove deliberate indifference here, they undoubtedly have.

119.    There is no question that COVID-19 poses a serious risk to Plaintiffs. COVID-19 is highly contagious and can cause severe illness and death.

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

120.    Defendants are aware of the serious risk that COVID-19 poses to Plaintiffs and have failed to meaningfully mitigate that risk. Medical experts for the Department of Homeland Security have also identified the risk of COVID-19 spreading to ICE detention centers.

121.    Defendants also are aware that significantly reducing the detained population in order to facilitate consistent, meaningful, social distancing is the only effective preventative measure. Drs. Allen and Rich, their own medical experts, told them as much in three letters, sent in February and March 2020, which emphasized that "[s]ocial distancing through release is necessary to slow transmission of infection."

122.    Nevertheless, Defendants have failed to take any concrete steps to ensure that Plaintiffs can maintain consistent social distancing within Mesa Verde and YCJ. Instead, they have taken a series of half measures that are "patently insufficient to protect [Plaintiffs]." *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1481503, at *6-*7 (S.D.N.Y. Mar. 26, 2020). Defendants' response, in turn, constitutes deliberate indifference to a serious risk to Plaintiffs' health and safety.

123.    Moreover, other prisons and jails around the country are already releasing detainees because the risk of contagion is overwhelming.

124.    The circumstances of this case make clear that release is the only means to ensure compliance with Plaintiffs' due process rights. Public health information makes clear that the only way to prevent infection is through social distancing and increased hygiene. These measures are functionally impossible to implement under current conditions at YCJ and Mesa Verde. The only course of action that can remedy these unlawful conditions is a rapid, orderly, systematized decrease of the population in these detention centers.

**C.      The Court Has Authority to Order Plaintiffs' Release to Vindicate Their Fifth Amendment Rights, and Such Relief Is Necessary Here.**

125.    Courts have broad power to fashion equitable remedies to address constitutional violations in prisons, *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978), and "[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a

1   prison's population," *Brown v. Plata*, 563 U.S. 493, 511 (2011).

2          126.    "The scope of a district court's equitable powers" in this regard "is broad, for

3   breadth and flexibility are inherent in equitable remedies." *Hutto*, 437 U.S., at 687, n. 9. Thus,

4   even where "[t]he inquiry involves uncertain predictions regarding the effects of population

5   reductions, as well as difficult determinations regarding the capacity of prison officials to

6   provide adequate care at various population levels," federal courts "have substantial flexibility

7   [in] making these judgments" and crafting an appropriate remedy. *Plata*, 563 U.S. at 538.

8          127.    In recent weeks, a judge within the Northern District and numerous other courts

9   have ordered the release of ICE detainees and criminal justice system prisoners and detainees as

10  a result of COVID-19 concerns. *See, e.g., Ortuño*, 2020 WL 1701724 at *4 (N.D. Cal. Apr. 8,

11  2020) (holding that four individuals were likely to succeed that continued detention violated due

12  process where they "cannot practice meaningful social distancing in their respective detention

13  facilities"); *see also Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL 1429877, at *1 (9th Cir.

14  Mar. 24, 2020) (*sua sponte* ordering immediate release of ICE detainee "[i]n light of the rapidly

15  escalating public health crisis, which public health authorities predict will especially impact

16  immigration detention centers"); *Bent v. Barr*, No. 19-cv-06123-DMR, 2020 WL 1812850 at *6

17  (N.D. Cal. Apr. 9, 2020) (quoting *DeShaney*, 489 U.S. at 199-200 (1989) ("[E]ven assuming

18  that Respondents accurately describe Mesa Verde's current practices, these practices are

19  inadequate to ensure the 'safety and general wellbeing' of Mesa Verde detainees during the

20  COVID-19 pandemic."); *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at

21  *2 (S.D.N.Y. Mar. 19, 2020) (releasing pretrial detainee in light of "the unprecedented and

22  extraordinarily dangerous nature of the COVID-19 pandemic"); *State v. Ferguson*, No. 2019-

23  270536-FH, Order (Mich. Ct. App. Mar. 23, 2020) (ordering defendant's immediate release on

24  bond due to "the public health factors arising out of the present public health emergency"); *In re

25  Request to Commute or Suspend County Jail Sentences*, No. 084230 (N.J. Mar. 22, 2020) (court

26  consent order, creating immediate presumption of release for every person serving a county jail

27  sentence based on COVID-19); *Malam v. Adduci*, No. 20 Civ. 10829, 2020 WL 1672662 (E.D.

