1  WILLIAM S. FREEMAN (SBN 82002)
   wfreeman@aclunc.org
2  SEAN RIORDAN (SBN 255752)
   sriordan@aclunc.org
3  ANGÉLICA SALCEDA (SBN 296152)
   asalceda@aclunc.org
4  AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF NORTHERN
5  CALIFORNIA
   39 Drumm Street
6  San Francisco, CA 94111
   Telephone: (415) 621-2493
7  Facsimile: (415) 255-8437

8  *Attorneys for Petitioners-Plaintiffs*
   Additional Counsel Listed on Following Page

   MANOHAR RAJU (SBN 193771)
   Public Defender
   MATT GONZALEZ (SBN 153486)
   Chief Attorney
   FRANCISCO UGARTE (CA SBN 241710)
   francisco.ugarte@sfgov.orga
   GENNA ELLIS BEIER (CA SBN 300505)
   genna.beier@sfgov.org
   EMILOU H. MACLEAN (CA SBN 319071)
   emilou.maclean@sfgov.org
   OFFICE OF THE PUBLIC DEFENDER
   SAN FRANCISCO
   555 Seventh Street
   San Francisco, CA 94103
   Direct: 415-553-9319
   Fax:    415-553-9810

9

10                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
11                      SAN FRANCISCO DIVISION

12

13  ANGEL DE JESUS ZEPEDA RIVAS,          CASE NO.
    BRENDA RUIZ TOVAR, LAWRENCE
14  MWAURA, LUCIANO GONZALO              **PETITIONERS-PLAINTIFFS'**
    MENDOZA JERONIMO, CORAIMA            **NOTICE OF MOTION AND**
15  YARITZA SANCHEZ NUÑEZ, JAVIER        **MOTION FOR TEMPORARY**
    ALFARO, DUNG TUAN DANG,              **RESTRAINING ORDER**
16
17              Petitioners-Plaintiffs,
18                   v.
19  DAVID JENNINGS, Acting Director of the
    San Francisco Field Office of U.S. Immigration
20  and Customs Enforcement; MATTHEW T.
    ALBENCE, Deputy Director and Senior
21  Official Performing the Duties of the Director
    of the U.S. Immigration and Customs
22  Enforcement; U.S. IMMIGRATION AND
    CUSTOMS ENFORCEMENT; GEO GROUP,
23  INC.; NATHAN ALLEN, Warden of Mesa
    Verde Detention Facility,
24
25              Respondents-Defendants.

26

27

28

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING
ORDER

1   BREE BERNWANGER* (NY SBN 5036397)    MARTIN S. SCHENKER (SBN 109828)
    bbernwanger@lccrsf.org                mschenker@cooley.com
2   TIFANEI RESSL-MOYER (SBN 319721)      COOLEY LLP
    tresslmoyer@lccrsf.org                101 California Street, 5th Floor
3   HAYDEN RODARTE (SBN 329432)           San Francisco, CA  94111
    hrodarte@lccrsf.org                   Telephone: (415) 693-2000
4   LAWYERS' COMMITTEE FOR                Facsimile: (415) 693-2222
    CIVIL RIGHTS OF
5   SAN FRANCISCO BAY AREA                TIMOTHY W. COOK (Mass. BBO# 688688)*
    131 Steuart St #400                   tcook@cooley.com
6   San Francisco, CA 94105               FRANCISCO M. UNGER (Mass. BBO#
    Telephone: (415) 814-7631             698807)*
7                                         funger@cooley.com
    JUDAH LAKIN (SBN 307740)              COOLEY LLP
8   judah@lakinwille.com                  500 Boylston Street
    AMALIA WILLE (SBN 293342)             Boston, MA 02116
9   amalia@lakinwille.com                 Telephone: (617) 937-2300
    LAKIN & WILLE LLP                     Facsimile: (617) 937-2400
10  1939 Harrison Street, Suite 420
    Oakland, CA 94612                     *Attorneys for Petitioners-Plaintiffs*
11  Telephone: (510) 379-9216
    Facsimile: (510) 379-9219             *Motion for Admission *Pro Hac Vice*
12                                        Forthcoming
    JORDAN WELLS (SBN 326491)
13  jwells@aclusocal.org
    STEPHANIE PADILLA (SBN 321568)
14  spadilla@aclusocal.org
    MICHAEL KAUFMAN (SBN 254575)
15  mkaufman@aclusocal.org
    AMERICAN CIVIL LIBERTIES UNION
16  FOUNDATION OF SOUTHERN
    CALIFORNIA
17  1313 West Eighth Street
    Los Angeles, CA 90017
18  Telephone: (213) 977-9500
    Facsimile: (213) 977-5297

19

20

21

22

23

24

25

26

27

28

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION .................................................................................. 1

I.    INTRODUCTION ................................................................................................ 1

II.   FACTS .............................................................................................................. 3

      A.    COVID-19 Poses Grave Risk of Harm to Plaintiffs ................................. 3

      B.    Adequate Social Distancing is Impossible at Current Population Levels at
            Mesa Verde and YCJ ............................................................................... 5

      C.    Plaintiffs Face an Imminent and Substantial Risk of Exposure to COVID-19
            in Mesa Verde and YCJ ........................................................................... 8

III.  LEGAL STANDARD ........................................................................................ 11

IV.   ARGUMENT .................................................................................................... 12

      A.    Plaintiffs are Likely to Succeed on the Merits ...................................... 13

            1.    Plaintiffs' Detention in an Environment Where Social Distancing is
                  Impossible is Unreasonably Dangerous in Violation of Substantive
                  Due Process ................................................................................... 13

                  a.    The Impossibility of Social Distancing Exposes Plaintiffs to
                        an Unjustifiable Risk of Contracting A Deadly Virus in Light
                        of Alternatives to Detention that Would Equally Serve the
                        Government's Interests in Appearance for Removal
                        Proceedings and Community Safety ......................................... 14

                  b.    Plaintiffs are also Likely to Prevail by Showing Defendants'
                        Refusal to Ensure Adequate Social Distancing Constitutes
                        Deliberate Indifference ............................................................. 18

      B.    Plaintiffs Satisfy the Remaining Factors for Preliminary Relief ......................... 21

            1.    Exposure to a Lethal Virus Which Lacks Any Vaccine, Treatment,
                  or Cure Constitutes Irreparable Harm ....................................... 21

            2.    Public Interest and Balance of Equities Weigh Heavily in Plaintiffs'
                  Favor ............................................................................................. 22

      C.    Justice Requires Comprehensive Relief for the Class ........................... 23

V.    SECURITY ....................................................................................................... 24

VI.   CONCLUSION ................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

PAGE(S)

Cases

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ................................................................... 12, 13

*Bahena Ortuño v. Jennings*,
   2020 WL 1701724 (N.D. Cal. Apr. 8, 2020) ................................................. passim

*Bent v. Barr*,
   2020 WL 1812850 (N.D. Cal. Apr. 9, 2020) ................................................. passim

*Castillo v. Barr*,
   2020 WL 1502864 (C.D. Cal. Mar. 27, 2020) ............................................ 14, 15, 25

*Castro v. Cnty. of Los Angeles*,
   833 F.3d 1060 (9th Cir. 2016) ...................................................................... 24, 27

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
   489 U.S. 189 (1989) ......................................................................................... 23

*Doe v. Barr*,
   2020 WL 1820667 (N.D. Cal. Apr. 12, 2020) ................................................ passim

*Elrod v. Burns*,
   427 U.S. 347 (1976) ......................................................................................... 28

*Helling v. McKinney*,
   509 U.S. 25 (1993) ........................................................................................... 18

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ............................................................................. 30

*Indep. Living Ctr. of S. Cal., Inc. v. Shewry*,
   543 F.3d 1047 (9th Cir. 2008) ........................................................................... 28

*J.P. v. Sessions*,
   2019 WL 6723686 (C.D. Cal. Nov. 5, 2019) ...................................................... 24

*Jackson v. Indiana*,
   406 U.S. 715 (1972) ......................................................................................... 16

*Jones v. Blanas*,
   393 F.3d 918 (9th Cir. 2004) ............................................................... 16, 17, 18, 24

*Jorgensen v. Cassiday*,
   320 F.3d 906 (9th Cir. 2003) ............................................................................. 33

*M.R. v. Dreyfus*,
   663 F.3d 1100 (9th Cir. 2011) ........................................................................... 28

ii
PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING
ORDER

*Malam v. Adducci*,
2020 WL 1809675) (E.D. Mich. Apr. 9, 2020) ...................................................... 20

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ............................................................................... 28

*Orantes–Hernandez v. Smith*,
541 F. Supp. 351 (C.D. Cal. 1982) ....................................................................... 33

*Padilla v. ICE*,
953 F.3d 1134 (9th Cir. 2020) ............................................................................. 28

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) .......................................................................... 18, 29

*Basank v. Decker*,
2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ...................................................... 31

*Rafael L.O. v. Tsoukaris*,
WL 1808843 (D.N.J. Apr. 9, 2020) ...................................................................... 21

*Savino v. Souza*,
2020 WL 1703844 (D. Mass. Apr. 8, 2020) .................................................... 19, 20

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001) ............................................................................... 12

*Thakker v. Doll*,
No. 1:20-cv-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) ...................... 21, 22

*Toussaint v. Rushen*,
553 F. Supp. 1365 (N.D. Cal. 1983) ..................................................................... 33

*Unknown Parties v. Nielsen*,
2020 WL 813774 (D. Ariz. Feb. 19, 2020) ........................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................................................ 12

*Youngberg v. Romeo*,
457 U.S. 307 (1982) ................................................................................. 15, 17, 23

*Zadvydas v. Davis*,
533 U.S. 678 (2001) ............................................................................................ 15

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING
ORDER

1  **OTHER AUTHORITIES**

2  Letter from Drs. Scott A. Allen & Josiah Rich to Rep. Bennie Thompson, *et al*.
   (Mar. 19, 2020) ..................................................................................................................... 18

3

4  U.S. Gov't Accountability Office, GAO-15-26, *Alternatives to Detention:*
   *Improved Data Collection and Analyses Needed to Better Assess Program*
   *Effectiveness 10-11* (Nov. 2014).......................................................................................... 18

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**NOTICE OF MOTION AND MOTION**

2      PLEASE TAKE NOTICE that, as soon as they may be heard, Plaintiffs will and hereby

3  do move, pursuant to Civil L. R. 7-1 and 65-1, for a temporary restraining order directing ICE[1]

4  to release a sufficient number of putative class members in order to allow for social distancing

5  at Mesa Verde ICE Processing Facility (Mesa Verde) and Yuba County Jail (YCJ). This motion

6  is supported by the following Memorandum of Points and Authorities, the Class Petition for

7  Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief, the Motion for

8  Provisional Class Certification, and declarations of each of the Class Representative Plaintiffs,

9  or their attorneys on their behalf, and various experts, all of which are filed contemporaneously.

10      Pursuant to Civil L.R. 65-1(b), on April 20, 2020 at 4 p.m., counsel for Plaintiffs called

11  Assistant U.S. Attorney Sara Winslow at the U.S. Attorney's Office for the Northern District of

12  California and sent an e-mail to Ms. Winslow to advise of the emergency reasons requiring

13  them to seek a temporary restraining order. In addition, Plaintiffs' counsel e-mailed to Ms.

14  Winslow copies of (1) the Class Petition for Writ of Habeas Corpus and Class Complaint for

15  Injunctive and Declaratory Relief, (2) Motion for Temporary Restraining Order, (3) Motion for

16  Provisional Class Certification, and (4) associated proposed orders.

17  **I.   INTRODUCTION**

18      As COVID-19 ravages the country and the world, Plaintiffs are trapped in close quarters

19  in two immigration detention centers, Mesa Verde and YCJ. Plaintiffs spend their days within

20  arm's reach of one another, share communal bathrooms and showers, and are forced into tightly

21  spaced single-file lines throughout the day. To prevent contracting and spreading COVID-19,

22  the Centers for Disease Control and Prevention ("CDC") has recommended that individuals

23  avoid contact with others and practice social distancing.[2] Yet, Plaintiffs' continued detention in

24  Mesa Verde and YCJ prevents them from doing exactly what the CDC recommends.

25

26

27  [1] References to "Defendants" in this motion are not intended to suggest that Plaintiffs here seek injunctive relief against any non-governmental entities.

28  [2] See Coronavirus Disease 2019 (COVID-19), Prevent Getting Sick, How to Protect Yourself & Others, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

1    Social distancing is critical with COVID-19 because the disease has no known vaccine or

2 cure and is highly contagious. It can survive on hard surfaces and be transmitted by touch. It can

3 be carried and transmitted by people who exhibit no symptoms. To implement the CDC's

4 guidance, 95% of Americans—about 316 million people—have been ordered to stay at home.[3]

5 Until there is a vaccine or cure for COVID-19, which will likely take over a year,[4] the disease

6 will continue to spread and could threaten the life of any adult who contracts it.

7    Defendants' response to has been dangerously inadequate. Experts have been warning

8 Defendants that COVID-19 will spread "like wildfire" in congregate settings, like Mesa Verde

9 and YCJ, where people cannot consistently maintain a distance of at least six feet from one

10 another. In other jails and detention center, it has, with deadly results. Defendants have the

11 power to reduce the detained populations at both Mesa Verde and YCJ to sufficiently

12 accommodate consistent, meaningful social distancing. They refuse to do so. Indeed, in recent

13 weeks, Defendants *increased* the detained immigrant population at YCJ.[5]

14    Recognizing the profound risk that continued detention in Mesa Verde and YCJ poses to

15 those detained there, multiple judges in this District have ordered ICE to release detained

16 immigrants on the grounds that their continued detention would violate the Constitution.[6]

17 Plaintiffs here are currently suffering the *same* constitutional violation that has justified

18 individual release in these cases.

19    Hundreds of lives are at stake. The systemic crisis at Mesa Verde and YCJ must be

20 resolved at a systemic level. And it must be resolved quickly. As of April 17, there have been

---

[3] *See* Sarah Mervosh, et al., N.Y. Times (Apr. 7, 2020), *See Which States and Cities Have Told Residents to Stay at Home*, https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

[4] Carolyn Kormann, New Yorker (Mar. 8, 2020), *How Long Will It Take to Develop a Coronavirus Vaccine?*, https://www.newyorker.com/news/news-desk/how-long-will-it-take-to-develop-a-coronavirus-vaccine (quoting Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases).

[5] As of April 18, 2020, there were 157 ICE detainees at YCJ. This marks a net increase of seven ICE detainees at YCJ compared to April 2. During the same period, the net YCJ population of criminal detainees decreased by several dozen. Thus, during the same period that YCJ responded to COVID-19 by decreasing its population of criminal detainees, ICE made the facility more crowded than it otherwise would have been. Riordan ¶ 9.

[6] *See Doe v. Barr*, No. 20-cv-02141-LBR, 2020 WL 1820667, at *9-10 (N.D. Cal. Apr. 12, 2020) (granting TRO and ordering release of ICE detainee in YCJ on grounds that risk of continued confinement was excessive in relation to government interest); *Bent v. Barr*, No. 19-cv-06123-DMR, 2020 WL 1812850 at *4-6 (N.D. Cal. Apr. 9, 2020) (same Mesa Verde); *Bahena Ortuño v. Jennings*, No. 20-cv-02064-MMC, 2020 WL 1701724, at *3-5 (N.D. Cal. Apr. 8, 2020) (same for Mesa Verde and YCJ detainees).

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

1  124 confirmed COVID-19 cases among ICE detainees nationwide—a jump of over 50 cases

2  from the previous week.[7] This Court should grant a temporary restraining order to implement a

3  system for class members' expedited release until conditions in Mesa Verde and YCJ can

4  accommodate the required social distancing.

5  **II.**   **FACTS**

6      **A.**   **COVID-19 Poses Grave Risk of Harm to Plaintiffs**

7          COVID-19 is a deadly, highly contagious viral disease that has no cure. It has caused a

8  global pandemic, infecting millions of people and killing over a hundred thousand in a matter of

9  months.[8] In the United States, there are at least 720,630 cases and 37,202 confirmed deaths.[9] In

10  California, there are at least 31,530 cases and 1,178 confirmed deaths.[10]

11          COVID-19 poses a serious health risk to all adults. Although certain characteristics such

12  as advanced age or underlying health conditions exacerbate the risk of death or serious illness

13  from COVID-19, any adult who contracts the disease can experience severe illness, require

14  hospitalization, or die. While people under the age of 20 have largely been protected from

15  severe effects of the coronavirus, 55% of COVID-19 hospitalizations and 20% of deaths were

16  from people between the ages of 20 and 64. Greifinger ¶ 8. Early CDC data shows nearly 40%

17  of COVID-19 patients hospitalized in the U.S. have been between the ages of 18 and 54.[11] In

18  New York, approximately one-third of the patients between the ages of 30 and 39 who died

19

20  [7] U.S. Immigr. & Customs Enforcement, Confirmed Cases, ICE Guidance on COVID-19 (last updated Apr. 17, 2020, 8:00 p.m.), https://www.ice.gov/coronavirus.

21  [8] *See* World Health Org., Coronavirus Disease 2019 (COVID-19) Situation Report – 89 (Apr. 18, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200418-sitrep-89-covid-19.pdf?sfvrsn=3643dd38_2.

22  [9] *See* Ctrs. for Disease Control & Prevention, Coronavirus Disease 2019 (COVID-19), Cases, Data, & Surveillance, Cases of Coronavirus Disease (COVID-19) in the U.S. (last updated Apr. 19, 2020),

23  https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. Kern County, where Mesa Verde is located, has seen 574 cases and three deaths. *See* Kern Cty. Pub. Health Servs. Dep't, COVID-19 Dashboard (last

24  updated Apr. 19, 2020), https://kernpublichealth.com/covid-19_dashboard/. Yuba and Sutter Counties have seen 40 cases and three deaths, while neighboring Sacramento and Yolo Counties have seen more than 1,000 cases and 400

25  deaths. *See* Yuba Cty., Coronavirus Update for Yuba-Sutter (last updated Apr. 19, 2020, 6:18 p.m.), https://www.yuba.org/coronavirus/. Dr. Greifinger has cautioned that according to at least one model, as few as ten

26  confirmed cases in a county indicate a near-certainty of an existing, undetected epidemic. Greifinger ¶ 45.

    [10] *See* L.A. Times, *Tracking Coronavirus in California* (last updated Apr. 19, 2020, 11:50 p.m.),

27  https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/.

    [11] *See* Dr. Sanjay Gupta, *The Mystery of Why the Coronavirus Kills Some Young People,* CNN (Apr. 6, 2020),

28  http://www.cnn.com/2020/04/05/health/young-people-dying-coronavirus-sanjay-gupta/index.html.

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

from COVID-19 did not appear to have any risk factors,[12] and physicians treating COVID-19 have noted the "randomness" with regard to which young people are unable to survive contraction of the illness.[13] Short of death, COVID-19 can cause prolonged illness and suffering in people of any age who contract it. In addition to requiring ventilation to stabilize oxygen intake, increasing numbers of patients also risk kidney failure and require dialysis, possibly permanently.[14] People of all ages and medical backgrounds who have contracted COVID-19 describe painful symptoms including vomiting, diarrhea, fever, relentless shivering, and severe difficulty breathing.[15]

In addition, many people have undiagnosed risk factors. For example, hypertension makes someone at higher risk of severe illness from COVID-19,[16] but the CDC has stated that about 11 million adults in the U.S. have high blood pressure but do not know it.[17] Under-diagnosis of risk factors is particularly likely among the proposed class, who are part of a population that often lacks adequate access to healthcare. Among the nonelderly population, 23% of noncitizens with lawful status and more than four in ten (45%) undocumented

---

[12] *See* Chris Mooney et al., *Hundreds of Young Americans Have Now Been Killed by the Coronavirus, Data Shows*, Wash. Post (Apr. 8, 2020), https://www.washingtonpost.com/health/2020/04/08/young-people-coronavirus-deaths/.
[13] *Id.*
[14] Reed Abelson et al., *An Overlooked, Possibly Fatal Coronavirus Crisis: A Dire Need for Kidney Dialysis*, N.Y. Times (Apr. 18, 2020), https://www.nytimes.com/2020/04/18/health/kidney-dialysis-coronavirus.html.
[15] *See* Marissa J. Lang, *Nightmares, Flashbacks, Uncertainty: A 29-year-old Recovers After Coronavirus Brought Him Near Death*, Wash. Post (Apr. 17, 2020), https://www.washingtonpost.com/local/coronavirus-covid-19-recovery-francis-wilson-virginia-dc/2020/04/16/0bb55974-7858-11ea-a130-df573469f094_story.html (describing experience of otherwise healthy 29-year-old who survived COVID-19 after requiring an 11-day medically induced coma); Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure from COVID-19—Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients (respiratory therapist describing COVID-19 as "knocking out what should be perfectly fit, healthy people. Patients will be on minimal support, on a little bit of oxygen, and then all of a sudden, they go into complete respiratory arrest, shut down and can't breathe at all."); Fiona Lowenstein, *I'm 26. Coronavirus Sent Me to the Hospital.*, N.Y. Times (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/opinion/coronavirus-young-people.html (describing feeling "desperate for oxygen" before being hospitalized); Sui Lee Wee & Vivian Wang, *Two Women Fell Sick from Coronavirus. One survived.*, N.Y. Times (Mar. 13, 2020), https://www.nytimes.com/interactive/2020/03/13/world/asia/coronavirus-death-life.html (describing experiences of two otherwise healthy nurses in China who contracted COVID-19 and were hospitalized, one of whom died).
[16] Ctrs. for Disease Control & Prevention, Coronavirus Disease 2019 (COVID-19), People Who Need Extra Precautions, People Who are at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.
[17] Ctrs. for Disease Control & Prevention, CDC Features, Diseases & Conditions, 5 Surprising Facts About High Blood Pressure, https://www.cdc.gov/features/highbloodpressure/index.html.

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

immigrants were uninsured as of March 2020, compared to less than one in ten (9%) citizens.[18]

Lack of health insurance often results in a failure to identify chronic diseases or other health

conditions.[19]

There is no vaccine, antiviral treatment, or cure for COVID-19. Greifinger ¶ 6. The

disease is believed to spread through "respiratory droplets" through "close exposure" of up to

six feet. Mishori ¶ 6; Greifinger ¶ 11. "Transmission also is possible through contact with

contaminated surfaces." Greifinger ¶ 10. Individuals infected with COVID-19 can transmit it to

others even if they have no symptoms. Mishori ¶ 6.

Because of its highly contagious nature, the only available strategy to reduce the risk of

injury or death from COVID-19 is to prevent people from being infected in the first place.

Greifinger ¶ 6; Mishori ¶ 22. "Social distancing," or maintaining a minimum of six feet of

separation at all times from other people, paired with "hand hygiene," is the only effective

means of stopping the spread of the disease. Greifinger ¶ 11; Hernandez ¶ 12 ("The most

effective mitigation measures are community-wide social distancing."). Social distancing is the

"cornerstone" of the CDC's prevention plan.[20] In the last month, state governments and the

federal government have fundamentally restructured American life to limit all interaction except

within one's own household, and, when such interaction is unavoidable, to require social

distancing.[21]

## B. Adequate Social Distancing is Impossible at Current Population Levels at Mesa Verde and YCJ

In early April, Mesa Verde had detainee population of 286 people. *See Bahena Ortuño v.*

*Jennings*, No. 20-cv-02064-MMC (N.D. Cal.), Supp. Dec. of Erik Bonnar ¶ 2 (ECF No. 29-2).

---

[18] Health Coverage of Immigrants, Kaiser Family Foundation (Mar. 18, 2020), https://www.kff.org/disparities-policy/fact-sheet/health-coverage-of-immigrants/.

[19] Jennifer Tolbert et al., Key Facts about the Uninsured Population, Kaiser Family Foundation (Dec. 13, 2019), https://www.kff.org/uninsured/issue-brief/key-facts-about-the-uninsured-population/.

[20] Ctrs. for Disease Control & Prevention, Coronavirus Disease 2019 (COVID-19), Prevent Getting Sick, Cloth Face Covers, Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

[21] Mervosh et al., *supra* note 2 (listing orders by state).

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

YCJ has a current detainee population of approximately 286 people—approximately 157 of those are ICE detainees, while the remainder are detained pursuant to the Yuba County criminal justice system. Riordan ¶ 9. Social distancing is incompatible with every aspect of life in detention at Mesa Verde and YCJ.

*First*, Plaintiffs and the proposed class cannot maintain physical distance from other detainees in the units where they sleep. YCJ contains several different types of housing units, each with its own alphabetical designation. There are four dorms (B, C, P, R) in which detainees sleep in bunk beds in close proximity to one another. Riordan Exh. A (Berg Report at p. 9); *id*. Exh. C (photograph marked as DSC "198" is unit C); *id*. Exh. D (photographs marked as DSC 112 and DSC 114 are of housing unit R); Kavanagh ¶¶ 5-6, 10-11. The C and D dorms have 50 beds. Kavanagh ¶ 6. Six other housing units (G, H, I, J, K, L) have bunk beds bolted to the wall and are separated from corridors by a set of bars with open space between the bars, so air flows freely between the cells and the corridors. Riordan Exh. A at 9; *id*. Exh. D (photograph marked as DSC 105 is of housing unit I); Kavanagh ¶ 9. The distance from top to bottom bunk throughout the facility is less than six feet. Mwaura ¶ 10; Zepeda ¶ 15. Several other housing units (D, E, F) involve two-person cells surrounding a common area where half of each unit's detainees are released at a time during the day. Riordan Exh. A at 9.

Throughout the sleeping quarters in YCJ, social distancing is impossible. Mwaura ¶¶ 9-10; Tovar ¶ 14; Zepeda ¶¶ 14-15. From their own beds, Plaintiffs can reach out and touch the beds beside them. Tovar ¶ 14; Mwaura ¶ 10 (describing two bunks within two feet of him and four more within four feet). The dorms in which plaintiffs live are crowded. Tovar ¶ 14 (dorm is "completely full"); *see also* Mwaura ¶ 10 (only 8 detainees out of 36 do not have a bunk mate); Zepeda ¶ 15 (describing that all bottom bunks are less than a meter apart and occupied).

In Mesa Verde, all detainees sleep in bunk beds only a few feet apart in 100-bed dormitory spaces. Knox Dec. ¶ 9; Riordan Exh. E (2018 PREA Audit) at 2. Mesa Verde has three isolation cells in a restricted housing unit that hold one person each. Riordan Exh. E at 2. Plaintiffs also describe being arm's width from others while in their beds. Dang ¶ 13; Nuñez ¶

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

14; Alfaro ¶ 18 ("[The bunk beds] are so close to one another I can reach out my arms and touch another bunk bed."). Social distancing is impossible at current levels. *See* Dang ¶ 11 (surrounded by full bunks in at-capacity dorm); Nuñez ¶¶ 12, 14 (sleeping in half-capacity dorm less than six feet from two other women); Alfaro ¶ 16 (describing one or two beds free out of 100).

"[B]y definition [the sleeping arrangements in both facilities] prohibit[] social distancing, as the distance between the upper and lower bunks is less than six feet." Greifinger ¶ 34. Further, "[b]ecause detainees get in and out of bed, bunk beds that are closer than ten feet from one another will not allow adequate social distancing." *Id*. ¶ 35. At Mesa Verde specifically, Dr. Greifinger has concluded that it "is fundamentally a congregate living space where there is a high risk of infectious spread." Greifinger Dec. ¶ 34(a). Similarly, at YCJ, although there are number of different unit layouts, "none of the sleeping arrangements appear safe in the context of the coronavirus." Greifinger ¶ 34(b).

*Second*, Plaintiffs and the proposed class cannot maintain safe physical distance from one another when sharing common areas in their housing units, including when eating and using the bathroom and shower. In the dining areas in both facilities, most tables and chairs in common spaces are bolted to the ground and cannot be moved. Kavanagh ¶ 3 (YCJ); Riordan Exhs. C & D (Takei ECF No. 197-17 & 197-15) (YCJ); Riordan Exh. F (Takei at 5, 24, 25) (Mesa Verde); Tovar ¶ 14 (YCJ); Alfaro ¶ 22 (Mesa Verde). At the tables, class members sit "right next to each other," Zepeda ¶ 16 (YCJ), "elbow to elbow," Mwaura ¶ 13 (YCJ); Alfaro ¶ 22 ("When we watch television, we sit right next to one another") (Mesa Verde). There is not enough space between chairs to maintain social distances at the tables and not enough tables for detainees to space themselves among them. Kavanagh ¶ 9 (YCJ); Dang ¶¶ 17-18 (Mesa Verde); Nuñez ¶ 14 (Mesa Verde). At Mesa Verde, "[t]he people serving food are an arm's length distance or less" from Plaintiffs when they serve them. Dang ¶ 17.

Plaintiffs regularly have to line up without sufficient space to maintain social distancing in the line. At Mesa Verde, guards force Plaintiffs to line up and take them to the dining area;

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

they are "inches apart in line." Dang ¶ 17; *see also* Nuñez ¶ 14. At YCJ, Plaintiffs must also

regularly line up in close quarters. *See* Zepeda ¶ 21 (to use the bathroom), ¶ 23 (to see medical

staff); ¶ 24 (to receive afternoon medication); Mwaura ¶ 12 (to go to dining hall).

It is likewise impossible to maintain social distance when using the bathrooms and

showers at both facilities. At Mesa Verde, there are five toilets, five showers, and seven sinks

per 100-person dormitory. Riordan Exh. E at 2. Plaintiffs are "shoulder to shoulder" when

washing their hands. Nuñez ¶ 12. At YJC, toilets and showers are shared and are separated by

curtains or thin dividers that generally rise to shoulder height. Tovar ¶ 15 ("you do not have any

privacy or space"); Kavanagh ¶ 6; *see also* Mwaura ¶ 16. Plaintiffs' experiences illustrate that

"the structure and facilities of the Mesa Verde Detention Center and the Yuba County Jail

[make] social distancing [] impossible . . . and there is a serious risk of infection for all of those

who are detained." Greifinger ¶ 43.

C.    **Plaintiffs Face an Imminent and Substantial Risk of Exposure to COVID-19 in Mesa Verde and YCJ**

Jail and detention settings like Mesa Verde and YCJ "pose a heightened public health risk

to the spread of COVID-19, even greater than other non-carceral institutions." Greifinger ¶ 16.

According to Dr. Mishori, "The risk posed by infectious diseases in immigration detention

facilities is significantly higher than in the community, both in terms of risk of exposure and

transmission and harm to individuals who become infected." ¶ 7. In addition, at Mesa Verde and

YCJ, the risks inherent in detainees' inability to maintain six feet of physical distance from

others are compounded by other conditions of confinement, including poor sanitation,

inadequate access to personal hygiene, substandard medical care, and the entry of newly-

detained people into the population without proper screening or quarantine. Greifinger ¶¶ 39,

41, 42, 49-56 (identifying factors within Mesa Verde and YCJ that compound the risk inherent

in Plaintiffs' inability to maintain social distancing).

Plaintiffs describe sanitary and hygienic conditions that are wanting. At Mesa Verde,

detainees must wash their hands, shower, and clean their personal items using hotel-size

shampoo and soap. Nuñez ¶ 11. On April 17, 2020, they received a liquid soap dispenser and napkin dispenser, ostensibly in response to COVID-19. Nuñez ¶¶ 11, 16. There is no access to hand sanitizer. Dang ¶ 20. Plaintiffs are paid $1 per day to clean their dorms and the bathrooms they share with up to 99 other detainees for themselves, using only a mop, gloves, and cleaning solution. Dang ¶ 16. One individual describes that everyone in his dorm must "use and re-use the same little towel over and over again to dry [their] hands or wipe surfaces, and it smells and is unsanitary." Alfaro ¶ 23. At YCJ, the solitary bathroom in the yard is "disgusting," (Tovar ¶ 17) and clothes often come back from laundry with a foul smell (Zepeda ¶ 26). Detainees without protective gear were forced to clean up after a visibly ill woman was removed from a dorm in which she languished for days. Tovar ¶ 21.[22] Moreover, Defendants' responses to people with symptoms have been delayed and inconsistent with CDC recommendations and their own internal policies. *See* Tovar ¶¶ 7-9, 21 (describing delayed, inadequate response to sick woman in dorm); Mwaura ¶ 30 (sick detainees in dorm room not receiving attention); Alfaro ¶ 39 ("I have also never heard of anyone here who has been isolated or quarantined.").

Perhaps even more shockingly, Defendants have continued to introduce *new* detainees into the ghastly existing conditions at Mesa Verde and YCJ, including people transferred from facilities with known COVID-19 cases and who entered without a two-week quarantine. Alfaro ¶ 17 ("within hours of someone leaving, a new person comes in to take their place"); Dang ¶ 12 (describing newly-detained people who are coughing and sick); Nuñez ¶ 16 (detailing transfer from YCJ to MV who was not quarantined before joining dorm); Zepeda ¶¶ 29-30 (noting two transfers from Santa Rita Jail, one of whom entered YCJ dorm after five days in cell alone and another who was isolated for only six hours)[23]; Mwaura ¶ 31 (describing new detainee who entered Apr. 17, 2020).

---

[22] Even outside the context of the pandemic, Plaintiffs have experienced substandard medical care in both YCJ and Mesa Verde. *See* Tovar ¶ 18 (YCJ); Mwaura ¶ 6 (not receiving care for Valley Fever at YCJ); Zepeda ¶ 9 (10 outstanding requests to see medical staff at YCJ); Dang ¶ 24 (MV failed to respond to request for medical records).

[23] Santa Rita Jail has 27 confirmed cases of COVID-19. *See* Rick Hurd, *Coronavirus: Alameda County Now Has Second-Most Cases in Bay Area*, East Bay Times (Apr. 17, 2020), https://www.eastbaytimes.com/2020/04/17/coronavirus-alameda-county-now-has-second-most-cases-in-bay-area/.

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

Defendants' own medical subject matter experts have recognized that conditions like those present currently at Mesa Verde and YCJ amount to a "tinderbox scenario" for the rapid spread of COVID-19. *See* Letter from Drs. Scott A. Allen & Josiah Rich to Rep. Bennie Thompson, *et al*. (Mar. 19, 2020), https://www.documentcloud.org/documents/6816336-032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.html#document/p4/a557238 (hereafter "Drs. Allen & Rich Letter"). So, too, have Plaintiffs' experts. As Dr. Mishori described, "A coronavirus brought into a detention facility can quickly spread among the dense detainee cohort. Soon many are sick—including high-risk groups such as those with chronic conditions—quickly overwhelming the already strained health infrastructure within the facility." ¶ 16. Dr. Greifinger has specifically reviewed ICE's response to the threat of COVID-19 and concludes that it "is deficient, putting detainees . . . in imminent danger of serious illness and death." ¶ 43.

In addition, it is clear that the only way to mitigate against this doomsday scenario is to significantly reduce the population of both Mesa Verde and YCJ. As Dr. Greifinger explains, ICE has failed "to appreciate the importance of releasing detainees to limit the risk for the individuals released, for those who remain detained, and for the general public." Greifinger ¶ 47.[24] All experts agree that social distancing, paired with vigilant hygiene, is the most effective measure to prevent transmission of COVID-19, *see* Hernandez Dec. ¶¶ 11-12; Mishori Dec. ¶¶ 10-11; Greifinger Dec. ¶ 11, 30, 31, and it is clear that both Mesa Verde and YCJ have "fail[ed] to meet minimally acceptable standards of social distancing, putting the residents at grave and unacceptable risk of pervasive infections, [which will] lead[] to serious illness and death." Greifinger ¶ 59. In turn, release is "the most important means of mitigating the spread of COVID-19 in ICE detention centers … even if the conditions inside the facility were impeccable." Greifinger ¶ 48.

At this point, ICE does not need to hypothesize as to what might happen in Mesa Verde or YJC once COVID-19 takes hold as, sadly, in other congregate facilities where conditions are

---

[24] Greifinger identifies numerous other deficiencies in ICE's national response. *See* Greifinger ¶¶ 39, 41, 42, 48-55.

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

1  similar to those in Mesa Verde and YCJ, tragedy has struck. In three weeks across March and

2  April, the jail at Rikers Island in New York jumped from no cases among inmates to 273 cases,

3  a higher rate of infection than in the most infected places in the world; four corrections staff

4  members and one inmate have died. Greifinger ¶¶ 21-22. The Cook County Jail has likewise

5  seen an alarming rise in cases: the Jail went from two confirmed inmate cases on March 23,

6  2020, to 342 confirmed inmate cases on April 17, 2020.[25] Three inmates have died.[26] As of

7  April 17, 2020, there were at least 124 confirmed cases among detainees in ICE custody,

8  including at least eighteen at the Otay Mesa Detention Center in San Diego.[27] These tragedies

9  are foreseeable and preventable.

10       The catastrophe of a concentrated outbreak, which endangers the lives of not only those

11  trapped in custody, but also those on the outside because it can overwhelm an already-stressed

12  public health infrastructure, are precisely why multiple jurisdictions, including Los Angeles,

13  Detroit, Travis County, New York City, and more than half of states have released thousands of

14  people from criminal custody.[28]

15  **III.   LEGAL STANDARD**

16       Plaintiffs are entitled to a temporary restraining order if they establish that they are

17  "likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of

18  preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the

19  public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l*

20  *Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that

21  preliminary injunction and temporary restraining order standards are "substantially identical").

22

23  [25] Andy Grimm, *'I feel like I lost the battle for my husband,' widow of dead Cook County Jail detainee says*, Chicago Sun Times, https://chicago.suntimes.com/2020/4/16/21224183/lost-battle-husband-widow-dead-cook-county-jail-detainee-coronavirus (Apr. 16, 2020).

24  [26] *Id*.
  [27] U.S. Immigration and Customs Enforcement, Confirmed Cases, ICE Guidance on

25  COVID-19 (last updated Apr. 13, 2020, 11:43 a.m.), https://www.ice.gov/coronavirus (click on "Confirmed Cases"); *see also* Max Rivlin Nadler, KPBS, *Otay Mesa COVID-19 Outbreak Now The Largest At A US*

26  *Immigration Detention Center*, https://www.kpbs.org/news/2020/apr/14/otay-mesa-detention-center-now-largest-immigration/ (Apr. 14, 2020).

27  [28] *See* Responses to COVID-19 pandemic, Prison Policy Initiative (Apr. 10, 2020) (collecting instances where jails and prisons have released detainees due to COVID-19),

28  https://www.prisonpolicy.org/virus/virusresponse.html#releases.

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

1   A temporary restraining order may likewise issue where "serious questions going to the merits

2   [are] raised and the balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild*

3   *Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citation omitted). To succeed under the

4   "serious question" test, Plaintiffs must show that they are likely to suffer irreparable injury and

5   that an injunction is in the public's interest. *Id*. at 1132.

6   **IV.   <u>ARGUMENT</u>**

7          As the institutions of American life, including jails and prisons across the country,

8   fundamentally transform to accommodate social distancing, ICE stands virtually alone in

9   defying the medical and societal consensus. Despite overwhelming expert evidence to the

10  contrary, ICE asserts that immigrants detained in facilities where no one has tested positive for

11  COVID-19 are not at risk of infection at all, even as the disease ravages the communities

12  outside and regardless of whether ICE has administered any tests. ICE maintains that it can keep

13  immigrants in custody safe by ordering increased access to soap and sanitizer, conducting

14  screenings that fail to account for asymptomatic transmission, and issuing bare

15  recommendations that encourage social distancing while simultaneously admitting that "strict

16  social distancing may not be possible in congregate settings such as detention facilities."[29]

17         ICE has made clear that it will not act of its own volition to make social distancing

18  possible. Although on April 10, ICE issued a non-binding recommendation that detention

19  centers consider reducing their populations to 75% of capacity (regardless of whether such a

20  reduction was actually sufficient to accommodate social distancing in any particular facility), a

21  week later, ICE's Acting Director Matthew T. Albence told a Congressional oversight

22  committee that the agency contemplated no further releases.[30] Before Congress, Acting Director

23  Albence went further, testifying that ICE cannot release any more detainees because it would

24  suggest that the Administration is "not enforcing our immigration laws," which would be a

25

---

26  [29] ICE ERO, *COVID-19 Pandemic Response Requirements*,
    https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (Apr. 10, 2020).

27  [30] House Committee on Oversight and Reform, *DHS Officials Refuse to Release Asylum Seekers and Other Non-Violent Detainees Despite Spread of Coronavirus*, https://oversight.house.gov/news/press-releases/dhs-officials-

28  refuse-to-release-asylum-seekers-and-other-non-violent-detainees (Apr. 17, 2020).

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING
ORDER

1   "huge pull factor" and create a "rush at the borders."[31] ICE's actions in California bear out this

2   strategy of relative inaction. Just in the past few weeks, the population of ICE detainees at YCJ

3   has *increased*. Riordan ¶ 9. In court, ICE has taken the position that the threat of COVID-19 is

4   speculative because there are no confirmed cases at Mesa Verde or YJC.[32]

5        Courts in this circuit have seen ICE's responses to the COVID-19 crisis for what they

6   are: half-measures that do not effectively protect the civil detainees in ICE's custody from a

7   serious risk of infection. *See e.g.*, *Castillo v. Barr*, No. cv-20-00605, 2020 WL 1502864, at *5

8   (C.D. Cal. Mar. 27, 2020) ("Civil detainees must be protected by the Government. Petitioners

9   have not been protected. They are not kept at least 6 feet apart from others at all times.") As a

10  result, judges have required ICE to release individual detainees from Mesa Verde and YCJ on

11  the grounds that their continued detention would violate due process. *See Bahena Ortuño v.

12  Jennings*, No. 20-cv-02064-MMC, 2020 WL 1701724 at *4 (N.D. Cal. Apr. 8, 2020); *Bent v.

13  Barr*, No. 19-cv-06123-DMR, 2020 WL 1812850 at *6 (N.D. Cal. Apr. 9, 2020); *See Castillo v.

14  Barr*, No. cv-20-00605 TJH (AFMX), 2020 WL 1502864, at *5 (C.D. Cal. Mar. 27, 2020).

15       The population levels in Mesa Verde and YCJ are a structural barrier that prohibit

16  necessary social distancing and, as a result, the risk of contracting COVID-19 looms over every

17  single Plaintiff every single day. This Court's intervention is urgently needed to prevent the

18  catastrophic harm to Plaintiffs that will result if ICE is permitted to proceed in its intransigent

19  refusal to reduce the population of its facilities.

20       **A.    Plaintiffs are Likely to Succeed on the Merits**

21            **1.    Plaintiffs' Detention in an Environment Where Social
                     Distancing is Impossible is Unreasonably Dangerous in**
22                   **Violation of Substantive Due Process**

23       The Constitution prohibits the government from exposing people in its custody to

24  unjustifiable or unreasonable risks of harm. These constitutional protections are strongest for

25

26  [31] House Committee on Oversight and Reform, *DHS Officials Refuse to Release Asylum Seekers and Other Non-Violent Detainees Despite Spread of Coronavirus*, https://oversight.house.gov/news/press-releases/dhs-officials-refuse-to-release-asylum-seekers-and-other-non-violent-detainees (Apr. 17, 2020).

27  [32] Opp. Brief at 16, *Bahena Ortuño v. Jennings*, No. 3:20-cv-02064 (N.D. Cal. Mar. 30, 2020) ("In any event, Petitioners' assertion that detention per se poses an increased risk of health complications or death from COVID-19
28  is purely speculative. COVID-19 has not spread to the facilities where Petitioners are being detained.")

13

1   civil detainees like Plaintiffs, who are in detention pursuant to civil immigration laws. *See*

2   *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Their constitutional rights while in custody are

3   derived from the Due Process Clause of the Fifth Amendment, which provides significantly

4   greater protection than the Eighth Amendment's ban on cruel and unusual punishment.

5   *Youngberg v. Romeo,* 457 U.S. 307, 321-22 (1982). Plaintiffs are likely to prevail on either of

6   two due process theories. First, the risks presented by COVID-19 in the congregate detention

7   environments of Mesa Verde and YCJ are excessive in relation to the government's interests

8   and could be achieved by alternative and less harsh methods. Second, the government's decision

9   to maintain robust population levels at Mesa Verde and YCJ constitutes deliberate indifference.

10
11
12   **a. The Impossibility of Social Distancing Exposes Plaintiffs to an Unjustifiable Risk of Contracting A Deadly Virus in Light of Alternatives to Detention that Would Equally Serve the Government's Interests in Appearance for Removal Proceedings and Community Safety**
13

14   Conditions of confinement violate due process when they expose civil detainees to a risk

15   of harm that is either excessive in relation to a legitimate government objective, or is imposed to

16   achieve an objective that could be accomplished using "alternative and less harsh methods."

17   *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004); *see also Jackson v. Indiana*, 406 U.S. 715,

18   738 (1972) ("[D]ue process requires that the nature and duration of commitment bear some

19   reasonable relation to the purpose for which the individual is committed.").

20   Conditions of confinement for civil detainees are presumptively unconstitutional when

21   they are "identical to, similar to, or more restrictive than" those afforded their criminal

22   counterparts. *Unknown Parties v. Nielsen*, No. CV-15-00250-TUC-DCB, 2020 WL 813774, at

23   *4 (D. Ariz. Feb. 19, 2020) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982)). There

24   is currently a nationwide trend of mass releases of people serving sentences for criminal

25   convictions to protect their health and facilitate social distancing within jails and prisons.[33] Los

26   Angeles County alone has released at least 1,700 people from county jails, Washington State

27
28   ---
    [33] *See supra* n. 27.

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

1   has released at over 1,100 people serving sentences for convictions, and Michigan is releasing at

2   least 1,000 people per month.[34] Plaintiffs, as civil detainees, are entitled to "more considerate

3   treatment" than their criminal counterparts, *Jones*, 393 F.3d at 931-32, but Defendants have

4   notably not extended them similar treatment. Out of well over 30,000 civil ICE detainees

5   nationwide, the agency has released 693,[35] and does not intend to release more.[36] In YCJ, also

6   home to individuals incarcerated for criminal offenses, the county has released some prisoners

7   in response to COVID-19, but ICE has *increased* its population of civil detainees.[37] Instead of

8   depopulating detention centers in line with criminal justice authorities nationwide, Defendants

9   have sought to make changes at the margins that do not effectively address the risk that their

10  current custody imposes on Plaintiffs. *See* Greifinger ¶ 47. Because Plaintiffs have been

11  afforded considerably inferior treatment than their criminal counterparts, their continued

12  detention is presumptively unconstitutional.

13          It is well-settled that a detained individual's constitutional protections extend to "future

14  harm," including a "condition of confinement that is sure or very likely to cause serious illness

15  and needless suffering the next week or month or years." *Helling v. McKinney*, 509 U.S. 25, 33

16  (1993); *see also id.* at 34 ("It would be odd to deny an injunction to inmates who plainly proved

17  an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened

18  to them"); *Parsons v. Ryan*, 754 F.3d 657, 679 (9th Cir. 2014) (affirming the certification of a

19  class of prison inmates and explaining that "every single [] inmate faces a substantial risk of

20  serious harm if [the prison's] policies and practices provide constitutionally deficient care for

21  treatment of medical, dental, and mental health needs").

22          As detailed *supra*, under the current conditions in Mesa Verde and YCJ, Plaintiffs are

23  exposed to a risk of infection with a deadly, incurable virus because consistent social distancing

24  _____

25  [34] *Id*.
    [35] Hott Decl. ¶¶ 10, 13, ECF No. 125-1, *Fraihat v. ICE*,  No. 5:19-cv-01456 (C.D. Cal. Apr. 15, 2020).

26  [36] Press Release, House Comm. on Oversight and Reform, *DHS Officials Refuse to Release Asylum Seekers and Other Non-Violent Detainees Despite Spread of Coronavirus* (Apr. 17, 2020),

27  https://oversight.house.gov/news/press-releases/dhs-officials-refuse-to-release-asylum-seekers-and-other-non-violent-detainees.

28  [37] Riordan ¶ 9 (noting increase in ICE population at YCJ); *id*. Exh. G, David Wilson, *Yuba County Jail Population Reduced*, Appeal Democrat (Apr. 15, 2020).

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

1    is impossible. *Supra* § II.B. Defendants cannot seriously dispute this. Three judges in this

2    district have ordered detainees released from Mesa Verde and YCJ, pointing to their risk of

3    infection without the ability to maintain social distance. *Bahena Ortuño*, 2020 WL 1701724 at

4    *4 (finding that four "petitioners cannot practice meaningful social distancing in [Mesa Verde

5    and YCJ]"); *Bent*, 2020 WL 1812850 at *6 ("[E]ven assuming that Respondents accurately

6    describe [Mesa Verde]'s current practices, these practices are inadequate to ensure the 'safety

7    and general wellbeing' of [Mesa Verde] detainees during the COVID-19 pandemic."); *Doe v.

8    Barr*, No. 3:20-cv-02141 LB, 2020 WL 1920667 at *10-11 (citing *Bahena Ortuño* and *Bent* in

9    holding same for YCJ detainee).

10        Because *all* adults risk serious harm if they contract COVID-19, *see* Greifinger ¶ 8, and

11   all individuals are at the same risk of contracting COVID-19, all putative class members are at

12   serious risk of harm from COVID-19. *Cf. Savino v. Souza*, No. 1:20-cv-10617-WGY, 2020 WL

13   1703844 at *7 (D. Mass. Apr. 8, 2020) (certifying class of all ICE detainees in Bristol County

14   House of Corrections and recognizing that "[c]rucial to the Court's determination is the

15   troubling fact that even perfectly healthy detainees are seriously threatened by COVID-19. . . . it

16   cannot be denied that the virus is gravely dangerous to all of us"); *Malam v. Adducci*, No. 2:20-

17   cv-10829, 2020 WL 1809675 at *3) (E.D. Mich. Apr. 9, 2020) ( "declin[ing] to set a floor for

18   the level of risk a party must show to warrant immediate release from immigration detention due

19   to the COVID-19 pandemic" and ordering release of ICE detainee who did not fall into CDC

20   risk category.)

21        The Government's judicially-recognized interest in the continued detention of

22   Plaintiffs—ensuring public safety and that Plaintiffs appear at their removal proceedings—

23   cannot justify exposing them to a substantial risk of contracting a deadly, incurable virus and

24   suffering severe bodily harm or death as a result. Judges in this District have already ordered

25   individual detainees released, finding that the government's interests can be accomplished

26   through "alternative, less harsh methods," like release on supervision and conditions. *Bahena

27   Ortuño* 2020 WL 1701724 at *4 (finding that despite the government's "non-punitive purpose"

28

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING
ORDER

1    in detaining petitioners their current detention is "excessive in relation to that purpose"); *Doe*,

2    2020 WL 1820667 at *10 (same for YCJ detainee); *Bent*, 2020 WL 1812850 at *7-8 (same for

3    Mesa Verde detainee). Courts throughout the country have reached similar conclusions. *See,*

4    *e.g.*, *Rafael L.O. v. Tsoukaris*, No. 20-3481, 2020 WL 1808843 at *7 (D.N.J. Apr. 9, 2020)

5    (recognizing that "COVID-19, and its associated risks, is the difference maker—it changes the

6    equation in evaluating the government's legitimate objectives"); *Thakker v. Doll*, No. 1:20-cv-

7    480, 2020 WL 1671563 at *8 (M.D. Pa. Mar. 31, 2020) (same for ICE detainees in York County

8    Jail in Pennsylvania). ICE itself has recognized as much when it issued a statement recognizing

9    the need for alternatives to detention for *new arrestees* to protect public health.[38] Inexplicably,

10   however, ICE has refused to apply that same logic to its current detainees.

11           This is particularly troubling because it is well established that ICE has a range of highly

12   effective tools at its disposal to ensure that individuals report for court hearings and other

13   appointments, including conditions of supervision. *See Thakker*, 2020 WL 1671563 at *8

14   (noting "that ICE has a plethora of means *other than* physical detention at their disposal by

15   which they may monitor civil detainees and ensure that they are present at removal proceedings,

16   including remote monitoring and remote check-ins") (emphasis in original). These alternatives

17   to detention are highly effective: for example, a federally contracted evaluation of a program

18   that featured monitoring instead of immigration detention reported a 99% attendance rate at all

19   immigration court hearings and a 95% attendance rate at final hearings. *See* U.S. Gov't

20   Accountability Office, GAO-15-26, Alternatives to Detention: Improved Data Collection and

21   Analyses Needed to Better Assess Program Effectiveness 10-11 (Nov. 2014),

22   https://www.gao.gov/assets/670/666911.pdf; *see also Brief of 43 Social Science Researchers*

23   *and Professors as Amici Curiae in Support of Respondents*, at 36-37, *Jennings v. Rodriguez*,

24   2016 WL 6276890, (No. 15-1204) (discussing an alternatives to detention program studied in

25

26

27   _____

      [38] *See* ICE Guidance on COVID-19, https://www.ice.gov/covid19 (Apr. 17, 2020) (during pandemic, in many
28   circumstances ICE "will exercise discretion to delay enforcement actions until after the crisis or use alternatives to
      detention, as appropriate."), available at https://www.ice.gov/covid19.

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING
ORDER

2011 that saw fewer than 1% of participants removed from the program due to arrest by another law enforcement agency).

Plaintiffs and the proposed class are therefore likely to demonstrate that the government's interests could be satisfied by alternatives to detention and that their current detention in dangerous conditions is unconstitutionally excessive.

### b. Plaintiffs are also Likely to Prevail by Showing Defendants' Refusal to Ensure Adequate Social Distancing Constitutes Deliberate Indifference

People in government custody have a right to reasonable health and safety. *See Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982). "The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989).

As individuals who are detained for civil offenses, Plaintiffs need not prove "deliberate indifference" to prevail on a substantive due process claim. *Jones*, 393 F.3d at 933. Nonetheless, here, Defendants clearly are being deliberately indifferent to the substantial risks posed by COVID-19 within the congregate detention environments of Mesa Verde and YCJ. In contrast to the subjective Eighth Amendment standard, the Fifth Amendment deliberate indifference standard is purely objective. The government violates due process when "there is a substantial risk of serious harm" to Plaintiffs and the proposed class "that could [be] eliminated through reasonable and available measures that [Defendants] did not take" and that are likely to "caus[e] the injury the plaintiff [will] suffer[]." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016). Where Defendants are fully aware of the serious risks facing Plaintiffs and fail to take the only measures known to effectively mitigate those risks, they are deliberatively indifferent under the Fifth Amendment. *See, e.g.*, *J.P. v. Sessions*, 2019 WL 6723686 at *36 (C.D. Cal. Nov. 5, 2019) (finding the plaintiffs likely to succeed in proving the government was

1    deliberately indifferent where they presented evidence that immigration enforcement agencies

2    were aware of risks associated with a policy and implemented it anyways).

3          Here, Defendants have acted, and continue to act, with deliberate indifference to known

4    and obvious risks of COVID-19 transmission. On February 25, 2020, March 13, 2020, and

5    March 19, 2020, Defendants' own medical experts warned them that COVID-19 endangered

6    everyone in their custody and that "social distancing is essential to slow the spread of the

7    coronavirus to minimize the risk of infection." *See supra* Drs. Allen & Rich Letter (Mar. 19,

8    2020). On March 17, 2020, these same medical experts published an opinion piece in the

9    *Washington Post* explaining the need to act immediately to stem the spread of COVID-19 in

10   jails and prisons.[39] They warned Defendants that only release from custody on a large scale

11   could prevent calamity. Scores of medical experts, including the expert testimony in this case,

12   have subsequently agreed. Greifinger ¶¶ 47, 58; Hernandez ¶ 30; Mishori ¶¶ 22-23.

13   Respondents have disregarded their advice and instead adopted a series of half-measures that are

14   "patently insufficient to protect Petitioners." *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL

15   1481503, at *6-7 (S.D.N.Y. Mar. 26, 2020) (ordering release from immigration detention

16   because Defendants were deliberately indifferent to risk of COVID-19 infection); *see also*

17   *Castillo*, 2020 WL 1502864, at *5 (ordering release from Adelanto ICE Processing Center

18   because "Petitioners have not been protected. They are not kept at least 6 feet apart from others

19   at all times. They have been put into a situation where they are forced to touch surfaces touched

20   by other detainees, such as with common sinks, toilets, and showers.").

21         It is not possible to mitigate the risk of contracting COVID-19 in Mesa Verde and YCJ

22   without consistent social distancing. Greifinger ¶ 31 ("If there is inadequate social distancing,

23   hygiene and sanitation, there will almost certainly be infection and an outbreak."), ¶ 59 ("The

24   only way to avoid these unacceptable risk is to materially reduce the population, implement

25   social distancing as described herein, and ensure appropriate hygiene."). According to the CDC

26

27   [39] Josiah Rich *et. al*, *We must release prisoners to lessen the spread of coronavirus*, Washington Post (Mar. 17,

28   2020), https://www.washingtonpost.com/opinions/2020/03/17/we-must-release-prisoners-lessen-spread-coronavirus/.

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING
ORDER

a "cloth face cover is not a substitute for social distancing."[40] The uniform medical consensus, embraced by the CDC, maintains that even when vigilant hygiene and sanitation are maintained,[41] it simply is not possible to prevent contagion unless people can maintain a physical distance of at least six feet from one another at all times. Greifinger ¶47.

While Defendants have issued guidance to "promote" social distancing,[42] it is patently insufficient at Mesa Verde and YCJ, where social distancing is currently impossible. Greifinger Dec. ¶ 47 ("The measures outlined in ICE's April 10 Guidance are impossible to carry out given the limits of the infrastructure" at Mesa Verde and YCJ). Even if, as the guidance suggests, detention centers actually reduce their populations to 75% of capacity, Dr. Greifinger points out that "ICE provides no evidence that 70% of 75% capacity would facilitate effective social distancing within dormitories or cells, which requires that individuals maintain six feet of separation." Greifinger Dec. ¶ 48(a). As Judge Phillips just found in a case involving prisoners, "The County's assurances that it has provided unlimited free soap to prisoners and advised prisoners to remain physically distant—without establishing that it is physically possible to do so—is unlikely to be sufficient to defeat a claim of deliberate indifference . . . In sum, Defendant has failed to demonstrate that it is currently taking adequate precautions to protect the health of the prisoners in the country jails." *Gray v. Cty. of Riverside*, 5:13-cv-0444-VAP-OPx (C.D. Cal. Apr. 14, 2020), Order at *5 (ECF 191).

Similarly, courts have already found that ICE's current actions to date—which include providing free soap, increasing sanitation supplies, screening staff for body temperature, and encouraging good hygiene—do not satisfy Defendants' constitutional duty to mitigate the risk of harm to detainees in Mesa Verde and YCJ because they do not accommodate social distancing. *Doe*, 2020 WL 1820667 at *11 ("The petitioner cannot meaningfully protect himself at the Yuba County jail from the risks of his custody"); *Bahena Ortuño*, 2020 WL 1701724 at

---

[40] CDC, Coronavirus Disease 2019 (COVID-19) Protect Yourself: Know How It Spreads, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.
[41] Vigilant hygiene and sanitation are not possible at Mesa Verde and YCJ. *Supra* § II.C.
[42] ICE ERO COVID-19 Pandemic Response Requirements at 4, 13 (Apr. 10, 2020), available at https://www.ice.gov/covid1.

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

1  *4 (ordering release of petitioners with medical vulnerabilities because they "cannot practice

2  meaningful social distancing in [Mesa Verde and YCJ]").

3        The facts are clear: social distancing is the only meaningful measure to prevent the spread

4  of COVID-19 among the Plaintiff class. Social distancing is currently impossible in Mesa Verde

5  and YCJ. It will continue to be impossible in Mesa Verde and YCJ unless Defendants

6  significantly reduce the detained populations in each detention center. Mishori ¶¶ 22-23. The

7  law is also clear: because Defendants have failed to take known, available measures to mitigate

8  an obvious, substantial risk to Plaintiffs, the law is also clear: the conditions of Plaintiffs'

9  confinement violate due process. *See Castro*, 833 F.3d at 1071.

10       **B.      Plaintiffs Satisfy the Remaining Factors for Preliminary Relief**

11            **1.      Exposure to a Lethal Virus Which Lacks Any Vaccine,
                      Treatment, or Cure Constitutes Irreparable Harm**

12

13       "[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable

14  injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427

15  U.S. 347, 373 (1976)). Irreparable harm exists where government actions threaten an

16  individual's health. *See M.R. v. Dreyfus*, 663 F.3d 1100, 1111 (9th Cir. 2011), *as amended by*

17  697 F.3d 706 (9th Cir. 2012); *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1047, 1050

18  (9th Cir. 2008). Likewise, continued immigration detention under "substandard physical

19  conditions, [and] low standards of medical care" is a form of irreparable harm supporting

20  injunctive relief. *See Padilla v. ICE*, 953 F.3d 1134, 1148 (9th Cir. 2020). Defendants cannot

21  dispute that all adults face a risk of serious illness upon contracting COVID-19. Greifinger Dec.

22  ¶ 8, that social distancing is the only effective measure to prevent the spread of COVID-19,

23  Hernandez Dec. ¶ 12, and that social distancing will not be possible inside Mesa Verde and YCJ

24  without reducing the detained population. Greifinger Dec. ¶¶ 33-35. "Inadequate health and

25  safety measures at a detention center cause cognizable harm to every detainee at that center."

26  *Hernandez v. Wolf*, No. 20-cv-00617, slip op. at 8-9 (C.D. Cal. Apr. 1, 2020), *citing Parsons*,

27

28

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

754 F.3d at 679. The entire Plaintiff class is at risk or irreparable harm that can be remedied only be depopulating Mesa Verde and YCJ.

### 2. Public Interest and Balance of Equities Weigh Heavily in Plaintiffs' Favor

Plaintiffs' continued detention at current population levels "threatens the health of detainees, staff and the broader population." Greifinger Dec. ¶ 24. For these reasons, as in the cases where this Court has already granted relief, the balance of equities falls squarely in the Plaintiffs' favor. *See Doe*, 2020 WL 1920667 at *11; *Bent*, 2020 WL 1812850 at *7; *Bahena Ortuño*, 2020 WL 1701724 at *4.

As an initial matter, "[f]aced with . . . preventable human suffering, [the Ninth Circuit] ha[s] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (quotation omitted). Moreover, it is in both ICE's and the broader public interest to reduce the threat of an imminent COVID-19 outbreak at Mesa Verde and YCJ. ICE has an interest in preventing any potential spread of COVID-19 in its detention facility, which may then affect guards, visitors, attorneys, and others who may potentially interact with detainees. An outbreak of COVID-19 at Mesa Verde and YCJ would doubtless put significant pressure on or exceed the capacity of local health infrastructure. Hernandez Dec. ¶¶ 23 (stating that an outbreak at Mesa Verde or YCJ would likely "strain[] and overload[]" nearby emergency medical facilities) As a judge of this Court explained:

> [U]nder the highly unusual circumstances presented, i.e., a global pandemic of a type not seen within recent memory, the public interest is served by the requested injunction. Specifically, the public interest in promoting public health is served by efforts to contain the further spread of COVID-19, particularly in detention centers, which typically are staffed by numerous individuals who reside in nearby communities.

*Bahena Ortuño*, 2020 WL 1701724 at *4. Accordingly, the balance of equities favors Plaintiffs. To the extent ICE has public safety or flight concerns about any particular detainee, those can be accounted for through the alternatives to detention discusses above. *See supra* at 17-18.

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

### C.      Justice Requires Comprehensive Relief for the Class

"[T]he appropriate capacity of a jail during a pandemic obviously differs enormously from its appropriate capacity under ordinary circumstances." *Bent*, 2020 WL 1812850 at *4, *quoting Basank*, 2020 WL 1481503 at *6. There are hundreds of ICE detainees at Mesa Verde and YCJ. Should the Court deny Plaintiffs' motion for provisional class certification and a temporary restraining order, dozens of individual Mesa Verde and YCJ detainees will likely file claims for relief depending on their access to lawyers. Those individual petitions would vindicate individual Petitioners through release, but, given the time-consuming nature of individual habeas litigation, would leave hundreds of identically situated people detained under conditions that violate their due process rights. They also would constitute an enormous tax on this Court's resources, will likely take too long and would, at best, result in constitutional rights turning on the happenstance of whether a detainee has access to a lawyer, or on their language skills and education level. That is fundamentally unfair. *All* of the Proposed Class Members are at grave risk of COVID-19 infection under their current conditions of confinement, regardless of whether their circumstances permit them to file individual claims. The appropriate remedy for the system-wide crisis at Mesa Verde and YCJ is system-wide relief for all those whose rights are being violated.

Litigation on behalf of the detainees in both facilities, which share in the jurisdiction of the San Francisco ICE Field Office, also prevents absurd efforts that depopulate one facility but result in increased populations in the other, like transfers *between* the facilities. During the course of the COVID-19 pandemic, ICE has transferred detainees from YCJ to Mesa Verde, thus reducing the population in one while increasing the other, and unjustifiably placing the transferred detainee and detainees in the new facility at risk. Sanchez-Nunez ¶ 16 (detainee transferred from YCJ to Mesa Verde immediately introduced into general population).

Another district court recently certified a class of ICE detainees held at two detention centers in Bristol County, Massachusetts, recognizing that a systemic remedy was necessary "*in order to protect everyone* [in the facility] from the impending threat of mass contagion." *See Savino*, 2020 WL 1703844 at *7 (emphasis added). That court issued an order requiring a

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

reduction of the population of those detention centers on an expedited, individualized basis. *Id*. at 28.

Plaintiffs propose that this Court adopt a similar procedure, as set forth in the Proposed Order, by which claims for relief are processed fast enough that there is a chance social distancing could be established at Mesa Verde and YCJ before a serious outbreak occurs, but also allows this Court to assess the individual circumstances of detainees at Mesa Verde and YCJ and craft appropriate conditions of release. Of course, nothing in Plaintiffs' Proposed Order bars Defendants from implementing an alternative plan to rapidly reduce the populations to a level where they could implement social distancing at both facilities.

ICE, however, has steadfastly refused to implement such a system to date— leaving no doubt that this Court's intervention is desperately needed. This Court should grant the temporary restraining order, adopt Plaintiffs' proposal for considering release requests on an expedited basis, and keep that system in place until the Government takes the necessary steps to cease the ongoing system wide Fifth Amendment violation at Mesa Verde and YCJ.

## V.   **SECURITY**

"Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation marks and citation omitted). District courts routinely exercise this discretion to require no security in cases brought by indigent and/or incarcerated people. *See, e.g.*, *Toussaint v. Rushen*, 553 F. Supp. 1365, 1383 (N.D. Cal. 1983) (state prisoners); *Orantes–Hernandez v. Smith*, 541 F. Supp. 351, 385 n. 42 (C.D. Cal. 1982) (detained immigrants). This Court should do the same.

PETITIONERS-PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER

## VI.   **CONCLUSION**

This Court should grant Plaintiffs' motion and order ICE to release people from Mesa Verde and YCJ in order to facilitate social distancing.

Dated: April 20, 2020

Respectfully submitted,

/s/ William S. Freeman
William S. Freeman
Sean Riordan
Angélica Salceda
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA

Bree Bernwanger
Tifanei Ressl-Moyer
Hayden Rodarte
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA

Judah Lakin
Amalia Wille
LAKIN & WILLE LLP

Jordan Wells
Stephanie Padilla
Michael Kaufman
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA

Manohar Raju
Public Defender
Matt Gonzalez
Chief Attorney
Francisco Ugarte
Genna Ellis Beier
Emilou H. MacLean
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO

Martin S. Schenker
Timothy W. Cook
Francisco M. Unger
COOLEY LLP

*Attorneys for Petitioners-Plaintiffs*