DAVID L. ANDERSON (CABN 149604)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
WENDY M. GARBERS (CABN 213208)
ADRIENNE ZACK (CABN 291629)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7031
    FAX: (415) 436-6748
    adrienne.zack@usdoj.gov

Attorneys for Federal Defendants

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, *et al.*, <br><br>     Plaintiffs, <br><br>    v. <br><br> DAVID JENNINGS, *et al.*, <br><br>     Defendants. | Case No. 20-cv-02731 VC <br><br> **FEDERAL DEFENDANTS' OPPOSITION TO MOTIONS FOR TRO AND PROVISIONAL CLASS CERTIFICATION, AND MOTION TO STAY IN LIGHT OF *FRAIHART*** |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ....................................................................................................2

    A.    CDC and ICE Guidance................................................................................2

    B.    The Facilities................................................................................................2

        1.    Mesa Verde ICE Processing Facility. ............................................3

        2.    Yuba County Jail............................................................................6

LEGAL STANDARDS ............................................................................................................7

    A.    Preliminary Injunctive Relief Standards........................................................7

    B.    Class Certification Standards.......................................................................9

ARGUMENT ........................................................................................................................10

I.    UNDER THE FIRST-TO-FILE DOCTRINE, THIS ACTION SHOULD BE STAYED IN LIGHT OF *FRAIHAT*. ..................................................................10

II.    PLAINTIFFS HAVE FAILED TO MEET THEIR HEAVY BURDEN OF ESTABLISHING THAT THEY ARE ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF...............................................................................12

    A.    The Court Lacks Jurisdiction To Hear Petitioners' § 2241 Habeas Petition. ...................12

    B.    Plaintiffs Do Not Satisfy The Requirements For Preliminary Injunctive Relief. ..............14

        1.    Plaintiffs Are Unlikely To Succeed On The Merits............................................14

            (i)    Statutory Bases For Detention. ................................................15

            (ii)    Plaintiffs Have Not Established That The Conditions Of Their Confinement Violate The Fifth Amendment. ...........................16

            (iii)    Plaintiffs Have Not Established That They Are Being Subjected To Punishment. ..........................................................18

        2.    Plaintiffs Have Not Shown Irreparable Harm......................................................18

        3.    The Balance Of Interests And Public Interest Favors Respondents. .....................19

III.    THE REQUEST FOR PROVISIONAL CLASS CERTIFICATION SHOULD BE DENIED...............................................................................................20

    A.    No Class Should Be Certified In This Matter, Instead the Action Should Be Stayed In Light of *Fraihat*. ......................................................................20

    B.    Plaintiffs Cannot Establish Sufficient Commonality To Warrant Provisional Class Certification.................................................................20

C.      Plaintiffs Cannot Establish Sufficient Typicality To Warrant Class Certification. ...................................................................................................................23

D.      Plaintiffs Have Not Established Adequacy. ........................................................26

IV.    PLAINTIFFS' PROPOSED TRO IS UNWORKABLE AND UNLAWFUL. ...........................27

**V.**    OBJECTIONS TO PLAINTIFFS' DECLARATIONS ..................................................31

CONCLUSION.......................................................................................................................33

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Albino-Martinez v. Adducci*,
No. 2:20-cv-10893, 2020 WL 1872362 (E.D. Mich. April 14, 2020) .................................. 25

*Armentero v. INS*,
382 F.3d 1153 (9th Cir. 2004) ...................................................................................... 13

*Awshana v. Adducci*,
--- F. Supp. 3d ---, 2020 WL 1808906 (E.D. Mich. April 9, 2020) ................................. 25

*Baatz v. Columbia Gas Transmission, LLC*,
814 F.3d 785 (6th Cir. 2016) ................................................................................. 10, 20

*Barajas v. Lynch*,
No. LACV1604682VBFJEM, 2016 WL 4035677 (C.D. Cal. July 8, 2016) ...................... 13

*Basank v. Decker,* No. 20-cv-2518, ___ F. Supp. 3d ___,
2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ................................................................. 17

*Bent v. Barr,*
No. 19-cv-06123-DMR, 2020 WL 1812850 (N.D. Cal. Apr. 9, 2020) ......................... 17, 18

*Blackie's House of Beef, Inc. v. Castillo*,
659 F.2d 1211 (D.C. Cir. 1981) .................................................................................... 19

*Bodley v. Whirlpool Corp.*,
No. 17-CV-05436-JST, 2018 WL 2357640 (N.D. Cal. May 24, 2018) ........................... 12

*Bracy v. Gramley*,
520 U.S. 899 (1997)....................................................................................................... 27

*Caribbean Marine Services Co., Inc. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ........................................................................................ 19

*Castillo v. Barr*,
No. cv-20-00605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020).................................... 17

*Cau v. Lynch*,
No. CV1507601FMODTB, 2016 WL 1358656 (C.D. Cal. Feb. 16, 2016) ....................... 13

*Clardy v. Pinnacle Foods Grp., LLC*,
No. 16-CV-04385-JST, 2017 WL 57310 (N.D. Cal. Jan. 5, 2017) ............................. 10, 12

*Dada v. Witte*,
No. CV 20-1093, 2020 WL 1674129 (E.D. La. Apr. 6, 2020) ....................................... 14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).................................................................................................... 32

*Dawson v. Asher*,
  No. 20-cv-0409-JLR-MAT, 2020 WL 1304557 (W.D. Wash. March 19, 2020) .............. 16, 17, 19, 25

*Dawson v. Asher*,
  No. 20-cv-0409-JLR-MAT, 2020 WL 1704324 (W.D. Wash. Apr. 8, 2020) ......................... 16, 17, 19

*DeShaney v. Winnebago County Dept. of Social Services*,
  489 U.S. 189 (1989) ........................................................................................................... 17

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) .................................................................................................. 8

*Doe v. Barr*,
  No. 20-cv-02141-LB, 2020 WL 1820667 (N.D. Cal. Apr. 12, 2020) .................................... 17

*Douglas v. Barr*,
  No. 2:19-CV-10035-AB-MAA, 2019 WL 6310270 (C.D. Cal. Nov. 25, 2019) .................................. 13

*Earth Island Inst. v. Carlton*,
  626 F.3d 462 (9th Cir. 2010) .................................................................................................. 8

*Farmer v. Brennan*,
  511 U.S. 825 (1994) ...................................................................................................... 17, 19

*Flynt Distrib. Co., Inc. v. Harvey*,
  734 F.2d 1389 (9th Cir. 1984) .............................................................................................. 32

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) .................................................................................................. 8

*Gen. Tel. Co. v. Falcon*,
  457 U.S. 147 (1982) ............................................................................................................... 9

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .............................................................................................. 26

*Hassoun v. Searls*, --- F.,
  Supp. 3d ---, 2020 WL 1819670 (W.D.N.Y. April 10, 2020) .............................................. 25

*Henry v. Home Depot U.S.A., Inc*,
  No. 14-CV-04858-JST, 2016 WL 4538365 (N.D. Cal. Aug. 31, 2016) ....................... 11, 12

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018) .................................................................................................... 15, 21

*Jones v. Blanas*,
  393 F.3d 918 (9th Cir. 2004) ............................................................................................... 16

*Kohn Law Grp., Inc. v. Auto Parts Mfg. Mississippi, Inc.*,
  787 F.3d 1237 (9th Cir. 2015) ........................................................................................ 10, 11

*Landscape Specialists, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
  No. SACV191419JVSKESX, 2020 WL 968693 (C.D. Cal. Jan. 8, 2020) ........................... 10

*Los Angeles Memorial Coliseum Commission v. National Football League*,
  634 F.2d 1197 (9th Cir.1980) ............................................................................................... 19

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
  571 F.3d 873 (9th Cir. 2009) ................................................................ 8, 19

*Matter of Guerra*,
  24 I. & N. Dec. 37 (BIA 2006) ................................................................. 15

*Matter of Urena*,
  25 I. & N. Dec. 140 (BIA 2009) ............................................................... 16

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) .................................................................................... 8

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) .................................................................... 23

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................................. 19

*Ortuno v. Jennings*,
  No. 20-cv-02064-MMC, 2020 WL 1701724 (N.D. Cal. Apr. 8, 2020)............ 17, 18, 22, 24

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) .................................................................... 26

*Ramirez v. Culley*,
  No. 2:20-cv-609, 2020 WL 1821305 (D. Nev. April 9, 2020) ................... 25

*Renteria v. Sessions*,
  No. CV1801797PHXJATBSB, 2018 WL 5017001 (D. Ariz. Aug. 24, 2018)............ 13

*Republic of the Philippines v. Marcos*,
  862 F.2d 1355 (9th Cir. 1988) .................................................................. 32

*Rivera v. Holder*,
  307 F.R.D. 539 (W.D. Wash. 2015) ......................................................... 13

*Rovio Entertainment Ltd. v. Royal Plush Toys, Inc.*,
  907 F. Supp. 2d 1086 (N.D. Cal. 2012) ..................................................... 7

*Rumsfeld v. Padilla*,
  542 U.S. 426 (2004) ............................................................................ 12, 13

*Rutledge v. Elec. Hose & Rubber Co.*,
  511 F.2d 668 (9th Cir. 1975) ...................................................................... 9

*Sacal-Micha v. Longoria*,
  __F. Supp. 3d __, 2020 WL 1518861 (S.D. Tex. Mar. 27, 2020) .......... 17, 19, 24

*Saillant v. Hoover*,
  No. 1:20-cv-6090JPW, 2020 WL 1891854 (M.D. Pa. April 16, 2020)............ 25

*Saravia v. Sessions*,
  280 F. Supp. 3d 1168 (N.D. Cal. 2017) .................................................... 14

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
  739 F.2d 1415 (9th Cir. 1984) ............................................................... 8, 27

*Stanley v. Univ. of S. California*,
 13 F.3d 1313 (9th Cir. 1994) ........................................................................................... 8

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
 240 F.3d 832 (9th Cir. 2001) ........................................................................................... 7

*Tenrreiro v. Ashcroft*,
 No. CV 04-768-PA, 2004 WL 1588217 (D. Or. July 12, 2004)....................................... 13

*Thakker v. Doll*,
 ___ F.Supp.3d ___, 2020 WL 1671563 (M.D. Pa. March 31, 2020) ................................ 17

*Tomassi v. City of Los Angeles*,
 No. CV 08-1851 DSF SSX, 2008 WL 4722393 (C.D. Cal. Oct. 24, 2008) ........... 28, 29, 30

*Umarbaev v. Lowe*,
 No. 1:20-CV-00413, 2020 WL 1814157 (M.D. Pa. Apr. 9, 2020) ................................... 25

*United States ex rel. Jordan v. Northrop Grumman Corp.*,
 No. CV 95-2985 ABC, 2003 WL 27366247 (C.D. Cal. Feb. 24, 2003)............................ 32

*United States v. Martinez-Fuerte*,
 428 U.S. 543 (1976) ...................................................................................................... 19

*Verma v. Doll*,
 No. 4:20-cv-14, 2020 WL 1814149 (M.D. Pa. April 9, 2020) ........................................ 25

*Wairimu v. Dir., Dep't of Homeland Sec.*,
 No. 19-CV-174-BTM-MDD, 2019 WL 460561 (S.D. Cal. Feb. 5, 2019) ......................... 13

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011)................................................................................................. passim

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008)................................................................................................. 8, 11, 19

*Youngberg v. Romeo*,
 457 U.S. 307 (1982)................................................................................................. 16, 20

*Zinser v. Accufix Research Inst., Inc.*,
 253 F.3d 1180 (9th Cir. 2001) ........................................................................................ 9

**Statutes**

8 U.S.C. § 1182(d)(5) ............................................................................................................ 36

8 U.S.C. § 1225(b) ................................................................................................................ 36

8 U.S.C. § 1226(a) ................................................................................................................ 23

8 U.S.C. § 1226(c) ........................................................................................................... 22, 24

8 U.S.C. § 1226(c)(2) ............................................................................................................ 22

8 U.S.C. § 1231(a)(2) ............................................................................................................ 22

8 U.S.C. § 1231(a)(6) .................................................................................................... 23

28 U.S.C. § 2241(a) ...................................................................................................... 17

42 U.S.C. §§ 1320d ....................................................................................................... 41

28 U.S.C. § 2241(c)(3) ..................................................................................................... 7

**Rules**

Fed. R. Civ. P. 23(a) ..................................................................................................... 11

Fed. R. Civ. P. 23(a)(2) ................................................................................................. 33

Fed. R. Civ. P. 23(b)(2) ..................................................................................... 12, 39, 41

**Regulations**

8 C.F.R. § 236.1(c)(8) ............................................................................................ 23, 36

**Other Authorities**

*Class Certification in the Age of Aggregate Proof*,
    84 N.Y.U. L. Rev. 97 (2009) ................................................................................... 33

The Federal Defendants respectfully submit this opposition to plaintiff's motion for a temporary restraining order and motion for provisional class certification. (ECF 5, 6.) Defendants also move for a stay of this action, in light of the district court's nationwide provisional class certification and preliminary injunction in *Faour Abdallah Fraihat, et al. v. U.S. Immigration and Customs Enforcement, et al.*, No. 19-1546 JGB (C.D. Cal.).

## INTRODUCTION

Plaintiffs seek to certify a class of all civil immigration detainees at Yuba County Jail ("YCJ") and Mesa Verde ICE Processing Facility ("MVDF") (with subclasses for each facility) and seek an unworkable and improper temporary restraining order that establishes a system by which defendants would be required to disclose confidential medical information to counsel for plaintiffs, as putative class counsel, without the permission of putative class members, and which will allow plaintiffs' counsel to pick and choose at their discretion which detainees will be presented to this Court for consideration for release. Rather than grant this extraordinary and improper relief, the Court should stay this matter under the first-to-file doctrine in light of *Fraihat, et al. v. U.S. Immigration and Customs Enforcement, et al.*, No. 19-1546 JGB (C.D. Cal.), which is nation-wide class action, in which a preliminary injunction has been entered that orders relief that overlaps with the relief sought by plaintiffs here.

Moreover, the Court does not have jurisdiction over this matter because plaintiffs are confined in the Eastern District of California and plaintiffs' immediate custodians are in the Eastern District of California. This case should therefore be dismissed or transferred. If the Court proceeds with this case, it should deny plaintiffs' motion for a temporary restraining order and for provisional class certification. A temporary restraining order is not required because defendants are not violating plaintiffs' Fifth Amendment rights, and plaintiffs have not shown irreparable harm. Defendants are adequately protecting plaintiffs and have taken substantial steps to reduce populations at YCJ and MVDF, screen detainees and individuals entering the facilities, increase sanitization, provide masks, and numerous other measures. There are currently no suspected or confirmed cases of COVID-19 at either facility. Finally, the proposed class and subclasses lack commonality and typicality because plaintiffs are not seeking common relief for all class members but rather individualized release determinations.

**FACTUAL BACKGROUND**

**A.      CDC and ICE Guidance.**

The Centers for Disease Control (CDC) has issued Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (dated March 23, 2020, available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf).

On April 10, 2020, ICE released its ERO COVID-19 Pandemic Response Requirements (PRR), a guidance document that builds upon previously issued guidance and sets forth specific mandatory requirements to be adopted by all detention facilities housing ICE detainees, as well as best practices for such facilities, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this pandemic. *See* Declaration of Erik Bonnar (submitted herewith) ¶ 7; Declaration of Polly E. Kaiser (submitted herewith) ¶ 7; PRR available at https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

**B.      The Facilities.**

Pursuant to contracts with ICE, the Mesa Verde Detention Facility (MVDF) and the Yuba County Jail (YCJ) house immigration detainees. The clinical health care services at both facilities are overseen by Field Medical Coordinators (FMCs), who work for the ICE Health Service Corps (IHSC). 3/27/20 Declaration of Capt. Jennifer Moon (MVDF), attached as Exhibit A to the Declaration of Erik Bonnar, ¶¶ 1-2; 3/26/20 Declaration of Capt. Jennifer Moon (YCJ), attached as Exhibit A to the Declaration of Polly E. Kaiser, ¶¶ 1-2. IHSC comprises a multidisciplinary workforce that consists of U.S. Public Health Service Commissioned Corps officers, federal civil servants, and contract health professionals. Bonnar Dec., Exh. A ¶ 4; Kaiser Dec., Exh. A ¶ 4. IHSC's FMCs do not provide hands-on care or direct the care at MVDF or YCJ, but instead ensure that the provision of medical care by the facilities' contractors meets detention standards, as required by ICE's contracts with the facilities. Bonnar Dec., Exh. A ¶ 3; Kaiser Dec., Exh. A ¶ 3. ICE is in daily contact with both facilities, and ICE staff is on site daily at MVDF. Bonnar Dec. ¶ 14; Kaiser Dec. ¶ 11.

Since the onset of reports of COVID-19, ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on

screening and management of potential exposure among detainees.  Bonnar Dec., Exh. A ¶ 5; Kaiser Dec., Exh. A ¶ 5.

In testing for COVID-19, IHSC is also following CDC guidance to safeguard those in its custody and care.  Bonnar Dec., Exh. A ¶ 6; Kaiser Dec., Exh. A ¶ 6.  Both MVDF and YCJ have testing capability.  Bonnar Dec. ¶ 12; Kaiser Dec. ¶ 10(m).

Despite the spread of COVID-19 in the general population, neither of the facilities at issue currently has any suspected or confirmed COVID-19 cases.  Bonnar Dec. ¶ 13; Kaiser Dec. ¶ 12; *see also* https://www.ice.gov/coronavirus (last visited April 24, 2020).

In response to the COVID-19 pandemic, ICE has taken affirmative steps to reduce the number of immigration detainees at MVDF and YCJ to 75 percent or less of capacity by reconsidering custody determinations and parole requests, and issuing orders of supervision on release for those aliens who are not subject to mandatory custody, do not pose a danger to the community or flight risk, and/or there is no significant likelihood of removal in the foreseeable future.  Bonnar Dec. ¶ 8; Kaiser Dec. ¶ 8; *see also* PRR, available at https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf, p.13 ("Efforts should be made to reduce the population to approximately 75% of capacity").  ICE will continue to evaluate for potential release those individuals who may be at high risk for COVID-19.  Bonnar Dec. ¶ 9; Kaiser Dec. ¶ 8.  Indeed, ICE has informed the undersigned that plaintiffs Angel de Jesus Zepeda Rivas and Luciano Gonzalo Mendoza Jeronimo were released on April 24, 2020.[1]

In addition, both facilities have provided masks to detainees, and are taking various other measures to promote sanitation, screening, social distancing, and quarantine.  Bonnar Dec. ¶¶ 10-12 & Exh. A ¶¶ 8-12, 15-20; Kaiser Dec. ¶¶ 9-11 & Exh. A ¶¶ 7-11, 14-19.

### 1.     Mesa Verde ICE Processing Facility.

MVDF is a private detention center owned and managed by The GEO Group, Inc., an independent contractor.  Bonnar Dec. ¶ 5.

Since the World Health Organization (WHO) declared COVID-19 a global pandemic on March

---

[1] Undersigned counsel was informed of this information too late to prepare a declaration.

11, 2020, ICE has taken affirmative steps to reduce the number of detainees at MVDF by reconsidering custody determinations and parole requests, and issuing orders of supervision on release for those aliens who are not subject to mandatory custody, do not pose a danger to the community or flight risk, and/or there is no significant likelihood of removal in the foreseeable future. Bonnar Dec. ¶ 8. ICE has reduced the MVDF detainee population to less than 75 percent of its capacity, and will continue to evaluate for potential release those individuals who may be at high risk for COVID-19. *Id.* ¶¶ 8-9. As relevant specific information is provided on any particular detainee, ICE may exercise its discretion to release the detainee, provided he or she is not subject to mandatory custody, a danger to the community, or deemed a flight risk such that measures for alternatives to detention are inappropriate. *Id.* ¶ 9.

Medical care and screening at MVDF is provided by the GEO medical staff onsite, and is overseen by IHSC. *Id.* ¶ 6. The following screening and isolation procedures are in place for detainees at the MVDF facility. Each detainee is medically screened upon admission, including travel history, medical history, and body temperature. Bonnar Dec., Exh. A ¶¶ 7-8, 18. Detainees are also assessed for respiratory illness, and asked about contact with COVID-19-infected individuals, as well as travel through areas with sustained community transmission. *Id.* ¶ 8. Based on the results, the detainee may be monitored or isolated. *Id.* ¶ 9. Detainees presenting symptoms compatible with COVID-19 will be placed in isolation, where they will be tested; if they test positive, they will remain isolated and be treated. *Id.* In case of clinical deterioration, they will be referred to a local hospital. *Id.* Detainees who have known exposure to a person with COVID-19, but are themselves asymptomatic, are placed in cohorts with restricted movement for the 14-day incubation period, and are monitored daily for fever and respiratory illness symptoms. *Id.* ¶ 10. Those who show onset of fever and/or respiratory illness are referred to a medical provider. *Id.* Per ICE policy, detainees diagnosed with any communicable disease who require isolation are placed in an appropriate setting in accordance with CDC or state and local health department guidelines. *Id.* Detainees with signs and symptoms consistent with COVID-19 will be housed in the negative isolation room with enhanced respiratory droplet nuclei precaution for the staff. *Id.* ¶ 11. MVDF has identified housing units for quarantine in accordance with these procedures. *Id.* ¶ 20.

In addition, all detainees have been given surgical masks as of April 20, 2020. Bonnar Dec. ¶

11(d).  The detainees have been educated on proper usage of masks.  *Id.*  The masks will be replaced every Monday, Wednesday and Friday, supplies permitting.  *Id.*

MVDF medical staff are required to wear surgical masks at all times, and to wear N95 masks during patient encounters.  *Id.* ¶ 11(e).  Medical staff also have their temperatures taken daily on-site.  *Id.*  MVDF has the capability to conduct on-site testing of COVID-19; to date, the medical staff have not conducted any testing for COVID-19 since they have not encountered any detainee experiencing symptoms consistent with COVID-19.  *Id.* ¶ 12.  In order to promote social distancing, the MVDF medical staff is only seeing one detainee in the medical unit at a time, and is also limiting seating in the waiting area to one detainee at a time.  *Id.*  If it is necessary for any detainee to depart the facility for any off-site appointment, his or her temperature is screened before any departure from the facility and after his or her return to the facility.  *Id.*

All social visits have stopped, and legal visitors, staff, and vendors are screened when they enter MVDF.  Bonnar Dec., Exh. A ¶¶ 16-17.  Detainees have telephone access to attorneys, and any legal visitor requesting an in-person visit is required to wear protective gear.  Bonnar Dec., Exh. A ¶ 16.

MVDF has increased sanitation frequency, including frequent cleaning of all common area high contact surfaces, such as door handles, telephones, dining halls, and medical areas, which is being conducted throughout the day.  Bonnar Dec. ¶ 11(b).  Sanitation supplies are provided, including, but not limited to, soap, all-purpose cleaner, disinfectant, and a bathroom-specific cleaning solution.  *Id.* at ¶ 11(c).  Each detainee is provided a bar of soap, which may be replaced upon request when used up.  *Id.*  Each detainee has access to liquid soap available in soap dispensers near wash basins in each dormitory.  *Id.*  The facility has installed an additional four soap dispensers in each dormitory for a total of five total.  *Id.*  Staff also have access to soap and hand sanitizer.  *Id.*

The facility provides education on COVID-19 to staff and detainees (including townhalls, postings throughout the facility, and electronic messages to detainees through tablets), and provides detainees daily access to sick call.  Bonnar Dec. ¶ 11(a) & Exh. A ¶ 19.

Finally, MVDF has staggered beds in its Dorm A and Dorm B in order to increase distancing between detainees.  The same will be done in the remaining dormitories when space permits.  Bonnar Dec. ¶ 11(f).

### 2. Yuba County Jail.

YCJ is a county-owned and operated facility that houses both county jail inmates and ICE detainees. Kaiser Dec. ¶ 5.

Since the World Health Organization (WHO) declared COVID-19 a global pandemic on March 11, 2020, ICE has taken affirmative steps to reduce the number of detainees at YCJ by reconsidering custody determinations and parole requests, and issuing orders of supervision on release for those aliens who are not subject to mandatory custody, do not pose a danger to the community or flight risk, and/or there is no significant likelihood of removal in the foreseeable future. Kaiser Dec. ¶ 8. The current population at YCJ, including both ICE detainees and county inmates, is at 64 percent of its capacity. *Id.* ICE will continue to evaluate for potential release those individuals who may be at high risk for COVID-19. *Id.* As relevant specific information is provided on any particular detainee, ICE may exercise its discretion to release the detainee, provided he or she is not subject to mandatory custody, a danger to the community, or deemed a flight risk such that measures for alternatives to detention are inappropriate. *Id.*

Medical care and screening at YCJ is provided by the contract medical staff onsite, and is overseen by IHSC. Kaiser Dec. ¶ 6. The following screening and isolation procedures are in place for detainees at YCJ. Each detainee is medically screened upon admission, including travel history, medical history, and body temperature. Kaiser Dec., Exh. A ¶¶ 7-8, 17. Detainees are also assessed for respiratory illness, and asked about contact with COVID-19-infected individuals, as well as travel through areas with sustained community transmission. *Id.* ¶ 8. Based on the results, the detainee may be monitored or isolated. *Id.* ¶ 9. Detainees presenting symptoms compatible with COVID-19 will be placed in isolation, where they will be tested; if they test positive, they will remain isolated and be treated. *Id.* In case of clinical deterioration, they will be referred to a local hospital. *Id.* Detainees who have known exposure to a person with COVID-19, but are themselves asymptomatic, are placed in cohorts with restricted movement for the 14-day incubation period, and are monitored daily for fever and respiratory illness symptoms. *Id.* ¶ 10. Those who show onset of fever and/or respiratory illness are referred to a medical provider. *Id.* Per ICE policy, detainees diagnosed with any communicable disease who require isolation are placed in an appropriate setting in accordance with CDC or state and local

health department guidelines.  *Id.*  YCJ has identified housing units for quarantine in accordance with these procedures.  *Id.* ¶ 19.

The facility has provided masks to all detainees, and staff at the facility are required to wear masks at all times (including N95 masks for medical staff in contact with quarantined detainees).  Kaiser Dec. ¶ 10(j)-(l).

In addition, YCJ has suspended in-person social visitation and facility tours.  *Id.* ¶ 9.  Attorney contact visits are discouraged, and YCJ continues to provide detainees telephonic access to attorneys.  *Id.*  All staff, vendors, and attorneys are screened upon entry.  Kaiser Dec., Exh. A ¶ 16.  YCJ has increased sanitation frequency and provided sanitation supplies: The facility is sanitized twice daily, additional cleaning supplies have been offered to detainees, two handwashing stations have been added, and each detainee is issued a bar of soap that may be replaced once used up.  Kaiser Dec. ¶ 10(g)-(i) & Exh. A ¶ 14.

The facility provides education on COVID-19 to staff and detainees (including postings in English and Spanish on proper handwashing and other preventative measures, as well as videos on handwashing and sanitizing common surfaces), and provides detainees daily access to sick calls.  Kaiser Dec. ¶ 10(e)-(f) & Exh. A ¶¶ 11, 18.

## LEGAL STANDARDS

### A.     Preliminary Injunctive Relief Standards.

Federal district courts may grant writs of habeas corpus if the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

The standard for issuing a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction.[2]  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "A restraining order is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Rovio Entertainment Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1093 (N.D. Cal. 2012) (Armstrong, J.) (internal quotation omitted).

---

[2] Pursuant to the Court's order (ECF No. 33), Defendants advise that the Court may consider the motion for temporary restraining order as one for a preliminary injunction.  However, the Court should deny the motion no matter the type of order or injunction sought.

Preliminary injunctions are "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). "[P]laintiffs seeking a preliminary injunction face a difficult task in proving that they are entitled to this extraordinary remedy." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (internal quotation omitted). Plaintiffs' burden is aptly described as a "heavy" one. Id. A preliminary injunction requires "substantial proof" and a "'clear showing'" that it is warranted. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis original; internal quotation omitted).

"A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal quotation omitted). Alternatively, a plaintiff can show that there are "serious questions going to the merits and the balance of hardships tips sharply towards [plaintiff], as long as the second and third *Winter* factors are satisfied." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal quotation omitted).

The purpose of preliminary injunctive relief is to preserve the status quo pending final judgment, rather than to obtain a preliminary adjudication on the merits. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). "A preliminary injunction can take two forms." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009). "A prohibitory injunction prohibits a party from taking action and 'preserves the status quo pending a determination of the action on the merits.'" *Id.* (internal quotation omitted). "A mandatory inunction orders a responsible party to take action." *Id.* at 879 (internal quotation omitted). "A mandatory injunction goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored." *Id.* (internal quotation omitted). "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases." *Id.* (internal quotation omitted). Where a plaintiff seeks mandatory injunctive relief, "courts should be extremely cautious." *Stanley v. Univ. of S. California*, 13 F.3d 1313, 1319 (9th Cir. 1994) (internal quotation omitted). Thus, in a mandatory injunction request, the moving party "must establish that the law and facts clearly favor her position, not simply that she is likely to succeed." *Garcia*, 786 F.3d at 740 (emphasis original).

Here, rather than preserving the status quo, Plaintiffs seek mandatory injunctive relief in the form

of an order requiring a process for release. Plaintiffs do not even meet the standard for prohibitory preliminary injunctive relief, let alone the heightened standard for a mandatory injunction.

### B. Class Certification Standards.

A party seeking certification of a proposed class must demonstrate the existence of the four required elements set forth in Rule 23(a) of the Federal Rules of Civil Procedure.

Specifically, the moving party must show that: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the named plaintiffs are typical of claims or defenses of the class ("typicality"); and (4) the named plaintiffs will fairly and adequately protect the interests of the class ("adequacy of representation"). *See* Fed. R. Civ. P. 23(a); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011) ("Class certification is governed by Federal Rule of Civil Procedure 23."). In addition to meeting the requirements set forth in Rule 23(a), the proposed class must also qualify under Rule 23(b)(1), (2), or (3). *Dukes*, 564 U.S. at 345; *see also Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Plaintiffs seek certification under Rule 23(b)(2). (ECF 6 at 18.) Rule 23(b)(2) permits class actions for declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds that generally apply to the class." Fed. R. Civ. P. 23(b)(2). The "key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (citation omitted).

The party seeking class certification bears the burden of demonstrating that it has met all four Rule 23(a) prerequisites and that the class lawsuit falls within one of the three types of actions permitted under Rule 23(b). *Zinser*, 253 F.3d at 1186. Moreover, the failure to meet "any one of Rule 23's requirements destroys the alleged class action." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975). The Supreme Court has held that "actual, not presumed, conformance with Rule 23(a) [is] indispensable." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982); *Dukes*, 564 U.S. at 350 (Rule 23 "does not set forth a mere pleading standard."). A court should only certify a class "if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Dukes*, 564 U.S. at 350-51 (internal quotation omitted).

**ARGUMENT**

I.  **UNDER THE FIRST-TO-FILE DOCTRINE, THIS ACTION SHOULD BE STAYED IN LIGHT OF *FRAIHAT*.**

The instant putative class action substantially overlaps with *Fraihat, et al. v. U.S. Immigration and Customs Enforcement, et al.*, No. 19-1546 JGB (C.D. Cal.).  *See* ECF No. 26-1 (order granting motions for class certification and preliminary injunction).  Not only was *Fraihat* first filed, but there has already been a provisional class certification order and preliminary injunction entered therein, which includes members of the proposed class in this case.  Under the first-to-file doctrine, this action should be stayed pending *Fraihat*.  Defendants are filing a motion to stay concurrently with this brief.  Moreover, the preliminary injunction that has already been issued in *Fraihat*, which covers the MVDF and YCJ facilities at issue in this motion, removes the exigency of this matter and counsels against granting the expedited relief plaintiffs seek.

"The first-to-file rule allows a district court to stay proceedings if a similar case with substantially similar issues and parties was previously filed in another district court."  *Kohn Law Grp., Inc. v. Auto Parts Mfg. Mississippi, Inc.*, 787 F.3d 1237, 1239 (9th Cir. 2015); *see also Clardy v. Pinnacle Foods Grp., LLC*, No. 16-CV-04385-JST, 2017 WL 57310, at *2 (N.D. Cal. Jan. 5, 2017) ("The first-to-file rule allows a district court to transfer, stay, or dismiss an action when a similar complaint has already been filed in another federal court.").  "The purpose of the well-established first-to-file rule is to promote efficiency and to avoid duplicative litigation and thus it should not be lightly disregarded."  *Clardy*, at *2.  "When applying the first-to-file rule, courts should be driven to maximize 'economy, consistency, and comity.'"  *Kohn Law Grp., Inc.*, 787 F.3d at 1240.

The rule applies with particular force in putative class actions.  "Litigating a class action requires both the parties and the court to expend substantial resources.  Perhaps the most important purpose of the first-to-file rule is to conserve these resources by limiting duplicative cases."  *Baatz v. Columbia Gas Transmission, LLC*, 814 F.3d 785, 791 (6th Cir. 2016).  The first-to-file rule also avoids the potential for inconsistent judgments.  *See Landscape Specialists, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. SACV191419JVSKESX, 2020 WL 968693, at *4 (C.D. Cal. Jan. 8, 2020) ("staying the case will serve the purposes of the first-to-file rule by promoting judicial efficiency and avoiding inconsistent

judgments").  Significantly, the rule "does not only apply when the allegations and parties are exactly the same."  *Henry v. Home Depot U.S.A., Inc*, No. 14-CV-04858-JST, 2016 WL 4538365, at *4 (N.D. Cal. Aug. 31, 2016).  "The issues in both cases also need not be identical, only substantially similar."  *Kohn Law Grp., Inc.*, 787 F.3d at 1240.

The instant lawsuit is substantially similar to *Fraihat*.  Both lawsuits are brought against ICE and concern whether ICE has taken sufficient measures to protect detainees from COVID-19.  Plaintiffs here argue that a "systemic remedy" is needed at MVDF and YCJ in order to address the COVID-19 crisis.  (*See, e.g.,* ECF 5 at p. 29.)  That is precisely what *Fraihat* provides.  In its April 20, 2020 order provisionally certifying a nationwide class of detainees in ICE detention and entering a temporary restraining order, the *Fraihat* court mandated a "system-wide" response to COVID-19.  (ECF 26-1 at p. 24 (p. 23 of *Fraihat* order) ("the common question driving this case is whether Defendants' system-wide response—or lack of one—to COVID-19 violates Plaintiffs' rights").)  The class provisionally certified in *Fraihat* is nationwide (*id.* at p. 22 (p. 21 of *Fraihart* order), and thus applies to the MVDF and YCJ facilities at issue here.

The *Fraihat* court ordered injunctive relief that encompasses further reduction of the MVDF and YCJ populations to allow for greater social distancing and that also requires implementation of additional precautions to protect all detainees from COVID-19.  This is the same type of relief that plaintiffs seek here.  Specifically, the *Fraihat* order requires that ICE:

- "identify and track all ICE detainees with Risk Factors" and reconsider whether these detainees should be released, taking into account "the willingness of the detainees with Risk Factors to be released, and other information on post-release planning";

- "promptly issue a performance standard or a supplement to their Pandemic Response Requirements . . . defining the minimum acceptable detention conditions for detainees with the Risk Factors"; and

- "monitor and enforce facility-wide compliance with the Pandemic Response Requirements and the Performance Standard," which provide for a comprehensive approach to ensure that conditions at the detention facilities appropriately protect all detainees from COVID-19.  (ECF 26-1 at pp. 39-40 (pp. 38-39 of *Fraihat* order).)

The relief the *Fraihat* court has already ordered at MVDF and YCJ substantially overlaps with the relief that plaintiffs seek here—an order requiring "ICE to release people from Mesa Verde and YCJ in order to facilitate social distancing." (ECF 5 at p. 31; *see also* ECF 5-7 (plaintiff's proposed TRO, which provides for an individualized release assessment based on putative class members' "current medical conditions".))

The first-to-file rule does not permit these overlapping putative class actions to proceed in tandem. *Fraihat* was filed first and is substantially further along than this case, which was just filed on April 20, 2020. The *Fraihat* court has already entered a preliminary injunction, which provides similar COVID-19 relief to that requested by plaintiffs here. Under the first-to-file doctrine, this action should be stayed in deference to *Fraihat*. *See Henry*, 2016 WL 4538365, at *1 (applying first-to-file rule to "two overlapping class actions against Home Depot"); *Clardy*, 2017 WL 57310, at *1 (staying N.D. Cal. putative class action in deference to "putative class action in Illinois involv[ing] the same Defendant, overlapping putative classes, and substantially similar issues"); *Bodley v. Whirlpool Corp.*, No. 17-CV-05436-JST, 2018 WL 2357640, at *2 (N.D. Cal. May 24, 2018) (applying first-to-file rule to two "substantially similar" class actions, even though "the two lawsuits [were] not identical"). Doing so will both promote efficiency and protect the government from being subjected to inconsistent orders.

## II. PLAINTIFFS HAVE FAILED TO MEET THEIR HEAVY BURDEN OF ESTABLISHING THAT THEY ARE ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF.

If the Court declines to stay this case, the Court should deny plaintiffs' motion for a temporary restraining order.

### A. The Court Lacks Jurisdiction To Hear Petitioners' § 2241 Habeas Petition.

Plaintiffs are detained in facilities in the Eastern District of California. Accordingly, this Court lacks jurisdiction over their habeas petition. "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241(a). The Supreme Court has made clear that in "core" habeas petitions—petitions like this one that challenge the petitioner's physical confinement—the petitioner must file the petition in the district in which he is confined and name his immediate custodian as the respondent. *See Rumsfeld v. Padilla*, 542 U.S. 426, 437 (2004). In its analysis of the proper forum for habeas challenges to present

confinement, the Supreme Court examined "two related subquestions." *Id.* at 434. First, it decided who is the proper respondent, and concluded was the "warden of the facility where the [petitioner] is being held." *Id.* at 435. Second, the Court examined whether the federal district court in which the petition is filed has "territorial jurisdiction," *i.e.*, because the "immediate custodian and the [petitioner] reside" there. *Id.* at 444.

The Court's analysis of these two subquestions led it to conclude that the federal habeas statute requires a habeas petitioner to challenge his detention in the district in which he is confined:

> The proviso that district courts may issue the writ only "within their respective jurisdictions" forms an important corollary to the immediate custodian rule in challenges to present physical custody under § 2241. Together they compose a simple rule that has been consistently applied in the lower courts, including in the context of military detentions: Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement.

*Id.* at 446-47 (citation omitted). In so doing, the Supreme Court rejected the "legal reality of control" standard and held that legal control over the detained individual does not determine the proper respondent in a habeas petition that challenges present physical confinement. *Id.* at 437-40.

Since the Supreme Court's decision in *Padilla*, the Ninth Circuit has not addressed the immediate custodian and district of confinement rule in the immigration context. A decision issued just prior to *Padilla*, which had relaxed the immediate physical custodian requirement in immigration habeas cases, was withdrawn. *See Armentero v. INS*, 382 F.3d 1153 (9th Cir. 2004). District courts in this circuit have divided over the question.[3] Defendants recognize that this Court has concluded that this district could be proper for an immigration-related habeas petition filed by a petitioner physically confined in the Eastern

---

[3] *Compare, e.g.*, *Douglas v. Barr*, No. 2:19-CV-10035-AB-MAA, 2019 WL 6310270, at *3 (C.D. Cal. Nov. 25, 2019) ("This Court is not authorized to issue a writ of habeas corpus directed outside its territorial jurisdiction."); *Wairimu v. Dir., Dep't of Homeland Sec.*, No. 19-CV-174-BTM-MDD, 2019 WL 460561, at *2 (S.D. Cal. Feb. 5, 2019); *Barajas v. Lynch*, No. LACV1604682VBFJEM, 2016 WL 4035677, at *1 (C.D. Cal. July 8, 2016) (holding that habeas petition for individual detained at MVDF must be filed in the Eastern District of California); *Tenrreiro v. Ashcroft*, No. CV 04-768-PA, 2004 WL 1588217, at *1 (D. Or. July 12, 2004) (finding that an immigration detainee in Tacoma, Washington, must file petition in the Western District of Washington, not Oregon, and name the Tacoma warden); *with, e.g.*, *Renteria v. Sessions*, No. CV1801797PHXJATBSB, 2018 WL 5017001, at *3 (D. Ariz. Aug. 24, 2018) (allowing the Attorney General and DHS Secretary to be named as custodians); *Cau v. Lynch*, No. CV1507601FMODTB, 2016 WL 1358656, at *3 (C.D. Cal. Feb. 16, 2016), report and recommendation adopted, No. CV1507601FMODTB, 2016 WL 1354947 (C.D. Cal. Apr. 4, 2016); *Rivera v. Holder*, 307 F.R.D. 539, 544 n.1 (W.D. Wash. 2015) (finding the immediate custodian rule inapplicable and allowing the Attorney General and DHS Secretary as custodians).

District of California post-*Padilla*. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1183 (N.D. Cal. 2017). Plaintiffs' circumstances are distinguishable from those that led the Court to allow a San Francisco Immigration Official to be named in *Saravia*. First, the Court held that "a petitioner held in federal detention in a non-federal facility pursuant to a contract should sue the federal official most directly responsible for overseeing that contract facility when seeking a habeas writ." *Id.* at 1185. Here, the ICE official most directly responsible for overseeing the contract facility at YCJ is Assistant Field Office Director Dana Fishburn, who is assigned to the Sacramento Sub-Office, located in the Eastern District of California. *See* Declarations of Dana Fishburn ¶¶ 1-2, submitted herewith. The ICE official most directly responsible for overseeing the contract facility at MVDF is Assistant Field Office Director Alexander Pham, who is assigned to the Bakersfield Sub-Office, located in the Eastern District of California. *See* Declaration of Alexander Pham ¶ 1, submitted herewith. Second, unlike *Saravia,* in which petitioners challenged the fact of their detention, this petition is a challenge of the conditions of confinement in YCJ and MVDF, over which the actual wardens of YCJ and MVDF have control.

Therefore, venue is improper in this judicial district because plaintiffs' immediate custodians (the Warden of MVDF and the Sheriff of Yuba County and/or the AFOD responsible for YCJ and MVDF), as well as the detention centers where plaintiffs are housed, are located in the Eastern District of California. *See Dada v. Witte*, No. CV 20-1093, 2020 WL 1674129, at *3 (E.D. La. Apr. 6, 2020) (rejecting argument that New Orleans ICE Field Office was the immediate custodian, as opposed to the warden of each facility where each plaintiff was held). Thus, only the U.S. District Court for the Eastern District of California has jurisdiction over plaintiffs' challenge to their detention.

**B.      Plaintiffs Do Not Satisfy The Requirements For Preliminary Injunctive Relief.**

**1.      Plaintiffs Are Unlikely To Succeed On The Merits.**

Defendants have taken substantial steps to protect the detainees at MVDF and YCJ, including the promotion of social distancing at the facilities. See Bonnar Dec. ¶¶ 8 (MVDF population is at less than 75 percent of capacity), 11(f) (beds in Dorms A and B have been staggered); Kaiser Dec. ¶ 8 (YCJ population is at 64 percent of capacity). ICE has exercised its discretion to reduce the detainee populations at the facilities by releasing eligible detainees with underlying medical conditions. Bonnar Dec. ¶¶ 8-9, 15; Kaiser Dec. ¶¶ 8, 13. Defendants have also provided masks to the detainees,

implemented screening procedures for detainees and staff, and taken various other measures to protect them from the pandemic.  Bonnar Dec. ¶¶ 11-12; Kaiser Dec. ¶¶ 10-11.  As of April 24, 2020, there are no suspected or confirmed cases of COVID-19 at either YCJ or MVDF.  Bonnar Dec. ¶ 13; Kaiser Dec. ¶ 12,

### (i)        Statutory Bases For Detention.

Many of the plaintiffs are detained under 8 U.S.C. § 1226(c) and § 1231, which mandate detention pending completion of removal proceedings or during the removal period.  Congress has expressly prohibited release for individuals detained under 8 U.S.C. §§ 1226(c) or 1231.

When Section 1226(c) governs detention, the government "may release" the detainee "only if" release is "necessary" for witness-protection purposes and "the alien satisfies the [Secretary of Homeland Security]" that he "will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding."  8 U.S.C. § 1226(c)(2).  Outside of the narrow circumstances of release for witness protection purposes, Congress has determined that these individuals must not be released from detention pending removal, even on bond.  The Supreme Court has emphasized that Section 1226(c) "mandates detention of any alien falling within its scope and that detention may end prior to the conclusion of removal proceedings 'only if' the alien is released for witness-protection purposes." *Jennings v. Rodriguez*, 138 S. Ct. 830, 847 (2018).

For aliens who have final removal orders, custody is generally mandatory during the removal period under 8 U.S.C. § 1231(a)(2).  Once the removal period has expired, custody becomes discretionary under 8 U.S.C. § 1231(a)(6), and release on supervision may be appropriate if there is no significant likelihood of removal in the foreseeable future.

In contrast, an immigration detainee held under 8 U.S.C. § 1226(a) may be released in the exercise of ICE's discretion.  Further, if such an individual is detained, ICE or an immigration judge has determined that the individual is a danger to persons or property, a threat to national security, or a flight risk that cannot be ameliorated by bond.  *See* 8 C.F.R. § 236.1(c)(8); *Matter of Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006).

**(ii)    Plaintiffs Have Not Established That The Conditions Of Their Confinement Violate The Fifth Amendment.**

Plaintiffs fail to show that their detention is not proportionately related to the government's non-punitive responsibilities and administrative purposes.  "[A] restriction is punitive where it is intended to punish, or where it is excessive in relation to its non-punitive purpose."  *Jones v. Blanas*, 393 F.3d 918, 933-34 (9th Cir. 2004) (internal quotation omitted).  While civil detainees retain greater liberty protections than individuals convicted of crimes, *see, e.g., Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982), the continued immigration detention of Plaintiffs pending removal cannot be described as punitive or excessive in relation to the legitimate government purpose of protecting the public and ensuring their removal.  *See, e.g., Dawson v. Asher*, No. 20-cv-0409-JLR-MAT, 2020 WL 1304557, at *2 (W.D. Wash. March 19, 2020) (*Dawson I*).  The COVID-19 outbreak does not change this analysis or weaken the government's legitimate interest in plaintiffs' detention pending removal.  *Id.*

In their motion, plaintiffs focus on the fact that ICE utilizes alternatives to detention ("ATD") for certain individuals and points to this program as a cure-all.  (ECF No. 5 at 23.)  However, while ATD may assist in ameliorating flight risk, it does not ameliorate danger.  In fact, many detainees at YCJ and MVDF are detained because Congress has determined them to be in a class of individuals that are both a danger and a flight risk mandating detention, 8 U.S.C. § 1226(c), or because ICE or an immigration judge has determined they are a danger or a flight risk that cannot be ameliorated by bond or ATD.  *See generally Matter of Urena*, 25 I. & N. Dec. 140 (BIA 2009).  These considerations show the government's continued legitimate interest in plaintiffs' detention pending removal.

In denying a request for release from immigration detention in the Western District of Washington last month, when Seattle was the epicenter of the COVID-19 outbreak in this country, the court noted that "Plaintiffs do not cite to authority, and the court is aware of none, under which the fact of detention itself becomes an 'excessive' condition solely due to the risk of a communicable disease outbreak — even one as serious as COVID-19."  *Dawson I,* 2020 WL 1304557, at *2.  Denying a second TRO motion in the same case, the *Dawson* court noted that, "under the Fifth Amendment, Respondents are not required to eliminate any risk to Petitioners.  Instead, Respondents are required to provide for their 'reasonable safety.'"  *Dawson v. Asher,* No. 20-cv-0409-JLR-MAT, 2020 WL 1704324, at *12

(W.D. Wash. Apr. 8, 2020) (*Dawson II*) (quoting *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 200 (1989)).

As in *Dawson*, plaintiffs here have not established that their conditions of detention are unconstitutional.  It is clear from news reports COVID-19 is spreading in the general population.  In contrast, there is no evidence that anyone at MVDF or YCJ has tested positive for COVID-19, and ICE is undertaking appropriate measures to prevent the spread of the disease.  *See, e.g., Dawson II,* 2020 WL 1704324, at *12; *Dawson I*, 2020 WL 1304557, at *2-3; *Sacal-Micha v. Longoria,* __F. Supp. 3d __, 2020 WL 1518861, at *6 (S.D. Tex. Mar. 27, 2020) ("the fact that ICE may be unable to implement the measures that would be required to fully guarantee Sacal's safety does not amount to a violation of his constitutional rights and does not warrant his release") (citing *Farmer v. Brennan,* 511 U.S. 825, 832 (1994)).  As set forth above, ICE has undertaken measures at both MVDC and YCJ to reduce the populations, screen incoming detainees, and provide a sanitary environment for those in their care.

Other courts have ordered release from ICE detention due to the COVID-19 pandemic, usually based on individualized decisions related to each detainee's specific factual situation, or conditions at the facility that are not present here.  In *Ortuno v. Jennings,* No. 20-cv-02064-MMC, 2020 WL 1701724, at *5 (N.D. Cal. Apr. 8, 2020), the Court granted certain detainees' request for release from MVDF and YCJ, while denying others' requests for release from the same facilities, demonstrating that the various detainees at MVDF and YCJ lack commonality, and indeed have different interests.  *See also Doe v. Barr,* No. 20-cv-02141-LB, 2020 WL 1820667 at *4-*5, *11 (N.D. Cal. Apr. 12, 2020) (granting TRO releasing YCJ detainee based in part on his medical conditions); *Bent v. Barr,* No. 19-cv-06123-DMR, 2020 WL 1812850 at *2, *6 (N.D. Cal. Apr. 9, 2020) (conditionally granting TRO releasing MVDF detainee based in part on his medical conditions).

In *Basank v. Decker* and *Thakker v. Doll,* there were confirmed COVID-19 cases at the jails housing the petitioners—unlike at MVDF and YCJ.  *See Basank v. Decker,* No. 20-cv-2518, ___ F. Supp. 3d ___, 2020 WL 1481503, at *2 (S.D.N.Y. Mar. 26, 2020); *Thakker v. Doll,* ___ F.Supp.3d ___, 2020 WL 1671563 at *1 (M.D. Pa. March 31, 2020) (detention facilities included the York County Prison and the Pike County Correctional Facility, both of which have confirmed COVID-19 cases, according to https://www.ice.gov/coronavirus).  Similarly, in *Castillo v. Barr*, No. cv-20-00605, 2020

WL 1502864 (C.D. Cal. Mar. 27, 2020), the court specifically noted that DHS's Office of Inspector General had found "significant" health and safety risks in the detention center at issue – unlike the facilities at issue in the present case. *Id.* at *1.

To the extent plaintiffs rely on a letter from Drs. Scott Allen and Josiah Rich, that unsworn letter provides no basis for this Court to depart from the well-reasoned *Dawson* opinion. Drs. Allen and Rich serve as contracted subject matter experts in detention health for DHS's Office for Civil Rights and Civil Liberties (OCRCL). There is no evidence that Drs. Allen and Rich have ever visited the facilities at issue in this case (let alone recently), that they are aware of the procedures and protocols adopted by those facilities to protect detainees from COVID-19, or that they are even aware that ICE has in fact reduced the detainee population at both facilities in light of the COVID-19 emergency. *See* Bonnar Dec. ¶ 5 (no visits to MVDF by OCRCL); Exh. 2 ¶ 5 (same regarding YCJ within last five years). Defendants' evidence shows that the detainee population at MVDF has been reduced to less than 75 percent of capacity and YCJ is at 64 percent of capacity. Bonnar Dec. ¶ 8; Kaiser Dec. ¶ 8.

> **(iii)** **Plaintiffs Have Not Established That They Are Being Subjected To Punishment.**

Defendants have a non-punitive purpose in detaining Plaintiffs. *Ortuno*, 2020 WL 1701724, at *4. Plaintiffs cannot plausibly argue that defendants are subjecting them to punishment. ICE has implemented procedures and protocols to protect the detainees in its care, including at the facilities at issue in this case and has also exercised its discretion to reduce the detainee populations at those facilities. *See generally* Bonnar and Kaiser Decs. The continued lack of any suspected or confirmed COVID-19 cases at MVDF and YCJ underscores the effectiveness and care that defendants have taken to protect vulnerable detainees. These precautions taken by ICE at the two facilities at issue carry far more weight than the generalized opinions expressed in the various declarations submitted by plaintiffs' proffered experts about populations in immigration detention centers in general and other detention and institutional settings.

Plaintiffs have not shown that they are likely to succeed on the merits.

> **2.** **Plaintiffs Have Not Shown Irreparable Harm.**

Plaintiffs have not demonstrated that they will suffer irreparable injury absent the mandatory

injunctive relief they seek.  Plaintiffs must demonstrate "immediate threatened injury."  *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citing *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980)).  Merely showing a "possibility" of irreparable harm is insufficient.  *See Winter*, 555 U.S. at 22.  Moreover, mandatory injunctions are not granted unless extreme or very serious damage will result.  *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879 (internal citation omitted).  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.  The standard "is not guaranteed safety–an impossible standard to meet no matter the circumstances–but rather a likelihood of irreparable harm."  *Dawson II,* 2020 WL 1704324, at *12; *see also Sacal-Micha*, __F. Supp. 3d __, 2020 WL 1518861, at *6 ("the fact that ICE may be unable to implement the measures that would be required to fully guarantee Sacal's safety does not amount to a violation of his constitutional rights and does not warrant his release") (citing *Farmer,* 511 U.S. at 832).

In light of the numerous precautions defendants have taken to protect plaintiffs from the risk of COVID-19, it is speculative to assume that only plaintiffs' release into the general population will spare them from the disease.  *See* Bonnar Dec. ¶¶ 10-12; Kaiser Dec. ¶¶ 9-11.  COVID-19 is spreading in the general population, but not in either of the facilities where plaintiffs are detained.  As in *Dawson I,* "[t]here is no evidence of an outbreak at the detention center or that Defendants' precautionary measures are inadequate to contain such an outbreak or properly provide medical care should it occur."  2020 WL 1304557, at *3 (footnote omitted).

Plaintiffs have not shown irreparable harm.

### 3.     The Balance Of Interests And Public Interest Favors Respondents.

It is well settled that the public interest in enforcement of United States' immigration laws is significant.  *See, e.g., United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant.") (citing cases); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) ("There is always a public interest in prompt execution of removal

orders: The continued presence of an alien lawfully deemed removable undermines the streamlined

removal proceedings IIRIRA established, and permits and prolongs a continuing violation of United

States law.") (internal quotation omitted).

Moreover, the public interest is best served by allowing immigration detention facilities to follow

the orderly medical processes and protocols implemented by government professionals, as ICE has been

doing. *See, e.g.,* Bonnar Dec. ¶ 8 (describing ICE's reduction of detainee population at MVDF); Kaiser

Dec. ¶ 8 (describing ICE's reduction of immigration detainee population at YCJ); *Youngberg*, 457 U.S.

at 322-23 (urging judicial deference and finding presumption of validity regarding decisions of

government professionals concerning conditions of confinement).

Plaintiffs have not shown that the balance of hardships and public interest tips in their favor.

## III.    THE REQUEST FOR PROVISIONAL CLASS CERTIFICATION SHOULD BE DENIED.

Plaintiffs request for provisional class certification should be denied.  The proposed class

overlaps with the provisionally certified class in *Fraihat*, and the two actions cannot proceed in tandem.

Moreover, the remedy that plaintiffs seek does not equally apply to all class members.  Plaintiffs

propose that some class members be released, while others remain detained—which bucket each class

member will be placed in is to be determined through individual habeas applications.  The

individualized proceedings that plaintiffs propose are antithetical to classwide treatment, and the motion

for class certification should be denied.

### A.    No Class Should Be Certified In This Matter, Instead the Action Should Be Stayed In Light of *Fraihat.*

As set forth above, this action should be stayed, under the first-to-file rule, in deference to

*Fraihat*, where a provisional class has already been certified.  It is not appropriate to certify overlapping

classes, as doing so both wastes judicial resources and "subjects [the parties] to inconsistent rulings."

*Baatz*, 814 F.3d at 791.  For this reason alone, plaintiffs' motion for provisional class certification

should be denied, and this matter should be stayed.

### B.    Plaintiffs Cannot Establish Sufficient Commonality To Warrant Provisional Class Certification.

Plaintiffs do not demonstrate that class treatment is otherwise appropriate.  Although plaintiffs

argue that "[t]he proposed class is a quintessential Rule 23(b)(2) class" because an "injunction or declaration will provide relief on a class-wide basis" (ECF 6 at 18), the proposed TRO that plaintiffs have submitted demonstrate that this is not the case. Notably, plaintiffs are not seeking the closure of MVDF and YCJ and release of all detainees therein. Instead, plaintiffs seek individualized habeas proceedings, through which the MVDF and YCJ populations will be further reduced by releasing some indeterminate number of proposed class members and continuing to detain others. (ECF 5-7 at 5.) Moreover, plaintiffs' counsel proposes to pick and choose on behalf of which individual class members they will advocate for release by bringing their individual habeas applications first—presumably by selecting class members whose medical conditions put them at risk for COVID-19 complications (ECF 5-7 at 9) and whose individual circumstances will permit counsel to argue that they are neither a flight risk nor a danger to the community. In short, plaintiffs' requested TRO provides for individualized proceedings, not classwide treatment.

But, to obtain class certification, plaintiffs must demonstrate that the proposed class is entitled to common relief as to each count on which certification is sought. *See* Fed. R. Civ. P. 23(a)(2), (b)(2). The Supreme Court has repeatedly held that "what matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009)).

The commonality requirement is especially rigorous when applied to a class that seeks certification under Rule 23(b)(2). As the Supreme Court recently noted in reviewing a Ninth Circuit immigration detention case, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Jennings*, 138 S. Ct. at 852(quoting *Dukes*, 564 U.S. at 360). For certification under Rule 23(b)(2), plaintiffs must show that the challenged conduct is "such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360. Accordingly, plaintiffs bear the burden of demonstrating that any factual differences among the proposed class members are unlikely to affect their entitlement to relief. *See id.* Class certification under Rule 23(a) and (b)(2), therefore, requires two steps: (1) the identification of a common legal problem, and (2) a showing that the common legal issue may be

resolved as to all class members simply by virtue of their membership in the class. *Dukes*, 564 U.S. at 350 (concluding that the common legal problem "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

Plaintiffs' proposed class and proposed class TRO order fails to meet the commonality requirement. Some class members will be released under plaintiff's proposed TRO, and many will not. Plaintiffs suggest that the class members' underlying medical conditions will dictate which class members get released and which do not. (ECF 5-7 at 9.) *See, e.g., Ortuno v. Jennings,* No. 20-cv-02064-MMC, 2020 WL 1701724, at *5 (N.D. Cal. Apr. 8, 2020) (granting certain detainees' request for release from MVDF and YCJ, while denying others' requests for release from the same facilities, based on their underlying medical conditions). But, the proposed class members have vastly different risk profiles for COVID-19 based on preexisting conditions, age, and a host of other factors. *See* CDC Guidance, People Who are at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed April 23, 2020). For example, plaintiff Coraima Yaritza Sanchez Nunez is 26 years old, but has asthma. (ECF 6-5 at ¶¶ 2, 10.) This is different from plaintiff Javier Alfaro, who is 39 years old, but does not have any other medical conditions that place him at increased risk for severe COVID-19 illness. (ECF 6-6.) Whether any particular class member will be released under the proceeding proposed in plaintiffs' TRO, is an individualized, and not common question, involving wide factual variation. Such "[d]issimilarities within the proposed class" defeat commonality. *Dukes*, 564 U.S. at 530.

Additionally, the circumstances within each facility are not uniform. At YCJ, ICE detainees are intermingled with county inmates. Kaiser Dec. ¶ 5. Neither ICE nor the Court have the authority to mandate the actions taken by YCJ with respect to county inmates. At MVDF, the beds in two dorms have been staggered to allow six feet distancing. Bonnar Dec. ¶ 11(f). These differences within the subclasses further show that they lack commonality.

Detainees are also held under differing statutory authorities, which makes considerations regarding detention and release vary from one individual to the other. *See*, *e.g.*, 8 U.S.C. § 1225(b) (requiring mandatory detention for aliens pending final determination in credible fear proceedings);

§ 1226(c) (requiring mandatory detention for aliens who have committed certain criminal offenses); § 1231(a)(2) (requiring mandatory detention during the 90-day removal period after a final order of removal is entered). Even where a detainee is eligible for release, ICE must assess whether the detainee is a danger to the community or a flight risk. *See* 8 C.F.R. § 236.1(c)(8). In addition, 8 U.S.C. § 1182(d)(5) grants the Attorney General discretion to "parole [aliens] into the United States temporarily under such conditions as he may prescribe." Plaintiffs cannot show that a single common remedy is appropriate for everyone in the proposed class, especially where detention for some individuals is mandated by statute and release requires an assessment of dangerousness and flight risk that is, by nature, made on a case-by-case basis. Plaintiff Javier Alfaro, for example, has been convicted of felony infliction of corporal injury on a spouse/cohabitant, whereas plaintiff Coraina Sanchez Nunez's criminal conviction was for a DUI. (Declaration of Alexander Pham at ¶¶ 5, 15.) In deciding which individual habeas applications to pursue, plaintiffs' counsel is likely to analyze the class members' varying criminal histories and flight risk profiles, and pursue just those who are good candidates for release. (ECF 5-7 at 9.)

Because plaintiffs cannot meet their burden to demonstrate commonality the Court must deny their motion to certify a class. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) (common issues do not predominate where "an individualized case" must be made on behalf of each class member in order to obtain relief).

### C. Plaintiffs Cannot Establish Sufficient Typicality To Warrant Class Certification.

Plaintiffs' proposed class also fails to satisfy the typicality requirement. The commonality and typicality requirements of Rule 23(a) are interrelated and, in some instances, merge. *Dukes*, 564 U.S. at 349 n.5. "Both [requirements] serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* Because the putative class members' circumstances and ultimate eligibility for relief are too varied to satisfy the commonality requirement, plaintiffs are also unable to satisfy Rule 23(a)(3).

The different forms of relief requested demonstrate that plaintiffs cannot establish typicality.

Plaintiffs request that the Court order defendants to release some, but not all, class members in order to facilitate social distancing. (ECF 5 at 31.) To do so, plaintiffs propose implementation of a system where the Court reduces the population based on individualized factors. (ECF 5-7.) The proposed relief demonstrates that the individual decision to release any putative class member will be different based on their individual circumstances. Under plaintiffs' proposal, some class members will be released from YCJ and MVDF, whereas other detainees will remain in custody. While plaintiffs focus their typicality argument on the need for social distancing (ECF 6 at 15), plaintiffs ignore that their proposed remedy is vastly different for different class members. Plaintiffs seek a supposed classwide remedy on an individualized basis (ECF 5-7)—a contradiction in terms, which demonstrates class treatment is not appropriate.

In addition, each plaintiff's claim to release must be decided on a case-by-case basis and is subject to unique defenses based on the facts and circumstances of each individual class member. *See Sacal-Micha*, 2020 WL 1518861, at *5 (noting that decisions from other district courts demonstrate individualized nature of analysis to determine whether release is appropriate). The relief sought in plaintiffs' proposed TRO (ECF 5-7) underscores this point. Plaintiffs request individualized medical and other information for each YCJ and MVDF detainee. (ECF 5-7.) Plaintiffs then propose to file "individual applications for release," implicitly dependent on class counsel acting as quasi-ICE officers exercising "prosecutorial discretion" over which cases merit release and should be presented to the Court. (*Id.* at 5.) In other words, plaintiffs are requesting that they take on the policy role of deciding who among the detained population is entitled to relief in the form of release from detention. This proposed relief is wholly inconsistent with the requirement that relief be common among the class. *Dukes*, 564 U.S. at 360.

Hundreds of other ICE detainees have sought release across the country. *See, e.g.*, *Dawson v. Asher*, No. C20-0409 JLR-MAT (W. D. Wash. Mar. 19, 2020); *Francisco M. v. Decker*, No. 20-2176 (CCC) (D.N.J. Mar. 25, 2020); *Patel v. Barr*, No. C20-488-RSM-BAT (W.D. Wash. April 2, 2020). This fact cuts against class certification. That numerous detainees nationwide are having their cases for release heard on an individualized basis, with some detainees obtaining release and others not, demonstrates that classwide relief is not appropriate. *See, e.g.*, *Ortuno,* 2020 WL 1701724, at *5

(granting relief to some petitioners but not others); *Murai v. Adducci*, No. 3:20-cv-10816-RHC-PTM, ECF No. 8 (E.D. Mich. April 16, 2020) (denying TRO where facility has no confirmed cases of COVID-19); *Saillant v. Hoover*, No. 1:20-cv-6090JPW, 2020 WL 1891854 (M.D. Pa. April 16, 2020) (denying habeas petition where facility has taken steps to address COVID-19 and petitioner made no allegation that he had a risk factor making him more susceptible to the disease); *Albino-Martinez v. Adducci*, No. 2:20-cv-10893, 2020 WL 1872362, at *4 (E.D. Mich. April 14, 2020) (denying temporary restraining order requesting release in light of COVID-19 when the "battle against COVID-19 is ever evolving and changing"); *Ramirez v. Culley*, No. 2:20-cv-609, 2020 WL 1821305 (D. Nev. April 9, 2020) (denying TRO where detention facility did not present constitutionally unsafe conditions and no evidence of COVID-19 present at the facility); *Hassoun v. Searls*, --- F. Supp. 3d ---, 2020 WL 1819670 (W.D.N.Y. April 10, 2020) (denying release of petitioner with underlying health concerns and who has not followed medical advice that housed separately from other detainees and where facility has taken steps to address the spread of COVID-19); *Awshana v. Adducci*, --- F. Supp. 3d ---, 2020 WL 1808906 (E.D. Mich. April 9, 2020) (denying release where detention facility has no confirmed or suspected COVID-19 cases and petitioners have no conditions that place them in higher risk categories); *N.Z.M. v. Wolf*, No. 5:20-cv-24, ECF No. 20 (S.D. Tex. April 9, 2020) (denying TRO where petitioner did not present evidence of higher risk factors for COVID-19 and facility had no known reported cases); *Verma v. Doll*, No. 4:20-cv-14, 2020 WL 1814149, at *6 (M.D. Pa. April 9, 2020) (denying release because facility has taken reasonable steps to limit spread of COVID-19 through facility and explaining that there is "no perfect solution to preventing the spread of COVID-19 in detention facilities"); *Dawson,* 2020 WL 1304557 at *3 (holding potential exposure to COVID-19 insufficient to justify release). Indeed, as the court in *Umarbaev v. Lowe* observed the "success of each petition will depend not only on the circumstances of the petitioner before the Court, but also on a rapidly changing landscape that includes the state of the COVID-19 pandemic, current conditions in ICE facilities, and the evolving response by ICE and facility officials to medical needs." *Umarbaev v. Lowe*, No. 1:20-CV-00413, 2020 WL 1814157, at *7 (M.D. Pa. Apr. 9, 2020) (denying a TRO for release of petitioner with risk factors but who has been receiving medical care in detention and monitored during 14-day quarantine period). Such individualized considerations are entirely inappropriate for a Rule 23(b)(2) class, inasmuch as the relief must equally

benefit all class members. *Dukes*, 564 U.S. at 360.

To the extent that plaintiffs rely on *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), that case is readily distinguishable due to the nature of the relief sought. In *Parsons*, the Ninth Circuit found that a class action based on detention conditions satisfied Rule 23(b)(2) because the remedy sought was applicable on a classwide basis. *Id.* at 689. But the *Parsons* remedy was not release of only some inmates. Plaintiffs in *Parsons* sought a change in policy that would increase access to medical services for all inmates, relief that the Ninth Circuit found applied to all class members. *Id.* at 663, 689. In contrast, plaintiffs here are not seeking uniform relief, but instead are asking for *either* release *or* to be detained in a less crowded facility. Plaintiffs cannot meet their burden of establishing typicality.

### D. Plaintiffs Have Not Established Adequacy.

The named plaintiffs—who will surely urge class counsel to advocate for their release first—have a conflict of interest with other members of the class who will not be released. Thus, plaintiffs cannot establish adequacy either.

The adequacy requirement serves to protect the due process rights of absent class members who will be bound by the judgment. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. 338. Assessing the adequacy of class representation turns on two inquiries: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.*

Plaintiffs seek a reduction in the YCJ and MVDF detainee populations, not the release of all detainees. (ECF 5 at 31.) They further propose staggered applications for release until the detainee populations are sufficiently reduced to permit what plaintiffs deem adequate social distancing. (ECF 5-7 at 5.) This proposal violates *Dukes*' requirement that classwide injunctive relief equally benefit the entire proposed class. 564 U.S. at 360 (Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.") (emphasis in original). Accordingly, the named plaintiffs' interests are not aligned with all members of the putative class, and, as with commonality and typicality, plaintiffs have failed to establish adequacy. The request for provisional class certification should be denied.

## IV.    PLAINTIFFS' PROPOSED TRO IS UNWORKABLE AND UNLAWFUL.

Even if the Court were to provisionally certify plaintiffs' proposed classes[4] and find that plaintiffs are entitled to a TRO or preliminary injunction, the order proposed by plaintiffs is legally improper and presents numerous practical difficulties.

First, plaintiffs' proposed order includes a declaratory judgment that is not appropriate in a TRO. *See* ECF No. 5-7 at 3, ¶ 1.  The purpose of preliminary injunctive relief is to preserve the status quo pending final judgment, rather than to obtain a preliminary adjudication on the merits.  *Sierra On-Line*, 739 F.2d at 1422.  By seeking to have the Court definitively declare that "conditions of confinement . . . are unconstitutional," the proposed order would be an improper full adjudication on the merits of some of plaintiffs' claims.  ECF No. 5-7 at 3, ¶ 1.  The Court should strike paragraph 1.

Second, as discussed above, plaintiffs' proposed order is objectionable because it permits class counsel to determine the order of applications for release that they would present to the Court with no oversight or guidelines.  *Id.* ¶ 2(f).  Class counsel may not be given the role of an ICE official to exercise discretion and determine who of approximately 427 individuals warrants first consideration for release by the Court.  Indeed, it is conceivable that class counsel would advocate for release of the named plaintiffs first, some of whom have no underlying medical conditions that place them at higher risk, even over individuals whose circumstance may be more compelling.  Class counsel should not be given such latitude to usurp the power of the government or the Court.

Third, plaintiffs' proposed method of collecting information violates detainees' privacy interests. If the Court certifies a provisional class pursuant to Federal Rule of Civil Procedure 23(b)(2), all ICE detainees at MVDF and YCJ would be class members and would not have the ability to opt out. Paragraph 2(b) of the proposed order would require defendants to provide sensitive medical information[5] regarding every detainee class member to class counsel, whom class members have not asked to represent them.  Medical information is among the most sensitive private information.  *See*

---

[4] If the Court declines to certify the proposed classes, the proposed TRO would be an improper back-door attempt to obtain discovery where it is not otherwise permitted. *See, e.g., Bracy v. Gramley*, 520 U.S. 899, 904 (1997) ("A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course.").

[5] Additionally, in paragraph 2(b), plaintiffs demand that defendants provide class members "current medical conditions."  It is unclear what "current medical conditions" means.

*generally* Health Insurance Portability and Accountability Act, 42 U.S.C. §§ 1320d, 1320d-6. Requiring defendants to produce this information to class counsel without regard to the desires of individual detainees contravenes detainee privacy rights. Plaintiffs' proposal differs from other circumstances where courts have required defendants to turn over information on all class members or potential class members notwithstanding privacy concerns. For example, in *Tomassi v. City of Los Angeles*, No. CV 08-1851 DSF SSX, 2008 WL 4722393, at *4 (C.D. Cal. Oct. 24, 2008), the court balanced the privacy right of putative class members and class counsel's need for information and found that defendants were required to provide a list of potential class member names and addresses. However, medical information is far more sensitive than names and addresses. In this instance, such sensitive information tips the balance in favor of protecting class members' privacy rights. Defendants therefore object to providing ICE detainee medical information as proposed in paragraph 2(b).

Fourth, the forms proposed by plaintiffs conflict with the text of the proposed order. Paragraph 2(a) instructs that "Defendants shall obtain from *every* member" a potential release address and contact information. (emphasis added). However, Form A, which plaintiffs propose to collect such information, does not require the detainee to complete the form and states that "if you do NOT want to be considered for release, do not fill out this form." As plaintiffs recognize in the proposed form, detainees should not be forced to give defendants this information. The proposed order therefore cannot require defendants to obtain information from detainees who do not wish to provide this information.

Fifth, plaintiffs proposed forms fail to distinguish between non-ICE detainees and ICE detainees at YCJ. Plaintiffs' suit and proposed subclass definition include only individuals held in ICE custody, not those criminal defendants held by Yuba County. *See* ECF No. 6 at 11. Therefore, care must be taken to distinguish between ICE detainees, who would be subject to an order in this case, and Yuba County inmates, who are not provisional class members. Form A requires changes to make clear that only ICE detainees at YCJ would be permitted to be considered for release. Moreover, ICE detainees are not totally segregated from Yuba County inmates and outright differential treatment should be avoided.

Sixth, plaintiffs proposed timelines are internally conflicting and unworkable. Paragraph 2(b) permits defendants to begin providing medical information "at a rate of 25 class members per day," but

paragraph 2(c) states that within 72 hours, that medical information "shall" be provided to each class member. These timelines are conflicting. Moreover, the timelines proposed by plaintiffs are unworkable. Defendants are unable to obtain medical information for every potential class member in the time proposed. *See* First Fishburn Dec. ¶ 6. Defendants are also unable to present the factors that might counsel against release, such as criminal history, flight risk factors, immigration history, or unsuitability of proposed release location or sponsor, within 24 hours of class counsel submitting an application. *Id.* ¶ 9. The A-files for individuals detained at YCJ and MVDF are located in many locations, including ICE offices at immigration courts, other regional ICE office, and offices for FOIA processing. *Id.* There is also no limit on the number of applications class counsel would be able to present each day, potentially overwhelming the limited resources of defendants. Further, defendants' limited resources are better devoted to protecting the detainees and continuing to review cases for release under defendants' policies already in place, rather than creating this parallel and entirely new process proposed by plaintiffs.

Seventh, defendants are unable to provide for translation of plaintiffs' proposed forms, either in writing or orally. The process for ICE to obtain translation of document takes weeks and sometimes months. *See* First Fishburn Dec. ¶ 4. Defendants are unable to obtain translations on the timeline proposed by plaintiffs. To orally translate the forms, each of the approximately 427 detainees would need to be transferred to an ICE sub-office to have the translation done, and such movement of detainees is discouraged due to the pandemic. *Id.*

Should the Court order preliminary injunctive relief, rather than order a process which requires defendants to violate putative class members privacy, defendants propose that the Court order defendants to reduce the populations at MVDF and YCJ to numbers that permit social distancing. Defendants would then determine which class members would be released and provided weekly updates to the Court regarding the class members released and the current populations at MVDF and YCJ. *Id.* ¶ 9.

If the Court is inclined to order an individualized review process, to correct the issues identified above, defendants propose the following. Defendants would provide provisional class counsel a list of the names of any provisionally certified class members. *Id.* ¶ 5. Class counsel would be responsible for

translating any and all forms and notices. *Id.* ¶¶ 4, 8. Defendants could post notices and distribute forms, but class members would be responsible for completing the forms, which should include, in addition to the information proposed by plaintiffs, information about where a class member would go if released, and whether that location has been approved by the individual's parole and/or probation officer. *Id.* ¶¶ 4-8. Class members would then mail the forms to class counsel and provide a copy to defendants through the kite process. *Id.* ¶ 4.

Should the Court order any putative class member to be released, defendants respectfully request that such an order(s) expire when the current state and local shelter-in-place orders are lifted, and that each of the released putative class members be required to self-report to ICE within 24 hours after the lifting of both the shelter-in-place order for the State of California and any shelter-in-place order for the county where s/he resides. In addition, defendants respectfully request that release ordered include the following conditions of release:

1. The released class member is to reside and shelter in place at the address specified in the release order.

2. The released class member must obtain approval of the address from his parole officer (if any); and also provide defendants with w/ the name, date of birth, DHS alien number (if any), and telephone number of the person at the residence who will be responsible for the class member, so that defendants may conduct their usual vetting process and advise the Court of any objections.

3. The released class member shall be transported by a person to be specified in said order from his/her place of detention to the residence where s/he will reside and shelter in place.

4. Pending further order of the Court, the released class member shall not leave the residence where s/he will shelter in place, except to obtain medical care, to appear at immigration court proceedings, or to obey any order issued by the Department of Homeland Security.

5. The released class member shall not violate any federal, state, or local law.

6. If a released class member violates the conditions ordered by this Court or DHS, ICE may re-detain him at any time to complete removal proceedings without advance notice to the Court or the class member.

7. If a released class member's removal order becomes final and a travel document is obtained, ICE

may re-detain him/her to effectuate his removal without advance notice to the Court or petitioner.

These additional conditions will place released class members on the same footing as detainees who obtain discretionary release pursuant to defendants' statutory and regulatory authority. To the extent any class member is subject to mandatory statutory detention, any TRO ordering their continued release would be based solely on the COVID-19 pandemic. As such, there is no justification for requiring less supervision and authority over these individuals than defendants have over released detainees who are not subject to mandatory detention.

## V.  OBJECTIONS TO PLAINTIFFS' DECLARATIONS

Defendants recognize that the COVID-19 public health emergency has made it difficult for plaintiffs' counsel to obtain signed declarations from plaintiffs. That does not change the fact that the declarations purporting to establish plaintiffs' individual situations and the conditions at the detention facilities are inherently unreliable. Plaintiffs have not submitted any declarations that they signed. Instead, some plaintiffs have had unsigned declarations submitted by counsel; others purport to be submitted by translators, which state that they were read to plaintiffs in Spanish or Vietnamese, while submitted to the Court only in English. But, the translators' certifications are also unsigned.

In this regard, defendants object to the following declarations as not being signed by the declarants, who are plaintiffs in this case: Angel de Jesus Zepeda Rivas (ECF 6-1); Brenda Ruiz Tovar (ECF 6-2); Lawrence Kuria Mwaura (ECF 6-3); Luciano Gonzalo Mendoza Jeronimo (ECF 6-4); Coraima Yaritza Sanchez Nunez (ECF 6-5); Javier Alfaro (ECF 6-6); and Dung Tuan Dang (ECF 6-7).

In addition, defendants object that the following unsigned declarations were read to the declarants in Spanish or Vietnamese, but submitted to the Court only in English, with no way for the Court or defendants to confirm the accuracy of the translation: Angel de Jesus Zepeda Rivas (ECF 6-1); Brenda Ruiz Tovar (ECF 6-2); Luciano Gonzalo Mendoza Jeronimo (ECF 6-4); Javier Alfaro (ECF 6-6); and Dung Tuan Dang (ECF 6-7).

Defendants object to the following declarations as being replete with hearsay and/or not based on the personal knowledge of the declarant and/or based on outdated information: Lisa Knox (ECF 5-4); Kathleen Anne Kavangh (ECF 5-5); and Sean Riordan (ECF 5-6).

The Court should afford little or no weight to these unreliable declarations. Courts may, in their discretion, give some weight to hearsay and otherwise inadmissible evidence when considering whether to issue emergency relief. *See*, *e.g.*, *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988); *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). The above declarations warrant little or no weight because they are significantly lacking in foundational support and other indicia of reliability.

Likewise, plaintiffs' declarations from physicians warrant little or no weight because they lack a sufficient factual basis about the current conditions at MVDF and YCJ. Opinions based on scientific, technical, or specialized knowledge are governed by Federal Rule of Evidence 702, which provides that a qualified witness may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if:

(a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, (b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires courts to ensure that expert opinions are not only relevant, but also reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). To be reliable, the underlying facts or data upon which an expert relies must be reliable; when an expert does not cite factual support for their opinion, it lacks indicia of reliability. *See, e.g., United States ex rel. Jordan v. Northrop Grumman Corp.*, No. CV 95-2985 ABC, 2003 WL 27366247, at *3 (C.D. Cal. Feb. 24, 2003) (finding expert testimony unreliable because it amounted to "conclusory opinions lacking any factual basis.").

Here, the declarant physicians' opinions are not based on sufficient facts or data because they either fail to state if they know of the current conditions at MVDF and YCJ, or base their opinions on their experiences at other immigration facilities from previous months or years, well before COVID-19. For example, while Dr. Greifinger provides citations to support some of his factual assertions, he does not provide any specific references to current conditions at MVDF and YCJ; his opinions based on detention conditions are not indicative of the current conditions in the facilities at issue. For example, Dr. Greiginger refers to declarations of two attorneys who visited the facilities, the declaration regarding

YCJ does not specify when the attorney made her most recent visit, *see* Declaration of Kathleen Anne Kavanaugh, (ECF 5-5), and the declaration regarding MVDF describes a visit from March 13, 2020 – a relatively long time ago in the fast-moving COVID-19 situation – and is replete with hearsay, as noted above. *See* Declaration of Lisa Knox (ECF 5-4).

## CONCLUSION

For the foregoing reasons, the Court should stay this matter pending *Freihat* to prevent overlapping claims and because it was first-filed. In the alternative, the Court should dismiss or transfer this case as filed in the improper district or deny plaintiffs' motion for class certification and motion for a temporary restraining order.

DATED: April 25, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

*/s/ Adrienne Zack*
ADRIENNE ZACK
Assistant United States Attorney