DAVID L. ANDERSON (CABN 149604)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
WENDY M. GARBERS (CABN 213208)
ADRIENNE ZACK (CABN 291629)
Assistant United States Attorneys

   450 Golden Gate Avenue, Box 36055
   San Francisco, California 94102-3495
   Telephone: (415) 436-7031
   FAX: (415) 436-6748
   adrienne.zack@usdoj.gov

Attorneys for Federal Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, *et al.*,, <br><br> Plaintiffs, <br><br> v. <br><br> DAVID JENNINGS, *et al*, <br><br> Defendant. | Case No. 20-cv-02731 VC <br><br> **DECLARATION OF POLLY E. KAISER IN SUPPORT OF FEDERAL DEFENDANTS' OPPOSITION TO TRO AND MOTION TO STAY IN LIGHT OF *FRAIHART*** |

I, Polly E. Kaiser, declare as follows:

1. I am the Deputy Field Office Director for U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO"), in the San Francisco Field Office ("ERO San Francisco").  I have held this position since July 2016.  From December 2014 to July 2016, I was an Assistant Field Office Director for ERO San Francisco.  From August 2008 to December 2014, I was a Supervisory Detention and Deportation Officer for ERO San Francisco.

2. In my capacity as Deputy Field Office Director, I am responsible for direction and oversight of ICE immigration enforcement operations within the California counties of Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Glenn, Humboldt, Lake,

Lassen, Marin, Mendocino, Modoc, Monterey, Napa, Nevada, Placer, Plumas, Sacramento, San Benito, San Francisco, San Joaquin, San Luis Obispo, San Mateo, Santa Clara, Santa Cruz, Shasta, Sierra, Siskiyou, Solano, Sonoma, Stanislaus, Sutter, Tehama, Trinity, Tuolumne, Yolo and Yuba.  My office is responsible for the identification, apprehension, detention and removal of illegal aliens from the United States.  This responsibility includes the immigration case docket management and oversight of aliens detained at the Yuba County Jail ("YCJ") pending removal.

3. The facts in this declaration are based on my personal knowledge, consultation with other ICE personnel, and review of official documents and records maintained by the agency and Department and other relevant sources obtained during the regular course of business.  I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case.

4. ICE is charged with removing aliens who lack lawful immigration status in the United States. Detention is an important and necessary part of immigration enforcement.  ICE detains aliens to secure their presence both for immigration proceedings and their removal, with a special focus on those who represent a risk to public safety, or for whom detention is mandatory by law.

5. The YCJ is a county owned and operated facility that houses county jail inmates and ICE detainees.  Through ICE's Inter-Governmental Service Agreement ("IGSA") with Yuba county, the county provides the facility ("YCJ"), management, personnel and services for 24-hour supervision of aliens in ICE custody at YCJ.  Besides its own county and state oversight and inspection processes, the federal government also mandates oversight through various inspection processes by ICE and other entities.  However, to my knowledge, the DHS' Office of Civil Rights and Civil Liberties ("CRCL") has not visited, toured or inspected YCJ within at least the last five years.

6. Medical care, including screening, at YCJ is provided by the contract medical staff on-site and is overseen by the ICE Health Services Corps ("IHSC"), which provides medical services through a

combination of U.S. Public Health Service Commissioned Corps ("USPHS") officers, federal civil servants, and contract health professionals.

7. On April 10, 2020, ICE released its ERO COVID-19 Pandemic Response Requirements ("PRR"), a guidance document that builds upon previously issued guidance and sets forth specific mandatory requirements to be adopted by all detention facilities housing ICE detainees, as well as best practices for such facilities, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this pandemic.[1]

8. YCJ currently has the capacity to house up to 420 individuals. With a max capacity for ICE detainees capped at 210 of that 420. YCJ houses both male and female detainees, however the numbers of each is not specifically limited by sex, but rather by availability. YCJ has the capability to identify, isolate, and segregate detainees from each other. Three ICE detainees, who have pre-existing conditions and deemed high-risk for COVID19 based on CDC guidelines, have been removed from general population as a preventive measure and relocated to another facility where they are more closely monitored 24/7, including having their temperatures taken twice a day. The three ICE detainees are asymptomatic for COVID-19. On March 11, 2020, the World Health Organization ("WHO") declared COVID-19 a global pandemic. Since that time, the ERO Stockton sub-office has taken affirmative steps to reduce the number of detainees at YCJ by reconsidering custody determinations, parole requests, and issuing orders of supervision on release for those aliens who are not subject to mandatory custody, pose a danger to the community or flight risk; and/or there is no significant likelihood of removal in the foreseeable future. Consequently, from March 11, 2020 to present, ICE has reduced the YCJ detainee population from 168 to 144. The ICE population at YCJ is less than 50% of YCJ's total capacity. As of April 24, 2020, YCJ's total population to include ICE detainees is at 64% of its total capacity. However, these numbers do not reflect the fluctuation of additional book ins and releases between March 11, 2020 and present. At present, there are 8 female ICE detainees and 136 male ICE detainees. These numbers fluctuate on a daily basis. ICE will continue to

---

[1] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf

evaluate cases that may be high-risk for COVID-19, and as more relevant specific information is provided on any particular detainee, release may be appropriate provided they are not mandatory custody, a danger to the community, or deemed a flight risk where measures for alternatives to detention are inappropriate.

9. Pursuant to ICE ERO protocols and under the direction of my office, YCJ implemented several processes to protect the detainee population. For example, YCJ stopped all social visitations and tours. YCJ has encouraged attorney visits to be non-contact. YCJ continues to provide access to attorneys through various telephonic means as established under the *Lyon v. U.S. Immigration and Customs Enforcement* settlement agreement. YCJ staff are notifying attorneys in advance that they must submit to medical screening prior to entering the facility.

10. In addition to the screening and other protective measures described in Captain Moon's declaration of March 26, 2020 (a true and correct copy of which is attached hereto as Exhibit A), YCJ has implemented several other measures to protect the detainee population from COVID-19 infection. These measures include, but are not limited to the following:

    a. YCJ has implemented ICE COVID-19 screening protocols, including a 14-day quarantine for new book-ins.
    b. YCJ medical staff is also screening for COVID-19 during all in-take and 14 day physical exams;
    c. YCJ is also affirmatively taking the temperatures of all detainees on a daily basis in every housing unit;
    d. YCJ will isolate, medically assess, and monitor any detainee who has a temperature of 100.4 or above; the detainee will be housed in the medical unit, cared for, and monitored for as long as medically necessary depending a variety of factors and what additional medical care, if any, becomes necessary.
    e. YCJ has provided education regarding COVID-19 to staff and detainees, including postings in both the English and Spanish languages on proper hand washing and other preventative measures. Postings will be provided in additional languages upon request;

    f. YCJ has added instructions on hand washing, sanitizing common surfaces and other health and wellness information by video for detainees;

    g. YCJ is ensuring the facility, to include the housing units, are sanitized twice daily;

    h. Additional cleaning supplies have been offered to detainees who have been educated on how to sanitize the phones for common use before and after each use;

    i. YCJ has added two handwashing stations within the facility to encourage and aid in recommended handwashing. Each detainee is issued a bar of soap that may be replaced when requested by the detainee. In addition, hand sanitizer is available for use by staff at the facility.

    j. YCJ has issued washable cloth masks to all detainees to wear;

    k. YCJ medical staff is required to wear N95 masks during any contact with any detainee who is being quarantined in POD F;

    l. YCJ and ICE staff are required to wear masks at the facility at all times;

    m. YCJ has the capability to conduct on-site testing of COVID-19;

11. ICE ERO management staff, including myself, conference daily over YCJ and any issues stemming from COVID-19. Additionally, my staff is in daily contact with YCJ management to include medical over the health and safety of detainees. Given the ICE protocols, YCJ staff and ICE officers are taking appropriate measures to ensure the health and safety of detainees and will continue to do so. YCJ medical staff will examine any detainee promptly who submits a medical request due to symptoms consistent with COVID-19. Out of an abundance of caution, YCJ has tested two ICE detainees who were asymptomatic, but during the in-take screening one of the detainees claimed to have been previously quarantined in another jail due to possible exposure to someone who may have had COVID-19 prior to arriving at YCJ, and the other ICE detainee was transported with that detainee to YCJ. They were immediately quarantined and monitored pending the results. They both tested negative for COVID-19 but were nevertheless quarantined for 14-days. They did not develop any symptoms and are no longer quarantined. My staff is on-site daily and is able to address issues as presented and report back any issues they may observe that need to be addressed by my staff or by me.

12. As of April 24, 2020, the IHSC FMC confirmed with YCJ that there are zero suspected cases of COVID-19 and zero confirmed cases of COVID-19 at YCJ.

13. ICE will continue to review its detained population for people who are "at higher risk for severe illness," as identified by the CDC, to determine if detention remains appropriate, considering the detainee's health, public safety and mandatory detention requirements, and adjust custody conditions when appropriate, to protect health, safety and well-being of its detainees.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 24, 2020, at Walnut Creek, California.

                                                                              _____
                                                                              POLLY E. KAISER