WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
ANGÉLICA SALCEDA (SBN 296152)
asalceda@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Attorneys for Petitioners-Plaintiffs*
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
GENNA ELLIS BEIER (CA SBN 300505)
genna.beier@sfgov.org
EMILOU H. MACLEAN (CA SBN 319071)
emilou.maclean@sfgov.org
FRANCISCO UGARTE (CA SBN 241710)
francisco.ugarte@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: (415) 553-9319
Facsimile: (415) 553-9810

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUBI RUIZ TOVAR, LAWRENCE KURIA MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG,<br><br>Petitioners-Plaintiffs,<br><br>v.<br><br>DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; NATHAN ALLEN, Warden of Mesa Verde Detention Facility,<br><br>Respondents-Defendants. | CASE NO. 3:20-CV-02731-VC<br><br>**PLAINTIFFS-PETITIONERS' MEMORANDUM ON COMMON ISSUES IN BAIL REVIEW PROCESS**<br><br>JUDGE VINCE CHHABRIA |

BREE BERNWANGER* (NY SBN 5036397)
bbernwanger@lccrsf.org
TIFANEI RESSL-MOYER (SBN 319721)
tresslmoyer@lccrsf.org
HAYDEN RODARTE (SBN 329432)
hrodarte@lccrsf.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA
131 Steuart St #400
San Francisco, CA 94105
Telephone: (415) 814-7631

JUDAH LAKIN (SBN 307740)
judah@lakinwille.com
AMALIA WILLE (SBN 293342)
amalia@lakinwille.com
LAKIN & WILLE LLP
1939 Harrison Street, Suite 420
Oakland, CA 94612
Telephone: (510) 379-9216
Facsimile: (510) 379-9219

JORDAN WELLS (SBN 326491)
jwells@aclusocal.org
STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

MARTIN S. SCHENKER (SBN 109828)
mschenker@cooley.com
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIMOTHY W. COOK* (Mass. BBO# 688688)
tcook@cooley.com
FRANCISCO M. UNGER* (Mass. BBO# 698807)
funger@cooley.com
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

*Attorneys for Petitioners-Plaintiffs*
* Admitted *Pro Hac Vice*

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................... 1

II.    THE RANGE OF COVID-19 VULNERABILITIES IDENTIFIED BY THE
       GOVERNMENT IS TOO NARROW ..................................................................... 1

III.   THE COURT SHOULD NOT PLACE EXCESSIVE WEIGHT ON CRIMINAL
       HISTORY IN EVALUATING CURRENT DANGEROUSNESS ................................... 5

       A.    PRIOR CONVICTIONS ................................................................................ 5

             1.     Criminal Justice Authorities Recognize No Further Need to Protect
                    Community Safety by Detaining Class Members ....................................... 5

             2.     Past Convictions Alone Do Not Show Current Dangerousness ................. 6

             3.     Courts Regularly Release People from Immigration Detention Who
                    Have Serious Past Criminal Convictions to Comply with
                    Constitutional Protections ........................................................................ 8

       B.    MERE CHARGES AND DISMISSALS SHOULD BE GIVEN NO WEIGHT ......................... 9

IV.    RELEASE SHOULD NOT BE DENIED ON THE BASIS OF AN INTERPOL
       "RED NOTICE" ..................................................................................................... 10

V.     GANG ALLEGATIONS ........................................................................................ 11

VI.    CLASS MEMBERS WHO LIKELY CANNOT BE REMOVED ................................. 12

VII.   OPPORTUNITIES TO RESPOND TO MISREPRESENTATIONS IN
       GOVERNMENT SUBMISSIONS ........................................................................... 14

# **TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Ali v. DHS.*, No. 20-CV-0140,
 2020 WL 1666074 (S.D. Tex. Apr. 2, 2020) .......................................................................... 13

*Bahena Ortuño v. Jennings*,
 No. 20-CV-02064-MMC, 2020 WL 1701724 (N.D. Cal. Apr. 8, 2020) ................................... 8

*Bent v. Barr*,
 No. 19-CV-06123-DMR, 2020 WL 1812850 (N.D. Cal. Apr. 9, 2020) .................................... 8

*Clark v. Martinez*,
 543 U.S. 371 (2005) .................................................................................................................. 9

*Coffin v. United States*,
 156 U.S. 432 (1895) .................................................................................................................. 9

*Doe v. Barr*,
 No. 20-CV-02141-LB, 2020 WL 1820667 (N.D. Cal. Apr. 12, 2020) ...................................... 4

*Fraihat v. ICE*, No. 19-cv-1546-JGB,
 2020 WL 1932570 n. 20 (C.D. Cal. Apr. 20, 2020) .................................................................. 3

*In re Lawrence*,
 44 Cal.4th 1181 (2008) ............................................................................................................. 6

*In re Nunez*,
 173 Cal.App.4th 709 (2009) ..................................................................................................... 5

*Jennings v. Rodriguez*,
 2016 WL 6276890 (No. 15-1204) ............................................................................................ 5

*Judalang v. Chertoff*,
 562 F.Supp.2d 1119 (S.D. Cal. 2008) ....................................................................................... 8

*Lopez v. Sessions*,
 No. 18 CIV. 4189 (RWS), 2018 WL 2932726 (S.D.N.Y. June 12, 2018) ......................... 11, 12

*Maldonado v. Lloyd*,
 No. 18 CIV. 3089 (JFK), 2018 WL 2089348 (S.D.N.Y. May 4, 2018*)* .............................. 11, 12

*Mau v. Chertoff*,
 562 F.Supp.2d 1107 (S.D. Cal. 2008) ....................................................................................... 7

*Medina v. U.S. Dep't of Homeland Security*,
 313 F.Supp.3d 1237 (W.D. Wash. 2018) ........................................................................... 11, 12

*Nadarajah v. Gonzalez*,
 443 F.3d 1069 (9th Cir. 2006) ................................................................................................... 9

*Ngo v. INS*,
  192 F.3d 390 (3d Cir. 1999) ................................................................................................ 7

*People v. Elliot*,
  54 Cal.2d 498 (1960) ........................................................................................................ 10

*People v. Holman*,
  214 Cal.App.4th 1438 (2013) ........................................................................................... 10

*People v. Medina*,
  11 Cal.4th 694 (1995) ....................................................................................................... 10

*Ramos v. Sessions*,
  293 F.Supp.3d 1021 (N.D. Cal. Mar. 13, 2018) ................................................................. 8

*Sales v. Johnson*,
  No. 16-cv-01745-EDL, 2017 WL 6855827 (N.D. Cal. 2017) ............................................ 8

*Saravia v. Sessions,*
  280 F.Supp.3d 1168 (N. D. Cal. 2017) ............................................................................. 11

*Thai v. Ashcroft*,
  366 F.3d 790 (9th Cir. 2004) .............................................................................................. 9

*Trop v. Dulles*,
  356 U.S. 86 (1958) .............................................................................................................. 7

*United States v. Salerno*,
  481 U.S. 739 (1987) ....................................................................................................... 6, 9

*United States v. Taylor*,
  289 F.Supp.3d 55 (D.D.C. 2018) ........................................................................................ 7

*United States v. Watts*,
  519 U.S. 148 (1997) .................................................................................................... 10, 11

*United States v. Williams*,
  636 F.3d 1229 (9th Cir. 2011) ............................................................................................ 5

*Weems v. United States,*
  217 U.S. 349 (1910) ............................................................................................................ 7

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) .................................................................................................. 8, 9, 12

**STATUTES**

8 U.S.C. § 1226 ............................................................................................................................. 8

18 U.S.C. 3553 .............................................................................................................................. 5

18 U.S.C. § 3142 ....................................................................................................................... 6, 7

iii
CASE NO. 3:20-CV-02731-VC
PLAINTIFFS-PETITIONERS' COMMENTS RE STANDARD CONDITIONS OF RELEASE

**RULES**

Cal. Rules of Court 4.410 ............................................................................................................. 5

I. **INTRODUCTION**

Plaintiffs-Petitioners submit this memorandum to provide the Court with their perspective on several critical issues that commonly arise in class members' bail assessments. These issues include: (1) a full accounting of conditions that make someone more vulnerable to serious illness or death caused by COVID-19; (2) the proper weight to be accorded to criminal history, other criminal justice information, gang allegations, and Interpol "Red Notices" in bail assessments; (3) the situation of class members who cannot be repatriated; and (4) the problem of misstatements in Defendants' responses to Plaintiffs' bail applications.

Plaintiffs do not address the ongoing threat COVID-19 poses to class members in this brief, as the Court has already found "an exceedingly strong likelihood that [Plaintiffs] will prevail on their claim that current conditions at the facilities violate class members' due process rights by unreasonably exposing them to a significant risk of harm." (ECF 53 at 3). Yet the issues addressed below should be considered in the context of recent COVID-19 developments. There are now more than 670 confirmed cases of COVID-19 in immigration detention facilities, where approximately 50 percent of tests come back positive for the disease.[1] An ICE detainee has now died from COVID-19.[2] Total COVID-19 cases and deaths continue to grow substantially throughout the United States, including in California.[3] Yet against this backdrop, and even as the Court orders class members released, ICE continues to take new class members into custody, blunting the effect of the Court's release orders. Plaintiffs accordingly hope what follows will assist in identifying as many class members as possible who may be released.

II. **THE RANGE OF COVID-19 VULNERABILITIES IDENTIFIED BY THE GOVERNMENT IS TOO NARROW**

A broad range of factors and conditions make certain class members especially vulnerable to COVID-19, rendering proper identification of risk factors critical. The risk of

---

[1] *See* https://www.ice.gov/coronavirus.
[2] *See* Maria Santana and Catherine E. Shoichet, First ICE detainee dies from coronavirus, CNN (May 6, 2020), https://www.cnn.com/2020/05/06/politics/ice-detainee-coronavirus/index.html.
[3] May 5 marked the largest single day total of confirmed COVID-19 cases in California since the crisis began. See *Tracking coronavirus in California*, L.A. Times, https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/.

hospitalization and death from COVID-19 increases significantly based on age or comorbidities.[4] However, the "medical conditions" identified by Defendants in this case are an extraordinarily limited subset of vulnerabilities recognized as increasing an individual's risk of severe or fatal COVID-19.

Defendants' spreadsheets include only four conditions (diabetes, asthma, hepatitis C, and HIV) that increase a detainee's risk upon contracting COVID-19, which fail to account for numerous medical vulnerabilities widely recognized by medical experts, including the Centers for Disease Control and Prevention (CDC), as increasing an individual's risk of harm from COVID-19 infection. The CDC has recognized each of the following conditions as additional comorbidities which increase an individual's risk of COVID-19[5]:

- Hypertension[6]
- Obesity[7]
- A history of smoking
- Cancer
- Cardiovascular disease or other serious heart conditions
- Chronic kidney disease
- Chronic respiratory or lung disease
- Liver disease
- Cortisteroid use
- A prior organ transplant
- Blood disorders (e.g., sickle cell disease or on blood thinners)

---

[4] Safiya Richardson *et al.*, *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, Apr. 22, 2020, https://jamanetwork.com/journals/jama/fullarticle/2765184 (21% fatality of 5700 patients hospitalized in New York City).

[5] The CDC's has issued several guidance documents on these conditions. *See Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)* (updated Apr. 6, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (*hereinafter* "CDC Interim Clinical Guidance"); *Coronavirus Disease 2019: People Who Are At Higher Risk* (Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 5, 2020), and *Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission*, Appendix A (Mar. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf (last visited May 5, 2020).

[6] Stage 1 hypertension is defined as systolic readings of 130-139 mm Hg or diastolic mm Hg of 80-89; Stage 2 as systolic of 140 mm Hg or higher or diastolic of 90 mm Hg or higher; and hypertensive crisis as systolic of 180 Hg or higher or diastolic of 120 mm Hg or higher. *Guideline for the Prevention, Detection, Evaluation, and Management of High Blood Pressure in Adults*, J. of American College of Cardiology (May 7, 2018), at https://www.acc.org/latest-in-cardiology/ten-points-to-remember/2017/11/09/11/41/2017-guideline-for-high-blood-pressure-in-adults.

[7] In addition to the CDC COVID-19 Higher Risk Categories, *supra*, note 6, *see also* Stephanie Soucheray, *In New York, Obesity Appears to Raise COVID-19 Risk*, Center for Infectious Disease Research and Policy (Apr. 10, 2020), https://www.cidrap.umn.edu/news-perspective/2020/04/new-york-obesity-appears-raise-covid-19-risk (BMI of over 30 significantly increased likelihood of COVID-19 hospitalization).

- Endocrine disorders
- Metabolic disorders (such as inherited metabolic disorders and mitochondrial disorders)
- Neurological and neurodevelopment conditions, intellectual disabilities and stroke
- A compromised immune system

Furthermore, the testimony of Plaintiffs' expert, Dr. Robert Greifinger, that many other conditions increase risk of harm (see ECF 5-2 ¶ 49) has never been contested, much less rebutted, by Defendants.

Defendants also fail to acknowledge the extent to which age may increase an individual's risk of severe COVID-19. While the CDC states that the most significant risk of harm is for those 65 years old or older, data concerning hospitalization and fatality demonstrates that the risk of severe COVID-19 begins at a far earlier age.[8] Moreover, studies have increasingly recognized harm from COVID-19 for all adults regardless of age,[9] as confirmed by Dr. Greifinger (see ECF 5-2 ¶ 49b) and not contested by Defendants. Thus, while risk increases with age, there is not a clear age demarcation where the risks of severe COVID-19 are suddenly present.[10]

Moreover, the novelty of COVID-19 means that the panoply of risk factors remains in flux. For instance, while the CDC has not yet recognized high cholesterol as a risk factor for severe COVID-19, high cholesterol was the third most common comorbidity among New York State's COVID-19 fatalities.[11] A recent study, not yet replicated on a larger scale, has also shown

---

[8] CDC, *Laboratory-Confirmed COVID-19-Associated Hospitalizations* (last Updated Apr. 25, 2020), at https://gis.cdc.gov/grasp/COVIDNet/COVID19_3.html (last visited May 5, 2020) (hospitalization risks increased from 2.1% for 18-49 year-olds to 6.4% for 50-64 year-olds to 13.2% for those over 65); CDC, *Provisional COVID-19 Death Counts by Sex, Age, and State*, https://data.cdc.gov/NCHS/Provisional-COVID-19-Death-Counts-by-Sex-Age-and-S/9bhg-hcku (last visited May 6, 2020); CDC Interim Clinical Guidance, *supra*, note 5.

[9] Lisa Lockerd Maragakis, *Coronavirus and COVID-19: Younger Adults Are At Risk Too*, at https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-and-covid-19-younger-adults-are-at-risk-too (38% of those hospitalized in the United States between 20 and 54 years old and half in intensive care younger than 65, similar to results elsewhere), *citing* CDC, *Morbidity and Mortality Weekly Report: Severe Outcomes Among Patients with Coronavirus Disease 2019 – United States, February 12 – March 16, 2020*, at https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2 (last visited May 5, 2020).

[10] ICE has previously recognized 60 as the age to consider custody redeterminations in light of COVID-19. Peter Berg, Asst. Dir., Field Operations, ICE, *Updated Guidance: COVID-19 Detained Docket Review—Effective Immediately*, Apr. 4, 2020, at https://www.ice.gov/doclib/coronavirus/attk.pdf. The court in *Fraihat v. ICE* identified that individuals 55 or older would be at heightened risk. *Fraihat v. ICE*, No. 19-cv-1546-JGB, 2020 WL 1932570, at *16 n. 20 (C.D. Cal. Apr. 20, 2020).

[11] Danny Hakim, *Asthma Is Absent Among Top Covid-19 Risk Factors, Early Data Shows,* N.Y. Times (Apr. 16, 2020), https://www.nytimes.com/2020/04/16/health/coronavirus-asthma-risk.html?referringSource=articleShare (citing New York State Department of Health, "Fatalities," https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no (last visited May 5, 2020). *See also* The Hospitalist, *Comorbidities the Rule in New York's COVID-19 Deaths* (Apr. 8, 2020),

that tuberculosis (both active and latent) may be an important risk factor for severe COVID-19, associated with "more rapid development of symptoms" and "more severe or critical COVID-19 symptoms."[12] Finally, a growing body of evidence suggests that mental illness—including post-traumatic stress disorder, stress, and depression—can suppress the immune response and increase the risk of severe effects of COVID-19, leaving other courts to consider psychological disorders relevant to a consideration of release in the context of COVID-19.[13]

Finally, Defendants fail to present risk factors where a class member's specific underlying health conditions are known to ICE because of medical care the individual received while in custody,[14] or have been affirmatively presented to ICE in, i.e., a humanitarian parole request or a *Fraihat* notice provided by the individual or his counsel to ICE.[15] Defendants fail to present these CDC risk factors even where ICE has recognized them in other contexts as relevant to COVID-19 custodial re-determinations.[16] Similarly, Defendants identified "AGE" as a medical vulnerability for a single individual—the eldest class member, 78-year-old Jose Guevara—even though many other class members with advanced age face heightened risk.

---

https://www.the-hospitalist.org/hospitalist/article/220457/coronavirus-updates/comorbidities-rule-new-yorks-covid-19-deaths.

[12] Yu Chen et al., *Active or Latent Tuberculosis Increases Susceptibility to COVID-19 and Disease Severity*, (Mar. 16, 2020), at https://www.medrxiv.org/content/10.1101/2020.03.10.20033795v1.full.pdf (last visited May 5, 2020). *See* World Health Organization, *WHO Urges Health Care Providers to Maintain TB Services During COVID-19 Pandemic* (Mar. 24, 2020), at https://www.avert.org/news/who-urges-health-care-providers-maintain-tb-services-during-covid-19-pandemic%E2%80%AF.

[13] *See, e.g.*, *Fraihat*, *supra* note 14, at *16 n. 20 (C.D. Cal. Apr. 20, 2020); *Doe v. Barr*, No. 20-CV-02141-LB, 2020 WL 1820667, at *4 (N.D. Cal. Apr. 12, 2020) (PTSD, depression, and latent tuberculosis).

[14] While in ICE custody on March 16, 2020, Jose Lopez-Guevara underwent heart surgery because of a serious heart condition; this was not, however, identified by ICE to the Court either in the spreadsheets presenting "medical conditions" of all class members or in the Government's response to Mr. Lopez-Guevara's bail application. (ECF No. 86.)

[15] For example, the following class members have documented their CDC vulnerabilities in *Fraihat* notifications and requests for release presented to Defendants, but that information was omitted on the spreadsheets Defendants presented to the Court: Javier Alfaro (diabetes and hypertension); Eleazar Porcayo Garcia (diabetes); and Edgar Rodriguez Rojas (hypertension).

[16] Peter Berg, Asst. Dir., Field Operations, ICE, *Updated Guidance: COVID-19 Detained Docket Review—Effective Immediately* (Apr. 4, 2020), https://www.ice.gov/doclib/coronavirus/attk.pdf (requiring custody reviews for, i.e., detainees over 60 years old, with chronic kidney disease, compromised immune system, and neurological and neurologic and neurodevelopment conditions).

### III. THE COURT SHOULD NOT PLACE EXCESSIVE WEIGHT ON CRIMINAL HISTORY IN EVALUATING CURRENT DANGEROUSNESS

Plaintiffs recognize that this Court has discussed the potential relevance of criminal history during the hearing on the temporary restraining order and the case management conferences. Plaintiffs respectfully detail their legal positions on this subject below.

#### A. Prior Convictions

For the three reasons listed below, past convictions should receive limited weight in determining whether a class member has shown that he or she is not presently dangerous, particularly given the range of protective conditions in the Court's release orders.[17]

##### 1. Criminal Justice Authorities Recognize No Further Need to Protect Community Safety by Detaining Class Members

As a rule, class members with prior criminal convictions have either completed their fixed-term criminal sentences or have been released from their criminal sentences on parole or some other early release program. Their release from criminal imprisonment represents a recognition—sometimes implicit, other times explicit—that their further detention is unnecessary to protect community safety. Criminal sentences are expressly calibrated to account for community safety in determining the appropriate length of a sentence. *See* 18 U.S.C. 3553(a)(2)(C) (stating that in "impos[ing] a sentence sufficient, but not greater than necessary" the court "shall consider," among other factors "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"); Cal. Rules of Court 4.410(a)(5) (providing that "objectives of sentencing" include "[p]reventing the defendant from committing new crimes by isolating him or her for the period of incarceration"). This principle of incapacitation is recognized in both the federal and California criminal justice systems. *See United States v. Williams*, 636 F.3d 1229, 1234 (9th Cir. 2011) ("Rehabilitation and incapacitation are central purposes of the criminal justice system[.]"); *In re Nunez*, 173 Cal.App.4th 709, 731 (2009) (discussing incapacitation as sentencing principle). Class members' completion of their fixed-

---

[17] Alternatives to detention, like the conditions fashioned by the Court in this case, are effective in preventing criminal activity by immigrants released on bond. For instance, in 2011, fewer than 1% of participants in ICE's intensive supervision program were removed from the program due to arrest by another law enforcement agency. *See Brief of 43 Social Science Researchers and Professors as Amici Curiae in Support of Respondents*, at 36-37, *Jennings v. Rodriguez*, 2016 WL 6276890, (No. 15-1204).

term criminal sentences functions as a recognition that they *can* return to their communities without imperiling public safety.

This is even more true for class members who have been discharged for their criminal sentence pursuant to a parole or other early release proceedings. The parole board must make a threshold suitability determination that a prisoner is not dangerous. 15 C.C.R. § 2281(a) ("Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."). In making this determination, "the fundamental consideration . . . is public safety . . . [which] involves an assessment of an inmate's *current* dangerousness." *In re Lawrence*, 44 Cal.4th 1181, 1205 (2008) (emphasis added). The parole board then examines "[a]ll relevant, reliable information," including, *inter alia*, "past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; [and] any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community." 15 C.C.R. § 2281(b). A class member who has been released by a parole board thus satisfied an expert panel that he or she is not presently dangerous based on an exhaustive presentation of criminal history. For class members released from criminal sentence by a parole board, prior convictions should be given *no* weight in evaluating present danger to the community.

### 2. Past Convictions Alone Do Not Show Current Dangerousness

Past convictions alone also cannot show that a person *currently* poses an "identified and articulable threat to an individual or the community." *United States v. Salerno*, 481 U.S. 739, 751 (1987). The federal Bail Reform Act (BRA) illustrates this concept. In upholding the BRA against a facial constitutional challenge, the Supreme Court in *Salerno* noted, "[t]he Bail Reform Act . . . narrowly focuses . . . only on individuals who have been arrested for a specific category of extremely serious offenses. See 18 U.S.C. § 3142(f)." *Id*. at 750. Notably, the BRA creates a presumption in favor of detention only where there is probable cause to believe a person has

*newly* committed one of those "extremely serious offenses" or where the accused previously committed a serious crime *while* on pre-trial release.[18] *See* 18 U.S.C. § 3142(e). Past criminality alone—even when serious—*does not* give rise to a presumption in favor of detention under the BRA.[19] In the immigration detention context in particular, past criminal conduct alone cannot support a finding of *present* dangerousness. *See Mau v. Chertoff*, 562 F.Supp.2d 1107, 1118 (S.D. Cal. 2008) ("Aside from Petitioner's past convictions for alcohol related driving offenses, the Government presented no evidence tending to show that, even with appropriate conditions of release, Petitioner would pose a threat to the community if released."); *see also Ngo v. INS*, 192 F.3d 390, 398 (3d Cir. 1999) ("Measures must be taken to assess the risk of flight and danger to the community on a *current basis*.") (emphasis added).

Giving significant weight to past convictions would also raise serious constitutional concerns about effectively perpetual punishment. *See Weems v. United States,* 217 U.S. 349 (1910) (finding the perpetual accessory penalties that followed the primary penalties of a term of imprisonment to be unconstitutionally cruel and unusual); *Trop v. Dulles*, 356 U.S. 86 (1958) (finding punishments cruel and unusual in part because of burdensome and systematic collateral consequences). To deny class members release and freedom from the mortal dangers of COVID-19 on the basis of a past criminal convictions alone would unlawfully transform civil immigration detention into prohibited punishment.

---

[18] On the topic of presumption cases, a court has found that the dangers of COVID-19 "tilt[] the balance in favor of release," even where there has been a previous judicial finding of dangerousness and no other changed circumstances. *United States v. McLean*, No. 1:19-cr-00380-RDM (D.D.C. Mar. 28, 2020), Order of Release (ECF 21).

[19] For class members whose convictions are remote in time or who are older, the relevance of past convictions is even less probative of current dangerousness. *See United States v. Taylor*, 289 F.Supp.3d 55, 72 (D.D.C. 2018) ("Taylor's drug conviction is almost a quarter-of-a-century old. Although sufficiently serious to warrant a ten year sentence, the underlying conduct was apparently committed when he was only about nineteen years old, and Taylor is now forty-three. [T]he use of the high intensity supervision program and other conditions should mitigate any risk that Taylor's pretrial release might otherwise present.").

CASE NO. 3:20-CV-02731-VC
PLAINTIFFS-PETITIONERS' MEMORANDUM ON COMMON ISSUES IN BAIL REVIEW PROCESS

### 3. Courts Regularly Release People from Immigration Detention Who Have Serious Past Criminal Convictions to Comply with Constitutional Protections

In response to the COVID-19 pandemic, courts across the country have ordered the release of individuals being held in civil detention by ICE, including those with past criminal convictions and pending criminal charges. Judges in this Court recently ordered release on conditions for people with convictions for attempted murder and voluntary manslaughter, *Bent v. Barr*, No. 19-CV-06123-DMR, 2020 WL 1812850 (N.D. Cal. Apr. 9, 2020), second-degree robbery and assault with a firearm, lewd and lascivious acts upon a child under 14 years old, battery and a variety of financial crimes, and multiple DUIs and witness interference, *Bahena Ortuño v. Jennings*, No. 20-CV-02064-MMC, 2020 WL 1701724 (N.D. Cal. Apr. 8, 2020). Other courts have acted similarly. *See, e.g.*, *Malam v. Adducci*, No. 20-10829 (E.D. Mich. Apr. 5, 2020) (ordering immediate release of petitioner detained pursuant to 8 U.S.C. § 1226(c)); *Hernandez v. Wolf*, No. 20-00617 (C.D. Cal. Apr. 1, 2020) (ordering release of petitioner with a criminal history consisting of at least eight convictions). In these cases, the need to release the petitioners to protect them and the community against the threat of COVID-19 outweighed their significant criminal histories.

Though these COVID-19 release orders arise under exceptional circumstances, they follow the ordinary course where courts order the release of immigrants whose detention violates the Constitution, even when those non-citizens have serious past criminal convictions.[20] The Supreme Court and the Ninth Circuit have often required the release of non-citizens with serious criminal convictions where their detention has become unconstitutional. In *Zadvydas v. Davis*, 533 U.S. 678, 684-85 (2001), the Supreme Court found the prolonged, indefinite detention of two non-citizens would raise serious constitutional concerns, even though one had a "long

---

[20] Courts within this district, as well as others, regularly order release for immigration detainees while imposing conditions on that release for those with extensive criminal history when continued detention would otherwise violate their due process rights. *See Jimenez v. Wolf*, No. 19-cv-07996-NC, 2020 WL1082648 (N.D. Cal. 2020) (ordering release on conditions of supervision for detainee charged with drug trafficking and convicted of accessory after the fact); *Ramos v. Sessions*, 293 F.Supp.3d 1021, 1030-31 (N.D. Cal. Mar. 13, 2018) (same for detainee with two prior DUI convictions); *Sales v. Johnson*, No. 16-cv-01745-EDL, 2017 WL 6855827, at *6 (N.D. Cal. 2017) (same for detainee with second-degree murder conviction); *Judalang v. Chertoff*, 562 F.Supp.2d 1119 (S.D. Cal. 2008) (same for detainee with voluntary manslaughter conviction).

criminal record, involving drug crimes, attempted robbery, attempted burglary, and theft" and the other was convicted of manslaughter after a gang-related shooting. As the Court noted, "we have upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections." *Id*. at 690-91. Several years later, the Ninth Circuit applied *Zadvydas* to a non-citizen who "established a record as a violent criminal, accumulating convictions for assault, harassment, and third-degree rape." *Thai v. Ashcroft*, 366 F.3d 790, 792 (9th Cir. 2004). The Ninth Circuit rejected the government's attempts to distinguish Mr. Thai's criminal history from the heartland of *Zadvydas* and accordingly ordered him released. *See id*. at 798. *See also Clark v. Martinez*, 543 U.S. 371 (2005) (applying *Zadvydas* to non-citizens stopped at the border who had previously been convicted of assault with a deadly weapon, burglary, and grand theft and ordering them released); *cf. Nadarajah v. Gonzalez*, 443 F.3d 1069 (9th Cir. 2006) (ordering the release of non-citizen alleged to be a member of a foreign terrorist organization because his prolonged, indefinite detention violated due process). The *Zadvydas* line of cases demonstrate that even serious past criminal conduct generally cannot justify further unconstitutional immigration detention.

      **B.**      **Mere Charges and Dismissals Should Be Given No Weight**

Mere charges that have not resulted in a conviction should carry no weight at all. *See Coffin v. United States*, 156 U.S. 432, 453 (1895) (referring to the presumption of innocence as "the undoubted law, axiomatic and elementary" such that its enforcement is "the foundation of the administration of our criminal law"). This is also true of those charged with serious crimes. *Cf. Salerno*, 481 U.S. at 750 ("Nor is the [Bail Reform] Act by any means a scattershot attempt to incapacitate those who are merely suspected of these serious crimes. The Government must *first of all* demonstrate probable cause to believe that the charged crime has been committed by the arrestee, *but that is not enough*.") (emphasis added). Because class members who have only been charged have not had their required opportunity to respond to the charges, this Court should not draw conclusions about these individuals' purported danger based solely on pending charges.

The risk of relying on mere charges is particularly acute for crimes charged in California Superior Court, where a class member may not have yet had the opportunity to challenge the

state's evidence at a preliminary hearing. "The purpose of the preliminary hearing is to weed out groundless or unsupported charges of grave offenses, and to relieve the accused of the degradation and the expense of a criminal trial. Many an unjustifiable prosecution is stopped at that point, where the lack of probable cause is clearly disclosed." *People v. Elliot*, 54 Cal.2d 498, 505 (1960) (quotations omitted). For such cases, there may not be even a threshold judicial probable cause determination.[21]

Dismissed charges should also be given no weight, whether they resulted from outright dismissal in furtherance of justice or dismissal under Penal Code § 1203.4. Under section 1203.4, dismissal comes with the "palpable benefit" of "the 'release [ ] from penalties and disabilities'. . . such that the conviction may be treated as if it were not a conviction for most purposes." *People v. Holman*, 214 Cal.App.4th 1438, 1463 (2013). Only if ICE could prove the conduct underlying a dismissed charge actually occurred should it have any potential weight. *Cf. United States v. Watts*, 519 U.S. 148, 157 (1997) ("hold[ing] that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, *so long as that conduct has been proved by a preponderance of the evidence*") (emphasis added).[22]

## IV.  RELEASE SHOULD NOT BE DENIED ON THE BASIS OF AN INTERPOL "RED NOTICE"

As Judge Chesney found in *Bahena Ortuño*, a Red Notice is not a sufficient basis on which to deny release to a Class Member; even the government does not believe such a notice to be sufficient basis for an arrest since it "does not meet the requirements for arrest under the Fourth Amendment to the Constitution." *See Bahena Ortuño*, No. 20-CV-02064-MMC (ECF 51) (N.D. Cal. Apr. 14, 2020). As Plaintiffs explained in that case, in the past two decades, Red Notices have proliferated and been used abusively by countries with weak rule-of-law institutions. Plaintiffs-Petitioners' Response (ECF No. 39) at 5-7. As Dr. Theodore Bromund, a

---

[21] Arrests without formal charges or conviction should similarly carry no weight. *See People v. Medina*, 11 Cal.4th 694, 769 (1995) ("mere arrests are usually inadmissible, whether as proof of guilt or impeachment, or aggravating penalty phase evidence").

[22] The Court should also not consider uncharged conduct—such as disciplinary records—as evidence of dangerousness. Not only are such charges not reliable because they have not been tested, it would be unfair for the Court to rely on them where class members and counsel do not have access to them.

Senior Research Fellow at the Heritage Foundation, explains, Red Notices do not involve any review of judicial documents or proceedings from the requesting country. *Id*., Expert Report, Ex. A to Supplemental Declaration of William S. Freeman ("Bromund Report"), at 4 (ECF No. 39-1). Interpol's review of Red Notice requests requires no more than ensuring that the requesting country "has checked the appropriate box" on a form. *Id*. "Interpol ha[s] acknowledged, and other experts ha[ve] concluded, that its [Red Notice] review process is administrative, not substantive." *Id*. at 5. Indeed, the U.S. Department of Justice will not rely on a Red Notice alone to arrest an individual. *Id*.

## V.   GANG ALLEGATIONS

Gang allegations are particularly prone to error and abuse. As this Court has previously observed, basing adverse immigration action on conclusory law enforcement allegations of gang membership is arbitrary, capricious, and constitutionally suspect. *See Saravia v. Sessions,* 280 F.Supp.3d 1168, 1199 (N. D. Cal. 2017), *aff'd*, 905 F.3d 1137 (2018). Other courts have come to the same conclusion. *See, e.g., Medina v. U.S. Dep't of Homeland Security*, 313 F.Supp.3d 1237, 1251 (W.D. Wash. 2018) (Plaintiff was likely to succeed on claim that DHS arbitrarily and capriciously sought to revoke DACA on basis suspect claims of gang membership); *Lopez v. Sessions*, No. 18 CIV. 4189 (RWS), 2018 WL 2932726, at *14 (S.D.N.Y. June 12, 2018) (detaining Petitioner indefinitely on ICE gang allegations based on "Petitioner's clothing and social associations" raised serious constitutional questions because facts underlying allegation did not constitute "probable cause"); *Maldonado v. Lloyd*, No. 18 CIV. 3089 (JFK), 2018 WL 2089348, at *10 (S.D.N.Y. May 4, 2018*); appeal withdrawn sub nom. Maldonado on behalf of E.H.E. v. Lloyd*, No. 18-2177, 2018 WL 8897922 (2d Cir. Nov. 2, 2018) (identifying the "due process concern" where ICE cited only the Petitioner's "choices of wardrobe and associates" as evidence of gang membership and finding that Petitioner's arrest was pretextual).

Courts also recognize that, even when gang allegations are specific, they are also often insubstantial or incorrect. The allegations advanced in *Saravia*—and in other cases where courts have found allegations of gang membership to lack credible foundation—involved specific allegations about individual petitioners' conduct. *See Saravia*, 280 F.Supp.3d at 1199 (writing

"503" in notebook and associating with known gang members); *Lopez*, 2018 WL 2932726, *14 (gang clothing and association with known gang members); *Maldonado*, 2018 WL 2089348, *10 (same). The Court should not credit gang allegations absent the submission of evidence substantiating them. *See Medina v. U.S. Dep't of Homeland Security*, 313 F.Supp.3d 1237 at 1251 (enjoining DHS from using gang allegations to strip the Petitioner of DACA status where DHS continued to assert that the Petitioner was gang-affiliated "despite providing no evidence specific to [Petitioner] . . . and offering no evidence to support its assertion."

There is already a clear example of the government misusing gang allegations in this case. The Court denied the bail application of Mr. Willian Matias Rauda after the government claimed that he is an active and self-identified gang member (ECF No. 87-5). Yet in removal proceedings in June 2019, ICE took the opposite position it takes now. The ICE attorney strenuously argued that Rauda was a "family man" and would not face danger of being tortured in El Salvador because he *would not be identified as a gang member.*[23] The Immigration Judge agreed.

## VI. CLASS MEMBERS WHO LIKELY CANNOT BE REMOVED

Due process requires that immigration detention "bear[] a reasonable relation to the purpose for which the individual was committed," *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), "namely, assuring the alien's presence at the moment of removal." *Id.* at 699. Where removal is not likely in the reasonably foreseeable future, detention during the pandemic poses an especially egregious injury.

A class member's removal may be unforeseeable for either of two reasons: the virtual halt of international travel and logistical barriers owing to COVID-19 or the lack of a repatriation

---

[23] *See* Tr. of Proceedings, June 12, 2019, at p. 212 [statement of Jennifer Castro, ICE attorney]: "And in this particular case, we have a lot of circumstances and conditions that have changed significantly since he was in El Salvador back in 2014. He's now an adult. He has committed to a law abiding life and he will no longer participate in gang activities or criminal acts in El Salvador. He's a family man so that's how do you say, additional incentive for him to lead a law abiding life and try to incorporate himself into society and try and just raise his family. He has work experience that he's garnered here in the United States that would help his job prospects and help him, how do you say, do that resume, his life as an adult in El Salvador." Mr. Rauda testified credibly that he had never been initiated in any gang, and was forced to participate in MS 13 in El Salvador at the young age of 14-15 years old.

agreement between the United States and the country to which an individual may be deported. *First*, the pandemic has caused numerous countries worldwide to close their borders to slow the spread of the virus.[24] *See, e.g., Ali v. DHS.*, No. 20-CV-0140, 2020 WL 1666074 (S.D. Tex. Apr. 2, 2020) (granting habeas petition of Pakistani national because ICE was "significantly likely to remove Petitioner in the reasonably foreseeable future" due to Pakistan closing its border). While ICE uses charter flights to effectuate removals to certain countries, for many it relies on commercial airlines, many of which have suspended flights.[25] In light of COVID-19, foreign government employees responsible for processing passport and document requests are likely working from home, making it unlikely that ICE will be able to timely obtain passports or travel documents for plaintiffs who do not already have them. This will also affect removals to countries where transit visas through third countries are necessary because there are no direct flights to the country of deportation.

*Second*, there are countries that lack a repatriation agreement with the United States, or have one that is limited to certain deportees.[26] For example, class representative Dung Tuan Dang came to the United States from Vietnam before 1996 and, thus, is very unlikely to be removed. For people in his situation, removal proceedings are effectively an idle exercise, and detention during this pandemic is gratuitous, unconstitutional, and unconscionable.

Plaintiffs will identify repatriation issues in bail applications going forward and urge the Court to grant the applications of class member for whom ICE cannot show that removal is significantly likely in the reasonably foreseeable future.

---

[24] For example, Colombia announced that its borders will remain shut from March 16 until May 30, including canceling all international flights. Honduras, Ecuador, and Peru made similar announcements, according to U.S. embassy websites for those countries. In the past six weeks, the Dominican Republic, Democratic Republic of the Congo, India, Iraq, Liberia, South Africa, Cape Verde, Guatemala, Venezuela, Trinidad and Tobago, St. Lucia, Kenya, and El Salvador all have limited inbound flights due to COVID-19.

[25] *See* Pallini, *64 Global Airlines Have Completely Stopped Flying Scheduled Flights Due to Travel Bans, Airspace Closures, and Low Demand for Travel*, Bus. Insider (Apr. 1, 2020), businessinsider.com/coronavirus-global-airlines-stopping-flights-suspending-operations-2020-3.

[26] *See* Cong. Research Service, *Immigration: "Recalcitrant" Countries and the Use of Visa Sanctions to Encourage Cooperation with Alien Removals* (updated Jan. 23, 2020), https://fas.org/sgp/crs/homesec/IF11025.pdf.

VII. **OPPORTUNITIES TO RESPOND TO MISREPRESENTATIONS IN GOVERNMENT SUBMISSIONS**

Plaintiffs have observed several instances in which inaccurate information has been presented in Defendants' responses to bail applications. While Plaintiffs do not contend these inaccuracies are intentional, Plaintiffs' current inability to reply to these inaccuracies before the Court makes a bail decision is prejudicial to the interests of the applicant. To cite a single example, as discussed above, the Court denied the bail application of Mr. Rauda after the government claimed that he is an active and self-identified gang member (ECF No. 87-5). Yet ICE has taken the position that he is *not* a gang member in his immigration proceedings.[27] There are other examples.[28] As discussed at the case management conference on May 7, Plaintiffs will endeavor to file a brief reply by the end of the same calendar day that Defendants file a document containing an inaccuracy or new allegation not previously disclosed.

Dated: May 7, 2020

Respectfully submitted,

/s/ Sean Riordan
William S. Freeman
Sean Riordan
Angélica Salceda
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA

Bree Bernwanger
Tifanei Ressl-Moyer
Hayden Rodarte
LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF SAN FRANCISCO BAY AREA

Manohar Raju
Public Defender
Matt Gonzalez
Chief Attorney
Francisco Ugarte
Genna Ellis Beier
Emilou H. MacLean
OFFICE OF THE PUBLIC DEFENDER SAN FRANCISCO

Judah Lakin
Amalia Wille
LAKIN & WILLE LLP

Jordan Wells
Stephanie Padilla
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA

Martin S. Schenker
Timothy W. Cook
Francisco M. Unger
COOLEY LLP

*Attorneys for Petitioners-Plaintiffs*

---

[27] *See supra* note 25.
[28] For example, Defendants claimed that one class member did not have an alternative living arrangement, even though counsel for the class member notified ICE that she did. (Jennifer Lara Plascenia (ECF 87-3).) Defendants also inaccurately claimed that another class member failed to file a claim for relief from removal, when she has filed a claim, and her merits hearing is set for May 14, 2020. (Ruby Joy Acita Buenaventura (ECF 103-6).)