DAVID L. ANDERSON (CABN 149604)
United States Attorney

SARA WINSLOW (DCBN 457643)
Chief, Civil Division

WENDY M. GARBERS (CABN 213208)
ADRIENNE ZACK (CABN 291629)
SHIWON CHOE (CABN 320041)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6967
    Facsimile: (415) 436-6748
    wendy.garbers@usdoj.gov
    adrienne.zack@usdoj.gov
    shiwon.choe@usdoj.gov

Attorneys for Federal Defendants

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, *et al.*, | CASE NO. 3:20-cv-02731-VC |
| Plaintiffs, | **FEDERAL DEFENDANTS' (1) MOTION FOR ORDER CONFIRMING THAT TEMPORARY RESTRAINING ORDER HAS EXPIRED, ENDING BAIL PROCESS, AND VACATING BAIL ORDERS AND (2) OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DAVID JENNINGS, *et al.*, | |
| Defendants. | |
| | Date: June 2, 2020 |
| | Time: 10:00 a.m. |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION, AND NOTICE OF OPPOSITION ........................................... 1

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

I.      CDC and ICE Guidance ............................................................................................ 3

II.     ICE Has Significantly Reduced the Population at Both Mesa Verde and Yuba ........................... 4

III.    Mesa Verde and Yuba Screen All New Arriving Detainees .................................................. 5

IV.     Mesa Verde and Yuba Provide Ongoing Medical Care for Detainees ...................................... 5

V.      Mesa Verde and Yuba Provide Education About COVID-19 for Detainees ................................. 6

VI.     Mesa Verde and Yuba Have Increased Cleaning and Sanitizing and Encourage
        Detainees to Practice Good Hygiene ......................................................................... 6

VII.    Mesa Verde and Yuba Have Increased Social Distancing .................................................... 6

VIII.   Mesa Verde and Yuba Provide All Detainees with Masks and Require Staff to Wear
        Masks ............................................................................................................. 7

IX.     Mesa Verde and Yuba Minimize and Screen Outside Contacts .............................................. 8

X.      Mesa Verde and Yuba Have Never Had Any Confirmed or Suspected Cases of
        COVID-19 ......................................................................................................... 8

XI.     ICE Continues to Closely Monitor the Situation and Reviews Detainees at Higher
        Risk for COVID-19 to Determine on a Case-By-Case Basis If Detention Remains
        Appropriate ...................................................................................................... 8

ARGUMENT ...................................................................................................................... 8

I.      The Court Lacks Jurisdiction Over This Case, and Class Certification Is Inappropriate ............... 8

II.     Plaintiffs Are Not Entitled to the Extraordinary Remedy of a Preliminary Injunction ................ 9

        A.      Plaintiffs Fail to Establish Irreparable Harm ................................................... 10

        B.      Plaintiffs Fail to Establish a Likelihood of Success on the Merits ........................... 11

        C.      Plaintiffs Fail to Establish That the Equities and Public Interest Tip in Their
                Favor ............................................................................................. 14

        D.      Plaintiffs' Proposed Injunction Is Overbroad and Improper .................................... 15

III.    The Court Should End the Bail Process and Vacate All Bail Orders, Because It Does
        Not Have Authority to Order Class Members Here Released on Bail ......................................... 18

        A.      District Courts Do Not Have Authority to Order Immigration Detainees
                Released on Bail Where, as Here, No Statute Affirmatively Allows Them to
                Do So .............................................................................................. 18

B. District Courts Do Not Have Authority to Order Detainees Released on Bail in a Non-Habeas Case, and This Case Is Not a Proper Habeas Case ...................................20

C. District Courts Do Not Have Authority to Order Detainees Released on Bail Where, as Here, Congressional Statutes Limit Such Authority........................................22

D. District Courts Do Not Have Authority to Order Detainees Released on Bail Outside of an "Exceptional Case," and the Ninth Circuit Has Held That a Risk of COVID-19 Does Not Give Rise to an "Exceptional Case" Warranting Release on Bail ..........................................................................................................23

CONCLUSION..........................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amylin Pharm., Inc. v. Eli Lilly and Co.*,
  456 F. App'x 676 (9th Cir. 2011) ................................................................ 10

*Bell v. Wolfish*,
  441 U.S. 520 (1979) ......................................................................................... 12

*Benisek v. Lamone*,
  138 S. Ct. 1942 (2018) .............................................................................. 9–10

*Blackie's House of Beef, Inc. v. Castillo*,
  659 F.2d 1211 (D.C. Cir. 1981) ................................................................... 14

*Bolante v. Keisler*,
  506 F.3d 618 (7th Cir. 2007) .............................................................. passim

*Brown v. Plata*,
  563 U.S. 493 (2011) .................................................................................. 19–20

*Calmo v. Sessions*,
  No. C 17-07124 WHA, 2018 WL 2938628 (N.D. Cal. June 12, 2018) .............................. 24

*Caribbean Marine Servs. Co., Inc. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ........................................................................ 10

*Castro v. Cty. of Los Angeles*,
  833 F.3d 1060 (9th Cir. 2016) (en banc) .................................................. 14

*Chin Wah v. Colwell*,
  187 F. 592 (9th Cir. 1911) ...................................................................... 18–20

*Cinquemani v. Ashcroft*,
  No. 00-CV-1460 (RJD), 2001 WL 939664 (E.D.N.Y. Aug. 16, 2001) ...................... 22–23

*Citizens for Rational Coast Dev. v. U.S. Fed. Highway Admin.*,
  No. 07-4551 (JAP), 2008 WL 2276005 (D.N.J. May 30, 2008) ........................... 18

*Crawford v. Bell*,
  599 F.2d 890 (9th Cir. 1979) .............................................................. 9, 20, 22

*Dawson v. Asher*,
  No. C20-0409JLR-MAT, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020) (*Dawson I*) .............. 11–12

*Dawson v. Asher*,
  No. C20-0409JLR-MAT, 2020 WL 1704324 (W.D. Wash. Apr. 8, 2020) (*Dawson II*) ............... 10, 12

*Demore v. Kim*,
  538 U.S. 510 (2003) ......................................................................................... 12

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
  489 U.S. 189 (1989) ................................................................................ 12–13

*Doran v. Salem Inn, Inc.*,
  422 U.S. 922 (1975) ...................................................................................... 15

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ...................................................................... 10

*Earth Island Inst. v. Carlton*,
  626 F.3d 462 (9th Cir. 2010) .......................................................................... 9

*East Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018) ........................................................................ 24

*Espinosa v. Ahearn (In re Hyundai and Kia Fuel Econ. Litig.),*
  926 F.3d 539 (9th Cir. 2019) (en banc) ........................................................ 21

*Ex parte Perkov*,
  45 F. Supp. 864 (S.D. Cal. 1942) .................................................................. 19

*Farmer v. Brennan*,
  511 U.S. 825 (1994) ...................................................................................... 14

*Friends of the Wild Swan v. Weber*,
  767 F.3d 936 (9th Cir. 2014) ........................................................................ 10

*Garfias-Rodriguez v. Holder*,
  702 F.3d 504 (9th Cir. 2012) (en banc) ........................................................ 15

*Helling v. McKinney*,
  509 U.S. 25 (1993) ........................................................................................ 14

*Hernandez Roman v. Wolf*,
  No. 20-55436, 2020 WL 2188048 (9th Cir. May 5, 2020) ...................... passim

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ........................................................................ 23

*Hope v. Warden York Cty. Prison*,
  956 F.3d 156 (3d Cir. 2020) .......................................................................... 25

*In re Hanoff*,
  39 F. Supp. 169 (N.D. Cal. 1941) .................................................................. 19

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018) .................................................................................... 12

*Jones v. Blanas*,
  393 F.3d 918 (9th Cir. 2004) ........................................................................ 11

*Kraft v. Gates*,
  905 F.2d 1540, 1990 WL 84279 (9th Cir. 1990) (table) ................................ 22

*Land v. Deeds*,
   878 F.2d 318 (9th Cir. 1989) ................................................................................................ 20

*Landano v. Rafferty*,
   970 F.2d 1230 (3d Cir. 1992) .............................................................................................. 20

*Mapp v. Reno*,
   241 F.3d 221 (2d Cir. 2001) ........................................................................................ passim

*Marino v. Vasquez*,
   812 F.2d 499 (9th Cir. 1987) ......................................................................................... 20–21

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ...................................................................................................... 10–11

*Moturi v. Asher*,
   No. C19-2023 RSM-BAT, 2020 WL 2084915 (W.D. Wash. Apr. 30, 2020) ..................... 11

*Murai v. Adducci*,
   No. 20-10816, 2020 WL 2526031 (E.D. Mich. May 18, 2020) .................................. 11, 15

*Nadarajah v. Gonzales*,
   443 F.3d 1069 (9th Cir. 2006) ............................................................................................ 19

*Nettles v. Grounds*,
   830 F.3d 922 (9th Cir. 2016) (en banc) ................................................................... 9, 21–22

*Padilla v. ICE*,
   953 F.3d 1134 (9th Cir. 2020) ............................................................................................ 17

*Peter O.C. v. Tsoukaris*,
   No. 20-4622 (SDW), 2020 WL 2301442 (D.N.J. May 7, 2020) ......................................... 13

*Prieto-Romero v. Clark*,
   534 F.3d 1053 (9th Cir. 2008) ............................................................................................ 24

*Ramirez v. Culley*,
   No. 2:20-cv-00609-JAD-VCF, 2020 WL 1821305 (D. Nev. Apr. 9, 2020) .................. 13–14

*Ramirez v. Galaza*,
   334 F.3d 850 (9th Cir. 2003) .......................................................................................... 21–22

*Roe v. U.S. Dist. Ct. (In re Roe)*,
   257 F.3d 1077 (9th Cir. 2001) ................................................................................. 19–20, 23

*Rumsfeld v. Padilla*,
   542 U.S. 426 (2004) .............................................................................................................. 9

*Sacramento v. Lewis*,
   523 U.S. 833 (1998) ............................................................................................................ 14

*Savino v. Souza*,
   __ F. Supp. 3d __, No. 20-10617-WGY,
   2020 WL 1703844 (D. Mass. Apr. 8, 2020) ....................................................................... 24

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................................... 8–9

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) ........................................................................................ 15

*Swain v. Junior*,
  958 F.3d 1081, 2020 WL 2161317 (11th Cir. 2020) .................................................. 13, 17

*Tam v. INS*,
  14 F. Supp. 2d 1184 (E.D. Cal. 1998) ............................................................................ 20

*Thakker v. Doll*,
  __ F. Supp. 3d __, No. 1:20-cv-480,
  2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) (*Thakker I*) .................................................. 1

*Thakker v. Doll*,
  __ F. Supp. 3d __, No. 1:20-cv-480,
  2020 WL 2025384 (M.D. Pa. Apr. 27, 2020) (*Thakker II*) .......................................... passim

*Torres v. Mercer Canyons, Inc.*,
  835 F.3d 1125 (9th Cir. 2016) ........................................................................................ 24

*Toure v. Hott*,
  __ F. Supp. 3d __, No. 1:20-cv-395,
  2020 WL 2092639 (E.D. Va. Apr. 29, 2020) .................................................................... 23

*United States v. Dade*,
  __ F.3d __, No. 19-35172,
  2020 WL 2570354 (9th Cir. May 22, 2020) .................................................................. 3, 25

*United States v. Martinez-Fuerte*,
  428 U.S. 543 (1976) ...................................................................................................... 14

*United States v. McCandless*,
  841 F.3d 819 (9th Cir. 2016) .................................................................................... 19, 23

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001) ...................................................................................................... 15

*United States v. Valenzula-Bernal*,
  458 U.S. 858 (1982) ...................................................................................................... 24

*Valentine v. Collier*,
  956 F.3d 797 (5th Cir. 2020) .................................................................................... 16–17

*Vt. Agency of Natural Res. v. United States ex rel. Stevens*,
  529 U.S. 765 (2000) ........................................................................................................ 9

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ...................................................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................................................... 9–10

*Woodcock v. Donnelly*,
    470 F.2d 93 (1st Cir. 1972) ................................................................................................ 21

*Zepeda Rivas v. Jennings*,
    __ F. Supp. 3d __, No. 20-cv-02731-VC,
    2020 WL 2059848 (N.D. Cal. Apr. 29, 2020) ............................................................. passim

## Statutes

8 U.S.C. § 1225 ...................................................................................................................... 22

8 U.S.C. § 1226 ............................................................................................................. 4, 17, 22

8 U.S.C. § 1231 .................................................................................................................. 4, 22

8 U.S.C. § 1252 ...................................................................................................................... 17

18 U.S.C. § 3626 .................................................................................................................... 20

## Rules

Fed. R. Civ. P. 23 .................................................................................................................. 21

Fed. R. Civ. P. 65 .................................................................................................................... 1

Fed. R. App. P. 23 .................................................................................................................. 19

## Other Authorities

Ctrs. for Disease Control and Prevention,
    *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in
    Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/
    2019-ncov/downloads/guidance-correctional-detention.pdf ........................................ passim

Immigr. and Customs Enf't,
    *COVID-19 Pandemic Response Requirements* (Apr. 10, 2020), https://www.ice.gov/doclib/
    coronavirus/eroCOVID19responseReqsCleanFacilities.pdf ................................................. 4

**NOTICE OF MOTION AND MOTION, AND NOTICE OF OPPOSITION**

PLEASE TAKE NOTICE that on June 2, 2020 at 10:00 a.m., defendants David Jennings, Matthew T. Albence, and U.S. Immigration and Customs Enforcement (ICE) (Federal Defendants) will appear and move for an order (1) confirming that the temporary restraining order (TRO) issued on April 29, 2020 (ECF No. 53) has expired,[1] (2) ending the ongoing bail process, and (3) vacating all bail orders. Federal Defendants will also appear to oppose Plaintiffs' motion for a preliminary injunction.

## INTRODUCTION

In an early COVID-19 case, the Middle District of Pennsylvania was confronted by a habeas petition brought by eleven immigration detainees seeking their immediate release from three detention facilities. *Thakker v. Doll*, __ F. Supp. 3d __, No. 1:20-cv-480, 2020 WL 1671563, at *1 & n.1 (M.D. Pa. Mar. 31, 2020) (*Thakker I*). In deciding the petitioners' motion for a TRO one week after they first filed their lawsuit, the court ordered them released from detention, on the theory that (1) their "tinderbox" allegations that COVID-19 would rapidly spread within their facilities and infect them demonstrated a likelihood of irreparable harm, *id.* at *3–8, (2) they were likely to succeed on the merits of their claim that their continued detention in the face of this alleged risk amounted to "punishment" that violated due process, *id.* at *8–9, and (3) the balance of equities favored them, *id.* at *9.

By the time the petitioners brought a motion for a preliminary injunction a month later to continue their release, however, the landscape had changed. Instead of facing speculation about an uncertain future as it had at the TRO stage, by the preliminary-injunction stage, the court had the benefit of a month's worth of actual facts on the ground. The court recognized, "[a]t the time of our [TRO] nearly one month ago, it was reasonable to posit that it would only be a matter of time before COVID-19 decimated our prison populations. Thankfully, that feared outcome has generally not come to pass, largely due to the quick actions of Facility officials." *Thakker v. Doll*, __ F. Supp. 3d __, No. 1:20-cv-480, 2020 WL 2025384, at *4 (M.D. Pa. Apr. 27, 2020) (*Thakker II*). While one of the three facilities had 40 confirmed cases of COVID-19 among detainees and staff, *id.* at *6, the other two facilities had one and zero confirmed cases, respectively, and had implemented measures to address the risk of

---

[1] A TRO expires after at most 14 days or, if extended for good cause, after at most 28 days. Fed. R. Civ. P. 65(b)(2).

COVID-19, *id.* at *4–5. In light of these facts, the court held that the petitioners' "tinderbox" theory of irreparable harm with respect to the latter facilities was speculative and could not support an injunction:

> When we first considered Petitioners' claims nearly one month ago, the impact of COVID-19 on central Pennsylvania was largely prognostic. While confirmed cases had been reported in Pennsylvania, the gravity of COVID-19's effects on our communities was yet to be seen. Indeed, given the grim reports on the then-current conditions in the Facilities, combined with the potentially devastating effects of the virus on Petitioners in particular, it was reasonable to apprehend that COVID-19 was inexorably marching towards the Facilities, tsunami-like in its looming catastrophic impact.
> . . . .
> In the last month, however, YCP and CCCF [the facilities] have quickly and effectively implemented the guidelines published by the CDC such that they have stymied any potential outbreak within their walls. The fears which we reasonably harbored of a "tinderbox" scenario have largely failed to appear within those Facilities. This again is a credit to the staffs at those institutions. Indeed, and as aforestated, there are no reported cases at CCCF and the single reported case at YCP appears to have been effectively contained. Thus, we find that any allegations of irreparable harm at YCP and CCCF are largely speculative and cannot satisfy the second element of our Preliminary Injunction analysis.

*Id.* at *7–8. Similarly, the court held that in light of "the evidence that [the facilities] are able to effectively control COVID-19 transmission, we find that the improved conditions therein do not negate the Government's legitimate interest in detention. Thus, we find that the Petitioners previously housed at [the facilities] are now unlikely to succeed on the merits of their claims." *Id.* at *5. The court reversed course from its TRO, denied the preliminary-injunction motion with respect to all of the petitioners who had been detained at those two facilities, and ordered them to be taken back into detention. *Id.* at *12.[2]

    *Thakker* is instructive here. *See Zepeda Rivas v. Jennings*, __ F. Supp. 3d __, No. 20-cv-02731-VC, 2020 WL 2059848, at *2 n.9 (N.D. Cal. Apr. 29, 2020) (citing *Thakker*). As in *Thakker*, the "tinderbox" scenario that Plaintiffs posited has not come to pass. In the month since this lawsuit was filed, and in the two-and-a-half months since the World Health Organization (WHO) declared COVID-19 to be a global pandemic, there have been zero confirmed or suspected cases of COVID-19 at the two facilities (Facilities) at issue here: the Mesa Verde Detention Facility (Mesa Verde) and the Yuba County Jail (Yuba). Both Facilities have taken numerous measures to safeguard against COVID-19,

---

[2] The court allowed three of the four petitioners who had been held at the facility with 40 COVID-19 cases to remain released. *Thakker II*, __ F. Supp. 3d __, 2020 WL 2025384, at *9, *11. The court ordered the fourth petitioner from that facility re-detained, finding that despite that there were COVID-19 cases and the petitioner had diabetes, his criminal history — assaulting his wife in front of his children — was such that the public interest in detention outweighed his interest in release. *Id.* at *9.

including reducing their populations to well under 50% capacity, implementing social distancing, screening all staff and detainees that enter the Facilities, providing medical care and education, cleaning and sanitizing surfaces, providing masks to all detainees and staff, and minimizing and screening outside contacts. As in *Thakker*, these measures have been successful in keeping COVID-19 at bay.

Federal Defendants respectfully submit that the Court should deny Plaintiffs' motion for a preliminary injunction, because Plaintiffs have not met their burden of establishing (1) that they have a likelihood on the success of the merits of their claims, (2) that they will suffer irreparable harm absent an injunction, or (3) that the balance of equities or public interest tip in their favor. Federal Defendants further respectfully submit that the Court should deny Plaintiffs' proposed injunction because it is overbroad and unduly restrains ICE from carrying out its statutory duties under the Immigration and Nationality Act (INA). The Ninth Circuit recently stayed a similar preliminary injunction issued in another COVID-19 case, *Hernandez Roman v. Wolf*, No. 20-55436, 2020 WL 2188048 (9th Cir. May 5, 2020), and Plaintiffs' proposed injunction is similarly defective here. Federal Defendants further respectfully submit that the Court should end the bail process and vacate all bail orders, because (1) under binding Ninth Circuit precedent, the Court does not have the authority to order the release of immigration detainees on bail in a pending lawsuit absent statutory authorization, (2) the Court does not have authority to order release in a non-habeas case, and this case is not a proper habeas case, (3) the statutory INA bars release, and (4) the Court does not have authority to order release where a detainee does not present an "extraordinary case," and a binding Ninth Circuit precedent issued this past Friday confirms that a risk of COVID-19 does not satisfy the "extraordinary case" standard. *United States v. Dade*, __ F.3d __, No. 19-35172, 2020 WL 2570354 (9th Cir. May 22, 2020).

**STATEMENT OF FACTS**

## I.      CDC and ICE Guidance

The Centers for Disease Control and Prevention (CDC) has issued guidance on the management of COVID-19 in detention facilities. Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (last visited May 27, 2020) (CDC Guidance). ICE has also issued COVID-19 Pandemic Response

Requirements, which build on the CDC Guidance. Immigr. and Customs Enf't, *COVID-19 Pandemic Response Requirements* (Apr. 10, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19response ReqsCleanFacilities.pdf (last visited May 27, 2020) (PRR). ICE has taken numerous steps at both Facilities to reduce the risk of COVID-19, including dramatically reducing their populations to allow for more distancing and implementing additional cleaning, screening, and other protective measures. *See generally* Pham Decl.; Fishburn Decl. ICE closely follows the CDC Guidance and the PRR with respect to the Facilities at issue here. Pham Decl. ¶¶ 17–18; Fishburn Decl. ¶¶ 17–18.

## II.     ICE Has Significantly Reduced the Population at Both Mesa Verde and Yuba

Mesa Verde has the capacity to house 400 detainees, and Yuba has the capacity to house 210 ICE detainees (in addition to 210 Yuba County inmates, for a maximum capacity of 420). Pham Decl. ¶ 7; Fishburn Decl. ¶ 5. As of March 11, 2020, there were 355 ICE detainees at Mesa Verde and 168 ICE detainees at Yuba. Pham Decl. ¶ 8; Fishburn Decl. ¶ 6. Following the WHO's declaration, ICE began voluntarily reducing the population at the Facilities (without being subject to any court order). By the end of March, ICE was able to reduce its detainee population at Mesa Verde by 43 detainees, or approximately 12%, and its detainee population at Yuba by 18 detainees, or approximately 11%. Pham Decl. ¶ 9; Fishburn Decl. ¶ 7. ICE continued its efforts to reduce its detainee population at the Facilities through April and May. As of yesterday, ICE has reduced its detainee population at Mesa Verde from 355 to 168, a reduction of approximately 53%, and reduced the population at Yuba from 168 to 79, a reduction of approximately 53%. Pham Decl. ¶ 10; Fishburn Decl. ¶ 8.

These numbers understate the total number of detainees that ICE has released from the Facilities, as these reflect net releases, not gross releases.[3] In the INA, Congress mandated that ICE detain certain categories of aliens pending removal, such as aliens who are convicted of certain crimes, including aggravated felonies, *see* 8 U.S.C. § 1226(c), or aliens who have been ordered to be removed from the United States, *see* 8 U.S.C. § 1231(a)(2). To implement Congress's mandate, ICE must take in new detainees. Pham Decl. ¶ 11; Fishburn Decl. ¶ 9. (Many of the new detainees that Mesa Verde and Yuba

---

[3] Release from a detention facility includes release into the community, release for removal from the United States, and release for transfer to another facility for removal from the United States. Pham Decl. ¶ 11 n.1; Fishburn Decl. ¶ 9 n.1.

takes in are aliens with criminal histories received from jails or state or federal prison. Pham Decl. ¶ 11; Fishburn Decl. ¶ 9.[4]) At the same time, ICE has diligently worked to significantly reduce the population at the Facilities, which means that ICE has released even more detainees than its net population reduction alone indicates. For example, in the past month alone, ICE has released 194 detainees from Mesa Verde and 73 detainees from Yuba.[5] Even while complying with Congress's mandate to take in new detainees, ICE has managed to reduce the populations at the Facilities, with both operating at under 50% capacity. Pham Decl. ¶¶ 12–13; Fishburn Decl. ¶¶ 11–12.

### III.    Mesa Verde and Yuba Screen All New Arriving Detainees

All new detainees at the Facilities are screened by nurses, who wear personal protective equipment, per protocol. Pham Decl. ¶ 21; Fishburn Decl. ¶ 20. The results dictate whether to monitor or isolate the detainee. Pham Decl. ¶ 21; Fishburn Decl. ¶ 20. At Mesa Verde, new detainees who are asymptomatic but who may be at risk due to their travel history or exposure to COVID-19 patients are placed in isolation for precautionary monitoring. Pham Decl. ¶ 22. At Yuba, all new detainees are placed in a 14-day quarantine, no matter their history. Fishburn Decl. ¶ 21. These Yuba detainees are housed in the "F-pod" unit in their own cells, and are kept apart from the general population for 14 days. *Id.* ¶ 21.

At both Facilities, detainees who present symptoms consistent with COVID-19 will be placed in isolation, where they will be tested for COVID-19 and influenza to rule out any other source of symptoms. Pham Decl. ¶ 23; Fishburn Decl. ¶ 22. In testing for COVID-19, the Facilities follow the CDC Guidance to safeguard those in their custody and care. Pham Decl. ¶ 23; Fishburn Decl. ¶ 22. Detainees who test positive will remain isolated and be treated. Pham Decl. ¶ 23; Fishburn Decl. ¶ 22.

### IV.    Mesa Verde and Yuba Provide Ongoing Medical Care for Detainees

Medical staff at both Facilities will examine any detainee who submits a request to see medical due to symptoms consistent with COVID-19. Pham Decl. ¶ 25; Fishburn Decl. ¶ 23. As described above, detainees who present symptoms consistent with COVID-19 will be placed in isolation and will be

---

[4] As contained in the weekly detainee lists that ICE has been providing to Plaintiffs and the Court, among the new detainees that ICE has taken in within the past month are aliens who have been criminally convicted of murder, rape, robbery, assault with a firearm, possession of a stabbing weapon in prison, and lewd or lascivious acts by force with a child under 14 years of age.

[5] 46 detainees were released from the two Facilities pursuant to the Court's bail orders; the remaining 221 were released without the need for a bail order from the Court.

tested for COVID-19. Pham Decl. ¶ 23; Fishburn Decl. ¶ 22.

**V.      Mesa Verde and Yuba Provide Education About COVID-19 for Detainees**

Both Facilities provide education about COVID-19 to detainees. Pham Decl. ¶¶ 28–31; Fishburn Decl. ¶¶ 30–32. Both Facilities post information and flyers in multiple languages to inform detainees about COVID-19 and precautions they should take. Pham Decl. ¶¶ 29–30; Fishburn Decl. ¶ 31. Both Facilities tell detainees to seek immediate medical care if they feel ill. Pham Decl. ¶ 31; Fishburn Decl. ¶ 32.

**VI.     Mesa Verde and Yuba Have Increased Cleaning and Sanitizing and Encourage Detainees to Practice Good Hygiene**

Both Facilities are engaging in frequent cleaning and sanitizing of the facilities and common area high-contact surfaces. Pham Decl. ¶ 32; Fishburn Decl. ¶ 33. Both Facilities supply detainees with disinfectants, sanitizers, bar soap, and liquid soap, free of charge, and encourage detainees to use them. Pham Decl. ¶¶ 33–37; Fishburn Decl. ¶ 34–36.

**VII.    Mesa Verde and Yuba Have Increased Social Distancing**

Both Facilities are running at below 50% capacity and have taken numerous measures to increase social distancing among detainees, in accordance with the CDC Guidance.

Mesa Verde has four housing units A–D. Pham Decl. ¶ 38. Each unit has a maximum capacity of 100 and currently houses fewer than 50. *Id.* ¶ 39. There are 32 detainees in A-Dorm, 41 detainees in B-Dorm, 43 detainees in C-Dorm, and 44 detainees in D-Dorm. *Id.* Each housing unit contains 50 two-person bunks, set in rows of 25 on opposite walls with a central walkway at least eight feet wide separating them. *Id.* ¶ 40. Mesa Verde has staggered sleeping arrangements so that no two adjacent beds are occupied. *Id.* ¶ 41. Detainees are sleeping one to each bunk, alternating between top and bottom bunks, and are instructed to sleep positioned head-to-feet in the alternating top and bottom bunks. *Id.* The bunk beds are spaced on average a little over three feet apart, the vertical distance between the bottom and top bed platforms is 49 inches, and the average distance between the head of a top bunk and the head of the next alternating bottom bunk is approximately 90 inches (or 7.5 feet). *Id.* Each housing unit contains two identical common-use bathrooms. *Id.* ¶ 43. Mesa Verde has taped off and shut down adjacent sinks, toilets, and showers to encourage social distancing. *Id.* ¶¶ 44–47.

Mesa Verde has two dining halls, each with a maximum capacity of 80. *Id.* ¶ 55. Mesa Verde has staggered meal times to limit the number of detainees in a dining hall to a maximum of 25 at any given time. *Id.* ¶ 56. There are 25 tables, to allow each detainee to sit as his own table during meals. *Id.* It is possible for 25 detainees to sit at the 25 tables without sitting within six feet of each other. *Id.* ¶¶ 57–58.

Yuba has five units A–E that currently house ICE detainees. Fishburn Decl. ¶ 37. Each unit has a maximum capacity of 40–50 and currently houses fewer than 20. *Id.* ¶¶ 38–39. Units A, D, and E have identical layouts. *Id.* ¶ 41. Each is a two-story unit with 20 two-person cells measuring 6' by 11'7", in addition to a common area. *Id.* Each detainee is in an individual cell, and no two detainees share a cell. *Id.* Detainees are free to remain in or return to their cells at any time. *Id.* ¶ 42. Plaintiffs acknowledge that detainees are able to socially distance while in their cells. Siguantay Decl. ¶ 6 (ECF No. 229-14). There are two showers in each unit, one on the lower floor and one on the upper floor. Fishburn Decl. ¶ 41. The showers, being on different floors, are not within six feet of each other. *Id.* Units B and C also have identical layouts. *Id.* ¶ 46. Each is two-story dorm-style housing unit. *Id.* Each originally contained 25 two-person bunks, but Yuba removed five bunks from each unit, in order to space out the bunks at least six feet apart. *Id.* All detainees sleep on the bottom bunk, and no two detainees share a bunk. *Id.* The bunks are spaced approximately 6'2" by 6' apart. *Id.* Each unit has one shower, two toilets, and four sinks on the lower floor and two showers, four toilets, and two sinks on the upper floor. *Id.* ¶ 47. Unlike Mesa Verde, there are no dining halls in Yuba. *Id.* ¶¶ 43. 48. Detainees take meals in their respective housing units. *Id.* It is possible for detainees to receive their meals and sit without any two detainees sitting within six feet of each other if they eat at their bunks, which they are encouraged to do by YCJ staff. *Id.* ¶¶ 45, 49–50.[6]

## VIII.   Mesa Verde and Yuba Provide All Detainees with Masks and Require Staff to Wear Masks

Both Facilities provide all detainees with masks and require staff to wear masks any time they are within six feet of a detainee. Pham Decl. ¶¶ 65–67; Fishburn Decl. ¶¶ 56–57. Medical staff are required to wear N95 masks during all patient encounters at Mesa Verde. Pham Decl. ¶ 67, and during

---

[6] Plaintiffs attach a number of old photographs of housing units at Yuba. Rodriguez Diaz Decl. & Exs. (ECF No. 229-2); Perez Decl. & Ex. (ECF No. 229-7); Salgado Decl. & Ex. (ECF No. 229-13); *see also* Greifinger Second Suppl. Decl. (ECF No. 229-19). With one exception, none of the photographs reflect the current conditions of units at Yuba used to house ICE detainees. Fishburn Decl. ¶¶ 53–54.

all contact with any detainee quarantined in F-pod at Yuba, Fishburn Decl. ¶ 58.

## IX.    Mesa Verde and Yuba Minimize and Screen Outside Contacts

Both Facilities have suspended all social visitations to minimize outside contacts that might introduce an infection to the facilities. Pham Decl. ¶ 69; Fishburn Decl. ¶ 59. Both Facilities have encouraged non-contact visits with attorneys, while continuing to provide access to attorneys via telephone and in-person visits (provided that the attorney wears appropriate personal protective equipment and submits to medical screening prior to entering the facilities). Pham Decl. ¶ 69; Fishburn Decl. ¶ 59. Both Facilities screen all staff and vendors when they enter the facilities for any symptoms, including body temperature. Pham Decl. ¶ 70; Fishburn Decl. ¶ 60.

## X.    Mesa Verde and Yuba Have Never Had Any Confirmed or Suspected Cases of COVID-19

There have been never been any confirmed or suspected cases of COVID-19 among any detainees or staff at either of the Facilities at any point. Pham Decl. ¶ 14; Fishburn Decl. ¶ 13. Medical staff at the Facilities have not encountered any detainee having symptoms consistent with COVID-19 at any point. Pham Decl. ¶ 15; Fishburn Decl. ¶ 14. No staff member has reported having symptoms consistent with COVID-19 at any point. Pham Decl. ¶ 16; Fishburn Decl. ¶ 15.

## XI.    ICE Continues to Closely Monitor the Situation and Reviews Detainees at Higher Risk for COVID-19 to Determine on a Case-By-Case Basis If Detention Remains Appropriate

ICE management are in constant communication with the Facilities regarding any issues stemming from COVID-19. Pham Decl. ¶ 71; Fishburn Decl. ¶ 61. ICE continues to review the populations for those who are "at higher risk for severe illness" if they contract COVID-19, as identified by the CDC, to determine if detention remains appropriate. Pham Decl. ¶ 72; Fishburn Decl. ¶ 62.

## ARGUMENT

## I.    The Court Lacks Jurisdiction Over This Case, and Class Certification Is Inappropriate

Federal Defendants respectfully submit that the Court (1) lacks jurisdiction over this case because Plaintiffs lack standing and (2) lacks habeas jurisdiction over this conditions-of-confinement case and because venue is improper. There continue to be no confirmed or suspected COVID-19 cases at the Facilities, while some public reports show that the disease continues to spread in certain locations outside of the Facilities. Plaintiffs therefore have not raised an injury that is "'concrete and

particularized' and 'actual or imminent, not conjectural or hypothetical,'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) or established "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact," *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (quotation marks omitted). Additionally, as the Court recognized, this lawsuit "is about conditions of confinement at the facilities," *Zepeda Rivas*, 2020 WL 2059848, at *1, and thus there is no habeas jurisdiction, as lawsuits that challenges only conditions of confinement are not cognizable in habeas, and release is not an available remedy. *Nettles v. Grounds*, 830 F.3d 922, 933 (9th Cir. 2016) (en banc); *Crawford v. Bell*, 599 F.2d 890, 892 (9th Cir. 1979). Even if there were habeas jurisdiction, plaintiffs in detention may file a habeas petition only in the district where they are confined and must name their immediate custodian as the respondent. *See* Fed. Defs. TRO Opp'n 12 (ECF No. 37) (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 437 (2004)). The Facilities, and ICE officials most directly responsible for overseeing the Facilities, are all located in the Eastern District of California, not here. *Id.* at 14 (citing declarations).[7]

Additionally, while the Court granted provisional class certification in its TRO, now that the TRO has expired, Federal Defendants respectfully submit that continuing provisional class certification is inappropriate. Among other things, there is a lack of commonality and typicality among the class members, such that the Court has had to make individualized determinations. In addition to the obvious differences in their criminal records, detainees also vary greatly with regard to other factors, such as risk of flight, medical conditions, situations for home release, and many other potentially relevant variables. Thus, there is no commonality or typicality as required for class certification.

## II.   Plaintiffs Are Not Entitled to the Extraordinary Remedy of a Preliminary Injunction

"A preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "[P]laintiffs seeking a preliminary injunction face a difficult task in proving that they are entitled to this 'extraordinary remedy.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). A plaintiff's burden is a "heavy" one, *id.*, that requires "substantial proof" and a "*clear showing*" that an

---

[7] Federal Defendants recognize that the Court previously disagreed with their view on standing and venue. *Zepeda Rivas*, 2020 WL 2059848, at *2 & nn.4–5.

injunction is warranted, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original).

"As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from [(1)] a plaintiff's showing of a likelihood of success on the merits." *Benisek*, 138 S. Ct. at 1943–44 (citing *Winter*, 555 U.S. at 32). "Rather, a court must also consider whether the movant has shown '[(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest.'" *Id.* at 1944 (quoting *Winter*, 555 U.S. at 20). Where the government is a party, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Plaintiffs fail to satisfy any of the *Winter* factors, much less all of them. Their motion for a preliminary injunction therefore should be denied.

### A.    Plaintiffs Fail to Establish Irreparable Harm

Taking the second *Winter* factor first, Plaintiffs must establish "immediate threatened injury." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir. 2014) (quoting *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)). Merely showing a "possibility" of irreparable harm is insufficient. *Winter*, 555 U.S. at 22. "To support injunctive relief, harm must not only be irreparable, it must be imminent; establishing a threat of irreparable harm in the indefinite future is not enough." *Amylin Pharm., Inc. v. Eli Lilly and Co.*, 456 F. App'x 676, 679 (9th Cir. 2011). The standard is not "guaranteed safety — an impossible standard to meet no matter the circumstances — but rather a likelihood of irreparable harm." *Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL 1704324, at *12 (W.D. Wash. Apr. 8, 2020) (*Dawson II*).

The facts on the ground do not support a claim of an immediate threatened irreparable injury in the absence of an injunction. In the two-and-a-half months since the WHO declared COVID-19 to be a pandemic, the Facilities have had zero confirmed or suspected cases. Plaintiffs' "tinderbox" theory that COVID-19 would rapidly spread within the Facilities and overwhelm their medical infrastructure has not happened. Having suffered no injury in the past two-and-a-half months without an injunction, Plaintiffs have not established that they suffer immediate threatened irreparable injury without an injunction now. This is particularly true given that ICE has, on its own, taken numerous measures to dramatically reduce the population in the Facilities and implement distancing, sanitizing, and monitoring

procedures.[8] *Cf. Thakker II*, 2020 WL 2025384, at *8; *accord, e.g.*, *Murai v. Adducci*, No. 20-10816, 2020 WL 2526031, at *6 (E.D. Mich. May 18, 2020) ("[Facility] has pursued aggressive reforms to prevent COVID-19 from entering the general population, to avert the spread of the disease if it did enter, and to ensure detainees are provided quality medical attention, if needed. Speculation as to what *could* go wrong with such conditions and how Petitioner *could* be affected given his health profile does not amount to an 'imminent' or 'unreasonable' risk sufficient to establish a constitutional violation.") (emphasis in original); *Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL 1304557, at *3 (W.D. Wash. Mar. 19, 2020) (*Dawson I*) (denying injunctive relief because "[t]here is no evidence of an outbreak at the detention center or that Defendants' precautionary measures are inadequate to contain such an outbreak or properly provide medical care should it occur").[9]

### B.   Plaintiffs Fail to Establish a Likelihood of Success on the Merits

As this Court recognized, Plaintiffs' claim is a conditions-of-confinement claim under the Fifth Amendment. *Zepeda Rivas*, 2020 WL 2059848, at *1 ("At root, this lawsuit is not about whether any particular person should be released; it is about the conditions of confinement at the facilities."). Conditions of confinement violate a civil detainee's Fifth Amendment rights when "those conditions amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "[A] restriction is punitive where it is intended to punish, or where it is excessive in relation to its non-punitive purpose." *Jones v. Blanas*, 393 F.3d 918, 933–34 (9th Cir. 2004) (quotation marks and brackets omitted). Plaintiffs do not

---

[8] Plaintiffs attempt to shift the burden of proof, apparently arguing that they are entitled to an injunction because "Defendants . . . are unable to prove that any of these efforts have appreciably reduced the danger to Class members." Pls. Mot. 16. This has it backwards. It is Plaintiffs who bear the burden to present "substantial proof" and a "*clear showing*" that an injunction is warranted. *Mazurek*, 520 U.S. at 972 (emphasis in original).

[9]  Plaintiffs' experts claim that detention "at these two detention facilities all but guarantees mass infection," Iwasaki Decl. ¶ 34 (ECF No. 229-16), and that "[i]t is very likely people will become infected and die because of the unsafe conditions at these facilities," Allen Decl. ¶ 56 (ECF No. 229-18), without addressing or explaining how it is that, in the past two-and-a-half months, there has been no mass infection and no one has become infected and died. *Cf. Thakker II*, 2020 WL 2025384, at *8 (the reason for a lack of an outbreak may be that "[the facilities] have quickly and effectively implemented the guidelines published by the CDC such that they have stymied any potential outbreak within their walls"). The Court should reject these opinions as conclusory, as one court has already done with respect to a COVID-related opinion from Dr. Greifinger (albeit an opinion that related only to a single individual). *Cf. Moturi v. Asher*, No. C19-2023 RSM-BAT, 2020 WL 2084915, at *4 (W.D. Wash. Apr. 30, 2020) ("Dr. Greifinger's opinion is overly conclusory to say the least.").

claim punitive intent and have not established that their detention is excessive.[10]

The Supreme Court has recognized that preventing detained aliens from absconding and ensuring that they appear for removal proceedings, as well as protecting the community from dangerous criminal aliens, are legitimate governmental objectives. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). Indeed, "deportation proceedings would be vain if those accused could not be held in custody pending the inquiry into their true character." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quotation marks omitted). Plaintiffs and class members are in detention because they violated the immigration laws of the United States and are subject to detention under those laws — in some cases, mandatory detention based on their criminal history. Their detention is thus "reasonably related" to a legitimate government interest.

Nor is their detention "excessive" in relation to the government's interest. "[T]he fact of detention itself [does not] become[] an 'excessive' condition solely due to the risk of a communicable disease outbreak — even one as serious as COVID-19." *Dawson I*, 2020 WL 1304557, at *2. "[U]nder the Fifth Amendment, Respondents are not required to eliminate any risk to Petitioners. Instead, Respondents are required to provide for their 'reasonable safety.'" *Dawson II*, 2020 WL 1704324, at *12 (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)). ICE and the Facilities have done so in accordance with the CDC Guidance. In addition to screening, sanitizing, and safety measures the Facilities have proactively undertaken, ICE has significantly reduced the detainee population to allow for social distancing in housing units, bathrooms, dining halls, and recreation areas. At Yuba, all beds are six feet or more apart from each other. Plaintiffs themselves acknowledge that they are able to socially distance in E-pod (and therefore, because the layouts are identical, in A-pod, D-pod, and F-pod as well). Siguantay Decl. ¶ 6 (ECF No. 229-14); *accord* Erazo Decl. (ECF No. 229-11) (stating that he was in D-pod and H-tank and making no complaints about D-pod). Similarly, in B-pod and C-pod, all beds are six feet or more apart from each other. Fishburn Decl. ¶ 46. At Mesa Verde,

---

[10] Plaintiffs argue that the Court found at the TRO stage that they have a likelihood of success on the merits, and thus they must still have a likelihood of success on the merits now. *See* Pls. Mot. 1, 15 (ECF No. 229). But the fact that a court might have granted a TRO does not mean that the plaintiff has established a likelihood of success on the merits at the preliminary-injunction stage, where the landscape has changed and the court has the benefit of new facts and information. *Cf. Thakker II*, 2020 WL 2025384, at *5 (after finding at TRO stage that plaintiffs had likelihood of success on their claims, the evidence a month later that facilities "are able to effectively control COVID-19 transmission" rendered it that the plaintiffs "are now unlikely to succeed on the merits of their claims").

detainees are in alternating bunks sleeping head to foot to increase the distance between each other. Pham Decl. ¶ 41. While the distance between two adjacent occupied bunks is admittedly less than six feet, the distance between the heads of two occupied bunks is over six feet. *Id.* ¶¶ 40–41; *cf.* CDC Guidance 11 ("Arrange bunks so that individuals sleep head to foot to increase the distance between them.").

Even assuming class members did come within six feet of each other, that would not satisfy Plaintiffs' burden to show a likelihood of success on the merits of their claims. Plaintiffs have cited no authority that six-foot social distancing is a constitutional requirement.[11] By way of comparison, in the *Hernandez Roman* litigation, the Ninth Circuit stayed a district-court injunction requiring an immigration detention facility to maintain a firm six-foot distance between detainees. *See* Prelim. Injunction ¶¶ 2, 15, *Hernandez Roman v. Wolf*, No. 5:20-cv-00768-TJH-PVC (C.D. Cal. Apr. 23, 2020) (*Hernandez Roman Injunction*) (Choe Decl. Ex. 1), *stayed by Hernandez Roman*, 2020 WL 2188048, at *1. The Eleventh Circuit stayed a similar injunction. *Swain v. Junior*, 958 F.3d 1081, __, 2020 WL 2161317, at *2, *7 (11th Cir. 2020) (staying an injunction requiring non-immigration detention facility to "provide and enforce adequate spacing of six feet or more between people").

The standard for Plaintiffs' conditions-of-confinement claim is not a per se rule of six feet of social distancing. The standard is "reasonable safety." *DeShaney*, 489 U.S. at 200. Plaintiffs have not established a likelihood of success on the merits of a claim that ICE, with all of the numerous safeguards it has voluntarily taken, and in the complete absence of any COVID-19 cases, has failed to provide this. *Cf. Thakker II*, 2020 WL 2025384, at *5; *accord, e.g.*, *Peter O.C. v. Tsoukaris*, No. 20-4622 (SDW), 2020 WL 2301442, at *3 (D.N.J. May 7, 2020) (describing safeguards facility had taken and denying injunctive relief because "[a]ll of these measures taken to limit or alleviate the effects of COVID-19 on the jail population clearly show that the conditions to which Petitioner has been subjected are not excessive in relation to the Government's interest in detaining criminal aliens"); *Ramirez v. Culley*, No.

---

[11] The CDC Guidance does not mandate six feet of social distancing. It suggests six feet, but it recognizes that detention facilities may have space constraints, *see* CDC Guidance 11 ("Not all strategies will be feasible in all facilities. . . . If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions."), and does not provide that lesser social distancing is unreasonable, much less a constitutional violation. *see id.* at 16 ("If the ideal choice does not exist in a facility, use the next best alternative.").

2:20-cv-00609-JAD-VCF, 2020 WL 1821305, at *2–4 (D. Nev. Apr. 9, 2020) (same).[12]

Plaintiffs also have not established a likelihood of success on a substantive-due-process claim based on purported deliberate indifference to their medical needs. Substantive due process protects only those liberty interests that are "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). Plaintiffs' burden for showing that the government has been deliberately indifferent to their well-being is, therefore, a high one. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ("[T]he deprivation alleged must be, objectively, 'sufficiently serious.'"). The conduct at issue must be tantamount to an "abuse of power . . . which shocks the conscience," *Sacramento v. Lewis*, 523 U.S. 833, 846 (1998), and must "pose an unreasonable risk of serious damage to [the] future health" of those detained, *Helling v. McKinney*, 509 U.S. 25, 35 (1993). Even if Plaintiffs could show that the government's conduct substantially increased the risk of harm (which they cannot), that would not support a claim. Instead, a detainee must demonstrate that government officials exhibited "something akin to reckless disregard." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc). As discussed above, ICE has taken numerous reasonable efforts to protect detainees' health and safety. When the government undertakes reasonable efforts to protect detainees' health and safety, it cannot be deemed deliberately indifferent, even if the policies through which it operates are imperfect or the methods chosen are later determined to be suboptimal by a reviewing court. *Farmer*, 511 U.S. at 844–45.

### C.    Plaintiffs Fail to Establish That the Equities and Public Interest Tip in Their Favor

It is well settled that the public interest in enforcement of the United States' immigration laws is significant. *See, e.g., United States v. Martinez-Fuerte*, 428 U.S. 543, 556–58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981). Plaintiffs have not shown that the equities and public interest tip in their favor. *Cf. Thakker II*, 2020 WL 2025384, at *9 (given that "[facility] has no documented cases of COVID-19, in conjunction with the greatly enhanced infectious disease

---

[12] By way of comparison, it is not necessarily feasible for non-detained individuals to maintain six feet of distance at all times either. For example, people have to shop for food and invariably come into contact with other people while doing so. However much a grocery store may encourage shoppers to stay six feet apart, shoppers nonetheless may at times come closer than six feet to other shoppers, and they typically must come closer than six feet to a cashier to check out. The fact that people may come closer than six feet to other people at times does not suggest a constitutional violation.

prevention measures now in place therein, we find that the public's interest in reinstated detention outweighs the lessened risk COVID-19 will pose to Petitioner"); *Murai*, 2020 WL 2526031, at *7 ("Confinement does not become unnecessary simply due to the existence of COVID-19.").

Plaintiffs make no secret of their ultimate goal in this litigation: "to significantly depopulate the facilities." Pls. Mot. 11–12. This effectively would bar ICE from doing its job. Congress has authorized the detention of the class members here — many of whom have lengthy criminal histories and are subject to mandatory detention. Plaintiffs' proposed injunction, which (among other things) calls for additional releases and bars ICE from taking in new detainees at the Facilities, would undermine the public's interest in enforcing the immigration laws and having removable aliens, including dangerous or criminal aliens, taken into lawful (often mandatory) detention. The public interest is better served by allowing ICE to continue in its statutory mission while following the CDC Guidance and safeguarding against COVID-19, as it has been doing successfully for the past two-and-a-half months, than by blocking enforcement of the immigration laws in order to "significantly depopulate the facilities."

### D.      Plaintiffs' Proposed Injunction Is Overbroad and Improper

"Injunctive relief must be tailored to remedy the specific harm alleged." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (ellipsis omitted). "An overbroad injunction is an abuse of discretion." *Id.* Additionally, courts do not have equitable discretion where "'a statute clearly provides otherwise.'" *Garfias-Rodriguez v. Holder*, 702 F.3d 504, 525 (9th Cir. 2012) (en banc) (quoting *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001)). Even assuming (counterfactually) that Plaintiffs had satisfied all of the *Winter* factors and met their heavy burden to show they warranted an injunction, Plaintiffs' proposal (ECF No. 229-21) is overbroad and improper.

Plaintiffs first request that the Court declare that the conditions of confinement at the Facilities violate the Fifth Amendment. Pls. Proposed Order ¶ 1 (ECF No. 229-21). This is patently inappropriate. There is no such thing as preliminary declaratory relief, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975), and it goes without saying that the Court cannot declare a constitutional violation at this preliminary stage, when Federal Defendants have yet to receive their full day in court.

Plaintiffs next unfurl a litany of injunctive demands not tailored to their alleged harm. Among other things, they demand that ICE reduce their population at the Facilities to the point that all detainees

can maintain a distance of *ten* feet (up from their prior demand of six feet),[13] file detailed written plans about how detainees "will sleep, dine, bathe, use toilets and showers, and line up for recreation," provide a weekly census of detainees, and submit to monthly inspections by class counsel and their experts — and further demand that ICE be barred from adding any new detainees or transferring any detainees other than in certain specified conditions. Pls. Proposed Order ¶¶ 2.a–n.[14] Plaintiffs' proposal is unreasonably overbroad and intrusive.

The Ninth Circuit confronted a similar injunction in *Hernandez Roman*, which (like Plaintiffs' proposal) required ICE to reduce the population at a detention facility to a level that would allow remaining detainees to maintain six feet of distance from each other, file detailed written plans about how it would implement distancing and sanitization, and provide a census of all class members — and further barred ICE from taking in new detainees or transferring detainees except under certain specified conditions. *Hernandez Roman Injunction* ¶¶ 1, 2, 4–6, 15–16, 27. The Ninth Circuit stayed each of these provisions from going into effect. *Hernandez Roman*, 2020 WL 2188048.[15]

Similarly, the Fifth Circuit was confronted (in a non-immigration context) with an injunction that, among other things, required detention officials to provide a detailed plan for testing and quarantining of detainees and barred detention officials from transporting detainees except under certain specified conditions. *See Valentine v. Collier*, 956 F.3d 797, 799–800 (5th Cir. 2020). The Fifth Circuit stayed the injunction, writing:

> As we've said before about such intrusive orders, this one creates an administrative nightmare for TDCJ [defendant] to comply with the district court's quotas and deadlines. The burden upon TDCJ in terms of time, expense, and administrative red tape is too great while it must respond in other ways to the crisis.
> The harm to TDCJ is particularly acute because the district court's order interferes with the rapidly changing and flexible system-wide approach that TDCJ has used to respond to the pandemic so far. . . . TDCJ's ability to continue to adjust its policies is significantly hampered by the preliminary injunction, which locks in place a set of policies for a crisis that defies fixed approaches. And it prevents TDCJ from responding to the COVID-19 threat without a permission slip from the district

---

[13] Plaintiffs' new ten-foot demand is not found anywhere in the CDC Guidance.

[14] Plaintiffs' proposed order also provides for the continuation of the bail process, which also is improper, as discussed in the next section.

[15] The Ninth Circuit permitted to go into effect a provision in the injunction requiring ICE to put into effect best practices, recommendations, and guidelines issued by the CDC and state officials. The Ninth Circuit stayed the injunction in all other respects.

court. That constitutes irreparable harm [warranting staying the injunction].

*Id.* at 803–04 (citations, quotation marks, and brackets omitted). The Eleventh Circuit stayed a similarly overbroad and intrusive injunction, agreeing that "[t]he injunction hamstrings [detention] officials . . . from acting with dispatch to respond to this unprecedented pandemic" and that "the district court assumed the role of 'super-warden' that our decisions repeatedly condemn." *Swain*, 958 F.3d at __, 2020 WL 2161317, at *5 (citing *Valentine*, 956 F.3d at 804 and other cases). The same concerns are present here. Plaintiffs' proposed order would create administrative nightmares for ICE, burden it with red tape, and prevent it from responding flexibly to the ongoing COVID-19 situation.

Additionally, Plaintiffs' proposed order would violate 8 U.S.C. § 1252(f)(1), which provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter [Inspection, Apprehension, Examination, Exclusion, and Removal], other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." For example, Plaintiffs' proposed limitations on ICE's ability to take in new detainees at the Facilities, Pls. Proposed Order ¶ 2.j (ECF No. 229-21), would restrain ICE's operations, including its obligation under the INA to mandatorily detain certain criminal aliens. *See, e.g.*, 8 U.S.C. § 1226(c).[16] Similarly, Plaintiffs' proposed limitations on ICE's ability to transfer detainees would restrain ICE's operations, including its authority and ability to remove aliens from the United States. *See* Fed. Defs. Resp. re Removal (ECF No. 228).[17]

In sum, even assuming (counterfactually) that Plaintiffs were entitled to an injunction, Plaintiffs' proposed order is overbroad and not tailored to their alleged harm and should be rejected. The Court did not go this far at the TRO stage and should not do so now.[18]

---

[16] Mesa Verde and Yuba are the only facilities in northern and central California to house ICE detainees pending removal or proceedings before the San Francisco immigration court. *See* Immigr. and Customs Enf't, *Detention Facility Locator*, https://www.ice.gov/detention-facilities (last visited May 27, 2020).

[17] The Ninth Circuit has held that § 1252(f)(1) does not restrict injunctive relief on a class basis where each member of the class "is in removal proceedings and facing an immediate violation of their rights." *Padilla v. ICE*, 953 F.3d 1134, 1151 (9th Cir. 2020). (The government argued to the contrary in *Padilla*, and the period for seeking rehearing or certiorari in that case has not yet expired.) Plaintiffs' proposed injunction goes beyond class members, however. Aliens who have not yet been detained are not members of the class, and a bar on ICE's taking new aliens into detention thereby restrains the operations of the INA in a manner beyond the class-member exception discussed in *Padilla*.

[18] Plaintiffs also attempt to impose discovery obligations, such as depositions and site visits, in their

*        *        *

Because Plaintiffs have failed to establish irreparable harm, a likelihood of success on the merits, that the balance of equities tips in their favor, or that their proposed injunction is appropriately tailored and not overbroad, Federal Defendants respectfully request that the Court deny their motion.

## III.    The Court Should End the Bail Process and Vacate All Bail Orders, Because It Does Not Have Authority to Order Class Members Here Released on Bail

It is undisputed that no statute or regulation allows for the release of class members here while this lawsuit is pending. In the absence of a statute or regulation allowing it to do so, the Court stated in its TRO that it had inherent authority to release class members on bail. *Zepeda Rivas*, 2020 WL 2059848, at *3 & n.17. Respectfully, the Court does not have that authority. First, binding Ninth Circuit precedent holds that district courts may not order the release of immigration detainees on bail absent a statute allowing them to do so. No such statute exists here. Second, any inherent authority to order release on bail in a pending lawsuit that may exist attaches only in a habeas case. This case is not a proper habeas case, and thus the Court lacks authority to order release here. Third, any inherent authority to order release that may exist can be constrained or removed by Congress. Congress has done so here in the INA. Fourth, any inherent authority to order release that may exist can be exercised, if at all, only in an "extraordinary case." A binding Ninth Circuit precedent issued this past Friday confirms that the risk of COVID-19 does not satisfy the "extraordinary case" standard.[19]

### A.    District Courts Do Not Have Authority to Order Immigration Detainees Released on Bail Where, as Here, No Statute Affirmatively Allows Them to Do So

The Ninth Circuit has held that courts do not have inherent authority to release immigration detainees on bail absent a statute allowing them to do so. *Chin Wah v. Colwell*, 187 F. 592, 594 (9th Cir. 1911) (rejecting proposition that "the courts of the United States have the inherent power to admit to bail in deportation cases" because "[i]t is uniformly conceded that those courts can exercise no powers not

---

proposed order. Pls. Proposed Order ¶¶ 2.c–d, g (ECF No. 229-21). Again, this is improper. A preliminary injunction is not the proper vehicle for addressing run-of-the-mill discovery that should be subject to the Federal Rules of Civil Procedure. *Cf. Citizens for Rational Coast Dev. v. U.S. Fed. Highway Admin.*, No. 07-4551 (JAP), 2008 WL 2276005, at *6 (D.N.J. May 30, 2008).

[19] Additionally, even assuming (counterfactually) that a bail process of some sort were proper, Federal Defendants object to the current process, which provides ICE insufficient time to properly vet bail applicants and provides for no avenue to appeal or challenge any bail decision.

vested in them by statute"); *accord Ex parte Perkov*, 45 F. Supp. 864, 866–67 (S.D. Cal. 1942) ("The courts of the United States have no inherent power to admit to bail in deportation cases.") (citing *Chin Wah*, 187 F. at 594); *In re Hanoff*, 39 F. Supp. 169, 172 (N.D. Cal. 1941) ("It is uniformly conceded that those courts can exercise no powers not vested in them by statute. The rule thus established [in *Chin Wah*] is binding upon this Court. . . . Even if petitioner has the right to bail under the provisions of the Immigration Act, the power to admit to bail is not reposed in this Court.") (citing *Chin Wah*, 187 F. at 594). The Ninth Circuit has further held that any authority that courts might have to release detainees in criminal proceedings on bail does not extend to detainees in civil deportation proceedings. *Chin Wah*, 187 F. at 594 ("The general statutory provisions in regard to bail in criminal cases do not apply, for deportation cases are not criminal in their nature. And the right to bail on arrest in civil proceedings depends upon statutory provisions.") (citations omitted).

This remains the law of this circuit. *See Mapp v. Reno*, 241 F.3d 221, 225 (2d Cir. 2001) (recognizing *Chin Wah*, *Perkov*, and *Hanoff* as holding that "there is no such inherent power in the federal courts and that they cannot admit a person to bail unless such power is expressly conferred by statute"). The Ninth Circuit has never reversed *Chin Wah* or ever held that courts in this circuit have inherent authority to release immigration detainees on bail in a pending litigation. Indeed, the Ninth Circuit has never endorsed the theory that courts have any inherent authority to release an individual on bail in a pending habeas litigation in *any* context, *see United States v. McCandless*, 841 F.3d 819, 822 (9th Cir. 2016) (citing *Roe v. U.S. Dist. Ct. (In re Roe)*, 257 F.3d 1077, 1080 (9th Cir. 2001)), much less in the context of civil immigration detention, which the Ninth Circuit expressly distinguished from other contexts such as criminal detention, *see Chin Wah*, 187 F. at 594. Consequently, *Chin Wah* remains binding, and thus, within the Ninth Circuit, district courts may not release on bail immigration detainees absent a statute that expressly allows them to do so.[20] No such statute exists here. The Court therefore does not have authority to release immigration detainees like class members here on bail.[21]

---

[20] The Ninth Circuit has discussed whether Federal Rule of Appellate Procedure 23(b) provides it with authority to order the release of an immigration detainee in a pending appeal, *Nadarajah v. Gonzales*, 443 F.3d 1069, 1083 (9th Cir. 2006), but that rule does not authorize release in a litigation pending before a district court, *Roe*, 257 F.3d at 1080.

[21] To the extent that Plaintiffs rely on *Brown v. Plata*, 563 U.S. 493 (2011) for the proposition that courts have the authority to order release, their argument fails. *Brown* dealt with the Prison Litigation

### B. District Courts Do Not Have Authority to Order Detainees Released on Bail in a Non-Habeas Case, and This Case Is Not a Proper Habeas Case

Even those courts that — unlike the Ninth Circuit — have recognized a district court's inherent authority to release an immigration detainee on bail in a pending litigation, have held that this authority arises only in conjunction with a cognizable petition for writ of habeas corpus. This case is not a proper habeas case. Thus, even assuming (counterfactually) that *Chin Wah*'s prohibition on bail were not binding on the Court, the Court would not have the authority to order the release of class members here.

As the Ninth Circuit has held (in the context of a habeas petition in the context of a criminal case), "[t]he federal court's authority to release a state prisoner on recognizance or surety in the course of a habeas corpus proceeding" — assuming any such authority exists at all[22] — "derives from the power to issue the [habeas] writ itself." *Marino v. Vasquez*, 812 F.2d 499, 507 (9th Cir. 1987). Outside of habeas, courts do not have authority to order the release of detainees, even if the detainees were to ultimately win a final decision on the merits at the end of their litigation. *See Crawford*, 599 F.2d at 892 ("The appropriate remedy for [a conditions-of-confinement claim], if proven, would be a judicially mandated change in conditions and/or an award of damages, but not release from confinement."). A fortiori, outside of habeas, courts do not have authority to order the release of detainees while a litigation is still pending, when the detainee has not won any decision on the merits. *See Bolante v. Keisler*, 506 F.3d 618, 620 (7th Cir. 2007) ("Inherent judicial authority to grant bail to persons who have asked for

---

Reform Act, which contains a statutory provision that expressly allows release as a remedy (and only when ordered by a three-judge court). 18 U.S.C. § 3626(a)(3)(B), (E). No analogous statute exists here. Additionally, the three-judge court in *Brown* ordered release only after a series of remedial orders over a period of years "giving ample time" for the State to remedy the ongoing violations, *Brown*, 563 U.S. at 514, 516, and only after the "course of years in which th[e] litigation had been pending" in which "no other remedies had been found to be sufficient," *id.* at 501, not (as here) at the outset of a lawsuit.

A district court in this circuit has allowed release on bail of an immigration detainee in a pending habeas litigation. *Tam v. INS*, 14 F. Supp. 2d 1184, 1190 (E.D. Cal. 1998). The court relied on two cases involving criminal habeas petitions, each of which *denied* bail, (1) a Third Circuit decision where the district court granted bail and the Third Circuit reversed and ordered the petitioner re-detained, and (2) a Ninth Circuit decision where the district court denied bail and the Ninth Circuit dismissed the appeal. *Id.* (citing *Landano v. Rafferty*, 970 F.2d 1230 (3d Cir. 1992); *Land v. Deeds*, 878 F.2d 318 (9th Cir. 1989)). *Tam* did not address *Chin Wah*'s prohibition on releasing immigration detainees on bail absent a statute that allows them to do so or *Chin Wah*'s instruction that any authority that might exist to release criminal detainees on bail does not extend to civil immigration detainees. *Cf. Chin Wah*, 187 F. at 594.

[22] *Roe* clarified that *Marino* did not definitively hold that any such authority exists in the first place and that whether such authority exists remains an open question in this circuit. *Roe*, 257 F.3d at 1079–80.

relief in an application for habeas corpus is a natural incident of habeas corpus . . . . [O]utside the habeas corpus setting, the claim of an inherent authority to grant bail is more questionable."); *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972) ("All the cases and rules speak either of our power to admit to bail pending decision of an appeal otherwise properly before us, or of the power of a district court to admit to bail pending its determination of the merits in a habeas petition.").

As the Court recognized, "[a]t root, this lawsuit is not about whether any particular person should be released; it is about the conditions of confinement at the facilities." *Zepeda Rivas*, 2020 WL 2059848, at *1. The Ninth Circuit has long held that lawsuits that challenges only conditions of confinement are not cognizable as habeas cases. *Nettles*, 830 F.3d at 933. This lawsuit consequently does not assert a proper habeas claim — and thus it does not vest in the Court any inherent authority to order release on bail that might otherwise attach in a proper habeas lawsuit. *Cf. Marino*, 812 F.2d at 507.

The fact that this lawsuit challenges only conditions of confinement and does not present a proper habeas claim for release is not an accident. Rather, it is the natural and inevitable result of the manner in which Plaintiffs have pleaded their claims and litigated this lawsuit. Plaintiffs made the affirmative choice to try to bring this case as a class action. To seek certification as a class action, Plaintiffs had to satisfy the requirements set out in Federal Rule of Civil Procedure 23 — including adequacy, which requires that (among other things) plaintiffs and class members not have conflicts of interest amongst one another. *Espinosa v. Ahearn (In re Hyundai and Kia Fuel Econ. Litig.)*, 926 F.3d 539, 566 (9th Cir. 2019) (en banc). Plaintiffs do not, and cannot, claim that all detainees at the Facilities should be released — at most, they argue that some should. Plaintiffs knew that if they were seeking their own release in this lawsuit, the class would have insuperable conflicts, with each detainee seeking his own release over the release of his fellows. Consequently, in an attempt to avoid these conflicts, Plaintiffs disclaimed that they were necessarily seeking their own release.[23]

But by disclaiming that they were seeking their own release, Plaintiffs pleaded themselves out of a habeas claim. As the Ninth Circuit has held, "habeas jurisdiction is absent . . . where a successful

---

[23] *See, e.g.*, Pls. Class Cert. Reply 4 (ECF No. 41) ("Consider a small room housing three detainees: if adequate social distancing could be achieved with two detainees remaining in the room, releasing one detainee would remedy the constitutional violation for all three detainees.").

challenge to a prison condition will not necessarily shorten the prisoner's sentence" or lead to his release. *Ramirez v. Galaza*, 334 F.3d 850, 859 (9th Cir. 2003); *see Nettles*, 830 F.3d at 934; *accord, e.g.*, *Kraft v. Gates*, 905 F.2d 1540, 1990 WL 84279, at *1 (9th Cir. 1990) (table) (claims that "challenged the conditions of confinement . . . were improperly brought in a petition for habeas corpus") (citing *Crawford*, 599 F.2d at 891). And without a proper habeas claim, no authority for a court to order release (either at the end of the litigation or while it is still pending) ever attaches. *Crawford*, 599 F.2d at 892.

### C.   District Courts Do Not Have Authority to Order Detainees Released on Bail Where, as Here, Congressional Statutes Limit Such Authority

Even those courts that — unlike the Ninth Circuit — have recognized a district court's inherent authority to release an immigration detainee on bail in a pending litigation recognize that any such authority can be constrained or removed by an Act of Congress. Congress has by statute limited the power of courts to release immigration detainees like Plaintiffs and class members here. Thus, even assuming (counterfactually) that *Chin Wah*'s prohibition on bail were not binding on the Court, the Court would not have the authority to order the release of class members here.

"[I]nherent judicial authority is not an indefeasible authority. It is an exercise of a court's common law powers and thus, unlike a ruling based on the Constitution, is subject to legislative curtailment. Even if in the absence of legislation a federal court could grant bail to an alien challenging a removal order, it cannot do so if Congress has forbidden it." *Bolante*, 506 F.3d at 620–21.

Congress has legislated that certain aliens are subject to mandatory detention. *See* 8 U.S.C. §§ 1225(b), 1226(c), 1231(a)(2). Congress has further legislated that ICE has discretion to detain certain other aliens pending a decision on their removal, 8 U.S.C. § 1226(a), and that "[n]o court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole," 8 U.S.C. § 1226(e). Ordering the release of an alien detained under these statutory provisions contravenes an Act of Congress. Inherent authority does not extend that far. *See Bolante*, 506 F.3d at 620–21 (court cannot order release on bail of alien held under § 1225(b)); *Mapp*, 241 F.3d at 229 n.12 ("had the INS exercised its discretion under § 1231(a)(6) and decided not release Mapp on bail, we would be required to defer to its decision"); *Cinquemani v. Ashcroft*, No. 00-CV-1460 (RJD), 2001 WL 939664, at *7–8 (E.D.N.Y. Aug. 16, 2001)

(same); *Toure v. Hott*, __ F. Supp. 3d __, No. 1:20-cv-395, 2020 WL 2092639, at *8 n.4 (E.D. Va. Apr. 29, 2020) (identifying § 1226(e) as "a statutory limitation precluding release as a form of relief" in COVID-19 conditions-of-confinement case).[24] Because a court's inherent authority cannot override the legislature's enactments in the INA, the Court does not have inherent authority to order release here.

**D.    District Courts Do Not Have Authority to Order Detainees Released on Bail Outside of an "Exceptional Case," and the Ninth Circuit Has Held That a Risk of COVID-19 Does Not Give Rise to an "Exceptional Case" Warranting Release on Bail**

Even those courts that — unlike the Ninth Circuit — have recognized a district court's inherent authority to release an immigration detainee on bail in a pending litigation recognize that any such authority is highly constrained and may be exercised, if at all, only in "extraordinary" cases and circumstances. *Accord* Bail Standard Order (ECF No. 90). While the Ninth Circuit has never agreed that district courts have authority to order any releases even in an extraordinary case, it does agree that a district court "clearly err[s]" if it orders release on bail outside of an "extraordinary case." *Roe*, 257 F.3d at 1080. Mass bail in the context of a class action is inconsistent with this "extraordinary case" standard, and the Ninth Circuit confirmed this past Friday that COVID-19 does not satisfy this standard either. Thus, even assuming (counterfactually) that *Chin Wah*'s prohibition on bail were not binding on the Court, the Court would not have the authority to order the release of class members here.

"[C]ircuit courts that have upheld the inherent authority of the federal district courts to admit habeas petitioners to bail . . . have stressed the constraints on this facet of judicial power." *Mapp*, 241 F.3d at 226 n.5 (citing cases). Even outside the context of immigration, the need for judicial restraint with respect to ordering release on bail on "inherent authority" is clear. Inherent judicial authority, by definition, finds no basis or support in any statute or regulation. Courts therefore must be cognizant that

---

[24] The Ninth Circuit has held that these detention statutes do not necessarily preclude a court from exercising habeas jurisdiction to hear constitutional claims or questions of law. *See, e.g.*, *Hernandez v. Sessions*, 872 F.3d 976, 987 (9th Cir. 2017). But the question of a court's power to hear a proper habeas lawsuit alleging constitutional claims is separate from the question of a court's power to order a detainee released on bail while his lawsuit is pending — i.e., before the detainee wins any judgment on the merits. *See Roe*, 257 F.3d at 1080 ("[T]he seriousness of the constitutional violations [detainee] alleges in his complaint does not justify [his] release on bail. . . . We do not propose to open the door to the release of those thousands of prisoners on the basis of mere allegations in their petitions.") (internal quotation marks and ellipsis omitted). It is not clear that such a power to order release in a pending habeas lawsuit exists at all. *See id.* at 1080 & n.2; *McCandless*, 841 F.3d at 822. Even assuming such a power did exist, it is not a constitutional power that can trump a statute — it is at most a common-law power and therefore "is subject to legislative curtailment." *Bolante*, 506 F.3d at 620.

any power they might have to order the release of a detainee in a pending litigation — a power, not found in any statute or regulation, exercised when the detainee has won no judgment on the merits — "is a limited one, to be exercised in special cases only." *Id.* at 226 & n.5.

This need for judicial restraint is all the more pressing in the context of immigration. "The power to regulate immigration — an attribute of sovereignty essential to the preservation of any nation — has been entrusted by the Constitution to the political branches of the Federal Government." *United States v. Valenzula-Bernal*, 458 U.S. 858, 864 (1982). By contrast, "[courts] review the immigration decisions of the political branches only with the greatest caution where [their] actions may inhibit [the political branches'] flexibility to respond to changing world conditions. . . . Thus, it is not the judicial role to probe and test the justifications of immigration policies." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018) (internal quotation marks and ellipsis omitted).

As far as Federal Defendants' research has been able to determine, prior to *Savino v. Souza*, __ F. Supp. 3d __, No. 20-10617-WGY, 2020 WL 1703844 (D. Mass. Apr. 8, 2020), no court has ever authorized, much less granted, applications for release on bail in a pending litigation on a mass basis. This is unsurprising. Mass bail is inherently inconsistent with the "extraordinary case" standard that applies to release on bail in a pending litigation. This is particularly true where plaintiffs are bringing a class action, which requires them to satisfy the requirements set out in Rule 23 — including typicality, which requires that plaintiffs and class members all have suffered the same or similar injury. *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016). It cannot be that an alleged injury shared by dozens or hundreds of class members presents an "extraordinary case" dozens or hundreds of times over, as this would render the "extraordinary case" limitation essentially no limitation at all.[25] It is informative that no Court of Appeals has ever endorsed such an approach — and that at least two Courts of Appeals

---

[25] For example, in the context of a habeas case without a bail application, a district court must defer to an immigration judge's discretionary decision denying an immigration detainee released on bond because he presents a danger to the community or a flight risk. *Prieto-Romero v. Clark*, 534 F.3d 1053, 1058 (9th Cir. 2008) ("[D]iscretionary decisions granting or denying bond are not subject to judicial review, *see* [8 U.S.C.] § 1226(e)."); *accord, e.g.*, *Calmo v. Sessions*, No. C 17-07124 WHA, 2018 WL 2938628, at *4 (N.D. Cal. June 12, 2018) ("A district judge may not second-guess the immigration judge's weighing of the evidence."). But in the context of a bail application, no limits appear to apply. *See, e.g.*, Bail Order No. 17 (ECF No. 246) (ordering the released of detainee Livia Pinheiro, despite the fact that the immigration judge found, by clear and convincing evidence, that she presented a danger).

have stayed orders granting mass releases in response to COVID-19. *See Hernandez Roman*, 2020 WL 2188048 (staying district-court order to release 250 or more detainees); *Hope v. Warden York Cty. Prison*, 956 F.3d 156, 159 (3d Cir. 2020) (staying district-court order to release 20 detainees).

Were there any question about whether the hundreds of class members here can claim that COVID-19 renders their cases all to be "extraordinary cases" that warrants their release on bail, a precedential decision from the Ninth Circuit this past Friday makes clear that the answer is no. In *Dade*, __ F.3d __, 2020 WL 2570354, the Ninth Circuit addressed a (criminal) detainee who was appealing a denial of his habeas petition and, additionally, sought his release while his appeal was pending. Release pending a habeas appeal (like release in a pending litigation before a district court) is "reserved for extraordinary cases." *Id.* at *2 (ellipsis omitted). "[A] likelihood of success [on his claim] is not enough" — a detainee "must make a further showing of exceptional circumstances[.]" *Id.* The detainee argued that COVID-19 and the risk that he might contract it while in detention constituted a "special circumstance." *Id.* The Ninth Circuit held that while COVID-19 might constitute a special circumstance that might warrant a change in the conditions of his confinement if that risk were not being adequately addressed, it did not constitute a special circumstance warranting release. *Id.* The Ninth Circuit's holding that COVID-19 does not satisfy the "extraordinary case" standard warranting release in the context of a criminal detainee applies all the more strongly in the context of immigration detainees, where the political branches have greater authority and a court's authority is even more restrained.

*    *    *

Because the Court does not have authority to order the release of class members here, Federal Defendants respectfully request that the Court end the bail process and vacate all bail orders.

**CONCLUSION**

For the foregoing reasons, Federal Defendants respectfully request that the Court enter an order (1) confirming that the TRO has expired, (2) ending the ongoing bail process, (3) vacating all bail orders, and (4) denying Plaintiffs' motion for a preliminary injunction.

DATED: May 27, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

*s/Shiwon Choe*
SHIWON CHOE
Assistant United States Attorney

Attorneys for Federal Defendants