UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, et al.,<br><br>              Plaintiffs,<br><br>     v.<br><br>DAVID JENNINGS, et al.,<br><br>             Defendants. | Case No.  20-cv-02731-VC<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. 229 |

Seven weeks ago, ICE detainees at Mesa Verde Detention Center and Yuba County Jail filed this class action alleging the facilities were so crowded that any kind of social distancing— the primary available defense against Covid-19—was impossible. They also alleged that ICE had taken virtually no meaningful steps to reduce the risk of outbreak at either facility. This, according to the plaintiffs, rendered their detentions unconstitutional.

After full briefing and a hearing, this Court provisionally certified a class of all detainees at the two facilities and entered a temporary restraining order. *Zepeda Rivas v. Jennings*, __ F. Supp. 3d. ___, 2020 WL 2059848 (N.D. Cal. Apr. 29, 2020) (Dkt. No. 53). The TRO required ICE to give the Court and class counsel information about all the detainees, including any criminal history and any health vulnerabilities putting them at heightened risk. The TRO also established a system for the Court to consider, on an ongoing basis and with the assistance of briefing from both sides, whether certain detainees should be temporarily released to help mitigate the dangerous conditions in the facilities. This system contemplates that no detainee may be released unless class counsel demonstrates "extraordinary circumstances justifying

release while the habeas petition is pending, based on a consideration of the following factors: (i) the likelihood that the class will ultimately prevail on its habeas petition; (ii) the risk posed to the detainee by current conditions at the facilities; (iii) the likelihood that the detainee will not be a danger to the community if released with conditions; and (iv) the likelihood that the detainee will appear for subsequent immigration/removal proceedings as required." Dkt. No. 50.

The plaintiffs have now moved for a preliminary injunction. The motion is granted, but the injunction will be far narrower and less intrusive than what the plaintiffs request. This ruling assumes that the reader is familiar with the TRO ruling, and the analysis from that ruling is incorporated here.

I

When this lawsuit was filed, governments and public health officials throughout the country had long since recognized the urgent danger posed by the coronavirus pandemic. Indeed, nearly five weeks had passed since Governor Newsom ordered a statewide shutdown that forced massive changes in the daily lives of virtually all Californians. But for the ICE detainees at Mesa Verde and Yuba County Jail, it was pretty much business as usual. People were still sleeping in barracks-style dorms within arm's reach of one another. Only two detainees had been tested for Covid-19, despite the well-known "tinderbox" risk of jail epidemics. It appeared that ICE had not even made the effort to determine which of its detainees suffer from medical conditions that put them in particularly severe danger from the virus.

Since the TRO, substantial progress has been made. The number of detainees in custody at both facilities has dropped, which has allowed for a greater degree of social distancing. For example, Mesa Verde has been able to stagger meals, limiting each dining table to a single detainee at a time. More than half the bunks in each Mesa Verde dorm are now empty, so the detainees sleep at alternating bunk-bed levels (with heads on alternating sides of the bed). The conditions in the facilities are hardly ideal, but they have indisputably improved. Subject to a few caveats discussed in the next section, it's possible that the facilities have gotten close to the point where keeping certain detainees there (those who are a danger to the community or whose

2

detention is otherwise necessary even in the face of the risks posed by the pandemic) does not create an unreasonable risk for the class in violation of due process.

However, these safety improvements came almost entirely from this litigation: ICE acted only because it was ordered to do so, or in response to concerns raised by the Court or the plaintiffs during the proceedings. Since the TRO, the parties have participated in eight status conferences, and ICE has been required to provide the Court and class counsel with a steady stream of information. Throughout this process, ICE has shown disinterest and a lack of dexterity in adjusting its conduct to respond to a global crisis, along with obstinance in evaluating whether any of its detainees can safely be temporarily released.

Take, for example, the bail process implemented in the wake of the TRO. On a schedule set by the Court, class counsel has submitted nearly two hundred requests for temporary release of individual detainees, subject to strict conditions such as identifying a custodian whom ICE can vet, observing a 14-day quarantine, and submitting to GPS monitoring. The population reduction in the facilities appears to have been accomplished largely by temporary releases ordered pursuant to this process, with 95 detainees having been ordered released.[1] But invariably, ICE argues that the detainee in question should not be released because they pose a danger to the community or are a flight risk. To be sure, reasonable minds can differ on some of these release applications; indeed, the Court has denied release for 79 detainees, mostly out of concern that they would be a danger to the community. *See, e.g.*, Order re Domestic Violence, Dkt. No. 224. But ICE's insistence on opposing these bail applications on a blanket basis has led it to take some positions that are downright irrational, not to mention inhumane.

One example was Jose Luis Lopez-Guevara. Mr. Lopez-Guevara is 78 years old, walks with a cane, suffers from numerous chronic health conditions, and underwent heart surgery in March while in ICE custody. *See* Dkt. No. 66. Back in 1980, Mr. Lopez-Guevara was convicted of second-degree murder for shooting an acquaintance in the heat of argument, but was granted

---

[1] ICE has also deported a large number of detainees, while at the same time detaining many new people.

parole in 2019 after 38 years in custody when the parole board found (with Governor Newsom's assent) that he poses no threat to the community due to his age, overall criminal history, and substantial evidence of self-improvement and rehabilitation. Following the grant of parole, ICE took Mr. Lopez-Guevara into custody pending deportation and had been holding him for nearly a year. In his request for temporary release from ICE custody, Mr. Lopez-Guevara explained that if released he would stay with his son Henry, a decorated U.S. Marine, and Henry's wife, a registered nurse, in their five-bedroom house in Santa Clarita, in accordance with his approved parole plan. ICE opposed his release.

Or take Jennifer Lara Plascencia, a woman with a single conviction for wire fraud arising from improper use of her company's credit card. *See* Dkt. No. 72-4. Her numerous medical conditions had landed her in the emergency room multiple times during her detention at Mesa Verde, and she sought temporary release to stay in Chula Vista with her husband, a U.S. military servicemember, and their 20-month-old U.S. citizen son. ICE opposed her release. Similarly, Victor Fierros Hurtado, a man with a single misdemeanor drug conviction from 2001, sought to be temporarily released to stay with his wife and three U.S. citizen children at their family home in Vallejo. *See* Dkt. No. 128-4. ICE opposed his release.

To be sure, ICE has released a relatively small number of people into the community without waiting for an order from this Court. But those decisions are, at least in large part, just as much a product of this litigation. For example, ICE has now taken the seemingly obvious step of releasing all remaining women from Mesa Verde—virtually none of whom appeared to have histories suggesting they were a danger to the community—to allow the male detainees to be spread out into the women's dorm. But this measure came in response to questions posed by the Court during a status conference about why ICE was tying up an entire 100-bed dorm with a small number of women with little or no criminal record. In the many weeks prior, ICE either hadn't thought of this or was too indifferent to make the effort.

In arguing that no further judicial intervention is necessary to address conditions in its facilities, ICE has also made at least one misrepresentation to the Court about a matter of great

importance. A critical safety issue is how new arrivals to the facilities are processed and checked for Covid-19. In opposing the plaintiffs' motion for a preliminary injunction, ICE filed a declaration from Alexander Pham, an ICE official responsible for oversight of Mesa Verde. Mr. Pham declared under oath: "All new arrivals transferred from another facility where there are any reported cases of COVID-19 infection will be placed in isolation for 14 days prior to being released into the general population." Pham Decl. ¶ 22, Dkt. No. 264-1. In response, the plaintiffs filed a declaration from Arnulfo Ramirez Ramos, a detainee who recently arrived at Mesa Verde from La Palma Correctional Facility, which had 78 confirmed cases of Covid-19. Mr. Ramirez stated that upon arrival at Mesa Verde he was neither tested for Covid-19 nor quarantined, but instead was placed directly into the general population. Ramirez Decl. ¶ 8, Dkt. No. 286-1. After the Court issued an order indicating that an evidentiary hearing may be necessary, ICE submitted a new declaration in which Mr. Pham stated that his prior sworn declaration was "inadvertently inaccurate," because ICE in fact does *not* quarantine detainees transferred from Covid-19-infected facilities unless the detainee is already experiencing symptoms or awaiting test results. Dkt. No. 324-1. The Court is still awaiting an adequate explanation for how ICE could have made so dramatic a misstatement about so important an issue (not to mention an explanation for why ICE is not doing what Pham originally asserted).

Responding to this fast-moving crisis is undoubtedly creating novel challenges for detention facilities across the country, but ICE's conduct and attitude towards its detainees at Mesa Verde and Yuba County Jail since the pandemic began have shown beyond doubt that ICE cannot currently be trusted to prevent constitutional violations at these particular facilities without judicial intervention. As Judge Young recently noted of ICE's response to the coronavirus in Massachusetts, "Where elasticity is vital, they are rigid; where life hangs upon a carefully drawn line, they opt for near-blanket incarceration. That is evidence of deliberate indifference." *Savino v. Souza*, 2020 WL 2404923, at *9 (D. Mass. May 12, 2020).

Therefore, the fact that conditions have improved at the facilities does nothing to disturb the Court's conclusion that the requirements for interim relief have been met, and that a

preliminary injunction is needed, at a minimum, to lock in place the safety improvements achieved in recent weeks. *See Winter v. NRDC*, 555 U.S. 7, 20 (2008); *Zepeda Rivas*, 2020 WL 2059848, at *2–3; *see also Costa v. Bazron*, 2020 WL 2735666, at *5 (D.D.C. May 24, 2020) ("[M]ere compliance with the existing TRO does not obviate the need for preliminary relief.").[2]

## II

Although preliminary injunctive relief is warranted, the plaintiffs propose judicial intervention into ICE's detention practices that is more intrusive than necessary, at least on the current evidentiary record.

The plaintiffs ask the Court to order ICE to ensure that detainees at both facilities be at least ten feet apart from one another while sleeping (with detailed sub-rules regarding the configuration of beds), and that they be able maintain a six-foot distance at almost all other times. The plaintiffs further propose that ICE be required to develop and submit to the Court "detailed written plans" for bringing each facility into compliance with this social distancing goal, subject to objection from the plaintiffs and scrutiny and modification by the Court. In addition, they propose that ICE should be flatly prohibited from admitting any new people into the detainee population until compliance with the plans is achieved, and barred from transferring detainees *out* of Mesa Verde or Yuba County Jail unless the destination facility has achieved an equal degree of social distancing.

The plaintiffs' proposed injunction appears based on the assumption that the government should create conditions of confinement for immigration detainees that approximate the level of safety achievable for people not in detention. Further, the plaintiffs often seem to assume that if

---

[2] ICE argues that there has been no outbreak of Covid-19 yet at either facility, and that therefore the plaintiffs are not being irreparably harmed. This is wrong for several reasons. For one, the absence of the virus at the facilities is far from clear—ICE had tested only two detainees at the time of the TRO hearing, and there is no evidence that the agency has tested even a single additional person in the weeks since then. For another, the conditions at the facilities have improved primarily as a result of this litigation, so the absence of confirmed cases thus far does not imply that an injunction maintaining the status quo is unnecessary. And lastly, the fact that Covid-19 has not yet entered the facilities does nothing to undermine the unrebutted evidence that if and when it does, it may cause a rapid and dangerous outbreak. *See, e.g.*, Iwasaki Decl. ¶ 40; *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993).

this level of safety cannot be achieved, the only answer is that more people should be released. But this is not what due process demands, and the plaintiffs' proposed injunction thus intrudes too much on ICE's function and decision-making authority.

Of course, people subject to government detention have a constitutional right to safe conditions of confinement. *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982). But this right guarantees only "reasonable safety," with the understanding that detention will almost never be as safe as freedom. *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 200 (1989). To assess whether safety risks rise to the level of a constitutional violation in a particular case, courts must consider the government's own interests, as well as the measures reasonably available to reduce the risks. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Bell v. Wolfish*, 441 U.S. 520, 537 (1979); *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018); *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004). The unfortunate reality is that a certain degree of danger can be among the "inherent incidents of confinement in such a facility." *Bell*, 441 U.S. at 537.

And the federal government has an interest in detaining people subject to removal proceedings who pose a danger to the community or are a flight risk. *Demore v. Kim*, 538 U.S. 510, 518–19 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 690–91 (2001). Through the bail process, this Court has learned that many of the people currently detained at Mesa Verde and Yuba County Jail would in fact pose a significant danger to the community if released. Indeed, even though some of these people have medical vulnerabilities that make them more susceptible to severe outcomes of Covid-19 infection, it still is not appropriate to release them. This is presumably true of some of the people whom ICE might seek to detain in the future—sometimes detainees come to these facilities straight from jail or prison, having committed a string of violent crimes, and with little or no evidence that they've reformed. As Judge Sabraw recently noted, the government's interest in protecting the community from dangerous detainees "fundamentally alters the analysis of whether the continued confinement of these subclass members violates their substantive due process rights." *Alcantara v. Archambeault*, 2020 WL

2773765, at *3 (S.D. Cal. May 26, 2020).

Against this legal backdrop, it appears possible that the conditions at the facilities have reached, or at least are approaching, the constitutional minimum given the health threat—at least for detainees who pose a significant danger to the community or otherwise should not be released. Based on the current record, detainees at Mesa Verde are sleeping in alternating directions on alternating levels of bunk beds that are spaced about three feet apart. *See generally* Pham Decl. No two detainees are sharing a bunk bed. About half the sinks, showers, and toilets are shut off to allow for greater spacing. Meals are staggered such that each detainee can sit at his own table during meal times. Masks are provided free of charge to detainees; new arrivals are screened by nurses for possible exposure to the coronavirus (although the effectiveness of this process is unclear); and medical staff will examine any detainee who submits a request due to symptoms consistent with Covid-19. At Yuba County Jail, no two detainees are sharing a cell in units A, D, and E, and each celled detainee has his own sink and toilet. *See generally* Fishburn Decl., Dkt. 264-2. In units B and C, no two detainees share a bunk and the bunks are spaced about six feet apart. Detainees can eat at their bunks or cells more than six feet from each other. Masks are provided free of charge, and detainees who present symptoms of Covid-19 are placed in isolation in the medical unit. Furthermore, although it appears that Yuba may have stopped taking new arrivals, all arriving detainees are placed in a 14-day quarantine. *Id.* ¶ 21.

Given the improvements that have been achieved since the TRO was entered, for now the primary relief to be ordered is that ICE must maintain the status quo of safety that currently exists in the facilities. *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam) ("The purpose of . . . interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward.") (internal citation omitted). As a practical matter, this may mean that ICE cannot increase the net number of detainees more than minimally. But perhaps not, because ICE could conceivably find a way to change the way a facility is used or configured so as to allow more detainees to enjoy the same amount of distancing that currently exists (as occurred, for example, when the remaining women

were released from Mesa Verde). Maintaining the status quo also means that the Court's prior orders temporarily releasing certain detainees will remain in effect, and the Court will continue for now to consider requests from class counsel for the temporary release of individual detainees, as there are almost certainly still some people whose continued detention in the facilities under present circumstances is unreasonable and contributes to an unnecessary risk of harm to the class as a whole. As previously ordered, ICE will be granted additional time to respond to release requests to better facilitate vetting of custodians.

Evidentiary gaps in the parties' presentations have left some unanswered questions regarding whether ICE could reasonably take additional steps to alleviate the likely due process violations in both facilities. In particular, there seems to be considerable uncertainty regarding how new arrivals are actually being screened at Mesa Verde, and whether those procedures are creating serious and avoidable health risks. The parties are ordered to meet and confer about that, and report to the Court at the next status conference. And if the plaintiffs believe that additional preliminary relief is necessary to address risks to class members who must continue to be detained, the Court will hold an evidentiary hearing.[3] Any requests for additional relief, however, must recognize that "[w]hen [executive] officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad." *S. Bay United Pentecostal Church v Newsom*, 2020 WL 2813056, at \*1 (U.S. May 29, 2020) (Roberts, C.J., concurring) (internal quotation marks omitted).

III

ICE raises a number of legal objections to this narrower form of injunctive relief. But these objections do not prevent the Court from requiring that the status quo be maintained to protect detainees (not to mention facility staff and the surrounding communities) from the harm that would have likely occurred if ICE had been left to its own devices.

---

[3] As discussed with the parties, the Court has not read or considered any aspect of the declaration of Dr. Allen, who has a distant relationship with a law clerk, and will not do so without further discussing with the parties whether they have any objections.

ICE argues that Ninth Circuit law prohibits district courts from ordering the temporary release of immigration detainees while litigation is pending. For this proposition ICE cites *Chin Wah v. Colwell*, 187 F. 592 (9th Cir. 1911), a decision from more than one hundred years ago in which the Ninth Circuit interpreted the Chinese Exclusion Act and affirmed a district court's discretionary denial of bail under that law. The court in that case concluded that "the power to admit to bail in deportation cases, if it exists, is created by implication in [certain] provisions of the exclusion acts . . . ." *Id.* at 594. Regardless of whether *Chin Wah* remains good law, its application to this case is questionable at best. The Ninth Circuit discussed the district court's powers when adjudicating an appeal from a deportation order under a long-obsolete statutory scheme. The opinion did not address, let alone resolve, the question of whether a district court can order the temporary release of detainees held in unconstitutionally dangerous conditions. Indeed, many district courts throughout the Ninth Circuit have ordered the release of immigration detainees during the Covid-19 pandemic. *See, e.g.*, *Singh v. Barr*, 2020 WL 2512410, at \*10 (N.D. Cal. May 15, 2020); *Pimentel-Estrada v. Barr*, 2020 WL 2092430, at \*19 (W.D. Wash. Apr. 28, 2020); *Kaur v. U.S. Dep't of Homeland Sec.*, 2020 WL 1939386, at \*4 (C.D. Cal. Apr. 22, 2020).

ICE next argues that the Court cannot rely on its inherent authority to grant bail to habeas petitioners because challenges to conditions of confinement cannot be brought in habeas corpus petitions. ICE relies primarily on *Nettles v. Grounds*, 830 F.3d 922 (9th Cir. 2016) (en banc), but that case concerned only the relationship between habeas corpus and section 1983 remedies for state prisoners—the Ninth Circuit declined to address the scope of habeas for federal prisoners (or federal immigration detainees). *Id.* at 931. The rationales behind *Nettles* and the Supreme Court's *Preiser* line of cases—in particular, the need to impose the correct set of statutory procedural safeguards on state prisoner claims—do not apply in a case involving federal immigration detainees. *See id.* at 934 ("If the prisoner's claim challenges the fact or duration of the conviction or sentence, compliance with AEDPA is mandated, while if the claim challenges any other aspect of prison life, the prisoner must comply with the PLRA."); *Preiser v. Rodriguez*,

411 U.S. 475, 477 (1973). And the Supreme Court has long left open the possibility that conditions of confinement claims may be brought pursuant to habeas corpus. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862–63 (2017) ("A successful habeas petition would have required officials to place respondents in less-restrictive conditions immediately."). Nor has *Crawford v. Bell*, 599 F.2d 890, 892 (9th Cir. 1979), foreclosed the possibility of federal detainees bringing conditions-of-confinement claims under 28 U.S.C. § 2241. *See Hernandez v. Campbell*, 204 F.3d 861, 864 (9th Cir. 2000) (per curiam) (noting that federal prisoner petitions that "challenge the manner, location, or conditions of a sentence's execution must be brought pursuant to § 2241 in the custodial court."); *Moore v. Winn*, 698 F. App'x 485, 486 (9th Cir. 2017) (unpublished) (holding that prisoners in federal custody can bring conditions-of-confinement claims via habeas corpus).

Furthermore, the plaintiffs have brought this case not only under habeas corpus but also as a claim for declaratory and injunctive relief. If ICE were correct that habeas relief is not available here, then the plaintiffs would be entitled to relief under the equitable power of federal courts to restrain unlawful executive action. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326–27 (2015); *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019); *Solida v. McKelvey*, 820 F.3d 1090, 1096 (9th Cir. 2016); *see also Abbasi*, 137 S. Ct. at 1862 (noting the possibility of "injunctive relief," as distinct from habeas or *Bivens* relief, to address conditions of confinement). This Court has labeled its temporary release orders as "bail orders," invoking the inherent power of federal courts to release habeas petitioners on bail in extraordinary cases. *See Mapp v. Reno*, 241 F.3d 221, 229 (2d Cir. 2001); *Land v. Deeds*, 878 F.2d 318, 318 (9th Cir. 1989) (per curiam); *see also Zepeda-Rivas*, 2020 WL 2059848, at *2–3; *United States v. McCandless*, 841 F.3d 819, 822 (9th Cir. 2016) (per curiam). But alternatively, these orders can be considered provisional relief on the plaintiffs' equitable claim that the conditions of confinement pose unreasonable dangers to the class. *See Brown v. Plata*, 563 U.S. 493, 526 (2011); *Doe v. Kelly*, 878 F.3d 710, 720 (9th Cir. 2017); *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992) ("[T]he injunction is authorized by the

district court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief."); *see also Savino*, 2020 WL 2404923, at *3.

Lastly, in its papers and at the preliminary injunction hearing, ICE has repeatedly claimed that the Ninth Circuit's recent decision in *United States v. Dade*, __ F.3d ___, 2020 WL 2570354 (9th Cir. May 22, 2020), establishes that "COVID-19 does not satisfy the 'extraordinary case' standard warranting release." Opposition Brief at 25, Dkt. No. 264. That case says no such thing, and ICE's description of it is borderline sanctionable. In *Dade*, the court indicated that the pandemic does present a "special circumstance," but held (in the criminal collateral review context) that the petitioner was also required to make a showing of lack of dangerousness and flight risk. 2020 WL 2570354, at *2. In this case, which concerns civil rather than criminal detention, this Court has granted temporary release only where it has concluded that a detainee poses neither a danger to the community nor a flight risk. *See* Dkt. No. 50.

IV

The motion for a preliminary injunction is granted. ICE and all of its officers, agents, servants, employees, and attorneys, are ordered while this case is pending to maintain, at a minimum, the status quo that currently exists as it relates to protection from transmission of Covid-19 at the Mesa Verde Detention Center and Yuba County Jail. ICE must also continue to provide information to the Court and the plaintiffs as previously ordered, and must respond to reasonable discovery requests from class counsel. A status conference will take place Thursday, June 11, 2020, at 2:00 p.m. by videoconference to discuss the need for an evidentiary hearing and any other matters the parties wish to address. If the parties prefer to push back the status conference to the following week, they may submit a stipulated request to do so.

**IT IS SO ORDERED.**

Dated: June 9, 2020

_____
VINCE CHHABRIA
United States District Judge