WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
ANGÉLICA SALCEDA (SBN 296152)
asalceda@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Attorneys for Petitioners-Plaintiffs*
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
FRANCISCO UGARTE (SBN 241710)
francisco.ugarte@sfgov.orga
GENNA ELLIS BEIER (SBN 300505)
genna.beier@sfgov.org
EMILOU H. MACLEAN (SBN 319071)
emilou.maclean@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: 415-553-9319
Fax:    415-553-9810

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUIZ TOVAR, LAWRENCE MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG,<br><br>Petitioners-Plaintiffs,<br><br>v.<br><br>DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; NATHAN ALLEN, Warden of Mesa Verde Detention Facility,<br><br>Respondents-Defendants. | CASE NO. 3:20-CV-02731-VC<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>DATE: AUGUST 5, 2020<br>TIME:  9:00 A.M. |

BREE BERNWANGER* (NY SBN 5036397)
bbernwanger@lccrsf.org
HAYDEN RODARTE (SBN 329432)
hrodarte@lccrsf.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA
131 Steuart St #400
San Francisco, CA 94105
Telephone: (415) 814-7631

JUDAH LAKIN (SBN 307740)
judah@lakinwille.com
AMALIA WILLE (SBN 293342)
amalia@lakinwille.com
LAKIN & WILLE LLP
1939 Harrison Street, Suite 420
Oakland, CA 94612
Telephone: (510) 379-9216
Facsimile: (510) 379-9219

JORDAN WELLS (SBN 326491)
jwells@aclusocal.org
STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

MARTIN S. SCHENKER (SBN 109828)
mschenker@cooley.com
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIMOTHY W. COOK (Mass. BBO# 688688)*
tcook@cooley.com
FRANCISCO M. UNGER (Mass. BBO# 698807)*
funger@cooley.com
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

*Attorneys for Petitioners-Plaintiffs*

*Admitted *Pro Hac Vice*

At the most recent Case Management Conference on July 6, 2020, the Court requested that the parties confer to develop a schedule for the remainder of the case. The parties have now conferred and jointly submit their proposed schedules set forth as Item 5 below.

In addition, the parties wish to update the Court on the following recent developments:

1. **Positive COVID-19 tests at Mesa Verde and Yuba.**

**Plaintiffs' Statement:** At the Court's instruction, Defendants have periodically informed Plaintiffs of positive test results among staff and detainees at the two facilities. As of today, Plaintiffs have been informed of positive tests for thirteen staff members and three detainees at Mesa Verde, and two staff members at Yuba. The number of COVID-positive staff members at Mesa Verde is almost certainly a severe undercount of staff who are infected with COVID-19, as discovery reveals that GEO is not offering testing to GEO officers and has no clear policy to ensure that positive tests from staff taken outside the facility are promptly communicated to management and acted upon. Except as noted below, in almost all cases, Defendants have stated that these positive results do not suggest a need for additional testing of detainees, since Defendants contend that only one of the staff members had "close contact" with any detainee.[1] Even in that case, one of the detainees who had had close contact with the COVID-positive staff member affirmatively sought testing (after initially refusing) but was denied a test because he was not symptomatic. In response to the first COVID-positive staff member, Defendants ultimately tested twelve detainees with whom that staff member had come into contact, but Defendants contended that such testing was not required because there was no "close" contact. Defendants are also not reporting whether staff have had close contact with other staff members, even though staff are a primary vector for the introduction of COVID-19 in congregate facilities.

On July 30, Plaintiffs learned through deposition testimony of the GEO Facility Administrator that a class member in Dorm B at Mesa Verde tested positive for COVID-19 after

---

[1] Defendants have provided sparse information about each staff member who has tested positive, making it difficult to discern the accuracy of their assertion that the individual had no "close contact" with any detainees. Where the staff member is a GEO officer, in almost all cases, Defendants have provided no further information about whether the officer was typically in the dorms or interacted with detainees in the course of their work.

experiencing serious illness. While the dorm is now cohorted, the GEO Facility Manager testified that GEO had no intention of testing anyone in Dorm B and ICE had not asked them to be tested. (As stated by Defendants below, that directive appears to have been since revised. Defendants have not reported any test results.) Moreover, over the last week, at least five class members have been transferred from Dorm B to Dorms C and D, increasing the risk of facility-wide transmission. To Plaintiffs' knowledge, no one in any of these dorms has been offered a test. Plaintiffs disagree that such limited testing of class members is required where more than 10% of the Mesa Verde staff have tested positive for COVID-19 in recent weeks. Plaintiffs believe these new developments make it even more urgent that Defendants implement, or be required to implement, more uniform and comprehensive plans for testing detainees, and for housing or releasing detainees, and/or limiting intake, to mitigate the risk of COVID transmission at both facilities.[2]

**Defendants' Statement:** As of July 30, 2020, to Federal Defendants' knowledge, two Yuba County Jail staff have tested positive for COVID-19. Contact tracing revealed no detainee contact with the first individual and no detainee close contact with the second.

As of July 30, 2020, thirteen active staff members (eight GEO Group staff and five Wellpath staff) at Mesa Verde have tested positive for COVID-19. Guidance from the CDC regarding contact tracing recommends determining who was in "close contact" with the individual testing positive. A close contact is "someone who was within 6 feet of an infected person for at least 15 minutes starting from 2 days before illness onset (or, for asymptomatic

---

[2] At the last Case Management Conference, the parties discussed a positive test of a detainee upon intake at Mesa Verde, which led to the transfer of six other detainees to Adelanto Detention Center. In response to an inquiry from the Court, counsel for Plaintiffs noted (based on information on the ICE website) that Adelanto had a significant number of detainees who had tested positive for COVID-19, as well as one death. With regard to the death, Plaintiffs' counsel subsequently discovered that he had confused Adelanto with Otay Mesa. Counsel apologizes to the Court and defense counsel for the error. Defendants note that at the time of the statement by Plaintiffs' counsel, there were zero active confirmed COVID cases among Adelanto detainees, and there had been eight cumulative cases, all of whom had recovered. See Declaration of AFOD Gabriel Valdez, Roman v. Wolf, 5:20-cv-768-TJH-PVC (C.D. Cal. July 10, 2020), Dkt. No. 163-1. However, the ICE website did show a different number, as explained in AFOD Valdez's declaration.

patients, 2 days prior to specimen collection) until the time the patient is isolated." https://www.cdc.gov/coronavirus/2019-ncov/php/contact-tracing/contact-tracing-plan/appendix.html#contact. GEO and/or Wellpath have conducted contact tracing for each positive staff member. Of the thirteen staff members, one GEO officer had close contact with one detainee and some contact with another detainee on June 30, 2020.[3] Both detainees were offered testing in this instance and both refused. No other close contact with detainees has been identified. Some of the thirteen active staff members had close contact with other staff members, and those close contacts were informed according to CDC guidance. While the information regarding close contacts between staff have not been reported to Plaintiffs in each case, contact tracing among staff member is being conducted. Additionally, the Wellpath medical staff were all offered testing in mid-July due to the positive cases in the medical staff.

Two detainees have tested positive for COVID-19 during their intake screenings. The first detainee tested positive on July 1, 2020, and was in medical isolation until July 28, 2020. While he has tested positive as recently as July 22, 2020, he has remained asymptomatic throughout. He is now considered "persistently positive" but not contagious. *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-hospitalized-patients.html. He remains in the medical unit away from other detainees. The second detainee tested positive during intake on July 29, 2020. He is currently isolated in medical isolation. This detainee had close contact with one other detainee during transport, who was placed into B Dorm to cohort (see below).

On the afternoon of July 29, 2020, a detainee in the B Dorm presented to medical staff with fever, headache, and body aches. He was tested using the Abbott ID Now machine, and the results returned positive. He was placed into medical isolation. The remaining population of B Dorm plus the individual that was exposed during transport (33 individuals) are being cohorted. The individuals in cohort are being monitored and checked twice daily for symptoms, in

---

[3] Counsel for Federal Defendants previously informed counsel for Plaintiffs that the GEO officer had close contact with both detainees. However, in preparing this report, counsel discovered that she misread the information provided to her. One detainee had close contact, the other had contact but not close contact with the GEO officer. Counsel regrets the error.

accordance with ICE Health Services Corps guidelines. On July 30, 2020, all 33 individuals were offered COVID-19 testing.[4] 32 individuals consented to testing, and the specimens have been sent out to a lab for analysis. Results are expected in 4-7 days.

2. **Increased Density at Mesa Verde.**

**Plaintiffs' Statement.** Defendants have informed Plaintiffs and the Court that they are increasing intakes in Mesa Verde, without a commensurate increase in releases. Over the past four days, there have been sixteen new arrivals at Mesa Verde and only seven releases. Moreover, the GEO Facility Administrator testified that only half of the class members transferred into the detention center are being tested for COVID-19 before entering the general population, due to purported refusals.[5] Plaintiffs are concerned about the increased density of the facility, limiting social distancing, particularly in light of the growing number of positive tests and Defendants' acknowledged lack of space to isolate infected individuals.

**Defendants' Statement:** Defendants were only made aware of Plaintiffs' concerns regarding the population density at Mesa Verde on Friday, July 31, 2020, at 5:54 p.m. PT. Defendants will address in a supplemental filing or at the case management conference.

3. **Information Sharing**

**Defendants' Statement:** As noted above, Defendants have provided Plaintiffs with updates regarding COVID-19 testing results multiple times each week since the last status conference. Federal Defendants also continue to provide Plaintiffs with 1) daily arrival and release information, 2) weekly facility rosters, and 3) rolling provision of Form I-213s, rap sheets, and medical records for arrivals to Mesa Verde and Yuba.

---

[4] Plaintiffs state that the GEO Facility Manager testified that GEO was not testing the detainees in B Dorm. The Facility Manager gave this testimony on July 30, 2020, the same day that all detainees in Dorm B were being offered testing. The Facility Manager was not onsite during the testing (or otherwise able to perform his usual duties and responsibilities that day) because he was instead at Plaintiffs' deposition.

[5] Class counsel have requested to communicate with class members who have purportedly refused. Experts have reported to class counsel that refusal numbers are typically very low for COVID-19 testing and class counsel are concerned that a purported 50% refusal rate at intake may not be an accurate reflection of willingness to test. Notably, when Defendants recently offered a test to those in Dorm B, all but one of the 33 detainees agreed to be tested.

On July 12, 2020, after learning that a released class member was unable to report to ICE as required because he had tested positive for COVID-19, Federal Defendants requested that class counsel notify Federal Defendants if a class member contracts COVID-19 after being released on bail. In response, class counsel informed Federal Defendants of another released class member that had contracted COVID-19 and, just prior to receiving his positive test results, had reported to ICE in a federal building in Los Angeles. Class counsel stated they provided this information because the class member sought their assistance in communicating the information to ICE. However, class counsel also stated that they did not believe they had an affirmative obligation to report positive tests in other circumstances. If Plaintiffs continue to oppose voluntary provision of this information, Federal Defendants intend to seek an order from the Court at the case management conference instructing them to provide it. Among other reasons, this information is needed so that ICE can take appropriate measures if a positive released class member came in contact with personnel during an ICE check-in and so that ICE can plan for removals of released class members as appropriate. It is also relevant to the relative dangers of release versus continued detention.

Additionally, in investigating address changes proposed by released class members on July 13, 2020, Federal Defendants discovered that one released class member was in county criminal custody. Federal Defendants informed class counsel of this and further asked that class counsel notify Federal Defendants of arrests of class members that are released on bail. In response, class counsel revealed that another released class member was also in county criminal custody.[6] However, class counsel has not agreed to provide Federal Defendants with notification of the arrest of released class members. If Plaintiffs will not agree to voluntary provision of this information, Federal Defendants intend to seek an order from the Court at the case management conference instructing them to provide it.

**Plaintiffs' Statement:** Class Counsel do not believe that they can or should be required to continuously monitor released class members as to their health status or whether they have

---

[6] Both of these individuals were in custody due to alleged probation violations and both were released from custody without a finding of violating probation.

been incarcerated by state or local officials. Class counsel do not have the ability to continually check in with dozens of released detainees. As to re-incarceration, ICE has available mechanisms to track the whereabouts of released detainees that are not available to class counsel, and indeed, in one instance, learned of a class member's arrest by local law enforcement before class counsel.

In both incidents of re-arrest identified by Defendants, individuals were briefly taken into custody on suspicion of a probation violation that resulted from ICE actions (in one case, a prior deportation; in the other, ICE arrest and detention). In both instances, the individuals were quickly released without any finding of a probation violation.

In the one incident where a class member had contact with ICE immediately prior to receiving a positive test result, the individual immediately notified ISAP (which provides electronic monitoring for ICE). Notably, the two individuals who tested positive for COVID-19 were able to rapidly seek testing and readily quarantine.

4. **Plaintiffs' proposal regarding testing and further steps at facilities in light of further positive COVID tests.**

On July 24, Plaintiffs sent Defendants a detailed proposal for universal, regular testing of detainees, contact tracing, and re-arranging facilities (by cohorting) or (if necessary to preserve suitable social distancing) releasing detainees to account for potential positive test results, with a request to meet and confer on the proposal. A copy of the proposal is attached hereto as Exhibit A. The parties have since conferred once on these issues, and expect to confer further.

5. **Discovery.**

a. Defendants have been producing documents in response to Plaintiffs' requests initial requests for production that were limited to subjects on which Plaintiffs might request additional preliminary injunctive relief. The parties are currently conferring regarding ongoing document production and the production of privilege logs.

b. Defendants have served two limited interrogatories on Plaintiffs, asking (1) whether class members will consent to be tested for COVID-19 and, if not, why not, and (2) whether class members are wearing their masks (as Defendants' observation has been that the

vast majority of class members, at least at Mesa Verde, do not wear their facility-provided masks) and, if not, why not, with a request for expedited response. Plaintiffs provided an expedited response as requested, objecting, *inter alia,* that the interrogatories constituted improper attempts to conduct discovery of absent class members, were not relevant to material issues, were unreasonably burdensome, and constituted (particularly with respect to testing) incomplete hypothetical questions. Defendants submit that the interrogatories are appropriate, the detained class members are readily available to class counsel for the purpose of obtaining responses, and the information is highly relevant to the issues before the Court (including whether any further injunctive relief ordered should require any action on the part of class members).

    **c.**    Plaintiffs have noticed the following depositions, the first two of which have been completed:

- Alexander Pham (ICE Assistant Field Office Director for Mesa Verde): July 29[7]
- Defendant Nathan Allen (Warden, Mesa Verde/GEO FRCP 30(b)(6)): July 30
- Yuba County Jail (Fed.R.Civ.P. 30(b)(6)): August 6

    **d.**    Particularly in light of the non-responsive answers given by Mr. Pham, Plaintiffs require the deposition of ICE related to conditions at Mesa Verde pursuant to Fed.R.Civ.P. 30(b)(6). Plaintiffs requested available dates for such a deposition on July 8. Defendants have designated Deputy Field Office Director Erik Bonnar, but have indicated that he will not be

---

[7] Plaintiffs note that Mr. Pham was extraordinarily evasive and non-responsive throughout the deposition, claiming to have difficulty understanding routine questions and claiming little or no recollection of numerous events, decisions, and conversations occurring within the past two months. Plaintiffs may seek both sanctions and additional time to question the deponent. Defendants dispute Plaintiffs' characterization of Mr. Pham, who has not had duties regarding the detained docket at Mesa Verde for over a month. (Mr. Pham previously had been performing the work of two Assistant Field Office Directors due to an AFOD vacancy, including but not limited to duties regarding the detained docket at Mesa Verde, but the AFOD vacancy has since been filled, and Mr. Pham has not had been in that position regarding the detained docket at Mesa Verde for over a month.)

available until at least August 25 due to his responsibilities at a detail in another jurisdiction. Plaintiffs do not believe this seven-week delay is appropriate and seek the Court's involvement in requiring an earlier deposition date.

**6.      Potential Motion for Further Injunctive Relief.**

Plaintiffs anticipate bringing a motion for further injunctive relief, focusing on the issues set forth in Plaintiffs' proposal regarding testing, contact tracing and re-arranging facilities that is described in Item 3 above. Plaintiffs had intended to file this motion on our around August 14, but their ability to do so depends upon the availability of Mr. Bonnar for deposition. Plaintiffs do not request an evidentiary hearing in connection with their motion, but have no objection should the Court wish to set an evidentiary hearing in connection with this motion. If the parties can reach agreement on these issues, the motion will not be necessary.

**7.      Proposed case schedules.**

The parties separately propose the following schedules for the remainder of the case.

**Plaintiffs' proposed schedule:** Plaintiffs, having reviewed Defendants' proposed schedule, observe that the discovery cutoff and trial dates are unrealistic and would severely compromise Plaintiffs' ability to discover relevant evidence. To date, Plaintiffs have propounded extremely limited discovery concerning the subjects of additional injunctive relief, even this discovery has been contentious and subject to significant delay. Discovery is necessary concerning additional facts relevant to a potential permanent injunction, and no discovery has taken place concerning additional claims including the First Amendment claims. (Plaintiffs dispute Defendants' contention, below, that no such discovery is necessary because these are "legal issues" that "can be resolved on summary judgment.") Plaintiffs anticipate that further legitimate document requests will be met with the contention that document production will require several months at least, making an October 31 fact discovery cutoff, for example, unrealistic and prejudicial. Plaintiffs propose the following schedule:

- Completion of fact discovery: March 5, 2021
- Completion of expert discovery: June 4, 2021
- File motions for summary judgment: August 6, 2021

- Trial: March 7, 2022

**Defendants' proposed schedule:** As Plaintiffs and the Court has observed,[8] there is no real factual dispute about the measures being taken and not taken at Mesa Verde and Yuba. The parties' dispute simply is whether the measures are sufficient or insufficient and what other options, if any, there are (about which Plaintiffs are taking discovery now). Defendants therefore propose that, to the extent Plaintiffs maintain the current measures are insufficient, Plaintiffs file their motion for further injunctive relief, the Court hold an evidentiary hearing or other hearing as necessary, and the Court enter a final order deciding the COVID portion of the case granting or denying injunctive relief. Specifically, Defendants propose the following schedule:

- Plaintiffs' motion for further injunctive relief: August 14, 2020 or August 28, 2020, subsequent to Fed.R.Civ.P. 30(b)(6) deposition of ICE witness regarding Mesa Verde
- Defendants' response to Plaintiffs' motion for further injunctive relief: August 28, 2020, or September 11, 2020
- Plaintiffs' reply in support of their motion for further injunctive relief: September 4, 2020, or September 18, 2020
- Hearing on Plaintiffs' motion for further injunctive relief: A date on or after September 18, 2020, or October 2, 2020, convenient for the parties and the Court, following which the Court will enter a final order deciding the COVID portion of the case granting or denying injunctive relief.

Defendants do not believe additional discovery and trial will be necessary for the remaining APA/First Amendment claim, as such legal issues can be resolved on summary judgment. Should the Court determine additional discovery and a trial are necessary, Defendants propose the following schedule:

- Completion of fact discovery: October 30, 2020
- Completion of expert discovery: December 18, 2020
- File motions for summary judgment: January 15, 2021

---

[8] *See* Tr. of June 19, 2020 Case Mgmt. Conf. 11–13.

- Trial: March 29, 2021

Dated: July 31, 2020

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA

By: /s/ William S. Freeman
William S. Freeman
*Attorney for Plaintiffs*


DAVID L. ANDERSON
United States Attorney

By: */s/ Adrienne Zack*
Adrienne Zack, Assistant U.S. Attorney
*Attorney for Federal Defendants*


BURKE, WILLIAMS & SORENSEN, LLP

By: */s/ Susan E. Coleman*
Susan E. Coleman
*Attorney for The GEO Group, Inc. and Nathan Allen*

### ATTESTATION RE SIGNATURES

Pursuant to N.D. Cal. Civ. L. R. 5-1(i)(3), the undersigned attests that concurrence in the filing of this document has been obtained from each of the other signatories.

*/s/ William S. Freeman*
William S. Freeman

# Exhibit A

| | |
|---|---|
| **From:** | Sean Riordan |
| **To:** | Zack, Adrienne (USACAN); Choe, Shiwon (USACAN); Garbers, Wendy (USACAN); Coleman, Susan E. |
| **Cc:** | Bill Freeman; Angelica Salceda; Marty Schenker; Emilou Maclean; Bree Bernwanger; Francisco Unger; Timothy Cook; Genna Beier; Judah Lakin |
| **Subject:** | [Zepeda Rivas] proposal for testing/cohorting protocol |
| **Date:** | Friday, July 24, 2020 12:47:20 PM |

Dear Counsel:

We write to address the urgent need for universal and regular COVID-19 testing of class members at Mesa Verde. As you know, twelve MVDF staff and two detained class members have recently tested positive for COVID-19. While we believe that universal and regular testing should have already been occurring, in light of these developments it is imperative that ICE quickly establish such a testing regime and a plan for responding to any positive test. As the CDC's testing guidance ("CDC Guidance") states, "Before testing large numbers of asymptomatic individuals without known or suspected exposure, facility leadership should have a plan in place for how they will modify operations based on test results."

In recent days we have consulted medical and public health experts to better understand the problem and come up with potential solutions. Given that ICE has already expressed its willingness to engage in universal testing, we hope the Defendants will quickly agree to the implementation of this plan. We note that Defendants identified problematic conditions precedent to the implementation of universal testing, see Bonnar Declaration (ECF 429-1), para. 10 & n.3. Experts identified such conditions as either inconsequential or surmountable.

Specifically, we propose:

- **Intake:** ICE continue to test all arriving class members at intake and to medically isolate any such person who tests positive.

- **Universal and regular testing:** ICE test all MVDF personnel and class members on a regular basis, at least once per week, through a point of care test that returns results quickly, allowing the results to be acted upon.
    - Experts inform us that the Abbott ID test already in use at MVDF is adequate for these purposes. By contrast, any test would be inadequate if it presents a significant delay in the availability of results, as Defendants have suggested is likely for tests that require offsite laboratory analysis. See Bonnar Dec. n. 3.
    - As a point of reference, some other institutions – like universities – are planning to test their populations two to three times per week to control against outbreaks. Professional sports leagues are doing this daily – they are, like DHS, multi-billion dollar operations with the possibility of widespread COVID infection if adequate mitigation measures are not implemented. Experts have advised that weekly tests are appropriate in a setting such as MVDF, and this is consistent with CDC Guidance ("Approaches for early identification of asymptomatic individuals include, initial testing of everyone in the setting, periodic (e.g., weekly) testing of everyone in the setting, and testing of new or returning entrants into the setting.").

- **Effective contact tracing:** ICE trace and test anyone who was in contact with staff or

class members who tested positive, with a contact window beyond the two days that is the current practice. Experts recommend tracing and testing all those who came into contact with a confirmed positive individual within 14 days from the date that the individual contact tested positive absent evidence that the person who tested positive became infected only more recently.

- **Arranging facility for cohorting:** The Defendants establish a plan for responding to positive tests among the general population (i.e., not including intakes). If a class member tests positive, they should be placed in medical isolation consistent with the CDC guidelines. If there is insufficient space in medical isolation cells and/or the RHU in which to isolate that person, as an alternative Plaintiffs propose that the Defendants would cohort the confirmed COVID-positive class members in a separate dorm. Thus, Defendants would:
    - Clear the class members from one of the dorms and use that dorm as the site in which to quarantine those who test positive in a cohort. The clearing of that dorm should include taking measures to ensure that air is not circulating from that dorm to other parts of the facility. This may require modifying the existing ventilation system. It should also include significant measures to ensure that staff serving that COVID-positive dorm take measures to prevent transmission to other parts of the facility (i.e., with staff limiting their engagement with other class members outside of the dorm of those who test positive except to the extent necessary). On the expectation that adoption of this protocol would increase the safety level of the remaining dorms, we would be willing to discuss a modest increase in the number of detainees housed in those dorms.
    - Refrain from adding any new individual into a dorm from which a class member was moved after testing positive until 14 days have passed or all individuals in that dorm have tested negative. The dorm from which a class member was moved essentially becomes its own temporary cohort.

- **Refusal issues:** If the benefits of being tested were explained to all class members, we believe it would be very rare for a class member to refuse a test. With this in mind:
    - The parties should work together to formulate an information sheet providing basic information about testing to class members, which would be provided at the time a test is offered.
    - Any class members who refuse to be tested should be provided an opportunity to speak with class counsel.
    - If after speaking with class counsel, they continue to decline testing, they should be cohorted in one of the RHU or medical cells, if available, or, if space restrictions render it necessary, in another dorm that could be cleared for the purpose of cohorting those who refuse.
    - ICE should refrain from transferring to another detention facility anyone who refuses to be tested on intake. Public health experts inform us that this practice presents a risk to the personnel involved in the transport and to the personnel and detainees at the receiving facility, and these concerns are consistent with the [CDC Guidance on Management of COVID-19 in Correctional and Detention Facilities](#) which strongly discourages transfers of detained persons "unless necessary." At intake, individuals should be presented in a positive way the option of taking a test, afforded an opportunity to speak with class counsel about the test if they express reluctance, and cohorted for 14 days with anyone else who refuses if they ultimately decline to be tested.

- **Releasing individuals to avoid increased density if dorms need to be rearranged in light of positive test results**: Given the significant possibility that at least one and possibly two dorms would have to be cleared under this plan, and to comply with the preliminary injunction's requirement that conditions be maintained at the current level of safety, ICE will likely need to release additional class members at MVDF and/or slow

or stop the arrival of new class members for a time. Otherwise, in clearing one or more dorms, the remaining dorms will be made significantly more crowded, increasing the risk of COVID-19 transmission in those remaining dorms. This should be done either voluntarily or through the Court's revisiting of bail applications, and this should prioritize those with medical vulnerabilities.

The Defendants have already offered universal testing of some sort (Bonnar Dec. para. 10) and have apparently seriously considered a cohorting scheme similar to the one suggested here (GEO 059). We hope then that the parties can reach a quick agreement to meaningfully address the testing and cohorting issues that the recent positive test results have made all the more urgent. Everyone involved has a significant interest in ensuring that Mesa Verde doesn't become the San Quentin of immigration detention centers. Our experts think the measures we've proposed, which are consistent with CDC guidance, represent a reasonable way to hedge against a tragic and deadly outcome.

We suggest the parties meet and confer to discuss this at the earliest opportunity. We hope to be able to resolve this without further litigation.

Best Regards,
Sean