*Zepeda Rivas, et al. v. Jennings, et al.*, 3:20-cv-2731-VC
**Plaintiffs-Petitioners' Letter Brief Regarding Staff Testing**

**Introduction**

Defendants should be ordered to test all Mesa Verde Detention Facility (Mesa Verde) staff who have contact with class members for COVID-19 at least once every two to three days with a test that returns rapid results. Frequent testing should continue until there are no further positive cases in the facility and there is no longer unchecked spread within the surrounding community. Absent these measures, there is a near certainty that staff will transmit COVID-19 into Mesa Verde, prolonging and exacerbating the current outbreak or producing new outbreaks.

Defendants have opposed staff testing despite a consistently growing number of staff who have tested positive for COVID-19 beginning on June 17. Defendants would have this Court rely exclusively on their good faith efforts to practice social distancing and wear personal protective equipment. The results have demonstrated that that is grossly inadequate: more than 10% of staff have tested positive, even without any systematic testing, and more than 10% of class members have as well, even with most test results unavailable.

Defendants will no doubt argue that frequent, universal testing will be difficult or expensive. But it is Defendants' recent failure to take reasonable steps on testing that has allowed COVID-19 to continue spreading throughout Mesa Verde. Having caused this dire situation, Defendants cannot credibly claim that they should now be excused from taking necessary measures to mitigate further serious illness merely because doing so is onerous. The evidence is clear that routine and frequent testing is required to quell an outbreak; Defendants must be required to implement it.

**Facts**

At least sixteen Mesa Verde staff have recently tested positive despite the absence of universal testing (or any policy by Defendants concerning the testing of staff). During the ongoing COVID-19 outbreak at Mesa Verde, at least fifteen class members have recently tested positive, and several have been hospitalized. Only in response to a court order have Defendants established a mass testing program for detainees at Mesa Verde.[1] But Defendants continue to resist testing staff who directly and indirectly interact with vulnerable class members.

---

[1] The program has extraordinary limitations: More than a week after the first round of laboratory PCR testing, no results have been received. The results are also not available for a second round of testing completed on Tuesday. During this entire period, detainees have been commingled in dorms with limited ability to socially distance and with the certainty that some among them are COVID-positive. Defendants shifted responsibility to class members, asserting to the Court that 29 people this week had refused to test. Dkt. 538 at 2. Yet class counsel have communicated thus far with 27 of those and all but four agreed to testing; some made clear that *they never refused and were instead in the shower or sleeping when testing was offered*. Others were understandably reluctant in light of Defendants' failure to produce timely results. *Compare* Dkt. 484-1 (Becerra declaration of Aug. 4 stating that "lab results remain pending and are expected within 4 to 7 days, well within the 14-day quarantine"); Dkt. 527 (Becerra declaration of Aug. 11 stating that "due to a recent increase of sample submissions to the lab the results [for the same

The facts supporting Plaintiffs' request for universal and frequent staff testing are largely from information of Defendants' abject failure to take reasonable measures to protect their own staff and class members from COVID-19 and from the declaration of Dr. Nathan Grubaugh, a microbiologist who is an expert on COVID-19 testing.

Staff at Mesa Verde have not been tested systematically since the beginning of the pandemic. This was not by accident. MacLean Dec., Exh. A (GEO 6450) (May 26, 2020 Email from GEO Facility Administrator Nathan Allen to GEO's Western Region Director of Operations Cheryl Nelson) ("The [ICE Assistant Field Office Director] mentioned during [sic] he would rather not have staff testing as that may also impact ERO functions, i.e., an asymptomatic person testing positive would require possible dorm cohorts and detainee testing protocols."). Both ICE and GEO intentionally avoided testing staff despite knowledge of the risks to their own staff from working in a high-risk congregate environment, and the risks to detainees in their custody. *See, e.g.*, MacLean Dec., Exh. B (GEO 6467) (GEO Western Region Director of Operations responding "Yikes!" to Mesa Verde Facility Administrator affirming a growing number of COVID-positive staff); MacLean Dec., Exh. C (GEO 7222) (recognizing growing number of staff testing positive on June 25); MacLean Dec., Exh. D (GEO 9537) (same on July 14). A May 2020 plan to offer testing to all staff was never implemented despite testing kits having arrived to Mesa Verde on May 19 for this purpose. MacLean Dec., Exh. E (GEO 134); Exh. F (GEO 59); Exh. G (ICE 691). Aware of a growing problem with multiple new staff testing positive every week, Facility Administrator Allen nonetheless affirmed in sworn testimony on July 30, 2020 that GEO had no intention of changing course. MacLean Dec., Exh. H (Allen Dep. (rough) at 171-73).[2]

Staff have not even been tested when they have been symptomatic, exposed to others who are COVID-19 positive, or are awaiting test results. One staff member was told to come to work despite her husband and father-in-law testing positive. MacLean Dec., Exh. I (GEO 10968) (GEO Human Resource Manager confirming that she advised a GEO officer who is "symptom free" to come to work even though "her husband has tested positive for COVID 19 [and] her father in law is on life support due to COVID 19"). *See also* MacLean Dec., Exh. J (GEO 9212) (confirming that staff may, but are not required to, test even if they are a close contact of another staff member who has tested positive). Another apparently was cleared to come to work the day after identifying COVID-19 symptoms, and without being tested. MacLean Dec., Exh. K (GEO 10941). *See also* MacLean Dec., Exh. L (GEO 11595) (officer working, including doing security checks in the dormitories, while results are pending).

Defendants have also failed to introduce a consistent system to ensure that staff who *do* test positive—through testing conducted independently outside of the facility—effectively notify relevant personnel about the positive test. Instead there is a haphazard system that guarantees haphazard results. MacLean Dec., Exh. M (GEO 9717); Exh. H (Allen Dep. (rough) at 196-97). Nothing changed even after, in one instance, it took GEO six days to read an email about a

---

tests] may take up to 7 to 10 days"); & Dkt. 538 (daily report of Aug. 12 stating that the same tests will now not likely be returned for *another* seven to ten days).

[2] GEO produced many of the documents cited here only after Plaintiffs deposed Warden Allen. Accordingly, Plaintiffs have not had the opportunity to fully develop the record on some of these subjects.

positive staff test. Dkt. 407; Exh. H (Allen Dep. (rough) at 126-27) (Q: "Is there a written policy about how staff need to notify if they have a positive COVID result?" Mr. Allen: "I don't know if there's a specific policy. There might be a document that says that." Q: Do staff have to report within a specific time frame at all?" Mr. Allen: "I don't know if there's a time frame at all? . . I don't know if there's a specific time frame if they find out—if they have tested positive. I don't recall if there's something on there that says immediately or as soon as possible or within so many working days. I don't know if that's on there or not."); *id*. (Allen Dep. (rough) at 166-69) (affirming that there is no policy for testing even close contacts of staff who test positive). This makes contact tracing and quarantining effectively impossible.

Plaintiffs' expert declaration by Dr. Nathan Grubaugh explains what is necessary for an adequate testing system. Dr. Grubaugh is an assistant professor at the Yale School of Public Health and is working on new research and applications regarding COVID-19 testing, including advising the National Basketball Association on its testing regime. Grubaugh Dec. ¶¶ 1-4. Dr. Grubaugh explains why it is necessary for staff at a facility like Mesa Verde to be universally tested on a frequent basis using a test that returns results in no more than 24-48 hours. "In a 'closed' congregate environment—such as a detention center, prison, jail, nursing home … the most significant vector for SARS-CoV-2 transmission is the introduction of outside personnel into the closed space." Grubaugh Dec. ¶ 24. As Dr. Grubaugh notes, the cadence or frequency of testing should turn on the risk of transmission in the given population. Grubaugh Dec. ¶ 25. Based on Dr. Grubaugh's "understanding of the risk factors at Mesa Verde—because of the current community infection rate, outbreak at the facility, and vulnerability of those detained—[his] expert opinion is that facility employees who have direct contact with detainees should be tested once every two or three days." *Id*. The "uncontrolled spread" in Kern County, which has "the highest prevalence in the state of California and a very high prevalence rate nationwide," and the significant rate of staff infection (more than 10%), which "suggests that there are other staff who are infected with SARS-CoV-2, and infectious, but who do not know that they are infected," dictate a greater frequency of testing than might be necessary in other circumstances. Grubaugh Dec. ¶¶ 26-27. Moreover, in a closed facility like a detention center where "contact rates" between staff and detainees are high "more frequent testing is necessary." Grubaugh Dec. ¶ 28.

Testing staff every two to three days could also relieve the need to test detainees as frequently as would otherwise be necessary. With frequent testing of staff, it should be possible "to largely stop the introduction of COVID-19 into the facility such that detainees would only need to be tested every week or every other week for public health surveillance purposes, i.e., to ensure that SARS-CoV-2 is indeed not entering the facility." Grubaugh Dec. ¶ 30. While such testing should extend to all staff who have direct or indirect (i.e., through another staff member) contact with detainees, "back-office staff who neither interact with detainees nor interact with staff who have contact with detainees," could have "different testing obligations or frequency for them." Grubaugh Dec. ¶ 31.

As Dr. Grubaugh explains, this frequent testing regime must be coupled with timely results in order to be effective. "Ideally results should be available within 24 hours to be effectively acted upon." Grubaugh Dec. ¶ 34. By contrast:

> Results that take longer than 48 hours to be available and acted upon are effectively worthless for the purpose of preventing the spread of SARS-CoV-2 in a congregate facility. If individuals are waiting for results for four days or more,

> *that may be their peak period of infectiousness, or the entire period in which they are infectious*. If they are unable to isolate during this time because it is not known that they are SARS-CoV-2-positive, and if they are in contact or close contact with others, *they may transmit the virus to a significant number of other people while the test results are pending*.

Grubaugh Dec. ¶ 36 (emphasis added). Delayed results may even lead to "multiple chains of transmission during the period where the results are pending alone. For instance, Person A whose results are pending may infect person B. While results are still pending, Person B may infect Person C." Grubaugh Dec. ¶ 37. Thus, an institution that does not get results within 48 hours is "a recipe for a massive outbreak." *Id*.

Dr. Grubaugh also explains the practical problems with relying on PCR tests that must be sent to a laboratory for results. "[T]here is a backlog of lab testing (as continues to be true throughout the United States)." Grubaugh Dec. ¶ 18. As a result, "it can be necessary—and indeed the only effective option—in certain settings to use [point-of-care ("POC")] tests because they produce rapid results and can identify almost all of those who have the virus." *Id*.

> POC tests are recommended, for instance, in detention centers, jails, schools, nursing homes, and other congregate settings where social distancing is challenging in the best of circumstances. In such settings, there is a premium on testing everyone and quickly getting actionable information that allows for the isolation and removal from the general population of people who are positive.

*Id*. "In sum: for the purposes of population surveillance and limiting outbreaks, higher test *sensitivity* (the benefit of the PCR testing) *is not as important as frequent testing and the availability of quick results* (the benefit of POC testing)." Grubaugh Dec. ¶ 17 (emphasis added) (*citing* Daniel B. Larremore et al., "Test sensitivity is secondary to frequency and turnaround time for COVID-19 surveillance," medRxiv (preprint publication), June 27, 2020 ("surveillance should prioritize accessibility, frequency, and sample-to-answer time; analytical limits of detection should be secondary").

For these reasons, Dr. Grubaugh believes that it is necessary – among other measures – for Mesa Verde to test staff every two of three days through a test that returns results within 24-48 hours. Grubaugh Dec. ¶ 9. Dr. Grubaugh also states that, "In light of the backlogs prevalent in laboratories throughout the United States, if it cannot be guaranteed that PCR results can be returned within 48 hours, point of care tests are the only effective way to implement a universal or mass testing program." *Id*.

**Argument**

Defendants cannot credibly contest the fact that COVID-19 was introduced into Mesa Verde – resulting in the infection of class members—either through staff or through the introduction of new class members into the population. Nor can they credibly contest the idea that staff will continue to transmit the disease into the facility absent an adequate testing protocol. Yet Defendants have inexplicably refused to implement any system for testing staff at Mesa Verde, let alone a system that would be sufficient to stop the current COVID-19 outbreak and guard against future outbreaks.

The Court has already found that Plaintiffs satisfied the TRO and injunctive relief factors on a record where there were *no* confirmed positive tests at Mesa Verde. Dkt. 53; Dkt. 357. In

the face of Defendants' inaction as COVID-19 spreads throughout Mesa Verde, the conditions are even more dangerous, the harm more imminent, and the equities more sharply tipped in favor of immediate relief than at earlier phases in the case. The Court accordingly granted additional provisional relief requiring rapid testing of class members at Mesa Verde. Dkt. 500.

Defendants have had months to prepare for the inevitable outbreak that experts long warned would happen. Dkt 357 at 6, n. 2 ("[T]he fact that Covid has not yet entered the facilities does nothing to undermine the unrebutted evidence that if and when it does, it may cause a rapid and dangerous outbreak."). They have done virtually nothing, refusing to implement a universal testing protocol for staff and even encouraging staff who had been exposed to COVID-19 to come to work without being tested. Further temporary relief is now necessary to prevent an increasingly dangerous situation from spiraling even more out of control. *See Savino v. Souza*, -- F.Supp.3d --, 2020 WL 2404923, *5 (D. Mass, May 12, 2020) (granting preliminary injunction requiring, *inter alia*, staff testing, even absent any outbreak because, "Testing of both staff and detainees has been minimal, so the real infection rate is a mystery. Measures to isolate the carriers and prevent the disease's spread cannot succeed without testing.").

Defendants will claim that implementing universal and frequent testing of staff is onerous.[3] But as was true for class member testing, "The defendants, having responded to the health crisis in such a cavalier fashion (even in the face of litigation and a string of court orders), have lost the credibility to complain that the relief requested [regarding staff testing] is too rigid or burdensome. The defendants have also lost the right to be trusted that they will accomplish on their own what the plaintiffs contend requires a court order to ensure." Dkt 500 at 2.

Defendants will no doubt have to invest in financial resources into a testing process to bring the current outbreak under control and to create a system to prevent such future outbreaks. But as Judge Nunley noted earlier this week in another case implicating GEO's immigration detention operations:

> Federal, state, and local governments have urgently struggled to find a balance between mitigating the economic effects of the pandemic and preventing the risks to human life. However, as the Ninth Circuit has stated, "[f]aced with such a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983); s*ee also Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008). Here, the Court finds the need to avoid the preventable risk of severe illness and death that is likely to result from detainee transfers far outweighs GEO and the City's financial concerns.

*Immigrant Legal Resource Ctr., et al. v. City of McFarland, et al.,* 2020 WL 4593886, *12 (E.D. Cal., Aug. 11, 2020). The balance of hardships tip sharply in favor of mandatory testing. *Cf. id.*

Defendants have a duty to ensure that class members are safe. *See Bent v. Barr*, -- F.Supp.3d --, 2020 WL 1812850, *5 ("The Constitution imposes an obligation on the

---

[3] Defendants may also argue that it is difficult for them to deal with staff who hypothetically would refuse testing. In order to protect the class members, other of Defendants' staff, and the Kern County community, refusing staff either should not work until they accept testing or should be reassigned to "back office" work where they will not interact with class members.

5

government to provide for the "safety and general wellbeing" of those it holds in custody."); ICE *Nat'l Detention Standards* at 1 (2019) ("ICE detention standards ensure that detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled."). Half measures will not suffice to stop the spread of this deadly illness at Mesa Verde. As Dr. Grubaugh convincingly explains, staff testing every two to three days with tests that return results in no later than 48 hours is a condition for bringing COVID-19 under control there.

### Conclusion

For the reasons provided above, the Court should order, as a further temporary restraining order (pending the Order to Show Cause hearing) that: (1) Defendants test all Mesa Verde staff at least once every three days, except staff who have no direct or indirect contact with class members, (2) that such testing be through a method that reliably returns results within 24-48 hours, at slowest, and (3) that staff who refuse may not work until they (a) accept the testing ordered herein or (b) are reassigned to work where they will not come into direct or indirect contact with class members.

*/s/ Sean Riordan*
SEAN RIORDAN
Counsel for Plaintiffs