Susan E. Coleman (SBN 171832)
E-mail:  scoleman@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
444 South Flower Street, Suite 2400
Los Angeles, CA  90071-2953
Tel:  213.236.0600      Fax:  213.236.2700

Attorneys for Respondents-Defendants
THE GEO GROUP, INC. (Sued herein as
GEO GROUP, INC.) and NATHAN ALLEN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUIZ TOVAR, LAWRENCE MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG, | Case No.  3:20-cv-02731-VC **DEFENDANTS THE GEO GROUP INC. AND NATHAN ALLEN'S BRIEF RE MEDICAL CARE AT MESA VERDE FOR COVID+ DETAINEES** |
| Petitioners-Plaintiffs, | Judge:    Hon. Vince Chhabria |
| v. | |
| DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; NATHAN ALLEN, Warden of Mesa Verde Detention Facility, | |
| Respondents-Defendants. | |

Defendants The GEO Group, Inc. and Facility Administrator Nathan Allen

hereby respond to this Court's Orders (Docs. #561, 563) to file briefing addressing

medical conditions/ care for COVID-19 positive detainees.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................... 1

II.     CURRENT MEDICAL PROCEDURES AND CARE FOR COVID+
        DETAINEES AT MESA VERDE ................................................... 1

III.    STANDARD FOR PRELIMINARY INJUNCTION .................................. 7

IV.     WELLPATH MEDICAL STAFF IS NOT DELIBERATELY
        INDIFFERENT; CARE EXCEEDS COMMUNITY STANDARDS .......... 8

V.      MEASURES TAKEN TO REDUCE RISK OF DETAINEES'
        HEALTH DETERIORATING IN B DORM ............................................. 10

VI.     LEVEL OF MONITORING TO ENSURE HOSPITALIZATION AS
        NEEDED IS ADEQUATE ................................................................ 11

VII.    DETAINEES WITH COVID ARE AT GREATER RISK OF
        COMPLICATIONS/DEATH IF RELEASED ........................................ 12

VIII.   PAYMENT FOR HOSPITALIZATION DOES NOT CREATE
        DISINCENTIVES TO HOSPITALIZE DETAINEES ............................. 12

IX.     WHETHER COVID-POSITIVE PERSONS SHOULD BE
        RETESTED .................................................................................. 13

X.      CONCLUSION ............................................................................ 14

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- i -

3:20-CV-02731-VC
DEFTS' BRIEF  RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Federal Cases

*Colwell v. Bannister*,
  763 F.3d 1050 (9th Cir. 2014) .................................................................... 10

*Farmer v. Brennan*,
  511 U.S. 825 (1994) ................................................................................. 7

*Gantt v. City of Los Angeles*,
  717 F.3d 702 (9th Cir. 2013) ...................................................................... 8

*Gordon v. City of Orange*,
  888 F.3d 1118 (9th Cir. 2018) .................................................................... 8

*Jackson v. McIntosh*,
  90 F.3d 330 (9th Cir. 1996) ...................................................................... 10

*Kingsley v. Hendrickson*,
  576 U.S. 389 (2015) ................................................................................. 7

*Munaf v. Geren*,
  553 U.S. 674 (2008) ................................................................................. 7

*Sanchez v. Vild*,
  891 F.2d 240 (9th Cir. 1989) .................................................................... 10

*Toguchi v. Chung*,
  391 F.3d 1051 (9th Cir. 2004) .................................................................... 9

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................... 7

### Federal Statutes

18 U.S.C. § 3626(a)(2) .................................................................................. 10

### Other Authorities

Eighth Amendment ........................................................................................ 7

Fourteenth Amendment ............................................................................... 7, 8

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- ii -

3:20-CV-02731-VC
DEFTS' BRIEF RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

I.      **INTRODUCTION**

        This Court ordered Defendants to submit briefing on the issue of "how it can be sufficient from a medical standpoint to check on people known to be infected with COVID only two times per day, considering the ongoing outbreak at the facility." (Doc. #561.) In actuality, far more than merely two checks per day are being done, as described below in more detail, and there is no cause for an Order directing that medical staff alter their current procedures and/or superseding their trained medical judgment.

        Defendants note that the medical care at Mesa Verde Detention Facility is provided by a third-party subcontractor, Wellpath. While medical staff is expected to comply with IHSC guidelines, and to also follow CDC recommendations for custody/detention facilities for COVID-related issues, they also must rely on their considerable education, training, knowledge and experience, and use their judgment and discretion when providing medical care.

II.     **CURRENT MEDICAL PROCEDURES AND CARE FOR COVID+ DETAINEES AT MESA VERDE**

        At Mesa Verde, the medical staff is required to follow both CDC and IHSC guidelines, and these guidelines are often exceeded. (Medrano Decl. ¶ 3.)

        Based on Dr. Medrano[1]'s supervision, observations, and experience working for CCS and now Wellpath at Mesa Verde Detention Facility, it is his informed professional opinion that the current standard of care at Mesa Verde for COVID-19 positive patients exceeds the standard of community care in the United States. Testing, care, and monitoring are also more readily available and accessible at Mesa Verde than in the community. Dr. Medrano's opinion about the quality and expediency of care takes into account the fact that there are currently 56 COVID+

---

[1] As noted in Dr. Medrano's declaration filed contemporaneously herewith, he is a U.S.C. Keck School of Medicine graduate who is a California licensed physician and the Regional Medical Director for Wellpath.

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 1 -

3:20-CV-02731-VC
DEFTS' BRIEF RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

1    detainees at Mesa Verde, and would apply even if the number rises.  (*Id.,* ¶ 4.)

2           Even with COVID-19 infections on the rise in many communities, and

3    mortality rates for this novel virus, it has been Dr. Medrano's experience and

4    observation that it still takes time to obtain appointments for a COVID test

5    (sometimes 1-2 weeks unless symptoms are severe) and the results can take as long

6    as 7-10 days.  (*Id.*, ¶ 5.)  Same day appointments are rare outside the correctional

7    environment, and same day results for COVID-19 tests are uncommon.  People

8    who test positive with COVID-19 are told to stay at home and isolate and <u>not</u> go to

9    the hospital unless they have severe symptoms such as chest pain, shortness of

10   breath, or other concerning symptoms. They are not routinely checked by any

11   medical provider in person unless there is a concern.  (*Id.*)

12          In Dr. Medrano's medical opinion, detainees who are COVID+ are at no

13   greater risk for complications than if they were in the community, and if anything

14   they are at less risk.  There is an increased level of access to care and monitoring

15   provided in the facility, and timely intervention for complications is more likely.

16   (*Id.*, ¶ 6.)  Further, a person who tests positive in the community is most likely to be

17   isolated at home without any routine checks on their vital signs and oxygen

18   saturation. Most lay persons are also less likely to recognize warning signs than

19   trained medical professionals.  (*Id.*)  In contrast, detainees have 24/7 access to

20   medical care and even asymptomatic COVID-positive patients are seen and

21   evaluated several times a day.  (*Id.*, ¶ 7.)

22          Mesa Verde currently has 1 full time physician, 1 full-time Nurse

23   Practitioner, 1 full time Physician's Assistant, 4 full-time Registered Nurses, and 7

24   full-time Licensed Vocational Nurses.  From 7:00 a.m. to 8:00 p.m. Mondays –

25   Fridays, there is always a provider on duty at the facility; on weekends and

26   evenings, one medical provider is always on call.  Nurses are staffed on 12-hour

27   shifts.  On day shift, there are 2 LVNs on duty and at night there is 1 RN and 1

28   LVN on duty.  (*Id.*)  Detainees who put in sick call slips are typically seen within

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 2 -

3:20-CV-02731-VC
DEFTS' BRIEF  RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

24 hours.  The detainees can submit sick call requests on their Tablets or on paper forms that are picked up daily in the units by a nurse.  A Registered Nurse triages the sick call slips based on the reported symptoms, with the most severe symptoms resulting in the shortest turnaround time. Most detainees are seen the same day, though routine requests (such as refills of Tylenol or fungal powder) may be done within the following day or two.  Sick call slips averaged 600 to 700 per month before the pandemic, and with the reduced population are now approximately 200-250 per month.  (*Id*.)

Currently, the population at Mesa Verde is greatly reduced[2] but the level of medical staffing has not been reduced, so there is a greater ratio of medical providers to detainees.  Between the reduction in sick call requests, the reduction in detainees, and the same level of medical staffing, detainees are seen very quickly for any medical issues. (*Id*., ¶ 9.)

Detainees are educated about their health care access upon intake and orientation, including the sick call system and how to use it.  (*Id*., ¶ 10; *also see* Ex. B to Medrano Decl.)  Custody officers within the housing units also often communicate to the medical clinic the need for care for a particular detainee, and they can either call the medical unit if it is an emergency ("code blue") or escort/send the detainee to the clinic as appropriate. Staff and detainees are both taught to say something if they are having an emergency or observe one, whether medical or otherwise.  (*Id.,* ¶ 11.)

Medical staff is expected to use their experience, training, and discretion in determining whether to send a detainee to the hospital, either via custody staff or by ambulance if emergent. Regional Medical Director Dr. Medrano advises medical staff to do what is correct, medically speaking, and to use their medical judgment. (*Id*., ¶ 12.)  Nurses have discretion to call 911, but they can also reach a provider

---

[2] As of today, there are 103 detainees at Mesa Verde.

Burke, Williams & Sorensen, LLP
Attorneys At Law
Los Angeles

- 3 -

3:20-CV-02731-VC
DEFTS' BRIEF RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

on-call if they have any questions.  Mercy Hospital is very close to the Facility, on Truxtun Avenue, so they can be transported quickly and ambulances respond quickly if needed.  (*Id*.)  Wellpath medical staff errs on the side of caution in sending detainees out to the hospital.  In fact, of the last 5 detainees sent to the hospital, only detainee Zamora Guzman ended up being admitted. The other 4 detainees were returned to the Facility without being admitted, and with prescriptions for the same medication they were already prescribed by Mesa Verde medical staff.  (*Id*., ¶ 13.)

For example, detainee Ruiz was sent to the hospital by ambulance on August 11, 2020, due to his oxygen saturation level, coughing, and report of chest pain while coughing, but he was returned the facility without being admitted and continued on the same medications with no new interventions recommended by ER.  (*Id.,* ¶ 14.)  Detainee Najera Grajeda was sent to the hospital by ambulance on August 3, 2020, due to complaints of shortness of breath and chest pain.  Grajeda had a physical exam, an EKG, and an X-ray of his lungs, which showed his lungs were clear and his EKG was normal. Grajeda was returned to the Facility with medication recommendations which we continued.  (*Id.,* ¶ 15.)

Plaintiffs' counsel complained that detainee Villalobos-Suria had serious symptoms of COVID since August 1, 2020, including trouble breathing, and requested that he be brought to a hospital.  But Villalobos said he was fine on August 3, 2020, when he was advised he had tested positive.  He said he'd had a sore throat a week ago and did some workouts to "sweat it out."  Villalobos was seen by medical other times but did not submit a sick call slip until August 5, 2020, noting he had a sore throat.  Villalobos was prescribed appropriate medications by the facility provider.  Villalobos had a chest X-ray on August 6, 2020, which was within normal limits.  On August 7, 2020, he reported he felt better with the inhaler.  His oxygen saturation (checked twice per day at minimum) has always been within normal limits. Villalobos has never complained to medical about trouble breathing.

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 4 -

3:20-CV-02731-VC
DEFTS' BRIEF RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

1   On August 10, 2020, Villalobos stated he was doing better. Thus, medical did not

2   feel that emergency services were warranted given that his lungs were clear and his

3   vital signs were normal. (*Id.*, ¶ 16.)

4       For the B dorm, which contains detainees who have tested positive for

5   COVID-19, nurses check on each detainee at least twice per day and chart their

6   findings in the person's chart. This involves taking the detainee's temperature,

7   blood pressure, heart rate, respiration rate, and Oxygen saturation level. The person

8   is also asked about symptoms and how they feel, and any significant comments are

9   noted on the patient's chart. (*Id.*, ¶ 17, *also see* Ex. C thereto.) Nurses are in B

10  dorm approximately 3 times per 12-hour shift (or 6 times per day). In addition to

11  taking vitals and other measurements, nurses also conduct pill call, passing out

12  medications to detainees including giving insulin. Nurses also administer any

13  treatments prescribed to detainees such as nebulizer/breathing treatments. During

14  these times, detainees often speak with nurses about any concerns or questions.

15  (*Id.*, ¶ 19.)

16      When there were fewer detainees in B dorm, nurses spent approximately 2-3

17  hours per day doing vital checks, pill line, and treatments; however, now that the

18  population has increased, nurses are in B dorm providing care 4-6 hours per day or

19  more, depending on the day and what needs to be done. For the vitals alone, it now

20  takes 4 hours per day with 2 nurses doing them. (*Id.*, ¶ 20.)

21      In addition to the twice-daily checks by nurses in B dorm, doctors also do

22  rounds daily in the B dorm and ask patients how they are doing. They routinely

23  select a few patients to do a full assessment on, with the selection based on factors

24  such as if someone is medically vulnerable and of concern to them, or if someone

25  has been putting in sick call slips or complaining to nurses. (*Id.*, ¶ 18.) Medical

26  providers (above the level of RN) spent 1-2 hours per day in B dorm last week, but

27  this week it will be much more. This is in addition to custody staff, on duty 24

28  hours per day in the dorm. (*Id.*, ¶ 20.)

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 5 -

3:20-CV-02731-VC
DEFTS' BRIEF RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

In B dorm, although all of the detainees housed in that dormitory are COVID-positive, only a handful of them have active symptoms at any one time. Thus, while medical staff is routinely monitoring the detainees for changes in condition and development and/or changes of symptoms, not every detainee in the unit needs medicine for COVID-19 or other medical intervention.  Most will likely recover from COVID via rest and fluids. (*Id.,* ¶ 21.)

Given that the dorms have different COVID-19 statuses, medical staff is currently following a protocol to make their rounds in a particular order: D dorm first (where everyone tested negative on the last round), then C and A dorms (where detainees are cohorted after moving out some who tested positive on the last round), then lastly B dorm (all positive detainees).  (*Id.,* ¶ 22.)  Medical staff has separate equipment to check vitals for the D dorm, the cohort/quarantined detainees in A and C, and the B dorm, so that it is not shared even though it's routinely disinfected after use.  Medical staff also wears full PPE – gown gloves, face shield, bouffant plastic cap to cover hair, shoe covers, and a N95 mask with surgical mask over it to all pods.  This PPE is changed/replaced between dorms to limit cross-contamination.  (*Id.,* ¶ 23.)

ICE pays for hospital visits and hospitalization of detainees.  Regardless of who pays for the hospital bills, Dr. Medrano relies on his medical judgment, training, experience and discretion about whether to send someone to the hospital and he instructs and expects all Wellpath medical staff to do the same.  (*Id.,* ¶ 24.) Wellpath medical staff do not need or seek ICE or GEO's approval before sending someone to the hospital, and if they feel a detainee needs to go to the hospital, they do it forthwith.  (*Id.*)

Custody staff is authorized to call 911 for emergency medical services if they believe it is warranted.  This might include a wide range of scenarios, such as if they find someone unconscious or with stab wounds, but they are permitted to use their best judgment.  (Allen Decl. ¶ 2; *also see* Ex. A thereto.)

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 6 -

3:20-CV-02731-VC
DEFTS' BRIEF RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

1    Custody staff is also encouraged to let medical staff know if a detainee seems

2  to have a medical issue, either by calling for an appointment, escorting the person

3  to the clinic, or calling a "code blue" for medical to respond immediately to the

4  unit, depending on the situation.  There is always a custody officer in each dorm to

5  supervise the detainees. At times, officers or other staff will help detainees fill out a

6  sick call slip if requested.  Custody staff persons are trained on First Aid

7  procedures, including CPR, in the case of an emergency. (Allen Decl. ¶ 3.)

8    GEO does not provide regular medical care to detainees, but instead

9  subcontracts with Wellpath to provide medical care at Mesa Verde.  (Id., ¶ 4.)

10  Facility Administrator Nathan Allen is informed and believes that ICE pays for any

11  hospital bills of detainees. (*Id.*, ¶ 5.)  Allen has never heard of anyone discouraging

12  hospital visits or hospitalization of detainees due to costs, if they are needed.

13  Everyone shares the goal of wanting the detainees to be safe and healthy.  (*Id.*)

14  **III.    STANDARD FOR PRELIMINARY INJUNCTION**

15    "A preliminary injunction is an extraordinary and drastic remedy; it is never

16  awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 690 (2008). "A plaintiff

17  seeking a preliminary injunction must establish that he is likely to succeed on the

18  merits, that he is likely to suffer irreparable harm in the absence of preliminary

19  relief, that the balance of equities tips in his favor, and that an injunction is in the

20  public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

21    To succeed on the merits here, Plaintiffs must show a likelihood to prevail

22  under the Fourteenth Amendment, which requires they establish "deliberate

23  indifference" on the part of Defendants.  *Farmer v. Brennan*, 511 U.S. 825, 846

24  (1994) (Eighth Amendment); *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct.

25  2466, 2473-74 (2015) (Fourteenth Amendment).  As the Ninth Circuit has

26  explained, "[d]eliberate indifference is the conscious or reckless disregard of the

27  consequences of one's acts or omissions. It entails something more than negligence

28  but is satisfied by something less than acts or omission for the very purpose of

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 7 -

3:20-CV-02731-VC
DEFTS' BRIEF RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

1   causing harm or with knowledge that harm will result." *Gantt v. City of Los*
2   *Angeles*, 717 F.3d 702, 708 (9th Cir. 2013).

3        For a Fourteenth Amendment claim, Plaintiffs must prove objective
4   deliberate indifference. *Gordon v. City of Orange*, 888 F.3d 1118, 1124-25 (9th Cir.
5   2018) ("[C]laims for violations of the right to adequate medical care brought by
6   pretrial detainees against individual defendants under the Fourteenth Amendment
7   must be evaluated under and objective deliberate indifference standard") (internal
8   quotations omitted). The Ninth Circuit has developed a four-part test to determine
9   objective deliberate indifference:  (i) the defendant made an internal decision with
10  respect to the conditions under which the plaintiff was confined; (ii) those
11  conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the
12  defendant did not take reasonable available measures to abate that risk, even though
13  a reasonable official in the circumstances would have appreciated the high degree
14  of risk involved – making the consequences of defendant's conduct obvious; and
15  (iv) by not taking such measures, the defendant caused the plaintiff's injuries.
16  *Gordon*, 888 F.3d at 1125.

17  **IV.    WELLPATH MEDICAL STAFF IS NOT DELIBERATELY**
18  **INDIFFERENT; CARE EXCEEDS COMMUNITY STANDARDS**

19       This Court has questioned whether the medical care provided at Mesa Verde
20  is adequate, in light of the COVID-outbreak.  As discussed in Dr. Medrano's
21  declaration, cited above, the care provided to COVID positive detainees is well
22  above community standards.  (Medrano Decl. ¶ 4.)  Testing, care, and monitoring
23  are more readily available and accessible at Mesa Verde than in the community.
24  (*Id.*)  Between the reduction in detainees, the reduction in sick call requests, and the
25  same level of medical staffing, detainees are seen very quickly for any medical
26  issues.  (*Id.* ¶ 9.)

27       In the outside community, it takes time to obtain appointments for a COVID
28  test (sometimes 1-2 weeks unless symptoms are severe) and the results can take as

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 8 -

3:20-CV-02731-VC
DEFTS' BRIEF RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

long as 7-10 days.  Same day appointments are rare outside the correctional environment, and same day results for COVID-19 tests are uncommon.  People who test positive with COVID-19 are told to stay at home and isolate and <u>not</u> go to the hospital unless they have severe symptoms such as chest pain, shortness of breath, or other concerning symptoms. They are not routinely checked by any medical provider in person unless there is a concern. (Id. ¶ 5.)  In contrast, detainees at Mesa Verde have an increased level of access to care and monitoring provided in the facility, and timely intervention for complications is more likely. (*Id.* ¶ 6.)  Further, a person who tests positive in the community is most likely to be isolated at home without any routine checks on their vital signs and oxygen saturation. Most lay persons are also less likely to recognize warning signs than trained medical professionals.  (*Id.*)

In contrast, detainees have 24/7 access to medical care.  (*Id.* ¶ 7.)

Nurses are in the B dorm 4-6 hours a day conducting vital sign checks, talking to detainees, handing out medications, and providing any medical treatments needed.  (*Id.* ¶¶ 19-20. ) In addition to these twice-daily checks by nurses in B dorm, doctors also do rounds daily in the B dorm and ask patients how they are doing.  They routinely select a few patients to do a full assessment on, with the selection based on factors such as if someone is medically vulnerable and of concern to them, or if someone has been putting in sick call slips or complaining to nurses.  (*Id.* ¶ 18.)  Thus, medical care is far quicker and more accessible inside Mesa Verde than in the outside community.

At Mesa Verde, the medical staff is required to follow both CDC and IHSC guidelines, and Wellpath often exceeds these guidelines.  (Id. ¶ 3.)  Thus, because Wellpath's COVID-19 protocol is based upon current CDC guidance and recommendations, in addition to IHSC requirements, it cannot possibly be disregarding an excessive risk to detainee health or safety.  A mere difference in medical opinion cannot support a finding of deliberate indifference.  *See Toguchi v.*

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 9 -

3:20-CV-02731-VC
DEFTS' BRIEF RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

*Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004); *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Colwell v. Bannister*, 763 F.3d 1050, 1068 (9th Cir. 2014) ("A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." (citation and quotation marks omitted).) Accordingly, no change in protocol should be ordered.

Further, for any preliminary injunction, relief must be narrowly drawn, extend no further than necessary to correct the harm, and be the least intrusive means of addressing the violation of the federal right(s) or correcting the harm. *See* 18 U.S.C. § 3626(a)(2) (setting requirements for prospective relief in any civil action with respect to prison conditions). This Court has ordered regular COVID testing of detainees and staff, but should not order changes

Rather than ordering any changes to medical procedures at Mesa Verde, which are not warranted, this Court may instead simply mandate that Wellpath continue to comply with current CDC and IHSC recommendations as they continue to evolve. A court order mandating anything beyond that would hinder Wellpath's ability to adjust its plan and rely on its providers' medical experience, training, knowledge, discretion and judgment at a time when flexibility and adoption of evolving standards is critical to mitigating the spread of COVID-19.

## V.   MEASURES TAKEN TO REDUCE RISK OF DETAINEES' HEALTH DETERIORATING IN B DORM

The Wellpath medical staff are taking extensive measures to monitor detainees in dorm B, as described in detail above, and any change in medical condition will be treated appropriately either by medical staff at Mesa Verde, or if needed, by sending the applicable detainees to the hospital. If someone rapidly deteriorates, GEO staff can call the medical unit or 911, and Wellpath medical staff can either handle the treatment or send the person to the hospital if needed.

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 10 -

3:20-CV-02731-VC
DEFTS' BRIEF RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

1       Custody staff is also encouraged to let medical staff know if a detainee seems

2   to have a medical issue, either by calling for an appointment, escorting the person

3   to the clinic, or calling a "code blue" for medical to respond immediately to the

4   unit, depending on the situation.  There is always a custody officer in each dorm to

5   supervise the detainees. At times, officers or other staff will help detainees fill out a

6   sick call slip if requested.  Custody staff persons are trained on First Aid

7   procedures, including CPR, in the case of an emergency. (Allen Decl. ¶ 3.)

8       While there is always a risk of people infected with the novel COVID-19

9   virus worsening, there are constantly other detainees and staff in the unit who can

10  seek assistance, and medical staff are present in the unit 6-8 hours per day,

11  checking on detainees' symptoms and adjusting treatments as needed.  Medical

12  staff are also in the clinic nearby 24/7 and available to treat detainees bedside or at

13  the medical clinic. GEO staff are trained to call medical if they see a problem, or to

14  call 911 if they believe emergent care is needed.

15  **VI.**   **<u>LEVEL OF MONITORING TO ENSURE HOSPITALIZATION AS</u>**

16        **<u>NEEDED IS ADEQUATE</u>**

17      Similar to observing detainees to make sure they do not deteriorate without

18  commensurate medical care being provided, the same measures taken at Mesa

19  Verde ensure that detainees are promptly sent to the hospital if needed.

20      Medical staff are expected to use their experience, training, and discretion in

21  determining whether to send a detainee to the hospital, either via custody staff or by

22  ambulance if emergent. Regional Medical Director Dr. Medrano advises medical

23  staff to do what is correct, medically speaking, and to use their medical judgment.

24  (Medrano Decl., ¶ 12.)  Nurses have discretion to call 911, but they can also reach a

25  provider on-call if they have any questions.  Mercy Hospital is very close to the

26  Facility, on Truxtun Avenue, so they can be transported quickly and ambulances

27  respond quickly if needed.  (*Id*.)

28      Wellpath medical staff errs on the side of caution in sending detainees out to

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 11 -

3:20-CV-02731-VC
DEFTS' BRIEF RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

the hospital.  In fact, of the last 5 detainees sent to the hospital, only detainee Zamora Guzman ended up being admitted. The other 4 detainees were returned to the Facility without being admitted, and with prescriptions for the same medication they were already prescribed by Mesa Verde medical staff.  (*Id.*, ¶ 13.)

Custody staff is also authorized to call 911 for emergency medical services if they believe it is warranted.  This might include a wide range of scenarios, such as if they find someone unconscious or with stab wounds, but they are permitted to use their best judgment.  (Allen Decl. ¶ 2; *also see* Ex. A thereto.)  Thus, the risk of someone needing hospitalization without obtaining that level of care is low, and there is greater access to hospitalization while at Mesa Verde than outside.

## VII.  DETAINEES WITH COVID ARE AT GREATER RISK OF COMPLICATIONS/DEATH IF RELEASED

Medically speaking, the COVID-positive detainees are much better off remaining at Mesa Verde than being released.  As explained above, the detainees have ready access to medical care upon request, numerous visits per day from medical staff, and regular monitoring of vital signs including oxygen saturation, with increased care as needed – including hospitalization - if symptoms worsen.

In Dr. Medrano's medical opinion, detainees who are COVID+ are at no greater risk for complications than if they were in the community, and if anything they are at less risk.  There is an increased level of access to care and monitoring provided in the facility, and timely intervention for complications is more likely.  (Medrano Decl., ¶ 6.)

## VIII.  PAYMENT FOR HOSPITALIZATION DOES NOT CREATE DISINCENTIVES TO HOSPITALIZE DETAINEES

ICE pays for hospital visits and hospitalization of detainees.  (Allen Decl. ¶ 5.)  But regardless of who pays for the hospital bills, Dr. Medrano relies on his medical judgment, training, experience and discretion about whether to send someone to the hospital and he instructs and expects all Wellpath medical staff to

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 12 -

3:20-CV-02731-VC
DEFTS' BRIEF  RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

1  do the same.  (Medrano Decl. ¶ 24.)  Wellpath medical staff do not need or seek

2  ICE or GEO's approval before sending someone to the hospital, and if they feel a

3  detainee needs to go to the hospital, they do it forthwith.  (*Id.*)

4       The fact that only 1 of the last 5 detainees sent to the hospital by Wellpath

5  medical were admitted indicates they err on the side of caution. The other 4

6  detainees were returned to the Facility without being admitted, and with

7  prescriptions for the same medication they were already prescribed by Mesa Verde

8  medical staff.  (*Id.*, ¶ 13.)

9       Facility Administrator Nathan Allen has never heard of anyone discouraging

10 hospital visits or hospitalization of detainees due to costs, if the care is needed.

11 Everyone shares the goal of wanting the detainees to be safe and healthy.  (*Id.*)  It

12 would be penny wise and pound foolish to try to save money on hospital bills while

13 risking the life or safety of an individual.

14 **IX.    WHETHER COVID-POSITIVE PERSONS SHOULD BE RETESTED**

15      Detainees should not be re-tested on a prescribed schedule.  Instead, the

16 decision on when to re-test previously COVID+ detainees should be made by

17 Wellpath medical staff based on their medical judgment and based on examination

18 of the individual and whether he is still symptomatic.   According to the CDC

19 website:

20      Data to date show that a person who has had and recovered from
21      COVID-19 may have low levels of virus in their bodies for up to 3
        months after diagnosis. This means that if the person who has
22      recovered from COVID-19 is retested within 3 months of initial
        infection, they may continue to have a positive test result, even though
23      they are not spreading COVID-19.

24      CDC guidelines indicate that people who had COVID-19 can be around

25 others after: 10 days since symptoms first appeared and 24 hours with no fever

26 without the use of fever-reducing medications and other symptoms of COVD-19

27 (except perhaps loss of taste and smell).  Given that this determination depends on

28 symptoms including fever, and the fact that a positive test can persist after the

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 13 -

3:20-CV-02731-VC
DEFTS' BRIEF  RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES

person is not infectious, regular testing should not be required but should be left up to medical judgment and discretion[3].

## X.   **CONCLUSION**

No changes should be made to Wellpath's protocol for medical care of Covid+ detainees at Mesa Verde, which is ample to respond to any worsening medical situations and/or send detainees out to the hospital if needed.  Wellpath is providing medical care above the community standards, particularly in light of the availability and expediency of their services.  COVID+ detainees are safer inside the facility than if released.  Thus, Wellpath should be permitted and encouraged to continue its adherence to CDC and IHSC protocol and recommendations as they evolve and for its medical staff to continue to use their medical judgment on decisions about medical care.


Dated:  August 19, 2020                    BURKE, WILLIAMS & SORENSEN, LLP


                                           By: /s/ *Susan E. Coleman*
                                               Susan E. Coleman

                                           Attorneys for Defendants
                                           THE GEO GROUP, INC. and NATHAN
                                           ALLEN

---

[3] The same rationale applies to staff testing.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -

3:20-CV-02731-VC
DEFTS' BRIEF  RE MEDICAL CARE
AT MV FOR COVID+ DETAINEES