| | |
|---|---|
| WILLIAM S. FREEMAN (SBN 82002)<br>wfreeman@aclunc.org<br>SEAN RIORDAN (SBN 255752)<br>sriordan@aclunc.org<br>ANGÉLICA SALCEDA (SBN 296152)<br>asalceda@aclunc.org<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION OF NORTHERN<br>CALIFORNIA<br>39 Drumm Street<br>San Francisco, CA 94111<br>Telephone: (415) 621-2493<br>Facsimile: (415) 255-8437<br><br>*Attorneys for Petitioners-Plaintiffs*<br>Additional Counsel Listed on Following Page | MANOHAR RAJU (SBN 193771)<br>Public Defender<br>MATT GONZALEZ (SBN 153486)<br>Chief Attorney<br>FRANCISCO UGARTE (CA SBN 241710)<br>francisco.ugarte@sfgov.orga<br>GENNA ELLIS BEIER (CA SBN 300505)<br>genna.beier@sfgov.org<br>EMILOU H. MACLEAN (CA SBN 319071)<br>emilou.maclean@sfgov.org<br>OFFICE OF THE PUBLIC DEFENDER<br>SAN FRANCISCO<br>555 Seventh Street<br>San Francisco, CA 94103<br>Direct: 415-553-9319<br>Fax:    415-553-9810 |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUIZ TOVAR, LAWRENCE MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG,<br><br>Petitioners-Plaintiffs,<br><br>v.<br><br>DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; NATHAN ALLEN, Warden of Mesa Verde Detention Facility,<br><br>Respondents-Defendants. | CASE NO. 3:20-CV-02731-VC<br><br>**PETITIONERS-PLAINTIFFS' RESPONSE TO DEFENDANTS' SUBMISSIONS RE MEDICAL CARE AT MESA VERDE** |

BREE BERNWANGER* (NY SBN 5036397)
bbernwanger@lccrsf.org
HAYDEN RODARTE (SBN 329432)
hrodarte@lccrsf.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA
131 Steuart St #400
San Francisco, CA 94105
Telephone: (415) 814-7631

JUDAH LAKIN (SBN 307740)
judah@lakinwille.com
AMALIA WILLE (SBN 293342)
amalia@lakinwille.com
LAKIN & WILLE LLP
1939 Harrison Street, Suite 420
Oakland, CA 94612
Telephone: (510) 379-9216
Facsimile: (510) 379-9219

JORDAN WELLS (SBN 326491)
jwells@aclusocal.org
STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

MARTIN S. SCHENKER (SBN 109828)
mschenker@cooley.com
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIMOTHY W. COOK (Mass. BBO# 688688)*
tcook@cooley.com
FRANCISCO M. UNGER (Mass. BBO# 698807)*
funger@cooley.com
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

*Attorneys for Petitioners-Plaintiffs*

*Admitted Pro Hac Vice*

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | ADDITIONAL BACKGROUND REGARDING DEFENDANTS' DECLARANTS | 2 |
| | A. Declaration of Dr. Richard Medrano | 2 |
| | B. Declaration of Nathan Allen | 4 |
| | C. Declaration of Dr. Ada Rivera | 4 |
| III. | RESPONSES TO THE COURT'S SPECIFIC QUESTIONS | 5 |
| | A. Measures to reduce the risk of deteriorating health of Dorm B detainees | 5 |
| | B. Level of monitoring necessary to ensure prompt hospitalization | 8 |
| | C. Increased risk of complications or death within the facility compared to outside | 9 |
| | D. Who pays for hospitalizations | 10 |
| | E. Responses to the Court's questions regarding staff testing | 11 |
| IV. | CONCLUSION | 12 |

## I. INTRODUCTION

Plaintiffs-Petitioners hereby respond to the briefs and declarations filed by Defendants on August 19, 2020 addressing the Court's questions regarding "the appropriate level of care and monitoring necessary for a dorm full of people who have tested positive for Covid-19." (ECF 563.) The Court asked the parties to address four specific questions:

(1) "the measures that can be taken to reduce the risk of the detainees' health deteriorating after being housed in the Covid-positive dorm;"

(2) "the level of monitoring necessary to ensure that detainees are hospitalized promptly when needed;"

(3) "the assertion made by class counsel … that people with Covid-19 are at greater risk of complications or death in the facility than if released; and

(4) "who pays for hospitalization and whether there are any financial disincentives to hospitalizing detainees." *Id.*

At the most recent Case Management Conference, the Court also asked Plaintiffs to respond to Defendants' comments regarding re-testing of staff who have previously tested positive.

In response, Defendants the GEO Group, Inc. and Nathan Allen ("GEO") devote more than half of their brief to other issues, namely: (1) rearguing the general standards for preliminary injunctive relief and (2) arguing that they are not "deliberately indifferent" to the health of detainees. These are *not* the subjects on which the Court requested briefing from the parties, and a comprehensive response would require the completion of additional discovery. In light of the 24-hour turnaround for this response, Plaintiffs will remain focused on the Court's specific questions. Plaintiffs will address the broader issues at the appropriate time, or upon the Court's request.

Further, Defendants' responses are not based on credible expert testimony. GEO presents declarations from its contractor Wellpath's regional Medical Director, and from the Mesa Verde warden. The Federal Defendants have also relied on an employee: a medical director stationed in Washington, D.C. Although all of them can describe written policies, none of them has first-hand knowledge of how care is actually being delivered. None of them has knowledge or experience concerning the provision of care during a pandemic. None of them demonstrates, either through experience or independence, why their views should be credited by the Court.

By contrast, Plaintiffs provide the testimony of four highly experienced experts who are qualified to address the proper treatment of infectious diseases in carceral settings and have reviewed key documents and events in the case. (Third Supplemental Declaration of Robert B. Greifinger, M.D. ("Greifinger"), ¶¶ 1-4; Second Supplemental Declaration of Sandra Hernandez ("Hernandez"), ¶¶ 1-4; Supplemental Declaration of Sarah Allen. M.D. ("S. Allen"), ¶¶1-6; Declaration of Allen Keller, M.D. ("Keller"), ¶¶ 1-6.) Plaintiffs also present the declaration of an attorney who has been in contact with multiple detainees at Mesa Verde whose actual experiences conflict with the rosy picture presented by Defendants. (Declaration of Susan Beaty ("Beaty"), ¶¶ 1-3.)

## II. ADDITIONAL BACKGROUND REGARDING DEFENDANTS' DECLARANTS

### A. Declaration of Dr. Richard Medrano

Dr. Medrano's declaration raises more questions than it answers. Although he is the Regional Medical Director for Wellpath, in a "region" that includes Mesa Verde and Adelanto, he does not explain how large the "region" is; how many other facilities it covers; how long he has held the position; or even how much of his practice is devoted to the job.[1] Although he

---

[1] WebMD and other internet sources show that a Dr. Richard M. Medrano is a family medicine practitioner based in Pasadena, CA who also practices at "one other location" in Adelanto, CA.

claims that he is "on-call and/or serve[s] as backup Physician for the facility when needed" (Medrano Dec. ¶ 1), he does not explain whether the "facility" to which he refers is Mesa Verde or the much larger Adelanto facility, and he does not state how often he has directly participated in or even observed the delivery of medical care at Mesa Verde. Dr. Medrano states that he has worked for Wellpath and its predecessor company, Correct Care Solutions, since 2015. During this time period, the DHS Office of Inspector General conducted a site visit at Adelanto in May 2018, and issued a scathing report on the delivery of health care there.[2] The Inspector General cited numerous problems including wait times of "weeks and months" to see a doctor; appointments "canceled with no explanation"; and appointments canceled because "guards were not available to take detainees from their cells to their appointments."[3] The IG concluded that "Failure to Provide Timely and Adequate Medical Care for Detainees Increases Health Risks," and that "Medical Care for Detainees is Delayed and Inadequate."[4] The Court is entitled to take these findings into consideration when evaluating Dr. Medrano's "professional opinion" that "the current standard of care at Mesa Verde for COVID-19 positive patients exceeds the standard of community care in the United States.[5,6]

---

*E.g.,* https://doctor.webmd.com/doctor/richard-medrano-a56d3359-15ba-4e01-87f0-85dca2c1dfe0-appointments. Pasadena is about a two-hour drive from both Adelanto and Mesa Verde.
[2] DHS Office of Inspector General, "Management Alert - Issues Requiring Action at the Adelanto ICE Processing Facility in Adelanto, California, September 27, 2018, available at: https://www.oig.dhs.gov/sites/default/files/assets/Mga/2018/oig-18-86-sep18.pdf. A copy of this report is attached as Exhibit 1 to the Declaration of William S. Freeman.
[3] *Id.* at 8.
[4] *Id.* at 7-8.
[5] Wellpath is also the subject of significant criticism in the press as a private-equity-backed for-profit provider of in-custody medical services. *See, e.g.,* "The Private Option," *The Atlantic,* Sept. 12, 2019, available at: https://www.theatlantic.com/politics/archive/2019/09/private-equitys-grip-on-jail-health-care/597871/
[6] As discussed below, Plaintiffs have asked GEO to produce its contract relating to the provision of medical services at Mesa Verde, but GEO has stated that this contract is a "trade secret" and

### B. Declaration of Nathan Allen

Warden Nathan Allen, the Facility Administrator at Mesa Verde, does not provide any additional information responsive to the Court's specific questions. He states only that "custody staff" can call 911 in an emergency to "let medical staff know if a detainee seems to have a medical issue" (N. Allen Dec. ¶¶ 2-3), but understandably does not claim any specialized medical knowledge and states that GEO contracts with Wellpath to provide medical care at Mesa Verde. (*Id.* ¶ 4.)

### C. Declaration of Dr. Ada Rivera

It is not clear that Dr. Rivera, the Federal Defendants' declarant, who "oversee[s] and monitors[s]" clinical services at ICE detention facilities that are staffed by ICE Health Services Corps personnel, can contribute any relevant testimony concerning the provision of services at a facility such as MV that is not staffed by IHSC. Dr. Rivera states that cohorting of lab-confirmed positive cases of COVID-19 is "specified as allowable" under CDC guidelines, but provides no information concerning facts on the ground at Mesa Verde, and does not even attempt address the Court's question regarding "the measures that can be taken to reduce the risk of the detainees' health deteriorating after being housed in the Covid-positive dorm."[7]

---

will not be produced. Plaintiffs have also inquired concerning the time period of the contract; to date, GEO has not provided this information.

[7] Notably, the CDC has also identified "cohorting" as a sub-optimal option. CDC, "Guidance for Correctional & Detention Facilities," July 22, 2020, available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("While cohorting those with confirmed COVID-19 is acceptable, cohorting individuals with suspected COVID-19 is not recommended due to high risk of transmission from infected to uninfected individuals.").

## III. RESPONSES TO THE COURT'S SPECIFIC QUESTIONS

### A. Measures to reduce the risk of deteriorating health of Dorm B detainees

In addition to increased frequency of monitoring and availability of self-monitoring (discussed in III.B below), facilities must have a *facility-specific* plan in place that dictates how patients are triaged and diagnosed, how they will be isolated and monitored, and how they will be transferred to a higher level of care; how PPE will be handled; and how the area housing the patients will be sanitized on a daily basis. (S. Allen ¶¶ 9, 18; Greifinger ¶ 18.) Not only is it clear that Defendants do not have such a plan (S. Allen ¶ 20; Greifinger ¶ 19), they admitted in a recent status conference that they still believe it is acceptable for infected detainees to be cleaning their own dormitory. Particularly in the face of the current widespread outbreak at Mesa Verde, there must be a system in place for life support or "Code Blue" situations (S. Allen ¶ 11), and for immediate access to emergency medical care (Greifinger ¶¶ 10-11). There must be oxygen available at all times, and the current inventory of oxygen at Mesa Verde is inadequate. (S. Allen ¶ 14.) Appropriate patient care during a pandemic requires a level of effective communication among medical personnel, and between members of the medical team and the patients, that goes far beyond anything described by Defendants. (*Id.* ¶¶ 15-16; Greifinger ¶¶ 12-17.)

The practice described by Defendants under which known COVID patients are required to fill out "sick call slips" or "kites" and are "typically" seen within 24 hours (Medrano ¶ 8) is "an entirely unsafe and inappropriate practice" and is "dangerous" because such patients should be constantly monitored and not have to take the initiative to seek care due to the risk of rapid deterioration. (S. Allen ¶¶ 10, 21-23; Greifinger ¶¶ 7, 25-27.) The failure of medical personnel to consistently respond within 24 hours to significant health concerns in the middle of a COVID

5
CASE NO. 3:20-CV-02731-VC
PETITIONERS-PLAINTIFFS' RESPONSE RE MEDICAL CARE AT MESA VERDE

outbreak is evidence of substandard care that places the lives and health of COVID-positive detainees at risk. (Keller ¶ 59.)

Defendants' claim to have "custody officers within the housing units" who are "encouraged to let medical staff know if a detainee seems to have a medical issue" (Medrano ¶ 11; N. Allen ¶ 3) is inadequate if the officer has not been trained to spot the signs of a rapidly declining patient, and is not *required* to communicate urgently with medical personnel. (Greifinger ¶¶ 28-30.)

Having reviewed Defendants' plans and protocols to the extent they exist, Dr. Sara Allen concludes that Defendant "have failed to provide the appropriate level of care to COVID patients in their care" and "need to take significant, immediate steps to improve the degree of patient monitoring, provide bedside access to medical care, and streamline access to emergency medical care." (S. Allen ¶ 19.) Dr. Allen's specific findings are set forth in detail at ¶¶ 20-25 of her declaration. She concludes that "Defendants' resources fail to meet the appropriate level of care" and that "barriers to medical treatment at [Mesa Verde] are deeply troubling."  (*Id.* ¶¶ 24, 28.)

Dr. Greifinger in particular explains that the blanket statement that Wellpath's staff "is required to follow both CDC and IHSC [ICE Health Service Corps) guidelines" (Medrano ¶ 8) provides no assurance because these guidelines state only general policies but do not specify, on an operational level, how staff should respond to particular situations; and this has not been done at Mesa Verde. (Greifinger ¶¶ 20-21, 24.) For example, Defendants relied on IHSC guidance when they initially refused to test people in dorms whether individuals had tested positive for COVID-19. (*Id.* ¶ 22.) In addition, the general statement is untrue in many respects; for example, Defendant are *not* following CDC guidance that they revise their influenza and disaster plans for COVID-19 and train staff to the revised plan. (*Id.* ¶ 24.)

6
CASE NO. 3:20-CV-02731-VC
PETITIONERS-PLAINTIFFS' RESPONSE RE MEDICAL CARE AT MESA VERDE

Dr. Greifinger concludes that Defendants' failure to establish a detailed plan "to respond to the needs of COVID-infected individuals at Mesa Verde is a striking example" of their "indifference to the obligation to mitigate the risk of COVID transmission…." (*Id.* ¶ 32.) He recommends that "Mesa Verde immediately establish an effective COVID-19 medical care plan that does not only rely on CDC and IHSC guidelines but that responds to the particular constraints, limitations and obligations that exist at Mesa Verde." (*Id.* ¶ 33.) Such a plan would require that on-site GEO officers communicate detainees' health care needs directly to a health care professional review, and eliminate any existing obstacles to immediate assistance from on-site health care professionals. (*Id.*)

Ms. Beaty, whose non-profit legal organization represents many individual clients inside Mesa Verde, explains how the deficiencies detailed by the medical experts affect the quality and timeliness of health care delivered to detainees every day. Regarding the "sick call slip" system touted by Dr. Medrano, her clients report that often "it takes multiple days to be seen by a doctor after requesting medical care on the tablet … even after they have reported concerning COVID-19 symptoms." (Beaty ¶¶ 4-5; individual detainee experiences set forth at ¶¶ 6-9.) As Dr. Greifinger feared, GEO staff members, whether through lack of training or lack of caring, fail or delay in alerting medical staff to serious COVID-19 symptoms. (*Id.* ¶ 10; examples at ¶¶ 11-19.) Medical personnel fail to provide adequate information to detainees related to the COVID-19 outbreak, leading to a climate of distrust of medical staff. (*Id.* ¶ 23; examples at ¶¶ 24-26.) Class members lack basic information about what it means to have tested positive, signs and symptoms to watch for, when to alert staff, and the meanings of oxygen and blood pressure results. (*Id.* ¶ 27; examples at ¶¶ 28-30.) Not only do these problems endanger detainees' physical health; they adversely affect their mental health as well. (¶ 34; examples at ¶¶ 35-38.)

Finally, Dr. Keller, having had access to detailed medical records concerning four Covid-positive detainees, has engaged in a detailed review of those records and concludes, without hesitation, that numerous failures and delays in testing and treatment for these individuals could easily have cost these detainees their lives, and still could. (*E.g.,* Keller ¶¶ 25, 35, 47, 58.) The review of these records makes clear that, among other things, (1) highly symptomatic individuals were not offered rapid tests which would have identified their COVID status earlier, thereby endangering their health and likely infecting many others; (2) seriously medically vulnerable individuals were placed in crowded close-contact cohort dorms and, in at least one identified case (and almost certainly others) contracted COVID as a result; and (3) MV health care providers repeatedly discounted legitimate and serious concerns of COVID-positive and medically vulnerable individuals, at critical moments in which their health was deteriorating. (*Id.* ¶¶ 12 (summary), 13-57 (details).)While Plaintiffs will not repeat here the shocking details of the substandard treatment provided to these class members, we earnestly hope the Court will review Dr. Keller's declaration if it has any doubt that the deficiencies set forth here have life-or-death consequences.

B.   **Level of monitoring necessary to ensure prompt hospitalization**

Covid-19 patients - even those who have previously had mildly abnormal vital signs – can deteriorate dramatically in less than one hour due to a "cytokine storm" in which the body's immune system overreacts to the virus. (S. Allen ¶¶ 7-8; Greifinger ¶ 6.) For this reason, such patients should have instant access to nurses and physicians, either by means of a bedside buzzer or telephone, or via a medical professional or detention officer who is specifically trained to identify signs and symptoms requiring urgent treatment. (S. Allen ¶ 10; Greifinger ¶ 8.) In a multi-patient cohort setting like Dorm B at Mesa Verde, COVID-infected persons should be visually monitored at all times because not all patients may be physically able to call for a nurse.

(S. Allen ¶ 23). Although twice- or thrice-daily monitoring of symptoms is acceptable in many situation, medically vulnerable detainees should have their vital signs checked even more frequently. (*Id.* ¶ 13.)

    **C.    Increased risk of complications or death within the facility compared to outside**

Dr. Medrano states that in his opinion, detainees are at "no greater risk for complications" inside Mesa Verde than outside in the community, because access to care is more readily available inside. (Medrano ¶ 6.) This opinion fails to take into account, however, for the fact that detainees in Dorm B are surrounded by other very sick people, whereas someone on the outside will not be, which brings with it the risk of infection by a whole host of serious secondary respiratory pathogens, which increases the likelihood of poor outcomes. (S. Allen ¶ 25.) When influenza season arrives, as it surely will, there will be "more COVID-influenza co-infections and thus sicker patients." (*Id.*) Ideally, COVID-positive patients should be medically isolated; proximity to other sick patients in a dormitory such as Dorm B increases the likelihood of co-infection. (*Id.* ¶¶ 25-27, 29.) Indeed, even the IHSC that Defendants purport to follow recognizes that "plac[ing] the [COVID-confirmed] detainee in a private medical housing room, ideally in an airborne infection isolation room" is preferable to merely "hous[ing] the ill detainee separately from the general population." (ISHC Reference Sheet on COVID-19 (Freeman Ex. 3), p. 3.

Dr. Medrano's sanguine view of the relative risk inside and outside the facility also fails to account for the overwhelming evidence of negligence, indifference, and lack of imagination and flexibility that the Court has repeatedly noted, and which leads inescapably to the conclusion that Defendants cannot be trusted to take any constructive action unless ordered to do so by the Court. As Dr. Keller concludes, "There is little evidence in the records I have reviewed that would give me confidence in the ability of Mesa Verde's health care professionals to

competently care for the health care of dozens of COVID-positive individuals in their custody. (Keller ¶ 59.) Without further Court intervention, these failures will almost certainly lead to tragic results.

Dr. Hernandez concludes that "it is in the interest of public health to release detainees from detention centers so long as they can safely quarantine or isolate in the community" (Hernandez ¶¶ 5, 13, 18), and lays out the steps that are required for safe quarantine (*Id.* ¶¶ 6-11.) Releases will lower the risk of infection both inside the facility and in the greater community. (*Id.* ¶¶ 14-15.) Reducing the population of COVID-positive patients in Mesa Verde also lowers the risk of overburdening the already strained public health system in Kern County, which has the highest test positivity rate in the state (*Id.* ¶18). Ms. Beaty's organization has created and executed numerous successful individual release plans, and stands ready to assist with more. (Beaty ¶¶ 39-42.) By contrast, even with regular testing, the frequency of staff and personnel movement within the facility inevitably increases the risk of further transmission, with detrimental health consequences for individuals who are detained as well as for the broader public. (Hernandez ¶¶ 16.)

### D. Who pays for hospitalizations

Defendants state that ICE pays for hospitalizations, and Plaintiffs have no basis to challenge this assertion. That is hardly the only question that must be answered to determine Wellpath's potential financial interest in rationing the provision of medical care, however. As a for-profit business, Wellpath's return to its investors depends on how economically it can deliver care; yet the existence of a pandemic and an outbreak within the facility clearly require that greater resources be expended per detainee. If Wellpath is not compensated for the greater effort

10
CASE NO. 3:20-CV-02731-VC
PETITIONERS-PLAINTIFFS' RESPONSE RE MEDICAL CARE AT MESA VERDE

required, it is unlikely to commit greater resources.[8] For this reason, it is critical to know not just who pays for hospitalizations, but the basis on which Wellpath is paid for the delivery of its services: whether it is paid a fixed fee per detainee day, or a scheduled fee for each service delivered, or on a cost-plus basis, or on some other basis.

Plaintiffs have requested this information from GEO, but it has so far refused to provide it. Mindful of the Court's repeated instruction to Defendants that they should respond promptly, and without requiring formal discovery requests, to reasonable requests for relevant information and documents, on Tuesday, August 18, Plaintiffs' counsel orally requested that GEO's counsel provide a copy of the contract between GEO and Wellpath so that Plaintiffs could determine the basis on which Wellpath is paid. *See* Freeman declaration, filed herewith, at ¶ 3 Plaintiffs renewed the request Counsel renewed the request in writing on August 19. *Id.* ¶ 4 and Ex. 2. Later that day, counsel for GEO stated that GEO would not provide the contract(s), claiming they are "trade secret protected." *Id.* Plaintiffs renewed their request, and asked that GEO provide details concerning how Wellpath is compensated even if it would not produce the contract. *Id.* Counsel for GEO have not, as of this time, responded to this request. *Id.*

Plaintiffs respectfully request that GEO produce to Plaintiffs the contract(s) governing its provision of health care services at Mesa Verde.

E. **Responses to the Court's questions regarding staff testing**

At the most recent status conference, the Court also asked both parties to answer two questions concerning staff testing: (1) whether staff should be tested, and required to test negative, prior to returning to work after a positive test; and (2) whether staff who previously

---

[8] Dr. Medrano states that because of the reduced population at Mesa Verde, there is a greater provider-to-detainee ration (Medrano Dec. ¶ 9.) While this may be true, it does not account for the greatly increased medical needs of the remaining detainees, and the greatly increased level of effort needed to adequately care for them, which he does not address.

11
CASE NO. 3:20-CV-02731-VC
PETITIONERS-PLAINTIFFS' RESPONSE RE MEDICAL CARE AT MESA VERDE

tested positive should be required to be tested again in the weekly testing regimen established by this Court.

First, the CDC and other medical experts currently recommend a "symptom-based strategy" for returning to work after a positive COVID test. Thus, a negative test is not required; rather, the requirements for returning to work should conform to evolving CDC guidelines based on lack of symptoms and the passage of time.[9] Second, a prior positive test should not eliminate the obligation of staff at MV to submit to regular testing. While there is significant ongoing research in this area, there is currently no confirmation that an individual cannot be re-infected with COVID—and be infectious to others—after a positive test.[10] Routine and frequent testing thus continues to be recommended even after a prior COVID infection has resolved.

## IV. CONCLUSION

Contrary to Defendants' blanket assurances that the level of medical care provided to detainees at Mesa Verde is adequate, the opinions of four independent experts, the actual stories of detainees' experiences, and a detailed medical records review prove that it is woefully inadequate. Plaintiffs respectfully request that the Court require Defendants to bring their care up to acceptable standards or release additional detainees, contingent on a satisfactory release plan, to safely isolate in their communities.

Dated: August 20, 2020

Respectfully submitted,

/s/ William S. Freeman
William S. Freeman
Sean Riordan
Angélica Salceda

---

[9] See https://www.cdc.gov/coronavirus/2019-ncov/hcp/return-to-work.html; https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/testing-non-healthcare-workplaces.html.
[10] https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/testing-non-healthcare-workplaces.html. *See also* https://www.nytimes.com/2020/08/16/health/coronavirus-immunity-antibodies.html.

| | AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA |

Bree Bernwanger
Hayden Rodarte
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA

Judah Lakin
Amalia Wille
LAKIN & WILLE LLP

Jordan Wells
Stephanie Padilla
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA

Manohar Raju
Public Defender
Matt Gonzalez
Chief Attorney
Francisco Ugarte
Genna Ellis Beier
Emilou H. MacLean
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO

Martin S. Schenker
Timothy W. Cook
Francisco M. Unger
COOLEY LLP

*Attorneys for Petitioners-Plaintiffs*