WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
ANGÉLICA SALCEDA (SBN 296152)
asalceda@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Attorneys for Petitioners-Plaintiffs*
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
FRANCISCO UGARTE (CA SBN 241710)
francisco.ugarte@sfgov.orga
GENNA ELLIS BEIER (CA SBN 300505)
genna.beier@sfgov.org
EMILOU H. MACLEAN (CA SBN 319071)
emilou.maclean@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: 415-553-9319
Fax:    415-553-9810

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUIZ TOVAR, LAWRENCE MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG, <br><br> Petitioners-Plaintiffs, <br><br> v. <br><br> DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; NATHAN ALLEN, Warden of Mesa Verde Detention Facility, <br><br> Respondents-Defendants. | CASE NO. 3:20-CV-02731-VC <br><br> **DECLARATION OF WILLIAM S. FREEMAN IN SUPPORT OF PETITIONERS-PLAINTIFFS' RESPONSE TO DEFENDANTS' SUBMISSIONS RE MEDICAL CARE AT MESA VERDE** |

BREE BERNWANGER* (NY SBN 5036397)
bbernwanger@lccrsf.org
HAYDEN RODARTE (SBN 329432)
hrodarte@lccrsf.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA
131 Steuart St #400
San Francisco, CA 94105
Telephone: (415) 814-7631

JUDAH LAKIN (SBN 307740)
judah@lakinwille.com
AMALIA WILLE (SBN 293342)
amalia@lakinwille.com
LAKIN & WILLE LLP
1939 Harrison Street, Suite 420
Oakland, CA 94612
Telephone: (510) 379-9216
Facsimile: (510) 379-9219

JORDAN WELLS (SBN 326491)
jwells@aclusocal.org
STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

MARTIN S. SCHENKER (SBN 109828)
mschenker@cooley.com
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIMOTHY W. COOK (Mass. BBO# 688688)*
tcook@cooley.com
FRANCISCO M. UNGER (Mass. BBO# 698807)*
funger@cooley.com
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

*Attorneys for Petitioners-Plaintiffs*

*Admitted *Pro Hac Vice*

I, William S. Freeman, declare:

1. I am a member of the State Bar of California and of the Bar of this Court. I am one of the attorneys representing Plaintiffs in this action. The following facts are set forth based on personal knowledge.

2. Attached hereto as Exhibit 1 is a true and correct copy of a report issued on September 27, 2018 by the Office of Inspector General of the U.S. Department of Homeland Security entitled, "Management Alert - Issues Requiring Action at the Adelanto ICE Processing Facility in Adelanto, California." The report, which is based on an OIG inspection at Adelanto conducted in May 2018, is available at: https://www.oig.dhs.gov/sites/default/files/assets/Mga/2018/oig-18-86-sep18.pdf.

3. On Tuesday, August 18, 2020, during a conference call among counsel for all parties in the case, I orally requested to counsel for the GEO Defendants, Susan Coleman, that her clients promptly provide Plaintiffs with a copy of the contract governing the provision of medical services at the Mesa Verde ICE Processing Facility by Wellpath, Inc. to GEO Group, Inc. I made this request mindful of the Court's instructions to the parties that Defendants should respond to reasonable requests for information by Plaintiffs promptly and without the need for formal discovery requests.

4. On the morning of Wednesday, August 19, I renewed this request in writing to Ms. Coleman. A true and correct copy of an email chain of which this message is a part is attached hereto as Exhibit 2.

5. Ms. Coleman responded promptly to my email, stating that "[t]he contracts are trade secret" and that GEO would not provide them. *See* Ex. 2 (message from Susan Coleman to Bill Freeman and others, 8/19/20, 11:30 a.m.)

6. In response, I reiterated Plaintiffs' view that the contract should be produced, and asked, in the meantime, that GEO answer several specific questions concerning the basis on which Wellpath was compensated for provision of medical services at Mesa Verde, "so that [Plaintiffs] may properly respond to Defendants' briefing on medical care issues." *See id.* (Message from Bill Freeman to Susan Coleman and others, 8/19/20, 11:47a.m.)

7. As of the time of filing this declaration (the evening of August 20), GEO has neither provided the contract nor responded to my written questions.

8. Attached as Exhibit 3 hereto is a true and correct copy of ICE Health Service Corps' Interim Reference Sheet on 2019 Novel Coronavirus (COVID-19): Detainee Care, Version 11.0, dated May 21, 2020.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 20, 2020 at Hillsborough, California.


    */s/ William S. Freeman*

# EXHIBIT 1

# Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California

Homeland Security

September 27, 2018

OIG-18-86



# DHS OIG HIGHLIGHTS
## *Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California*

**September 27, 2018**

# Why We Did This Alert

This Alert is part of an ongoing review to inspect U.S. Immigration and Customs Enforcement (ICE) detention facilities. We conducted an unannounced visit to the Adelanto ICE Processing Center and, using ICE's 2011 *Performance-Based National Detention Standards*, we identified serious violations that are important to inform ICE of immediately.

# What We Recommend

We recommend that ICE conduct a full review of the Adelanto ICE Processing Center and the GEO Group's management of the center immediately to ensure compliance with ICE's 2011 *Performance-Based National Detention Standards.* As part of this assessment, ICE must ensure compliance with the standards addressing personal housekeeping requirements, segregation, and medical care.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

# What We Found

During our May 2018 unannounced inspection of the Adelanto ICE Processing Center in Adelanto, California, we identified a number of serious issues that violate ICE's 2011 *Performance-Based National Detention Standards* and pose significant health and safety risks at the facility. Specifically, we are concerned about the following:

- Nooses in Detainee Cells
- Improper and Overly Restrictive Segregation
- Untimely and Inadequate Detainee Medical Care

ICE must ensure the Adelanto Center complies with detention standards to establish an environment that protects the safety, rights, and health of detainees. Mitigation and resolution of these issues require ICE's immediate attention and increased engagement with the center and its operations.

# ICE Response

ICE concurred with the recommendation and is implementing corrective actions to ensure the Adelanto ICE Processing Center meets required detention standards. ICE reported that it will complete a full inspection of the Adelanto facility and a Special Assessment Review to ensure concerns identified in this report are fully inspected and addressed. We consider the one recommendation resolved and open.



September 27, 2018

MEMORANDUM FOR:  Ronald D. Vitiello
Senior Official Performing the Duties of Director
U.S. Immigration and Customs Enforcement

FROM:  John V. Kelly
Senior Official Performing the Duties of the Inspector
General

SUBJECT:  *Management Alert – Issues Requiring Action at the*
*Adelanto ICE Processing Center in Adelanto, California*

For your action is our final report, *Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California.* We incorporated the formal comments provided by your office.

The report contains one recommendation aimed at improving compliance with these U.S. Immigration and Customs Enforcement (ICE) detention standards and to strengthen its oversight of the Adelanto ICE Processing Center. Your office concurred with the one recommendation.

Based on information provided in your response to the draft report, we consider recommendation 1 open and resolved. Once your office has fully implemented the recommendation, please submit a formal closeout letter to us within 30 days so that we may close the recommendation. The memorandum should be accompanied by evidence of completion of agreed-upon corrective actions. Please send your response or closure request to OIGInspectionsFollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Jennifer L. Costello, Chief Operating Officer, or John D. Shiffer, Chief Inspector, at (202) 981-6000.



# Background

The Adelanto ICE Processing Center, owned and operated by the GEO Group, Inc., houses up to 1,940 U.S. Immigration and Customs Enforcement (ICE) detainees through an Intergovernmental Service Agreement.[1] Based on this agreement, the Adelanto Center must comply with ICE's 2011 *Performance-Based National Detention Standards*, as revised in December 2016. These detention standards establish requirements for areas such as:

- environmental health and safety: e.g., cleanliness, sanitation, security, admission into facilities, classification, detainee searches, segregation[2] (Special Management Units), and disciplinary system;
- detainee care: e.g., food service, medical care, and personal hygiene;
- activities: e.g., religious practices, telephone access, and visitation; and
- grievance system.

In May 2018, we visited the Adelanto ICE Processing Center as part of our latest round of unannounced spot inspections. At the time, 307 contract guards oversaw 1,659 detainees housed in different facilities around the center. On the west side of the center, detainees resided in 16 housing units consisting of 18 cells each that can hold approximately 4 to 8 detainees per cell. On the east side of the center, detainees resided in 2 open bay housing modules with 7 dormitories and an average of 94 detainees per dormitory. While at the center, we identified serious issues relating to safety, detainee rights, and medical care that require ICE's immediate attention. These issues not only constitute violations of ICE detention standards but also represent significant threats to the safety, rights, and health of detainees.

## Nooses Made from Braided Bed Sheets Present Ongoing Safety and Security Risks

ICE standards[3] prohibit detainees from hanging or draping objects from their beds, fixtures, or other furniture. However, in about 15 of the approximately 20 male detainee cells we visited within 4 housing units on the west side, we observed braided bedsheets, referred to as "nooses" by center staff and

---

[1] The Intergovernmental Service Agreement (IGSA) was established between the City of Adelanto and ICE.

[2] Segregation is the process of separating certain detainees from the general population for administrative, disciplinary, or protective reasons.

[3] ICE, *Performance-Based National Detention Standards, 2011,* Section 5.8.V.C, Voluntary Work Program, Expected Practices, Personal Housekeeping Required (Revised Dec. 2016). The pertinent part of this standard requires detainees to maintain their immediate living areas in a neat and orderly manner by making their bunk beds daily; stacking loose papers; keeping the floor free of debris and dividers free of clutter; and refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture.



detainees, hanging from vents (see figure 1). The contract guard escorting us during our visit removed the first noose found in a detainee cell, but stopped after realizing many cells we visited had nooses hanging from the vents. We also heard the guard telling some detainees to take the sheets down.

During our interviews, detainees provided a range of reasons for braiding and hanging bedsheets in the cells. One detainee told us, "I've seen a few attempted suicides using the braided sheets by the vents and then the guards laugh at them and call them 'suicide failures' once they are back from medical." Four detainees told us the braided sheets can be easily unfurled to temporarily create privacy within the cell, specifically the bathroom area or individual bunk area. Two detainees reported tying the braided sheets from one bedpost to another to serve as a clothesline.

 

Nooses Found Hanging in Cells

**Figure 1**. Nooses hanging from vents in detainee cells observed by the Office of Inspector General (OIG) at the Adelanto Center on May 1, 2018.
*Source*: OIG

ICE has not taken seriously the recurring problem of detainees hanging bedsheet nooses at the Adelanto Center; this deficiency violates ICE standards. According to the guard escorting us, the nooses are a daily issue and very widespread. When we asked two contract guards who oversaw the housing units why they did not remove the bed sheets, they echoed it was not a high priority. In March 2018, an ICE contractor who conducts daily center checks noted that detainees were hanging bedsheets in their cells and began sending a weekly deficiency report to ICE for action. According to a senior ICE official, however, local ICE management at Adelanto does not believe it is necessary or a priority to address the braided sheets issue.


ICE must prioritize addressing the issue of sheets hanging in detainee cells, as they represent the potential to assist suicide acts. In March 2017, a 32-year-old male died at an area hospital after being found hanging from his bedsheets in an Adelanto cell. In the months after this suicide, ICE compliance reports documented at least three suicide attempts by hanging at Adelanto, two of which specifically used bedsheets. Media reports based on 911 call logs indicate at least four other suicide attempts at the center from December 2016 to July 2017.[4] In total, these reports represent at least seven suicide attempts at the Adelanto Center from December 2016 to October 2017. Nationwide, self-inflicted strangulation accounts for 4 of the 20 detainee deaths reported between October 2016 to July 2018, according to ICE news releases. The most recent ICE detainee death, on July 10, 2018, at the Stewart Detention Facility in Georgia, again highlights the current need to prioritize this issue, as ICE preliminarily attributed that death to self-inflicted strangulation. ICE's lack of response to address this matter at the Adelanto Center shows a disregard for detainee health and safety.

## Inappropriate Segregation Restricts Detainee Rights

Detainees may be separated from the center's general population because they committed a serious prohibited act or rule violation (disciplinary segregation)[5] or to protect themselves, others and property, for medical reasons, and for secure and orderly facility operations (administrative segregation). ICE standards[6] obligate the Adelanto Center to meet numerous requirements for segregation, including:

- preventing the commingling of detainees in administrative and disciplinary segregation;
- placing detainees in disciplinary segregation only after they are found to have committed a prohibited act and only when alternative dispositions may inadequately regulate the detainee's behavior;
- avoiding the use of restraints on detainees;

---

[4] Paloma Esquivel, *'We don't feel OK here': Detainee deaths, suicide attempts and hunger strikes plague California immigration facility*, LOS ANGELES TIMES (Aug. 8, 2017), http://www.latimes.com/local/lanow/la-me-ln-adelanto-detention-20170808-story.html.
[5] A prohibited act or rule violation must be classified at a "greatest" (e.g., killing, rioting, assault), "high" (e.g., fighting, drug possession, bribery), or "high-moderate" (e.g., theft, refusal to obey staff or officer orders, gambling) level as defined in ICE standards.
[6] ICE, *Performance-Based National Detention Standards, 2011,* Section 2.12, Special Management Units (Revised Dec. 2016). "This detention standard protects detainees, staff, contractors, volunteers and the community from harm by segregating certain detainees from the general population in Special Management Units with an Administrative Segregation section for detainees segregated for administrative reasons and a Disciplinary Segregation section for detainees segregated for disciplinary reasons."


- providing communications assistance to detainees in segregation who cannot speak English or who may be blind or deaf; and,
- providing regular access to supervisory, management, program, and health care staff.

Nonetheless, our review of disciplinary segregation revealed multiple violations of ICE detention standards. These violations pose a significant threat to maintaining detainee rights and ensuring their mental and physical well-being.

<u>Detainees Are Placed in Disciplinary Segregation Prematurely and Inappropriately</u>

During our visit to the Adelanto Center, there were 14 detainees in disciplinary segregation. Through our file review, we found that the Adelanto Center inappropriately placed all 14 detainees in disciplinary segregation before they were found guilty of a prohibited act or rule violation. We also identified one detainee who requested placement in administrative segregation but was inappropriately held in disciplinary segregation for more than a week.

ICE standards state that a detainee shall be placed in disciplinary segregation only after a disciplinary hearing panel finds the detainee guilty of a prohibited act or rule violation and the disciplinary panel chair completes a written order for segregation. Yet, based on file reviews and interviews with GEO Group staff, the Adelanto Center places detainees in disciplinary segregation prior to a guilty finding and a written order for segregation. GEO Group staff indicated it is the center's practice to place all detainees directly in disciplinary segregation after an alleged incident to prevent further issues with the detainee. We reviewed files for the 14 detainees in disciplinary segregation and only found disciplinary panel decisions for 7 of the detainees. File reviews indicated that this segregation placement is also done before the disciplinary panel assesses a penalty for the violation and the detainee has the opportunity to appeal, thereby violating the detainee's right to due process.

This premature placement in disciplinary segregation may further restrict detainee rights by imposing additional sanctions not included in the disciplinary panel's decision or orders. In the seven cases where we found a disciplinary panel decision in the detainee file, the sanctions imposed went beyond the penalties listed in the disciplinary panel decision. For example, through interviews and observations, we learned that these detainees lost the ability to purchase or keep commissary items in their cells while in disciplinary segregation, but the disciplinary panel's decisions did not include this penalty. Further, according to center staff, all detainees in disciplinary segregation lose contact visits with family. However, neither the disciplinary segregation orders


for the 14 detainees nor the center handbook's description of rule violation penalties listed loss of contact visits with family as an available penalty.

Our file review also revealed that a disabled detainee who had requested to be placed in administrative segregation, was instead placed in disciplinary segregation. This violates two aspects of the Special Management Units standard: one requiring a guilty finding before disciplinary segregation, and another prohibiting commingling detainees in administrative and disciplinary segregation. The center initially placed the detainee in disciplinary segregation due to an unrelated behavioral problem in administrative segregation at the time of transfer but inappropriately held him there for 9 days until we raised the issue to the center's Medical Health Services Administrator. Based on our file review, in those 9 days, the detainee never left his wheelchair to sleep in a bed or brush his teeth. During our visit, we saw that the bedding and toiletries were still in the bag from his arrival. We also observed medical staff just looking in his cell and stamping his medical visitation sheet rather than evaluating the detainee, as required by ICE standards. After our notification, the Medical Health Administrator moved the detainee from segregation to medical for observation.

Detainees in Disciplinary Segregation Are Improperly Handcuffed and Shackled

According to ICE standards, placement in disciplinary segregation alone does not constitute a valid basis for using restraints (i.e., handcuffs and shackles) on detainees. However, in disciplinary segregation, we observed GEO Group contract guards moving six detainees in physical restraints, including handcuffs and shackles. The GEO Group segregation supervisor and guards said they place all detainees held in disciplinary segregation in restraints when outside their cells. The center reported using restraints for security reasons, though according to ICE standards, restraints should only be used if necessary as a precaution against escape during transfer, when directed by the medical officer for medical reasons, or to prevent self-injury, injury to others, or serious property damage. Physically restraining all disciplinary segregation detainees whenever they are outside their cells does not comport with ICE standards and gives the appearance of criminal, rather than civil, custody.

Detainees in Disciplinary Segregation Lack Communication Assistance

ICE standards require facilities to provide communication assistance to detainees in segregation with disabilities or who are limited in their English proficiency. During our visit, we encountered a blind, limited English proficient detainee in disciplinary segregation but found the center had no auxiliary aids or translated materials for the detainee to read or understand documents he was given. In addition, file reviews of the 14 detainees in disciplinary



segregation at the time of our visit revealed that none of the segregation orders or information provided to detainees while in segregation was translated or otherwise communicated to ensure the detainee's understanding. Without proper communication assistance, ICE cannot ensure that detainees placed in disciplinary segregation understand the reasoning for their segregation and are aware of their rights.

## Failure to Provide Timely and Adequate Medical Care for Detainees Increases Health Risks

ICE has not ensured that Adelanto Center general population and segregated detainees receive appropriate and necessary medical and dental care, as required by ICE standards.[7] We observed medical staff performing limited checks on detainees in disciplinary segregation, which do not effectively ensure detainee well-being. Based on interviews with detainees and medical staff and a review of independent reports, we concluded that detainees do not have timely access to proper medical care. Also, our detainee interviews and review of medical records revealed that detainees are placed on waitlists for months and, sometimes, years to receive basic dental care, resulting in tooth loss and unnecessary extractions in some cases.

### Medical Oversight in Disciplinary Segregation Is Ineffective in Ensuring Detainee Well-Being

Although ICE standards require face-to-face medical assessments of all detainees in segregation at least once daily to ensure their welfare, we observed Adelanto Center medical providers, including nurses, physicians, and mental health providers, conducting cursory walk-throughs of disciplinary segregation. For example, we observed two doctors walking through disciplinary segregation and stamping their name on the detainee records, which hang outside each detainee's cell, indicating that they visited with the detainee. However, we observed them doing so without having any contact with 10 of the 14 detainees in disciplinary segregation. For the four detainees a doctor did speak with, the doctor asked if the detainee was "ok" in English, not necessarily a language the detainee understood. We confirmed with guards that these four detainees were non-English speakers, and the doctor left without any acknowledgment or response from the detainee. Although ICE's detainee death review of the March 2017 suicide at Adelanto previously identified similar issues with medical oversight of detainees in segregation, our spot inspection of the center confirmed these issues persist.

---

[7] ICE, *Performance-Based National Detention Standards, 2011*, Section 4.3, Medical Care (Revised Dec. 2016). "This detention standard ensures that detainees have access to appropriate and necessary medical, dental and mental health care, including emergency services."



Medical Care for Detainees Is Delayed and Inadequate

From November 2017 to April 2018, detainees filed 80 medical grievances (about 34 percent of all grievances filed) with the center for not receiving urgent care, not being seen for months for persistent health conditions, and not receiving prescribed medication. Four of the 13 detainees we interviewed reported waiting weeks and months to see a doctor. They also reported that their appointments were sometimes canceled with no explanation, and that they were then placed back on the waiting list for a future appointment. In 2017, the medical unit conducted a quality improvement investigation and identified 60 to 80 clinic appointments that were canceled because contract guards were not available to take detainees from their cells to their appointments.

Detainee statements also corroborated a 2017 outside medical review that reported wait times to see a provider for both acute illness/injury and chronic care needs are often excessively long. Further, ICE's detainee death reviews for three Adelanto Center detainees who have died since fiscal year 2015 also cited medical care deficiencies related to providing necessary and adequate care in a timely manner. ICE must take these continuing violations seriously and address them immediately.

Dental Providers Do Not Provide Basic Dental Care

ICE standards expect detention facilities to provide dental care, including checkups, cleanings, and procedures, after an individual has been in detention for 6 months. The Adelanto Center, however, does not include time spent at other ICE facilities when calculating the 6 months, and only adds detainees requesting dental cleanings to a waitlist for dental care after they have been at the Adelanto Center for more than 6 months. Records indicated and center staff corroborated that the center was waiting for detainees to leave rather than providing cleanings. Further, the Adelanto Center has only two dentists on staff to provide care for up to 1,940 detainees. According to center logs, no detainees received cleanings for almost 4 years. Dental cleanings began shortly before our visit due to findings from an external medical review.

Our review of all requests for fillings since 2014 also found that although the center's two dentists identified cavities and placed detainees on a waitlist for fillings, no detainees have received fillings in the last 4 years. One detainee we interviewed reported having multiple teeth fall out while waiting more than 2 years for cavities to be filled. When we asked one of the dentists why fillings were not performed, he said he barely has time to do cleanings and screening, so as a result he does not do fillings. He offered extractions over other types of


dental care; we corroborated this information through detainee interviews. In our interviews with detainees, one reported having to wait 8 months for an extraction and another reported having the wrong tooth pulled. We reviewed the detainee dental records for tooth extraction and corroborated the detainee statements.

During our interviews, a center dentist stated that he only provides "palliative care" and does not have time to complete cleanings or fillings. The dentist dismissed the necessity of fillings if patients commit to brushing and flossing. Floss is only available through detainee commissary accounts, but the dentist suggested detainees could use string from their socks to floss if they were dedicated to dental hygiene.

## Conclusion

ICE must ensure the Adelanto Center complies with detention standards to establish an environment that protects the safety, rights, and health of detainees. Although this form of civil custody should be non-punitive, some of the center conditions and detainee treatment we identified during our visit and outlined in this management alert are similar to those one may see in criminal custody. Mitigation and resolution of these issues require ICE's immediate attention and increased engagement with the center and its operations.

## Recommendation

**Recommendation 1**: We recommend that ICE conduct a full review of the Adelanto ICE Processing Center and the GEO Group's management of the center immediately to ensure compliance with ICE's 2011 *Performance-Based National Detention Standards*. As part of this assessment, ICE must review and ensure compliance with those standards addressing:

1. Personal housekeeping requirements, associated with hanging bedsheets
2. Segregation
3. Medical Care

## Management Comments and OIG Analysis

ICE concurred with the one report recommendation. Appendix A contains a copy of ICE's management comments in their entirety. We also received technical comments from ICE, and we incorporated those comments in the report where appropriate. We consider this recommendation to be resolved and open. A summary of ICE's response and our analysis follows.



**ICE Response to Recommendation 1:** ICE concurred with this recommendation. ICE reported that it has scheduled a contractor to inspect the Adelanto ICE Processing Center, beginning October 10, 2018. The inspection is intended to gauge compliance with the 2011 PBNDS [*Performance-Based National Detention Standards*]. In addition, ICE Office of Enforcement and Removal Operations (ERO) has implemented a Special Assessment Review in response to this Management Alert. The Special Assessment Review is an additional detention facility review to target emergent concerns like those identified by the OIG. Additionally, ERO and the ICE Health Services Corps will meet to discuss an ongoing plan for providing technical assistance, monitoring, and oversight to ensure corrective actions are completed. ICE anticipates these actions to be completed by January 31, 2019.

**OIG Analysis:** We consider these actions responsive to this recommendation, which is resolved and open. We will close this recommendation when we receive sufficient evidence that ICE has completed both the full inspection of Adelanto and a Special Assessment Review that will cover the areas of concern identified in this report. Once we receive documentation that these two inspections have been completed and ICE's plan to address these reports, we will close this recommendation.

# Scope and Methodology

We visited the Adelanto ICE Processing Center as part of our larger effort to inspect ICE detention facilities. We used ICE's 2011 *Performance-Based National Detention Standards* to conduct our inspection, as these are the standards under which the center reported currently operating. These standards, which were developed in coordination with component stakeholders, prescribe the expected outcomes of each standard and the expected practices required to achieve them. ICE detention standards were also designed to improve safety, security, and conditions of confinement for detainees.

During our inspection, we interviewed the following ICE staff members: ICE Supervisory Detention and Deportation Officer, ICE Assistant Field Office Director, Detention Management and Compliance Officer, and medical oversight staff at the Adelanto ICE Processing Center. We interviewed employees of the GEO Group, including the Warden, Assistant Warden, Grievance Coordinator, Classification Officer, Segregation Supervisor, Health Services Administrator, and medical providers. We also interviewed detainees held in the general population and segregation. We reviewed documentation from previous ICE inspections, center documents, detainee records, and documentation of grievances.


As part of our inspection we toured the following areas of the center:

- General medical unit for detainees
- Kitchens
- Special Management Unit (segregation)
- Modular housing units, including individual cells
- Center intake
- Control room

We reviewed disciplinary and administrative segregation files, as well as medical files and records for detainee care, including dental logs for patients awaiting care.

We conducted this review from May 2018 to July 2018 under the authority of the *Inspector General Act 1978*, as amended, and in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency. Major contributors to this report are: John D. Shiffer, Chief Inspector; Stephanie Christian, Lead Inspector; Michael Rich, Lead Inspector; Ryan Nelson, Senior Inspector; and LaDana Crowell, Independent Reference Reviewer.



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## Appendix A
## ICE Response to the Draft Management Alert

*Office of the Chief Financial Officer*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



U.S. Immigration
and Customs
Enforcement

September 17, 2018

MEMORANDUM FOR:   John V. Kelly
Senior Official Performing the Duties of the Inspector
General

FROM:   Nathalie Asher   *Nathalie R. Asher*
(A) Executive Associate Director
Enforcement and Removal Operations

SUBJECT:   Management Response to OIG Draft Report: "Management
Alert - Issues Requiring Attention at the Adelanto ICE
Processing Center in Adelanto, California"
(Project No. 17-123-ISP-ICE MA-Adelanto)

Thank you for the opportunity to review and comment on this draft report. U.S. Immigration and Customs Enforcement (ICE) appreciates the work of the Office of Inspector General (OIG) in planning and conducting its review and issuing this report.

In its prior work, the OIG has acknowledged that treatment and care of detainees can be challenging. The OIG has reported on ICE's collaboration with stakeholders for more than a decade to improve the safety, security, and conditions of confinement for detainees. The OIG reported that ICE's Office of Professional Responsibility (OPR) implemented a thorough inspection methodology and recognized the persistent efforts of ICE's Office of Enforcement and Removal Operations (ERO) on-site detention monitoring personnel.

ICE is committed to continually enhancing civil detention operations to promote a safe and secure environment for both administrative detainees and staff. ICE utilizes a layered approach to monitor detention conditions at facilities, with processes in place to implement corrective actions in instances where non-compliance to ICE detention standards is found. ICE maintains a rigorous and multi-faceted inspection schedule for its detention facilities. ICE's detention operations are governed by national detention standards and are overseen by field office personnel, inspections by OPR, and other programmatic oversight and inspections by ERO. ICE works on a daily basis with the ERO field offices, the OPR Office of Detention Oversight, and the DHS Office for Civil

www.ice.gov


Rights and Civil Liberties to ensure that facilities comply with ICE detention standards or take the necessary corrective action to address problems and concerns.

The safety, rights, and health of detainees in ICE's care are paramount. ICE is concerned by the OIG's findings. However, the OIG's draft report lacks important context on some issues. For example, when a disciplinary infraction occurs, it may be necessary to remove the detainee from the general population while the matter is investigated to ensure the safety and security of the facility. During the investigation, the detainee is placed under administrative segregation protocols, which are less restrictive than the disciplinary protocols described. Additionally, ICE maintains a robust program to provide meaningful access to limited English proficient individuals. Current language resources include translation and interpretation through both government run and contract language lines. ICE will evaluate whether additional services may be required.

ICE concurs with OIG's single recommendation in the draft report. Attached is ICE's response to the recommendation. ICE provided technical comments under separate cover.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact us if you have any questions. We look forward to working with you again in the future.

Attachment

2



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

**Attachment: Management Response to Recommendation
Contained in 17-123-ISP-ICE MA-Adelanto**

The OIG recommended that ICE:

**Recommendation 1:** Conduct a full review of the Adelanto ICE Processing Center and the GEO Group's management of the center immediately to ensure compliance with ICE's 2011 *Performance-Based National Detention Standards* [PBNDS]. As part of this assessment, ICE must review and ensure compliance with those standards addressing:
1. Personal housekeeping requirements, associated with hanging bedsheets
2. Segregation
3. Medical Care

**Response:** Concur. ICE ERO's contracted inspection firm is scheduled to inspect the Adelanto ICE Processing Center, beginning October 10, 2018. The inspection is intended to gauge compliance with the 2011 PBNDS. In addition, ICE ERO has implemented a Special Assessment Review (SAR) in response to this Management Alert. The SAR is an additional detention facility review to target emergent concerns like those identified by the OIG. Additionally, ERO and the ICE Health Services Corps will meet to discuss an ongoing plan for providing technical assistance, monitoring, and oversight to ensure corrective actions are completed.

Estimated Completion Date: January 31, 2019.

3



## Appendix B
## Report Distribution

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
Director, ICE
ICE Component Liaison

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305

# EXHIBIT 2

| | |
|---|---|
| **From:** | Bill Freeman <wfreeman@aclunc.org> |
| **Sent:** | Wednesday, August 19, 2020 11:47 AM |
| **To:** | Coleman, Susan E.; Winslow, Sara (USACAN) |
| **Cc:** | Emilou Maclean; Genna Beier |
| **Subject:** | Wellpath contract - Zepeda Rivas |

Susan,

We respectfully but emphatically disagree with the contention that a contract for the provision of health care to detainees held by the U.S. government can be protected from discovery as a trade secret. Even if it were a trade secret, it could be appropriately protected under the existing protective order and would have to be produced. We believe that the financial terms of the contract, among others, are critical to understanding the incentive structure surrounding the provision of health care services, which goes beyond the decision whether to hospitalize a patient and potentially impacts many aspects of ICE's, GEO's, and Wellpath's care of detainees. If the contract is not provided promptly we intend to raise this issue with the Court.

Meanwhile, we request answers to the following questions today concerning the contract(s) under which Wellpath is compensated to provide medical care at Mesa Verde, so that we may properly respond to Defendants' briefing on medical care issues:

1. What period of time does the current contract cover?
2. Who are the contracting parties?
3. What organization or entity directly compensates Wellpath under the contract?
4. What is the specific basis of Wellpath's compensation? (In other words, is Wellpath compensated based on reimbursement for specific procedures performed or medications dispensed; on a flat rate based on the number of detainees in the facility on a given day; on a flat daily, monthly or annual rate; on a cost-plus basis; or on some other basis?)
5. Are there any provisions in the contract that provide for an adjustment to the payment amounts in the event of an extraordinary health crisis such as the current pandemic? If so, please describe them and whether they have been invoked in light of the pandemic.

Thank you.

Bill

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Wednesday, August 19, 2020 11:30 AM
**To:** Bill Freeman <wfreeman@aclunc.org>; Winslow, Sara (USACAN) <Sara.Winslow@usdoj.gov>
**Cc:** Emilou Maclean <emilou.maclean@sfgov.org>; Genna Beier <genna.beier@sfgov.org>
**Subject:** RE: No call today - Zepeda Rivas

The contracts are trade secret protected (particularly the $ amounts). We are not providing. Note I do not have a copy of the contract either. If you have specific questions, I may be able to get answers. I believe you'll see from the briefing today that it does not affect any medical decisions ie hospitalization or otherwise.

With regard to Edmonson, medical would prefer to wait until they receive the confirmatory lab results from yesterday's testing to make sure he is not put into a dorm where anyone is positive. Hopefully his move can be done Friday.

With regard to Lin, I've asked that he be informed of his negative Abbott results to see if that affects his suicidal ideations. There is no printout to show him.

Finally, can everyone please put the case name on the subject line? I get a million emails, many of them unrelated to this case, so the email could get buried.

Susan

**Susan E. Coleman | Partner**
444 South Flower Street, Suite 2400 | Los Angeles, CA 90071-2953
d - 213.236.2831 | t - 213.236.0600 | f - 213.236.2700
scoleman@bwslaw.com | vCard | bwslaw.com



The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Bill Freeman [mailto:wfreeman@aclunc.org]
**Sent:** Wednesday, August 19, 2020 11:23 AM
**To:** Winslow, Sara (USACAN); Coleman, Susan E.
**Cc:** Emilou Maclean
**Subject:** No call today

[EXTERNAL]

Sara and Susan,

We don't see a need for a 5 pm call today, but if you disagree, please let us know.

Susan, we would appreciate your confirmation that you are providing to us a copy of the Wellpath contract, and when we can expect it, or if you are not, a statement to that effect. Thanks.

Bill



**William S. Freeman**
*Senior Counsel*
*Pronouns: he/him*

ACLU Foundation of Northern California

39 Drumm Street, San Francisco, CA 94111

415-293-6335

# EXHIBIT 3


**Interim Reference Sheet on 2019-Novel Coronavirus (COVID-19): Detainee Care**
*Version 11.0, May 21, 2020*

---

*Key changes*

**Version 11.0**
- Updated Intake Medical Screening section to include a broader scope of signs and symptoms consistent with COVID-19 including fever, feeling feverish, chills, cough, difficulty breathing, muscle pain, sore throat, new loss of taste or smell
- Under Isolation, added minimal clinical assessment recommendations for patients with confirmed or suspected COVID-19
- Updated all links to resources on SharePoint
- Updated information for discontinuing isolation including IHSC's preference to use the symptom-based or time-based strategies unless the patient is immunocompromised

---

**Situation Summary**

The CDC is closely monitoring a pandemic caused by a novel (new) coronavirus (COVID-19). The situation is evolving and expanding with community transmission occurring in multiple countries including the United States. For the most current information, check the CDC information pages at https://www.cdc.gov/coronavirus/2019-ncov/index.html frequently for updates. CDC interim guidance for health care professionals, including clinical criteria, is available at https://www.cdc.gov/coronavirus/2019-nCoV/clinical-criteria.html.

**ICE Health Service Corps Recommendations**

*Note: recommendations will be updated if and as necessary to address the evolving public health situation. See also 2019 Novel Coronavirus Resource Page including Reducing the Risk of COVID-19 Transmission and Dental Care - Prioritizing Care and Staying Safe*

1. ***During intake medical screening:***
   - **Ask all detainees if they have had close contact[1] with a person with laboratory-confirmed COVID-19 in the past 14 days**
     i. **If the detainee responded yes to 1a),** assess for signs and symptoms consistent with COVID-19 including the following:

- Fever
- Feeling feverish
- Chills
- Cough
- Difficulty breathing
- Muscle pain
- Sore throat
- New loss of taste or smell

- If the detainee has a fever and/or symptoms consistent with COVID-19, refer to ISOLATION below.
- If the detainee does not have fever or symptoms consistent with COVID-19, refer to EXPOSURE-BASED COHORTING, below.

- If the detainee has fever and/or symptoms consistent with COVID-19 and if they have not had close contact[1] with a person with laboratory-confirmed COVID-19 or their respiratory secretions in the past 14 days → refer to a medical provider (see ENCOUNTER below).

- Educate all detainees to include the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, and requesting sick call if they feel ill.
  i. Illness Prevention and Patient Education resources in multiple languages are available on the 2019 Novel Coronavirus Resource Page.

2. ***ENCOUNTER. During sick call, health assessment, or other clinical encounter in which a detainee presents with or complains of fever and/or respiratory illness, or is observed with signs of fever and/or respiratory illness:***

   **a. If the detainee had close contact[1] with a person with laboratory-confirmed COVID-19 or their respiratory secretions in the past 14 days**
   i. → refer to ISOLATION below.

   b. If the detainee has not had close contact[1] with a person with laboratory-confirmed COVID-19 or their respiratory secretions in the past 14 days, then
   i. → Providers should use their judgment to determine if a patient has signs and symptoms compatible with COVID-19 and whether the patient should be isolated and tested. Decisions on which patients receive testing should be based on the epidemiology of COVID-19, as well as the clinical course of illness. Providers are strongly encouraged to test for other causes of respiratory illness, including infections such as influenza.
   ii. See Reducing the Risk of COVID-19 Transmission and Dental Care - Prioritizing Care and Staying Safe

  iii. See SPECIMEN COLLECTION AND LABORATORY TESTING below.
 c. Educate detainees to include the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, and requesting sick call if they feel ill.
  i. Illness Prevention and Patient Education resources in multiple languages are available on the 2019 Novel Coronavirus Resource Page.

**3. *ISOLATION and management of detainees with fever and/or symptoms of respiratory illness and who are suspected or confirmed to have COVID-19:***

- See Coronavirus Disease 2019 (COVID-19) | Housing Symptomatic Detainees
- See Reducing the Risk of COVID-19 Transmission and Dental Care - Prioritizing Care and Staying Safe.
- Place a tight-fitting surgical mask on the detainee.
- Promptly consult with a medical provider, preferably the Clinical Director or designee.
- Place the detainee in a private medical housing room, ideally in an airborne infection isolation room if available. If no single occupancy medical housing unit room is available, placement in other areas of the facility may be utilized to house the ill detainee separately from the general detention population.
- Call the local and/or state health department for notification and guidance.
- Use the eCW templates (ACUTE: COVID-19 Medical Provider Template or ACUTE: Nurse COVID-19 Template) to help guide and optimally document clinical observations and care
- Vital signs including oxygen saturation should be collected at least daily on patients with suspected or confirmed COVID-19 until the end of their isolation/observation period. Consider more frequent vital sign collection if the patient is medically vulnerable (age or comorbidities) and/or is complaining of lower tract symptoms (cough, shortness of breath or chest pain). If oxygen saturation is below 95% on room air, consult with your CD or designee for emergency department referral.
- Patients with COVID-19 may have symptoms and even complications after the acute illness, including thromboembolic phenomena; evaluate patients with a history of recent COVID-19 infection (the past 30 days) with close attention to their distal extremities, heart and lung examination.  Promptly seek consultation with your CD, RCD and/or Infectious Disease Program as necessary.
- Laboratory testing for COVID-19 is available through commercial laboratories including LabCorp and through local and/or state health departments.
 i. See SPECIMEN COLLECTION AND LABORTORY TESTING below.
 ii. Report positive test results for COVID-19 promptly to the local or state health department
- If the detainee has underlying illness or is acutely ill, or symptoms do not resolve, consult with the Regional Clinical Director, and/or Infectious Disease program.

- If the detainee is referred to a local hospital, call the hospital in advance to notify of the recent relevant travel history and respiratory symptoms and to coordinate how manage the detainee safely.
- Promptly notify the facility's staff responsible for infection prevention and control (e.g., in IHSC facilities, notify the Infection Prevention Officer, or the Facility Healthcare Program Manager (if the facility does not have an Infection Prevention Officer position); if the Infection Prevention Officer or Facility Healthcare Program Manager is not available, IHSC staff should notify the Infection Prevention Group at #IHSC_PHSP_IPO@ice.dhs.gov.
- Facilities without IHSC medical staffing should notify their assigned Field Medical Coordinator.
- IHSC Infection Prevention Officers, Facility Healthcare Program Managers, Field Medical Coordinators, or designees should notify the Regional Infection Prevention Supervisory Nurse immediately.
- Detainees isolated for respiratory illness and who have epidemiologic risk for COVID-19 exposure should wear a tight-fitting surgical mask when outside of the isolation room.
- See REPORTING below.
- The duration of the contagious period for COVID-19 is still uncertain.
  i. A person with COVID-19 is thought to be contagious starting 48 hours before symptom onset
  ii. If the detainee tests negative for COVID-19 and fever and/or symptoms persist, consult with the Regional Clinical Director and/or Infectious Disease Program
- Educate detainees to include the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, requesting sick call if they feel ill, and social distancing to maintain 6 feet (2 meters) between individuals when possible.
  i. Illness Prevention and Patient Education resources in multiple languages are available on the 2019 Novel Coronavirus Resource Page.

## 4. CRITERIA FOR DISCONTINUING ISOLATION
- Note: IHSC recommends using the symptom-based strategy for febrile and/or symptomatic patients and the time-based strategy for afebrile and asymptomatic patients, unless the patient is immunocompromised. IHSC recommends the test-based strategy for immunocompromised patients.
- Detainees that meet criteria for discontinuation of transmission-based precautions can be housed in general population.
  i. *Symptom-based strategy: patients initially presenting with fever and/or symptoms*

- At least 3 days (72 hours) have passed since recovery defined as resolution of fever without the use of fever-reducing medications **and** improvement in respiratory symptoms (e.g., cough, shortness of breath); **AND**,
- At least 7 days have passed since symptoms first appeared, **AND**
- A minimum of 14 days has passed since the first specimen collection resulting in a positive confirmatory test for an FDA EUA COVID-19 molecular assay for detection of SARS-CoV-2.

ii. *Time-based strategy: patients initially testing positive and presenting without fever or symptoms*
- A minimum of 14 days has passed since the first specimen collection resulting in a positive confirmatory test for an FDA EUA COVID-19 molecular assay for detection of SARS-CoV-2.
- If the detainee develops signs and/or symptoms consistent with COVID-19; the release from isolation precautions needs to be determined using the *symptom-based strategy* above

iii. *A detainee is clinically suspected of having COVID-19 and is not tested for disease confirmation*
- Follow the *symptom-based strategy* above to determine when it is appropriate to discontinue isolation precautions

iv. *Test-based strategy: patients initially presenting with or without fever and/or symptoms (preferred if the patient is immunocompromised)*
- *Resolution* of fever without the use of fever-reducing medications (if initially febrile) **AND**
- *Improvement* in symptoms (if initially present), **AND**
- Negative results of a Food and Drug Administration (FDA) Emergency Use Authorized (EUA) COVID-19 molecular assay for detection of SARS-CoV-2 from at least two consecutive respiratory specimens collected ≥24 hours apart (total of two negative specimens). See Interim Guidelines for Collecting, Handling, and Testing Clinical Specimens for 2019 Novel Coronavirus, **AND**
- A minimum of 14 days has passed since the first specimen collection resulting in a positive confirmatory test with an FDA EUA COVID-19 molecular assay for detection of SARS-CoV-2

5. *SPECIMEN COLLECTION AND LABORATORY TESTING for COVID-19*
- Only molecular assays for detection of SARS-CoV-2 with an FDA EUA should be used for diagnosis and clinical decisions.
- Laboratory testing for COVID-19 is available through commercial laboratories including LabCorp and through local and/or state health departments.
- See **Specimen Collection instructions on the 2019 Novel Coronavirus Resource Page**.

> i. LabCorp ordering codes are 2019 Novel Coronavirus (COVID-19), NAA; TEST: 139900.

## 6. *INFECTIOUS DISEASE PUBLIC HEALTH ACTIONS*

- Educate detainees to include the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, and requesting sick call if they feel ill.
  - i. Illness Prevention and Patient Education resources in multiple languages are available on SharePoint.
- See also 05-06-G-02 Infectious Disease Public Health Actions Guide: Isolation and Management of Detainees Exposed to Infectious Organisms.

## 7. **EXPOSURE-BASED COHORTING**

*Note: testing SHOULD NOT be used to release detainees from exposure-based cohorting before completion of the most recent incubation period*

- **Known exposure to a person with confirmed COVID-19**
  - i. Implement cohorting with restricted movement for detainees housed with the ill detainee or who have been in close contact[1] with the ill person for the duration of the most recent incubation period (14 days after most recent exposure to an ill person).
  - ii. Refer exposed detainees with new onset fever and/or respiratory illness to a medical provider for evaluation.
  - iii. Discontinue cohorting when 14-day incubation period completes with no new cases.
- **Exposure to a person with fever or symptoms being evaluated or under investigation for COVID-19 but not confirmed to have COVID-19**
  - i. Implement cohorting with restricted movement for detainees housed with the ill detainee or who have been in close contact[1] with the ill person for the duration of the most recent incubation period.
  - ii. Refer exposed detainees with new onset fever and/or respiratory illness to a medical provider for evaluation.
  - iii. If the index patient is subsequently confirmed to have COVID-19, see ***Known exposure to a person with confirmed COVID-19*** above.
  - iv. Discontinue cohorting if the index patient receives an alternate diagnosis that excludes COVID-19.
  - v. Any of the cohorted detainees with exposure risk should complete their initial 14-day monitoring period (i.e., for asymptomatic monitoring).
- **Visit dorms daily and remind detainees that medical services are available.**
  - i. Educate patients to report if they feel ill or feverish.
  - ii. Remind custody staff to report any patients they are concerned about, with special attention to those who might have fever, cough, or shortness of breath.

      iii.   Promote access to care through sick call and urgent care services.
      iv.   *Provide frequent patient education via town halls and similar dorm visits to reinforce detainee knowledge about how to access care.*

### 8. *Recommendations to the Field Office Director or Designee and the Facility Administrator or Warden for routine intake cohorting*

a. Consider housing separately from GP all new intakes for 14 days before they enter the facility's general population (SEPARATELY from other individuals who are cohorted due to contact with a COVID-19 case).

b. This could be individual housing or as a routine intake cohort.

c. If housed as a routine intake cohort, consider allowing each individual to be moved to the general population after 14 days if no fever or symptoms.

d. If any person in the routine intake cohort does develop fever or symptoms, the cohort status would be changed to an *exposure-based cohort*

e. Routine intake cohorts do not require tracking or reporting

### 9. *Recommendations to the Field Office Director or Designee Regarding Detainee Release and Special Circumstance Movement*

- Recommend all detainees being released be given the fact sheets S*teps to help prevent the spread of COVID-19 if you are sick* and *Stop the spread of germs*.

- **Recommend the following considerations if decisions are made to release in the U.S. detainees with confirmed or suspected COVID-19 and detainees exposed to a person with confirmed or suspected COVID-19:**

    i.   **For all detainees that have tested positive for COVID-19 (including detainees that have completed the isolation period) and for afebrile and asymptomatic detainees that must be released before the recommended cohorting period is complete, discuss release of the individual with state or local health department with as much advance notice as possible, preferably at least 24 hours advance notice**

- **Provide the health department with the detainee's name, intended address, email address, all available telephone numbers, and planned mode of transportation to their intended destination**

- **Coordinate with the health department to facilitate any needed public health actions; examples of public health actions include but are not limited to delivering health officer orders and making the detainee available for transportation if arranged by the health department.**

    ii.   Facilitate safe transport, continued shelter, and medical care, as part of release planning.

- Make direct linkages to community resources to ensure proper medical isolation and access to medical care if needed.

- Coordinate with the detainee for a family member or friend to provide transportation

- Advise the detainee to avoid public transportation, commercial ride sharing (e.g., Uber, Lyft), and taxis
    iii. Give the detainee the CDC's *What To Do if You Are Sick* fact sheet (see [https://icegov.sharepoint.com/sites/ihsc/phspunit/2019-nCoV/PHSPMostCurrentGuidance/patient%20education](https://icegov.sharepoint.com/sites/ihsc/phspunit/2019-nCoV/PHSPMostCurrentGuidance/patient%20education))
- Detainees under isolation or cohort should be permitted to attend other medically necessary appointments with advance coordination with the receiving facility
- Detainees under isolation or cohort should not be restricted from movement to facilitate a medically- or behaviorally necessary placement
- If a detainee under isolation or cohort must be moved to another facility; the receiving facility must be notified of the isolation or cohort end dates
    i. **Recommend to Field Office Director or designee that detainees that are in isolation, are febrile, symptomatic, have pending test results or that were exposed to a person with confirmed or suspected COVID-19 in the past 14 days NOT BE TRANSFERRED OR TRANSPORTED UNLESS MEDICALLY NECESSARY.**
    ii. See [IHSC Interim COVID-19 Risk Assessment](#) on the [2019 Novel Coronavirus Resource Page](#).
- **If a detainee is inadvertently removed that is febrile and/or symptomatic, that tests positive for COVID-19, that has a pending test result for COVID-19, or that was exposed to a person with confirmed or suspected COVID-19 in the past 14 days, recommend that the Field Office Director or designee notify the respective consulate so notifications and public health actions can occur.**

## 10. REPORTING

- Document any ill detainee who is suspected of having COVID-19 on the [Lower Respiratory Illness Tracking Tool.](#)
    i. Only document tests and results performed using molecular assays for detection of SARS-CoV-2 with an FDA EUA; do not document antibody tests or results that are not approved for diagnosis.
- Document exposure-based cohorting through routine IHSC cohort reporting protocols using the [Cohort Tracker](#).
- Any employee known to have a positive test result for COVID-19 must be promptly reported to the local or state health department in accordance with local or state public health laws and permissible exemptions under the Health Insurance Portability and Accountability Act (HIPAA) requiring notifications to public health departments for conducting investigations and interventions and to avert a serious threat to public health and safety. Reported must include the employee's name, date of birth, address, phone number, and testing location.

[1]**Close contact** is defined as:

a) being within approximately 6 feet (2 meters) of a COVID-19 case for a prolonged period of time; close contact can occur while caring for, living with, visiting, or sharing a healthcare waiting area or room with a COVID-19 case
– *or* –
b) having direct contact with infectious secretions of a COVID-19 case (e.g., being coughed on)

If such contact occurs while not wearing recommended personal protective equipment or PPE (e.g., gowns, gloves, NIOSH-certified disposable N95 respirator, eye protection), criteria for PUI consideration are met.


**Resources and references**
- [2019 Novel Coronavirus Resource Page](#) on SharePoint
- [Reducing the Risk of COVID-19 Transmission](#)
- [Illness Prevention and Patient Education](#) resources in multiple languages are available on SharePoint.
- [COVID-19 Questions and Responses](#) on SharePoint for submitting questions, receiving responses from IHSC subject matter experts, and viewing all questions and responses


**IHSC Official Guidance**

| Guidance number | Guidance name | Type |
|---|---|---|
| 05-02 | Occupational Health Directive | Policy |
| 05-02 G-04 | Occupational Health Guide: Workforce Health | Guide |
| 05-02 G-1 | Occupational Health Guide: Bloodborne Pathogens and Other Potentially Infectious Materials | Guide |
| 05-02 G-2 | Occupational Health Guide: Personal Protective Equipment Program | Guide |
| 05-02-G-03 | Occupational Health Guide: Respiratory Protection Program | Guide |
| 05-04 | Environmental Health Directive | Policy |
| 05-04 G-01 | IHSC Environmental Health Guide | Guide |
| 05-06 | Infectious Disease Public Health Actions Directive | Policy |
| 05-06 G-01 | Infectious Disease Public Health Actions Guide: Contact and Outbreak Investigation Guide | Guide |
| 05-06 G-02 | Infectious Disease Public Health Actions Guide: Isolation and Management of Detainees Exposed to Infectious Organisms | Guide |
| 05-06 G-03 | Infectious Disease Public Health Actions Guide: Surveillance and Reporting | Guide |

- **[Infection Control: Novel Coronavirus 2019 (COVID-19) | CDC](#)**
- **[Interim Guidance: Healthcare Professionals 2019-nCoV | CDC](#)** (including CDC website listing of geographic area(s) with widespread or sustained community transmission
- **[Resources for Correctional and Detention Facilities | CDC](#)**
- [CDC | Coronavirus Disease 2019 (COVID-19)](#)
- [2019 Novel Coronavirus (2019-nCoV) | TDSHS](#)
- [nCOV2019 | CDPH](#)
- [Novel Coronavirus Outbreak 2020 | Washington State Department of Health](#)
- [ADHS - Highlighted Infectious Diseases for Arizona - Coronavirus Disease 2019 (COVID-19)](#)
- [Coronavirus | NYC Health](#)
- [2019 Novel (New) Coronavirus | NYDOH](#)
- [2019 Novel Coronavirus (2019-nCoV) | Florida Department of Health](#)
- [NJ Department of Health | Communicable Disease Service | COVID-2019 (Novel Coronavirus)](#)
- [Pennsylvania Department of Health | Coronavirus](#)
- [2019 Novel Coronavirus (2019 nCoV) | Frequently Asked Questions | IDPH](#)

**Points of contact for questions**

- IHSC Staff: [COVID-19 Questions and Responses](#) on SharePoint for submitting questions, receiving responses from IHSC subject matter experts, and viewing all questions and responses
  - Regional Infection Prevention Supervisory Nurses, PHSP Unit Senior Public Health Analyst, PHSP Unit Chief

- Facilities without IHSC Medical Staffing: Assigned Field Medical Coordinators

- Public health agencies: [IHSC_InfectionPrevention@ice.dhs.gov](mailto:IHSC_InfectionPrevention@ice.dhs.gov)

**Appendix A: Intake Screening Questions**

**Updated May 21, 2020**

1. **Have you been in close contact with a person with laboratory-confirmed 2019 novel coronavirus or their respiratory secretions in the past 14 days?**
   - ➢ Last date you had contact with that person: mm/dd/yyyy

2. **Have you had fever and/or symptoms consistent with COVID-19 in the past 14 days?**
   - Signs and symptoms include fever, feeling feverish, chills, cough, difficulty breathing, muscle pain, sore throat, new loss of taste or smell
   - **If yes, what date did you first notice symptoms?: mm/dd/yyyy**
   - **If yes,** isolate and refer to a medical provider, add Medical Hold, notify FHPM, IPO, or designee.
   - See [Reducing the Risk of COVID-19 Transmission](#)
   - **If no, implement EXPOSURE-BASED COHORTING;** house in single room (preferred) if available, implement daily checks for 14 days after initial DHS apprehension, add Medical Hold, notify FHPM, IPO, or designee.

3. If no fever, symptoms consistent with COVID-19, or close contact with a person with laboratory-confirmed 2019 novel coronavirus or their respiratory secretions in the past 14 days.
   - ➢ Routine intake