WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
ANGÉLICA SALCEDA (SBN 296152)
asalceda@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
FRANCISCO UGARTE (CA SBN 241710)
francisco.ugarte@sfgov.orga
GENNA ELLIS BEIER (CA SBN 300505)
genna.beier@sfgov.org
EMILOU H. MACLEAN (CA SBN 319071)
emilou.maclean@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: 415-553-9319
Fax:     415-553-9810

*Attorneys for Petitioners-Plaintiffs*
Additional Counsel Listed on Following Page

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUIZ TOVAR, LAWRENCE MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG,

               Petitioners-Plaintiffs,

v.

DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; NATHAN ALLEN, Warden of Mesa Verde Detention Facility,

               Respondents-Defendants.

CASE NO. 3:20-CV-02731-VC

**SUPPLEMENTAL DECLARATION OF SARAH ALLEN, M.D. IN SUPPORT OF PETITIONERS-PLAINTIFFS' RESPONSE TO DEFENDANTS' SUBMISSIONS RE MEDICAL CARE AT MESA VERDE**

BREE BERNWANGER* (NY SBN 5036397)
bbernwanger@lccrsf.org
HAYDEN RODARTE (SBN 329432)
hrodarte@lccrsf.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA
131 Steuart St #400
San Francisco, CA 94105
Telephone: (415) 814-7631

JUDAH LAKIN (SBN 307740)
judah@lakinwille.com
AMALIA WILLE (SBN 293342)
amalia@lakinwille.com
LAKIN & WILLE LLP
1939 Harrison Street, Suite 420
Oakland, CA 94612
Telephone: (510) 379-9216
Facsimile: (510) 379-9219

JORDAN WELLS (SBN 326491)
jwells@aclusocal.org
STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

MARTIN S. SCHENKER (SBN 109828)
mschenker@cooley.com
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIMOTHY W. COOK (Mass. BBO# 688688)*
tcook@cooley.com
FRANCISCO M. UNGER (Mass. BBO# 698807)*
funger@cooley.com
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

*Attorneys for Petitioners-Plaintiffs*

*Admitted Pro Hac Vice*

CASE NO. 3:20-CV-02731-VC
SUPPLEMENTAL DEC. OF SARAH ALLEN, M.D. I/S/O RESPONSE RE MEDICAL CARE AT MESA VERDE

## **SUPPLEMENTAL DECLARATION OF SARAH ALLEN, M.D.**

I, Sarah Allen, declare as follows:

1. I am a Professor of Medicine in the Division of Infectious Diseases at the University of New Mexico. I am a member of the Infectious Diseases Society of America.

2. I earned a Bachelor's degree and a Master's degree from Stanford University. I earned a Medical Degree from the University of Louisville School of Medicine. I completed my residency in Internal Medicine and my fellowship in Infectious Diseases at the University of New Mexico. I have spent the past 31 years treating patients, conducting research, and teaching medical students, residents and fellows in the field of Infectious Diseases.

3. I am licensed to practice medicine in the states of New Mexico and Texas. I am board certified in internal medicine and infectious diseases. I continue to maintain my medical practice. I am on the staff of a university hospital with over 500 beds and four intensive care units. I regularly treat critically ill patients with a variety of infections caused by bacteria, fungi and viruses, and consult and advise on the treatment and infection control of hospitalized patients with severe acute respiratory syndrome coronavirus 2, SARS-CoV-2 ("COVID-19").

4. I submit this declaration in support of Plaintiffs' brief regarding appropriate medical treatment for COVID-19-positive detainees. This supplemental declaration follows my earlier declaration submitted in support of Plaintiffs' motion for preliminary injunction, which I submitted on May 22, 2020. ECF 229-18 ("Allen Decl."). As I said in my initial declaration, the conditions at Mesa Verde are dangerous, every person at Mesa Verde—staff and detainees—is at risk of infection, and the risk of severe or fatal outcomes as a result of the conditions at Mesa Verde is high. Allen Decl. at ¶ 56. I stand by my first declaration and incorporate it into this declaration.

5. In support of this declaration, I have relied on my scientific and specialized knowledge, skill, experience, training, and education. I have also reviewed the following materials:
    a. The IHSC Interim Reference Sheet COVID-19.
    b. The IHSC Hospitals and Specialty Care.
    c. The IHSC COVID-19 Assessment Algorithm.
    d. The Wellpath Policy relating to Access to Care
    e. The Wellpath Policy relating to Emergency Services
    f. The Wellpath Policy relating to Non-Emergency Services
    g. The Wellpath Policy relating to Nursing Assessment and Protocols
    h. Defendants' Status Reports Dated August 18, and August 19, 2020.
    i. Declaration of Richard Medrano, M.D.

### A. COVID-19-Positive Patients Can Deteriorate Rapidly.

6. COVID-19 is a disease caused by a highly contagious virus that is transmitted from person to person. Since submitting my first declaration in May 2020, the number of confirmed cases in the United States has increased by approximately 3.5x and the number of COVID-19-

related deaths in the United States has doubled.[1]  Since submitting my first declaration, I understand that there has been an outbreak of COVID-19 at Mesa Verde.  I understand that the first detainee in the dormitories tested positive for the virus in late July 2020.  As of August 18, there are at least 57 detainees who have tested positive for COVID-19 and approximately 30 members of the medical and facility staff who have tested positive.

7.      The rapid increase in positive COVID-19 cases at Mesa Verde is concerning because there are now a large number of recently infected individuals who could deteriorate rapidly and concurrently.  One of the reasons for the high death count is because COVID-19 patients can deteriorate rapidly, often before effective medical therapy can be provided.  Oxygen levels for COVID-19 cases can drop drastically and without symptoms.  In my earlier declaration, I explained the concept of a cytokine storm.  Allen Decl. at ¶ 11.  The body produces cytokines to fight viral infection.  If the immune system "over-responds," a "cytokine storm" can occur, which is deleterious to the host and can lead to rapid deterioration, usually requiring immediate intensive care unit management.

8.      A patient experiencing a cytokine storm can deteriorate in less than an hour.  This can occur even in patients that have previously had mildly abnormal vitals.  Cytokine storm and the corresponding rapid deterioration typically present around day 10-14 after symptoms have started.  Other forms of deterioration can occur later than day 14.

### B.     COVID-19 Patients Must Have Immediate Access to Health Care Professionals at all Times.

9.      In the three months since I issued my initial declaration, medical providers around the country have learned from treating COVID patients, shared best practices with one another, and revised hospital policies related to treating COVID patients.  In my role as an infectious disease doctor, I have continuously participated in discussions about best practices for treating COVID patients, and I have reviewed hospital policies.  Every medical facility responsible for treating COVID patients should have a plan in place specific to their facility which includes how patients are triaged, diagnosed, where they will be isolated and monitored, what criteria will be used to transfer the patient for higher level of care.  Details as to how healthcare providers should be containing spread of the infection should be very clear, including which masks should be worn, and how PPE is to be donned and doffed.  Healthcare personnel should be fit-tested for N-95 masks, and if the N-95 mask cannot be documented to be adequate for the healthcare provider, access must be available for the provider to be trained and to wear a powered air-purifying respirator (PAPR).  Face shields should be in use in addition to N-95 masks.  In addition, details of how the area housing COVID-19 infected patients will be sanitized on a daily basis should be included in the plan.  There should be easy access for patients and providers to hand-sanitize with alcohol gel, and sinks for washing hands with soap and water, and drying with paper towels should be easily accessible in bathrooms and common areas.

10.     Because of the risk of rapid deterioration resulting in death or serious medical morbidity, there must be a system in place for immediate care for patients by nurses and physicians, with

---

[1] *Compare* Allen Decl., at ¶ 8 (1.5M cases; 93,439 deaths) *with* https://coronavirus.jhu.edu/map.html (5.5M cases; 171,648 deaths).

the option to transfer the patient to a nearby medical facility with ICU care that can accept new patients (i.e. not on divert or at capacity).  All COVID-19 patients must have rapid access to health care professionals for immediate care.  In practice, this means that COVID patients must have the ability to get immediate medical care from their beds, whether that be electronically by buzzer, by telephone, or visually.  (If it is not technologically possible to implement bedside phones or buzzers, facilities can provide immediate medical-care access by staffing a medical technician to monitor COVID patients in person to watch for visual requests for immediate care, or visual signs of instability or deterioration such a behavioral changes or visual evidence of respiratory distress).  Delays in treatment—even if for less than an hour—can have fatal consequences for COVID patients.

11.     There must also be a system in place for life support or "Code Blue" situations.  Due to the risk of rapid deterioration, there must be streamlined access to life-saving treatment and emergency transportation to hospital.  There must be a system in place for very sick patients to receive life support treatment and 911 care without delay.

12.     In addition to access to immediate health care, there must also be constant monitoring.  Particularly, access to oxygen monitoring should be available to all patients.  Oxygen monitoring devices are inexpensive, but they are critical tools to monitoring COVID patients.  When COVID patients are managed in the community, each patient has their own oxygen-monitoring device.  In a dorm setting, each patient should ideally have their own oxygen monitoring.  Regardless, there must be a member of the medical staff—a nurse or medical technician—who regularly and promptly monitors oxygen levels, at least three times/day and as needed or requested by the patient.  Any patient requiring oxygen should be transferred for higher level of care.

13.     In addition to oxygen levels, each patient must have their vital signs monitored as is appropriate for their level of illness.  For asymptomatic patients, checking vitals at least twice per day may be appropriate, but sick patients require more frequent vital checks throughout each 24-hour period  (i.e. at least three times per 24-hour period, but ideally more frequently).  Vital signs are critical tools that provide a window into a patient's progress and allow attentive health care providers the opportunity to escalate treatment before a patient deteriorates.  Because medically vulnerable patients are more likely to deteriorate quickly, vulnerable patients should have their vital signs checked more frequently.  For a discussion of medical vulnerabilities, please see my first declaration.

14.     In addition to monitoring patients regularly, medical providers must also have appropriate medical supplies.  Oxygen needs to be available at all times.  Because of the high number of COVID-19 patients, a facility must have multiple oxygen tanks and nasal cannula set-ups at the ready to immediately provide to patients who see a drop in oxygen levels.  My understanding is the current supplies on hand includes 6 oxygen tanks with regulators, 3 oxygen replacement tanks, 32 oxygen masks, 10 nasal cannula, and 4 pulse oximetry machines.  I am unclear if telemetry for cardiac monitoring is available.  The information I was provided with regard to oxygen tanks do not state the size.  Even if they are H tanks, which are the largest, with high oxygen flow rates, the tanks would not last more than a few hours.  The current number of oxygen tanks on hand is inadequate.

15.     Medical providers must communicate effectively with patients on a daily basis.  Patients should be directly asked how they are feeling with specific questions related to cardiac, respiratory, gastrointestinal, neurologic, limb pain, etc.  Sick patients, and patients in settings where there is a significant power disparity are often reluctant to "complain" or voice medical concerns.  Each patient should be informed of his or her rights and the reasons why constant monitoring and monitoring tools are being provided.  Empowered patients are important participants in their own health care.  Medical staff should explain the purpose of oxygen monitoring, inform patients of how and when to contact medical staff, and educate them on COVID-19.  This includes informing patients that COVID can be rapidly lethal, even with excellent medical care.  Patients should be informed about the purpose of checking vitals, how to prevent transmission, signs of deterioration, and what symptoms to report, etc.  However, patients are not responsible for treating themselves or monitoring other patients.  Medical staff must be vigilant in constantly checking vitals and oxygen levels, and asking patients about their symptoms.

16.     Healthcare providers should be communicating regularly with one another so there are no gaps in treatment.  Healthcare providers should be regularly updating patient charts.  There should be systems in place so that there is constant communication between medical staff team members on all patients, whether symptomatic or asymptomatic.  Communication should be required at the ends of shifts.

17.     All detainees should have ready access to hand sanitizer.  Cleaning staff should regularly spray down all community surfaces in the COVID dorm with appropriate sanitizing after patients come in contact with the surface, such as is done by individuals in gymnasiums that have re-opened for use in the United States during the COVID pandemic.  In addition, rooms and housing units that house COVID patients must be sanitized by an adequately trained detention center facility employee at least once each day, as well as when visible body fluid is noted anywhere in the unit.  Increased sanitization procedures must be implemented to decrease the amount of virus in patient settings and reduce the likelihood of transmission throughout the facility.

18.     Protocols should be in place when people—detainees, staff, healthcare providers—leave the COVID dorm.  Even if wearing a mask in a COVID-infested room, such as the COVID dorm, virus will contaminate the outer surfaces of masks and clothing and there is a risk of virus spreading in common areas throughout the facility.

### C.     Defendants' Practices Fail to Meet the Appropriate Level of Care.

19.     I have reviewed Defendants' written policies, declarations, and other evidence in this case.  In my opinion, Defendants have failed to provide the appropriate level of care to COVID patients in their care.  For the reasons explained below, Defendants need to take significant, immediate steps to improve the degree of patient monitoring, provide bedside access to medical care, and streamline access to emergency medical care.

20.     First, it is very concerning that Defendants do not have a facility-specific COVID treatment plan for Mesa Verde.  Treating COVID patients requires a tremendous amount of resources and planning because patients can deteriorate rapidly and because the virus is so

4

contagious. Facility-specific treatment plans must be in place because COVID outbreaks can spread in days, quickly overwhelming resources and staff. The fact that no written policy specific to Mesa Verde exists reflects a concerning lack of preparation.

21.     I understand that Defendants require known COVID patients, like all other detainees, to fill out forms in order to request access to medical care, which Defendants refer to as "sick call slips." That is an entirely unsafe and inappropriate practice. Those who have tested positive for COVID should be entitled to medical care at all times. Indeed, infected persons should be constantly monitored at all times and patients should be assessed immediately for any concerning clinical signs such as change in vital signs, symptoms of chest pain, pneumonia, sepsis, altered mental status or ischemia to a limb. If any ambiguity exists as to whether a COVID patient needs medical attention, the provider should err on the side of caution because of the extreme consequences of failing to act.

22.     I understand that patients who request "sick call slips" are "typically" seen within 24 hours (though some have reported having to wait longer, even after testing positive for COVID). That is an inappropriate and dangerous delay. A system that typically fails to treat patients for up to 24 hours (or more) is dangerous. Patients who have tested positive for COVID should be seen immediately.

23.     COVID patients should not be required to leave their beds to call for a nurse. Requirement to leave a bed to complete paperwork or otherwise seek help may endanger a COVID-infected patient, even one previously thought to be stable, by causing excessive heart or pulmonary strain, syncope, or falling. COVID patients should be entitled to prompt nursing care at all times, with immediate medical care if indicated. In a multi-patient cohort setting, COVID-infected persons should be visually monitored at all times as not all patients may be physically able to call for a nurse, or unable because of mental status changes brought on by hypoxia or onset of a systemic inflammatory response syndrome such as a cytokine storm. The goal of any COVID treatment plan should be to remove, rather than build, barriers to treatment.

24.     Defendants' resources fail to meet the appropriate level of care. I understand that Defendants have only four pulse oximetry devices for the entire facility. It is very difficult if not impossible to actively monitor 57 COVID patients' oxygen levels with only four pulse oximetry devices. Ideally, each patient should have their own pulse oximetry device. Furthermore, as explained above, the available oxygen supplies are insufficient.

25.     I have not seen any evidence that indicates Defendants are testing for any other respiratory viruses. COVID patients cohorted with other COVID-infected patients will be at a greater risk of complications or death in the facility than if released. Early in the COVID epidemic it was determined that COVID patients are often co-infected with other respiratory pathogens, such as respiratory syncytial virus, metapneumovirus, rhinovirus, and adenovirus. Patients with dual respiratory pathogens are at higher risk for deterioration because multiple respiratory pathogens can have a synergistic, deleterious effect on a patient. Housing multiple COVID patients together runs the risk of spreading these secondary pathogens within the already sick COVID patient population and increasing the likelihood of poor outcomes. In addition, as of this declaration, it is not yet influenza season, but when it is, we expect to see more COVID-

influenza co-infections and thus sicker patients. For these reasons, cohorting multiple COVID patients together is generally less safe than individual isolation. Best practices for any medical facility in the United States is only one COVID patient per room. Indeed, even in makeshift or triage hospitals, tents or other protective shielding are erected in an attempt to isolate patients and mitigate the risk of other respiratory infections. Defendants' own protocols recognized that COVID-positive patients should be medically isolated.

26. Accordingly, patients housed in the COVID dorm at Mesa Verde are not just at greater risk because of the barriers to treatment, insufficient monitoring, lack of resources, and unhygienic conditions. They are also at risk because their proximity to other sick patients increases the likelihood of contracting other infections that impede their ability to fight off COVID.

27. Releasing detainees to the community, provided that they have space to isolate in place, will protect the community, healthcare staff, guards, and other detainees. Releasing appropriate detainees to the community is likely to decrease the strain on community resources and community hospitals.

### D. Conclusion

28. The level of medical care at Mesa Verde fails to meet the appropriate standard of care for the management and care of COVID-infected patients. Treating COVID patients requires care tailored to the individual patient, taking into consideration the patient's age, medical co-morbidities, risk factors, and severity of illness. COVID patients housed at Mesa Verde have insufficient access to medical care, insufficient monitoring, and under-resourced care. The lack of a facility-specific COVID plan and the barriers to medical treatment are deeply troubling.

29. The conditions at Mesa Verde suggest that COVID-positive detainees are more likely to have fatal or severe clinical outcomes than they would if they were released, so long as they have access to effective isolation, monitoring and emergency care upon release. These patients are more likely to become infected with other respiratory viruses at Mesa Verde due to the lack of individual isolation capability. Patients are more likely to suffer from delays in care due to the numerous barriers to treatment identified here.

30. Three months ago I declared that it was very likely people will become infected and die because of the unsafe conditions at Mesa Verde. Allen Decl. at ¶ 56. Having reviewed the guidance Defendants follow when treating COVID patients and other evidence in this case, I unfortunately stand by that conclusion today.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief. Signed on August 20, 2020 in Albuquerque, New Mexico.

*[signature]*

Sarah E. Allen, M.D.
Professor of Medicine
University of New Mexico
Division of Infectious Diseases,
DoIM MSC 10-5550, 1 University
Albuquerque, New Mexico 87131