WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
ANGÉLICA SALCEDA (SBN 296152)
asalceda@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Attorneys for Petitioners-Plaintiffs*
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
FRANCISCO UGARTE (CA SBN 241710)
francisco.ugarte@sfgov.orga
GENNA ELLIS BEIER (CA SBN 300505)
genna.beier@sfgov.org
EMILOU H. MACLEAN (CA SBN 319071)
emilou.maclean@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: 415-553-9319
Fax:    415-553-9810

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUIZ TOVAR, LAWRENCE MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG,<br><br>Petitioners-Plaintiffs,<br><br>v.<br><br>DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; NATHAN ALLEN, Warden of Mesa Verde Detention Facility,<br><br>Respondents-Defendants. | CASE NO. 3:20-CV-02731-VC<br>**DECLARATION OF SUSAN BEATY IN SUPPORT OF PETITIONERS-PLAINTIFFS' RESPONSE TO DEFENDANTS' SUBMISSIONS RE MEDICAL CARE AT MESA VERDE** |

BREE BERNWANGER* (NY SBN 5036397)
bbernwanger@lccrsf.org
HAYDEN RODARTE (SBN 329432)
hrodarte@lccrsf.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA
131 Steuart St #400
San Francisco, CA 94105
Telephone: (415) 814-7631

JUDAH LAKIN (SBN 307740)
judah@lakinwille.com
AMALIA WILLE (SBN 293342)
amalia@lakinwille.com
LAKIN & WILLE LLP
1939 Harrison Street, Suite 420
Oakland, CA 94612
Telephone: (510) 379-9216
Facsimile: (510) 379-9219

JORDAN WELLS (SBN 326491)
jwells@aclusocal.org
STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

MARTIN S. SCHENKER (SBN 109828)
mschenker@cooley.com
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA  94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIMOTHY W. COOK (Mass. BBO# 688688)*
tcook@cooley.com
FRANCISCO M. UNGER (Mass. BBO# 698807)*
funger@cooley.com
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

*Attorneys for Petitioners-Plaintiffs*

*Admitted Pro Hac Vice*

CASE NO. 3:20-CV-02731-VC
DECLARATION OF SUSAN BEATY I/S/O RESPONSE RE MEDICAL CARE AT MESA VERDE

## DECLARATION OF SUSAN BEATY

I, Susan Beaty, hereby declare and state as follows:

1. My name is Susan Beaty. I am an attorney admitted to practice law in the state of California (CSB# 324048).  I am employed as a staff attorney in the Immigrants Rights' Project at Centro Legal de la Raza ("Centro Legal"), a non-profit organization that provides free legal services to low-income, immigrant, Black, and Latinx people in the Bay Area.

2. Centro Legal represents a number of individuals detained at the Mesa Verde Detention Facility ("MVDF") and coordinates a bimonthly Legal Orientation Program at the facility. Through our Post-Release Accompaniment Project (PRAP), Centro also supports people coming out of immigration detention, working with a large network of volunteers to connect recently released immigrants with transportation, housing, medical care, and other social services.

3. Since the COVID-19 pandemic began in March, 2020, I have spoken with multiple individuals detained at MVDF nearly every single working day. I have taken contemporaneous notes during these calls. Detained people have reported a number of concerns regarding the access and adequacy of medical care provided. What follows are summaries of recent conversations with people at Mesa Verde regarding these concerns.

**Barriers to accessing timely, adequate medical care**

4. **People detained at MVDF consistently report that it is very difficult to obtain timely medical care. Detained people can request medical care by sending a message through the tablets in their dormitories, or by alerting GEO staff members in their dorms.**

5. **Many people have told us that it takes multiple days to be seen by a doctor after requesting medical care on the tablet (submitting a "sick call slip"), even after they have reported concerning COVID-19 symptoms.**

6. For example, on August 4, I spoke with German Najera Grajera ("Mr. Najera Grajera"). Mr. Najera Grajera reported that he had been feeling sick for several days, and that he told GEO officials in his dorm that he was not feeling well, and asked to see a doctor. He put in a "kite," or written request to see a doctor on August 1. Two days later, on Monday, August 3, Mr. Najera Grajera was brought down to medical and a doctor told him he tested positive for COVID-19. He reported that medical staff told him "do not tell anyone in the dorm that you tested positive." He was then returned to the dorm for several hours.

7. On August 6, I spoke with William Matias ("Mr. Matias") in dorm C. He reported that he has a liver condition, and that he had been experiencing alarming symptoms-- head and body aches and diarrhea -- for about 5 days. He said he had requested two medical appointments in the prior two weeks, and it took three days to get an appointment each time.

8. On Tuesday, August 11, my colleague Lisa Knox spoke with Raleigh Figueras ("Mr. Figueras"). He reported that he suffers from hypertension, and that he began experiencing the symptoms of COVID-19 about a week prior. He reported that he requested a medical appointment and a COVID-19 test on August 8, but was not seen by medical staff until August 10. On August 10, he was brought down to medical and told that he tested positive for COVID-19.

9. On August 20, I spoke with Walter Cruz Zavala ("Mr. Cruz Zavala") in dorm B. He said that many people in the dorm are sick with symptoms of COVID-19, and have requested medical appointments through the kite system. He said that it is currently taking about 3 days to get an appointment, even for people with COVID-19 symptoms.

10. **Many class members have reported to us that GEO staff members in the dorms have failed to alert medical staff, or delayed in alerting medical staff, when people are experiencing concerning symptoms related to COVID-19.**

11. For example, Centro Legal represents Yao Saeturn ("Mr. Saeturn"), a 65 year-old man who suffers from a number of medical conditions which render him vulnerable to complications from COVID-19, including hypertension, cerebrovascular disease with significant functional limitations as a result of a prior stroke, and gout. Mr. Saeturn also speaks very little English. On August 1, I spoke on the phone with Mr. Cruz Zavala, Gabriel Yucate-Camey ("Mr. Yucate-Camey"), and Asif Qazi ("Mr. Qazi") about Mr. Saeturn. They each informed me that during the late evening on July 31, Mr. Saeturn was removed from their dormitory by medical staff. Mr. Qazi reported that Mr. Saeturn had been showing symptoms consistent with COVID-19 for at least two days – including body ache, coughing, and extreme fatigue. Mr. Qazi said that he and other men in the dorm had informed GEO officers in the dorm about Mr. Saeturn's condition at least four times. Mr. Qazi said that facility staff told him multiple times that Mr. Saeturn "looked fine" and refused to give Mr. Saeturn treatment. Mr. Qazi said that Mr. Saeturn's symptoms became increasingly severe over the course of the day on Friday, July 31, until he was removed from the dorm and then hospitalized.

12. On August 4, I spoke with Israel Parra ("Mr. Parra") in dorm B. He said that he began feeling ill around July 31, and sent a kite via the tablet to request a medical appointment. He did not receive a response. At a mental health appointment on August 2, he informed his practitioner and another staff person in the medical unit that he was feeling sick. His concerns were not addressed, and he was sent back to the dorm. The following day, on August 3, he was brought back down to medical and informed that he had COVID-19.

13. Also on August 4, I spoke with Margarito Zamorra Guzman ("Mr. Zamorra"). He said he was 54 years old, blind, and had only one functioning lung. He said he began experiencing the symptoms of COVID-19 on August 3, 2020, including a dry cough, chills, fever, body aches, dizziness, and headaches. He said he told GEO officials he was feeling sick on August 3 and August 4, and requested to see a doctor, but still had not received any medical care by the time we spoke.

14. Eight days later, on August 12, I spoke with Mr. Zamorra in Dorm B after he had tested positive for COVID. He reported that he had now been ill for over a week, and that his many requests for medical attention were ignored until he fainted on Monday, August 10. He said he was brought to the hospital for several hours, and then returned to the dorm. At the time of our call, he reported suffering from a cough, fever, chills, and body aches, and that he had not eaten in three days. He was only able to stay on the phone for about 10 minutes, and then he felt weak and returned to his bed. On August 14, Mr. Zamorra was re-hospitalized. I understand that he remains in the hospital with no future plan for discharge.

15. On August 4, I spoke with Jose Ruiz ("Mr. Ruiz"). Mr. Ruiz reported that he has asthma, sinusitis, and only one seeing eye due to an attack he suffered in El Salvador. He said that he began feeling sick with the symptoms of COVID-19 around 6 days earlier, and told GEO guards that he was not well and wished to see a doctor multiple times, but never received medical care. On August 3, he was finally brought down to medical and told that he tested positive for COVID-19.

16. A week later, on the morning of August 11, my colleague Ms. Knox spoke with Mr. Ruiz in dorm B. He reported that he was having difficulty breathing, and coughed throughout the conversation. He reported that he had a 105 degree fever, was scared for his life, and wanted to go to the hospital. He said he had asked the nurses and the GEO officials in the dorm several times that day to please take him to the hospital. At around 8pm on August 11, I received a call from Mr. Parra (another member of Mr. Ruiz's dorm). He reported that Mr. Ruiz's condition had worsened, and that Mr. Ruiz had just been removed from the dorm in a wheelchair. Mr. Parra said that Mr. Ruiz was extremely sick and bedridden for over three days, and that he and other men in the dorm had asked GEO staff to take Mr. Ruiz to the hospital several times a day.

17. On August 9, my colleagues received several calls from people in dorm B regarding Christian Orellana ("Mr. Orellana"). Callers reported that Mr. Orellana was extremely ill, and had collapsed on the floor beside his bed. They said that several men in dorm B had alerted guards to Mr. Orellana's collapse, but the guards refused to call in medical personal, and instead told Mr. Orellana to get up and walk to his bed. At the time of the call, Mr. Orellana was in his bed having difficulty breathing, and experiencing high fever, body aches, chills, headaches, and dizziness. Shortly thereafter, my colleague Ambar Tovar spoke with Mr. Orellana, who told her that he was afraid he was going to stop breathing. Mr. Orellana confirmed that he and other men in the dorm alerted MVDF staff of his condition, but that he had not received medical care. Mr. Orellana was not seen by medical staff personnel for at least 24 hours following his collapse, and days later by a medical doctor. Similarly, when Mr. Orellana first exhibited COVID-19 related symptoms, he was simply told to put in a medical request and wait to be called. Mr. Orellana, who also suffers from a mental illness, felt anxious about the wait time and asked to be seen by the therapist. It was only upon seeing his therapist that Mr. Orellana was immediately transferred to medical due to his high fever.

18. On August 11, my colleague Ms. Knox spoke to Mr. Figueras in dorm B. Mr. Figueras reported that GEO staff visited the COVID-19 dorm twice a day to take people's temperatures and oxygen levels, but did not provide any additional medical care. He reported

that multiple people in the dorm were very ill, and unable to get out of bed. He reported that many people in the dorm had alerted GEO staff of their symptoms and worsening health conditions, but GEO staff did not seek medical care on their behalf.

19. That same day, Ms. Knox spoke with Mr. Cruz Zavala, who reported he was also COVID-19 positive in dorm B. He said that he had a high degree fever, and was having difficulty breathing or staying out of bed for more than a few minutes at a time. He said he had told GEO staff multiple times that he did not feel well and wanted to see a doctor, but had not received medical attention since being moved into the COVID-19 dorm days earlier.

20. **People at MVDF consistently report that, even when symptomatic people are able to get medical attention, medical staff do not provide adequate care, and until recently, declined to test them for COVID-19.**

21. On August 6, Mr. Matias told me that after waiting three days to get a medical appointment to discuss his concerning COVID-19 symptoms, he was forced to wait in the medical holding tank with 4 other people until the doctor could see him. He said the tank was not sanitized before or after he was in it. He said that another appointment, a nurse mistakenly injected him with insulin because she confused him for another detained person. He said he asked the nurse, why did you inject me with insulin if I am not diabetic. He said the nurse replied, "I'm sorry, I thought you were someone else."

22. On Monday, August 10, my colleague Ms. Knox spoke with Mr. Figueras, who had been experiencing symptoms of COVID-19 for about six days. Mr. Figueras reported that when he went to medical earlier that day, a nurse told him he "very likely" had COVID-19 due to his symptoms (he lost his sense of taste, among other things), but he was sent back to the dorm without being tested. He said that he took a nap, and about 4 hours later he was brought back down to medical and administered a rapid COVID-19 test. He tested positive, and was then transferred to dorm B.

**Climate of distrust of medical staff due to lack of information**

23. **Since the start of the pandemic, I have heard countless reports that MVDF staff do not provide adequate information to detained people related to the COVID-19 outbreak. As a result, detained people consistently report that they do not trust the medical staff, or the GEO guards, to keep them safe or healthy.**

24. Detained people have reported to our staff that they are not consistently informed about the results of their COVID-19 tests. Multiple individuals we have spoken to who were moved into dorm B since the outbreak began were never told that they tested positive for COVID-19, they were simply transferred into the COVID dorm.

25. Several other individuals reported that they were informed of their positive test results in a large group setting, before being moved into dorm B. For example, on August 20, Mr. Yacute Camey reported that he learned of his COVID status MVDF staff came into dorm C

Declaration of Susan Beaty ISO Plaintiffs' Response Re: Medical Care            4

and told a group of about 30 men that they had all tested positive. He said MVDF staff read names off of a list, and did not provide any additional information about COVID-19 symptoms, complications, or treatment.

26. Many detained people report that, because of how GEO and ICE have mismanaged the outbreak, they do not trust MVDF staff to correctly identify COVID-19 cases. On August 14, I spoke with Mr. Wei Lin, who said he was mistakenly put into the COVID-19 dorm for about an hour before being returned to dorm D. That same day, several other people in dorm D called and corroborated his story. They reported that people in the dorm were very upset about possible contamination, and no longer trusted MVDF staff to provide accurate test results.

27. **In addition to not learning whether they have COVID-19, detained people have also not been given basic information about what it means to have tested positive, signs and symptoms to watch out for, and when to alert MVDF staff. Nurses administering health checks do not explain the significance of temperature, oxygen, and blood pressure tests, or what levels are healthy or normal.**

28. For example, on August 5, Mr. Parra reported that he told a GEO guard that he was scared about potential complications of COVID-19, particularly because he has diabetes. He told me that the GEO guard told him not to worry because COVID-19 is "just like a cold" and that he would be "fine" in about 10 days.

29. On August 20, Mr. Cruz Zavala reported that the only information he has on warning signs for complications were received from another detained person, who told him that a fever of above 104 is significant. Mr. Cruz Zavala told us that when he was informed that he had tested positive for COVID-19, he was with a three other men who all received the news together. Mr. Cruz Zavala says that the staff person only informed the group of their positive result, and that they would be moved to dorm B. They received no other information. He reported that now, when the medical staff comes into dorm B to perform temperature, oxygen, and blood pressure checks, they do not tell detained people the results of these checks. He also said that some of the medical staff are monolingual English speakers, and cannot communicate with the majority of the people in the dorms.

30. On August 20, I also spoke with Mr. Yacute Camey, in dorm B. He asked me how to treat COVID-19, and what medication is best for the illness. I asked him what MVDF staff had told him about how to treat COVID-19, and what he needs to get better, and said that staff had told him "nothing" about treatment. Mr. Yacute Camey also reported that detained people often have to help each other with interpretation when communicating with nurses and doctors during medical visits in the dorms.

**Inhumane conditions of confinement, and inability to control those conditions**
31. People at MVDF have also complained about other concerning conditions of confinement, including rotten and non-nutritious food and unsanitary and unhygienic living quarters. Detained individuals also complain that they are unable to control these conditions; they have little to no control over what food they eat, when and how often they can exercise, the

temperature or air flow of the dorms, or how many people they share living space with. In response to these conditions, and out of fear for their lives, people inside of MVDF have organized a series of protests. Since the start of the pandemic, they have gone on hunger strike four times, and labor strike once, to protest ICE and GEO's response to the pandemic.

32. **People detained at MVDF report that GEO staff do not clean the common areas in the dormitories, and that the cleaning supplies provided in the dorm are watered down, insufficient, and ineffective.** Individuals in Dorm B, all of whom have COVID-19, and several of whom are extremely ill, have been forced to clean the floors, bathrooms, and shared surfaces daily in order to keep the dorm clean.

33. **Many people have also complained about the quality of the food served at Mesa Verde.** I have been told countless times that people at MVDF are regularly served rotten and spoiled food; that they do not receive fresh fruits or vegetables or real meat; and that the portions are extremely small and people often leave meals feeling hungry. People inside MVDF organized an entire hunger strike demanding higher quality food to keep them nourished amidst the pandemic.

34. **Many people at MVDF have told me that their inability to change their living conditions has a profound negative impact on their mental health.**

35. For example, on August 4, Mr. Najera Grajera said he was feeling extremely ill, and had not received any medical care since being moved to isolation the previous day, and had been ignored by MVDF staff outside of his solitary cell. He said that he was very scared, alone, and claustrophobic. He told me "These people in here, they don't see us as human. They see us as animals. And they treat us like animals."

36. On August 10, Mr. Parra, reported that most of the men in dorm B were not sleeping at night, and that he had been kept up the night before by the sounds of wheezing and coughing. He said that he and the other men in the dorm were afraid of dying. He thinks it's only a matter of time before "ICE and GEO kill someone in here."

37. On August 11, Mr. Orellana described how being in a room full of people who were also sick was making him feel anxious, paranoid, and that he was beginning to hear more voices. On August 14, Mr. Orellana reported that he was transferred to the Restrictive Housing Unit under Level 1 Suicide Watch. Shortly thereafter, Mr. Orellana was transferred to a small intake room where he remained until he was hospitalized for psychiatric care.

38. On August 19, Mr. Yacute-Camey reported that people in the COVID-19 dorm were feeling very depressed and desperate. He said, "If I was on the outside, I would be able to quarantine. I could change the thermostat. I could eat healthier food. I could go to the hospital if I was really sick. I can't do any of that in here. We have to depend on the staff, and they don't care about us, and won't do anything for us, even if we are dying." He said that many people in the dorm are terrified of deportation, but at this point "some people would rather be deported and face death in their home countries, than face death in the hell that is Mesa Verde."

**Safe Release Planning for Individuals with COVID-19**

39. As mentioned above, my organization represents a number of people at Mesa Verde, and runs a program to assist people leaving ICE detention. In the past 5 years, we have coordinated release plans for over 300 people leaving Northern California detention facilities.

40. Since the start of the COVID-19 pandemic, we have created and executed release plans for dozens of individuals leaving MVDF. We have helped many individuals who do not have family to stay with find housing, including at local hotels and shelters, where they can quarantine safely. We work with a large network of community organizers and volunteers in Bakersfield (and across the state) who can check on released individuals, deliver meals, and provide rides to medical appointments if needed. We have also worked with doctors and public health officials to coordinate medical care for people leaving detention with COVID-19.

41. Each release plan for an individual with COVID-19 must detail how an individual can isolate safely and be monitored for any concerning signs or symptoms that require immediate medical assistance. Usually, this type of monitoring can be done by a family member, friend, or other supportive community member. For particularly vulnerable individuals, or those who are experiencing severe symptoms, our team can also work with health care professionals to ensure the individual's safe release into the community. In the case of our client Mr. Saeturn, for example, after ICE left him at the Emergency Room, we worked with a network of pro bono doctors to provide him wrap-around health services when he was released from the hospital.

42. My organization remains committed to supporting the safe release and reintegration of our community members.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 20th day of August, 2020 in Berkeley, California.

Susan Beaty