WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
ANGÉLICA SALCEDA (SBN 296152)
asalceda@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Attorneys for Petitioners-Plaintiffs*
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
FRANCISCO UGARTE (CA SBN 241710)
francisco.ugarte@sfgov.orga
GENNA ELLIS BEIER (CA SBN 300505)
genna.beier@sfgov.org
EMILOU H. MACLEAN (CA SBN 319071)
emilou.maclean@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: 415-553-9319
Fax:    415-553-9810

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUIZ TOVAR, LAWRENCE MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG,<br><br>Petitioners-Plaintiffs,<br><br>v.<br><br>DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; NATHAN ALLEN, Warden of Mesa Verde Detention Facility,<br><br>Respondents-Defendants. | CASE NO. 3:20-CV-02731-VC<br><br>**DECLARATION OF ALLEN KELLER, M.D. IN SUPPORT OF PETITIONERS-PLAINTIFFS' RESPONSE TO DEFENDANTS' SUBMISSIONS RE MEDICAL CARE AT MESA VERDE** |

CASE NO. 3:20-CV-02731-VC
DECLARATION OF ALLEN KELLER, M.D. I/S/O RESPONSE RE MEDICAL CARE AT MESA VERDE

BREE BERNWANGER* (NY SBN 5036397)
bbernwanger@lccrsf.org
HAYDEN RODARTE (SBN 329432)
hrodarte@lccrsf.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA
131 Steuart St #400
San Francisco, CA 94105
Telephone: (415) 814-7631

JUDAH LAKIN (SBN 307740)
judah@lakinwille.com
AMALIA WILLE (SBN 293342)
amalia@lakinwille.com
LAKIN & WILLE LLP
1939 Harrison Street, Suite 420
Oakland, CA 94612
Telephone: (510) 379-9216
Facsimile: (510) 379-9219

JORDAN WELLS (SBN 326491)
jwells@aclusocal.org
STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

MARTIN S. SCHENKER (SBN 109828)
mschenker@cooley.com
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA  94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIMOTHY W. COOK (Mass. BBO# 688688)*
tcook@cooley.com
FRANCISCO M. UNGER (Mass. BBO# 698807)*
funger@cooley.com
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

*Attorneys for Petitioners-Plaintiffs*

*Admitted *Pro Hac Vice*

CASE NO. 3:20-CV-02731-VC
DECLARATION OF ALLEN KELLER, M.D. I/S/O RESPONSE RE MEDICAL CARE AT MESA VERDE

**Declaration of Allen Keller, MD**

I, Allen S. Keller, M.D., hereby declare under penalty of perjury, that the following is true and correct to the best of my knowledge.

1. I am an Associate Professor at New York University School of Medicine (NYUSoM) in the Departments of Medicine and Population Health, and an Attending Physician in the Bellevue Hospital Primary Care Medical Clinic, at the oldest public hospital in the United States.

2. I have over 30 years of experience working with refugees, asylum seekers, and other vulnerable populations, including over 25 years of experience evaluating victims of severe trauma. This includes conducting thorough assessments of their physical, mental health and social problems; making determinations of the veracity of their allegations of trauma; and providing ongoing treatment addressing the physical, psychological and social health consequences of their trauma.

3. In 1995, I co-founded Bellevue/NYU Program for Survivors of Torture (PSOT) in New York City and from 1995-December 2018 served as PSOT's Director. PSOT is co-sponsored by Bellevue Hospital and NYUSoM. PSOT provides comprehensive, interdisciplinary medical, mental health and social services to immigrants who have suffered torture and other severe traumatic events. I am co-founder and Director of the NYU Center for Health and Human Rights (CHHR). Founded in 2000, CHHR conducts scholarly work and research on issues relating to health and human rights including torture and related trauma, prison conditions and forced migration.

4. I have over 25 years of experience evaluating prison conditions. From 2009 to 2016, I served as Co-Chair of the Immigration Detention Health Advisory Group for the U.S. Department of Homeland Security Immigration and Customs Enforcement NGO working group. In this role I also was part of several delegations visiting ICE detention facilities throughout the United States. I continue to conduct research on the conditions of detention and related health consequences. I am the author, coauthor and editor of nearly 100 scholarly publications on the evaluation and treatment of victims of trauma/human rights abuses; and prison conditions, including the health consequences of immigration detention.[1] To date, I have visited over 20 immigration detention facilities throughout the United States.

5. I have served as a medical expert on various investigations of immigration detention facilities. In 2004, I was appointed as an expert by the U.S. Commission on International Religious Freedom (USCIRF) for their congressionally mandated study on the expedited removal process for asylum seekers, which examined all aspects of the process including

---

[1] *See e.g.*, Granski, Megan; Keller, Allen; Venters, Homer, Death Rates among Detained Immigrants in the United States. International journal of environmental research & public health. 2015 Nov 12; 12(11):14414-14419.

immigration detention.[2] In 2017, I served as a medical expert for a review conducted by Human Rights Watch on medical care and deaths of immigrants in detention entitled "Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention."[3]

6. I am providing this expert declaration pro bono.

**Summary of Review of Records of Medical Care and Treatment of COVID-Positive Individuals at Mesa Verde**

7. I am providing this declaration to analyze the medical treatment provided to COVID-positive patients at Mesa Verde. For this review, I have been provided access[4] to the medical records of four individuals at Mesa Verde who were recently identified as COVID-infected and whose health has deteriorated to such a degree that they were transferred to a hospital for emergency medical care, in one case repeatedly. In some cases, these individuals were ultimately hospitalized and in other instances they had emergency medical care but were not subsequently admitted.

8. The four individuals whose medical records I reviewed[5] are:

    a. Margarito Zamora Guzman (who has been hospitalized for approximately one week),
    b. Jose Ruiz,
    c. German Najera Grajeda,
    d. Yao Saeturn (who was apparently hospitalized following his release from custody to the hospital).

9. I have also reviewed the COVID-19 testing history of these individuals and others at Mesa Verde, to the extent it was made available to Plaintiffs and to me. I understand, however, that there are some concerns from Defendants about the accuracy of this information as it had previously been provided so I am providing my best understanding of the testing history from a review of the records made available to me.[6]

10. These four individuals were identified as exemplars to allow me to evaluate the COVID-related medical care and treatment at Mesa Verde in light of the serious outbreak at the Facility that has left more than half of the detainees infected with the virus. While these

---

[2] *Report on Asylum Seekers in Expedited Removal*, available at https://www.uscirf.gov/reports-briefs/special-reports/report-asylum-seekers-in-expedited-removal.
[3] *Available at* https://www.hrw.org/report/2017/05/08/systemic-indifference/dangerous-substandard-medical-care-us-immigration-detention
[4] I have reviewed and signed the protective order governing access to these medical records.
[5] As the medical records were only provided to me mid-day on August 19, I only had approximately 24 hours for this review. Because of time limitations for review, I have not attached the medical records as exhibits to this declaration but would provide them upon request to the Court if desired.
[6] Dkt. 587 at n. 1 ("Defendants had previously included testing history in this spreadsheet. With the flurry of recent testing activity, Defendants discovered some possible discrepancies in the spreadsheet testing history and continue to be in the process of consulting with Wellpath to ensure accuracy.").

four individuals have unique vulnerabilities and COVID experiences, because they were ultimately hospitalized, an evaluation of their care and treatment helps to identify how Mesa Verde health personnel responded to their vulnerabilities, their diagnoses, their symptoms and the ultimate deterioration of their conditions.

11. My review of these medical records presents a damning picture of the lack of responsiveness of Mesa Verde personnel to the medical needs of those in their custody, including those infected with COVID-19 and severely medically vulnerable. Each of these individuals has at least one, and often multiple, indicia of vulnerability to severe COVID-19. Despite this, they were housed in crowded dormitory settings where the risk of exposure to COVID-19 is very high. Their health was put at grave risk, and in some cases appears to continue to be at risk, because of the failure to provide timely and effective medical care.

12. These records show, among other things:

    a. Apparently, Defendants failed to appropriately use rapid point-of-care COVID testing for detainees despite evident – and in some cases tell-tale – signs of COVID-19 infection.
    b. Defendants housed highly medically vulnerable individuals in dorms of individuals who are all contacts of COVID-positive detainees, increasing the risk of COVID-19 transmission.
    c. There appears to be evidence that, at least in one case, a medically vulnerable individual (Mr. Zamora Guzman) became infected *because* he was housed in this close-contact dorm for days without any significant effort to extract COVID-infected detainees from the dorm. He is currently hospitalized and has been hospitalized for nearly a week with concerning symptoms of severe COVID infection.
    d. Other individuals whose charts I reviewed (and those whose charts I did not review) may well have also been infected with COVID as a result of the cohorted housing described. Regardless, there is no question, given the lengths of their detentions, that all were exposed to and contracted their COVID infections during and as a result of their continued detention at Mesa Verde.
    e. Defendants discounted concerning reports from detainees of signs and symptoms of COVID-19, or severe COVID-19. In some cases, these reports begged urgent medical attention. The medical attention ultimately provided was too often delayed or inadequate, with consequences that in some cases appear to have been severely detrimental to the health of the individual.
    f. In one case (Mr. Ruiz), Defendants apparently reported to Plaintiffs and the Court that an individual had no significant health deterioration (contrary to the individual's urgent and repeated self-reports) and only needed education on how to properly use his inhaler. In fact, on the same day as that report, Defendants conducted an x-ray on the individual (who was COVID-positive with significant medical vulnerabilities) that identified pneumonia in both lungs. The individual had repeatedly sought medical care and complained of severe health problems, but these were rejected as unfounded. In fact, the medical records show that the

      radiologist was very concerned about the x-ray findings, but even this did not appear to compel urgent attention. From reports provided by other detainees, and included in a document Plaintiffs submitted to the Court, the individual required urgent medical attention and was transported to the hospital later that night.
  g. Defendants appeared to not provide the necessary language interpretation in multiple instances, including for psychological evaluations and despite evidence of significant language barriers.

**Margarito Zamora Guzman**

13. Mr. Zamora Guzman is a 55-year-old male detained at Mesa Verde since June 8, 2018. Mr. Zamora Guzman has a history of multiple medical vulnerabilities including cerebrovascular disease, coronary artery disease, insulin-dependent diabetes, diabetic retinopathy, chronic pulmonary disease (bronchiectasis and scarring of the lungs), facial nerve paralysis, glaucoma and dsyslipidemia. He is also legally blind. I have reviewed his medical records from July 20 to August 18, 2020.

14. Mr. Zamora Guzman has to date been twice urgently brought to Mercy Hospital for evaluation and treatment for COVID-19 related complications. He is currently hospitalized for such complications and has been for the past week with no plans for his imminent discharge.

15. According to the Facility's medical records, Mr. Zamora Guzman was cohorted in a dormitory setting, beginning in the last week of July, with other detainees believed to have been exposed to COVID-19. Nowhere documented in his Facility medical records is there any consideration the dangers of placing Mr. Zamora Guzman in this housing situation despite his multiple serious medical conditions making him more vulnerable to severe COVID.

16. Mr. Zamora Guzman was tested initially for COVID-19 on July 30, 2020. The results returned negative. Despite the results from the test being available on August 1, in multiple subsequent facility notes it is documented that the test results were still pending. It is unclear when or if Mr. Zamora Guzman was informed of the negative COVID test results.

17. Approximately 10 days later, on August 10, 2020, while being evaluated in the Mercy Hospital Emergency Room (following a loss of consciousness), he tested positive for COVID.

18. There is a high likelihood that Mr. Zamora Guzman was exposed to and contracted COVID during the period he was inappropriately cohorted with other detainees exposed to COVID. There is no question that he was exposed to and contracted COVID during the time he was held in ICE custody.

19. According to the Facility's medical records, on July 31, 2020, Mr. Zamora Guzman reportedly denied symptoms including fever, cough and shortness of breath. However,

according to Mercy Hospital medical records, on August 10, 2020 Mr. Zamora Guzman reported to have been suffering from COVID-related symptoms for two weeks, including fever, nausea, vomiting, chills, fatigue and shortness of breath.

20. In a Facility medical note from August 3, 2020, there is no documentation as to whether Mr. Zamora Guzman was even asked questions, as would be standard practice for medical monitoring for COVID, about COVID-related symptoms. The note simply states that he was being seen for follow-up as a member of a group cohorted for possible COVID exposure.

21. On August 4, Mr. Zamora Guzman was tested for COVID-19 with a PCR test that was sent to a laboratory. This was apparently at the time that all detainees in the two cohorted dorms had laboratory PCR tests. The results were not reported until August 19—over two weeks later. Mr. Zamora Guzman's test results confirmed that he was already infected with COVID-19 on August 4. However, he did not know that and the Facility staff did not know that. He thus remained in the crowded cohorted dorm for nearly a week before he was identified as COVID-positive when he was given a rapid test after being brought to the Emergency Room. The extraordinary delay in producing results likely led to the infection of others in the dorm and delayed Mr. Zamora Guzman's access to information about his health status and the care that he needed.

22. On August 4 and over the next several days, Mr. Zamora Guzman's clinical symptoms worsened. On August 4, 2020, Mr. Zamora Guzman was seen for a complaint of fevers, chills and phlegm. He was again returned to the cohort dormitory. On August 5 and 6, 2020, Mr. Zamora Guzman again complained of cough and phlegm. Again, he was returned to the cohort dormitory with no further testing or treatment.

23. On August 6, Mr. Zamora Guzman reported a loss of taste, a symptom frequently associated with COVID-19. According to the note, by that time he had been tested as an asymptomatic exposure and the results were pending. Despite his numerous COVID symptoms, it does not appear that he was ever provided a point-of-care test by the Facility. This limited the ability of medical professionals to provide him the care that he needed, and it also placed other detainees at risk because there was no effort to extract him from the dorm despite a likelihood, by this time, of his COVID infection.

24. Mr. Zamora Guzman was again seen by health care providers at the Facility on August 7 reportedly with improved pulmonary symptoms. However, there is no mention of any follow-up regarding the COVID-19 symptom that Mr. Zamora Guzman had previously identified—a loss of taste.

25. On August 10, Mr. Zamora Guzman was again seen, and was reportedly without complaints. Nearly one week after his records first identified COVID-19 symptoms of fever and chills, the records show that he is still "awaiting test results" and housed in the dorm of close contacts.

26. Two hours later, Mr. Zamora Guzman passed out and was brought to Mercy Hospital. Only then was he found to be positive for COVID-19 from a (likely point-of-care) test performed at the hospital. He was only at the hospital for several hours on August 10 and was then returned to the dorm at Mesa Verde.

27. Mr. Zamora Guzman was seen apparently once per day on August 12 and 13 at Mesa Verde. In the August 13 note, it is documented that Mr. Zamora Guzman complained of shortness of breath, loss of taste and smell, and poor appetite. The clinician noted that Mr. Zamora Guzman was coughing during the evaluation. His oxygen saturation was noted to be 90%, which is considered to be dangerously low. The plan identified by the clinician was to increase Mr. Zamora Guzman's inhalation therapy to four times a day, and instructions left to call "DO/RN" as soon as possible in case of respiratory distress. I presume from the context that this refers to either his deportation officer or a registered nurse though "DO" may also refer to a form of medical professional.

28. On August 14, Mr. Zamora Guzman was brought to the Mercy Hospital emergency room and was admitted. I found no documentation from Mr. Zamora Guzman's medical records documenting that he was to be brought to the hospital at that time, nor documenting the events that occurred immediately before he was brought to the hospital. The hospital medical records describe that over the next several days he frequently "de-saturated" (which refers to the decline of his blood oxygen levels).

29. The last note from hospital is from August 18, 2020. It notes that when Mr. Zamora Guzman gets out of bed to go to the bathroom, his oxygen levels go down to below 90%.

30. I understand that Mr. Zamora Guzman remains hospitalized with no current plans for discharge.

31. Mr. Zamora Guzman's medical records raise several substantial concerns about the evaluation and treatment of his medical conditions at Mesa Verde. Given Mr. Guzman's multiple medical vulnerabilities and advanced age, he was always at extraordinarily high risk for serious complications of COVID-19 infection.

32. Given his multiple serious risk factors for severe COVID-19, housing Mr. Zamora Guzman in a cohort setting – particularly a cohort setting of COVID contacts -- was particularly dangerous. Of note, he initially took a test on July 30 (although even days later facility health staff were apparently still unaware of the results). He tested positive on August 10, 2020 at Mercy Hospital Emergency Room. As such, it is almost certain that he became infected with COVID during the period he was inappropriately housed with other detainees suspected of COVID infection.

33. The failure to provide Mr. Zamora Guzman with a rapid point-of-care test at least when he identified clear COVID-19 symptoms further endangered the health of others in the dorm where he was cohorted.

34. At the time of Mr. Zamora Guzman's August 10 Mercy Hospital emergency room visit, it was noted he had a brief syncopal episode (loss of consciousness).  Given he is an insulin-dependent diabetic, a likely cause of this was low blood sugar and inadequate monitoring of this.[7]

35. Between August 10, 2020, when Mr. Zamora Guzman was returned to Mesa Verde, and August 14, 2020, when he was brought back and admitted to Mercy Hospital (where he remains), his condition as a result of COVID infection significantly deteriorated. Given his progressive symptoms and extremely high risks, he should have been released from custody in a congregate settings, monitored far more closely than he was, better protected from the risks inherent in the setting, and/or transferred sooner to Mercy Hospital.

36. While I sincerely hope that Mr. Zamora Guzman fully recovers, this extraordinary delay in testing and the provision of the appropriate level of care could have cost Mr. Guzman his life, and still could. It is almost certain that even if he recovers, he will suffer lasting complications of this infection.

**Jose Ruiz Bolanez**

37. Mr. Ruiz is a 41-year-old male who has been detained at Mesa Verde since March 26, 2020. Mr. Ruiz has a history of asthma and sinusitis. He also has a history of anxiety, depressed mood and post-traumatic stress disorder (PTSD). I reviewed his medical records from July 16 to August 17, 2020.

38. According to his Mesa Verde medical records, Mr. Ruiz suffered severe trauma in the past. In 2007, he was hit on the head with a machete and has suffered headaches. Additionally, according to mental health notes from Mesa Verde, he suffers from multiple severe psychological symptoms. In particular, Mr. Ruiz reports recurrent, intrusive memories of the trauma he suffered; substantial difficulty sleeping (3 hours/night); and, only since his detention, frequent nightmares. While Mr. Ruiz is receiving medication for his psychiatric symptoms, this treatment/dosage appears to be inadequate as his symptoms persist.

39. On July 30, 2020, Mr. Ruiz was tested for COVID and the test was reported as positive on August 1, 2020. It is unclear whether the "report date" in the medical records also reflects the date that Mesa Verde *received* the results, given the doctor's stamp and notation dated August 4, 2020. It would be incredibly concerning if there were a lag time of three days between when the results were produced, and when they were reviewed by the facility.

---

[7] At the time that he lost consciousness a fingerstick blood sugar is not documented to have been done as is standard procedure. While this may not have occurred because of priority being given to providing him with intravenous glucose, the Facility note reports that his fasting blood sugar-done several hours earlier was 169 (not low). Clinically, his blood sugar level from the morning, which was reported, is basically irrelevant to what his glucose level was at the time he lost consciousness.

40. On August 11, 2020, Mr. Ruiz was taken to the emergency room, where he was found to have pneumonia in both lungs.

41. A review of Mr. Ruiz' medical records reveals several instances of delays in Mr. Ruiz receiving appropriate and necessary medical evaluation and treatment, including medical care related to his COVID infection. This includes delays in being notified of the results of his COVID test as well as delays on at least two occasions in properly being evaluated for COVID-related symptoms.

42. On August 3, 2020 at 11:28 am, after he tested positive for COVID-19, Mr. Ruiz filled out a facility request form to be seen for medical evaluation because he was suffering from substantial pain in his throat and head. Despite the significance of these symptoms, and his COVID diagnosis, the request was marked as "routine" and Mr. Ruiz was not seen by facility medical providers until 24 hours later. It appears that it was only at that time that he was informed of having tested positive for COVID even though the results were "reported" on August 1, 2020.

43. On August 10, 2020 at 11 am, Mr. Ruiz presented to the Facility's medical unit complaining of cough and shortness of breath. A chest x-ray was ordered and performed later that day. The radiologist's report described the results of the x-ray as: "Bilateral Perihilar Infiltrates." In other words, pneumonia was seen in both sides of the lung. Importantly, these abnormal chest x-ray findings (pneumonia in both lungs) were absent on an x-ray performed on August 6, 2020. These findings were noted by the radiologist to be new and worsened compared to the prior chest x-ray. In his report, the radiologist emphasized the importance of quickly notifying the Facility's medical staff by stating at the end of the report (which included an asterix before and after): "*Notify referring physician.*"

44. Despite this flagging of the x-ray, Mr. Ruiz was not seen by Facility medical personnel until the next day, August 11, 2020. Based upon my review of the Facility clinician's note, the treating clinician appeared to have questioned the accuracy of the chest x-ray, stating in his note that he would discuss with the radiologist and repeat the x-ray on August 13, 2020 (two days later). He did not say when he would contact the radiologist.

45. I understand that, on the same day (August 10, 2020) that the radiologist conducted an x-ray on Mr. Ruiz and identified that Mr. Ruiz had pneumonia in both lungs (which is a very concerning development for someone who is COVID-positive and medically vulnerable), medical professionals reported that his only problem identified was that he did not know how to use his inhaler properly. Dkt. 521-2 ("once he complied with the directive on how to use it properly, he began feeling better and ceased coughing").[8]

---

[8] I reviewed a record of an email exchange between counsel for GEO and class counsel. Class counsel expressed strong concerns about Mr. Ruiz' health on August 8—noting that class counsel had spoken with Mr. Ruiz and that he "had noticeable difficulties breathing, sounded very weak and reportedly has a fever. He has also been experiencing cold chills, back pain and chest pain. He has been unable to speak to his counsel at length about his conditions because he is unable to stand by the phone for any meaningful amount of time." Counsel for GEO

46. In a note in the medical record on August 10, 2020, Mr. Ruiz was complaining of a cough and shortness of breath. He was found to have a fever of 102 degrees fahrenheit. The note also states he was observed to be seen sitting on his bed not short of breath. At the bottom of the note, it states "Other detainee reported that patient is not using his inhalers…Detainee instructed to be compliant with his inhalers.

47. This note raises several concerns. First, that the observations of another detainee may have been used to make clinical assessments. If this is correct, this would be relying on erroneous information, and arguably a violation of privacy (HIPAA policies). Furthermore, while it states that he was instructed to be compliant with his inhalers, it neither documents that it was clearly explained to him how to use his inhaler, nor that it was communicated to him in his native language. Furthermore, incorrect use of his inhaler would not explain why he had a fever of 102.

48. Later that evening, Mr. Ruiz' condition deteriorated such that he had to be brought to the Mercy Hospital Emergency Room. Concerningly, there is no documentation in his Facility medical record regarding the events leading up to his being taken to the emergency room.

49. A review of the Facility's medical records reveals, among other deficiencies, inconsistent and inadequate use of medical interpreters. Use of such interpreters is both essential and required in order to provide appropriate and informed medical care. Interpreters are documented to have been used on only a few occasions. Times where it was documented that an interpreter was used included an evaluation at the Facility by an ear-nose-threat (ENT) specialist and during a mental health evaluation by a psychologist. The instructions provided to Mr. Ruiz at the time he was discharged from Mercy Hospital's Emergency Room were provided to him in Spanish. However, on July 17, 2020, when Mr. Ruiz was seen for a follow up by a psychiatrist at the Facility, the evaluation was in English and the psychiatrist wrote: "Patient speaks fair English." The evidence he cited for this assessment was that Mr. Ruiz had started "that conversation by speaking English." Yet Mr. Ruiz' command of English is highly questionable. In one of the medical forms where he requested medical evaluation Mr. Ruiz wrote in broken English (note: this is an exact transcription from the medical record): "I weld like. To see the nurse because my throw hear a lot in my he'd." The exact wording of that request is repeated under a section entitled "Summary of Request." Requiring detainees to request (and receive) medical care in a language that they are not proficient in is not only demeaning, it is inappropriate and potentially dangerous.

50. Based on my review of Mr. Ruiz' medical records, it is my opinion that he has received substandard and inadequate medical services (including COVID-related medical care as well as mental health care). The records reflect poor clinical judgment, insensitivity, and potentially life-threatening delays in evaluation and treatment.

---

responded on August 9 at 12:52 pm: Per shift report from LVN Guzman, at 1800 Mr. Ruiz was provided additional education on using his inhaler and once he complied with the directive on how to properly use it, he began to feel better and ceased coughing." (Available upon request.)

51. Additionally, in this record and in others, the notes at the Facility by clinicians are handwritten. This is in contrast to standard medical care now using typed records in an electronic medical record. This can impact medical care as these medical notes are potentially illegible to other individuals who would attempt to read them. While I was able to decipher the notes, it required particular attention and might be challenging for other providers.

**German Najera Grajeda**

52. Mr. Najera Grajeda is a 33-year-old male who has been detained at Mesa Verde since April 9, 2020. Mr. Najera Grajeda has a history of asthma, which is a significant risk factor for serious COVID-19 infection. He uses an albuterol inhaler. I reviewed Mr. Najera Grajeda's medical records from July 24 to August 14, 2020.

53. As per a signed consent form, a COVID test was performed on Mr. Najera Grajeda on July 30, 2020 with the results reported as positive on August 1, 2020. As with Mr. Ruiz, it is unclear whether the reported date coincides with the date that the facility actually received or reviewed the results. He was apparently not informed of the results until August 3, and the records do not identify why there was a delay in providing him these results. Further, in Mr. Najera Grajeda's Facility medical records, there is no background information or documentation as to why the COVID test was ordered for Mr. Najera Grajeda as well as whether or not he had any symptoms at the time. Standard medical care and documentation requires that such basic information is collected and documented. As such, this deviates from accepted standard medical practices to document reasons for testing.

54. On August 1, 2020 at 12:06 am, Mr. Najera Grajeda completed the Facility's standard form requesting medical evaluation for headaches, sore throat, cold sweats and blurry vision. Despite suffering symptoms classic for acute COVID infection, the request was triaged as being "routine" rather than urgent. From a review of the medical records, it appears that Mr. Najera Grajeda did not receive medical evaluation at the Facility until two days later, on August 3, 2020.

55. Because of the severity of the symptoms he reported to facility staff when he was evaluated on August 3, 2020, which included, chest pressure, difficulty breathing and shortness of breath, he was sent on the same day to the Emergency Room at Mercy Hospital for further evaluation.

56. At the Emergency Room, it is documented that Mr. Najera Grajeda informed the medical providers there that he was experiencing difficulty breathing and chills for three days before he was informed he was COVID-positive. He was discharged from the Emergency Room later that day.

57. On August 7, 2020, during routine monitoring of the oxygen level in Mr. Najera Grajeda's blood using a pulse oximeter, the reading was 93%, which is low. A low

reading for a COVID-positive patient is anything below 95%. Anything below 90% is particularly concerning. Despite this low reading, the pulse oximeter was not rechecked until 8 hours later, and no further action/evaluation was done until the next day.

58. My review of Mr. Najera Grajeda's medical records from Mesa Verde reveals several deficiencies including inadequate documentation and delays in receiving necessary, potentially life-saving care. Additionally, it is unclear whether or not an interpreter was or should have been used. The only mention of Mr. Najera Grajeda's English language ability is in a note dated August 7, 2020 when Mr. Najera Grajeda was evaluated by a mental health provider which states "speaks adequate English."

**Saeturn Yao Xeng**

59. Mr. Saeturn is a 66-year-old male from Laos, detained at Mesa Verde from November 26, 2019 to August 1, 2020. In addition to his age, Mr. Saeturn has multiple medical conditions which make him vulnerable to severe COVID-19, including hypertension, which is uncontrolled and causes him dizziness and blurred vision. Mr. Saeturn also suffers from high cholesterol and gout, and reports a history of ulcers that have caused him to vomit blood and pass blood through his stool. Due to a stroke that left him wheelchair-bound for three years, Mr. Saeturn has limited mobility and requires a cane. I reviewed his medical records from July 16 to August 1, 2020.

60. Mr. Saeturn was brought to Mercy Hospital on July 31, 2020 because of COVID-related complications. I understand that Mr. Saeturn was released by ICE to "the community" on August 1, 2020, while he was still in the hospital.

61. The medical records available for me to review regarding Mr. Saeturn were extremely limited. Nevertheless, given his multiple medical conditions clearly recognized by the CDC as putting him at high risk of severe COVID infection, and the fact that he was ultimately released *after* he was suffering severe complications from COVID-19, it is very concerning that he remained in custody in a congregate setting where there were significant COVID infection already identified, with staff and detainees testing positive prior to his infection. He certainly contracted COVID-19 at the Facility. However, it was only after he developed a serious, potentially life-threatening illness that he was released.

**Conclusion**

62. Based on my review of these medical records, I have serious concerns about the adequacy of the health care provided to detainees at Mesa Verde. In just these four examples, the health care provided has been repeatedly and severely substandard and delayed; the concerns voiced by individuals about their symptoms, and their deteriorating health status, were often ignored or discounted. Health professionals did not provide individuals information about their own health status in a timely fashion, or with linguistic competency. The failure to provide clear and accurate information about one's health status often produces anxiety and distrust and may lead an individual to not be able to take the steps needed to protect their health. The failure to provide adequate care

appears life- and health-threatening. There is little evidence in the records I have reviewed that would give me confidence in the ability of Mesa Verde's health care professionals to competently care for the health care of dozens of COVID-positive individuals in their custody.

Date: August 20, 2020

*[signature]*

_____
Allen S. Keller, M.D.