**CHUNY TOUCH**

**SHORT-FORM BAIL APPLICATION**

**SUMMARY:**

Mr. Chuny Touch presents a strong application for bail. *See* Dkt. 90 (setting forth standard for bail applications); Dkt. 361 (setting forth process for bail applications). *First*, Mr. Touch is not a danger to the community. His last crime was in 1992, and he left the criminal gang he was involved in over a year before he was arrested or prosecuted for it. He served his sentence, engaged in rehabilitative programming, and after a rigorous process, the Parole Board and Governor Newsom found Mr. Touch suitable for parole. *Second*, Mr. Touch is not a flight risk. He has resided in the United States since he was a minor, has numerous U.S. citizen and lawful permanent resident family members, and would be released to a transitional housing program where he would be closely monitored. *Finally*, Mr. Touch is at risk of exposure to COVID-19 due to Mesa Verde's ongoing mismanagement of the pandemic.

1. **Name:** Chuny Touch

2. **Age:** 48

3. **Sex:** Male

4. **Primary Language:** Cambodian

5. **If Hearing, Is An Interpreter Needed?** Yes

6. **Detained in Mesa Verde Detention Facility** _X_ **or Yuba County Jail** ____

7. **Dorm Unit:** D

8. **Date of Bond Hearing, If Any:** None, not eligible.

9. **Outcome of Bond Hearing, If Any:** N/A

10. **Length of Time in Detention:** 3 months (since May 19, 2020)

11. **Medical Condition(s) That Put Detainee At Risk:**

Mr. Touch is currently in a dorm with approximately 25 other detainees. In D dorm, he was exposed to one person who was mistakenly taken from his dorm to B dorm (where COVID-19-positive individuals are being held), held for approximately 30 minutes, and then returned to D dorm.

Mr. Touch has been tested for COVID-19 on two occasions. He initially declined testing out of skepticism about the process because he had seen that others who were tested were never given results, and because he did not trust that staff were employing safety measures to avoid infecting

Name: _____Chuny Touch_____

1

him in the testing process. After discussing with class counsel the importance of testing, he has now consented to two tests, but he has still never been informed of his results. He seeks this information in order to protect himself and others from COVID.

**12. Attorney Name, Phone, Address and Email:**

N/A. Mr. Touch is pro se.

**13. Felony or Misdemeanor Convictions, Including Date and Offense:**

Mr. Touch has the following convictions:

- 3/12/1992 – P.C. 245(A)(1) – Assault With a Deadly Weapon (misdemeanor), sentenced to 60 days jail
- 6/8/1992 – P.C. 459—Burglary (Misdemeanor), sentenced to 3 years probation, work program
- 6/27/1995 – P.C. 187(A)—Attempted Murder; Second-Degree Murder w/ Firearm Enhancement, Sentenced to 15 years-life in Prison

Mr. Touch immigrated to San Diego in 1985, at age 13, after spending five years in refugee camps in Thailand and the Philippines. After suffering severe bullying and beatings in school due to not being able to speak English, he joined a gang for self-protection at around age fifteen. Around the same age, he began drinking, initially in response to peer pressure, but later on to boost his confidence.

In approximately 1989, when Mr. Touch was around 17 years old, a rival gang murdered a close friend of his, leaving him grieving and angry. Unfortunately, he chose to channel these feelings into retaliation. In 1991, he was drinking at a friend's house and when another friend informed him that the rival gang responsible for his friend's death was having a party nearby. Mr. Touch and his friends went to the party and began shooting at the rival gang members, tragically killing an innocent bystander. In approximately 1992, Mr. Touch had again been drinking when a friend came to his house and told him that the rival gang were at a restaurant. The two of them, both armed, went to the restaurant and followed the gang members who were leaving the restaurant. The two of them shot at the car of the rival gang, hitting and injuring two gang members. Mr. Touch was not implicated or arrested until years later for these crimes.

In March of 1992, when Mr. Touch was 19 years old, he was outside a store with a friend when a member of a rival gang arrived in his car and began cursing at and taunting Mr. Touch, who was holding a glass bottle. Mr. Touch responded by throwing the bottle at the car. No one was injured, but a police officer witnessed the assault, and Mr. Touch was arrested and sentenced to two months in jail. That same year, Mr. Touch broke into a car to steal a stereo, for which he was arrested and sentenced to probation and a work program.

According to the rap sheet, Mr. Touch was also arrested twice in 1993, for drug possession and burglary. These arrests did not result in convictions.

Prior to his arrest for the two shootings, in September of 1992, Mr. Touch became a father and decided to distance himself from the gang in order to focus on raising his daughter. He moved to

Name: _____Chuny Touch_____

2

Seattle with his girlfriend and infant and began working in landscaping to support his young family, cutting off all ties with the gang. However, in late 1994, when his daughter was about two years old, one of his co-defendants was apprehended and implicated Mr. Touch in the two shootings. A warrant was issued, and Mr. Touch was arrested and extradited back to California to face charges.

In prison, Mr. Touch engaged in significant efforts to rehabilitate himself. For the last nine years of his incarceration, he had no disciplinary write-ups, which resulted in his transfer to Soledad State Prison, a lower security prison, five years ago. At Soledad, Mr. Touch obtained his GED and a certificate in masonry, which he hopes to use working in construction. Soledad also offered more rehabilitative programming, and Mr. Touch began attending Alcoholics Anonymous, Narcotics Anonymous, and Criminals & Gang Members Anonymous (CGA). He found these programs especially helpful, as they assisted him in valuing his own life and allowed him to fully recognize the extent of the harm that his past criminal conduct had caused to the victims, their families, and the community. In particular, CGA helped him reflect on his past gang involvement and understand that gangs are not the family that they purport to be, but rather use each other in an effort to gain respect through intimidation and fear—which Mr. Touch now recognizes is not respect at all, and comes at a great cost to the community. Despite difficulty with the English language, every year since he began participating in these programs, he has written letters to the families of all three victims expressing deep remorse and empathy for the heartache his conduct caused them. Mr. Touch will continue participating in these programs as a condition of his parole if released from ICE custody.

In January 2020, the Board of Parole and Governor Newsom found Mr. Touch suitable for parole. The process of the Parole Board, whose mission it is to "protect and preserve public safety," involves a thorough and lengthy evaluation including an interview by one of the Parole Board's forensic clinical psychologists for purposes of producing a comprehensive risk assessment, a review of his institutional behavior and programming, with input solicited from the District Attorney, victim and victim's family, and a review of his criminal history and the circumstances of his crime. The Board's decision is then reviewed by the Governor of California.

14. **Pending Criminal Charges and Outstanding Warrants, Including Jurisdiction and Offense:**

N/A

15. **Scheduled Removal Date, If Any:** None.

Mr. Touch accepted a removal order to Cambodia on June 16, 2020. However, removals to Cambodia typically take 3-4 months and have been significantly delayed by the pandemic. Cambodia does not issue travel documents without an interview with consular officials; in normal circumstances, ICE periodically flies all detained Cambodians to a central location to interview with Cambodian officials for two weeks, and then flies them back to their original ICE detention center. Travel documents are then issued a month or two later, with a flight soon after. The most recent consular interviews were scheduled to take place in February 2020, but they were cancelled even as detainees were already boarding their flights. Mr. Touch has not had his consular interview despite the passage of over two months since his removal order.

Name: _____Chuny Touch_____

3

Although Mr. Touch has not been back to Cambodia since he was a child, he looks forward to re-starting his life there. He still feels more comfortable speaking Cambodian than English, and has family there who is ready to receive him.

16. **Family:**

Mr. Touch has a daughter and seven siblings in the United States, all of whom reside in San Diego, CA:

    Katrina Laoungrath, daughter, U.S. Citizen (age 27)
    Chunna Touch, Brother, Lawful Permanent Resident
    Sehu Lin, sister, U.S. Citizen
    Phavy Touch, sister, Lawful Permanent Resident
    Mar Touch, brother, U.S. Citizen
    Phally Touch, sister, Lawful Permanent Resident
    Semei Lin, sister, U.S. Citizen
    Phalla Touch, sister, Lawful Permanent Resident

17. **Proposed Custodian and Description of Proposed Release Residence:**

If released, Mr. Touch's sister Sehu Lin would pick him up from Mesa Verde and take him directly to his assigned transitional living program at Amity Foundation, 3745 S. Grand Ave, Los Angeles, CA 90007. Amity Foundation can be reached at (213) 741-2276. Class counsel has communicated with the Enrollment Coordinator, Elizabeth Langworthy, who confirmed this placement and the immediate availability of a bed upon release. Ms. Langworthy further confirmed that Amity Foundation now has facilities equipped to quarantine new arrivals from prison and detention, and that upon release, Mr. Touch would be placed in temporary quarantine housing pending confirmation of his COVID-negative status. Class counsel commits to promptly obtain the address of the temporary placement as soon as it is assigned and provide it to the government.

If he completes his transitional housing obligation prior to his removal, Mr. Touch will live with his sister Sehu Lin, who can be reached at ▮▮▮▮▮▮▮▮. Her address is ▮▮▮▮▮▮▮▮., San Diego, CA 92105. Mr. Touch would have his own bedroom and bathroom and could easily quarantine or isolate there, should it be necessary.

18. **Applicant's Ties to the Location of the Proposed Residence (such as length of time, family members, prior employment, etc.):**

Mr. Touch has never lived in Los Angeles, but he looks forward to having a fresh start there. His entire family lives in San Diego, where he resided for most of his life and would return to live with his sister if not removed prior to completing his transitional housing program.

19. **Employment History:**

                                                                                     Name:     Chuny Touch

Prior to his incarceration, Mr. Touch worked in landscaping. In prison, he worked as a janitor and a culinary worker. For the last five years of his sentence, he was in school, completing his GED and a certificate in masonry. If released, he hopes to work in masonry or construction.

**20. Other Information Relevant to Bail Determination:**

There is an uncontrolled outbreak of COVID-19 at Mesa Verde that places class members' lives in danger, with heightened risks for those who are medically vulnerable. There are currently at least 57 detainees who are confirmed positive for COVID-19 in the facility, one of whom remains hospitalized with serious complications. Dkt. 580. This represents over 50% of all individuals detained at Mesa Verde. In recent weeks, there have also been 27 staff members who are confirmed to have tested positive for COVID-19 before the staff testing started. Dkt. 575. This number constitutes more than 25% of all staff at Mesa Verde. It is nonetheless likely a severe underestimate given the lack of any comprehensive testing prior to the court's intervention.

Defendants recently admitted that they have no facility-specific plan for managing the COVID-19 outbreak. Dkt. 591. Dr. Greifinger, a correctional health expert, calls Defendants' lack of planning a "striking example" of their "indifference to the obligation to mitigate the risk of COVID transmission" at Mesa Verde. Dkt. 591-6 at ¶ 32. Without a plan for mitigating the spread of the virus, Defendants have floundered as the outbreak has grown unchecked. *See* Dkt. 591-2 at ¶ 29 ("Facility-specific treatment plans must be in place because COVID outbreaks can spread in days, quickly overwhelming resources and staff.") (Decl. of Dr. Sarah Allen).

Defendants' haphazard and negligent response to the outbreak puts class members' lives at risk. ICE and GEO have shown a lack of concern for the safety of class members, providing delayed and substandard care even for people who are severely medically vulnerable and confirmed COVID-infected. Individuals who are COVID-19 positive continue to face barriers to receiving medical care. Class members can wait days for medical staff to respond to sick call slips. Dkt 591-3 at ¶¶ 4-9 (Decl. of Susan Beaty). GEO custody officers regularly delay in alerting medical staff to serious COVID-19 symptoms. *Id*. at ¶¶ 10-19.

Even as class members with COVID-19 report signs of severe deterioration to staff, Defendants disavow any problem. Dkt. 591-6 at ¶ 45 (the same day a radiologist discovered pneumonia in both of Mr. Ruiz's lungs, medical staff reported that he only needed to be instructed how to use his inhaler property). Upon review of Defendants' current medical practices, infectious disease specialist Dr. Sarah Allen concluded that Defendants "need to take significant, immediate steps to improve the degree of patient monitoring, provide bedside access to medical care, and streamline access to emergency medical care." Dkt 591-2 at ¶ 19. Defendants' numerous failures and delays in testing and treatment could potentially cost class members' their lives. Dkt. 591-6 at ¶¶ 25, 35, 47, 58 (Decl. of Dr. Allen Keller).

Mr. Touch is far safer outside of Mesa Verde rather than inside. Because of the frequency of staff and personnel movement, the risk of transmission remains high for those who are currently negative. It is the recommendation of medical and public health experts that individuals who are

Name:  _____Chuny Touch_____

exposed to COVID-19 are safer outside of detention facilities than inside so long as they are able to safely quarantine. *See, e.g.*, Dkt. 5-1 ¶ 32; Dkt. 591-5. Mr. Touch's continued detention places not just his life and health in jeopardy, but also places the lives and health of detention center personnel (at high risk of exposure from the outbreak, and increased risk with more detainees infected) and the general public (detrimentally affected by an outbreak of COVID-19 in a congregate facility, particularly given the increasingly uncontrolled spread). Dkt. 591-5 at ¶ 5.

21. **<u>Attached are (check all that are applicable, but that is not a substitute for answering the above questions):</u>** Not applicable.
   _ Medical Records    ___ Rap Sheet    _ Letter from Proposed Custodian    ___ Bond Hearing Decision    ___ Bond Hearing Transcript


All information in this application is accurate based on information and belief. This application by Kelly Engel Wells, who is employed at the San Francisco Office of the Public Defender. In preparing this application, Ms. Wells spoke with Mr. Touch; his sister, Sehu Lin; the Officer of the Day at the Los Angeles Parole Department; Elizabeth Langworthy at Amity Foundation; Mr. Bin's attorney at the Parole Board, Gertrude Akpenyi; and, regarding the status of removals to Cambodia, to Asian Law Caucus attorney Kevin Lo. Ms. Wells additionally reviewed the Government's disclosures and Mr. Touch's rap sheet. His I-213 and medical records were not provided to class counsel.

Respectfully submitted,

/s/ *Kelly Engel Wells*
Kelly Engel Wells

Name:  _____Chuny Touch_____