WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
ANGÉLICA SALCEDA (SBN 296152)
asalceda@aclunc.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Attorneys for Petitioners-Plaintiffs*
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
FRANCISCO UGARTE (SBN 241710)
francisco.ugarte@sfgov.orga
GENNA ELLIS BEIER (SBN 300505)
genna.beier@sfgov.org
EMILOU H. MACLEAN (SBN 319071)
emilou.maclean@sfgov.org
OFFICE OF THE PUBLIC DEFENDER SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: 415-553-9319
Fax: 415-553-9810

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUIZ TOVAR, LAWRENCE MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG,

Petitioners-Plaintiffs,

v.

DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; NATHAN ALLEN, Warden of Mesa Verde Detention Facility,

Respondents-Defendants.

CASE NO. 3:20-CV-02731-VC

**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' WRITTEN PLAN TO IMPROVE MEDICAL ASSISTANCE FOR COVID-POSITIVE DETAINEES AT MESA VERDE**

BREE BERNWANGER* (NY SBN 5036397)
bbernwanger@lccrsf.org
HAYDEN RODARTE (SBN 329432)
hrodarte@lccrsf.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA
131 Steuart St #400
San Francisco, CA 94105
Telephone: (415) 814-7631

JUDAH LAKIN (SBN 307740)
judah@lakinwille.com
AMALIA WILLE (SBN 293342)
amalia@lakinwille.com
LAKIN & WILLE LLP
1939 Harrison Street, Suite 420
Oakland, CA 94612
Telephone: (510) 379-9216
Facsimile: (510) 379-9219

JORDAN WELLS (SBN 326491)
jwells@aclusocal.org
STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

MARTIN S. SCHENKER (SBN 109828)
mschenker@cooley.com
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIMOTHY W. COOK (Mass. BBO# 688688)*
tcook@cooley.com
FRANCISCO M. UNGER (Mass. BBO# 698807)*
funger@cooley.com
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

*Attorneys for Petitioners-Plaintiffs*

*Admitted *Pro Hac Vice*

REDACTED VERSION OF DOCUMENT SUBMITTED PARTIALLY UNDER SEAL

**TABLE OF CONTENTS**


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

- A. Defendants Submitted an Outdated, Incomplete Draft Medical Plan for Plaintiffs' Review. ..... 2
- B. Defendants Failed to Meet and Confer, Contrary to the Court's Order. ..... 3
- C. Defendants Submitted An Unresponsive Medical Plan in Defense of its Current Practices. ..... 4

III. PLAINTIFFS' SPECIFIC OBJECTIONS TO DEFENDANTS' MEDICAL PLAN ..... 6

IV. DEFENDANTS' CONTRACT FOR THE PROVISION OF MEDICAL CARE REQUIRES MORE MEDICAL PLANNING AND PREPAREDNESS BUT INCENTIVIZES LIMITING CARE. ..... 11

V. CONCLUSION ..... 13

Authorities

Blake Ellis & Melanie Hicken, *"Please Help Me Before It's Too Late,"* CNN, Jan. 25, 2019, https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/ ................................. 13

DHS Office of Inspector General, "Management Alert - Issues Requiring Action at the Adelanto ICE Processing Facility in Adelanto, California, September 27, 2018, https://www.oig.dhs.gov/sites/default/files/assets/Mga/2018/oig-18-86-sep18.pdf) ............... 10

Dictionary, Merriam Webster, https://www.merriam-webster.com/dictionary/plan ................................................................ 11

ICE, Progress in Implementing 2011 PBNDS Standards 5 (Jan. 17, 2017), https://www.hsdl.org/?abstract&did=818058 ................................................................ 12

Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional & Detention Facilities, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ................................................................ 8

Rules

Civ. L.R. 7-9(a) ................................................................ 6
Civ. L.R. 7-9(b) ................................................................ 6

## I. INTRODUCTION

Defendants have effectively flouted this Court's order, ignored its guidance, and refused to engage with Plaintiffs or their experts. On August 21, 2020, this Court ordered Defendants to create a "written plan to improve their system of monitoring, caring for, and responding to medical assistance requests from detainees who have tested positive and who have health conditions that the CDC has identified as creating an elevated risk of complications." Dkt. 595 at 1. This Court expressed a strong "hope[] and expect[ation]" that the plan could be agreeable to all parties, after meaningful consultation, but permitted Plaintiffs to file objections should there be a dispute. *Id.* at 1-2. Because Defendants failed to meaningfully engage with Plaintiffs and produced a Medical Plan which is nothing more than an attempted formalization of its inadequate practices and an opposition to an invisible motion, Plaintiffs object.

The Medical Plan is too vague even to describe meaningfully the current practice at Mesa Verde, let alone provide for improvements to practices recognized as deficient. Instead, it attempts to dress up the ineffective protocols that have been in place for months that failed to anticipate a readily foreseeable outbreak, prevent its spread, protect those most medically vulnerable, and respond to the dire and growing medical needs of class members. Defendants make no effort to rebut reports of their deficiencies and instead rely on the medical overseer of Mesa Verde who has seemingly never visited the facility since the onset of the COVID-19 pandemic.

Rather than heed the Court's explicit guidance, Defendants have opposed a straw-man injunction that was neither requested nor ordered. Contrary to Defendants' assertions, Plaintiffs have not sought further injunctive relief on medical care. Instead, they had hoped to work with Defendants, consistent with the Court's expectation, to reach meaningful change that would

recognize the time-sensitive need for improvement. Having been rebuffed, and in response to the express instructions of this Court, Plaintiffs outline objections to Defendants' Medical Plan in the hope that Defendants will incorporate Plaintiffs' suggestions to obviate the need for further motion practice on medical care at Mesa Verde. However, due to Defendants' unwillingness to engage in meaningful negotiation, the Court should grant Plaintiffs prompt discovery on the medical care at Mesa Verde to permit Plaintiffs to seek timely injunctive relief if warranted.

## II. BACKGROUND

### A. Defendants Submitted an Outdated, Incomplete Draft Medical Plan for Plaintiffs' Review.

Prior to last week, Defendants had no written plan to respond to COVID-related medical needs at Mesa Verde. *See* Bernwanger Dec. ¶ 2, Exh. A. On August 26, 2020, in response to this Court's Order, Defendants produced three documents constituting a "draft of the medical plan" that was still "awaiting additional input from [ICE Health Service Corps]" (hereinafter "Draft Medical Plan"). Bernwanger Dec. Exhs. B-D. First, Defendants produced GEO guidance from February 28, 2020 concerning COVID-19 management. *Id.* Exh. B. That guidance was not specific to Mesa Verde and was outdated; for example, it advised staff that "clinical observations" for diagnosing COVID required "a history of recent travel to China (within 14 days)." *Id.* at 1. Second, Defendants provided a one-page "Brief Summary of CDC's Recommendations for High-Risk Patients Living in Congregate Housing to Prevent COVID-19." *Id.* at Exh. C. This document was also not specific to Mesa Verde and appears written to provide guidance to individuals in custody, not to translate CDC guidance to Facility personnel as a plan would.[1] Finally, Defendants provided a three-page comparison document listing "CDC treatment

[1] This document is a modification of a document produced by CDC for "Living in Shared Housing," such as "apartments, condominiums, student or faculty housing," etc. It is not clear if or how this document was used at Mesa Verde.

guidelines for COVID-19" alongside "Wellpath Medical response/treatment" (hereinafter "Wellpath Response/Treatment Document"). Defendants sent no further drafts or edits to Plaintiffs.

**B. Defendants Failed to Meet and Confer, Contrary to the Court's Order.**

After sending Plaintiffs the three documents described above, Defendants refused to engage in the court-ordered process for developing the plan. Specifically, the Court ordered that Defendants (1) submit a draft plan to class counsel, (2) "confer in detail about the draft," (3) "give serious consideration" to Plaintiffs' suggested improvements, and (4) file a final draft of the plan. Dkt. 595 at 2. Defendants' Medical Plan—which they appear to have spent significantly less energy on than a legal brief and declaration arguing that they do not need a plan—is the product of their refusal to meet the Court's expectations at every turn.

Defendants *never* supplemented their initial draft plan with Plaintiffs, despite multiple requests from Plaintiffs to meet and confer as Defendants revised their draft. *See* Bernwanger Dec. ¶¶ 6-7. Within hours of receiving the Draft Medical Plan, Plaintiffs notified Defendants that the Draft was outdated and generic, failing to comply even with the broadest requirements of the Court's order. Bernwanger Dec. Exhs. E, F. *Compare Id.* Exhs. B-D (including policy dated February 2020) *with* Dkt. 595 (ordering a plan to "improve" care "designed to deal with the current situation at Mesa Verde."). Although Defendants ultimately added additional documents when they filed their Medical Plan with the Court, Defendants failed to share them with Plaintiffs for consultation or feedback, contrary to the Court's order.

For example, Defendants decided to include August 2020 IHSC Guidance in support of their plan, but never shared that document with Plaintiffs. *See* Dkt. 645-2 at 10.[2] And although Defendants informed Plaintiffs that they were consulting on the Medical Plan with Wellpath and Dr. Medrano, at no point did Defendants share any proposals from Wellpath or Dr. Medrano, any draft declarations from Dr. Medrano, or offer a chance to engage with Dr. Medrano's apparent

[2] The document was dated August 7, 2020, and thus was readily available when Defendants provided Plaintiffs with their Draft Medical Plan.

rejection of Plaintiffs' proposals. For example, although Dr. Medrano apparently disagreed with Plaintiffs' recommendation, drawn from multiple expert opinions, that an adequate medical plan must provide protocols for consistent identification of COVID-19 symptoms and determining when hospitalization is appropriate, Plaintiffs did not learn of that disagreement until the declaration was filed on the docket. *Compare* Dkt. 645-2 ¶ 13 ("I do not feel it is appropriate to set specific criteria or list the symptoms to trigger specific care or a certain diagnosis. . . Similarly, it is not appropriate to dictate that detainees should be sent to the hospital if they have certain symptoms or complaints. . .") *with* Bernwanger Dec. Exh. F (citing to expert declarations to propose nursing protocols that list COVID-19 symptoms to aid proper diagnosis and that set standards for hospitalization).

Plaintiffs repeatedly informed Defendants that they were available to meet and confer concerning the Medical Plan, but Defendants agreed only to a single phone call. *See* Bernwanger Dec. ¶¶ 5-7, Exh. E. During that phone call, Defendants' counsel declined to discuss any of Plaintiffs' proposals. *See* Bernwanger Dec. ¶ 5. In sum, Defendants stonewalled Plaintiffs and ignored their attempts to participate in crafting the Medical Plan.

### C. Defendants Submitted An Unresponsive Medical Plan in Defense of its Current Practices.

Defendants' final Medical Plan was only slightly modified from the draft version which Defendants had previously described as preliminary. Despite its deficiencies, the Wellpath Response/Treatment Document is incorporated wholesale into Defendants' final Medical Plan. Dkt. 645-1 at 4-6. Defendants added five new sections:

(1) a general, aspirational description of their commitment to "providing excellent health care services," Dkt. 645-1 at 1;

(2) a mislabeled page on "Before Infection: High Risk Non-Positive Patients," which largely states general affirmations regarding, for example, social distancing, "enhanced cleaning," population decreases, etc.; the only point relevant to high-risk patients is that "a nurse will make rounds on a daily basis to high risk patients who

have CDC listed preexisting conditions monitoring for elevated temperature and symptoms." Dkt. 645-1 at 2[3];

(3) an expanded section on the "sick call process", Dkt. 645-1 at 3;

(4) "criteria for hospital sendout"; and

(5) a definition of COVID-19 "recovery" including a vague expectation of "ongoing care" once an individual is deemed "recovered." Dkt. 645-1 at 7 ("High risk patients will continue to be monitored by a medical provider at an appropriate interval deemed appropriate by the medical provider.").

In support of their final Medical Plan, Defendants produced a supplemental declaration from Dr. Richard Medrano, the Regional Director for Wellpath, who "oversee[s] facilities in the area including Mesa Verde and Adelanto ICE Detention Facilities." Dkt. 645-2 (Medrano Decl.) at 1 ¶ 1. Defendants also produced an IHSC guidance document concerning "COVID-19 Detainee Care," dated August 7, 2020. Dkt. 645-2 at 10 (IHSC Guidance, Exh. A to Medrano Decl.). Dr. Medrano asserted in his declaration that Wellpath "continue[s] to implement IHSC guidelines . . . including the August 2020 IHCS [sic] recommendations." Dkt. 645-2 (Medrano Decl.) at 2 ¶ 3. In fact, there is no evidence that Defendants *are* implementing these IHSC recommendations at Mesa Verde, and there are certain recommendations clearly *not* being implemented—and even in conflict with Defendants' Medical Plan.[4]

---

[3] This section also cites to apparent "CDC guidelines . . . for high risk patients in congregate housing," but the citation referenced actually does *not* address high-risk patients. *See* Dkt. 645-1 at 2 (citing https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/shared-housing/index.html).

[4] Even assuming that the IHSC Guidance could stand alone as an operational care plan for Mesa Verde—a notion this Court has rightly rejected (*see* Dkt. 595 at 1)—many IHSC recommendations are open to discretion and interpretation. *See, e.g.*, Dkt. 645-2 at 14 (instructing that detention centers "[c]onsider more frequent vital sign collection if the patient is medically vulnerable" without offering concrete instruction). Defendants' Medical Plan also includes plain contradictions of the IHSC Guidance, such as waiting until oxygen saturation dips below 90% to seek hospitalization whereas the IHSC Guidance instructs detention centers to consider hospitalization anywhere below 95%. *Compare* Dkt. 645-1 at 7 (Medical Plan) *with* Dkt. 645-2 at 14 (IHSC Guidance). *See also* CDC, "Discharging COVID-19 Patients," Aug. 10, 2020, at https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-hospitalized-patients.html (defining "severe illness" to include an oxygen saturation level less than 94%). *But see* Dkt. 591-6 (Keller Dec.) ¶ 57 (class member with oxygen reading of 93% did not have another oxygen reading for eight hours and had "no further action/evaluation . . . until the next day"). Defendants' *practice* also conflicts with IHSC recommendations in other concrete ways. For instance, Defendants do not: "[c]ohort all new arrivals, preferably in a cell by themselves, for 14 days after their arrival," "[c]ohort detainees who refuse testing for 14 days

* * *

It is telling that seven months into an unprecedented global pandemic, and one month into a Facility outbreak resulting in multiple class members facing medical emergencies, Defendants only developed a written plan for providing medical care in response to the Court's order. *See* Dkt. 591-4 (Greifinger Dec.) ⁋ 33 (Defendants' failure to establish a detailed plan "to respond to the needs of COVID-infected individuals at Mesa Verde is a striking example" of their "indifference to the obligation to mitigate the risk of COVID transmission….."). Yet, rather than using the time they had to meaningfully engage with Plaintiffs or to draft a professional medical plan to protect those in their care, Defendants chose to devote their time and energy to attack the Court's order.[5] *See* Dkts. 645, 645-2; *see also* Dkts. 581, 585 (legal briefs in response to Court's factual questions regarding medical care).

## III. PLAINTIFFS' SPECIFIC OBJECTIONS TO DEFENDANTS' MEDICAL PLAN

Plaintiffs object to Defendants' medical care plan on the following grounds:

*First*, Defendants' Medical Plan fails to address key questions raised by the Court. *See* Dkt. 595. The Court ordered that, at a minimum, the plan should address "how the defendants will provide information to detainees (including non-English speaking individuals) about managing and responding to symptoms, and how the defendants will ensure that they respond promptly to sick detainees requesting medical assistance." *Id.* With regard to responding to the needs of class members with limited English proficiency, Defendants only provide that "[t]he

---

and monitor for symptoms consistent with COVID-19," place symptomatic individuals "under medical isolation," or ensure that "[a]ll new intakes . . . receive testing prior to release to general population." *See* Dkt. 645-2 at 12, 13, 14, 16, 18. The bald assertion that the IHSC recommendations guide decisions at Mesa Verde, or can otherwise be incorporated by reference into an otherwise deficient plan, is false.

[5] Although Defendants frame their unsolicited legal brief as an opposition to a future order for injunctive relief, which Plaintiffs have not at this time sought, Defendants appear to actually be challenging the order the Court *already* issued requiring Defendants to work with Plaintiffs to develop a plan for COVID-related medical care at Mesa Verde. *See* Dkt. 595. To the extent that Defendants ask the Court to revisit that order, they have improperly moved for reconsideration without seeking leave to do so. *See* Civ. L.R. 7-9(a) (requiring leave of court to file a motion to reconsider interlocutory order). Nor have Defendants met the standard here. Civ. L.R. 7-9(b).

detainees are [] educated, in their language, for better understanding their underlying illnesses," and that detainees are provided translation assistance at the time of a positive COVID test. Dkt. 645-1 at 1, 4. With regard to prompt response to medical needs, Defendants outline a "sick call policy" which provides that "urgent matters" may be seen up to 24 hours after they are identified. Dkt. 645-1 at 3 (sick calls are collected at midnight and then "scheduled to be seen within 24 hours for urgent matters").[6] Defendants do not provide a meaningful description of how they intend to provide class members with information about managing COVID symptoms, other than a vague commitment to "educate detainees regarding serious and concerning symptoms" and a reference to CDC posters about COVID-19. Dkt. 645-1 at pp. 2-3.

*Second*, Defendants' Medical Plan confirms their unwillingness to make any changes to their existing medical care. Indeed, the Plan does not acknowledge any shortfalls in the provision of medical care, nor does it list any facility-specific steps Defendants will take to address the delayed and substandard medical care that has endangered class members' lives. *See* Dkt. 591-6 at ¶¶ 36, 50, 58, 62 (Keller Decl.). Defendants' Medical Plan reinforces that Defendants have not taken seriously either the Court's order or the deficiencies in medical care elaborated by Plaintiffs which preceded the Court's order. *See, e.g.*, Dkts. 591, 591-2, 591-3, 591-4, 591-5,

[6] As Plaintiffs previously elaborated, the practice described by Defendants under which known COVID patients are required to fill out "sick call slips" or "kites" as the main mechanism for accessing medical care is "an entirely unsafe and inappropriate practice" and is "dangerous because such patients should be constantly monitored and not have to take the initiative to seek care. Dkt. 591-2 (S. Allen Dec.) ¶¶ 21-23; Dkt. 591-4 (Greifinger Dec.) ¶¶ 7, 25-27.) *See also* Dkt. 591-6 (Keller Dec.) ¶¶ 41-42, 54-56 ("Despite suffering symptoms classic for acute COVID infection, the request was triaged as being 'routine' rather than urgent" and the class member was seen two days after the request and, by that time, with symptoms deteriorating so severely that he was sent to the emergency room on the same day); Dkt. 591-3 (Beaty Dec.) ¶¶ 4-9. Further, despite express concerns about the failure to *require* in-dorm custody officers to communicate urgently with medical personnel if a class member has a medical issue, Defendants' Medical Plan entirely ignores the role of in-dorm custody officers and leaves in place the existing policy which leaves it up to the officer's discretion whether to seek medical care. *See* Dkt. 591-4 (Greifinger Dec.) ¶¶ 28-30; Dkt. 591-3 (Beaty Dec.) ¶¶ 10-19.

591-6. The plan to continue the status quo will only result in putting vulnerable class members at the mercy of a medically negligent care plan.

*Third*, Defendants' Plan lacks the basic criteria for a plan in response to the pandemic. *See* Dkt 591-4 at ¶ 18 (Greifinger Decl.) ("COVID-19 presents unique challenges that cannot be met without specialized planning…"). Defendants' Plan lacks the central elements needed in any meaningful response to the pandemic in a detention setting, including: 1) explicit nursing protocols for class members in different states (i.e. intake quarantine, close contacts, infected and medically vulnerable); 2) explicit protocols for detainees with Limited English Proficiency; 3) protocol for the care of medically vulnerable class members, infected or uninfected with COVID; and 4) protocol for immediate attention to pressing health concerns. *See* Bernwanger Decl. ¶ 5, Exh. F. While Defendants vaguely refer to "nursing protocols," as being "in place" to address "positive symptom screens" and "implement immediate interventions," these supposed protocols were not included, leaving Plaintiffs unable to probe their adequacy. *See* Dkt. 645-1 at 3, 6. The Medical Plan also lacks critical details, such as the definition of "severe" COVID-19, which goes unmentioned in the entire Plan.

Defendants cling to general CDC and IHSC guidance as a stand-in for operational protocol. But even the CDC acknowledges that its guidance is not intended to serve this purpose. The CDC directs correctional facilities to, *i.e.*, make plans to "disseminate critical information to incarcerated/detained persons" about COVID, and isolate, test, and provide medical care for infected individuals. *See* Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional & Detention Facilities, available at: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("Review existing influenza, all-hazards, and disaster plans, and

revise for COVID-19. . . Train staff on the facility's COVID-19 plan."). Medical and correctional health experts affirm that relying on general guidance does not substitute for on-the-ground planning. *See* Dkt. 591-4 at ¶ 18 (Greifinger Decl.) ("It is insufficient to rely on the general guidance from the CDC and the IHSC."); Dkt. 591-1 at ¶¶ 19-20 (Allen Decl.) ("The fact that no written police specific to Mesa Verde exists reflects a concerning lack of preparation."). Thus, Defendants' recitation that they follow generic public health guidance does not assuage concerns that poor *facility* planning could result in permanent injury or death.

*Fourth,* Defendants *still* have neither shared with Plaintiffs nor filed publicly a number of documents that appear integral to fully understanding their Plan. The Medical Plan itself makes several references to separate documents or policies related to ostensible COVID-19 precautions and care, including "Operations" related to "enhanced cleaning" in the facility (Dkt. 645-1 at 2), "nursing protocols" for sick calls (*Id.* at 3), "nursing practice protocols" for moderately ill patients (*Id.* at 6), information on "the monitoring and management of COVID-19 symptoms" (*Id*. at 4, mentioning "written or verbal communication"), and information on "how to request care should symptoms arise or worsen" (*Id*. at 4, also mentioning that information may be "written or verbal").[7] Defendants neither shared these documents with Plaintiffs nor filed them with the Court. The Court should order Defendants to provide the missing documents.

*Fifth*, the declaration of Dr. Richard Medrano, Wellpath's Regional Medical Director, does not support the Medical Plan. As a threshold issue, Dr. Medrano does not practice medicine at Mesa Verde. *See* Dkt. 645-2 ¶ 1 ("I visit Mesa Verde at least every two months. . . In 2016, I briefly filled in at Mesa Verde. . ."); *see also* Dkt. 591 n.1 (Dr. Medrano's professional web

[7] The Medical Plan also refers to a number of documents that may have bearing on their COVID-19 response which Defendants did not produce to Plaintiffs or file with the Court, including a medical history evaluation (*id.* at 1), a review of symptoms (*id.*), a process for identification of "high risk" detainees (*id.* at 2), an "access to care memo" provided to newly-arrived detainees (*id.* at 4), and a "code blue" process for emergencies (*id.* at 4, 5).

presence mentions only practice outside Mesa Verde). Dr. Medrano states that he is "often on-call" or a "backup Physician for Mesa Verde." *See* Dkt. 645-2 ¶ 1. But the declaration does not indicate when he last visited, whether his scheduled visits continued into the pandemic, when he last was called into Mesa Verde as an on-call or backup physician, or indeed whether, since 2016, he has *ever* been called into Mesa Verde as an on-call or backup physician. Dr. Medrano can state with no specificity the capacity in which he has been involved in the provision of medical care at Mesa Verde at all. Dr. Medrano states that "[w]e" implement IHSC and CDC guidelines without stating who "[w]e" is or where the guidelines are being implemented. *Id*. ¶ 3.

Aside from reciting CDC and IHSC guidelines, Dr. Medrano offers no credentials related to viral or other infectious diseases, nor does he mention ever actually treating anyone diagnosed with COVID-19. He refers to "experience and observation" regarding "obtain[ing] appointments" for COVID-19 tests, but offers no further information about when or where this experience or observation occurred. *Id.* ¶ 10. Dr. Medrano fails to establish "the standard of community care in the United States." *Id*. ¶ 4.

Also relevant, as Plaintiffs discussed previously, *see* Dkt. 591 at 3, Dr. Medrano appears to have been employed in a leadership role over the Adelanto Detention Facility at the time the DHS Office of Inspector General (OIG) issued a scathing report finding that "[d]elayed and [i]nadequate" medical care "[i]ncreased [h]ealth [r]isks" for detainees.[8] Dr. Medrano nowhere defends the actual medical care provided to class members. He does not explain the decision to forego detainee testing, the refusal to administer rapid testing, the wait time for COVID test results, or the decision to cohort detainees with pending test results.

---

[8] *See* Dkt. 591-1 Exh. 1 at 7-8 (DHS Office of Inspector General, "Management Alert - Issues Requiring Action at the Adelanto ICE Processing Facility in Adelanto, California, September 27, 2018, available at: https://www.oig.dhs.gov/sites/default/files/assets/Mga/2018/oig-18-86-sep18.pdf) (hereafter "OIG Report").

The Court should not credit the testimony of a supervising doctor who has apparently never visited the facility during a massive outbreak.

* * *

Overall, the Medical Plan is too vague to be useful. *See, e.g.*, Dkt. 645-1 at 3 ("treatment for moderate illness is very vast and depends on the presenting issue"). It lacks the kind of actionable and explicit guidance indicative of a plan.[9] Nor does it outline who is responsible for enacting the plan or how it will be implemented. Defendants have demonstrated they have no plan to respond to medical needs in the midst of a novel pandemic and significant outbreak.

## IV. DEFENDANTS' CONTRACT FOR THE PROVISION OF MEDICAL CARE REQUIRES MORE MEDICAL PLANNING AND PREPAREDNESS BUT INCENTIVIZES LIMITING CARE.

Since the parties' prior briefing on this issue, Plaintiffs have been able to review the contract regarding the provision of medical care at Mesa Verde ("Mesa Verde Contract").[10] On the one hand, Defendants' own contract seems to require more medical planning, epidemic preparedness, and prompt and effective medical care than Defendants have provided. On the other, the Mesa Verde Contract disincentivizes the provision of such care with a payment structure that rewards its medical care contractor for limiting its expenditures.

The existing contractual obligations compel Wellpath, Mesa Verde's medical care contractor, to provide responsive and effective care. Bernwanger Dec. Exh. H (GEO 12911-12).[11] They also compel Wellpath to plan for and respond to emergencies such as the COVID-19

---

[9] A plan is defined as "a detailed formulation of a program of action." Dictionary, Merriam Webster, https://www.merriam-webster.com/dictionary/plan.

[10] The Mesa Verde Contract, as defined here, includes the original contract as well as amendments, statements of work, and other incorporated documents.

[11] Among other things, the Mesa Verde Contract requires compliance with [redacted] Bernwanger Dec. Exh. H (GEO 12911-12) [redacted]

pandemic. *See* Bernwanger Dec. Exh. H (GEO 12861)



; (GEO 12909)

; (GEO 12927-28 . Such medical care and planning is also required by the ICE Performance-Based National Detention Standards ("PBNDS"). *See* Bernwanger Dec. Exh. H (GEO 12844, 12902, 12909).[12] The PBNDS require that "detainees have access to appropriate and necessary medical . . . health care, including emergency services." PBNDS at 257. To meet this goal, a facility must, among other things, have a "plan that address[es] the management of infectious and communicable diseases, including screening, prevention, education, identification monitoring and surveillance, immunization (when applicable), treatment, follow-up, isolation (when indicated) and reporting," and provide 24-hour emergency medical services to all detainees. *Id.* at 261.[13] Despite the obligations of the Mesa Verde Contract and the PBNDS, Defendants lack a meaningful plan and have failed to implement effective medical care in response to the pandemic.

The failure to develop and implement effective emergency medical planning in response to COVID is perhaps unsurprising in light of the compensation structure for the provision of medical care at Mesa Verde. Wellpath, the nation's largest for-profit health care provider for correctional facilities, is paid

*See* Bernwanger Dec. Exh. H (GEO 13036-37) (current

[12] The PBNDS establish a set of "mandatory requirements to which a facility is bound." ICE, Progress in Implementing 2011 PBNDS Standards 5 (Jan. 17, 2017), https://www.hsdl.org/?abstract&did=818058.

[13] The PBNDS also require that CDC "guidelines for the prevention and control of infectious and communicable diseases [] be followed." PBNDS at 258. The CDC requires updating emergency plans to account for COVID. *See* Dkt. 591-4 (Greifinger Decl.) ¶ 24; Dkt. 591 at 6.

compensation structure).[14] *See also id.* (GEO 12844, 12876-77, 12882). At the same time, Wellpath is "[REDACTED].[15] Bernwanger Dec. Exh. H (GEO 12849, 12855, 12858). With such a compensation structure, Wellpath is incentivized to provide fewer medical services at the lowest possible cost. As a for-profit business, Wellpath's return to its investors depends on how economically it can deliver care. As Wellpath is not compensated for greater effort, it is able to garner greater profits from minimizing resource expenditure.[16]

## V. CONCLUSION

The Court ordered Defendants to work with Plaintiffs in the service of what should be an urgent and common goal: protecting current and future class members infected with COVID-19 from suffering serious illness and dying. Instead, in a repeat of their performance two weeks ago when this Court first requested information about medical care at Mesa Verde, Defendants devoted their time and energy to mounting a legal defense against a motion that Plaintiffs have

---

[14] CCS became Wellpath following a merger with a competitor. *See* Bernwanger Dec. Exh. H (GEO 12882-84) [REDACTED]. *See also* Blake Ellis & Melanie Hicken, *"Please Help Me Before It's Too Late,"* CNN, Jan. 25, 2019, at https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/ ("Recently renamed Wellpath after being acquired by a multibillion-dollar private equity firm and combined with a smaller competitor, it is the nation's largest for-profit provider of health care to correctional facilities."). Notably, Mesa Verde contractors were highly capable of creating a detailed plan for the transition of medical services from CCS to Wellpath. *Compare* Bernwanger Dec. Exh. H (GEO 12884-94) with Dkt. 645-1.

[15] Defendants have previously asserted that hospitalizations are compensated by ICE. However, that is not clear from Plaintiffs' review of the contract. *See, e.g.*, Bernwanger Dec. Exh. H (GEO 12858) [REDACTED] Defendants have stated that this information may be included within an ICE-GEO contract.

[16] This compensation structure dictates "a focus on 'cost containment'" which critics around the country have decried as contributing to "substandard care that has led to deaths and other serious outcomes that could have been avoided." *See* Blake Ellis & Melanie Hicken, *"Please Help Me Before It's Too Late,"* CNN, Jan. 25, 2019, at https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/ (extensive investigation into Wellpath practices and complaints at correctional institutions around the country).

not filed and responding to questions the Court did not ask. *See* Dkts. 581, 585. Because Defendants have refused to meaningfully engage in the meet and confer process with Plaintiffs ordered by this Court, submitted a vague and incomplete plan, and supported their plan with a declaration lacking any foundation of personal knowledge or competence, Plaintiffs remain at a serious information deficit regarding the provision of medical care at Mesa Verde. Plaintiffs therefore respectfully request that the Court:

(1) Order Defendants to file all documents referenced by the Medical Plan filed on August 31, but not filed concurrently with the medical plan, on the public docket by 5:00 PM on September 8, 2020, including:

  a. "Operations" related to "enhanced cleaning" in the facility (Dkt. 645-1 at 2);
  b. "Nursing protocols" for sick calls (*id.* at 3);
  c. "Nursing practice protocols" for moderately ill COVID-19 patients (*id*. at 6);
  d. Written information provided to detainees on "the monitoring and management of COVID-19 symptoms" (*id*. at 4); and
  e. Written information provided to detainees on "how to request care should symptoms arise or worsen" (*id*. at 4);

(2) Order Defendants to file all existing documents related to the following practices mentioned in the medical plan:

  a. Medical history evaluation (*id.* at 1);
  b. Review of symptoms (*id.*);
  c. Process for identification of "high risk" detainees (*id.* at 2);
  d. "Access to care memo" provided to newly-arrived detainees (*id.* at 4); and
  e. "Code blue" process for emergencies (*id.* at 4, 5).

(3) Order Defendants to promptly respond to Plaintiffs' discovery requests related to the provision of medical care at Mesa Verde, including but not limited to interrogatories, requests for document production, and depositions.

Dated: September 2, 2020

Respectfully submitted,

/s/ Emilou MacLean
Manohar Raju
Public Defender
Matt Gonzalez
Chief Attorney
Francisco Ugarte
Genna Ellis Beier
Emilou H. MacLean
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO

Bree Bernwanger
Hayden Rodarte
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA

Judah Lakin
Amalia Wille
LAKIN & WILLE LLP

Jordan Wells
Stephanie Padilla
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA

William S. Freeman
Sean Riordan
Angélica Salceda
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA

Martin S. Schenker
Timothy W. Cook
Francisco M. Unger
COOLEY LLP

*Attorneys for Petitioners-Plaintiffs*