# EXHIBIT F-2

To: Defendants ICE, GEO and Nathan Allen
From: Plaintiffs, *Zepeda Rivas et al. v. Jennings et al.*
August 27, 2020

<u>Initial Response to COVID "Medical Plan" Presented August 26, 2020</u>

The Court ordered that Defendants "create a written plan to improve their system of monitoring, caring for, and responding to medical assistance requests from detainees who have tested positive and who have health conditions that the CDC has identified as creating an elevated risk of complications." Dkt. 595 at 1. In particular, the Court ordered that the written plan address, "at a minimum, how the defendants will provide information to detainees (including non-English speaking individuals) about managing and responding to symptoms, and how the defendants will ensure that they respond promptly to sick detainees requesting medical assistance." *Id.*

Defendants produced three documents on August 26, 2020 constituting a "draft of the medical plan" that was still "awaiting additional input from [ICE Health Service Corps]" (hereinafter "Draft Plan"). The three documents are:
- GEO Correctional Health Services, "Chapter: Infection Control," "Title: Coronavirus (COVID-19) Management," Number 531-A, effective date Feb. 28, 2020 (hereinafter "GEO Feb. 28 Guidance")
- A one-page "Brief Summary of CDC's Recommendations for High-Risk Patients Living in Congregate Housing to Prevent COVID-19" (hereinafter "CDC Congregate Housing COVID Summary")
- A 3-page comparison document listing "CDC treatment guidelines for COVID-19" and "Wellpath Medical response/treatment" (hereinafter "Wellpath Response/Treatment Document")

Defendants stated that this is a preliminary draft that does not yet reflect complete input from ICE. Putting aside that this does not comply with the terms of the Order, Plaintiffs offer the following observations. Among other things:

- The GEO Feb. 28 Guidance is extraordinarily outdated, produced at a time when much less was known about COVID, its identification, and its management. As but one example, under the section on "Clinical Observations," it includes "a history of recent travel to China (within 14 days)" as a prime factor identifying the existence of COVID, even though in August 2020, COVID faces uncontrolled spread virtually everywhere in the United States, including Kern County, the site of the Mesa Verde Detention Facility.
- None of these documents appear specific to Mesa Verde; none even mention Mesa Verde. It is possible that the Wellpath Response/Treatment Document is intended to be specific to Mesa Verde, but that is not evident from anything in the document. The other two documents are definitively *not* specific to Mesa Verde.
- The WellPath Response/Treatment Document is written in shorthand that is unclear even to knowledgeable outsiders.
- None of the documents suggest that Defendants have taken seriously either the Court's order of the deficiencies in medical care elaborated by Plaintiffs which preceded the

1

Court's order. *See, e.g.*, Dkts. 591, 591-2, 591-3, 591-4, 591-5, 591-6. To the extent that the Wellpath Response/Treatment Document is specific to Mesa Verde, it appears to merely elaborate what the existing practice is, and not suggest any improvements upon that practice.

- The Draft Plan, as produced, lacks basic elements that should be included in any plan responsive to the Court's order, including, i.e., 1) explicit nursing protocols for detainees in different states (i.e., intake quarantine, close contacts, infected and medically vulnerable, etc.); 2) explicit protocols for detainees with Limited English Proficiency; 3) protocol for the care of medically vulnerable detainees, infected or uninfected with COVID; 4) protocol for immediate attention to pressing health concerns; and 5) protocol for being deemed "recovered" from COVID.

In the interest of providing constructive input in a timely fashion to achieve better health care for class members in the middle of a COVID outbreak at Mesa Verde, Plaintiffs offer the following recommendations to address the Draft Plan's deficiencies with the expectation that Defendants will produce a revised draft plan that will allow for us to provide more concrete and detailed recommendations. Where relevant, Plaintiffs also cite to expert declarations previously produced.

A final medical plan should include, at a minimum:

1) **Explicit nursing protocols and care plans**, specific to the situation and resources at Mesa Verde and the particular needs of detainees, including specifically for detainees in:

   a) 14-day intake sequestration,
   b) close contact quarantine,
   c) known infected isolation for lower-risk detainees,
   d) known infected isolation for aged and otherwise vulnerable detainees, and
   e) known infected isolation and with moderate or severe COVID, or otherwise in deteriorating health.

   These protocols should include timing of assessments and instructions as to when to access a higher level of care, such as a physician or hospital. These should include a staffing roster with clearly defined roles. A registered nurse (RN) should perform or review assessments on a contemporaneous basis. Roles must be assigned consistent with licensure and there should be sufficient staff to carry out the duties outlined in the appropriate timelines. A general statement that Defendants will rely only on the CDC and IHSC Guidelines is insufficient. There should be Facility-specific guidance that incorporates these more general guidelines.

   *See* Dkt. 591-4 (Greifinger Decl.) ¶¶ 12-13, 18; Dkt. 591-2 (Allen Decl.) ¶ 9

2) **Explicit protocols for detainees with Limited English Proficiency**

All elements of the plan that involve communication with detainees must include a clear plan for using necessary language interpretation, including the use of medical interpreters.

*See* Dkt. 591-6 (Keller Decl.) ¶¶ 12.g, 49.

3) **Instructions for how to perform CPR in the face of COVID-infection**

4) **Thresholds for higher level care** such that custody and health care staff know when to refer COVID-19 positive individuals to what level of care
    o   *See* Dkt. 591-4 (Greifinger Decl.) ¶ 18. *See also* Dkt. 591-2 (Allen Decl.) ¶ 9 ("Every medical facility responsible for treating COVID patients should have a plan in place specific to their facility which includes…what criteria will be used to transfer the patient for higher level of care.").

5) **Protocol to ensure immediate attention for urgent** (as opposed to emergent) conditions. Mesa Verde must have a system for responding within minutes to a class member who develops symptoms or shows signs of deterioration, including:
    a) A plan for having a dedicated trained officer to the COVID-infected dorm (Dorm B) 24/7.
    b) Training for the officer to identify signs and symptoms requiring urgent treatment (which should be done by a medical professional).
    c) Clear <u>requirements</u> that the officer summon medical professionals in response to medical requests and under other clearly-defined circumstances.
    d) Medically-appropriate definitions of what constitutes an emergency in the COVID context, including:
        1. Difficulty breathing
        2. Persistent pain or pressure in chest
        3. New confusion
        4. Inability to wake/stay awake
        5. Bluish lips/face
    e) On-call medical professional who can immediately report for evaluation when an issue is flagged.
    f) Clear plan and timelines for responding to oral requests for care.

*See* Dkt. 591-4 (Greifinger Decl.) ¶¶ 7-10, 27. "Mesa Verde should have an officer in Dorm B at all times (24/7) to monitor whether any detainee needs immediate medical intervention. That officer must be provided with appropriate training to be able to identify the signs and symptoms that require urgent or emergent evaluation and treatment. It is not enough to have general emergency practices in place, or for custody officers to know that they can call the medical department in case of an emergency. What constitutes an emergency, in the context of a dorm full of COVID-19 positive individuals, must be well-defined." Dkt. 591-4 (Greifinger Decl.) ¶ 8. *See also* Dkt. 591-5 (Hernandez Decl.) ¶ 7 (importance of identifying "warning signs for health deterioration); Dkt. 591-2 (Allen Decl.) ¶ 11 ("There must also be a system in place for life support or "Code Blue" situations.").

6) **Protocol to ensure minimal delay for transport to emergency care**, including:
   a) Clear, streamlined process for summoning emergency assistance.
   b) No obstacles to summoning emergency care.
   c) Deference to medical staff on all situations requiring medical or nursing judgment.

   *See* Dkt. 591-4 (Greifinger Decl.) ¶¶ 9, 11. Dkt. 591-2 (Allen Decl.) ¶ 11

7) **Protocol to inform COVID-positive detainees how to self-identify COVID-19 medical emergencies**

   Training should be provided by medical staff and include the provision of clear information on how to identify, but not treat, a COVID medical emergency.

   *See* Dkt. 591-4 (Greifinger Decl.) ¶ 16.

8) **Protocol to provide basic health information to detainees, including test results for those who have been tested for COVID**

   *See, e.g.*, Dkt. 591-5 (Hernandez Decl.) ¶ 20.

9) **Protocol for vaccination against influenza and testing for other respiratory illnesses**

   Dkt. 591-2 (Allen Decl.) ¶ 25.

10) **Protocol to respond to surge in COVID-positive detainees** (in addition to plan for responding to and caring for individual patients)

    *See* Dkt. 591-4 (Greifinger Decl.) ¶ 18.

11) **Protocol to describe when COVID-19 positive individuals are deemed "recovered"**

    Dkt. 591-2 (Allen Decl.) ¶ 18.

12) **Protocol and criteria for COVID-19 point-of-care testing of symptomatic detainees**

    *See* Dkt. 591-6 (Keller Decl.) ¶ 23.

13) **Protocols and criteria for contact tracing**

14) **Training for medical staff and line staff, including:**
    a) Health care staff training on mode of transmission, use of containment, and signs and symptoms of disease and deterioration.
    b) Security staff training on when to summon medical professional and when to call 911.

4

*See* Dkt. 591-4 (Greifinger Decl.) ¶ 15.

15) **Mechanism to evaluate the quality of compliance with the policies and training in the plan**

    *See* Dkt. 591-4 (Greifinger Decl.) ¶ 17.

16) **Protocol to minimize risk of transmission *via* staff and *to* staff**

    *See, e.g.*, Dkt. 591-5 (Hernandez Decl.) ¶¶ 15, 16

17) **Detailed plan for provision and use of personal protective equipment (PPE)**

    Dkt. 591-2 (Allen Decl.) ¶ 9 ("Details as to how healthcare providers should be containing spread of the infection should be very clear, including which masks should be worn, and how PPE is to be donned and doffed. Healthcare personnel should be fit-tested for N-95 masks, and if the N-95 mask cannot be documented to be adequate for the healthcare provider, access must be available for the provider to be trained and to wear a powered air-purifying respirator (PAPR). Face shields should be in use in addition to N-95 masks."). *But see* GEO Feb. 28 Guidance at 7 ("Facility Administrator/designee will assure an adequate supply of PPE is maintained on-site.").

18) **Plan to ensure hygiene and sanitation throughout the facility**, including in particular among those detainees in isolation and contact quarantine

    Dkt. 591-2 (Allen Decl.) ¶ 9

19) **Plan to ensure sufficient medical supply level**

    Dkt. 591-2 (Allen Decl.) ¶¶ 4, 14

20) **Protocol to ensure proper coordination with local public health officials** in the case of infections, outbreaks, and hospitalizations

    *See, e.g.*, Dkt. 591-5 (Hernandez Decl.) ¶ 18

21) **Alternative or contingency plans**, i.e., if there is an outbreak or if hospitalization is needed and there are insufficient beds available at the local hospital