1   WILLIAM S. FREEMAN (SBN 82002)
    wfreeman@aclunc.org
2   SEAN RIORDAN (SBN 255752)
    sriordan@aclunc.org
3   AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF NORTHERN
4   CALIFORNIA
    39 Drumm Street
5   San Francisco, CA 94111
    Telephone: (415) 621-2493
6   Facsimile: (415) 255-8437

7   *Attorneys for Petitioners-Plaintiffs*
    Additional Counsel Listed on Following Page

    MANOHAR RAJU (SBN 193771)
    Public Defender
    MATT GONZALEZ (SBN 153486)
    Chief Attorney
    GENNA ELLIS BEIER (CA SBN 300505)
    genna.beier@sfgov.org
    EMILOU H. MACLEAN (CA SBN 319071)
    emilou.maclean@sfgov.org
    FRANCISCO UGARTE (CA SBN 241710)
    francisco.ugarte@sfgov.org
    OFFICE OF THE PUBLIC DEFENDER
    SAN FRANCISCO
    555 Seventh Street
    San Francisco, CA 94103
    Direct: 415-553-9319
    Fax:    415-553-9810

8

9

10                  UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
11                    SAN FRANCISCO DIVISION

12

13   ANGEL DE JESUS ZEPEDA RIVAS,              Case No. 3:20-cv-02731-VC
     BRENDA RUIZ TOVAR, LAWRENCE
14   MWAURA, LUCIANO GONZALO              **FIRST AMENDED CLASS**
     MENDOZA JERONIMO, CORAIMA           **PETITION FOR WRIT OF**
15   YARITZA SANCHEZ NUÑEZ, JAVIER       **HABEAS CORPUS AND CLASS**
     ALFARO, DUNG TUAN DANG, JUAN        **COMPLAINT FOR INJUNCTIVE**
16   JOSE ERAZO HERRERA, RAJNISH         **AND DECLARATORY RELIEF**
     RAJNISH, and WILLIAN MATIAS
17   RAUDA,

18                  Petitioners-Plaintiffs,

19          v.

20   DAVID JENNINGS, Acting Director of the
     San Francisco Field Office of U.S. Immigration
21   and Customs Enforcement; TONY H. PHAM,
     Senior Official Performing the Duties of the
22   Director of the U.S. Immigration and Customs
     Enforcement; U.S. IMMIGRATION AND
23   CUSTOMS ENFORCEMENT; GEO GROUP,
     INC.; and NATHAN ALLEN, Warden of Mesa
24   Verde Detention Facility,

25                  Respondents-Defendants.

26

27

28
     FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
                        INJUNCTIVE AND DECLARATORY RELIEF

1  BREE BERNWANGER (SBN 331731)         MARTIN S. SCHENKER (SBN 109828)
   bbernwanger@lccrsf.org                mschenker@cooley.com
2  HAYDEN RODARTE (SBN 329432)          COOLEY LLP
   hrodarte@lccrsf.org                   101 California Street, 5th Floor
3  LAWYERS' COMMITTEE FOR               San Francisco, CA  94111
   CIVIL RIGHTS OF                       Telephone: (415) 693-2000
4  SAN FRANCISCO BAY AREA                Facsimile: (415) 693-2222
   131 Steuart St #400
5  San Francisco, CA 94105              TIMOTHY W. COOK (Mass. BBO# 688688)*
   Telephone: (415) 814-7631             tcook@cooley.com
6                                        FRANCISCO M. UNGER (Mass. BBO# 698807)*
   JUDAH LAKIN (SBN 307740)              funger@cooley.com
7  judah@lakinwille.com                  COOLEY LLP
   AMALIA WILLE (SBN 293342)             500 Boylston Street
8  amalia@lakinwille.com                 Boston, MA 02116
   LAKIN & WILLE LLP                     Telephone: (617) 937-2300
9  1939 Harrison Street, Suite 420       Facsimile: (617) 937-2400
   Oakland, CA 94612
10 Telephone: (510) 379-9216
   Facsimile: (510) 379-9219
11
12 JORDAN WELLS (SBN 326491)
   jwells@aclusocal.org
13 STEPHANIE PADILLA (SBN 321568)
   spadilla@aclusocal.org
14 AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF SOUTHERN CALIFORNIA
15 1313 West Eighth Street
   Los Angeles, CA 90017
16 Telephone: (213) 977-9500
   Facsimile: (213) 977-5297

17                    *Attorneys for Petitioners-Plaintiffs*
                         *Admitted Pro Hac Vice*

1    **I.   INTRODUCTION**

2        1.      Defendant Immigration and Customs Enforcement (ICE) has been holding

3 Petitioners-Plaintiffs (Plaintiffs) and a proposed class of similarly situated detainees in civil

4 immigration detention at Yuba County Jail (YCJ) and Mesa Verde ICE Processing Facility

5 (Mesa Verde) (collectively, the Facilities) under extraordinarily dangerous conditions during the

6 current COVID-19 pandemic. Defendants GEO Group, Inc., the for-profit ICE contractor that

7 runs Mesa Verde, and Nathan Allen, a GEO employee and the Warden at Mesa Verde

8 (collectively, GEO), are the agents and/or alter ego of Defendant ICE, and perform a

9 governmental function in connection with the detention of proposed class members at Mesa

10 Verde, and are therefore liable for the constitutional violations described herein.

11        2.      Two of the most effective means of preventing the spread of COVID-19 are

12 social distancing—where people limit unnecessary interactions and remain at least six feet apart

13 from each other whenever possible—and swift testing and separation of individuals who may be

14 infected with the virus. But months into the global COVID-19 pandemic, conditions at the

15 Facilities still rendered social distancing impossible, and Defendants refused to take even

16 minimal precautions to test and separate those who are or may be infected with COVID-19.

17 Detainees in the Facilities lived in crowded, shared spaces. Many slept and spent most waking

18 hours within arm's reach of one another in assigned bunk beds in cramped dormitories. When

19 one bed emptied, usually because a detainee was deported, it was swiftly filled with a new

20 arrestee who was neither tested nor quarantined before entering the general population. Until

21 barred from doing so by a COVID outbreak and subsequent court order concerning one of the

22 Facilities, ICE continued to introduce new detainees into both Facilities. All the while, detainees

23 shared dining areas, standing inches apart as they waited in line for food and then sitting

24 shoulder to shoulder as they ate on chairs that are bolted to the floor. They shared communal

25 bathrooms and showers that were similarly congested, with toilet and shower stalls that were

26 well under six feet apart and separated only by thin dividers, and with adjacent sinks that left the

27 detainees using them standing shoulder to shoulder. The toilets and showers, moreover, were

28

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

1  not disinfected after each use. Detainees have had little access to essential hygiene products

2  such as hand sanitizer. ICE and GEO's failure to provide adequate hygiene—necessary to help

3  stem the transmission of COVID-19—has risked exacerbating the health crisis COVID-19 has

4  caused, and will inevitably continue to cause, because the Facilities lack proper social

5  distancing.

6      3.      Defendants' refusal to adequately respond to the COVID-19 pandemic has

7  required emergency court intervention in multiple lawsuits, including multiple orders in this

8  one. Court intervention secured the temporary release of many class members to facilitate social

9  distancing and imposed testing and quarantine requirements in Mesa Verde in the face of a

10  massive COVID-19 outbreak. Despite this intervention, absent a permanent injunction,

11  Defendants' practices in the Facilities will continue to subject detainees to catastrophic risk.

12      4.      While certain individuals are at higher risk of severe illness or death if they

13  contract COVID-19, all members of the proposed class are at risk of severe respiratory distress,

14  damage to vital organs, other debilitating, long-term health effects, and death.

15      5.      ICE's decision to continue to detain putative class representatives such as Brenda

16  Ruiz Tovar after the onset of the pandemic exemplifies ICE and the GEO Defendants'

17  dangerous course. Ms. Ruiz Tovar has prevailed against ICE in immigration court and been

18  granted relief by an immigration judge—twice. When she should have been safely sheltering at

19  home with her U.S.-citizen child and other family, ICE insisted on detaining her in an

20  environment where social distancing was impossible, releasing her nearly two months into the

21  pandemic and only upon a court order in this case.

22      6.      On behalf of all persons detained at the Facilities, the putative class

23  representatives respectfully request an order directing ICE and GEO to implement and maintain

24  social distancing, testing, and safe quarantine practices at the Facilities, including releasing

25  sufficient class members to make social distancing possible and implementing testing and

26  quarantine procedures for class members who remain detained.

27      7.      The Facilities are especially vulnerable to the explosive and lethal spread of

28

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

COVID-19. As Judge Chesney found before this lawsuit was filed, detainees in YCJ and Mesa Verde "cannot practice meaningful social distancing in their respective detention facilities." *Bahena Ortuño v. Jennings*, No. 20-CV-2064-MMC, 2020 WL 1701724, at *6 (N.D. Cal. Apr. 8, 2020). In the same vein, another decision predating this lawsuit emphasized failures by ICE to take appropriate measures to make social distancing possible at Mesa Verde. *Bent v. Barr*, No. 19-cv-06123- DMR, 2020 WL 1812850, at *6 (N.D. Cal. Apr. 9, 2020) ("Although Respondents represent that they are following CDC guidelines, they make no representations that they have attempted to implement CDC recommendations on social distancing in detention facilities, including by staggering meal and recreation times, rearranging bunks and dining hall seating, or minimizing the mixing of individuals from different housing units."). Even months after these decisions, Defendants refused to take the precautions necessary to ensure the reasonable safety of those in their custody until ordered by the Court to do so.

8.      Defendants continued to fail to act after seeing the devastating results of such failures elsewhere, with COVID-19 suddenly tearing through detention centers, yielding fatalities and alarming rates of cases. At the Otay Mesa Detention Center near San Diego, the virus had spread to half the facility and infected scores of detainees and staff by April 2020. In the midst of growing outbreaks at ICE detention facilities, ICE's acting director stated to a congressional committee on April 17, 2020 that the agency had no existing plans to release additional detainees around the country. As ICE refused to act, the outbreaks, not surprisingly, increased throughout ICE's detention centers nationwide. In August 2020, even after population reductions secured by court order, over half of the class members who remained detained in Mesa Verde contracted the virus when Defendants refused to test detainees, and to quarantine in response to positive cases.

9.      Without conditions that make it possible to achieve comprehensive social distancing, and to ensure preventative quarantine and effective testing of potentially-exposed detainees, there will be no effective way to prevent the transmission of COVID-19 in the Facilities. In the absence of sufficient reductions in population levels at the Facilities and safe

testing and separation practices for detainees who remain, remedial measures such as improved sanitation or hygiene will be insufficient to prevent the spread of COVID-19. As the CDC has warned, COVID-19 presents a serious risk of widespread transmission via asymptomatic carriers. Thus, screening and quarantine practices based on demonstrated symptoms or on whether a new detainee has been in contact with a known carrier of the virus are inadequate to contain the spread of the virus.

10.     Numerous courts released individual habeas petitioners from YCJ and Mesa Verde before this case was filed. But relief in such cases benefitted a select number of immigrants with attorneys. Meanwhile, the vast majority of detainees at the Facilities lack the resources to file individual lawsuits. Even if they all could somehow sue, a piecemeal approach would be too slow to meet the emergency at hand, too disorganized to ensure an orderly process, and too resource-intensive to be sustainable. It would also fail to reckon with the broader issue at stake: namely, that it is unconstitutional for ICE and GEO to detain individuals in crowded detention facilities without meaningful safety precautions in the context of the current pandemic. ICE's and GEO's patently inadequate response to the pandemic—including the glacially slow pace at which ICE released detainees at its onset and Defendants' resistance to implementing effective public health measures—endangers the lives of class members by failing to protect them from contracting COVID-19. The resulting risk of harm is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). This class action is a superior mechanism for the Court to address the due process violation at hand and resolve class members' overlapping claims to relief.

11.     While social distancing is now ubiquitous in all corners of American society, and government authorities have been ordering reductions in prison and jail populations throughout the country, YCJ and Mesa Verde remain an aberration. As district courts around the country have found, Defendants' continued detention of civil detainees where there is "potential exposure . . . to a serious, communicable disease" that is "very likely to cause a serious illness"

violates the Due Process Clause. *Castillo v. Barr*, No. cv-20-00605 TJH (AFMX), 2020 WL 1502864, at *5 (C.D. Cal. Mar. 27, 2020) ("Civil detainees must be protected by the Government. Petitioners have not been protected. They are not kept at least 6 feet apart from others at all times."); *see also Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL 1429877, at *1 (9th Cir. Mar. 24, 2020) (*sua sponte* ordering immediate release of ICE detainee "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers"); *see also Bahena Ortuño*, 2020 WL 1701724, at *4 (holding that four individuals were likely to succeed that continued detention violated due process where they "cannot practice meaningful social distancing in their respective detention facilities"); *see also Bent*, 2020 WL 1812850, at *6  (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) ("[E]ven assuming that Respondents accurately describe Mesa Verde's current practices, these practices are inadequate to ensure the 'safety and general wellbeing' of Mesa Verde detainees during the COVID-19 pandemic.").

12.     The present circumstances call for class treatment, in the interests of ICE detainees as well as orderly and fair judicial administration. *See Hernandez Roman v. Wolf*, 2020 WL 5683233, at *5 (9th Cir. Sept. 23, 2020) (affirming provisional certification of class of immigrant detainees at Adelanto ICE Processing Center).  As District of Massachusetts Judge William Young stated in certifying a facility-wide class of ICE detainees, all detainees in a given facility share an interest in the "release [of] a critical mass of [d]etainees—such that social distancing will be possible and all those held in the facility will not face a constitutionally violative substantial risk of serious harm." *Savino v. Souza*, 20-cv-10617-WGY, 2020 WL 1703844 at *7 (D. Mass. Apr. 8, 2020); *see also Hernandez Roman*, 2020 WL 5683233, at *5 ("The preliminary injunction afforded class-wide relief that would have remedied the constitutional violations as to all detainees, even though it would have entailed the release or transfer of only some of the detainees.").

13.     This Court has the authority to order ICE to release as many class members as necessary to guard against the spread of COVID-19 in the Facilities, and to require Defendants

to take such steps as may be necessary with respect to the conditions of confinement at the Facilities to comply with the Fifth Amendment. Whether by setting a benchmark population limit during the pandemic, by requiring Defendants to develop appropriate plans and protocols for the testing, detention and care of class members during an ongoing pandemic, or—as the Plaintiffs' first motion for preliminary injunction proposed, by engaging in expedited review of class members' requests for release,[1] this Court should proceed with all dispatch to order ICE to release enough class members to enable the necessary social distancing and to order Defendants to take measures to protect the health and safety of class members. Furthermore, this Court should order ICE to abstain temporarily from introducing any new detainees into the Facilities.

## II.   JURISDICTION AND VENUE

14.     Jurisdiction is proper and relief is available pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (original jurisdiction), 5 U.S.C. § 702 (waiver of sovereign immunity), 28 U.S.C. § 2241 (habeas corpus jurisdiction), 28 U.S.C. §§ 2201-02 (declaratory relief); 28 U.S.C. § 1651 (All Writs Act); 28 U.S.C. § 1361 (mandamus); Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause); the Due Process Clause of the Fifth Amendment to the United States Constitution; the First Amendment to the United States Constitution; and Article III of the United States Constitution.

15.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(e), because at least one federal Defendant resides in this District. Venue is also proper under 28 U.S.C. § 2243 because the actual custodians of all Plaintiffs reside in this District.

## III.   PARTIES

### A.   Plaintiffs

16.     **Angel de Jesus Zepeda Rivas** is a 32-year-old man who was detained by ICE at

---

[1] This truncated system for considering class members' claims for release is similar to one that has been in use for ICE detainees in the District of Massachusetts and in other courts. *See Savino*, 2020 WL 1703844. *See also* In re Expedited Detention Hearing Procedures Effective April 7, 2020, Miscellaneous General Order 20-12 (D. Alaska) (establishing expedited procedures for consideration motions for pretrial and presentence release based on COVID-19); Criminal Case Standing Order Re: Procedure for Review of Detention Orders in Light of Coronavirus Pandemic, M.J. Nat Cousins, Effective Mar. 16, 2020 (N.D. Cal.) (establishing expedited procedure for any request to reopen a detention hearing on health grounds in light of COVID 19 pandemic).

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

YCJ from November 21, 2019 until ICE released him under the pressure of this litigation. He has a two-year-old U.S.-citizen child with his long-term partner. Angel was diagnosed with type 2 diabetes in early 2019, and prior to arriving at YCJ, was taking medication to control the diabetes. During his time at YCJ, Angel experienced worsening symptoms, including painfully swollen feet and legs and tingling and numbness throughout his body. Angel has recently been diagnosed with hypertension, and the shortness of breath and chest pain have led to a constant fear of a life-threatening health event. YCJ medical staff recently prescribed him medication for diabetes and hypertension, along with chronic headaches and severe allergies, but this treatment has failed to relieve the pain, swelling, and other symptoms.

17.     Angel was found to have reasonable fear of torture if returned to his native country, El Salvador, and is in withholding proceedings. As a teenager, he was targeted by gangs and, when he refused to sell drugs for them, was sexually and physically assaulted. He has also been severely beaten by law enforcement in El Salvador. As COVID-19 spread through the United States, he was terrified to stay in YCJ, since he was unable to maintain a safe distance or protect himself from COVID-19, while sleeping in his bunk bed, standing in line for his medication and meals, or even while walking to see the medical staff at the facility. When he ran out of soap to wash his hands and clothes, Angel would use a chemical disinfectant, which would burn his skin. Angel experienced COVID-19 symptoms in YCJ but was never tested for coronavirus there. While he was detained, Angel's partner's adult daughter stood ready to receive him into her home in Oakland, California until he was past the COVID-19 incubation period, at which point he could have returned home to his own two-year-old daughter and partner.

18.     **Brenda Rubi Ruiz Tovar** is a 31-year-old Mexican national who was detained by ICE at YCJ from October 2, 2018 until the court ordered her temporary release on May 6, 2020 pending this litigation. She suffers from PTSD and Generalized Anxiety Disorder, stemming from childhood sexual abuse. Twice, she has won relief from deportation under the Convention Against Torture in immigration court. Each time, the Immigration Judge found that

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

1  she met the high bar of showing it is more likely than not she will be tortured or killed in

2  Mexico by or with the acquiescence of government actors. Each time, ICE has appealed the

3  Judge's grant of protection. She remained in detention while her case was on appeal to the

4  Board of Immigration Appeals (BIA) a second time. In the twenty-plus months Brenda was in

5  detention, she was separated from her family, including her 11-year-old U.S.-citizen son,

6  throughout her removal proceedings.

7     19.     Brenda suffered symptoms consistent with COVID-19 while at YCJ. After

8  contact with a fellow detainee who was sick, she was quarantined for several days with two

9  other women. Even while in quarantine, she was unable to maintain the recommended distance

10  from her cellmate, and she was forced to clean a bathroom area covered in feces. She was tested

11  for the flu, but never for COVID-19, and then reintegrated into the general population. She now

12  lives with her parents in Fresno, California, who were ready and able to receive her into their

13  home since her detention.

14     20.     **Lawrence Mwaura** is a 27-year-old man who was detained at YCJ from April

15  12, 2019 until the Court ordered his temporary release on October 20, 2020. In 2002, he fled

16  Kenya, fearing for his life. He was granted asylum in 2003 and became a permanent resident in

17  2006. His mother, brother, and sister are naturalized U.S. citizens, and his wife is a U.S. citizen.

18  Lawrence is contesting a final order of removal before the Ninth Circuit, which has issued a

19  stay preventing ICE from removing him.

20     21.     Due to respiratory complications stemming from severe pneumonia which he

21  suffered while working as a firefighter in 2014, Lawrence demonstrated asthma symptoms and

22  later contracted Valley Fever in March 2018. These conditions have caused him permanent lung

23  scarring, severe pain, difficulty breathing, coughing, and high sensitivity to pollutants, air-bone

24  particles, and changes in temperature. His respiratory specialist told him his Valley Fever can

25  return at any time and cause serious damage to his brain, nervous system, and skeletal system,

26  including paralysis. Lawrence continues to experience difficulty breathing, lung pain, and cough

27  in the cold, dusty confines of YCJ. Although his specialist told him he should have his blood

28

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

cells checked every 90 days to monitor his immune system due to his Valley Fever, YCJ medical staff did not test him for over ten months. A psychiatrist at YCJ also informed Lawrence that he meets the criteria for Post-Traumatic Stress Disorder. While detained at YCJ, Lawrence was terrified due to the lack of social distancing, unsanitary facility conditions, inadequate ventilation against contagion and air pollutants, constant movement of YCJ staff into the facility, and YCJ officials' lack of policies to protect detainees from COVID-19 infection.

22.     **Luciano Gonzalo Mendoza Jeronimo** is a 31-year-old Indigenous Mayan man and Guatemalan national who was in civil detention at YCJ, from February 2020 until ICE released him under the pressure of this litigation. His wife and daughter are permanent residents and his youngest son is a U.S. citizen, born in Berkeley, California. Luciano fled Guatemala after he was beaten by the National Civil Police for refusing forcible recruitment. His wife was granted asylum and filed a petition on his behalf. However, because he had a prior order of removal in absentia, ICE arrested him and reinstated the prior order. He passed a reasonable fear screening test with an asylum officer and was placed in withholding-only proceedings.

23.     Luciano feared contracting COVID-19 while at YCJ. Even though his pod was not completely full, he reported that it was not possible to consistently maintain six feet of distance. Throughout his detention, his wife and children stood ready to receive him into their home in Oakland, California.

24.     **Coraima Yaritza Sanchez Nuñez** is a 26-year-old Mexican national who was in civil detention at Mesa Verde from April 2019 until ICE released her under the pressure of this litigation. The United States is the only country she knows, having been brought here as an infant. She received Deferred Action for Childhood Arrivals ("DACA") when the program first began. As a DACA beneficiary, she worked as a full-time Lead Teller at Chase Bank for just under five years. She was detained by ICE in 2019, the year after she lost her DACA protection. She is currently pursuing an appeal to the BIA. Her U.S.-citizen husband will be filing a Form I-130, Petition for Alien Relative, in order to begin the Immigrant Visa process on her behalf.

25.     Coraima has always suffered from asthma, a condition aggravated whenever she

suffers from a cold or flu. She knows that her asthma puts her at a higher risk of suffering severe complications from COVID-19. She has participated in the hunger strike at Mesa Verde to convey through symbolic speech the inhumane conditions inside the facility—including not receiving antibacterial soap, cleaning supplies, and protective equipment—and to call for liberation from immigration detention. She felt very threatened by Defendants' threats of suspending her access to commissary, but she was even more worried about dying from COVID-19. Throughout her time in detention, her husband and family who all live in Sonoma, County, California, stood ready to receive her back into their home.

26.     **Javier Alfaro** is a 39-year-old Salvadoran national who was detained by ICE at Mesa Verde from January 14, 2020 until ICE released him under the pressure of this litigation. Javier was granted Temporary Protected Status (TPS) in approximately 2001, and only when he was placed in removal proceedings did he learn that DHS sought to terminate it. He was arrested by plainclothes ICE officers at the Fresno County Courthouse after a criminal court hearing he was required to attend. Between then and his release in May 2020, he was separated from his wife and three U.S.-citizen children, ages 15, 8, and 10 months.

27.     Javier suffers from diabetes, high cholesterol and high blood pressure. In Mesa Verde, he worried for himself and for the safety of all detainees, because their ability to stay healthy was largely out of their control. He reported that even after the onset of the pandemic, within hours of a bed emptying in his 100-person dorm, a new detainee would arrive to fill it. Throughout Javier's detention, his family stood ready to receive him back into their home in Mendota, California.

28.     **Dung Tuan Dang** is a 49-year-old Vietnamese national who was detained by ICE at Mesa Verde from June 7, 2019 until the court ordered his temporary release pending this litigation on June 10, 2020. Dung's father was a U.S. soldier fighting in Vietnam, and his mother was a Vietnamese woman. His biological parents abandoned him, and he was taken in by an adoptive Vietnamese family. He immigrated lawfully to the United States in 1989 under the Homecoming Act and has lived here continuously since then. Despite the fact that Dung was

stoned, beaten, and forced into a labor camp as a child, the Immigration Judge found that he would not face the requisite level of risk if he were deported to Vietnam. His application for protection was denied and he was ordered removed. He is now appealing to the BIA. Even if his removal order becomes final, he is very unlikely to be deported to Vietnam because of a long-standing diplomatic agreement concerning Vietnamese nationals who entered the United States before July 12, 1995. In that event, it is likely he eventually will be entitled to release from detention if and when it becomes clear the detention serves no legitimate purpose.

29.     Dung has a latent tuberculosis infection, which puts him at an elevated risk of suffering severe complications from COVID-19. After the onset of the pandemic, he was terrified to remain at Mesa Verde, where social distancing is impossible. He participated in the hunger strike aimed to get public attention on the dangers of COVID-19 to himself and fellow detained individuals. Throughout his detention, his adopted parents and siblings, stood ready to receive them in their home in San Jose, California.

30.     **Juan Jose Erazo Herrera** is a 20-year-old national of El Salvador who first entered the United States as an unaccompanied minor at the age of 16 years old. He is currently detained at YCJ. He is a survivor of child abuse, and as a teenager, he was tortured by the Salvadoran military and police, and also suffered threats from gang members. The immigration judge denied his application for relief. Juan Jose appealed this decision, and his case is currently at the Ninth Circuit Court of Appeals.

31.     In August 2020, a family court judge appointed U.S. citizen Pedro Alanis as Juan Jose's legal guardian due to abandonment and neglect by both parents and abuse by his mother. He now also has a pending application for Special Immigrant Juvenile Status. Juan Jose has been a leader while in custody at Yuba, participating in six hunger strikes and frequently speaking out about conditions there. The California Immigrant Youth Justice Alliance and numerous other local organizations have submitted letters in support of his release. He is a past smoker, and suffers from post-traumatic stress disorder based on the violence he suffered in El Salvador.

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

1    32.    **Rajnish Rajnish** is a 19-year-old national of India who fled to the United States

2    after he was badly beaten and threatened with death because of his family's political beliefs.

3    Upon arrival, he was designated an unaccompanied minor. He is currently detained at YCJ. In

4    July 2020, an Immigration Judge granted Rajnish withholding of removal because of the high

5    likelihood he will suffer renewed persecution or torture in India. However, he remains detained

6    because the government appealed the Immigration Judge's decision to the Board of Immigration

7    Appeals, a process which could take months to resolve. Rajnish suffers from adjustment

8    disorder and schizophrenia. He continues to be designated a patient with "mental health special

9    needs" by health care workers at YCJ. He has suffered symptoms consistent with COVID

10    during his detention, including significant and recurring respiratory symptoms, but has never

11    been tested for COVID-19.

12    33.    **Willian Matias Rauda** is a 23-year-old father of two U.S. citizen children. He is

13    currently detained at Mesa Verde. He fled his native El Salvador at 16 years old after being

14    caught in a crossfire between gangs and police. As a teenager, gangs forced him to do work for

15    them against his will. The police misidentified him as an active gang member, and he was

16    tortured on two different occasions by two different state security forces.

17    34.    In removal proceedings, Willian applied for relief under the Convention Against

18    Torture, asserting that it was more likely than not that he would be tortured again if deported to

19    El Salvador. The Immigration Judge found that Willian had been tortured on multiple occasions

20    by police, but denied Willian's application because he found that Willian was now a family man

21    and unlikely to be tortured because police would no longer identify him as a gang member. He

22    appealed this decision. His case is currently before the Ninth Circuit Court of Appeals. Willian

23    suffers from asthma, and has reported significant breathing problems since being detained at

24    Mesa Verde. His asthma places him at an elevated risk of suffering severe complications from

25    COVID-19. Willian has also complained of severe prostate pain over the past several months.

26    **B.    Defendants**

27    35.    Respondent-Defendant David Jennings is the Acting Field Officer Director for

28

the San Francisco Field Office of ICE and maintains his office in San Francisco, California, within this judicial district. The San Francisco Field Office is responsible for carrying out ICE's immigration detention operations at Mesa Verde and YCJ. Defendant Jennings is a legal custodian of Plaintiffs. He is sued in his official capacity.

36.     Respondent-Defendant Tony H. Pham is the Deputy Director and Senior Official Performing the Duties of the Director of ICE. Defendant Pham is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants. Defendant Pham is a legal custodian of Plaintiffs. He is sued in his official capacity.

37.     Respondent-Defendant ICE is a federal law enforcement agency within the Department of Homeland Security. ICE is responsible for the criminal and civil enforcement of immigration laws, including the detention and removal of immigrants. Enforcement and Removal Operations ("ERO"), a division of ICE, manages and oversees the immigration detention system. Defendant ICE is a legal custodian of Plaintiffs.

38.     Defendant GEO Group, Inc. is a private company that contracts with government entities to provide corrections officers and other detention-related services, and in doing so performs a governmental function. It is headquartered in Boca Raton, Florida. GEO contracts with ICE to operate Mesa Verde.

39.     Defendant Nathan Allen is a GEO employee and the warden of Mesa Verde Detention Facility. He is sued in his official capacity.

IV.     **FACTUAL ALLEGATIONS**

        A.     **COVID-19 Poses Grave Risk of Harm, Including Serious Illness or Death.**

40.     COVID-19 is a disease caused by a coronavirus that has reached pandemic status.

41.     As of October 2020, COVID-19 has killed over 220,000 people in the United States, and more than 8.5 million people in the United States have tested positive for the virus. For months, the United States has had more confirmed cases than any other country in the world.

1    42.    As of October 2020, there were ICE reports that there have been more than 6,800

2    confirmed cases of COVID-19 in its detention facilities, although this total is likely understated,

3    due to the dearth of testing at ICE facilities.[2]

4    43.    People who contract severe cases of COVID-19 need intensive medical support,

5    requiring highly specialized equipment that is in limited supply, and an entire team of care

6    providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care

7    physicians.

8    44.    COVID-19 infects people who come into contact with respiratory droplets and

9    aerosols that contain the coronavirus, such as those produced when an infected person talks,

10   coughs or sneezes. Such droplets and aerosols can spread between people at distances of greater

11   than six feet. The virus that causes COVID-19 is highly contagious and can survive for long

12   periods in the air and on inanimate surfaces, making it inevitable that the disease will spread

13   among communities where it appears.

14   45.    COVID-19 can severely damage lung tissue, which requires an extensive period

15   of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity.

16   COVID-19 may also cause inflammation of the heart muscle. This is known as myocarditis; it

17   can affect the heart muscle and electrical system, reducing the heart's ability to pump. This

18   reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart

19   failure that limits exercise tolerance and the ability to work.

20   46.    COVID-19 also can trigger an over-response of the immune system, further

21   damaging tissue and potentially resulting in widespread damage to the body's organs, including

22   permanent injury to the kidneys and neurologic injury.

23   47.    The need for care, including intensive care, and the likelihood of death, is much

24   higher from COVID-19 than from influenza.

25   48.    Current research estimates the fatality rate for COVID-19 to be much higher—

26   ten times or more—than a severe seasonal influenza, even in advanced countries with highly

27

28   _____
     [2] *ICE Guidance on COVID-19*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/covid19.

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

1  effective health care systems.

2  49.     There is no known cure for COVID-19 at this time. The only way to protect

3  people from grave illness and death is to prevent them from being infected with the coronavirus.

4  Thus, the only known means of minimizing the risk of infection is social distancing, combined

5  with rigorous sanitization practices. The only means of definitively detecting infection is

6  testing. Promising forms of treatment, such as Remdesivir, remain expensive and not widely

7  available.

8  50.     Nor is there scientific consensus as to whether COVID-19 infection confers

9  immunity. Subsequent infections are possible and can be more serious than the initial infection.

10  **B.     Everyone Detained at the Facilities is Vulnerable to Harm from COVID-19.**

11  51.     Every adult faces grave risks of harm from COVID-19, not just those deemed

12  particularly vulnerable. The CDC has reported that up to 20% of coronavirus hospitalizations in

13  the United States were of people under 44. And the WHO has reported that, globally, 10-15% of

14  adults under 50 who contract COVID-19 suffer moderate to severe cases.

15  52.     Recent findings reveal that the incidence of COVID-19 in the U.S. is "highest

16  amount young adults ages 20 to 29" and "adults ages 30 to 39" are the "second-largest group of

17  cases."[3] A research paper published in the American Medical Association's Internal Medicine

18  Journal found that, in a study of 3,200 adults ages 18 to 34 hospitalized with COVID-19, 21

19  percent required intensive care, 10 percent required mechanical ventilation and nearly 3 percent

20  died.[4] These findings make clear that  "Covid-19 is a life-threatening disease in people of all

21  ages…."[5]

22  53.     Preliminary data shows that Black and Hispanic people are twice as likely to die

23  of COVID-19 as are white people. There is a significantly higher proportion of Black and

24  Hispanic people at the Facilities than in the broader U.S. population.

25  54.     The Facilities also include a disproportionate number of people at heightened

26  _____

27  [3] Jacqueline Stenson, *Young people are at risk of severe Covid-19 illness*, NBC News (Sept. 28, 2020),
   https://www.nbcnews.com/health/health-news/young-people-are-risk-severe-covid-19-illness-n1240761.
   [4] *Id.*

28  [5] *Id.*

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

risk for other reasons. The CDC and other experts have identified several particularly vulnerable groups, including older adults, people who are immunocompromised, and people with a variety of pre-existing medical conditions of any age, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis), diabetes, asthma, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (include sickle cell disease), inherited metabolic disorders, stroke developmental delay, pregnancy (current or recent), and obesity.

55.     A significant percentage of the individuals at the Facilities have these medical conditions. Many of these conditions are disproportionately present among populations who are indigent with little or no access to high-quality healthcare, which is true of class members. In many cases, these individuals may not even be aware that they have relevant pre-existing conditions. Many class members likely have undiagnosed risk factors for COVID-19.

**C.     Conditions at the Facilities Create a Massive Risk of COVID-19 Infection.**

56.     The conditions at the Facilities endanger the lives of all who are detained there, as well as staff who work there.

57.     Because of the ease with which COVID-19 can spread via respiratory droplets, aerosolized particles, and also through long-lasting contamination of surfaces, enclosed group environments are especially prone to facilitating the rapid spread of COVID-19.

58.     Enclosed group environments, and especially prisons and detention centers, have long been the epicenters of the most severe COVID-19 outbreaks. By the time this case was filed, more than 700 people had tested positive at the jail complex on Rikers Island, which boasted one of the country's fastest rates of transmission.[6] Prior to the Rikers outbreak, Cook County Jail in Chicago was considered the "largest single point of infection in the U.S., with more than 500 people testing positive."[7] Since then, enclosed carceral settings have continued to experience large-scale, dangerous, outbreaks. Avenal State Prison is the "state prison with the

highest cumulative case count," with a staggering 3,246 confirmed COVID-19 infections.[8] A

state appellate court recently ordered San Quentin State Prison, where 2,539 inmates have tested

positive for COVID-19, to release or move nearly 1,500 inmates, holding that this was the only

means to protect inmates in this congregate setting.[9] These group settings share fundamental—

and dangerous—similarities to detention centers like the Facilities: numerous people living

indoors in close proximity, staff that interacts with multiple individuals, and regular foot traffic

in and out of the facility.

59.     Many outbreaks in carceral settings have been traced to new entrants who were

not tested and quarantined properly. At San Quentin State Prison ("San Quentin"), over 1,500

inmates and over 200 staff were infected after being commingled with inmates who were

transferred from a facility with a known outbreak based on outdated test results and without

appropriate quarantining.[10] Detainee transfers without appropriate testing and quarantine

practices have also caused COVID-19 outbreaks in ICE detention centers in five states.[11] Staff

who come and go between their communities and congregate facilities are another widely

recognized cause of transmission.  *See Hernandez Roman v. Wolf*, CV 20-00768 TJH, 2020 WL

6107069, at *8 (C.D. Cal. Oct. 15, 2020) ("[T]he current COVID-19 outbreak [at Adelanto] was

most likely caused by a staff member who – hopefully, unknowingly – reported to work while

infected with COVID-19.").

60.     In response to such outbreaks, jails in more than half of the states in the country

have released thousands of people from criminal custody, acknowledging the grave threat that

---

[8] Kerry Klein, *Valley's New Cases Drop, But Not Within Avenal State Prison - COVID-19 Update For Sept. 25*, Valley Public Radio (Sept. 25, 2020), https://www.kvpr.org/post/valleys-new-cases-drop-not-within-avenal-state-prison-covid-19-update-sept-25#stream/0; The New York Times, *Covid in the U.S.: Latest Map and Case Count*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Oct. 23, 2020).

[9] *Covid in the U.S.: Latest Map and Case Count*, s*upra* note 7; Rebecca Griesbach and Timothy Williams, *San Quentin Ordered to Reduce Prison Population by Half Over Virus Fears*, The New York Times (Oct. 21, 2020), https://www.nytimes.com/2020/10/21/us/san-quentin-prison-coronavirus.html.

[10] Bob Egelko, *San Quentin coronavirus outbreak apparently result of missed steps by prison overseer*, San Francisco Chronicle (July 20, 2020), https://www.sfchronicle.com/news/article/San-Quentin-coronavirus-outbreak-apparently-15421664.php

[11] Lisa Riordan Seville and Hannah Rappleye, *ICE keeps transferring detainees around the country, leading to COVID-19 outbreaks*, NBC News (May 31, 2020), https://www.nbcnews.com/politics/immigration/ice-keeps-transferring-detainees-around-country-leading-covid-19-outbreaks-n1212856

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

1  an outbreak in jails and detention centers poses.[12] As the court noted in *United States v.*

2  *Garlock*, No. 18-cr-00418-VC, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020), "[b]y now

3  it almost goes without saying that we should not be adding to the prison population during the

4  COVID-19 pandemic if it can be avoided."

5        61.    The Facilities are similarly dangerous enclosed environments. Detainees in the

6  Facilities live, sleep, and eat in congregate, enclosed settings. Before a series of emergency

7  court orders in this case reduced their populations, detainees in YCJ and Mesa Verde had no

8  ability to keep a safe distance from large groups or to avoid surfaces that countless others

9  regularly contact. And they were subject to security measures that render "social distancing"

10  impossible. These are ideal incubation conditions for the rapid spread of COVID-19. Indeed,

11  they resulted in a catastrophic COVID-19 outbreak at Mesa Verde that infected more than half

12  of the detainees in the facility at the time.

13        62.    At the time of filing the Complaint, at Mesa Verde, all detainees lived in four

14  dormitories that held up to 100 detainees. As of April 2, 2020 two dorms were at or near

15  capacity. In these dormitories, detainees must share one large room for sleeping, eating, and

16  socializing. Their beds are bunked and placed only a few feet apart. Scores of detainees in each

17  dormitory must share a relatively small number of sinks, toilets, and showers. The facility has

18  two single-cell medical segregation units, three single-cell units for administrative segregation,

19  and three intake units that are not designed, outfitted or authorized for long-term detention.

20  These few individual cells are regularly occupied for reasons unrelated to COVID infections.

21  There is thus  limited space for isolation or quarantine in the event of an infection or outbreak.

22        63.    At the time of filing the Complaint, at YCJ, detainees lived in a variety of

23  housing units, each with its own alphabetical designation. There are three dorms (B, C, R) in

24  which detainees sleep in bunk beds in close proximity to one another. The C and D dorms have

25  50 beds. Six other housing units (G, H, I, J, K, L) have bunk beds bolted to the wall and are

26  separated from corridors by a set of bars with open space between the bars, so air flows freely

27  _____

28  [12] *Response to the COVID-19 pandemic*, Prison Policy Initiative (Apr. 16, 2020),
https://www.prisonpolicy.org/virus/virusresponse.html

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

between the cells and the corridors. The distance from top to bottom bunk throughout the facility is less than six feet. Several other housing units (A, D, E, F, P, S, Q, T and N) involve single-, double- or quad-cells surrounding a common area. Some of these are used as administrative and medical segregation units. YCJ includes both County and ICE detainees, and at the start of this litigation, various units commingled the two groups.

64.     As of April 18, 2020, there were 157 ICE detainees at YCJ. This marked a net *increase* of seven ICE detainees at YCJ since April 2. During the same period, the YCJ population of criminal detainees decreased by several dozen. Thus, during the same period that Yuba County responded to COVID-19 by decreasing its population of criminal detainees, ICE made the same facility *more crowded* than it otherwise would have been.

65.     Food preparation and food service in the Facilities is communal, with little opportunity for disinfection. Sinks, toilets, and showers are also shared. The showers are consistently dirty and infrequently sanitized.

66.     Staff members in the Facilities arrive and leave on a shift basis, and until the Court issued an order requiring testing of Mesa Verde staff, there was limited ability to adequately screen staff for new, asymptomatic infection.

67.     Moreover, because detention facilities also limit access to items and services that are necessary to maintaining hygiene, such as hand sanitizer and clean clothes, the risk of disease spread is even higher. And typically, there is little instruction given to detainees regarding sanitation, including in response to the COVID-19 pandemic. At the Facilities, detainees have not been provided with hand sanitizer. They have been instructed about the need for social distancing, but not consistently provided with conditions in which it can be practiced.

68.     Months into this litigation, Defendants had a policy and practice of introducing most new detainees into Mesa Verde with no testing or quarantine, despite the risks. They relied primarily on screening for symptoms. The fact that no detainees were tested for COVID-19 by late July as a result of an identification of COVID symptoms strongly suggests that the symptom screening was inadequate. ICE misrepresented its intake policy in a sworn filing and

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1   Defendants began testing new intakes only after the commencement of this litigation.

2       69.     Until required to do so by order of the Court, staff members at the Facilities were

3   not systemically testing detainees for COVID-19 or being tested themselves. The daily

4   temperature test introduced at YCJ was not an adequate replacement for an actual COVID-19

5   test. Even when more than a dozen staff members at Mesa Verde tested positive for COVID-19,

6   Defendants did not modify their policies to require greater staff testing or quarantining to

7   minimize the risk of transmission to class members.

8       70.     Just days before the filing of the Complaint in this action, a judge within the

9   Northern District found that conditions in YCJ and Mesa Verde made them ripe for the spread

10  of COVID-19 and rendered social distancing impossible:

11          [P]etitioners cannot practice meaningful social distancing in their respective
            detention facilities. Petitioners have offered evidence, undisputed by respondents,
12          that detainees, both at Yuba and Mesa Verde, are kept in close proximity, i.e., less
            than six feet apart, not only when in their living quarters… but also during meals…
13          and, at Yuba, when lining up for temperature checks as well.

14  *Bahena Ortuño*, 2020 WL 1701724, at *4.

15      71.     Dr. Robert Greifinger, a correctional health expert with over three decades of

16  prisoner health care experience, attests that the crowded conditions at immigration detention

17  centers like YCJ and Mesa Verde make one of the most vital preventive measures, social

18  distancing, impossible.

19      72.     At the outset of the pandemic, experts predicted that it was "perhaps inevitable"

20  that COVID-19 would reach immigration detention facilities like YCJ and Mesa Verde, if it had

21  not already.

22      73.     After reviewing the COVID-19 protocols announced by ICE at the onset of the

23  pandemic, including the April 10 guidance, Dr. Greifinger concluded that the guidance was

24  "deficient" and did not reflect the reality of the overcrowded conditions in immigration

25  detention. Dr. Greifinger found that the most important mitigation measures for congregate

26  facilities—social distancing and release—are neglected in the COVID-19 protocols. Social

27  distancing is presented as "optional," and as Plaintiffs consistently report, is unacknowledged

28

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

and non-existent at the facilities. While "release is the most important means of mitigating the spread of COVID-19 in ICE detention centers," Dr. Greifinger concluded that ICE presents "arbitrary" and "inadequate" goals with regard to release.

74.     Dr. Greifinger further cited Defendants' failure to test and quarantine new entrants into the facilities as "rais[ing] concerns about the virus' introduction into the facilities." Although medical consensus recognizes testing and quarantine for new entrants as a necessary safety measure to prevent the virus from entering the facility, ICE guidance issued as recently as September 4, 2020 suggests only that detention centers "[c]onsider testing all newly detained persons before they join the rest of the population in the detention facility."

75.     The ICE guidance issued on April 10, 2020 acknowledged that the options to safeguard vulnerable detainees "depend on available space." The updated guidance issued on September 4, 2020 purports to excuse detention centers from maintaining "strict social distancing" because it "may not be possible in congregate settings such as detention facilities" and suggests only that it be maintained "[w]henever possible."  This updated guidance, however, cannot excuse or cure the constitutional violations alleged herein. The evidence at YCJ and Mesa Verde shows that the immigration facilities simply do not have that space, and therefore are incapable of protecting Plaintiffs and other detainees from the risks of COVID-19.

76.     Until the Court ordered them to do so, Defendants conducted no regular testing in Mesa Verde. In YCJ, Defendants still conduct no regular testing of the detainee population. In a context where wide-scale testing is unavailable or not implemented, a lack of proven cases of COVID-19 is functionally meaningless in determining the risk of COVID-19 transmission within an institution.

77.     Defendants' lack of testing meant they could not adequately protect detainees, in part, because of the prevalence of asymptomatic spread. As the CDC has recognized, COVID-19 can be spread by people who are not showing symptoms. Indeed, as one example of the exponential rate of asymptomatic transmission, the Boston Health Care for the Homeless Program tested every resident at a Boston homeless shelter for coronavirus. Program doctors

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

were "stunned" by the results: 146 of the 397 (36%) people tested were positive but asymptomatic.[13]

**D.   Defendants' Resistance to COVID-19 Testing and Quarantine Led to a Massive Outbreak in Mesa Verde.**

78.    Defendants several times considered plans to conduct testing among the detainee population in Mesa Verde, but consistently rejected those plans because even at reduced population levels, even a handful of identified positive cases would require isolation and cohorting exceeding the available space in the facility. Defendants did not take adequate measures to resolve the space constraints.  Sadly, Defendants' failure to take steps to ensure safe conditions of confinement played out with predictably dangerous and unconstitutional consequences for class members.

79.    In June and July 2020, as coronavirus cases spiked in the community surrounding Mesa Verde, increasing numbers of Mesa Verde staff informed GEO that they had tested positive offsite. GEO had no systematic policy for testing staff, requiring offsite staff testing, or ensuring that offsite positive tests were reported to management and acted upon. Defendants also remained steadfast in their refusal to develop or implement testing protocols for detainees. Defendants purported to test symptomatic members of the proposed class, but before the end of July asserted that they found none. Defendants established in late June a system to offer intake testing for incoming detainees, but introduced members of the purported class to dormitory settings whether or not they agreed to be tested. Defendants refused to test one detainee who had been exposed to infected staff, stating that he could not be tested unless he was symptomatic. Defendant GEO confirmed that a staff member should come to work without any obligation to test despite living with COVID-positive family members.

80.    On July 1, 2020, a new entrant into the facility tested positive for coronavirus. He had exposed six additional entrants to the virus. Lacking space to quarantine the additional

---

[13] *See* John Karalis, *Coronavirus spread: Testing shows 'stunning' asymptomatic COVID-19 rate at Boston homeless shelter*, Masslive.com, Apr. 15, 2020 https://www.masslive.com/coronavirus/2020/04/coronavirus-spread-testing-shows-stunning-asymptomatic-covid-19-rate-at-boston-homeless-shelter.html.

1    exposed entrants, Defendants transferred them to the Adelanto Detention Facility in Adelanto,

2    California, increasing the risk of transmission associated with transfers. A GEO officer exposed

3    to the infected entrant also tested positive.

4           81.     By July 29, thirteen facility staff members had tested positive. This number is

5    almost certainly an undercount of staff members who had had COVID by this time, as there was

6    no systematic staff testing in place. Yet that same week, Defendants *increased* the number of

7    detainees in Mesa Verde, booking in more new entrants than were released.

8           82.     On July 29, a second new entrant tested positive in intake. Instead of

9    quarantining any close contacts of the positive proposed class member, Defendants immediately

10   introduced one close contact to Dormitory B ("Dorm B") and commingled him with the general

11   population.

12          83.     Only July 29, Albert Orellana, a highly symptomatic detainee housed in Dorm B

13   also tested positive for the virus. At the time, 33 other class members were detained in Dorm B,

14   but several had been moved from Dorm B to Dorms C and D in the several days preceding the

15   positive test, increasing the risk of facility-wide spread. The following day, after counsel for

16   Plaintiffs urged them to do so, Defendants tested the remaining class members in Dorm B using

17   laboratory tests that would take days to return results. Defendants took no steps to test class

18   members in other dorms.  Exposed class members remained housed in congregate dorms while

19   awaiting their test results.

20          84.     On July 31, Yao Xeng Saeturn, a medically-vulnerable class member in Dorm C

21   who had been requesting medical attention for symptoms consistent with COVID-19 for at least

22   two days, was hospitalized. He tested positive for COVID-19 at the hospital. On August 1,

23   Defendants released him from custody while he was hospitalized. For days, Defendants failed to

24   test the remaining 31 detainees in Dorm C. On August 4, after Plaintiffs filed a motion for an

25   emergency TRO requiring Defendants to test all remaining class members using rapid-results

26   tests, Defendants offered laboratory testing to the remaining class members in Dorm C and

27   throughout the facility. Defendants were aware that results would take days to come back.

28

1    Defendants still housed exposed detainees in congregate dorms while awaiting these results.

2        85.     On August 3, Defendants had received test results for detainees in Dorm B. Five

3    had tested positive. Lacking any appropriate space to isolate them, Defendants isolated them in

4    a cohort in spaces otherwise reserved for intake. Notably, the 27 detainees who tested negative

5    had been exposed to the five infected detainees for four days while awaiting test results.

6    Nonetheless, they were not immediately retested.

7        86.     On August 4, Defendants combined the class members from Dorm B who had

8    tested negative in tests administered on July 30 with the class members in Dorm C, who were

9    only tested on the same day. This increased the density of Dorm C significantly with no reliable

10   determination of who in the dorm was infected with coronavirus. Defendants did not receive the

11   laboratory results for the tests administered to Dorm C on August 4 for over two weeks.

12   Multiple detainees in the commingled dorm of COVID contacts were already symptomatic at

13   the time the dorms were commingled.

14       87.     On August 6, the Court ordered that Defendants maintain a dedicated dormitory

15   for infected class members, conduct weekly testing of all class members detained in the facility,

16   and refrain from booking new entrants into the facility, among other things. The Court left open

17   the question of whether to administer point of care tests, which return results in a matter of

18   minutes, or laboratory tests, which return results days or weeks later. Defendants refused to use

19   point of care tests.

20       88.     On August 14, Defendants received test results for some class members who had

21   been combined in Dorm C and had tests taken August 11. ***More than half*** tested positive. When

22   Defendants finally received the results of their August 4 tests on August 19, it became clear that

23   11 of the 32 who tested positive on August 14 had already been infected on August 4. On

24   August 14, the Court ordered immediate, point of care testing for all detainees who had not yet

25   tested positive. Eventually, approximately 90% of the cohorted dorm would test positive for the

26   virus. At least four class members were rushed to the hospital; two required hospitalization.

27   Although the outbreak occurred nearly six months into the pandemic, Defendants had no written

28

1    policies for providing medical care to class members suffering from COVID-19 at Mesa Verde.

2    Defendants also had no plan for cleaning and sanitizing their detention space and required

3    infected detainees to clean and sanitize their own dorm.

4         89.    Defendants' refusal to address their space constraints in the months leading to

5    the outbreak created conditions in which infection spread like wildfire, as experts knew it

6    would. Defendants' failure to procure sufficient point of care tests, and refusal to use the point

7    of care tests they had, caused delays in testing during while dozens of class members were

8    exposed to the virus, many of whom were ultimately infected. Only through court orders did

9    Defendants take minimal steps to control the outbreak by conducting universal testing.

10   **E.    Maintaining Significantly Reduced Population Levels is Required to Ensure**
     **Reasonable Safety for Individuals at the Facilities.**

11

12        90.    Social distancing is required to prevent the widespread transmission of COVID-

13   19.

14        91.    To achieve social distancing at the Facilities, the detainee population must

15   remain significantly reduced.

16        92.    Reviewing current conditions at both facilities at the time of filing the

17   Complaint, Dr. Greifinger concluded that YCJ and Mesa Verde "are not prepared to prevent the

18   spread of COVID-19, treat those who are most medically vulnerable, and contain any outbreak,

19   and the risk of infectious spread at each of these facilities is very high." He concluded further

20   that "[t]he facilities fail to meet minimally acceptable standards of social distancing, putting the

21   residents at grave and unacceptable risk of pervasive infections, leading to serious illness and

22   death. The only way to avoid these unacceptable risks is to materially reduce the population,

23   implement social distancing as described herein, and ensure appropriate hygiene."

24        93.    It is not possible to achieve social distancing if more than one person is housed

25   in each cell, or if beds in dorms are placed within less than 8-10 feet of each other. Nor can

26   anyone share a bunk bed with another person under social distancing.

27        94.    The government's own subject matter experts have also called for ICE to release

28

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

detainees to protect them. Nearly five months ago, Dr. Scott Allen and Dr. Josiah Rich, medical experts to DHS, warned the agency about the danger to detainees of rapid spread of COVID-19 in immigration detention facilities.

95.     In a whistleblower letter to Congress, Dr. Allen and Dr. Rich recommended that "[m]inimally, DHS should consider releasing all detainees in high risk medical groups such as older people and those with chronic diseases." They concluded that "acting immediately will save lives not of only those detained, but also detention staff and their families, and the community-at-large."

**F.     ICE Has Failed to Implement Adequate Measures to Contain the Risk of COVID-19 Transmission in its Facilities.**

96.     Except as required by court orders, ICE has failed to adequately heed the imperative to reduce population levels in its facilities so that detainees are able to practice safe social distancing. Instead, ICE's response to the pandemic has been characterized by a business-as-usual approach. ICE has failed to adequately reduce population levels in its facilities, just as it has failed to ensure the availability of adequate hygiene products, sanitation, and medical care. In its Order Granting Motion for Preliminary Injunction (ECF 357 at 2), the Court concurred that at the time the Complaint was filed, "for the ICE detainees at Mesa Verde and Yuba County Jail, it was pretty much business as usual." Since then, in the face of Defendants' dangerous response to positive cases in Mesa Verde, the Court recognized that "[D]efendants have also lost the right to be trusted that they will accomplish on their own what the plaintiffs contend requires a court order to ensure." (ECF 500 at 2.) Meanwhile, ICE has continued to conduct its standard enforcement and detention operations, further increasing the risk of COVID-19 transmission.

97.     From early on in California's state of emergency, Defendants have resisted the need for substantial adaptations to their operations to mitigate the spread of the virus. As Californians in many cities began to shelter in their homes in compliance with public health directives on March 16, 2020, ICE's Los Angeles Field Office executed pre-dawn raids to cram

even more immigrants into detention centers.[14] Following public outcry, ICE claimed it would

modify its enforcement efforts in apparent recognition of the need to protect public health, but

declined to suspend arrests.[15]

98.     The day after, however, in response to a lawsuit for the release of vulnerable ICE

detainees, the agency again demonstrated its failure to appreciate the threats posed by the

COVID-19 pandemic, insisting that "Plaintiffs' assertion that detention *per se* poses an

increased risk of health complications or death from COVID-19 is purely speculative."[16] The

agency has repeated this claim in defending subsequent lawsuits.

99.     On April 10, 2020, after weeks of defending itself against a tidal wave of

litigation, ICE issued a guidance document titled "COVID-19 Pandemic Response

Requirements." This document, however, falls well short of what is needed to protect the people

in ICE's custody. The document acknowledges the need for social distancing, but sets an

arbitrary goal of reducing ICE facility populations to 75% of their capacities, a generic standard

that is devoid of any detailed analysis of relevant factors and that fails to account for variation

in facility design. Less than one week later, ICE undermined its limited April 10 guidance,

when then-Acting Director Albence stated to the congressional Committee on Oversight and

Reform that "our review of our existing population has been completed" and that ICE had no

existing plans to release additional detainees to slow the spread of the virus.

100.    Further, although ICE has made other updates to its non-binding guidance

responding to the pandemic, the most recent version, released on September 4, 2020, still

maintains this arbitrary 75% population goal, regardless of whether that number actually makes

social distancing possible.

101.    ICE has reiterated its intent to arrest and detain immigrants in facilities like the

Facilities. On September 25, 2020, ICE updated its COVID-19 information webpage to

---

[14] Brittny Mejia, *With Masks at the Ready, ICE Agents Make Arrests on First Day of California Coronavirus Lockdown*, L.A. Times, Mar. 17, 2020, https://www.latimes.com/california/story/2020-03-17/for-ice-agents-its-business-as-unusual-day-after-sweeping-coronavirus-order.
[15] *ICE Guidance on COVID-19*, U.S. Custom and Immigration Enforcement, https://www.ice.gov/covid19.
[16] Defs.' Opp., *Dawson v. Asher*, No. 20-0409 (W.D. Wash. Mar. 18, 2020), ECF No. 28 at 8.

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

1    announce its plans to proceed with full enforcement operations.[17] Furthermore, ICE has recently

2    announced a series of raids targeted at cities in California, including San Francisco and Los

3    Angeles.[18]

4         102.    Despite the recognized risk of COVID transmission in congregate facilities,

5    except as required by court orders Defendant GEO Group did not implement basic public health

6    measures recommended to mitigate the risk of transmission, including social distancing,

7    quarantining of new arrivals, systematic testing, and effective monitoring of symptoms.

8         103.    Defendants' head-in-the-sand response to the threats of this pandemic will prove

9    deadly to people in immigration detention if it is not remedied through this Court's intervention.

10   As the Court has observed (ECF 357 at 3), throughout this litigation, "ICE has shown disinterest

11   and a lack of dexterity in adjusting its conduct to respond to a global crisis;" and any safety

12   improvements at the facilities "came almost entirely from this litigation: ICE acted only because

13   it was ordered to do so, or in response to concerns raised by the Court of the plaintiffs during

14   the proceedings."

15        104.    Until ordered by the Court to cease doing so (*see* Order Granting Motion for

16   Temporary Restraining Order, ECF 500, at 2), ICE continued to introduce new detainees into

17   both Mesa Verde and YCJ. Defendants actively resisted effective systematic testing of detainees

18   and staff, conceding only when ordered by the Court and asserting no intention to continue such

19   testing if no longer under a court mandate. Defendants do not have a competent medical plan to

20   respond to COVID and failed to meaningfully monitor symptoms to permit early identification

21   of symptomatic COVID cases, which have higher likelihood of transmission.

22        105.    Inside the facilities, moreover, immigrants say that Defendants are not

23   consistently taking even the less aggressive precautionary measures necessary to contain the

24

25

26   [17] Monique O. Madan, *ICE reverses COVID-19 measure, says it will resume arresting non-criminal migrants*,
     Miami Herald (Sept. 29, 2020), https://www.miamiherald.com/news/local/immigration/article246093015.html.
27   [18] Tatiana Sanchez, *ICE arrests 128 undocumented immigrants in California's sanctuary cities, critics blast Trump
     for 'political theater',* San Francisco Chronicle (Oct. 7, 2020), https://www.sfchronicle.com/bayarea/article/ICE-
28   arrests-128-undocumented-immigrants-in-15628389.php.

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

transmission of COVID-19. Detainees at the Facilities continue to report insufficient access to basic hygiene and sanitation products.

106.    This echoes a concern of the two DHS experts, who say that "the track record of ICE facilities implementing [early screening, testing, isolation and quarantine] protocols historically has been inconsistent."

## V.    CLASS ALLEGATIONS

107.    This case is ideally suited to class treatment. Attorneys' collective realization that ICE failed to release enough people from Mesa Verde and YCJ has understandably resulted in the filing of multiple individual actions in the Northern District seeking the release of their particular clients. Unrepresented individuals, however, continue to languish in these facilities, fearing for their lives but lacking the wherewithal to sue ICE for their release. The resource-intensive process of litigating multiple individual cases is not ideally suited to the urgent situation at hand, where due process requires the swift but orderly release of significant numbers of ICE detainees.

108.    This case is brought on behalf of a class consisting of all civil immigration detainees at the Facilities. On April 29, 2020, the Court provisionally certified the proposed class.  *See* ECF 53 at 1.

109.    Plaintiffs further propose two sub-classes defined as follows:

**Sub-Class 1**:  All civil immigration detainees at YCJ, including those who were in custody at the time this action was filed or who entered during the course of this litigation, but who have been released to the community either through ICE's voluntary action or a bail order issued by this Court (the "YCJ Subclass").

**Sub-Class 2**:  All civil immigration detainees at Mesa Verde, including those who were in custody at the time this action was filed or who entered during the course of this litigation, but who have been released to the community either through ICE's voluntary action or a bail order issued by this Court (the "Mesa Verde Subclass").

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

110.     The proposed class and sub-classes satisfy the requirements of Rule 23(a)(1) because they are sufficiently numerous so as to make joinder impracticable. At the time of filing the Complaint, there were more than 280 class members at Mesa Verde and approximately 150 detainees at YCJ. And Defendants were continuing to funnel new detainees into these facilities. Joinder is also impracticable because many in the proposed class are *pro se*, indigent, have limited English proficiency, and/or have a limited understanding of the U.S. judicial system.

111.     The proposed class and sub-classes meet the commonality requirements of Federal Rule of Civil Procedure 23(a)(2) because there are common questions of law and fact affecting members of the proposed class, including "whether the government must modify the conditions of confinement—or, failing that, release a critical mass of [d]etainees—such that social distancing will be possible and all those held in the facility will not face a constitutionally violative substantial risk of serious harm." *Savino*, 2020 WL 1703844, at \*7; *Hernandez Roman*, 2020 WL 5683233, at \*5 ("The preliminary injunction afforded class-wide relief that would have remedied the constitutional violations as to all detainees, even though it would have entailed the release or transfer of only some of the detainees.").

112.     While some class members are healthier than others, they are all at grave risk of contracting COVID-19. As another federal court held in provisionally certifying a nearly identical class: It is a "troubling fact that even perfectly healthy detainees are seriously threatened by COVID-19. To be sure, the harm of a COVID-19 infection will generally be more serious for some petitioners than for others. Yet it cannot be denied that the virus is gravely dangerous to all of us." *Savino*, 2020 WL 1703844, at \*7.

113.     The proposed class and sub-classes meet the typicality requirement of Federal Rule of Civil Procedure 23(a)(3) because the claims of the representative Plaintiffs are typical of the claims of the class as a whole. Each named putative class representative has been harmed by the same course of conduct as the rest of the class, namely Defendants' decision to continue to detain them in a setting that makes social distancing impossible. And each seeks similar relief as the rest of the class.

1   114.    The proposed class and sub-classes meet the adequacy requirements of Federal

2   Rule of Civil Procedure 23(a)(4). Each putative class representative has committed to fairly and

3   adequately protecting the interests of the class and is aware of no conflict that would preclude

4   fair and adequate representation.

5   115.    Proposed class counsel are highly qualified to serve as class counsel and

6   collectively have extensive experience litigating class actions, immigration detention cases, and

7   First Amendment issues.

8   116.    Furthermore, Defendants' conduct has harmed all class members. An injunction

9   or declaration will provide relief on a class-wide basis.

10  **VI.    LEGAL FRAMEWORK**

11  **A.    Immigrant Detainees are Entitled to Constitutional Due Process Protections
        Against Exposure to Infectious Disease.**

12

13  117.    Whenever the government detains or incarcerates someone, it has an affirmative

14  duty to provide conditions of reasonable health and safety. As the Supreme Court has explained,

15  "when the State takes a person into its custody and holds him there against his will, the

16  Constitution imposes upon it a corresponding duty to assume some responsibility for his safety

17  and general well-being." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189,

18  199–200 (1989). As a result, the government must provide those in its custody with "food,

19  clothing, shelter, medical care, and reasonable safety." *Id*. at 200. Because the GEO Defendants

20  perform the federal public function of holding immigration detainees, the conditions of

21  confinement at Mesa Verde are the result of government action, and they are liable for

22  constitutional violations occurring there. *Torres v. U. S. Department of Homeland Security,* 411

23  F. Supp. 3d 1036, 1057 (C.D. Cal. 2019), and cases cited therein.

24  118.    Conditions that pose an unreasonable risk of future harm violate the Eighth

25  Amendment's prohibition on cruel and unusual punishment, even if that harm has not yet come

26  to pass. The Eighth Amendment requires that "inmates be furnished with the basic human

27  needs, one of which is 'reasonable safety.'" *Helling*, 509 U.S. at 33 (quoting *DeShaney*, 489

28

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

1  U.S. at 200). Accordingly, "[i]t would be odd to deny an injunction to inmates who plainly

2  proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had

3  happened to them." *Id.*

4      119.    The Supreme Court has explicitly recognized that the risk of contracting a

5  communicable disease may constitute such an "unsafe, life-threatening condition" that threatens

6  "reasonable safety." *Id.*

7      120.    These principles also apply in the context of immigration detention.

8      121.    The constitutional protections afforded to immigration detainees are more

9  comprehensive than those afforded to criminal defendants. Immigrant detainees, even those

10 with prior criminal convictions, are *civil detainees* held pursuant to *civil* immigration laws.

11 *Zadvydas v. Davis*, 533 U.S. 679, 690 (2001). Even those who in the past were convicted of

12 crimes and have completed their criminal sentences are being detained solely by reason of their

13 immigration status. Because detained immigrants are civil detainees, their constitutional

14 protections while in custody are derived from the Fifth Amendment. The Eighth Amendment

15 prohibits punishment that is "cruel and unusual," whereas the Due Process Clause of the Fifth

16 Amendment prohibits *any punishment at all.*

17      122.    The Ninth Circuit has applied this principle to make clear that civil detainees,

18 like Plaintiffs here, are entitled to conditions of confinement that are superior to those of

19 convicted prisoners and to those of criminal pretrial detainees. *Jones v. Blanas*, 393 F.3d 918,

20 933-34 (9th Cir. 2004), *cert. denied*, 546 U.S. 820 (2005); *see also King v. Cty. of Los Angeles*,

21 885 F.3d 548, 557 (9th Cir. 2018) (finding presumption of punitive, and thus unconstitutional,

22 treatment where conditions of confinement for civil detainees are similar to those faced by pre-

23 trial criminal detainees).

24      123.    Moreover, civil detainees like Plaintiffs need not show "deliberate indifference"

25 to establish a constitutional violation. *Jones*, 393 F.3d at 934. Instead, a condition of

26 confinement for a civil immigration detainee violates the Constitution "if it imposes some harm

27 to the detainee that significantly exceeds or is independent of the inherent discomforts of

28

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *5 (D. Ariz. Nov. 18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017).

124.    In the context of the COVID-19 pandemic, the Ninth Circuit recently held that "fail[ing] to impose social distancing," "mix[ing] new detainees with the general population or … other new detainees who arrived at different times," and refusing to provide necessary cleaning and hygiene supplies to civil immigration detainees likely violated their Fifth Amendment rights by depriving them of reasonable safety. *See Roman v. Wolf*, 2020 WL 6043833 (9th Cir. Oct. 13, 2020).

**B.      Defendants Are Violating Plaintiffs' Constitutional Due Process Rights.**

125.    The conditions described above are sufficient to demonstrate that Plaintiffs' constitutional due process rights are being violated. Keeping Plaintiffs detained in such close proximity to one another in unsafe conditions serves no legitimate purpose. Nor is detention under these circumstances rationally related to the enforcement of immigration laws. Finally, even if there were a legitimate purpose, it could be achieved by alternative and less harsh methods.

126.    ICE has a range of highly effective tools to ensure that individuals report for court hearings and other appointments. For example, ICE's conditional supervision program, ISAP (Intensive Supervision Appearance Program), relies on the use of electronic ankle monitors, biometric voice recognition software, unannounced home visits, employer verification, and in-person reporting to supervise participants. A government-contracted evaluation of this program reported a 99% attendance rate at all immigration court hearings and a 95% attendance rate at final hearings.

127.    Plaintiffs' due process rights will continue to be violated absent court intervention because the conditions of confinement imposed by Defendants place them at serious risk of being infected with COVID-19 and Defendants are being deliberately indifferent

to this critical safety concern. Although Plaintiffs need not prove deliberate indifference here, they undoubtedly have. *See Roman v. Wolf*, *supra* (holding substantially similar conduct by ICE and GEO in civil immigration detention violates due process).

128.    There is no question that COVID-19 poses a serious risk to Plaintiffs. COVID-19 is highly contagious and can cause severe illness and death.

129.    Defendants are aware of the serious risk that COVID-19 poses to Plaintiffs and have failed to meaningfully mitigate that risk. Medical experts for the Department of Homeland Security have also identified the risk of COVID-19 spreading to ICE detention centers.

130.    Defendants also are aware that significantly reducing the detained population in order to facilitate consistent, meaningful, social distancing is the only effective preventative measure. Dr. Allen and Dr. Rich, their own medical experts, told them as much in three letters, sent in February and March 2020, which emphasized that "[s]ocial distancing through release is necessary to slow transmission of infection."

131.    Nevertheless, Defendants have failed to take sufficient steps to ensure that Plaintiffs can maintain consistent social distancing within Mesa Verde and YCJ. Instead, they have taken a series of half measures that are "patently insufficient to protect [Plaintiffs]." *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1481503, at *6-*7 (S.D.N.Y. Mar. 26, 2020). Defendants' response, in turn, constitutes deliberate indifference to a serious risk to Plaintiffs' health and safety.

132.    Moreover, other prisons and jails around the country have released detainees because the risk of contagion is overwhelming.

133.    The circumstances of this case make clear that continued release, paired with meaningful testing and quarantine, is the only means to ensure compliance with Plaintiffs' due process rights. Public health information makes clear that the only way to prevent infection is through social distancing and increased hygiene. These measures are functionally impossible to implement under current conditions at YCJ and Mesa Verde. The only course of action that can remedy these unlawful conditions is to maintain populations sufficient to enable social

distancing in these detention centers through orderly, ongoing releases and limits to increases in population. In conjunction with release, Defendants must be required to institute and maintain sufficient plans, procedures, and reporting to ensure constitutionally adequate testing, medical care and conditions of confinement to ensure the reasonable safety of class members who are not released. As the Court has noted, Defendants "have lost the right to be trusted that they will accomplish on their own what the plaintiffs contend requires a court order to ensure." Dkt. 500.

**C.    The Court Has Authority to Order Plaintiffs' Release to Vindicate Their Fifth Amendment Rights, and Such Relief Is Necessary Here.**

134.    Courts have broad power to fashion equitable remedies to address constitutional violations in prisons, *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978), and "[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population," *Brown v. Plata*, 563 U.S. 493, 511 (2011).  Accordingly, "the district court ha[s] the authority both to entertain Plaintiffs' constitutional challenges and to grant injunctive relief in response to them."  *Hernandez Roman*, 2020 WL 5683233, at *3.

135.    "The scope of a district court's equitable powers" in this regard "is broad, for breadth and flexibility are inherent in equitable remedies." *Hutto*, 437 U.S., at 687, n. 9. Thus, even where "[t]he inquiry involves uncertain predictions regarding the effects of population reductions, as well as difficult determinations regarding the capacity of prison officials to provide adequate care at various population levels," federal courts "have substantial flexibility [in] making these judgments" and crafting an appropriate remedy. *Plata*, 563 U.S. at 538.

136.    In the weeks preceding the filing of the Complaint, a judge within the Northern District, and numerous other courts ordered, the release of ICE detainees and criminal justice system prisoners and detainees as a result of COVID-19 concerns. *See, e.g., Ortuño*, 2020 WL 1701724 at *4 (N.D. Cal. Apr. 8, 2020) (holding that four individuals were likely to succeed, that continued detention violated due process where they "cannot practice meaningful social distancing in their respective detention facilities"); *see also Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL 1429877, at *1 (9th Cir. Mar. 24, 2020) (*sua sponte* ordering immediate

release of ICE detainee "[i]n light of the rapidly escalating public health crisis, which public

health authorities predict will especially impact immigration detention centers"); *Bent v. Barr*,

No. 19-cv-06123-DMR, 2020 WL 1812850 at \*6 (N.D. Cal. Apr. 9, 2020) (quoting *DeShaney*,

489 U.S. at 199-200 (1989) ("[E]ven assuming that Respondents accurately describe Mesa

Verde's current practices, these practices are inadequate to ensure the 'safety and general

wellbeing' of Mesa Verde detainees during the COVID-19 pandemic."); *United States v.*

*Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at \*2 (S.D.N.Y. Mar. 19, 2020) (releasing

pretrial detainee in light of "the unprecedented and extraordinarily dangerous nature of the

COVID-19 pandemic"); *State v. Ferguson*, No. 2019-270536-FH, Order (Mich. Ct. App. Mar.

23, 2020) (ordering defendant's immediate release on bond due to "the public health factors

arising out of the present public health emergency"); *In re Request to Commute or Suspend*

*County Jail Sentences*, No. 084230 (N.J. Mar. 22, 2020) (court consent order, creating

immediate presumption of release for every person serving a county jail sentence based on

COVID-19); *Malam v. Adduci*, No. 20 Civ. 10829, 2020 WL 1672662 (E.D. Mich. Apr. 5,

2020), as amended (Apr. 6, 2020) (granting petitioner's release for duration of COVID-19

emergency); *Ali v. Dep't of Homeland Sec*., No. 20 Civ. 140, 2020 WL 1666074 (S.D. Tex.

Apr. 2, 2020) (granting petitioner's release due to coronavirus pandemic where the government

was not likely to remove petitioner in the foreseeable future); *Hernandez v. Decker*, No. 20 Civ.

1589, 2020 WL 1547459 (S.D.N.Y. Mar. 31, 2020) (granting ICE detainee's release due to risks

of COVID-19 where practice of social distancing was impossible in facility); *Thakker v. Doll*,

451 F.Supp.3d 358 (M.D. Pa. Mar. 31, 2020) (granting release of ICE detainees due to

imminent, irreparable harm posed by COVID-19). Recently, the Ninth Circuit endorsed the

issuance of such an order in a case involving a class of civil ICE detainees. *See Roman* at 14,

15, 19.

137.     This raft of recent COVID-19-related decisions in keeping with a well-

established tradition of federal courts ordering the release of detained persons when necessary to

remedy unconstitutional conditions caused by overcrowding. *See Hernandez Roman*, 2020 WL

5683233, at \*4 ("[T]he district court's power to grant injunctive relief included the authority to order a reduction in population, if necessary to remedy a constitutional violation."). *See also Plata*, 563 U.S. 493; *Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984) (concluding that court did not exceed its authority in directing release of low-bond pretrial detainees as necessary to reach a population cap); *Mobile Cty. Jail Inmates v. Purvis*, 581 F. Supp. 222, 224-25 (S.D. Ala. 1984) (concluding that district court properly exercised remedial powers to order a prison's population reduced to alleviate unconstitutional conditions and noting other cases); *Inmates of the Allegheny Cty. Jail v. Wecht*, 565 F. Supp. 1278, 1297 (W.D. Pa. 1983) (order to reduce overcrowding "is within our power to correct the constitutional violations"); *Brenneman v. Madigan*, 343 F. Supp. 128, 139 (N.D. Cal. 1972) ("If the state cannot obtain the resources to detain persons . . . in accordance with minimum constitutional standards, then the state simply will not be permitted to detain such persons."); *see also Unknown Parties v. Nielsen*, No. CV-15-00250-TUC-DCB, 2020 WL 813774, \*1 (D. Ariz. Feb. 19, 2020) (ordering that DHS release from custody detainees to whom it did not provide a bed, shower, nutritious food, and screening by a medical professional within 48 hours of booking).

138.    Public health information makes clear that social distancing and increased hygiene are critical to preventing the spread of infection. The only way to monitor and control infections is through testing and quarantining. Yet the defendants are detaining the plaintiffs under conditions that force them into close contact with many other detainees and staff and refuse to implement meaningful testing or quarantine protocols unless directed to do so by a court. By continuing detention in these circumstances, Defendants are subjecting class members to unreasonable harm. The only course of action that can remedy these unlawful conditions is the release of a substantial number of class members from detention and require testing and quarantining to protect the class members who remain in custody.

1

**FIRST CLAIM FOR RELIEF: VIOLATION OF THE FIFTH AMENDMENT RIGHT
TO SUBSTANTIVE DUE PROCESS (BY ALL PLAINTIFFS AGAINST ALL
DEFENDANTS)**

2

3        139.    Defendants' detention of Plaintiffs and other class members during the COVID-

4  19 pandemic violates the Due Process Clause of the Fifth Amendment of the United States

5  Constitution. Defendants GEO Group, Inc. and Allen are liable for these violations together

6  with ICE because they are the agents and/or alter ego of ICE and perform a governmental

7  function in connection with the detention of proposed class members at Mesa Verde.

8                        **PRAYER FOR RELIEF**

9
        WHEREFORE, Plaintiffs respectfully ask that this Court:
10
        a.      Take jurisdiction over this matter;
11
        b.      Certify the proposed Class and Sub-classes as indicated above, and appoint the
12
   named Petitioners/Plaintiffs as class representatives and the undersigned counsel as class
13
   counsel;
14
        c.      Declare that the continued detention of the plaintiff class members violates the
15
   Due Process Clause;
16
        d.      In gross or individually, order Defendants to release enough class members
17
   sufficient for the continued detention of any remaining class members not to violate their
18
   constitutional rights;
19
        e.      Order Defendants to institute and maintain sufficient plans, procedures, and
20
   reporting to ensure constitutionally adequate testing, medical care, and conditions of
21
   confinement for class members who are not released.
22
        f.      Order Defendants to suspend, temporarily, the introduction of immigration
23
   detainees into the Facilities until authorized by the Court to resume the introduction of new
24
   detainees into the Facilities;
25
        g.      Order Defendants to abstain from placing plaintiff class members into solitary
26
   confinement as a means of achieving social distancing;
27
        h.      Award Plaintiffs costs and reasonable attorneys' fees in this action under the
28

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF

Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any

other basis justified under law; and,

       i.     Grant such other and further relief as this Court deems just and appropriate.

Dated: October 30, 2020                Respectfully submitted,

                                      /s/ William S. Freeman
                                      William S. Freeman
                                      Sean Riordan

                                      AMERICAN CIVIL LIBERTIES UNION
                                      FOUNDATION OF NORTHERN
                                      CALIFORNIA

Bree Bernwanger                      Manohar Raju
Hayden Rodarte                       Public Defender
LAWYERS' COMMITTEE FOR      Matt Gonzalez
CIVIL RIGHTS OF                     Chief Attorney
SAN FRANCISCO BAY AREA       Francisco Ugarte
                                        Genna Ellis Beier
Judah Lakin                           Emilou H. MacLean
Amalia Wille                        OFFICE OF THE PUBLIC DEFENDER
LAKIN & WILLE LLP            SAN FRANCISCO

Jordan Wells                        Martin S. Schenker
Stephanie Padilla                 Timothy W. Cook
Michael Kaufman             Francisco M. Unger
AMERICAN CIVIL LIBERTIES UNION  COOLEY LLP
FOUNDATION OF SOUTHERN
CALIFORNIA                   *Attorneys for Petitioners-Plaintiffs*

FIRST AMENDED CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF