DAVID L. ANDERSON (CABN 149604)
United States Attorney

SARA WINSLOW (DCBN 457643)
Chief, Civil Division

WENDY M. GARBERS (CABN 213208)
ADRIENNE ZACK (CABN 291629)
SHIWON CHOE (CABN 320041)
NEAL C. HONG (ILBN 6309265)
Assistant United States Attorneys

> 450 Golden Gate Avenue, Box 36055
> San Francisco, California 94102-3495
> Telephone: (415) 436-6967
> Facsimile: (415) 436-6748
> wendy.garbers@usdoj.gov
> adrienne.zack@usdoj.gov
> shiwon.choe@usdoj.gov
> neal.hong@usdoj.gov

Attorneys for Federal Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, *et al.*, | CASE NO. 3:20-cv-02731-VC |
| Plaintiffs, | **DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED (ECF NO. 500)** |
| v. | |
| DAVID JENNINGS, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

LEGAL STANDARDS ....................................................................................................... 7

I.      Preliminary Injunction Standard ........................................................................... 7

II.     Fifth Amendment Standard .................................................................................... 9

ARGUMENT ..................................................................................................................... 10

I.      Plaintiffs Have Not Met Their Burden of Proving Entitlement to a Preliminary
        Injunction ............................................................................................................. 10

        A.      Plaintiffs Have Not Established a Likelihood of Success on the Merits .......... 10

                1.      Plaintiffs Have Not Established a Likelihood of Success on a
                        Deliberate-Indifference Theory ........................................................ 10

                2.      Plaintiffs Have Not Established a Likelihood of Success on a
                        Punishment Theory ........................................................................... 17

        B.      Plaintiffs Have Not Established Irreparable Harm ........................................ 18

        C.      Plaintiffs Have Not Established That the Equities and Public Interest Tip
                (Much Less Sharply Tip) in Their Favor ....................................................... 18

II.     The Requirements in the Court's TRO and Other Orders Are Not Tailored to
        Plaintiffs' Alleged Constitutional Harm .............................................................. 19

CONCLUSION .................................................................................................................. 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amylin Pharm., Inc. v. Eli Lilly and Co.*,
456 F. App'x 676 (9th Cir. 2011) ................................................................................ 18

*Arizmendi de Paz v. Wolf*,
No. 20-cv-955-WQH-BGS, 2020 WL 3469372 (S.D. Cal. June 25, 2020) ....................... 17

*Bell v. Wolfish*,
441 U.S. 520 (1979) ................................................................................................ 8, 10

*Benisek v. Lamone*,
138 S. Ct. 1942 (2018) ................................................................................................. 7

*Blackie's House of Beef, Inc. v. Castillo*,
659 F.2d 1211 (D.C. Cir. 1981) ................................................................................... 19

*Cameron v. Bouchard*,
815 F. App'x 978 (6th Cir. 2020) ........................................................................... 12, 16

*Caribbean Marine Servs. Co., Inc. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ...................................................................................... 18

*Chunn v. Edge*,
__ F. Supp. 3d __, No. 20-cv-1590 (RPK) (RLM),
2020 WL 3055669 (E.D.N.Y. June 9, 2020) ............................................................ 15, 16

*Dawson v. Asher*,
No. C20-0409JLR-MAT, 2020 WL 1704324 (W.D. Wash. Apr. 8, 2020) ........................ 18

*Demore v. Kim*,
538 U.S. 510 (2003) ............................................................................................. 13, 17

*Diouf v. Mukasey*,
542 F.3d 1222 (9th Cir. 2008) ...................................................................................... 9

*Duvall v. Hogan*,
No. ELH-94-2541, 2020 WL 3402301 (D. Md. June 19, 2020) ...................................... 12

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) ........................................................................................ 7

*Fernandez-Rodriguez v. Licon-Vitale*,
__ F. Supp. 3d __, No. 20 Civ. 3315 (ER),
2020 WL 3618941 (S.D.N.Y. July 2, 2020) ............................................................. 15, 16

*Friends of the Wild Swan v. Weber*,
767 F.3d 936 (9th Cir. 2014) ...................................................................................... 18

*Gonzalez v. Ahern,*
   No. 19-cv-07423-JSC, 2020 WL 3470089 (N.D. Cal. June 25, 2020) ................................. 17

*Gordon v. Cty. of Orange,*
   888 F.3d 1118 (9th Cir. 2018) .............................................................................................. 9, 15

*Granny Goose Foods, Inc. v. Bhd. of Teamsters,*
   415 U.S. 423 (1974).................................................................................................................. 7

*GSI Tech., Inc. v. United Memories, Inc.,* No. C,
   13-1081 PSG, 2013 WL 12172990 (N.D. Cal. Aug. 21, 2013)....................................... 8, 10

*Hayes v. Williams,*
   No. C-05-00070 RMW, 2009 WL 3004037 (N.D. Cal. Sept. 15, 2009)............................... 9

*Hernandez Roman v. Wolf,*
   __ F.3d __, No. 20-55436, 2020 WL 6040125 (9th Cir. Oct. 13, 2020) ..................... passim

*Hope v. Warden,*
   972 F.3d 310 (3d Cir. 2020) ......................................................................................... passim

*Jennings v. Rodriguez,*
   138 S. Ct. 830 (2018)................................................................................................. 13, 14, 17

*Jones v. Blanas,*
   393 F.3d 918 (9th Cir. 2004) .............................................................................................. 10

*Maney v. Brown,*
   __ F. Supp. 3d __, No. 6:20-cv-00570-SB, 2020 WL 2839423 (D. Or. June 1, 2020) ...... 14

*Mays v. Dart,*
   453 F. Supp. 3d 1074 (N.D. Ill. 2020) ................................................................................ 12

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997)......................................................................................................... 7, 10

*Murai v. Adducci,*
   461 F. Supp. 3d 599 (E.D. Mich. 2020)............................................................................. 19

*Orantes-Hernandez v. Thornburg,*
   919 F.2d 549 (9th Cir. 1990) .......................................................................................... 8, 10

*Parziale v. HP, Inc.,*
   No. 5:19-cv-05363-EJD, 2020 WL 5798274 (N.D. Cal. Sept. 29, 2020) ........................ 14

*Plata v. Newsom,*
   445 F. Supp. 3d 557 (N.D. Cal. 2020) ............................................................................... 11

*Prieto-Romero v. Clark,*
   534 F.3d 1053 (9th Cir. 2008) ............................................................................................ 13

*Rodriguez Alcantara v. Archambeault,*
   __ F. Supp. 3d __, No. 20cv0756 DMS (AHG),
   2020 WL 2773765 (S.D. Cal. May 26, 2020)............................................................... 10, 18

*Savino v. Souza*,
    459 F. Supp. 3d 317 (D. Mass. 2020) ............................................................................ 13

*Shell Offshore Inc. v. Greenpeace, Inc.*,
    815 F.3d 623 (9th Cir. 2016) ......................................................................................... 9

*Sims v. Sayre*, No. C 08-01691 SBA (pr),
    2010 WL 3932080 (N.D. Cal. Sept. 30, 2010) ............................................................ 19

*Solis-Martinez v. Adducci*,
    No. 1:20cv1175, 2020 WL 4057551 (N.D. Ohio July 20, 2020) ............................ 12, 15

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) .................................................................................. 8, 20

*Thakker v. Doll*,
    456 F. Supp. 3d 647 (M.D. Pa. 2020) ..................................................................... 10, 19

*Toguchi v. Chung*,
    391 F.3d 1051 (9th Cir. 2004) ................................................................................. 9, 15

*United States v. Gore*,
    3:10-cr-00250-PGS-1, 2020 WL 3962269 (D.N.J. July 13, 2020) ................................ 15

*United States v. Martinez-Fuerte*,
    428 U.S. 543 (1976) ..................................................................................................... 19

*Valentine v. Collier*,
    956 F.3d 797 (5th Cir. 2020) ........................................................................................ 21

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................................... 7, 18

*Zepeda Rivas v. Jennings*,
    __ F. Supp. 3d __, No. 20-cv-02731-VC, 2020 WL 3055449 (N.D. Cal. June 9, 2020) ............. passim

**Statutes**

8 U.S.C. § 1226 ....................................................................................................................... 13

8 U.S.C. § 1231 ....................................................................................................................... 13

**Regulations**

8 C.F.R. § 236.1 ...................................................................................................................... 13

On August 6, 2020, the Court issued a temporary restraining order (TRO) requiring Defendants to (1) administer weekly COVID tests to all detainees at the Mesa Verde Detention Facility,[1] (2) maintain their practice of not admitting new detainees to Mesa Verde, (3) maintain a dorm at Mesa Verde to segregate detainees who test positive for COVID, (4) file daily reports on the docket with information about the status of Mesa Verde and their efforts to manage COVID risk, and (5) "respond promptly" to "reasonable information requests" from class counsel regarding safety conditions at the facilities. TRO 2–3 (ECF No. 500). The Court ordered Defendants to show cause why a preliminary injunction should not issue requiring them to meet some or all of the above requirements on an ongoing basis pending final resolution of this case. *Id.* at 3. Defendants respectfully submit this response why the TRO should expire and why the Court should not issue a further preliminary injunction.

## INTRODUCTION

Defendants acknowledge the backdrop on which the Court issued its August 6 TRO. At the time, multiple detainees at Mesa Verde had tested positive for COVID. Mesa Verde had voluntarily ceased admitting new intakes, set aside a dorm (Dorm B) to segregate COVID-positive detainees, and offered COVID tests to all detainees, but many test results remained outstanding (and ultimately would return positive results for over half the detainees). On August 6, the Court ordered Mesa Verde to maintain its practice of not admitting new detainees, to administer weekly tests, and to maintain a segregated dorm.

The situation has since evolved now, three months later. Mesa Verde, which had been housing 121 detainees as of the TRO, now is housing 50 detainees (less than 13% capacity). There have been no new COVID cases among detainees since August 18 or staff since August 26. All of the detainees who tested positive for COVID have recovered as of September 2. Detainees continue to be offered weekly tests, with some detainees now having received a dozen or more negative tests in a row.

Defendants have promulgated new Detainee Intake Procedures for use in the event that the TRO expires and intakes are permitted to resume. The Intake Procedures provide that all new arrivals will be screened and offered COVID testing and, regardless of pre-intake screening and testing results, will be

---

[1] It was subsequently clarified that Defendants can exercise discretion regarding how frequently to retest detainees who previously tested positive and are not required to use point-of-care testing for the weekly testing requirement. ECF Nos. 540, 560.

quarantined for 14 days. Under the Intake Procedures, if Mesa Verde is unable to quarantine new arrivals, the arrivals will not be admitted to Mesa Verde.

Defendants respectfully submit that, in light of the current situation at Mesa Verde and the new Intake Procedures, the requirements in the TRO go beyond what is necessary to address a constitutional harm and unduly burden Defendants and their operations, and thus should not be entered as a preliminary injunction.

STATEMENT OF FACTS

Prior to the August 6 TRO, Defendants had taken a number of measures to respond to COVID.

The World Health Organization (WHO) declared COVID to be a global pandemic on March 11, 2020. In response to COVID, ICE took affirmative steps to reduce the number of detainees at Mesa Verde by reconsidering custody determinations, parole requests, and issuing orders of supervision on release for detainees who were not subject to mandatory detention and did not pose a danger to the community or a flight risk and/or where there was no significant likelihood of removal in the foreseeable future. Declaration of Erik Bonnar ¶ 6 (Bonnar Decl.). Between March 11 and April 30, ICE reduced the population at Mesa Verde from 355 to 258, a reduction of over 25%, which brought the population down to less than 65% capacity. *Id.* The ICE San Francisco field office prioritized enforcement and detention resources on public-safety risks and individuals subject to mandatory detention on criminal grounds and advised ICE enforcement units and Customs and Border Patrol that, for individuals who did not fall into these categories, the arresting officer must exercise discretion to delay enforcement actions until after the COVID crisis or use alternatives to detention, as appropriate. *Id.* ¶ 7.

At the time of the WHO's declaration, Mesa Verde was using one of its four dorms to house female detainees. *See id.* ¶ 8. Within a week of the WHO's declaration, ICE made the decision to try to empty the women's dorm to allow it to be used to house, and spread out, male detainees. *Id.* The process took time: there were 73 female detainees at Mesa Verde as of March 13, which ICE reduced to 58 as of March 30, to 47 as of April 16, to 34 as of April 30, and to 19 as of May 5. *Id.* The last female detainee was released from Mesa Verde on or about May 8, after which Mesa Verde reallocated the male population to allow them to use the now-cleared dorm. *Id.*

Defendants implemented a number of additional measures to increase safety and reduce the risk

of COVID at Mesa Verde. Mesa Verde posted flyers advising detainees about how to "Stop the Spread of Germs" and about "Social Distancing" in 11 different languages in the dining hall and in English, Spanish, and Chinese in the dorms, the intake areas, and the medical areas. July 11, 2020 Declaration of Nathan Allen ¶ 3.a (Choe Decl. Ex. 1). Mesa Verde staff advised detainees during orientation about Centers for Disease Control and Prevention (CDC) recommendations to practice social distancing and to wear masks and held a number of "town halls" explaining the benefits of masks and social distancing. *Id.* ¶ 3.c. Mesa Verde requires all GEO staff to wear masks while on duty (unless alone in their office, for example). *Id.* ¶ 3.d. Mesa Verde provides each dormitory with its own cleaning cart stocked with sanitation supplies, including soap, all-purpose cleaner, disinfectant, a bathroom-specific cleaning solution, mops, buckets, brooms, brushes, rags, and the like. *Id.* ¶ 3.e. Mesa Verde implemented social distancing measures, including alternating beds, sinks, and toilets to increase distancing and staggering meal times to limit the number of detainees in a dining hall at any given time. *Id.* ¶ 3.f. Mesa Verde suspended all social visitations to reduce the number of people entering the facility and instituted screens for all staff and vendors who enter the facility to look for COVID symptoms, including elevated body temperatures. *Id.* ¶ 3.g.

Mesa Verde provides detainees with surgical masks so that they can wear masks to limit the spread of COVID as well, along with instructions for protective mask usage, and issues mask replacements three times a week. *Id.* ¶ 3.b. Many detainees, however, do not wear their masks. *See* June 26, 2020 Declaration of Nathan Allen ¶¶ 8–11 & Exs. D–E (Choe Decl. Ex. 2 (without exhibits)).

On or about May 18, GEO circulated a proposed plan for testing all detainees at Mesa Verde for COVID. Bonnar Decl. ¶ 9. On or about June 3, the ICE Enforcement and Removal Operations (ERO) Bakersfield sub-office informed GEO that it had developed a plan to move forward with offering COVID tests to all detainees at Mesa Verde. *Id.* ¶ 10. ICE Headquarters made a determination not to conduct facility-wide testing at the time, because CDC guidance did not provide for facility-wide testing, and instead to focus on testing new arriving detainees. *Id.* ¶ 11. The ERO San Francisco field office made efforts to obtain an Abbot ID Now instrument for Mesa Verde to use for testing newly arriving detainees. *Id.* ¶ 12.

On June 9, the Court issued its first preliminary injunction. *Zepeda Rivas v. Jennings*, __ F.

Supp. 3d __, No. 20-cv-02731-VC, 2020 WL 3055449 (N.D. Cal. June 9, 2020).

On June 17, one Wellpath nurse reported testing positive for COVID. Status Report (ECF No. 393). The nurse had minimal contact, but not "close contact" as defined by the CDC, with approximately 12 detainees. *Id.* 11 of the detainees were tested for COVID and tested negative (the twelfth was released from Mesa Verde for removal to Honduras on June 16, before the nurse reported testing positive). Status Update (ECF No. 402). Eighteen other Wellpath medical staff members also were tested and tested negative. *Id.* On June 17, a GEO officer began feeling unwell and feverish. Status Report (ECF No. 407). GEO management instructed the officer not to come to work for at least ten days and that he had to be asymptomatic for three days before returning to work. *Id.* The officer was tested for COVID and tested positive. *Id.* One detainee who had been assisting the officer in the officer's cleaning duties was tested for COVID and tested negative. *Id.*

On June 17, Mesa Verde received an Abbott machine. Bonnar Decl. ¶ 12. An ICE Health Services Corps officer from another jurisdiction was brought in to give medical staff training on how to use the Abbott machine during the week of June 25. *Id.* Mesa Verde began offering Abbott point-of-care tests to all new arriving detainees beginning on June 29. *Id.*

On July 1, a newly arriving detainee was Abbott tested at intake and tested positive for COVID. *Id.* ¶ 13. The detainee was placed in a medical isolation unit (without entering the dorms). *Id.* Six other detainees who had arrived in intake on July 1 and who had been exposed to the detainee while being transported to Mesa Verde or in intake also were offered Abbott tests but declined to be tested, and were transported to the Adelanto Detention Facility to be quarantined. *Id.* On July 2, the Chief of Staff for the ERO San Francisco field office notified ERO managers within its jurisdiction that Mesa Verde would voluntarily cease taking on any new detainees. *Id.* ¶ 14. Mesa Verde did not take on any new detainees between July 2 and July 12. *Id.* When Mesa Verde resumed accepting detainees on or around July 13, it imposed new requirements regarding the pickup and transporting of detainees. *Id.*

On July 29, two detainees at Mesa Verde tested positive for COVID. August 11, 2020 Declaration of Moises Becerra ¶ 5 (August Becerra Decl.) (Choe Decl. Ex. 3). One was a newly arriving detainee who, after testing positive, was isolated from other detainees. *Id.* The other was a detainee who was housed in Dorm B and was experiencing symptoms consistent with COVID who was examined by

Mesa Verde medical staff. *Id.* Medical staff administered an Abbott test, which returned positive. *Id.* Medical staff placed the detainee in medical isolation and implemented CDC and ICE protocols to cohort the remaining 33 detainees in Dorm B. *Id.*

ICE took several additional immediate steps. The Chief of Staff for the ERO San Francisco field office notified ERO managers within its jurisdiction that Mesa Verde would temporarily cease accepting new intakes. *Id.* ¶ 6. The ERO Bakersfield sub-office requested that Mesa Verde implement a plan to offer COVID testing to all detainees in Dorm B. *Id.* On July 30, Mesa Verde medical staff offered COVID testing to the 33 detainees in Dorm B, 32 of whom consented. *Id.* Within four days, on August 3, the test results returned: 27 detainees tested negative and five detainees tested positive. *Id.*

On July 31, a detainee housed in Dorm C was experiencing symptoms consistent with COVID and was transferred to the hospital, where he tested positive. *Id.* ¶ 7. Upon notification that day, Mesa Verde cohorted Dorm C in accordance with CDC and ICE protocols. *Id.* On August 1, the ERO Bakersfield sub-office requested that Mesa Verde offer COVID testing to all cohorted detainees in Dorm C. *Id.* On August 4, Mesa Verde medical staff offered COVID testing to all detainees in Dorm C, and additionally offered COVID testing to all detainees in the two remaining dorms, Dorms A and D. *Id.* ¶ 10.[2] Ultimately, 62 detainees tested positive from July 29, 2020, to August 18, 2020.  See ECF Nos. August 19, 2020 Daily Report (ECF No. 580), August 31, 2020 Daily Report (ECF No. 640).

On August 6, the Court issued its TRO, requiring that (among other things) Defendants maintain their practice of not admitting new detainees to Mesa Verde, administer weekly COVID tests, maintain a dorm to segregate COVID-positive detainees, and file daily reports on the docket. ECF No. 500.

Defendants have not admitted any new detainees to Mesa Verde, have administered weekly tests, have maintained a dorm (Dorm B) to segregate COVID-positive detainees, and have been filing daily

---

[2] The tests performed were swab tests that were sent to an offsite laboratory. *See* August Becerra Decl. ¶¶ 6, 10. At the time, Mesa Verde did not have enough test kits to test all detainees with the Abbott machine. *Id.* ¶ 12. Additionally, while it takes about 15 to 20 minutes to process a single Abbott test, assuming no errors or complications, there are significant timing and logistical hurdles with running mass Abbott tests. *See* Declaration of Brooke Sanchez Othon ¶¶ 5–9 (Choe Decl. Ex. 4). The Abbott machine can process only one test at a time, requires a medical staff member to sit with the machine throughout the entire testing process, often must be run multiple times on a sample, and may overheat if it runs many tests continually back to back, making it less practicable to use the Abbott machine to conduct mass testing. *See id.*

reports on the docket, as ordered. *See* Daily Reports (ECF Nos. 515, 530, 531, 538, 544, 546, 544, 555, 562, 575, 576, 580, 586, 587, 592, 596, 610, 620, 621, 627, 632, 640, 654, 656, 661, 673, 674, 679, 682, 685, 687, 688, 689, 696, 697, 704, 707, 712, 715, 720, 723, 724, 725, 726, 728, 729, 730, 734, 735, 738, 742, 745, 749, 754, 756, 757, 761, 763, 766, 770, 771, 774, 776, 778, 781, 782).

The last new COVID case among detainees was on August 18. *See* August 19, 2020 Daily Report et seq. (ECF No. 580 et seq.). The last new COVID case among staff was on August 26. *See* August 26 Daily Report et seq. (ECF No. 620 et seq.). There currently are zero detainees at Mesa Verde with active COVID status; all detainees have either always tested negative or have recovered. Declaration of Wendy Baca ¶ 2 (Choe Decl. Ex. 5); November 2, 2020 Declaration of Moises Becerra ¶ 7 (November Becerra Decl.); *see* September 2, 2020 Daily Report et seq. (ECF No. 656 et seq.).

As of August 6, there were 121 detainees at Mesa Verde. November Becerra Decl. ¶ 5. As of today, there are 50 (plus one in the custody of the U.S. Marshals Service). *Id.* ¶ 6; November 2, 2020 Daily Report (ECF No. 782). Dorm B, the dorm being maintained to segregate COVID-positive detainees, has been empty since approximately September 9. Becerra Decl. ¶ 8; *see* September 9, 2020 Daily Report et seq. (ECF No. 682 et seq.). The other three dorms — Dorms A, C, and D — currently house nine, 25, and 14 detainees, respectively (with an additional two detainees currently being housed in restricted housing units). November 2, 2020 Daily Report (ECF No. 782).

Kern County, in which Mesa Verde is located, currently is in Tier 2 under California's COVID blueprint and has been in Tier 2 for the past three weeks. *See* Kern Cty. Pub. Health Servs. Dep't, News Release (Oct. 27, 2020), https://kernpublichealth.com/wp-content/uploads/2020/10/KernTier Update1.pdf (last visited Nov. 2, 2020). Kern County's testing positivity rate actually qualifies it for the less-restrictive Tier 3, although its other metrics still fall within Tier 2 metrics. *Id.* Kern County had a spike in new cases in July and, to a lesser extent, in August, peaking with 799 new cases on July 7. *See* Kern Cty. Pub. Health Servs. Dep't, COVID-19 Dashboard (Nov. 2, 2020) (Choe Decl. Ex. 6). Currently, however, its daily new cases have dropped to approximately one-tenth that level. *See id.*

Defendants have promulgated new Detainee Intake Procedures for use in the event that the TRO expires and intakes are permitted to resume. November Becerra Decl. ¶ 9 & Ex. 1. The Intake Procedures provide that there will be "pre-intake screening for all new entrants for COVID-19

symptoms." November Becerra Decl. Ex. 1, at 1. The Intake Procedures further provide that "[a]ll new

arrivals will be offered COVID-19 testing." *Id.* The Intake Procedures further provide that "[a]ll new

ICE detainees will complete a routine 14-day quarantine upon arrival and admission" and that "[i]f

[Mesa Verde] is unable to quarantine new intakes per the routine 14-day quarantine process, the

[Facility Administrator] will notify ICE and the detainee will not be admitted to [Mesa Verde]." *Id.*

## LEGAL STANDARDS

### I. Preliminary Injunction Standard

"A preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v.

Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24

(2008)). "[P]laintiffs seeking a preliminary injunction face a difficult task in proving that they are

entitled to this 'extraordinary remedy.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).

A plaintiff's burden is a "heavy" one, *id.*, that requires "substantial proof" and a "*clear showing*" that an

injunction is warranted. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). "Rule

65(b) does not place upon the party against whom a temporary restraining order has issued the burden of

coming forward and presenting its case against a preliminary injunction. . . . The burden [i]s on the

[movants] to show that they [a]re entitled to a preliminary injunction, not on the [non-movants] to show

that they [a]re not." *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 442–43 (1974);

*accord, e.g.*, *Hope v. Warden*, 972 F.3d 310, 321 (3d Cir. 2020) (vacating TRO issued in immigration-

detainee COVID-19 lawsuit where the district court placed the burden on the government to show why

injunctive relief should not be entered, rather than on the immigration detainees to prove clear

entitlement to injunctive relief).

"As a matter of equitable discretion, a preliminary injunction does not follow as a matter of

course from [(1)] a plaintiff's showing of a likelihood of success on the merits." *Benisek*, 138 S. Ct. at

1943–44 (citing *Winter*, 555 U.S. at 32). "Rather, a court must also consider whether the movant has

shown '[(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the

balance of equities tips in his favor, and [(4)] that an injunction is in the public interest.'" *Id.* at 1944

(quoting *Winter*, 555 U.S. at 20). Where the government is a party, the last two factors merge.

*Hernandez Roman v. Wolf*, __ F.3d __, No. 20-55436, 2020 WL 6040125, at *4 (9th Cir. Oct. 13, 2020).

"Further, where the balance of hardships tips sharply towards the plaintiff, a plaintiff need only show serious questions going to the merits, rather than likelihood of success on the merits, to warrant preliminary injunctive relief." *Id.* (quotation marks and ellipsis omitted).

"[A] district court possesses broad equitable authority to remedy a likely constitutional violation." *Id.* at *8. But "[t]here are limitations on this discretion; an injunction must be narrowly tailored to give only the relief to which plaintiffs are entitled." *Orantes-Hernandez v. Thornburg*, 919 F.2d 549, 558 (9th Cir. 1990); *accord, e.g.*, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) ("Injunctive relief must be tailored to remedy the specific harm alleged. An overbroad injunction is an abuse of discretion.") (citations, quotation marks, and ellipsis omitted). A court abuses its discretion if it "fail[s] to tailor the injunction to remedy the specific harm alleged by the [plaintiffs]." *Stormans*, 586 F.3d at 1140 (vacating preliminary injunction). While a court can order specific measures "if it concludes those actions are necessary to bring the conditions to a constitutionally adequate level," it should "avoid imposing provisions that micromanage the Government's administration of conditions . . . . [or] wade into facility administration at a granular level beyond what is required to remedy the constitutional violation identified. These types of considerations are better left to the 'professional expertise of corrections officials.'" *Hernandez Roman*, __ F.3d __, 2020 WL 6040125, at *8 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 n.23 (1979)).

"Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). Regarding the first requirement, the reasons for the injunction must be forward-looking, as "injunctive relief is designed to deter future misdeeds, not to punish past misconduct." *Orantes-Hernandez*, 919 F.2d at 564; *accord, e.g.*, *GSI Tech., Inc. v. United Memories, Inc.*, No. C 13-1081 PSG, 2013 WL 12172990, at *10 (N.D. Cal. Aug. 21, 2013) ("[T]he well-established purpose of [] preliminary injunctive relief . . . is to prevent future irreparable harm before a final judgment on the merits can be made, not to remedy past harms."). Regarding the second and third requirements, an injunction "should be phrased in terms of objective actions, not legal conclusions." *Hope*, 972 at 322; *see also Hernandez Roman*, __ F.3d __, 2020 WL 6040125, at *8 (cautioning against a lack of specificity).

A court entering a preliminary injunction "must find the facts specifically and state its conclusions of law separately." Fed. R. Civ. P. 52(a); *see Diouf v. Mukasey*, 542 F.3d 1222, 1235 n.7 (9th Cir. 2008). But "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 631 n.5 (9th Cir. 2016).

## II.   Fifth Amendment Standard

"The Fifth Amendment requires the government to provide conditions of reasonable health and safety to people in its custody." *Hernandez Roman*, __ F.3d __, 2020 WL 6040125, at *6. The elements for a claim for violating this duty — the "objective deliberate-indifference standard" — are that:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved — making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (quoted by *Hernandez Roman*, __ F.3d __, 2020 WL 6040125, at *6). "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case." *Id.* (quotation marks and brackets omitted). The "mere lack of due care by a state official" does not plead a claim. *Id.* "Thus, the plaintiff must prove more than negligence but less than subjective intent — something akin to reckless disregard." *Id.* (quotation marks omitted). "[A] mere difference of medical opinion is insufficient, as a matter of law, to establish deliberate indifference." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (citation, quotation marks, brackets, and ellipsis omitted); *see Hayes v. Williams*, No. C-05-00070 RMW, 2009 WL 3004037, at *4 (N.D. Cal. Sept. 15, 2009) (under the objective deliberative-indifference standard, "a plaintiff must [] show that the course of treatment was medically unacceptable under the circumstances. This requires showing more than a difference of medical opinion about a prisoner's treatment.") (citations, quotation marks, and ellipsis omitted); *accord Hope*, 972 F.3d at 329–30 (same, in immigration-detainee COVID-19 lawsuit).

Additionally, conditions of confinement violate a civil detainee's Fifth Amendment rights when

"those conditions amount to punishment of the detainee." *Bell*, 441 U.S. at 535. "[A] restriction is punitive where it is intended to punish, or where it is excessive in relation to its non-punitive purpose." *Jones v. Blanas*, 393 F.3d 918, 933–34 (9th Cir. 2004) (quotation marks and brackets omitted).

## ARGUMENT

## I.     Plaintiffs Have Not Met Their Burden of Proving Entitlement to a Preliminary Injunction

In assessing whether detainees are entitled to injunctive relief, trial courts look to current conditions of confinement, as opposed to past conditions. *See Rodriguez Alcantara v. Archambeault*, __ F. Supp. 3d __, No. 20cv0756 DMS (AHG), 2020 WL 2773765, at *3 (S.D. Cal. May 26, 2020) (originally granting a motion for TRO because "Plaintiffs had demonstrated a likelihood of success on their due process claim based on the conditions then in effect at Otay Mesa" but then denying a motion for preliminary injunction three weeks later because "other factors have changed, and lead this Court to conclude that Plaintiffs have not demonstrated a likelihood of success on their claim"); *Thakker v. Doll*, 456 F. Supp. 3d 647, 656 (M.D. Pa. 2020) (evaluating a motion for preliminary injunction based on "the current conditions at the Facilities," as opposed to the conditions at the time of the earlier TRO); *see also Hernandez Roman*, __ F.3d __, 2020 WL 6040125, at *7 (remanding to the district court "to assess what relief current conditions may warrant"); *see generally Orantes-Hernandez*, 919 F.2d at 564 ("[I]njunctive relief is designed to deter future misdeeds, not to punish past misconduct."); *GSI Tech*, 2013 WL 12172990, at *10 (same). Plaintiffs have not met their burden of making a "*clear showing*" that they are entitled to a preliminary injunction based on current conditions. *Cf. Mazurek*, 520 U.S. at 972 (emphasis in original).

### A.     Plaintiffs Have Not Established a Likelihood of Success on the Merits

### 1.     Plaintiffs Have Not Established a Likelihood of Success on a Deliberate-Indifference Theory

There currently are no COVID cases among detainees at Mesa Verde. The population at Mesa Verde is less than 13% of capacity. There have been no new COVID cases among detainees for over two-and-a-half months. All detainees have either repeatedly tested negative for COVID or have recovered. Detainees continue to be offered testing every week, which has returned negative results for months. These current conditions of confinement do not evince deliberate indifference.

The question, then, is what the conditions of confinement would be if the August 6 TRO were lifted, and whether Plaintiffs have established Defendants' deliberate indifference in that scenario. Plaintiffs have not.

In addition to Defendants' prior measures — reducing the population by releasing non-mandatory-detention, non-dangerous detainees; requiring staff to wear masks; providing masks to all detainees; providing cleaning supplies; alternating beds, sinks, and toilets to increase distancing; etc. — Defendants have promulgated new Detainee Intake Procedures that provide that all newly arriving detainees will be screened and offered COVID tests and that all newly arriving detainees, regardless of pre-intake screening and testing results, will be quarantined for 14 days. Courts have rejected deliberate-indifference claims by plaintiffs in the face of similar measures by detention facilities.

For example, in *Hope*, the Third Circuit reviewed a claim by immigration detainees that the government was deliberately indifferent to their medical needs in the wake of COVID. *Hope*, 972 F.3d at 325. The Third Circuit reviewed the conditions at the detention facilities at issue, which were operating at approximately 60% capacity, and noted (and did not reject) a finding by the district court that detainees were not capable of maintaining six feet of social distancing. *Id.* at 327–28. The Third Circuit noted other measures that the facility was taking: screening newly arriving detainees for disabilities, conditions, COVID symptoms, and COVID exposure, at intake; cohorting for 14 days newly arriving detainees who had COVID contacts; testing detainees who presented with COVID symptoms and quarantining detainees who tested positive; providing masks to detainees and cleaning supplies to every housing unit; and requiring staff to wear N95 masks. *Id.* at 328.

The Third Circuit first rejected an argument that six feet of social distancing was a requirement for detention to be constitutional. *Id.* at 327 (rejecting argument that six feet of social distancing is "a sine qua non of constitutional detention for individuals at higher risk of serious harm if they contract COVID-19," much less a constitutional requirement for low-risk detainees).[3] The Third Circuit then

_____

[3] *Accord, e.g.*, *Plata v. Newsom*, 445 F. Supp. 3d 557, 565 (N.D. Cal. 2020) ("Perhaps most significantly, although CDC guidance notes that social distancing strategies would 'ideally' provide '6 feet between all individuals,' the same guidance recognizes that 'strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. *Not all strategies will be feasible in all facilities*.' As another district court recently concluded: ['] . . . . plaintiffs have [failed] to show a reasonable likelihood of success on their contention that the Sheriff is acting in an objectively

rejected an argument that the detainees had established deliberate indifference by the government in light of the measures taken by the detention facilities there. *Id.* at 330. And the measures in place at Mesa Verde go beyond the measures taken at the detention facilities in *Hope*: they include offering COVID tests to all newly arriving detainees (not just detainees who present with COVID symptoms) and quarantining all new arriving detainees for 14 days (not just detainees who had COVID contacts). The measures at Mesa Verde do not evince deliberate indifference either.[4]

Plaintiffs cannot meet their burden to establish a likelihood of success on the merits by arguing that Defendants have been deliberately indifferent in the past, and thus that they should be presumed to be deliberately indifferent again in the future.

First, Plaintiffs have not made a clear showing that Defendants were deliberately indifferent in the past.

Plaintiffs fault ICE for not releasing more detainees. *See* Pls. Mot. for TRO 4, 7 (ECF No. 485). This does not establish deliberate indifference. ICE does not have unfettered discretion simply to release detainees broadly. For example, ICE does not have authority to release criminal detainees subject to the

---

unreasonable manner by failing to mandate full social distancing. This is particularly so because the Sheriff's submission reflects an ongoing effort to modify custodial arrangements at the Jail in a way that will permit greater separation of detainees.[']") (emphasis in original) (internal citation, brackets, and ellipsis omitted) (quoting *Mays v. Dart*, 453 F. Supp. 3d 1074, 1095 (N.D. Ill. 2020)).

[4] Other courts have likewise rejected claims of deliberate indifference in the face of similar measures. *See, e.g.*, *Cameron v. Bouchard*, 815 F. App'x 978, 985–86 (6th Cir. 2020) (finding prisoners and pretrial detainees failed to establish deliberate indifference at jail that, among other things, distributed memo about cleaning, stopped visitation, screened and quarantined new arrivals and detainees who experienced symptoms of COVID, and offered masks to all detainees); *Solis-Martinez v. Adducci*, No. 1:20cv1175, 2020 WL 4057551, at *9 (N.D. Ohio July 20, 2020) (finding immigration detainee failed to establish deliberate indifference at facility that, among other things, screened and isolated new detainees for 14 days, increased sanitation measures, restricted visitors, screened staff and contractors, and provided education about COVID); *Duvall v. Hogan*, No. ELH-94-2541, 2020 WL 3402301, at *13 (D. Md. June 19, 2020) (finding pretrial detainees failed to establish deliberate indifference at facility where 60 detainees and staff members tested positive and one staff member died but where facility posting education bulletins, canceling visitations, providing detainees with masks and cleansers, equipping staff with PPE, cleaning common areas, quarantining new detainees and isolating COVID-positive detainees, and on at least one occasion testing all detainees and staff, were "a reasonable response to the unforeseen, rapidly evolving COVID-19 pandemic"); *cf. Hernandez Roman*, __ F.3d __, 2020 WL 6040125, at *6 (affirming finding that immigration detainees established a likelihood of success on the merits of deliberate-indifference claim where detention facility was "so crowded" that social distancing was impossible, detainees had inadequate access to masks, guards were not required to wear masks, there was not enough soap or hand sanitizer to go around, and new arrivals were not being properly quarantined or tested).

mandatory-detention provision of 8 U.S.C. § 1226(c). As the Supreme Court has held, "aliens detained under [§ 1226(c)'s] authority are not entitled to be released under any circumstances" (other than under a witness-protection provision, 8 U.S.C. § 1226(c)(2), not at issue here). *Jennings v. Rodriguez*, 138 S. Ct. 830, 846 (2018). "[T]he statute expressly and unequivocally imposes an affirmative *prohibition* on releasing detained aliens under any other conditions." *Id.* at 847 (emphasis in original); *see also Demore v. Kim*, 538 U.S. 510, 520–21 (2003) (discussing Congress's passage of successive laws to "limit[] the Attorney General's discretion over custody determinations with respect to deportable aliens who had been convicted of aggravated felonies"). Similarly, ICE does not have authority to release detainees subject to a final order of removal during a 90-day removal period. 8 U.S.C. § 1231(a)(2); *see Prieto-Romero v. Clark*, 534 F.3d 1053, 1059 & n.4 (9th Cir. 2008).[5] Similarly, regulations provide that non-mandatory detainees who pose a danger to persons or property or present a risk of flight similarly may not be released. *See* 8 C.F.R. § 236.1(c)(8).

When the COVID pandemic began, ICE made efforts to release detainees who were not subject to mandatory detention and did not pose a danger or flight risk. ICE reduced the population of Mesa Verde by over 25% in March and April. *See* Bonnar Decl. ¶ 6. ICE prioritized detention of public-safety risks and individuals subject to mandatory detention and instructed enforcement units to not detain non-mandatory-detention, non-dangerous aliens. *Id.* ¶ 7. ICE worked over the course of months to try to empty the women's dorm, reducing the population from 73 around the time the WHO declared COVID to be a global pandemic, to 47 shortly before this lawsuit was first filed, to 34 around the time the Court issued its first TRO, and finally to zero in early May. *Id.* ¶ 8. ICE's ability to release detainees, however, is limited by the statutes and regulations discussed above. The fact that ICE has not released as many detainees as Plaintiffs might like does not establish that Defendants were deliberately indifferent.[6]

---

[5] This is not to say that ICE has never released a detainee subject to mandatory detention through mistake or human error. That ICE might have made a mistake in an individual case does not mean that it is free to release detainees subject to mandatory detention as a general practice.

[6] In its June preliminary-injunction order, the Court also appears to be citing the fact that ICE has not released more detainees as evidence of supposed deliberate indifference. *See Zepeda Rivas*, __ F. Supp. 3d __, 2020 WL 3055449, at *3 ("'Where elasticity is vital, they are rigid; where life hangs upon a carefully drawn line, they opt for near-blanket incarceration. That is evidence of deliberate indifference.'") (quoting *Savino v. Souza*, 459 F. Supp. 3d 317, 330 (D. Mass. 2020)). But this simply is the law that Congress has enacted and that ICE must follow. The Court cites three bail applications that ICE opposed as "l[eading] it to take some positions that are downright irrational, not to mention

Plaintiffs also fault Defendants for not instituting saturation COVID testing on the ground that in May, Defendants considered and rejected a saturation testing plan. *See* Pls. Mot. for TRO 9 (ECF No. 485); Pls. Mot. for TRO Reply 3–4 (ECF No. 497). This does not establish deliberate indifference. In May 2020, CDC guidance for detention facilities did not recommend testing asymptomatic individuals. *See* Ctrs. for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) > Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (May 31, 2020) (last updated May 7, 2020), https://web.archive.org/web/20200531161225/ https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Nov. 2, 2020) (May CDC Management Guidance) (not recommending testing for asymptomatic individuals beyond "daily temperature checks in housing units where COVID-19 cases have been identified").[7] Defendants considered saturation testing, and the ERO Bakersfield sub-office planned to move forward with it, but ultimately ICE decided instead to focus on intake testing and on obtaining an Abbott machine for Mesa Verde for that purpose rather than conducting saturation testing that went beyond CDC guidance. Bonnar Decl. ¶¶ 9–11.

In order to prevail on a deliberate-indifference claim, Plaintiffs must establish that, among other things, Defendants "did not take reasonable available measures to abate that risk, even though a

---

inhumane." *Id.* at *2. But the three detainees cited all were subject to mandatory detention. Jose Luis Lopez-Guevara was convicted of murder and thus was subject to the mandatory-detention requirement of § 1226(c), *see* Bail Resp. (ECF No. 86), which does not allow for release based on lack of dangerousness. *See Jennings*, 138 S. Ct. at 846–47. Jennifer Lara Plascencia was convicted of wire fraud arising from improper use of her company's credit card and thus also was subject to the mandatory-detention requirement of § 1226(c). *See* Bail Resp. (ECF No. 87-3). Whether or not wire fraud by use of a company credit card warrants mandatory detention is not a question for ICE to decide; it is for Congress to decide, and Congress deemed Ms. Plascencia's offense to be one that falls under the mandatory-detention requirement of § 1226(c). Victor Fierros Hurtado also was subject to mandatory detention, in his case under § 1231(a)(2). *See* Bail Resp. (ECF No. 139-4). In opposing the bail applications, ICE was attempting to carry out the will of Congress that detainees subject to mandatory detention not be released. It cannot be that ICE's efforts to take care that the laws be faithfully executed as Congress enacted them is evidence of deliberate indifference. *Cf. Maney v. Brown*, __ F. Supp. 3d __, No. 6:20-cv-00570-SB, 2020 WL 2839423, at *2 (D. Or. June 1, 2020) (reviewing prison population and observing that "there are medically vulnerable individuals in custody who could go home a few weeks or a few months early without risking public safety" but recognizing that prison officials cannot authorize those releases and not finding them deliberately indifferent for not doing so).

[7] This is the version of the CDC Management Guidance that was on the CDC's website as of May, as archived on the Internet Archive's Wayback Machine. "[D]istrict courts in this circuit have routinely taken judicial notice of content from the Internet Archive's Wayback Machine pursuant to [Federal Rule of Evidence 201(c)(1)]." *Parziale v. HP, Inc.*, No. 5:19-cv-05363-EJD, 2020 WL 5798274, at *3 (N.D. Cal. Sept. 29, 2020) (citing cases).

reasonable official in the circumstances would have appreciated the high degree of risk involved — making the consequences of the defendant's conduct obvious." *Gordon*, 888 F.3d at 1125. Plaintiffs have not established that the consequences of not implementing saturation testing of asymptomatic detainees were obvious, given that the CDC was not recommending saturation testing of asymptomatic detainees either. *Cf., e.g.*, *Hope*, 972 F.3d at 325–26, 332–33 (finding that immigration detainees in COVID lawsuit failed to establish likelihood of success on the merits, despite the facilities' testing only symptomatic detainees and not conducting saturation testing of asymptomatic detainees); *Solis-Martinez*, 2020 WL 4057551, at *7, *9 (generally same); *United States v. Gore*, 3:10-cr-00250-PGS-1, 2020 WL 3962269, at *4 (D.N.J. July 13, 2020) (observing in connection with inmate motion for release that "Defendant attempts to undermine the myriad health initiatives that [facility] has implemented thus far by suggesting that the prison must employ universal testing of inmates and prison staff. Yet, as Defendant himself admits, [facility]'s COVID-19 protocols conform to the CDC's guidelines for management of the virus in correctional and detention facilities. CDC's guidelines do not require global testing of inmates[.]"); *Fernandez-Rodriguez v. Licon-Vitale*, __ F. Supp. 3d __, No. 20 Civ. 3315 (ER), 2020 WL 3618941, at *23 (S.D.N.Y. July 2, 2020) (rejecting deliberate-indifference class-action claim on behalf of prisoners and pretrial detainees that facility must offer COVID tests to all vulnerable detainees and symptomatic or exposed staff, holding that detainees "have failed to show that the additional protections they seek are necessary to bring the conditions in the [facility] above the constitutional minimum."); *see also Chunn v. Edge*, __ F. Supp. 3d __, No. 20-cv-1590 (RPK) (RLM), 2020 WL 3055669, at *28 (E.D.N.Y. June 9, 2020) (rejecting deliberate-indifference class-action claim on behalf of prisoners and pretrial detainees based on facility's "failure to take additional steps that go beyond CDC guidelines").[8] The fact that ICE did not conduct saturation testing of asymptomatic detainees does not establish that Defendants were deliberately indifferent.[9]

---

[8] Additionally, in order to prevail on a deliberate-indifference claim, Plaintiffs must also show that "by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon*, 888 F.3d at 1125. Plaintiffs have not established that Defendants' not conducting saturation testing in May caused the outbreak in July.

[9] That Plaintiffs' experts might express a preference for a course of action beyond what the CDC recommended does not make their experts' recommendation the constitutional standard. *See Toguchi*, 391 F.3d at 1058 ("[A] mere difference of medical opinion is insufficient, as a matter of law, to establish deliberate indifference.") (citation, quotation marks, brackets, and ellipsis omitted); *Hope*, 972 F.3d at

Second, even assuming Plaintiffs had made a clear showing that Defendants were deliberately indifferent in the past, this does not establish that Defendants will be deliberately indifferent in the future such that Plaintiffs have established a likelihood of success on the merits of their claim for a preliminary injunction. Defendants have instituted protective measures and are making efforts to institute further protective measures, including their new Detainee Intake Procedures and the requirement that all newly arriving detainees be quarantined for 14 days. This belies a claim that Defendants are deliberately indifferent.

Addressing a class action brought on behalf of both inmates and pretrial detainees, the Southern District of New York recently examined the question of a facility's having an insufficient initial response but working to make improvements. *See Fernandez-Rodriguez*, __ F. Supp. 3d __, 2020 WL 3618941. The court there observed that "[t]he inmates are likely to show that the [facility]'s response to the pandemic was ad-hoc and overlooked many gaps in its scheme to identify and isolate infected inmates — creating conditions that posed a substantial risk to the health of all inmates." *Id.* at *2. "The record shows that the [facility] performed almost no planning for the pandemic until almost the day the first inmate tested positive. It further shows that, as the outbreak progressed, the [facility] had difficulty properly operating the existing sick-call system and implementing the response plans it had created. This record renders reasonable the inmates' doubts on the [facility]'s ability to follow through on its promises." *Id.* at *23. But the court also observed that the facility's warden was making efforts to improve and "is genuine in her willingness to fix the [facility]'s initially ineffective response." *Id.* The court found that the plaintiffs there thus had failed to show a substantial likelihood that the warden was deliberately indifferent and denied a motion for preliminary injunction compelling the facility to take additional measures. *Id.* at *23–24; *accord, e.g.*, *Cameron v. Bouchard*, 815 F. App'x 978, 985–86 (6th Cir. 2020) (vacating preliminary injunction entered by district court in class action brought on behalf of inmates and pretrial detainees and noting, "Plaintiffs claim that the jail officials adopted preventative measures only as a response to this lawsuit and later, after the court-ordered inspection, discontinued them. . . . [P]laintiffs' argument at most shows that defendants' response was imperfect. That is not

---

329 ("'[M]ere disagreement' as to the response to the risk to Petitioners in light of their medical condition will not support constitutional infringement.").

enough to establish deliberate indifference.").

Here, Defendants took measures to respond to COVID and to protect detainees well before this lawsuit was filed. In addition, they are genuine in their attempts to make additional improvements at Mesa Verde, while balancing that against their obligations to continue to enforce the immigration laws as Congress enacted them. Plaintiffs have not shown a likelihood of success on the merits of their claim that the current conditions of confinement subject them to deliberate indifference by Defendants.[10]

### 2. Plaintiffs Have Not Established a Likelihood of Success on a Punishment Theory

The Supreme Court has recognized that preventing detained aliens from absconding and ensuring that they appear for removal proceedings, as well as protecting the community from dangerous criminal aliens, are legitimate governmental objectives. *See Jennings*, 138 S. Ct. at 836. Indeed, "deportation proceedings would be vain if those accused could not be held in custody pending the inquiry into their true character." *Demore*, 538 U.S. at 523 (quotation marks omitted); *see also id.* at 528 (discussing how "in adopting § 1226(c), Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully").

As the Third Circuit and other courts have held, notwithstanding the fact of COVID, "[t]hese congressional objectives held constitutional by the Supreme Court — detention of aliens in removal proceedings and mandatory detention of criminal aliens — render unsound the District Court's conclusion that civil detention of aliens in removal proceedings is tantamount to punishment." *Hope*, 972 F.3d at 329; *accord, e.g.*, *Arizmendi de Paz v. Wolf*, No. 20-cv-955-WQH-BGS, 2020 WL 3469372, at *7–8 (S.D. Cal. June 25, 2020) (denying motion for TRO by immigration detainee and holding that

---

[10] Defendants anticipate that Plaintiffs will raise objections to the new Detainee Intake Procedures, e.g., by arguing that it is not specific enough with how and where quarantining will be achieved. As the Ninth Circuit cautioned, however, "[a] district court should, to the extent possible, avoid imposing provisions that micromanage the Government's administration of conditions at [a detention facility]" or "wade into facility administration at a granular level beyond what is required to remedy the constitutional violation identified." *Hernandez Roman*, __ F.3d __, 2020 WL 6040125, at *8; *see also Gonzalez v. Ahern*, No. 19-cv-07423-JSC, 2020 WL 3470089, at *8 (N.D. Cal. June 25, 2020) ("Defendants' approach may not be the plan that Plaintiffs think best; it may not even be the plan that the Court would choose, if it were sufficiently informed to offer an opinion on the subject. But the Fourteenth Amendment does not afford litigants and courts an avenue for de novo review of the decisions of prison officials.") (quotation marks and brackets omitted).

his detention did not constitute punishment in light of the government's legitimate interests in detaining individuals pending their removal proceedings). Plaintiffs have not shown a likelihood of success on the merits of their claim that the current conditions of confinement amount to unconstitutional punishment.

### B.      Plaintiffs Have Not Established Irreparable Harm

To warrant a preliminary injunction, Plaintiffs must establish "immediate threatened injury." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir. 2014) (quoting *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)). Merely showing a "possibility" of irreparable harm is insufficient. *Winter*, 555 U.S. at 22. "To support injunctive relief, harm must not only be irreparable, it must be imminent; establishing a threat of irreparable harm in the indefinite future is not enough." *Amylin Pharm., Inc. v. Eli Lilly and Co.*, 456 F. App'x 676, 679 (9th Cir. 2011). The standard is not "guaranteed safety — an impossible standard to meet no matter the circumstances — but rather a likelihood of irreparable harm." *Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL 1704324, at *12 (W.D. Wash. Apr. 8, 2020).

Defendants of course acknowledge the outbreak that occurred at Mesa Verde in late July. Thankfully, there were no deaths, and all of the detainees who contracted COVID have recovered. Defendants have promulgated new Detainee Intake Procedures that provide for improvements since that time. The Intake Procedures provide that, among other things, all new arriving detainees screened, offered COVID tests, and will be quarantined for 14 days and that, if Mesa Verde is unable to quarantine them, they will not be admitted to Mesa Verde. Plaintiffs have not established immediate threatened injury under the current conditions at Mesa Verde going forward. *Cf. Rodriguez Alcantara*, __ F. Supp. 3d __, 2020 WL 2773765, at *4 (observing at the immigration-detention facility that had the highest number of COVID cases in the country and one detainee death that "conditions have now changed" after the court's initial TRO and that "although there remains a chance that subclass members could contract the virus and suffer irreparable injury, that likelihood is significantly less under the current conditions at [facility]," in denying detainees' motion for preliminary injunction).

### C.      Plaintiffs Have Not Established That the Equities and Public Interest Tip (Much Less Sharply Tip) in Their Favor

It is well settled that the public interest in enforcement of the United States' immigration laws is

significant. *See, e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 556–58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981). The government has a continuing interest in detaining aliens where the immigration laws provide for such detention and in being able to use the detention facilities that it has available. Mesa Verde currently is operating at less than 13% capacity, and the government and the public have an interest in being able to use Mesa Verde (subject to appropriate safety measures) to take in and detain new aliens, including criminal aliens and aliens who may pose a danger to the public. *Cf. Thakker*, 456 F. Supp. 3d at 662–63 (allowing for redetention of immigration detainees previously released under TRO and finding in light of additional measures that facilities have taken that "the public's interest in reinstated detention outweighs the lessened risk COVID-19 will pose" to detainees); *Murai v. Adducci*, 461 F. Supp. 3d 599, 609 (E.D. Mich. 2020) ("Confinement does not become unnecessary simply due to the existence of COVID-19."). The inability to use housing capacity at Mesa Verde places burdens on ICE's operations and on other facilities. *See* Bonnar Decl. ¶ 19. ICE is willing to bear those burdens where necessary and appropriate — for example, if a new detainee cannot be quarantined at Mesa Verde, ICE will bear the burden of finding alternate housing — but a blanket prohibition on using Mesa Verde's housing capacity goes beyond what is necessary. *See id.* ¶¶ 19–20. Additionally, ICE — and thus, ultimately, taxpayers — have to pay for the housing capacity at Mesa Verde, *see id.* ¶ 17, even if that capacity is unused and ICE must pay again to house detainees elsewhere. An overbroad prohibition on intakes or on ICE's ability to use the housing capacity at Mesa Verde thus burdens the taxpaying public. *Cf. Sims v. Sayre*, No. C 08-01691 SBA (pr), 2010 WL 3932080, at *6 (N.D. Cal. Sept. 30, 2010) (denying inmate's motion for preliminary injunction for transfer and finding that the equities and public interest did not weigh in his favor because "prison transfers are funded by taxpayers. Thus, granting Plaintiff's request for such a transfer — that the record shows is not medically necessary — would instead weigh against the public's interest because it would be paid for by taxpaying citizens."). Plaintiffs have not established that the equities and public interest tip (much less sharply tip) in their favor under the conditions at Mesa Verde going forward.

## II.     The Requirements in the Court's TRO and Other Orders Are Not Tailored to Plaintiffs' Alleged Constitutional Harm

Even assuming that Plaintiffs could establish entitlement to further injunctive relief of some sort,

the requirements of the Court's August 6 TRO are not tailored to Plaintiffs' alleged constitutional harm. *Cf. Stormans*, 586 F.3d at 1140–41 ("Injunctive relief must be tailored to remedy the specific harm alleged. An overbroad injunction is an abuse of discretion.") (citations, quotation marks, and ellipsis omitted); *Hernandez Roman*, __ F.3d __, 2020 WL 6040125, at *8 (preliminary injunction should not "wade into facility administration at a granular level beyond what is required to remedy the constitutional violation identified").

        <u>Requirement not to admit new intakes</u>: When the Court first issued the August 6 TRO prohibiting new intakes, the population at Mesa Verde was 121. The population now is less than half of that at 51. A blanket prohibition on new intakes, regardless of the population at Mesa Verde and the measures being taken therein, is overbroad and goes beyond the relief required to remedy any constitutional violation. Defendants respectfully submit that this TRO requirement should expire and not be entered as a preliminary injunction.

        <u>Requirement to administer weekly testing of detainees</u>: The CDC's current testing guidance for correctional and detention facilities provides that:

> Facilities in communities with moderate to substantial levels of community transmission can **consider** the following:
>
> - Baseline testing for all current IDP [incarcerated or detained persons].
>
> - Testing all new IDP at intake before they join the rest of the population in the facility, and housing them individually while test results are pending to prevent potential transmission. Some facilities may choose to implement a "routine intake quarantine" in which new IDP are housed individually for 14 days before being integrated into general housing.
>
> - Testing for SARS-CoV-2 and reviewing results before transferring IDP to another facility or releasing them to the community, particularly if an IDP will transition to a congregate setting with persons at increased risk for severe illness from COVID-19. Refer to Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities for more information about transfer and release recommendations. Consider combining pre-transfer/release testing with a 14-day quarantine (ideally in single cells) before an individual's projected transfer or release date to further reduce risk of transmission to other facilities or the community.

Ctrs. for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) > Testing in*

*Correctional and Detention Facilities* (Oct. 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/ community/correction-detention/testing.html (last visited Nov. 2, 2020) (emphasis in original). The CDC's guidance does not recommend or provide for indefinite saturation testing of asymptomatic detainees. Defendants have conducted three months' worth of weekly baseline testing, and there have been no new positive cases for over two-and-a-half months. A court order to continue further saturation testing of asymptomatic detainees goes beyond the relief required to remedy any constitutional violation.[11] Defendants respectfully submit that this TRO requirement should expire and not be entered as a preliminary injunction.

Requirement to maintain a dorm to segregate COVID-positive detainees: Defendants have been maintaining a dorm to segregate detainees who test positive for COVID (Dorm B). As there are no active COVID cases at Mesa Verde, Dorm B has remained empty for over two-and-a-half months. Defendants acknowledge and agree with the goal of segregating detainees who test positive for COVID but respectfully submit that they be allowed flexibility in their operations as to how to achieve that, as opposed to being subject to a court order that locks in how they might use their housing units. *Cf. Hernandez Roman*, __ F.3d __, 2020 WL 6040125, at *8 ("These types of considerations are better left to the professional expertise of corrections officials.") (quotation marks omitted); *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (finding that "[facility]'s ability to continue to adjust its policies is significantly hampered by the preliminary injunction, which locks in place a set of policies for a crisis that defies fixed approaches" and staying injunction on appeal). Defendants respectfully submit that this TRO requirement should expire and not be entered as a preliminary injunction.

Weekly testing of staff:[12] Staff testing should not be mandated at this time. Test results have been uniformly negative for an extended period of time. In addition, staff members have consistently followed guidelines regarding the wearing of personal protective equipment. As CDC guidelines evolve, GEO will continue to adhere to those directives. If any of these circumstances change, additional

---

[11] This is of course not to say that Defendants would refuse to conduct saturation testing where appropriate. Defendants conducted such between July 29 and August 4 without the need for a court order. But Defendants respectfully submit that a court order micromanaging this process is overbroad and unwarranted. *Cf. Hernandez Roman*, __ F.3d __, 2020 WL 6040125, at *8.

[12] Federal Defendants take no position on the appropriateness of a preliminary injunction mandating testing of staff at Mesa Verde.

measures for testing can be adopted. At this time, however, there is no need for continued weekly testing.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the August 6 TRO should expire and that the Court should not issue a further preliminary injunction.


DATED: November 2, 2020                     Respectfully submitted,

                                            DAVID L. ANDERSON
                                            United States Attorney

                                            *s/Shiwon Choe*
                                            _____
                                            SHIWON CHOE
                                            Assistant United States Attorney

                                            Attorneys for Federal Defendants


                                            BURKE,WILLIAMS & SORENSEN, LLP

                                            *s/Susan E. Coleman\**
                                            _____
                                            SUSAN E. COLEMAN

                                            Attorneys for GEO Defendants


\* In compliance with Civil Local Rule 5-1(i)(3), the filer attests that all signatories have concurred in the filing of this document.