WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Attorneys for Petitioners-Plaintiffs*
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
GENNA ELLIS BEIER (SBN 300505)
genna.beier@sfgov.org
EMILOU H. MACLEAN (SBN 319071)
emilou.maclean@sfgov.org
FRANCISCO UGARTE (SBN 241710)
francisco.ugarte@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: (415) 553-9319
Facsimile: (415) 553-9810

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUBI RUIZ TOVAR, LAWRENCE KURIA MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG, JUAN JOSE ERAZO HERRERA, RAJNISH RAJNISH, and WILLIAN MATIAS RAUDA, <br><br> Petitioners-Plaintiffs, <br><br> v. <br><br> DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; NATHAN ALLEN, Warden of Mesa Verde Detention Facility, <br><br> Respondents-Defendants. | CASE NO. 3:20-CV-02731-VC <br><br> **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED (ECF NO. 500)** |

BREE BERNWANGER* (NY SBN 5036397)
bbernwanger@lccrsf.org
HAYDEN RODARTE (SBN 329432)
hrodarte@lccrsf.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA
131 Steuart St #400
San Francisco, CA 94105
Telephone: (415) 814-7631

JUDAH LAKIN (SBN 307740)
judah@lakinwille.com
AMALIA WILLE (SBN 293342)
amalia@lakinwille.com
LAKIN & WILLE LLP
1939 Harrison Street, Suite 420
Oakland, CA 94612
Telephone: (510) 379-9216
Facsimile: (510) 379-9219

JORDAN WELLS (SBN 326491)
jwells@aclusocal.org
STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

MARTIN S. SCHENKER (SBN 109828)
mschenker@cooley.com
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIMOTHY W. COOK (Mass. BBO#
688688)*
tcook@cooley.com
FRANCISCO M. UNGER (Mass. BBO#
698807)*
funger@cooley.com
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

*Attorneys for Petitioners-Plaintiffs*
*Admitted *Pro Hac Vice*

## **TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS ................................................................................. 2

   A.  Defendants' Multiple Misrepresentations ............................................. 2

     1.  AFOD Alexander Pham's false declaration about the quarantining of transferee intakes. ........................................................................... 2

     2.  DFOD Erik Bonnar's misleading declaration about the reasons for lack of testing. ................................................................................. 2

     3.  Defendants' false claim that they can properly isolate and segregate detainees. 3

     4.  Defendants' false claim that they acted on their own to protect detainees ........ 3

     5.  Defendants' claim that they decided on their own to empty the women's dorm. 4

     6.  Defendants' misrepresentation of the distance between bunks. ....................... 5

     7.  Defendants' claim that they cannot release persons subject to mandatory detention. .............................................................................. 5

     8.  Defendants' claimed compliance with CDC and ICE guidance ....................... 5

   B.  The Predictable July Outbreak and Defendants' Dangerous Response ............... 6

   C.  The Second TRO .................................................................................. 12

   D.  The Last-Minute "Detainee Intake Procedures" Plan .......................... 12

III.  ARGUMENT .................................................................................................. 14

   A.  Plaintiffs Are Likely to Succeed on the Merits .................................... 14

     1.  Defendants Have Failed Provide Reasonable Health and Safety ................... 14

     2.  Defendants' Conduct Amounts to Punishment ................................ 15

   B.  An Injunction Is Necessary to Remedy the Cognizable Danger that Defendants Will Continue to Violate Plaintiffs' Fifth Amendment Rights ............................ 16

C.    Absent an Injunction, Plaintiffs Face Irreparable Harm ...................................... 19

D.    The Equities Tip Sharply in Plaintiffs' Favor ...................................................... 20

IV.    PLAINTIFFS' PROPOSED INJUNCTION IS NECESSARY TO PREVENT THE REINTRODUCTION AND SPREAD OF COVID-19 AT MESA VERDE ......... 20

A.    Population Cap Per Dormitory............................................................................ 21

B.    Procedures for Preventing the Spread of COVID-19 Within Mesa Verde ......... 22

C.    Incoming Transfers and Intake Procedures......................................................... 23

D.    Regular Staff Testing .......................................................................................... 24

V.    CONCLUSION...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Castro v. County of Los Angeles*,
   833 F.3d 1060 (9th Cir. 2016) .............................................................. 14

*Demery v. Arpaio*,
   378 F.3d 1020 (9th Cir. 2004) .............................................................. 16

*Doe v. Kelly*,
   878 F.3d 710 (9th Cir. 2017) .......................................................... 15, 16

*Fed. Elec. Comm'n v. Furgatch*,
   869 F.2d 1256 (9th Cir. 1989) ......................................................... 16, 17

*Gonzalez v. Ahern*,
   2020 WL 3470089 (N.D. Cal. June 25, 2020) ................................... 19

*Gordon v. County of Orange*,
   888 F.3d 1118 (9th Cir. 2018) ......................................................... 14, 15

*Hayes v. Williams*,
   No. C-05-00070 RMW, 2009 WL 3004037 (N.D. Cal. Sept. 15, 2009) ................. 14

*Helling v. McKinney*,
   509 U.S. 25 ............................................................................ 20

*Hernandez Roman v. Wolf*,
   977 F.3d 935 (9th Cir. Oct. 13, 2020) ............................................ passim

*Hernandez Roman v. Wolf*,
   No. 20-000768, 2020 WL 5797918 (C.D. Cal. Sept. 29, 2020) ..................... 18

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) .......................................................... 20, 23

*Hope v. Warden*,
   972 F.3d 310 (3d Cir. 2020) ............................................................ 15

*Jones v. Blanas*,
   393 F.3d 918 (9th Cir. 2004) .......................................................... 15, 16

*Kingsley v. Hendrickson*,
   576 U.S. 389 (2015) .................................................................... 14

*N.L.R.B. v. Express Publishing Co.*,
   312 U.S. 426 (1941) .................................................................... 16

*Orantes-Hernandez v. Thornburgh*,
   919 F.2d 549 (9th Cir. 1990) .......................................................... 16

*Roman v. Wolf*,
   2020 WL 6107069 (C.D. Cal. Oct. 15, 2020) ...................................... 18

*Shelby County, Ala. v. Holder*,
   570 U.S. 529 ........................................................................... 1

*Toguchi v. Chung*,
   391 F.3d 1051 (9th Cir. 2004) ......................................................... 14

*United States v. Laerdal Mfg. Corp.*,
   73 F.3d 852 (9th Cir. 1995) .......................................................... 16, 17

## I.     INTRODUCTION

The history of this case powerfully proves the need for continuing injunctive relief.

When the complaint was filed in April, Plaintiffs warned that they were being held under dangerous conditions and that in the absence of Court intervention, a COVID-19 outbreak was highly likely. Complaint, ECF 1, at ¶¶ 1, 8. Yet as the Court observed back in June, Defendants responded to the pandemic with a mix of "obstinance," "disinterest," and "lack of dexterity;" they took "some positions [on bail applications] that are downright irrational, not to mention inhumane;" and they had made a significant misrepresentation of a material issue. Order Granting Preliminary Injunction, 6/9/20, ECF 357 ("First PI"), at 3-5. Predictably, a major outbreak ensued at Mesa Verde beginning in late July. About 60 percent of the detainees and more than one quarter of the staff at Mesa Verde eventually tested positive.

In light of the outbreak, the Court justifiably issued a second TRO on August 6, 2020, ECF 500 ("Second TRO") that is the subject of this Order to Show Cause, and additional orders requiring universal population and staff testing, ECF 561 & 577. It is true that due to this litigation and the Court's orders, conditions at Mesa Verde have improved. But these improvements "came almost entirely from this litigation; ICE acted only because it was ordered to do so, or in response to concerns raised by the Court or the plaintiffs during the proceedings." First PI, ECF 357, at 3.

Defendants now come before the Court suggesting that they have acted voluntarily to improve conditions at Mesa Verde, and as a result, further oversight is unnecessary. The opposite is true. Defendants have only acted when forced to do so. The evidentiary record leaves no doubt that the Court's assessment in the Second TRO remains valid today: that Defendants, "having responded to the health crisis in such a cavalier fashion (even in the face of litigation and a string of court orders), have … lost the right to be trusted that they will accomplish on their own what the plaintiffs contend requires a court order to ensure." Second TRO at 2.

In the words of the late Justice Ruth Bader Ginsburg, Defendants' proposal to now abandon all judicial oversight "is like throwing away your umbrella in a rainstorm because you are not getting wet." *Shelby County, Ala. v. Holder*, 570 U.S. 529, 590 (Ginsburg, J., dissenting). The

Court's continuing direction is needed now as much as ever, as the nation's public health experts foresee a new wave of infections and deaths during the coming winter. A further preliminary injunction ("Second PI") should be granted in the form submitted by Plaintiffs.

## II.    STATEMENT OF FACTS

Defendants have long known of the risk of a COVID outbreak at Mesa Verde.  Documents recently produced in discovery demonstrate that Defendants' response to the pandemic made the July outbreak inevitable and its spread rapid. Plaintiffs cannot hope to set forth here all of the documents and testimony that paint a damning picture of Defendants' cavalier pandemic response. Rather, Plaintiffs first identify some of Defendants' factual misrepresentations, and then discuss additional evidence of Defendants' failure to live up to their constitutional duty.

### A. Defendants' Multiple Misrepresentations

**1. AFOD Alexander Pham's false declaration about the quarantining of transferee intakes.** The Court is familiar with Assistant Field Office Director ("AFOD") Pham's sworn misrepresentation that arriving transferees from facilities with reported COVID-19 cases were "placed in isolation for 14 days prior to being released into the general population." First PI, ECF 357, at 5. This misrepresentation has never been explained.

**2. DFOD Erik Bonnar's misleading declaration about the reasons for lack of testing.** On July 6, 2020, the Court expressly ordered Defendants to file declarations "explaining what significant measures ICE and/or GEO have explored to improve the safety of conditions at Mesa Verde and, if applicable, *why those measures have not been taken*." ECF 421 (emphasis added). In response, Deputy Field Office Director ("DFOD") Bonnar declared under penalty of perjury on July 10: "ICE has considered testing all detainees at MVDF for COVID-19. One issue, however, is that significant numbers of detainees may not agree to testing." ECF 429-1 (July 10 Bonnar Dec.) at ¶ 9. DFOD Bonnar's answer was misleadingly incomplete; in seeking to blame subclass members for the lack of testing, he hid from the Court a more fundamental reason, which was well-known to him and others within ICE and GEO: that ICE knew that it would have

problems segregating detainees in the event of any significant number of positive tests. *See generally,* Plaintiffs' Notice of Motion and Motion for TRO, ECF 485 at 6-8; Second TRO, ECF 500, at 1; ECF 488-12, attached as Ex. 1 to MacLean Dec.

   **3.   Defendants' false claim that they can properly isolate and segregate detainees.**

Defendants have consistently asserted that "Mesa Verde has the capability to identify, isolate and segregate detainees from each other." *E.g.*, ECF 37-1 (Apr. 24 Bonnar Dec.) ¶ 8; ECF 264-1 (May 27 Pham Dec.) ¶ 22. **This is untrue**. As the Court is aware, Mesa Verde's configuration makes isolation and cohorting of multiple class members, or of multiple cohort groups, impossible absent the preservation of empty dormitories for this purpose, which Defendants had not undertaken at the time these declarations were executed. Mesa Verde has four dormitories that previously held up to 100 detainees each. The only areas suitable for housing detainees in isolation for more than a few hours are five single-cell units – three Restricted Housing Units (RHUs) and two medical isolation cells – and these are nearly always occupied. Ex. 2 to MacLean Dec. (Pham June 3 email) ("All [isolation units] are currently occupied as is generally always the case.").[1]

   **4.   Defendants' false claim that they acted on their own to protect detainees.**

Defendants repeatedly suggest that they instituted protective measures proactively and without judicial intervention. *See, e.g.*, Def. OSC Mem. at 2 ("Prior to the August 6 TRO, Defendants had taken a number of measures to respond to COVID."). **This is misleading at best**. As this Court has recognized, "safety improvements [at Mesa Verde] came almost entirely from this litigation: ICE acted only because it was ordered to do so, or in response to concerns raised by the Court or the plaintiffs during these proceedings." First PI, ECF 357 at 3. For example, nearly all of this population reduction at Mesa Verde occurred after the filing of a complaint in this District on

---

[1] *See also* Ex. 3 to MacLean Dec. (Pham May 21 Management Conference Call Notes) (IHSC guidelines would "constrain[] … housing resources"); Ex. 4 to MacLean Dec. (July 3 email from Wellpath to ICE) ("[W]e do not have the ability to isolate any additional cases should we have a positive on intake … Additionally, do not have the ability to cohort any cases…").

March 24, raising constitutional issues related to COVID-19 at Mesa Verde.[2] Similarly, a saturation testing plan circulated in May noted that bunks at Mesa Verde had been staggered "[d]ue to recent ICE litigation."[3]

     **5. Defendants' claim that they decided on their own to empty the women's dorm.** Defendants claim that they independently decided on March 19 to empty the women's dorm to allow for greater social distancing. Def. OSC Mem. at 2 & ECF 786-8 (Bonnar Dec.) ¶ 8. **This is unsupported by the record**. At the outset of this litigation, this Court identified Defendants' continued detention of a significant number of women, many with limited criminal history, as irrational in light of the risks associated with congregate facilities during the pandemic.[4] In extensive discussions with the Court concerning the women's dorm, counsel for Defendants made no mention of any prior decision to empty the women's dorm.[5] Federal Defendants *opposed* numerous bail applications of detained women *well into May*, including of women *not* subject to a mandatory detention statute. *See, e.g.*, ECF 87-2, 88-2, 87-3, 103-2, 103-6, 104-1, 104-3, 104-4 (oppositions to bail applications, all subsequent to May 2). In fact, Defendants have admitted under oath that the decision to release all of the remaining women from Mesa Verde was made *on May 7* and was *in response to litigation*. ECF 166-1 (May 13 Pham Dec.) at ¶ 9 ("[A]s a result of the temporary restraining order ('TRO') and habeas litigation in this case, ERO Bakersfield was required to find ways to drastically reduce its population at MVDF. . . On May 7, 2020, ERO made a decision to release all female detainees.").

---

[2] *See Bahena Ortuño v. Jennings*, No. 20-cv-2064-MMC, ECF 25-3 (Bonnar Dec.) ¶ 7 (population of 312 at Mesa Verde on March 30).

[3] *See* Ex. 5 to MacLean Dec. ("Saturation Testing Plan" sent from Allen to Baca on May 15).

[4] *See, e.g.*, Apr. 28 CMC Tr. at 11:22-12:1, attached as Ex. 6 to MacLean Dec; May 1 CMC Tr. at 10:22-11:9, attached as Ex. 7 to MacLean Dec. ("I was just curious what's going on with the women and why are there so many women detained with no criminal history at all at this time.")

[5] *See* Apr. 28 CMC Tr. at 12:11-21 (responding that ICE was "reducing the population where individuals are not subject to mandatory detention"); May 1 CMC Tr. at 10:16-19 (responding that ICE counsel had no further information about the women's dorm). Likewise, in an April 25 declaration concerning population reduction measures at Mesa Verde, DFOD Bonnar made no mention of any effort to clear out the women's dorm. ECF 37-1 (Bonnar Dec.). If Defendants had decided one month earlier to empty the women's dorm, he surely would have said so.

**6. Defendants' misrepresentation of the distance between bunks.** In an interrogatory response verified by AFOD Pham, Federal Defendants stated that the distance between the top and bottom bunks at Mesa Verde was 49 inches.[6] The 49-inch height is critical to Defendants' representation that detainees were spaced at least six feet apart. ECF 264 at 13 (Def's Opp. to First PI Mtn.) ("While the distance between two adjacent occupied bunks is admittedly less than six feet, the distance between the heads of two occupied bunks is over six feet."). Mr. Pham reiterated the measurement in a sworn declaration. ECF 264-1 (May 27 Pham Dec.) ¶ 40.

However, during a recent video site visit, Defendants revealed (in response to Plaintiffs' request for a measurement) that the distance is approximately 36 inches. This drastically impacts the distance between detainees in the "top of one bunk to bottom of next bunk" sleeping arrangement suggested by Defendants. Defendants would need to skip a bunkbed and alternate top and bottom bunks in order for class members to have even five feet of distance between them.[7]

**7. Defendants' claim that they cannot release persons subject to mandatory detention.** Despite consistently claiming they are unable to release such persons (*e.g.,* Def. OSC Mem. at 12-13), Defendants have repeatedly done so. *See* Declaration of Holly Cooper at ¶¶ 12-18; Ex. 9 to MacLean Dec. (May 7 email listing releases); Ex. 10 to MacLean Dec. (May 8 email listing releases).

**8. Defendants' claimed compliance with CDC and ICE guidance.** Defendants have consistently justified their inaction by claiming compliance with guidance from the Centers for Disease Control and Prevention ("CDC") and ICE's COVID-19 Pandemic Response Requirements ("PRR"). *See, e.g.*, Def. OSC Mem. at 2-4, 14. **These claims are not supported.** Defendants have treated the CDC guidance as mere suggestions they are free to ignore if difficult or inconvenient. *See, e.g.*, ECF 264-1 (May 27 Pham Dec.) at ¶ 18 ("ICE endeavors to closely follow the CDC Guidance where possible, and as recommended, makes adaptations according to

---

[6] ECF 229-20, Ex. A, Response to Interrogatory 1(f), at 2-3.

[7] This means that the current distance between a class member on a bottom bunk and one on the neighboring top bunk is just over four feet. Ex. 8 to MacLean Dec., Greifinger Dep. 210 (referencing diagrams at ECF 229-19 (2d Supp. Greifinger Dec.) at 7-8).

each facility's spacing, population, and resources."). Further, Defendants' actual practices at Mesa Verde have frequently deviated from CDC Guidance. For example, already in March, the CDC was advising that correctional facilities suspend all transfers to and from other facilities "unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding" and that facilities "[e]nsure that physical locations … have been identified to isolate confirmed COVID-19 cases and individuals displaying COVID-19 symptoms, and to quarantine known close contacts of cases … includ[ing] contingencies for multiple locations if numerous cases and/or contacts are identified and require medical isolation or quarantine simultaneously…."[8] These steps were not taken at Mesa Verde.[9] Defendants continued to introduce new detainees and transfer detainees for reasons other than those recognized as appropriate by the CDC.[10] Defendants left symptomatic individuals in crowded dormitories and failed to screen properly for symptoms.[11] ICE's own PRR were both inadequate and not implemented at Mesa Verde.[12]

### B.  The Predictable July Outbreak and Defendants' Dangerous Response

After deciding against saturation testing, Defendants ultimately chose a far more limited

---

[8] CDC, Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities at 7, 10, attached as Ex. 11 to MacLean Dec. (*hereinafter* "CDC Correctional Facilities Guidance"). The language cited here is from the March version which has since been revised to emphasize even more the need for contingency planning and "**separate** physical locations" for different cohorts. *Id.* at 6 (emphasis in original).

[9] Ex. 12 to MacLean Dec., Mull Dep. 45:11-46:15 (Acting AFOD responsible for liaising with Warden Allen could not recall any contingency plans to account for limited capacity to isolate detainees at Mesa Verde).

[10] *See, e.g.*, ECF 474 (July 31 Joint CMC Statement) at 4 (Defendants increased intakes at Mesa Verde, without a commensurate decrease in releases, immediately prior to the July outbreak).

[11] Defendants contend they identified zero detainees at Mesa Verde with COVID symptoms prior to July 29. *See* ECF 264-1 (May 27 Pham Dec.) ¶ 27 (no detainees with symptoms). This conflicts with medical records, class member declarations, and medical staff communications. *See* ECF 286-2 (MacLean Dec. to Pls.' PI Reply) ¶¶ 2-8 (detainees with symptoms present in medical records); Ex. 13 to MacLean Dec. (May 21-22 emails among Wellpath staff recognizing "a lot of sick calls for body aches and sore throat").

[12] *See* ECF 5-2 (Greifinger Dec.) ¶¶ 46-57.

testing scheme—offering testing to all new arrivals.[13] Defendants' intake testing was flawed from the start. They introduced most new arrivals immediately into the dorms if they declined to test[14]; by the start of the July outbreak, one-half of the new arrivals had purportedly declined to test and most were introduced into the general population anyway.[15] Well aware of the risk, Defendants brushed protective measures aside because of space constraints.[16]

       Defendants also did not have adequate space to accommodate newly arriving detainees who tested positive or contacts of detainees testing positive who may themselves have been exposed.[17] Defendants refused to quarantine new arrivals, notwithstanding CDC, ICE and GEO recommendations to do so.[18] Given the incubation period of the virus and the traits of the test

---

[13] ECF 407 (Defs' June 29 Joint Status Report); ECF 488-12 (ICE intra-office emails re "COVID-19 Testing Operational Plan").

[14] Detainees who refused testing were housed in the general population immediately unless they were street arrests or transfers from local or county jail. Ex. 14 to MacLean Dec. (IHSC June 11 Email) (ICE Health Service Corps identified that facilities typically do *not* use point of care testing for intakes due to "false negatives," and wanted a plan for "those that test negative if [Mesa Verde] do[es] not have cohorting capabilities"); Ex. 15 to MacLean Dec. (June 25 Intake Testing Plan) ("Mesa Verde does not have the space to place multiple new intakes into a separate housing area for 14-day monitoring").

[15] Ex. 16 to MacLean Dec. (July 1 DFOD Bonnar Email) ("Three intakes since the Abbott was up and running and all declined to be tested. Shows how the plan has a major flaw and doesn't really accomplish anything."); Ex. 17 to MacLean Dec. (July 30 Mesa Verde Daily COVID Report) (cumulative refusals: 26 of 52).

[16] *See* Ex. 18 to MacLean Dec. (Facility Administrator ("FA") Allen identifies "a concern" about "what to do with a detainee who refuses to be tested . . . as refusing the test is almost like a positive test as it relates to separation and 14-day cohort"); Ex. 19 to MacLean Dec. (June 25 plan obliged the transfer or release of incoming street arrestees who refused testing if there was insufficient space for quarantine, but allowed the immediate introduction into the general population of other new intakes).

[17] Ex. 20 to MacLean Dec. (AFOD Mull identifying as an issue: "[p]otential limited to no housing for individuals who test positive…[N]ot only do we have to quarantine the individual, the entire group must be quarantined and there may not be housing/cells available."); ECF 407 (Defs' Joint Status Report) (six incoming contacts of COVID-positive detainee transferred to Adelanto Detention Center July 1 because housing unavailable at Mesa Verde).

[18] ICE Health Service Corps has recommended intake quarantine since at least June. Ex. 21 to MacLean Dec. (June 3 IHSC Guidance). The CDC has done the same since at least March. CDC Correctional Facilities Guidance at 17 ("consider quarantining all new intakes for 14 days before they enter the facility's general population"). *See also* Exs. 22-23 to MacLean Dec. (April guidance from GEO recommending intake quarantine consistent with CDC guidelines).

Defendants used at intake, a negative result did not eliminate the risk that new arrivals were introducing COVID into the facility. ECF 545-1 (Grubaugh Dec.) ¶¶ 32-33. Defendants were well aware of this but ignored the risk.[19] Defendants *increased* new intakes at Mesa Verde in the days leading up to what ultimately became a devastating outbreak. ECF 474 (July 31 Joint CMC Statement) at 4.

Unsurprisingly, over the next three months, conditions worsened, culminating in an outbreak that was as dramatic as it was preventable. Beginning in mid-June 2020, staff members at Mesa Verde began testing positive for COVID-19.[20] The positive results were sporadic at first, but their frequency quickly increased.[21] Yet Defendants did not offer testing for all staff, require testing of staff who were close contacts, or have a policy to ensure that positive tests from staff taken outside the facility were promptly acted upon, as documented by Plaintiffs in their Letter Brief Regarding Staff Testing (ECF 545) and supporting exhibits.[22]

In June and July, there were increasing COVID-19 outbreaks in California correctional facilities, which were the transfer source for many new ICE intakes. Ex. 26 to MacLean Dec. Yet Defendants still did not quarantine new arrivals even if they refused testing.

Defendants soon reported the first positive COVID-19 tests of class members in the general population at Mesa Verde, on July 29 and 31. ECF 527 (Becerra Dec.) ¶¶ 5, 7. Remarkably, Defendants initially opposed testing class members in the affected dorm. ECF 474 (July 31 CMC Statement) at 1-4; Ex. 27 to MacLean Dec. (Wellpath staff confirmed to IHSC on July 30 that

---

[19] Ex. 24 to MacLean Dec. (Wellpath May 21 email) ("releasing them to GP after a negative test result will not ensure COVID-19 does not make it into the facility. This is due to the incubation period … needed to trigger a positive COVID-19 test result."); Ex. 14 to MacLean Dec. (IHSC: "None of our facilities are using [point of care] testing for intakes").

[20] Staff are one of the most common sources for the introduction of COVID into congregate facilities. *See* ECF 487 (Greifinger Dec.) ¶ 20; ECF 545-1 (Grubaugh Dec.) ¶ 24. Defendants' own purported expert, Dr. Richard M. Medrano, agrees. *See* ECF 701-1 (Medrano Dec.) ¶ 7.

[21] *See, e.g.*, ECF 393 (June 22 Def's Status Report); ECF 407 (Def's Status Report); ECF 474 (July 31 Joint CMC Statement) at 1 (at least 13 staff had tested positive by the start of the outbreak); ECF 575 (GEO Status Report) at 2-3 (cumulatively 37 positive staff tests by Aug. 18).

[22] In August, in the middle of the outbreak, the policy still allowed asymptomatic close contacts of COVID-infected people to come to work without testing. Ex. 25 to MacLean Dec.

detainees in the affected dorm will not be offered testing but "will be monitored for symptom onset over the next 14 days … per IHSC guidance"). Only in response to pressure from Plaintiffs and under the threat of a court order did Defendants ultimately consent to regular testing of individuals cohorted in the affected dorms.[23]

Even then, Defendants refused to use point-of-care tests which produce immediate results and would have allowed quick isolation of COVID-positive class members.[24] Defendants justify their refusal to use rapid tests as the crisis ballooned in part on their lack of sufficient tests. Def. OSC Mem. at 5 n.2. But when they believed that the Court might compel their use, Defendants were able to acquire sufficient rapid tests for the entire facility within one day.[25] Defendants also had authorization from ICE Headquarters by July 31 to use the test for "emergent situations," but refused to do so until compelled by the Court.[26]

Defendants chose instead to send tests to laboratories for analysis even though they were aware of the possibility of extensive delays.[27] Even two days' delay in a congregate dormitory can lead to significant transmission. *See* ECF 545-1 (Grubaugh Dec.) ¶¶ 34-37. Yet for the second affected dorm (Dorm C), Defendants waited four days after the identification of a positive test to

---

[23] ECF 474 (July 31 Joint CMC Statement) at 1-4; Ex. 28 of MacLean Dec. (DFOD Bonnar authorized testing for all in Dorm B the evening after the first positive test following communication with counsel, and reversing a prior position that the dorm would only be cohorted).
[24] ECF 545-1 (Grubaugh Dec.) ¶¶ 9(d), 9(i), 16-18, 34-37.
[25] *See* ECF 484-1 (Becerra Dec.) ¶ 10 (only 25 point-of-care tests onsite); ECF 491 (Court ordered Defendants to investigate the possibility of acquiring additional tests); Ex. 29 to MacLean Dec. (one day later, Acting DFOD Becerra acquired sufficient tests for the entire facility but expressed an "intent" to not use the point-of-care test because the Court had not ordered it and to instead store the tests).
[26] *See* Ex. 30 to MacLean Dec. (ICE Headquarters granted authorization to use point-of-care tests for "special needed circumstances" July 31); Ex. 31 to MacLean Dec. (ICE refused to identify the outbreak as an "emergent use" on Aug. 3: "case-by-case exception is not applicable"). *But see* Ex. 32 to MacLean Dec., Becerra Dep. 169:64-172:16 (outbreak could be considered "emergent use").
[27] *E.g.,* ECF 429-1 (July 10 Bonnar Dec.) at 3 n.3 ("Due to a backlog at the laboratory, staffing and logistics involved in testing all detainees, it can take up to several weeks to obtain results.")

even *offer* testing to those in the dorm.[28] The test results would take two weeks to return.[29] When they ultimately did, they revealed that eleven additional class members in the facility were already positive in the earliest days of the outbreak.[30] Because of Defendants' lack of urgency and contingency planning, these people would infect dozens of others in the subsequent days.[31]

It had long been obvious that Mesa Verde's structural constraints would cause a crisis when there were more than a few positive tests. On July 31, Facility Administrator ("FA") Allen told ICE that he was "concerned about what happens if we get multiple positives and no way to isolate or cohort," and was "praying for negatives."[32] Yet Mesa Verde lacked a contingency plan and sought to develop one only in the midst of the crisis, delaying any response and jeopardizing the health of class members.[33] Federal Defendants ultimately released one medically vulnerable detainee to the hospital after he tested positive; with an increasingly dire shortage of space, Mesa

---

[28] Dorm C identified its first positive case on July 31, but Dorm C class members were not offered a COVID test until August 4. Ex. 33 to MacLean Dec. (FA Aug. 2 email: "Do not do any testing until further notice."); Ex. 34 to MacLean Dec. (FA Allen Aug. 2 email) ("mass testing of C dorm needs to be postponed until a plan can be approved by ICE and subsequently approved by GEO leadership").

[29] *See* ECF 535 (Allen Dec.) ¶ 3, ECF 580 (Def's Aug. 19 Status Report) at 2 (results sent to the lab on Aug. 4 were received on Aug. 18).

[30] ECF 580 (Def's Aug. 19 Status Report) at 2-3.

[31] For the first affected dorm (Dorm B), results took three days, which is too long in a dormitory setting. Plaintiff and Defendants' experts agree that results need to be available within 24-48 hours to be meaningful. *See* ECF 545-1 (Grubaugh Dec.) ¶¶ 34-35; Ex. 36 to MacLean Dec., Henderson Dep. 69:4-70:8. These results revealed five more detainees were COVID-positive and had likely infected others while awaiting their results. Ex. 35 to MacLean Dec. (five detainees tested positive in Dorm B, but were in the dorm awaiting results for three days).

[32] Ex. 37 to MacLean Dec. (FA Allen July 30 email). *See also* Ex. 38 to MacLean Dec. (FA Allen to AFOD Mull: "these are the issues we knew would happen if a positive population case."); Ex. 39 to MacLean Dec. (Wellpath Health Services Administrator: testing is "the easy part. Isolation of any positive cases will be the challenge").

[33] Ex. 40 to MacLean Dec. ("We definitely need a contingency plan in the event we have an unexpected high number of positive cases."); Ex. 41 to MacLean Dec. (FA Allen inquiring to ICE "if there are issues with exceeding the 50 detainee per dorm (social distance – double bunks) if/when we have to vacate a dorm"); Ex. 42 to MacLean Dec. (Aug. 3 plan considered housing symptomatic detainees pending results with confirmed positives—though never implemented, this would have all but guaranteed infection for the former).

Verde simply had no place to house him.[34] They sought to relocate detainees to other facilities, but at least one potentially receiving facility recoiled at the risk of transmission.[35] Defendants held COVID-positive detainees in intake rooms not suitable for this purpose, and in contravention with Federal Defendants' own policy. Ex. 46 to MacLean Dec. (Becerra Aug. 3 Email) ("three detainees (positive COVID-19) are currently in intake ... with cots").

Defendants ultimately isolated seven COVID-positive individuals in one dorm cleared for that purpose. As a result, they were forced to cram 55 individuals who had been exposed to those individuals into a single "cohort dorm" for COVID contacts. *See* ECF 498-1 (Aug. 5 Email from Defense Counsel) at 3. Defendants knowingly left symptomatic class members in this crowded cohort dorm where social distancing was impossible; at least three were COVID-positive by August 4, but the results of these tests were not known for weeks.[36] IHSC and Wellpath medical advisors compromised medical recommendations in light of Mesa Verde's space constraints.[37]

The Mesa Verde cohort dormitory effectively became a case study for a COVID superspreader event. Because of Defendants' space constraints, lack of advance planning, failure to maintain social distancing in the cohort dorm, and refusal to use rapid tests, approximately 90% of the originally cohorted class members tested positive for COVID-19 in a matter of weeks.[38]

---

[34] Ex. 43 to MacLean Dec. (FA Allen Aug. 1 email) ("if he should be discharged we currently do not have a place to isolate him"); Ex. 44 to MacLean Dec. (Becerra Aug. 1 email) ("concluded that it's in the best interest of the detainee and the agency to release Saeturn … based on the exigent circumstance we are facing"). He was subject to mandatory detention and Defendants had opposed his bail application. Ex. 32 to MacLean Dec., Becerra Dep. 254:8-255:24; ECF 139-2.

[35] Ex. 45 to MacLean Dec. (Becerra & Mull Aug. 1 emails re "Bed Space Inquiry").

[36] Ex. 47 to MacLean Dec. (three "[persons under investigation]" in combined C dorm tested on Aug. 3 "due to being symptomatic"); ECF 580 (Def's Aug. 19 Status Report) at 2 (all three were already COVID-positive on Aug. 4, but these results returned two weeks later).

[37] *See* Ex. 48 to MacLean Dec. (IHSC Aug. 4 email) ("up to the provider discretion" whether to keep symptomatic detainees in combined cohort dorm; individual isolation will "amplif[y]" "spatial limitations."); Ex. 49 to MacLean Dec. (FA Aug. 1 Allen email) (Wellpath cautioned against mixing two dorms, including symptomatic detainees, but recognized "space issues" compelled it).

[38] *See* ECF 550 (Def's Aug. 14 Status Report), ECF 551 (Pls' Emergency Status Report) (32 new positive tests—30 from the combined cohort dorm—on Aug. 14).

### C.  The Second TRO

Plaintiffs filed their second Motion for Temporary Restraining Order ("Second TRO Motion") on August 4, 2020 (ECF 477-3). The Second TRO Motion, which led to issuance of the Second TRO, serves as the opening brief for the instant proceeding. Defendants assert that they "voluntarily" offered tests to all class members prior to the Court order. Def. OSC Mem. at 1. But Wellpath's records show that they conducted the testing only "because they said a lawyer was going to put a restraining order on us or something by the morning so it needed to be done" – in other words,  under threat of a court order. Ex. 50 to MacLean Dec. (Wellpath Aug. 4 email).

On the basis of this showing, in the Second TRO the Court ordered the Defendants to (1) administer a rapid-results COVID-19 test weekly to all detainees; (2) continue to suspend admission of new detainees; (3) continue to maintain a separate dormitory to segregate class members who tested positive; (4) file detailed reports daily on the court docket; and (5) respond promptly to reasonable requests from class counsel regarding safety conditions. ECF 500 at 2-3. In subsequent minute orders, as the virus continued to spread in Mesa Verde, the Court also ordered point-of-care testing for class members who had not already tested positive and weekly staff testing. ECF 561; ECF 577.

As of today—over five months after the Court's initial preliminary injunction order—62 class members and dozens of staff members at Mesa Verde have tested positive for COVID-19. ECF 580 (Def's Aug. 19 Status Report), ECF 640 (Def's Aug. 31 Status Report). At least four detainees had medical emergencies that required hospital care. *See* ECF 591-6 (Keller Dec.). But for this Court's intervention, these numbers would have been far higher, and these outcomes might have been far worse. Defendants' inaction requires continuing oversight.

### D.  The Last-Minute "Detainee Intake Procedures" Plan

One working day before submitting their brief in this proceeding, and three months after the July outbreak, Defendants promulgated new intake procedures in the event that the TRO expires and intakes are permitted. ECF 786-10 ("Proposed Intake Procedures").[39] The Proposed

---

[39] Defendants only recently began to develop new procedures. Ex. 51 to MacLean Dec., Dep. Ex. 72 (Oct. 2 draft intake procedures).

Intake Procedures would provide that all new intakes are offered a COVID test and placed in a "routine 14-day quarantine" prior to being introduced into the general population.[40] But as Defendants recognize, their Proposed Intake Procedures leave many questions unanswered. Def. OSC Mem. at 17 n.10. Defendants have not defined how many people could be either isolated or quarantined together at intake or identified particular locations for intake quarantine. Ex. 32 to MacLean Dep., Becerra Dep. 89:25-93:13, 207:16-208:12, 262:4-262:16. Defendants have also delegated to the Facility Administrator the discretion to cohort individuals in groups (i.e., those who refuse testing, those who are asymptomatic, and those who are symptomatic) and identify where cohorts or individuals should be housed during this quarantine period. *Id.* at 158:19-160:17, 163:2-163:24, 168:2-169:9, 262:25-263:24. The Proposed Intake Procedures do not *require* such cohorting, do not reserve space for isolation or cohorting, and do not detail any contingency planning in the event of one or more symptomatic or COVID-positive class members. *Id.* at 173:5-174:9, 100:9-100:21, 196:17-199:14. The apparent backup plan is an undefined transfer to another facility despite the concomitant risks. *Id.* at 158:19-160:17, 163:2-24, 174:20-176:2.

Dr. Akiko Iwasaki, a professor at the Yale University School of Medicine and an expert on COVID-19 immunology, has reviewed Defendants' latest plan and identified serious concerns with it. Dr. Iwasaki's "overarching concern" is the lack of dedicated spaces for isolation and quarantine. Second Supplemental Iwasaki Dec. ¶ 13. That is because "positive COVID-19 tests, symptomatic people, test refusers, and those with known exposures to COVID-19" must "be separately housed, while symptomatic people (especially) and test refusers should be individually housed for 14 days or until confirmatory testing shows them to be COVID-19 negative." *Id*. Dr. Iwasaki also has concerns about the plan apparently permitting group quarantine cohorts with no exit testing, which could allow COVID-19 to spread into the general population. *Id*. ¶ 14. Other problems include the failure to require individual isolation for symptomatic people, ambiguity about how refusers will be housed, and ambiguity as to how people deemed too risky to be housed

---

[40] These protections do not apply to individuals deemed recovered from a COVID infection in the past 90 days.

at Mesa Verde will be transferred on to other facilities. *Id*. ¶¶ 15-17.

Defendants have also testified that, despite past experience, they do not have a current plan to continue to offer periodic universal testing to either class members or staff. Ex. 32 to MacLean Dec., Becerra Dep. 151:6-21, 201:9-34 (class); 207:16-208:12 (staff).

## III.    ARGUMENT
### A.  Plaintiffs Are Likely to Succeed on the Merits

#### 1.  Defendants Have Failed To Provide Reasonable Health and Safety

Under the Fifth Amendment, the Government violates its duty to provide reasonable health and safety to people in its custody when it (1) makes an "intentional decision" to impose conditions of confinement that (2) create "a substantial risk of … serious harm," and (3) fails to "take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved." *Hernandez Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. Oct. 13, 2020) (*quoting Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)). After correctly reciting this standard, however, Defendants incorrectly cite to *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004), and *Hayes v. Williams*, No. C-05-00070 RMW, 2009 WL 3004037, at *4 (N.D. Cal. Sept. 15, 2009), which involve criminal custody and apply the Eighth Amendment's subjective deliberate indifference standard. *See* Def. OSC Mem. at 9.  In civil detention cases an objective standard applies: Defendants' conduct must only be "objectively unreasonable." *Roman, supra*, citing *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc); *see also, Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

As shown above, Defendants made a series of "intentional decision[s]" at Mesa Verde that made a viral outbreak inevitable. To summarize, Defendants:

- **Disregarded** concerns that Mesa Verde did not have sufficient space to isolate symptomatic or infected class members. Defendants refused to set aside such space, even after all isolation rooms became full.
- **Rejected** saturation testing proposals because of the insufficient space.
- **Refused** to quarantine new arrivals, despite guidance from their own health professionals to do so, and despite a high number of new arrivals who declined to be tested and an awareness that the viral incubation period could lead to "false negatives" from the single point-of-care test they used at intake.

- **Refused** to investigate or respond to increasing numbers of infections among staff, even though their own Regional Medical Director cited staff as the most likely vector to carry the virus into the facility.
- **Refused** to request additional point-of-care testing supplies, despite knowing that laboratory test results were unpredictable and often delayed.
- **Delayed** testing after discovering positive cases because they had no prearranged space to isolate new positive cases.
- **Refused** to use point-of-care tests on newly-symptomatic individuals in dorms affected by the outbreak. Defendants left these symptomatic individuals in congregate dormitories because they had no prearranged space to isolate them.
- **Ignored** medical advice from their own experts and combined two exposed dorms, including symptomatic class members in both.

Not only would "[a]ny reasonable official under the circumstances," have "appreciated the high degree of risk involved," *Gordon*, 888 F.3d at 1125, but Defendants *did* recognize that risk, and failed to act. Ultimately, only under the pressure of litigation, Defendants took measures that had been available to them for months. Now, they re-argue cases that the Court has previously considered, and issues the Court has already decided. And the Ninth Circuit's recent decision in *Hernandez Roman* dispenses with those cases and arguments at the appellate level, finding that the government "likely violated its constitutional duty to provide reasonably safe conditions to Plaintiffs." 977 F.3d at 943.[41]

### 2. Defendants' Conduct Amounts to Punishment

The Fifth Amendment also prohibits the government from punishing individuals subject to civil detention. A plaintiff need not show punitive intent to prevail. Rather, a "condition [of confinement is punitive when it] is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *Doe v. Kelly*, 878 F.3d 710, 714 (9th Cir. 2017); *see also Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004).

Defendants argue, citing cases, that the government has "legitimate interests in detaining individuals pending their removal proceedings." Def. OSC Mem. at 17-18. But *Jones* makes clear that due process requires further inquiry: if the conditions of confinement Defendants impose are

---

[41] The court in *Roman* distinguished decisions from other circuits, including *Hope v. Warden*, 972 F.3d 310 (3d Cir. 2020), upon which Defendants principally rely. 977 F.3d 935 at n. 5.

unrelated to, or excessive in relation to those interests, they are unconstitutionally punitive. *See Jones*, 393 F.3d at 932 (9th Cir. 2004).

The conditions that Defendants imposed with respect to intake, testing and quarantine and that led to and exacerbated the outbreak bear no relationship to Defendants' interests in preventing flight and promoting public safety, nor do Defendants make any effort to claim that they do. Without question, though, the conditions Defendants created "cause[d] harm or disability that … significantly exceed[ed] or [wa]s independent of the inherent discomforts of confinement"— namely, infecting over half of the class members with COVID-19. *See Doe*, 878 F.3d at 714 (*quoting Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004)).

### B.  An Injunction Is Necessary to Remedy the Cognizable Danger that Defendants Will Continue to Violate Plaintiffs' Fifth Amendment Rights

District courts have "broad power to restrain acts … whose commission in the future, unless enjoined, may be fairly anticipated from the defendant's conduct in the past." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990) (*quoting N.L.R.B. v. Express Publishing Co.*, 312 U.S. 426, 435 (1941)).[42] When the factual record demonstrates a "cognizable danger of recurrent violation," a district court acts well within its authority in issuing an injunction. *See United States v. Laerdal Mfg. Corp*., 73 F.3d 852, 855 (9th Cir. 1995). District courts consider factors including a defendant's knowledge of the violation, the frequency of violations, the likelihood that the defendant's characteristics might enable future violations, and "the sincerity of any assurances against future violations." *Fed. Elec. Comm'n v. Furgatch*, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989). District courts should "question[] [a defendant's] credibility with respect to reforms introduced under protest or after the violation was discovered," keeping in mind that

---

[42] Defendants cite *Orantes* for the proposition that "injunctive relief is designed to deter future misdeeds, not to punish past misconduct." Def. OSC Mem. at 8. The *Orantes* court, however, actually held that "past misconduct" could provide powerful evidence to support the likelihood of "future misdeeds." There, a permanent injunction was upheld where a defendant's "past and present misconduct indicated a strong likelihood of future violations." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990).

"[p]ast illegal conduct gives rise to an inference that future violations may occur." *Laerdal Mfg. Corp.*, 73 F.3d at 857.

The record here compels the conclusion that, absent court intervention, Defendants will continue to act with deliberate indifference toward Plaintiffs' health and safety. Defendants' failures here are "recurrent" and plentiful. Since June, Defendants have been under court order "to maintain, at a minimum, the status quo that currently exists as it relates to protection from transmission of Covid-19 at [Mesa Verde]." First PI, ECF 357 at 12. In the months that followed, as infection spread through facility staff and the correctional facilities and detention centers that feed the Mesa Verde population, Defendants repeatedly refused to respond to the mounting safety risk because doing so would force them to adjust their operations. *See* ECF 489-8 (May 26 email re: staff testing), attached as Ex. 52 to MacLean Dec. Yet Defendants are "persistent[] in claiming that (and acting as if) [their] conduct is blameless," advancing arguments the Court has already rejected; attempting to take credit for changes in conditions that were imposed on them; and arguing that their hands are tied by immigration policy. *Cf. Furgatch*, 869 F.2d at 1263 n.5. Defendants' claim that they have no choice but to use all available space at Mesa Verde for detention operations all but guarantees future outbreaks in the absence of an injunction.[43]

The Proposed Intake Procedures undercut Defendants' empty claim that they are "genuine in their attempts to make additional improvements at Mesa Verde." Def. OSC Mem. at 17. Rather, they bolster the conclusion that Defendants' only genuine desire is, as it has always been, to avoid court intervention. While the Proposed Intake Procedures would restore Defendants' ability to increase the population at Mesa Verde, they would fail to remedy the fundamental structural issues

---

[43] Notably, Defendants' position on the need to increase Mesa Verde's intakes of "criminal aliens" subject to mandatory detention, Def. OSC Mem. at 19, contradicts the latest version of their PRR, which "discontinue[s]" transfers into ICE facilities from other jurisdictions with only limited exceptions for "medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release or removal, or to prevent overcrowding." Because the exceptions do not include a carveout related to mandatory detention, Mesa Verde is now severely restricted in receiving future class members from carceral institutions. *See* Ex. 53 to MacLean Dec. (Oct. 28, 2020 PRR 5.0 at 27-28).

that caused and exacerbated the outbreak: the lack of space to isolate class members who test positive and the lack of testing to identify positive cases.[44] Defendants do not advance any plans that would continue proactive testing of the Mesa Verde population or staff.[45] This is unsurprising, given that once the Proposed Intake Procedures have been fully implemented, Defendants will again have nowhere to house positive or even symptomatic class members. They present no plans for how they could handle an outbreak differently than they did before.[46]

While Defendants seek to restore Mesa Verde to the conditions that caused the outbreak, they balk at a court order requiring them to reserve a specific space for isolating positive cases as "micromanage[ment]," repeatedly citing the Ninth Circuit's decision in *Hernandez Roman* for the proposition that district courts should not intervene. *See* Def. OSC Mem. at 8, n.4, n.10.  But in *Hernandez Roman*, at the Ninth Circuit's invitation, the district court entered an injunction requiring Defendants to develop a specific plan to remedy the ongoing constitutional violations at Adelanto, including weekly testing and population caps to ensure social distancing—much like the plan Plaintiffs seek here. *See, e.g.*, *Hernandez Roman v. Wolf*, No. 20-000768, 2020 WL 5797918, * 6 (C.D. Cal. Sept. 29, 2020) (requiring testing and a plan to cap population); *Hernandez Roman v. Wolf*, 2020 WL 6107069, *6-7 (C.D. Cal. Oct. 15, 2020) (implementing population cap and setting isolation requirements). Far from discouraging courts to take the measures Plaintiffs propose here, the Ninth Circuit held that "of course, the district court has authority to remedy a constitutional violation by ordering measures that it determines are necessary to counter the spread of an outbreak, **including mandating medical isolation of detainees who have tested positive for COVID-19 or who were likely exposed and are awaiting test results ….**" 977 F.3d at 946

---

[44] *See* Ex. 32 to MacLean Dec., Becerra Dep. 140:16-142:11, 142:17-143:8, 262:1-23 (stating that no plan to reserve space for cohort groups or isolation of COVID-positive individuals exists at Mesa Verde).

[45] *See Id.* at 151:6-151:21, 201:9-203:4 (no plan to periodically test class members); 207:16-208:12 (same for staff).

[46] The Acting Deputy Field Office Director responsible for Mesa Verde during the outbreak has done no formal evaluation of the steps leading to the outbreak and has defended Defendants' actions and failed to identify missteps. *Id.* at 238:13-239:13 (no evaluation); 260:1-261:25 (defending response).

(emphasis added). In Mesa Verde, mandating isolation is meaningless without mandating where it will take place, as Defendants have repeatedly proved unwilling to reserve such space themselves. In this case, by failing to remedy the causes of the outbreak, the Proposed Intake Plan fails to "bring the conditions to a constitutionally adequate level," rendering further court intervention necessary. *Id.*

Defendants also offer a misleading, out-of-context citation to *Gonzalez v. Ahern*, 2020 WL 3470089 (N.D. Cal. June 25, 2020) for the proposition that the Constitution requires only that they offer *a* plan to address COVID-19—regardless of its likelihood to address serious, known, safety risks—and that this Court cannot review it "de novo." Def. OSC Mem. at 17 n.10. But *Gonzalez* involves a facility (the Santa Rita Jail) that was *already* the subject of separate COVID-related litigation in which it was "being actively monitored by and cooperating with the [] court." *See Gonzalez* at *5-*6 (*citing Babu v. Ahern*, No. 5:18-cv-07677-NC (N.D. Cal.)). *Gonzalez* thus stands for the proposition that where a court has *already* intervened in a facility, Plaintiffs should first advance claims of further harm before that court. *Id.* at 6. This principle does not apply here.

On this record, Defendants have not earned "the right to be trusted that they will accomplish on their own what the plaintiffs contend requires a court order to ensure." Second TRO, Dkt. 500 at 2. Rather, recent discovery confirms that Defendants' few remedial actions in this case were almost always taken at the eleventh hour and "under protest" and in an effort to stay this Court's hand.

### C. Absent an Injunction, Plaintiffs Face Irreparable Harm

The irreparable harm that the Plaintiffs face without an injunction is clear: another outbreak, detected late, and with no space to house symptomatic or positive class members. The Proposed Intake Procedures, which offer no plan for testing class members already in the population or addressing the likelihood of viral transmission by staff, and which are completely divorced from the spatial limitations at Mesa Verde, wholly fail to address the fundamental safety risks that the July outbreak brought into sharp contrast. Absent an injunction, Plaintiffs will be in

the same position they were on the eve of the outbreak: detained in a facility with no meaningful testing and no space to isolate anyone who, inevitably, becomes infected.[47]

**D.** The Equities Tip Sharply in Plaintiffs' Favor

This Court has already held that "[t]he conditions of confinement do not merely threaten detainees; they also threaten facility staff, not to mention the greater community." ECF 53 at 4. That threat revealed itself in the recent outbreak; nearly 60% of class members and over 25% staff contracted the virus, creating the potential for exposure among their families and throughout the community. Defendants return to arguments that the need for immigration enforcement categorically outweighs these serious public health concerns, even though this Court and the Ninth Circuit have firmly rejected such arguments in the context of the pandemic. *See Hernandez Roman*, 977 F.3d at 944 (district court correctly held equities favored plaintiffs). Contrary to Defendants' arguments (*see* Def. OSC Mem. at 19), Plaintiffs do not seek "an overbroad prohibition on intakes or on ICE's ability to use the housing capacity at Mesa Verde." Instead, Plaintiffs seek injunctive relief that permits ICE to resume enforcement action in Mesa Verde in a way that meaningfully monitors the virus' entry into the facility through testing and ensures that isolation space will be available, so that ICE can follow *its own guidelines* when conducting testing.

Defendants' argument that the cost of operating Mesa Verde at reduced capacity tips the equities in their favor borders on frivolous. Federal Defendants are, in essence, asking for relief from the fact that their contract now pays GEO for work it does not do (*see* ECF 786-8 ¶ 7). "Faced with … a conflict between financial concerns and preventable human suffering," this court should "have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *See Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (quotations omitted).

IV.   **PLAINTIFFS' PROPOSED INJUNCTION IS NECESSARY TO PREVENT THE REINTRODUCTION AND SPREAD OF COVID-19 AT MESA VERDE**

---

[47] The risk of future harm is sufficient to warrant injunctive relief in a conditions case, *see Helling v. McKinney*, 509 U.S. 25, 33. Of course, the Subclass here has already suffered the harm of an outbreak.

Because Defendants' track record demonstrates that they cannot be trusted to protect subclass members, Defendants' request to eliminate all injunctive relief regarding intake, testing, and quarantine should be rejected. Moreover, Defendants' newly developed intake plan—the latest of Defendants' eleventh-hour efforts to stave off injunctive relief—consists of soft guidance of the kind that Defendants have routinely failed to adhere to in the past. The Court must establish clear standards as articulated in the proposed Second PI to prevent another outbreak.

As explained in detail below, the Second PI would allow Defendants to again add new people to the Mesa Verde population in a manner consistent with *the CDC's and ICE's own* COVID-19 guidance and with intake, testing and quarantine protocols designed to protect against the reintroduction and spread of COVID-19. It is tailored to address the specific failures that led to the July outbreak, and it includes many protections from the Second TRO and associated August orders. Where appropriate, it incorporates features from Defendants' proposed intake plan, and is consistent with the testimony of both sides' experts. As conditions have changed, the Second PI appropriately narrows those orders by allowing certain intakes and reducing Defendants' information-sharing requirements.

### A. Population Cap Per Dormitory

The provision that limits the population in any dormitory by prohibiting Subclass members from sleeping within six feet of each other (¶ 2.a) is supported by unanimous expert consensus. As explained above, with the new measurements obtained through Dr. Greifinger's virtual site visit, it is now clear that subclass members must be staggered one full bed apart in order to maintain at least six feet distance while sleeping.[48]

Plaintiffs' proposed population cap modifies only slightly the Court's initial preliminary injunction. For the week in which the Court ordered Defendants "to maintain … the status quo that currently exists as it relates to protection from transmission of Covid-19,"ECF 357 at 12, Mesa Verde had a reported population of 128 people. MacLean Dec. ¶ 2. Dividing that figure to account

---

[48] Due to the current fixed-bunk configuration, this limits the population to 26 per dormitory.

for the four dorms at Mesa Verde yields an average population per dormitory of 32 – slightly higher than the capacity dictated by a six foot separation rule while sleeping.[49]

## B.  Procedures for Preventing the Spread of COVID-19 Within Mesa Verde

Plaintiffs' proposed preliminary injunction also includes procedures for identifying COVID-19 within Mesa Verde and stopping the spread of the disease should it again emerge there. These include the maintenance of a dedicated dormitory for isolating those who test positive for COVID-19 (the "Cohort Isolation Dormitory") (¶ 2.b), procedures for isolating those who present COVID-19 symptoms (¶ 2.c), universal and regular testing for those who have not been recently infected (¶ 2.g), and procedures for quarantining those who test positive (¶ 2.d).

Because Mesa Verde has only five available single-cell units for isolation, maintaining the Cohort Isolation Dormitory is necessary to ensure that there will be isolation space available if more than a few people test positive for COVID-19. *See* Second Supplemental Iwasaki Dec. ¶¶ 13, 20. The difficulty of managing positive tests without such a dedicated space was a reason Defendants refused to engage in population testing for COVID-19 in the first place. *See* ECF 485 at 7-8 (describing Defendants' decision not to do population testing). Moreover, when the inevitable outbreak hit Mesa Verde, the absence of a dedicated cohort dormitory provoked Defendants to mix multiple dorms, exacerbating the outbreak. *See* ECF 550, 551. Even one of Defendants' identified medical experts recognizes the need for dedicated isolation and quarantine spaces. Ex. 54 to MacLean Dec., Medrano Dep. at 251:3-10, 252:6-14).

The Court should also require Defendants to isolate and test symptomatic subclass members. Defendants have regularly failed to respond to COVID-19 symptoms over the course of the pandemic. *Compare* Bonnar Dec. ¶ 8 (ECF 421-1) (explaining limited testing at Mesa Verde) *with* Zepeda Rivas Dec. ¶¶ 27-28 (ECF 6-1) (fever, cough, shortness of breath); Ruiz Tovar Dec.

---

[49] A population cap also protects against reactive measures that do more harm than good. In the midst of the Mesa Verde outbreak, Defendants combined two exposed dorms into a larger group of 55, thereby preventing the people in that larger group from social distancing. The result was that nearly everyone in the combined dorm contracted COVID-19. *See* ECF 550, 551.

¶¶ 7-11 (ECF 6-2) (fever, cough, sore throat); Dang Dec. ¶ 7 (ECF 6-7) (cough). Moreover, Plaintiffs' proposal is supported by CDC guidance and ICE's COVID-19 rules. Ex. 53 to MacLean Dec., CDC Correctional Facilities Guidance ("individuals with COVID-19 symptoms … should be placed under medical isolation immediately"); *id*. ("persons with symptoms are included in the high-priority group for testing in CDC's recommendations due to the high risk of transmission within congregate settings"); Ex. 53 to MacLean Dec. (Oct. 28, 2020 PRR 5.0) at 16 (incorporating CDC guidance).

The Court should also order continued weekly population testing with a test that returns rapid results so that Defendants can detect whether COVID-19 has entered Mesa Verde and can respond before a new outbreak occurs. *See* ECF 545-1 (Grubaugh Dec.) at ¶ 9.c ("All detainees should be tested every week as a safety net in case a SARS-Co V-2 introduction occurs."). As Dr. Grubaugh has explained, "In an environment where everyone or virtually everyone is tested, and those who test positive are quickly isolated and there is effective contact tracing and quarantine, it is possible to severely limit SARS-Co V-2 transmission." *Id*. ¶ 20; *see also* Second Supplemental Iwasaki Dec. ¶ 21.

The Court should also require that those who test positive for COVID-19 be moved to the Cohort Isolation Dormitory and that their contacts be tested with a point-of-care test. Defendants cannot object to the concept of cohorting, as it is central to their own proposed plan. ECF 786-10. Nor can they object to testing contacts, which one of their medical experts agrees is "an important safety measure." Ex. 54 to MacLean Dec. (Medrano Dep. at 249:18-21). Using a point-of-care test in this context is necessary to prevent the type of chain transmission that allowed COVID-19 to spread rapidly at Mesa Verde in July and August. *See* ECF 545-1 (Grubaugh Dec.) ¶¶ 34-37 (explaining importance of rapid tests to stop the chain of transmission in a congregate setting).

### C.  Incoming Transfers and Intake Procedures

While Plaintiffs acknowledge that Mesa Verde may now resume accepting new entrants, that process should be carefully calibrated to prevent new entrants from introducing COVID-19

into the facility. The [Proposed] Second PI thus allows only transfers into Mesa Verde that comply with ICE's own COVID-19 rules (¶ 2.e). As the operative version of ICE's PRR states:

> Transfers of ICE detainees and non-ICE detained populations to and from other jurisdictions and facilities are discontinued unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release or removal, or to prevent overcrowding.

Ex. 53 to MacLean Dec. (Oct. 28, 2020 PRR 5.0 at 27-28).[50] The CDC's Correctional Facilities Guidance endorses similar limits on transfers. *See* Ex. 11 to MacLean Dec.

Once ICE has transferred a person into Mesa Verde for a valid reason, the intake provisions would then protect against that person introducing COVID-19 into the facility (¶ 2.f). *See* Second Supplemental Iwasaki Dec. ¶ 23. While parts of Plaintiffs' intake screening and testing proposal are similar to Defendants' intake plan, Plaintiffs seek greater protections with respect to the intake quarantine system. Defendants would leave intake quarantine decisions to the facility administrator's discretion. But given Mesa Verde's layout, with only four dorms and five individual cells, allowing Defendants to defer decisions on how and where to quarantine people until problems arise invites the same problems that created and exacerbated the July outbreak.

Plaintiffs thus include two options for housing people during the intake process. The first option requires that intake quarantine occur through individual isolation, and is supported by DFOD Bonnar and one of Defendants' medical experts. Ex. 55 to MacLean Dec., Bonnar Dep.. at 242:2-243:5. The second option requires Defendants to develop a court-approved plan *if* they seek to quarantine people in groups. Such a plan is necessary because, as explained in detail above, ICE has been unable to explain in a variety of ways how its intake plan would work at Mesa Verde.

### D.  Regular Staff Testing

It is imperative to pair strong intake procedures with regular staff testing, given the role staff play as a potential source through which COVID-19 could be introduced to Mesa Verde. Dr.

---

[50] The PRR provides that "transfers for any other reason require pre-approval from the local ERO Field Office Director." *Id*. at 28. Plaintiffs are not opposed to incorporating this provision into the order, so long as it cannot be used to authorize routine transfers, a result that would nullify the PRR's general prohibition against transfers.

Grubaugh explains why it is necessary for staff at a facility like Mesa Verde to be universally tested on a frequent basis using a test that returns results in no more than 24-48 hours. "In a 'closed' congregate environment—such as a detention center, prison, jail, nursing home … the most significant vector for SARS-CoV-2 transmission is the introduction of outside personnel into the closed space." Grubaugh Dec. ¶ 24. Moreover, in a closed facility where "contact rates" between staff and detainees are high "more frequent testing is necessary." *Id.* ¶ 28.

## V.   CONCLUSION

Defendants' conduct throughout the course of this litigation demonstrates that the Second PI proposed by Plaintiffs is necessary for the health and safety of the subclass members, and should be ordered by the Court.

Dated: November 10, 2020

Respectfully submitted,

/s/ William S. Freeman
William S. Freeman
Sean Riordan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA

Bree Bernwanger
Hayden Rodarte
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA

Judah Lakin
Amalia Wille
LAKIN & WILLE LLP

Jordan Wells
Stephanie Padilla
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA

Manohar Raju
Public Defender
Matt Gonzalez
Chief Attorney
Francisco Ugarte
Genna Ellis Beier
Emilou H. MacLean
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO

Martin S. Schenker
Timothy W. Cook
Francisco M. Unger
COOLEY LLP

*Attorneys for Petitioners-Plaintiffs*