WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

Attorneys for Petitioners-Plaintiffs
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
GENNA Ellis BEIER (CA SBN 300505)
genna.beier@sfgov.org
Emilou H. MacLean (CA SBN 319071)
emilou.maclean@sfgov.org
FRANCISCO UGARTE (CA SBN 241710)
francisco.ugarte@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: (415) 553-9319
Facsimile: (415) 553-9810

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUBI RUIZ TOVAR, LAWRENCE KURIA MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG, JUAN JOSE ERAZO HERRERA, RAJNISH RAJNISH, and WILLIAN MATIAS RAUDA,<br><br>Petitioners-Plaintiffs,<br><br>v.<br><br>DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; TONY PHAM, Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; NATHAN ALLEN, Warden of Mesa Verde Detention Facility,<br><br>Respondents-Defendants. | **CASE NO. 3:20-CV-02731-VC**<br><br>**DECLARATION OF CARTER C. WHITE**<br><br>**JUDGE VINCE CHHABRIA** |

BREE BERNWANGER* (NY SBN 5036397)
bbernwanger@lccrsf.org
HAYDEN RODARTE (SBN 329432)
hrodarte@lccrsf.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA
131 Steuart St #400
San Francisco, CA 94105
Telephone: (415) 814-7631

JUDAH LAKIN (SBN 307740)
judah@lakinwille.com
AMALIA WILLE (SBN 293342)
amalia@lakinwille.com
LAKIN & WILLE LLP
1939 Harrison Street, Suite 420
Oakland, CA 94612
Telephone: (510) 379-9216
Facsimile: (510) 379-9219

JORDAN WELLS (SBN 326491)
jwells@aclusocal.org
STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

MARTIN S. SCHENKER (SBN 109828)
mschenker@cooley.com
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIMOTHY W. COOK* (Mass. BBO# 688688)
tcook@cooley.com
FRANCISCO M. UNGER* (Mass. BBO# 698807)
funger@cooley.com
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

*Attorneys for Petitioners-Plaintiffs*
*Admitted *Pro Hac Vice*

# DECLARATION OF CARTER C. WHITE

I, Carter White, declare:

1.  I am an attorney duly admitted to practice before this Court. I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.

2.  I am the supervising attorney of the King Hall Civil Rights Clinic at the U.C. Davis School of Law ("Clinic"). Since 2013, I have been counsel of record, along with attorneys at Rosen Bien Galvan & Grunfeld LLP, for the Plaintiff class in *Hedrick v. Grant*, 2:76-cv-00162-EFB (N.D. Cal.) ("*Hedrick*"). *Hedrick* is a class action brought against the County of Yuba on behalf of all incarcerated people in the Yuba County Jail (the "Jail"). The class includes pre- and post-trial county prisoners ("county prisoners") and immigration detainees in the custody of the United States Immigration and Customs Enforcement ("ICE") who are held at the Jail pursuant to a contract between ICE and Yuba County ("immigration detainees"). In 2018, the district court approved an Amended Consent Decree regarding the conditions in the Jail. *See Hedrick*, Dkt. 258. The Amended Consent Decree covers many areas of operation in the Jail, including, but not limited to, medical, mental health, and dental care for class members. Plaintiffs' counsel are the court-appointed monitors responsible for determining whether the defendants are complying with the terms of the Amended Consent Decree.

## Yuba Layout

3.  Throughout the more than seven years the Clinic has been involved in the *Hedrick* case, my students and I have monitored conditions in the Jail through prisoner interviews and review of documents. I have conducted multiple monitoring tours of all areas of the Jail. I am therefore extremely familiar with the layout of the Jail. The Jail is divided into the New Jail and Old Jail. The New Jail consists of A Pod, B Pod, C Pod, D Pod, E Pod and F Pod, which all house only male incarcerated people. All of these units are supervised via indirect supervision from a control booth. A Pod, D Pod, E Pod, and F Pod are celled housing units with twenty cells in each unit. Each cell is separated from a dayroom by a perforated door. B Pod and C Pod are dormitory units with a sleeping area on the bottom floor with bunk beds and a common area on

the second floor. The last time that I toured the Jail, the bunk beds in these two units were spaced approximately two to three feet apart from each other.

4. The Old Jail consists of G-Tank, H-Tank, I-Tank, J-Tank, K-Tank, L-Tank, N-Tank, P-Tank, the Q Cells, R-Dorm, S-Tank, and T-Tank. G-Tank through L-Tank are all in one area of the Jail and are laid out inside of a U-shaped hallway. The dorms are separated from the hallway only by bars. G-Tank, H-Tank, and I-Tank open to the right side of the U-shaped hallway, while J-Tank, K-Tank, and L-Tank open up to the left side of the U-shaped hallway. All six of these units are dormitory-style, with small common areas and extraordinarily cramped living areas with bunk beds set very close together. Each of these six tanks is designed to house between 10 and 20 incarcerated people. All six of the tanks share the same airflow because they all open onto the same hallway.

5. N-Tank is the worker unit and consists of a number of single cells separated from a hallway by bars. All of the incarcerated people in N-Tank breathe the same air because they all open onto the same hallway.

6. P-Tank and R Dorm are both female dormitory housing. P-Tank has capacity for approximately twelve incarcerated people, while R Dorm can house up to twenty-two incarcerated people.

7. There are four Q cells in the Old Jail. These cells are separated from the rest of the Jail by solid doors and have capacity for between one and four incarcerated people. Male incarcerated people housed in the Q cells must shower in the N-Tank shower. Female incarcerated people in the Q cells must shower in the S-Tank showers.

8. S-Tank is the female administrative segregation unit and consists of six double cells with bunk beds. The cells are separated from a common hallway only by bars.

9. Finally, T-Tank is a small dormitory unit. It has the capacity to house eight incarcerated people. T-Tank used to house female incarcerated people. It is now my understanding that T-Tank houses male incarcerated people.

**COVID Outbreak**

10. The Jail is currently experiencing an outbreak of COVID-19 among incarcerated people. I was first advised of the outbreak by Michael Ciccozzi, County Counsel for Yuba County, in an email sent to Plaintiffs' counsel in *Hedrick* on December 14, 2020. The email stated that an incarcerated person showed symptoms on December 7, 2020 and was tested that date. On December 9, 2020, the test came back positive. Three other people who had previously been housed with the person in a four-person cell, Q-4, were then tested on December 9, 2020. All three tests came back positive on December 12, 2020.

11. On December 17, 2020 at 2:00 p.m., my co-counsel and I participated in a telephone conference with a number of representatives from Yuba County: Mr. Ciccozzi, Hannah Bernard (in-house counsel for Wellpath, the private medical provider with whom the County contracts for medical care for incarcerated people), Lt. Fishurn, Sgt. Jenson, Dr. Fong Luu (Yuba County Public Health Department), Undersheriff Ron Johnson, George McKnight (Wellpath's Regional Director of Operations), Codie Spear, RN (Wellpath's Health Services Administrator for the Jail), Joseph Larmour (Yuba County Counsel's office), Undersheriff Nicholas Morzinski, and Cpt. Alan Garza.

12. During the telephone call, the County informed us that sixteen incarcerated people—fifteen men and one woman—had tested positive for COVID-19. The County informed us that all sixteen positive tests had been for county prisoners. They informed us that twelve of the male incarcerated people who had tested positive were being isolated in E Pod, which is a celled housing unit in the Jail that has twenty cells, with the remainder of males who tested positive being held in medical cells. They informed us that the female incarcerated person who tested positive was being isolated by herself in one of the Q cells in the Jail. The County informed us that they did not know how COVID-19 had entered the Jail.

13. The County further informed us that the people who tested positive had been housed in multiple housing units on the "Old Jail" at the time the tests were administered. The

County was unable to inform us of the specific housing units that were impacted, but did state that at least some of the people who tested positive had been in G-Tank and H-Tank. At the time of the call, the County had informed us that no incarcerated people housed in the New Jail had yet tested positive.

14. I have spoken to a number of incarcerated people in the Jail by telephone over the past week. These incarcerated people have provided me with additional information about where people who tested positive were housed.

15. I am aware that at least two women prisoners who were previously housed in R-dorm are now infected with COVID-19. On Tuesday, December 15, 2020, two women who had symptoms were moved into quarantine in one of the nearby Q cells. These women were tested on December 15, 2020. On Thursday, December 17, 2020, all prisoners in R dorm were tested. One woman prisoner who was symptomatic was given a rapid test that was positive; she was then isolated into a Q cell. The two women who had previously been quarantined in a two-person Q cell were then returned to R dorm, even though they did not have results from the tests they were given on Tuesday. Today the tests results came back and one of those women also tested positive, so that all of the women in R dorm have now been exposed by two different people.

16. I spoke to another male prisoner who is very sick with COVID-19; he is currently housed by himself in a medical cell. This prisoner told me he had been symptomatic for two weeks, but that he had to wait a week and a half before he was tested for COVID-19. This prisoner has COVID-19 risk factors including diabetes and hypertension. During the period he was symptomatic he was moved, first to A-pod, and then to cell Q-4, along with other prisoners with COVID-19 risk factors. Q-4 is a four-person cell; all 4 people who were housed there are now infected with COVID-19.

17. During the December 17, 2020 telephone conference with the County, the County further informed us that at the time of the call, there were five to six additional people in the Jail who were symptomatic and had been tested, but for whom the test results had not yet been

received.

18.     The County informed us that they were in the process of testing all incarcerated people in the Jail.  The County indicated that they were testing symptomatic people using the rapid antigen testing, but that all asymptomatic people were being tested using PCR testing.  The County indicated that the current turn-around time on PCR tests from the Jail is two to three days.  The County informed us that they had started conducting the testing and had completed testing in some areas of the Jail, but still had to test other areas of the Jail.  The County did not know when they would be able to complete the testing though indicated they hoped to do so as soon as possible.  The County also did not know when it would receive all of the results.  The County indicated that once testing was completed, they would place all units in the Jail on quarantine status so as not to cross-contaminate without knowing who had and had not tested positive.  We asked why the County was not using the antigen test (or "rapid test") to test everyone.  The County responded that they did not have enough available antigen tests to test everyone.  The County also indicated that it had concerns about false negative results from the antigen test.

19.     The County informed us that they were quarantining "in place" all incarcerated people who had potentially been exposed to the people who had tested positive or who were symptomatic.  We asked whether the County would be moving people housed in dormitory setting who were quarantining to celled housing.  The County indicated that they were not.

20.     The County informed us that, at the time of the call, there were twenty-one ICE detainees in the Jail and that none of the ICE detainees had yet tested positive.  We asked the County if they had requested that ICE transfer the ICE detainees out of the Jail.  The County responded that ICE had indicated that it did not have any other available location to which it could transfer the ICE detainees.

21.     The County further indicated that there were twelve "medically-vulnerable" individuals housed in the Jail and that all twelve had been transferred to A Pod.  This is the pod

which housed the first person who tested positive, increasing the risk of COVID exposure to individuals identified as medically vulnerable.

22. During the telephone call with the County, Plaintiffs' counsel inquired if Defendants were taking any measures to reduce the population of the Jail. The County responded that they had taken a number of steps to divert new intakes from being booked into the Jail. The County also stated it was considering early release of incarcerated people, but did not commit to any releases.

23. Plaintiffs' counsel asked about whether the County would require testing for staff. The County indicated that it was discussing the issue with human resources and expressed concerns that it would be unable to require staff to get tested.

24. The County also indicated that three staff members were quarantining because they had developed symptoms of COVID-19.

25. From my frequent touring of the Jail, social distancing—maintaining a minimum of six feet of distance from other people—is difficult in nearly all areas of the Jail, and especially in the dormitory units, which comprise most of the housing in the Jail.

26. Shortly after 5:00 p.m. today I received a call from a county prisoner who is housed in H-tank. He told me that 8 of the 10 people housed in H were just informed that they had tested positive for COVID-19. He said that the Jail has no plans to move any of the prisoners from that location, including the two people who did not test positive.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at El Paso, Texas this 18th day of December, 2020.

/s/ Carter C. White
Carter C. White