28

Mich. Apr. 5, 2020), as amended (Apr. 6, 2020) (granting petitioner's release for duration of COVID-19 emergency); *Ali v. Dep't of Homeland Sec.*, No. 20 Civ. 140, 2020 WL 1666074 (S.D. Tex. Apr. 2, 2020) (granting petitioner's release due to coronavirus pandemic where government was not likely to remove petitioner in the foreseeable future); *Hernandez v. Decker*, No. 20 Civ. 1589, 2020 WL 1547459 (S.D.N.Y. Mar. 31, 2020) (granting ICE detainee's release due to risks of COVID-19 where practice of social distancing was impossible in facility); *Thakker v. Doll*, No. 20 Civ. 480 (M.D. Pa. Mar. 31, 2020) (granting release of ICE detainees due to imminent, irreparable harm posed by COVID-19).

128.     This raft of recent COVID-19-related decisions in keeping with a well-established tradition of federal courts ordering the release of detained persons when necessary to remedy unconstitutional conditions caused by overcrowding. *See, e.g., Plata*, 563 U.S. 493; *Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984) (concluding that court did not exceed its authority in directing release of low-bond pretrial detainees as necessary to reach a population cap); *Mobile Cty. Jail Inmates v. Purvis*, 581 F. Supp. 222, 224-25 (S.D. Ala. 1984) (concluding that district court properly exercised remedial powers to order a prison's population reduced to alleviate unconstitutional conditions, and noting other cases); *Inmates of the Allegheny Cty. Jail v. Wecht*, 565 F. Supp. 1278, 1297 (W.D. Pa. 1983) (order to reduce overcrowding "is within our power to correct the constitutional violations"); *Brenneman v. Madigan*, 343 F. Supp. 128, 139 (N.D. Cal. 1972) ("If the state cannot obtain the resources to detain persons . . . in accordance with minimum constitutional standards, then the state simply will not be permitted to detain such persons."); *see also Unknown Parties v. Nielsen*, No. CV-15-00250-TUC-DCB, 2020 WL 813774, *1 (D. Ariz. Feb. 19, 2020) (ordering that DHS release from custody detainees to whom it did not provide a bed, shower, nutritious food, and screening by a medical professional within 48 hours of booking).

129.     Public health information makes clear that the only way to prevent infection is through social distancing and increased hygiene. Yet the defendants are detaining the plaintiffs under conditions that force them into close contact with many other detainees and staff. By

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1 continuing detention in these circumstances, the defendants are subjecting the plaintiffs to

2 unreasonable harm. The only course of action that can remedy these unlawful conditions is the

3 release of a substantial number of class members from detention.

4        **D.**      **Defendants Are Violating Plaintiffs' First Amendment Rights.**

5        130.    Plaintiffs' symbolic speech regarding their conditions of confinement pertains to

6 a matter of utmost public concern and seeks to influence political decisions about their fate. It

7 thus is entitled to the highest level of protection under the First Amendment. *See, e.g., Virginia*

8 *v. Black*, 538 U.S. 343, 365 (2003) (plurality opinion) (explaining that political speech is "at the

9 core of what the First Amendment is designed to protect").

10        131.    Defendants' retaliation against Plaintiffs for engaging in peaceful symbolic

11 speech violates the First Amendment's fundamental protection against censorship. *See Perry v.*

12 *Sindermann*, 408 U.S. 593, 597 (1972).

13        132.    Plaintiffs exercised their First Amendment rights by engaging in a hunger strike

14 for the purpose of protesting the conditions at Mesa Verde, calling attention to their plight, and

15 calling on Governor Newsom to aid them in reducing the population inside Mesa Verde.

16        133.    Defendants' response constituted an adverse action against Plaintiffs by

17 threatening to withhold access to commissary because of Plaintiffs' protected conduct.

18        134.    Defendants' adverse actions, i.e. systematically threatening to withhold access to

19 the commissary to those who protested, chilled many Plaintiffs from continuing their symbolic

20 speech, and would have chilled a person of ordinary firmness.

21        135.    Defendants' actions have not reasonably advanced a legitimate "correctional

22 goal," a phrase which itself is inapposite to this civil immigration context. Constitutional rights

23 are given greater protection in the context of civil detention than in other carceral settings.

24        136.    ICE's official policy, applicable to GEO Group as an ICE contractor, expressly

25 prohibiting Plaintiffs from "engaging in or inciting a group demonstration" violates the First

26 Amendment in numerous ways. It is a presumptively invalid prior restraint on speech. It

27 discriminates based on viewpoint, content, and speaker. It is overbroad in that it sweeps in wide

28

**CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

swaths of protected speech for prohibition and punishment. It is not adequately tailored to any legitimate government objective and is unnecessary given other ICE prohibitions that adequately protect legitimate government objectives. And it is void for vagueness.

137.   As a result of Defendants' unconstitutional actions, Plaintiffs have suffered and continue to suffer harm caused by Defendants' deliberate efforts to chill protected speech and their continued imposition of a ban on participating in any peaceful demonstration.

138.   This Court should enjoin Defendants' unconstitutional retaliation and set aside as unlawful ICE's policy prohibiting "engaging in or inciting a group demonstration."

**FIRST CLAIM FOR RELIEF: VIOLATION OF THE FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS (BY ALL PLAINTIFFS AGAINST GOVERNMENT DEFENDANTS)**

139.   Defendants' detention of Plaintiffs and other class members during the COVID-19 pandemic violates the Due Process Clause of the Fifth Amendment of the United States Constitution.

**SECOND CLAIM FOR RELIEF: VIOLATION OF THE FIRST AMENDMENT (BY MESA VERDE SUB-CLASS PLAINTIFFS AGAINST ALL DEFENDANTS)**

140.   Defendants' retaliation against, and interference with, Plaintiffs' exercise of their rights of assembly, petition, and free speech violate the First Amendment of the United States Constitution.

**THIRD CLAIM FOR RELIEF: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (BY MESA VERDE SUB-CLASS PLAINTIFFS AGAINST GOVERNMENT DEFENDANTS)**

141.   Defendants' policy prohibiting people in ICE detention facilities from "engaging in or inciting a group demonstration" constitutes agency action that is arbitrary and capricious, unconstitutional, and otherwise contrary to law, and thus violates the Administrative Procedure Act.

1

**PRAYER FOR RELIEF**

2    WHEREFORE, Plaintiffs respectfully ask that this Court:

3    a.    Take jurisdiction over this matter;

4    b.    Certify the proposed Class and Sub-classes as indicated above, and appoint the

5 named Petitioners/Plaintiffs as class representatives and the undersigned counsel as class

6 counsel;

7    c.    Declare that the continued detention of the plaintiff class members violates the

8 Due Process Clause;

9    d.    In gross or individually, order Defendants to release enough class members

10 sufficient for the continued detention of any remaining class members not to violate their

11 constitutional rights;

12    e.    Order Defendants to suspend, temporarily, the introduction of immigration

13 detainees into Mesa Verde and YCJ and notify the Court and class counsel before resuming the

14 introduction of new detainees into these facilities;

15    f.    Declare that Defendants and their agents have violated Plaintiffs' rights under

16 the First Amendment to engage in speech, including symbolic speech, to petition, and to

17 assemble peacefully without fear of government interference or retaliation;

18    g.    Issue an injunction enjoining Defendants and their agents from any further

19 interference with, or retaliation against, Plaintiffs' exercise of their First Amendment rights;

20    h.    Declare that ICE's policy prohibiting people in ICE detention facilities from

21 "engaging in or inciting a group demonstration" violates the Administrative Procedure Act and

22 the First Amendment;

23    i.    Set aside ICE's policy prohibiting people in ICE detention facilities from

24 "engaging in or inciting a group demonstration;"

25    j.    Order Defendants to abstain from placing plaintiff class members into solitary

26 confinement as a means of achieving social distancing;

27    k.    Award Plaintiffs costs and reasonable attorneys' fees in this action under the

28

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

1  Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any

2  other basis justified under law; and,

3         l.     Grant such other and further relief as this Court deems just and appropriate.

4  Dated: April 20, 2020                  Respectfully submitted,

5                                      /s/ William S. Freeman
                                       William S. Freeman

6                                      Sean Riordan
                                       Angélica Salceda

7                                      AMERICAN CIVIL LIBERTIES UNION
                                       FOUNDATION OF NORTHERN

8                                      CALIFORNIA

9  Bree Bernwanger                  Manohar Raju
   Tifanei Ressl-Moyer             Public Defender

10 Hayden Rodarte                  Matt Gonzalez
   LAWYERS' COMMITTEE FOR     Chief Attorney

11 CIVIL RIGHTS OF                Francisco Ugarte
   SAN FRANCISCO BAY AREA     Genna Ellis Beier

12                                     Emilou H. MacLean
   Judah Lakin                     OFFICE OF THE PUBLIC DEFENDER

13 Amalia Wille                    SAN FRANCISCO
   LAKIN & WILLE LLP

14                                       Martin S. Schenker
   Jordan Wells                    Timothy W. Cook

15 Stephanie Padilla            Francisco M. Unger
   Michael Kaufman            COOLEY LLP

16 AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF SOUTHERN    *Attorneys for Petitioners-Plaintiffs*

17 CALIFORNIA

18

19

20

21

22

23

24

25

26

27

28

CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF