**Ricardo Vasquez Cruz**
**Renewed Request for Release**

**Summary:**

Mr. Vasquez Cruz previously requested release in a Short-Form Bail Application filed on May 3, 2020 (Dkt. 78-5). Defendants replied on May 5, 2020. Dkt. 104-5. This Court denied his request for release in Bail Order #3 on May 6, 2020. Dkt. 106.

Now, over seven months later and in the midst of an uncontrolled COVID-19 outbreak at Yuba County Jail, Mr. Vasquez Cruz seeks re-consideration of his request based on his medical vulnerabilities. Mr. Vasquez Cruz is a 45-year-old man who suffers from hypertension, diabetes, and obesity. Mr. Vasquez Cruz is attaching evidence here that he does suffer from diabetes (not prediabetes), as Federal Defendants' alleged in their opposition to his first Bail Application. *See* Dkt. 104-5. In addition, for the past several months, Mr. Vasquez Cruz has been experiencing a deterioration of his health. He has reported ongoing symptoms of general fatigue, weakness, loss of appetite, and problems with his vision to Yuba County Jail officials. Earlier this month, after a medical exam, Mr. Vasquez Cruz was placed in medical isolation after being told that his white blood cells were low which meant that he had no defenses against illness and the medical professionals were concerned that he was vulnerable to illness. Two days later, without additional explanation, he was transferred to Dorm C, where he remains to this day.

Mr. Vasquez Cruz has a criminal conviction from 2017 for felony domestic violence and child abuse. Mr. Vasquez Cruz takes full responsibility for his actions that day and admits hitting his then-partner and pushing his then-fifteen-year-old son while drunk. He was sentenced to 364 days and served six months in county jail. Since then, he has been detained by ICE for two-and-a-half years, for a total detention of over three years and counting. During that time, he has engaged in significant rehabilitation, specifically alcohol treatment and anger management. He is committed to having no contact with his ex-partner, who he hasn't spoken to in years and who no longer has physical custody of their son.

Mr. Vasquez Cruz respectfully resubmits his application in light of changed circumstances, namely (1) new evidence regarding his medical vulnerabilities, (2) additional information and evidence regarding his rehabilitation and letters of support from both his ex-partner and his son, the victims in the above-mentioned criminal case, (3) a psycho-social evaluation, (4) a material change to the procedural posture of his immigration case, in that the Ninth Circuit granted his Petition for Review and remanded his removal proceedings to the BIA, where they are currently pending.

Given his medical vulnerabilities, his lengthy detention, extensive rehabilitation, and detailed and forthright disclosure of the circumstances underlying his most significant conviction, he warrants temporary release to avoid the potentially catastrophic effects of COVID-19 infection. This is particularly urgent now, when he faces imminent danger of infection with COVID-19 in Yuba due to federal Defendants' failure for the last ten months to take the necessary steps to prepare for the current outbreak.

1.  **Name:** Ricardo Vasquez Cruz

2.  **Age**: 45 years old

3.  **Sex**: Male

4.  **Primary Language:** Spanish

5.  **If hearing, is interpreter needed?** Yes

6.  **Detained**: Yuba County Jail

7.  **Dorm Unit:** C

8.  **Date of Bond Hearing, if Any:**

In response to Mr. Vasquez Cruz's original Bail Application, Federal Defendants noted that an Immigration Judge had "recently" denied Mr. Vasquez Cruz bond after finding him to be a danger. That determination was made in December 2019. Mr. Vasquez Cruz respectfully submits that now, after an additional year of sobriety and additional year of incarceration, his previous dangerousness determination is not controlling. Indeed, it has now been over three years since the incident that brought Mr. Vasquez Cruz into detention and three years of sobriety from alcohol.

9.  **Outcome of Bond Hearing**: Denied.

10. **Length of time in detention:** Two and a half years-- since May 15, 2018

11. **Medical Conditions That Put Detainee At Risk**:

In April 2020, Dr. Allen Keller, MD, reviewed Mr. Vasquez Cruz's Yuba County medical records and concluded that he suffers from **Stage 1 Hypertension**, which puts him at heightened risk for COVID-19. He also concluded that Mr. Vasquez Cruz suffers from **Type 2 Diabetes** and **obesity**.

The question as to whether Mr. Vasquez Cruz has prediabetes or diabetes first arose when Mr. Vasquez Cruz was a petitioner in *Ortuno et al. v. Jennings*, No. 20-cv-2064 MMC (N.D. Cal.).

In the course of that litigation, Dr. Allen Keller, M.D. prepared two different declarations relating to Mr. Vasquez Cruz's medical conditions. In the second declaration, dated April 15, 2020, Dr. Keller writes, "I am aware that the Defendants in this litigation have asserted that Mr. Vasquez Cruz was diagnosed with prediabetes, rather than diabetes. I respectfully disagree with this assessment, both in terms of what is documented in the medical records I have now reviewed, as well as my clinical and professional opinion as a primary care physician who has treated many patients with elevated glucose levels, both pre-diabetic and diabetic." *See* Keller Decl. at ¶ 18. He continued, "[I]t is important to note that prediabetes and diabetes are part of a

continuum. By definition, individuals with pre-diabetes already have increased blood sugars, which worsen in the face of viral infections. The increased risk of severe COVID-19 infections among diabetic patients is the result of a compromised immune system. As such, even if he were only prediabetic and not diabetic, which is not accurate for the reasons outlined above, patients labeled as pre-diabetic likely are immunocompromised as well. Furthermore, pre-diabetes can easily cross the threshold to diabetes as a result of viral infections such as COVID-19." *Id.* at ¶ 22.

Dr. Keller concluded, "The conditions of Mr. Vasquez Cruz put him at heightened risk of severe COVID-19 because of his past and present medical history and the conditions of his confinement. That Mr. Vasquez meets diagnostic criteria for Hypertension is clear. This in and of itself is a recognized risk factor for increased vulnerability to COVID-19. Furthermore, it is my professional opinion that Mr. Vasquez Cruz has Type 2 Diabetes and is at substantially greater risk of developing serious complications and possibly death from COVID-19 given this co-morbidity. While one can debate this issue of diabetes vs. pre-diabetes solely based on blood test results, to do so is both incorrect and myopic. Furthermore, regardless of whether one agrees or disagrees about whether Mr. Vasquez suffers from Type 2 Diabetes based on borderline lab results, there is no question, from a clinical perspective, based on the totality of information available that he has an impaired ability to regulate plasma glucose levels which puts him at substantially increased risk of severe COVID-19 and developing serious complications, including death, from an infection." *Id.* at ¶ 24. Dr. Keller's declaration is attached (with portions relating to medical information relating to another unrelated individual redacted).

The factual question as to whether Mr. Vasquez Cruz suffers from diabetes or prediabetes remains open. As the defendants noted in their first Bail Application Opposition, Judge Chesney concluded that Mr. Vasquez Cruz suffered from prediabetes, not diabetes, and denied him the relief he sought in a TRO in *Ortuno. See* Order re Petitioners' Motion for TRO, CF 38, April 8, 2020. However, that conclusion **predated** this second declaration from Dr. Keller, which is dated April 15, 2020, and was elaborated with the benefit of Mr. Vasquez Cruz's full medical record. Petitioners there sought leave to file a motion for reconsideration with this additional information on April 15, 2020. ECF 55. They filed Dr. Keller's declaration on April 16, 2020. ECF 56. That motion was denied because Judge Chesney found the medical records existed prior to the original TRO motion. Notably, the Judge did not make any factual findings related to the Dr. Keller declaration that is attached here. ECF 60.

12. **<u>Attorney Name, Phone, Address, and Email</u>**:

Jennifer T. Friedman
San Francisco Public Defenders Office
555 7th Street
San Francisco, CA 94103
Jennifer.friedman@sfgov.org

RENEWED BAIL REQUEST RICARDO VASQUEZ CRUZ

13. **Felony or Misdemeanor Convictions, including date and offense**:

- As detailed in his original Bail Application, in November 2017, Mr. Vasquez Cruz was arrested after an incident at Ms. Portillo's home. He had been drinking that day and he and Ms. Portillo got into an argument and were both very angry. Mr. Vasquez Cruz admits his reprehensible conduct on that evening, recognizing that he did briefly put his hands on Ms. Portillo's neck and hit her. While the couple was arguing, their then-fifteen-year-old son tried to separate them and Mr. Vasquez Cruz pushed him. Their son took several steps back as a result of the shove. Mr. Vasquez Cruz was arrested and convicted of Felony Spousal Battery, PC 273.5, and Felony Child Endangerment, PC 273A(a). He was sentenced to 364 days in jail and probation.

- Mr. Vasquez Cruz attaches here a declaration he submitted in his bail application in which he provided a full and honest rendition of his behavior on that date and taking responsibility for his actions. He also stated that "thinking about what I did makes me feel terrible. I'm not that person that I was that day. I was drinking too much, and I lost my head in that moment. This has cost me dearly. I am very regretful for how I acted, above all for my son seeing me that way and for pushing him. This was the day I regret most in my life."

- Upon his completion of six months in jail, he was transferred directly to ICE custody, where he has been for the last two and a half years—for a total detention of over three years.

- Mr. Vasquez Cruz has accepted the mistakes he made in the past and engaged in rehabilitation to make sure those mistakes are not repeated. In jail, Mr. Vasquez Cruz participated in anger management classes. He reports that in those classes, he learned "how to control my anger, how to try to focus on one's self, to think before one acts, to try to ignore someone or go away to avoid conflict, or have a calm conversation instead of getting angry. They also taught us strategies like counting to ten, deep breathes, take breaks before answering someone when we are angry. Although I've only lost my temper and physically hurt another person on one occasion, that was one time too many, and I have changed, I would never do that again. Also I now recognize that the alcohol was a major factor in the incident with my ex-partner and now that I'm sober, it won't happen again." He began attending church, and credits his faith as a major factor in his rehabilitation. Notably, throughout his entire time in custody in an objectively stressful environment where tensions often run high, he has never engaged in any physical altercation of any kind.

- Mr. Vasquez Cruz has also participated in alcohol treatment programs. He attended AA meetings in jail and in the previous ICE facility where he was held, he participated in DEUCE alcohol treatment, five days per week, three hours per day, for three months. He is also proud to report that he has been sober for over three years, which provides a solid basis from which to continue his journey in sobriety. He states, "through my experiences and work on myself in criminal and ICE custody, I have committed to my rehabilitation and recovery. I have not had any alcohol in over two years…. I feel confident in my

sobriety and in my ability to staying sober, and I am committed to making sure that I maintain my sobriety if I am released." Today, he is well-positioned to fulfill his commitment to maintain his sobriety if released. He accepts that he has to continue to work to maintain his sobriety if released and that drinking contributed to bad decisions and caused pain for his loved ones. Through his treatment programs, he has learned to identify strategies to avoid relapse and will continue to develop and employ those strategies if released to maintain his sobriety. In addition, he has a close connection with his social worker, Edith Castellon, who will help him identify and enroll in alcohol treatment programs, including The Freedom Center, where he has already completed an intake and been found appropriate for their 90-day outpatient treatment program. Mr. Vasquez Cruz is clear that he would not drink if released; nor would he drive and he does not currently have a car. In addition to the alcohol treatment, he participated in approximately nine months of anger management and identified specific lessons learned and strategies for dealing with anger without violence.

- Mr. Vasquez Cruz plans to participate in alcohol treatment program if released, including AA meetings available over Zoom and, when available, a 90-day outpatient treatment program through The Freedom Center. (When Mr. Vasquez Cruz sought bond in 2019, he proposed participating in a residential program; however, at this time after an additional year in custody and considering the additional risks and complications to such programs posed by the epidemic, plans to participate in outpatient treatment).

- In 2019, Social Worker Edith Castellon conducted a psycho-social evaluation over the course of four sessions with Mr. Vasquez Cruz in Yuba County Jail. Ms. Castellon concluded that Mr. Vasquez Cruz began struggling with alcohol abuse in 2016, in part in an effort to self-medicate after years of untreated trauma, including a brutal assault that he suffered and the murder of his younger brother in El Salvador. Ms. Castellon concluded that Mr. Vasquez displays symptoms consistent with a diagnosis of Post-Traumatic Stress Disorder (PTSD) and that he started drinking heavily as a coping mechanism when his trauma was triggered by the end of his relationship with Ms. Portillo and a period of unemployment. She also concluded that the period of sobriety, coupled with the rehabilitation he has undertaken while detained, "provided him with a period of deep insight and reflection," based on which "he will be well-positioned to recover from his traumatic past and sustain his sobriety and maintain a positive mental, physical, and social functioning." Ms. Castellon also concluded that he presents as "quite advanced in his rehabilitation process" and that he "demonstrates insight into his past use and what is required to remain sober moving forward." Therefore, if released and with the support of his family and rehabilitation programs, he is "well-positioned to take up his life again and move in a more positive direction to pursue his future goals and be reunited with his son." Finally, she manifests her intention to maintain connected to Mr. Vasquez Cruz and continue providing him with support if released. Psycho-Social Evaluation attached.

- In July 2018, Ms. Portillo wrote a letter expressing that the incident on November 17, 2017 was the only time Mr. Vasquez Cruz was ever violent toward her in their nearly twenty-year relationship; that she was not afraid of him; and that she hoped that he would

be released from ICE custody soon. She stated, "I know that Ricardo isn't dangerous to me or to anyone. During our time together we had conflicts, and we sometimes yelled at each other, he never physically attacked me, apart from November 17, 2017. When our fight turned physical." She stated that the day was "terrible, but it was very different from the way that Ricardo normally treated me and our family, and I am sure that it would never happen again." She also stated that she did not need or seek medical attention. That letter is attached. Mr. Vasquez Cruz has had no contact with Ms. Portillo since then and has no desire or intention to have any future contact with her- particularly given that she continues to struggle with substance abuse while he is in recovery. Their son, Ricardo Jr., no longer lives with her and sees her very infrequently, which further ensures that Mr. Vasquez Cruz and Ms. Portillo will have no need to communicate or have any contact whatsoever.

- Mr. Vasquez Cruz's son Ricardo Jr., now eighteen years old, wrote a letter in support of his father, also affirming that the incident in November 2017 was the only time he had experienced violence from his father and manifesting that he does not fear his father—on the contrary, he very much misses his father and hopes that he will be released. Ricardo Jr. has lived with his paternal grandmother for the last year and four months because his mother is struggling with her own substance abuse and is not able to care for him at this time. That letter is attached.

14. **Pending Criminal Charges**: None

15. **Scheduled Removal Date**:

None.  Since the original denial of his request for release, Mr. Vasquez Cruz's removal proceedings were remanded by the Ninth Circuit for further proceedings before the Board of Immigration Appeals. They remain pending before the BIA at this time. In my office's experience, a remand to the BIA typically takes six months to a year, and in this case will result in further remand for fact-finding by the Immigration Court. The Department of Homeland Security filed a Motion to Remand to the Immigration Judge for further factfinding in August 2020, a motion that Mr. Vasquez Cruz did not oppose, which will virtually certainly result in the granting of that motion.

16. **Family:**

Mr. Vasquez Cruz has extensive family in the United States; most notably, his U.S. citizen son, Ricardo Vasquez Jr., 18 years old, lives in San Bruno, California, with Mr. Vasquez Cruz's LPR mother, Maria Delia Vasquez.  He also has five siblings: Erica Vasquez, in San Francisco, CA; Donnis Vasquez, Daly City, CA; Griselda Vasquez Cruz, Silt, Colorado; Rebeca Vasquez, San Bruno, CA; and Jessica Vasquez, San Bruno, CA.

17. **Proposed Custodian and Description of Proposed Release Residence:**

If released, Mr. Vasquez Cruz will live with his mother, Maria Delia Vasquez, and his son Ricardo Jr., at their home at ███████████████, San Bruno, CA 94006. Ms. Vasquez

RENEWED BAIL REQUEST RICARDO VASQUEZ CRUZ

can be reached at ██████████. She is available to pick him up from Yuba to drive him home. She has resided in that home for the past ten years.  Ms. Vasquez will provide housing and financial support for Mr. Vasquez Cruz. The family's home is sufficient to allow Mr. Vasquez to quarantine for 14 days, maintain social distancing, and abide by any conditions the Court may impose. Ms. Vasquez will take all steps necessary to ensure that Mr. Vasquez Cruz complies with the Court or ICE's conditions of release.

### 18. Applicant's Ties to the Location of the Proposed Residence:

Mr. Vasquez Cruz has lived in the San Francisco area since his arrive in the US in 1999, much of that time with his mother. He was living with her before his incarceration in November 2017. Mr. Vasquez Cruz's son Ricardo Jr. also resides there and four of his siblings live nearby.

### 19. Employment History

Mr. Vasquez Cruz has worked running cable for telephones, internet and TV and as a sound and communications system installer. He worked for IDT for over 15 years, up until 2014. From 2014-2016, he worked for the IBEW Union doing sound and communications system installation.

### 20. Other Information Relevant to Bail Determination:

Mr. Vasquez Cruz maintained Temporary Protected Status (TPS) from 2001 through 2018 and paid taxes 2001 through 2016.

Mr. Vasquez Cruz's son Ricardo Jr. has struggled since his father's arrest, as detailed in his attached letter of support. He was failing tenth grade when he was living with his mother, Ana Portillo. He has resided with Ms. Vasquez, Mr. Vasquez Cruz's mother, for the past year and four months and is now excelling in school, but describes the emotional toll of being separated from both his mother and his father and how his father's support is particularly important now that his mother is not around.

Mr. Vasquez Cruz is at extraordinary risk of contracting COVID-19 and is at heightened risk of serious complications if infected. There has been an exponential increase of COVID cases at the Yuba County Jail in the past two weeks, and the numbers continue to grow amidst ongoing mismanagement of the pandemic by federal Defendants, including the failure to develop a plan for the segregation and treatment of COVID-positive individuals.

### 21. Attached documentation:

- Dr. Allen Keller, MD Declaration, April 15, 2020.
- Ricardo Vasquez Cruz Declaration in Support of Bond, dated December 4, 2019
- Letter from Ricardo Odair Vasquez Portillo, dated December 22, 2020
- Letter from Ana Marina Portillo, dated July 11, 2018
- Psycho-Social Evaluation of Mr. Cruz Vasquez by social worker Edith Castellon

RENEWED BAIL REQUEST RICARDO VASQUEZ CRUZ

- Letter form The Freedom Center, indicating Mr. Vasquez Cruz completed an intake and is appropriate for 90-day outpatient treatment; and literature about The Freedom Center

All information in this application is accurate based on information and belief. This application was prepared using information from Mr. Vasquez Cruz's attorney, undersigned class counsel. Class counsel reviewed the information herein as well as the prior related filings.

Respectfully submitted,

*/s/ Jennifer T. Friedman*
Jennifer T. Friedman

Class Counsel

## Declaration of Allen Keller, MD

I, Allen S. Keller, M.D., hereby declare under penalty of perjury, that the following is true and correct to the best of my knowledge.

1. I am an Associate Professor at New York University School of Medicine (NYUSoM) in the Departments of Medicine and Population Health, and an Attending Physician in the Bellevue Hospital Primary Care Medical Clinic, at the oldest public hospital in the United States.

2. I have over 30 years of experience working with refugees, asylum seekers, and other vulnerable populations, including over 25 years of experience evaluating victims of severe trauma. This includes conducting thorough assessments of their physical, mental health and social problems; making determinations of the veracity of their allegations of trauma; and providing ongoing treatment addressing the physical, psychological and social health consequences of their trauma.

3. In 1995, I co-founded Bellevue/NYU Program for Survivors of Torture (PSOT) in New York City and from 1995-December 2018 served as PSOT's Director. PSOT is co-sponsored by Bellevue Hospital and NYUSoM. PSOT provides comprehensive, interdisciplinary medical, mental health and social services to immigrants who have suffered torture and other severe traumatic events. I am co-founder and Director of the NYU Center for Health and Human Rights (CHHR). Founded in 2000, CHHR conducts scholarly work and research on issues relating to health and human rights including torture and related trauma, prison conditions and forced migration.

4. I have over 25 years of experience evaluating prison conditions. From 2009 to 2016, I served as Co-Chair of the Immigration Detention Health Advisory Group for the U.S. Department of Homeland Security Immigration and Customs Enforcement NGO working group. In this role I also was part of several delegations visiting ICE detention facilities throughout the United States. I continue to conduct research on the conditions of detention and related health consequences. I am the author, coauthor and editor of nearly 100 scholarly publications on the evaluation and treatment of victims of trauma/human rights abuses; and prison conditions, including the health consequences of immigration detention.[1] To date, I have visited over 20 immigration detention facilities throughout the United States.

5. I have served as a medical expert on various investigations of immigration detention facilities. In 2004, I was appointed as an expert by the U.S. Commission on International Religious Freedom (USCIRF) for their congressionally mandated study on the expedited removal process for asylum seekers, which examined all aspects of the process including

---

[1] *See e.g.*, Granski, Megan; Keller, Allen; Venters, Homer, Death Rates among Detained Immigrants in the United States. International journal of environmental research & public health. 2015 Nov 12; 12(11):14414-14419.

immigration detention.[2] In 2017, I served as a medical expert for a review conducted by Human Rights Watch on medical care and deaths of immigrants in detention entitled "Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention."[3]

6.  I have provided two previous declarations in this case. In my initial declaration, dated March 24, 2020, I explained generally the heightened risk of contracting COVID-19 in immigration detention facilities, and concluded that "if the diagnoses [the Petitioners] identify are accurate, then [they] are at risk of severe effects of COVID-19 if infected, because of their underlying medical conditions, their advanced age, or both." (¶ 24.)  At that time, I had not had the opportunity to review the Petitioners' medical records as I understand that some of these records were not yet available to their immigration attorneys, and in other cases had not been provided to counsel in this case and/or to me. In my prior declarations, I was relying on the descriptions of their diagnoses contained in their own declarations or the declarations of their attorneys.

7.  In my Supplemental Declaration, dated March 31, 2020, I responded to Defendants' assertions that some of the Petitioners are not medically vulnerable by reviewing the medical literature pertaining to their asserted medical conditions. Among these Petitioners were Ricardo Vasquez Cruz and Marco Montoya Amaya. However, at that time, I still did not have access to their complete medical records. I reviewed the limited medical records I had available.

8.  I am providing this further declaration to analyze the medical risks for Plaintiffs Ricardo Vasquez Cruz, Julio Cesar Buendia Alas, and Marco Montoya Amaya to more severe forms of COVID-19 infection.

9.  In response to Plaintiffs first Motion for a Temporary Restraining Order, the Court identified that there was insufficient information in the record clearly demonstrating that these four Plaintiffs suffer from a medical condition that places them at higher risk for severe illness from COVID-19. I have now been able to perform a detailed review of the medical records of these three individuals, which I understand are the only records available to them or their attorneys. I have reviewed the medical records of these individuals, and have access to the relevant records in support of my conclusions. This includes medical records from criminal and/or immigration custody, as well as in the case of Mr. Montoya Amaya, an independent psychological evaluation prepared in connection with his immigration case. I have also extracted some of the more relevant material from these medical records to aid the Court's review.

10. I am basing my expert opinions presented here on a review of the declarations of Plaintiffs and their counsel, medical records, a review of the current medical literature,

---

[2] *Report on Asylum Seekers in Expedited Removal, available at* https://www.uscirf.gov/reports-briefs/special-reports/report-asylum-seekers-in-expedited-removal.

[3] *Available at* https://www.hrw.org/report/2017/05/08/systemic-indifference/dangerous-substandard-medical-care-us-immigration-detention

and my professional experience and expertise. In several instances, I will note that I am restating previous testimony so that the Court will not have to search for that testimony in my prior declarations.

## RICARDO VASQUEZ CRUZ

11. Ricardo Vasquez Cruz is a 45-year-old male. I have reviewed his medical records from the Yuba County Facility, available through April 1, 2020.

### *Hypertension*

12. Mr. Vasquez Cruz has Stage 1 Hypertension according to established diagnostic criteria by the American Heart Association (AHA) and the American College of Cardiology (ACC) and based upon numerous elevated blood pressure readings documented in his medical records.

13. The AHA and AAC define Stage 1 Hypertension as systolic readings of 130-139 mm Hg or diastolic mm Hg of 80-89. The AHA and AAC define Stage 2 Hypertension as systolic readings of 140 mm Hg or higher or diastolic of 90 mm Hg or higher. A hypertensive crisis is a systolic blood pressure reading of 180 Hg or higher or diastolic of 120 mm Hg or higher.[4] A finding that an individual suffers from hypertension does not require that an individual have elevated readings every time their blood pressure is checked, but requires at least two elevated blood pressure readings.[5]

14. In 20 medical records from August 15, 2018 through March 28, 2020, Mr. Vasquez Cruz satisfied the criteria for Stage 1 and Stage 2 Hypertension on ten occasions. Here, the fact that 50 percent of Mr. Vasquez Cruz' readings are elevated—including two of the last five at a level of Stage 2 Hypertension—means that he is currently suffering from Hypertension.

---

[4] "2017 ACC/AHA/AAPA/ABC/ACPM/AGS/APhA/ASH/ASPC/NMA/PCNA Guideline for the Prevention, Detection, Evaluation, and Management of High Blood Pressure in Adults: A Report of the American College of Cardiology/American Heart Association Task Force on Clinical Practice Guidelines," J. of American College of Cardiology 2018;71:e127-e248, May 7, 2018, at https://www.acc.org/latest-in-cardiology/ten-points-to-remember/2017/11/09/11/41/2017-guideline-for-high-blood-pressure-in-adults. The systolic reading is the upper number; the diastolic reading is the lower number.

[5] *Id.* ("Prior to labeling a person with hypertension, it is important to use an average based on ≥2 readings obtained on ≥2 occasions to estimate the individual's level of BP.").

4/10/2020                                                CorEMR - Flow Sheets :: Vital Signs | v5.5.0

## RICARDO ALCIDES VASQUEZ-CRUZ

#▇▇▇▇▇▇▇▇

Chronic Care

Sex: M
DOB: ▇▇▇▇▇▇ (Age 44)
Height: 5ft 8in
Weight: 193 lbs
SSN: ▇▇▇▇▇▇▇
Agency: INS (#A 095 142 120)
Location: E : E : 18B : B
JID: 154700
Allergies:
NKDA

Flow Sheets
Vital Signs

# Vital Signs

Viewing 1-20 of 20 Flow Records

| User | Record Date | Pos | BP Sys | BP Dia | Pulse | Resp. | Temp. | Weight | Height | BMI | S$_P$O$_2$ | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MD Aponte-Guzman, Erick | 03/28/2020 0749 | Sitting | 135 | 89 | 86 | 16 | 97.0 °F | | | | 99.0% | Entered on a sick call created 03-28-2020 0746 |
| NP Malasan, Maria | 03/26/2020 1853 | Sitting | 115 | 70 | 60 | 18 | 98.6 °F | | | | 98.0% | Entered on a sick call created 03-26-2020 1839 |
| NP Malasan, Maria | 01/03/2020 1835 | Sitting | 121 | 70 | 59 | 18 | 98.6 °F | 193 lbs | | | 97.0% | Entered on a sick call created 01-03-2020 1824 |
| RN Ocheltree, Michael | 01/01/2020 0252 | Sitting | 140 | 80 | 76 | 16 | 98.1 °F | | 5ft 8in | .00 | 97.0% | |
| RN Ocheltree, Michael | 01/01/2020 0248 | Sitting | 140 | 80 | 76 | 16 | 98.1 °F | | 5ft 8in | .00 | 97.0% | |
| RN McPherson, Francis | 12/12/2019 0231 | Sitting | 119 | 79 | 78 | 16 | 98.7 °F | | | | 98.0% | Entered on a sick call created 12-12-2019 0218 |
| NP Malasan, Maria | 10/03/2019 1543 | Sitting | 114 | 70 | 62 | 18 | 98.2 °F | | | | 98.0% | Entered on a sick call created 10-03-2019 1526 |
| NP Malasan, Maria | 08/16/2019 1218 | Sitting | 128 | 78 | 62 | 18 | 97.5 °F | 193 lbs | | | 98.0% | Entered on a sick call created 08-16-2019 1216 |
| HSA Spear, Cotie | 08/14/2019 1658 | Sitting | 120 | 76 | 90 | 18 | 98.7 °F | | 5ft 8in | .00 | 98.0% | |
| HSA Spear, Cotie | 08/14/2019 1657 | - - - | | | | | | | 5ft 8in | .00 | | |
| RN McPherson, Francis | 08/12/2019 2130 | Sitting | 116 | 74 | 78 | 16 | 98.7 °F | | 5ft 8in | .00 | 98.0% | |
| NP Malasan, Maria | 07/29/2019 1434 | Sitting | 133 | 75 | 77 | 18 | 98.0 °F | 192 lbs | 5ft 8in | 29.20 | 98.0% | |
| RN Rodriguez, Yesenia | 06/18/2019 1056 | Sitting | 119 | 78 | 52 | 16 | 97.6 °F | | | | 96.0% | Entered on a sick call created 06-18-2019 1032 |
| HSA Spear, Cotie | 04/26/2019 1210 | Sitting | 111 | 65 | 64 | 18 | 97.4 °F | 150 lbs | 5ft 11in | 20.90 | 98.0% | Entered on a sick call created 04-26-2019 1207 |
| RN McPherson, Francis | 02/16/2019 0813 | Sitting | 126 | 80 | 71 | 16 | 98.7 °F | | 5ft 8in | .00 | 98.0% | |
| NP Malasan, Maria | 01/25/2019 2025 | Sitting | 130 | 78 | 71 | 18 | 98.8 °F | 173 lbs | | | 98.0% | Entered on a sick call created 01-25-2019 2022 |
| RN Gonzales, Adriana | 11/25/2018 1930 | Sitting | 120 | 84 | 80 | 16 | 97.8 °F | | | | 96.0% | Entered on a sick call created 11-25-2018 1917 |
| RN Watson, Shannon | 10/22/2018 1624 | Sitting | 118 | 78 | 78 | 16 | 97.6 °F | 200 lbs | 5ft 5in | 33.30 | 98.0% | Entered on a sick call created 10-22-2018 1620 |
| NP Malasan, Maria | 09/19/2018 1800 | Sitting | 134 | 80 | 70 | 18 | 98.4 °F | | | | 97.0% | Entered on a sick call created 09-19-2018 1738 |
| NP Malasan, Maria | 08/15/2018 1602 | Sitting | 110 | 82 | 66 | 18 | 98.0 °F | 197 lbs | | | 98.0% | Entered on a sick call created 08-15-2018 1538 |

Viewing 1-20 of 20 Flow Records

15. As I have previously stated (Supplemental Declaration, ¶¶ 4-5), hypertension is recognized by the Centers for Disease Control and Prevention (CDC) and in various studies as a comorbidity which increases the risk of severe COVID-19. In its most current "Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease," dated March 30, 2020, the CDC identified hypertension as among the "risk factors for severe illness."[6] The CDC identified that case fatality was seven times higher for individuals with hypertension than for those with no underlying medical conditions.[7] Aside from recognizing increased case fatality, the CDC notes that hypertension has been associated with increased illness severity and adverse outcomes:

---

[6] https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.
[7] *Id.* (*citing* Novel Coronavirus Pneumonia Emergency Response Epidemiology T. [The epidemiological characteristics of an outbreak of 2019 novel coronavirus diseases (COVID-19) in China]. *Zhonghua Liu Xing Bing Xue Za Zhi*. 2020;41(2):145-151.).

"Patients with no reported underlying medical conditions had an overall case fatality of 0.9%, but case fatality was higher for patients with comorbidities: 10.5% for those with cardiovascular disease, 7.3% for diabetes, and approximately 6% each for chronic respiratory disease, hypertension, and cancer. Heart disease, hypertension, prior stroke, diabetes, chronic lung disease, and chronic kidney disease have all been associated with increased illness severity and adverse outcomes. Accounting for differences in age and prevalence of underlying condition, mortality associated with COVID-19 in the United States was similar to China."

16. There is substantial additional medical evidence which demonstrates that hypertension is, at a minimum, associated with an increased risk for severe COVID-19 including:

- Lei Fang et al., "Are Patients with Hypertension and Diabetes Mellitus at Increased Risk for COVID-19 Infection?" The Lancet, Mar. 11, 2020 at https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30116-8/fulltext;

- Ying-Ying Zheng et al., "COVID-19 and the Cardiovascular System," Nature Reviews: Cardiology, Mar. 5, 2020, at https://www.nature.com/articles/s41569-020-0360-5?fbclid=IwAR3w4wcTno9A798v1fuYbALPLUHU5dNsVNVFKDc6GW-6yED2mXcyxrJY7dc ("In one study, among the patients with severe symptoms of COVID-19, 58% had hypertension. . . According to mortality data released by the [National Health Commission of China], 35% of patients with SARS-CoV-2 infection had a history of hypertension.");

- Fei Zhou et al., "Clinical Course and Risk Factors for Mortality of Adult Inpatients with COVID-19 in Wuhan, China: A Retrospective Cohort Study," The Lancet, Vol. 395, Issue 10229, Mar. 28-Apr. 3, 2020, at https://www.sciencedirect.com/science/article/pii/S0140673620305663 ("Comorbidities were present in nearly half of patients [hospitalized with a severe form of COVID-19 in one study], with hypertension being the most common comorbidity");

- Wei-jie Guan et al., "Clinical Characteristics of Coronavirus Disease 2019 in China," New England Journal of Medicine, Feb. 28, 2020, at https://www.nejm.org/doi/full/10.1056/NEJMoa2002032;

- Dawei Wang D, et al., "Clinical Characteristics of 138 Hospitalized Patients With 2019 Novel Coronavirus-Infected Pneumonia in Wuhan, China," JAMA, Feb. 7, 2020, at https://jamanetwork.com/journals/jama/fullarticle/2761044 ("Compared with patients who did not receive ICU care (n = 102), patients who required ICU care (n = 36) were significantly older (median age, 66 years [IQR, 57-78] vs 51 years [IQR, 37-62]; P < .001) and were more likely to have underlying comorbidities, including hypertension (21 [58.3%] vs 22 [21.6%] . . .").

*Diabetes*

17. Mr. Vasquez Cruz also suffers from Diabetes which places him at an elevated risk of severe COVID.

18. I am aware that the Defendants in this litigation have asserted that Mr. Vasquez Cruz was diagnosed with prediabetes, rather than diabetes. I respectfully disagree with this assessment, both in terms of what is documented in the medical records I have now reviewed, as well as my clinical and professional opinion as a primary care physician who has treated many patients with elevated glucose levels, both pre-diabetic and diabetic.

19. On August 16, 2019, health care providers at Yuba County Jail diagnosed Mr. Vasquez Cruz with Type 2 Diabetes. In fact, from that point up to the present, there is no mention of pre-diabetes anywhere in Mr. Vasquez Cruz' medical records. The providers at that point placed Mr. Vasquez Cruz on a "diabetic diet" and prescribed "diabetic shoes." Health care providers prescribed Metformin for Mr. Vasquez Cruz. Metformin is a medication approved by the U.S. Food and Drug Administration (FDA) for treating diabetes, not pre-diabetes.[8]

20. The medical records from Yuba County Jail are extrapolated below:

> **Plan:** 08/02/2019 Lab results reviewed with pt = Verbalized understanding Metformin 500 mg PO BID x 30 days MTO for Diabetic Diet and Diabetic shoes x 90 days Informed pt of plan of care = Verbalized understanding R/S NPSC to 08/21/2019 for physical exam and assess response to tx

21. Mr. Vasquez Cruz' blood tests at the time of his Type 2 Diabetes diagnosis showed that both his serum sugar and Glycosylated Hemoglobin (a blood test providing information about how well or poorly his sugars are controlled) were increased compared to prior tests. These blood tests improved with Metformin treatment. Additionally, he suffers from significant risk factors consistent with Type 2 Diabetes including obesity and gout. The correlation between gout and diabetes is well-established. In his declaration, he also identified that he was "feeling tired and weak all the time," which is consistent with

---

[8] "Glucophage (metformin hydrochloride) Tablets, Glucophage XR (metformin hydrochloride) Extended-Release Tablets," (https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/020357s037s039,021202s021s023l bl.pdf ("GLUCOPHAGE (metformin hydrochloride) Tablets is indicated as an adjunct to diet and exercise to improve glycemic control in adults and children with type 2 diabetes mellitus. GLUCOPHAGE XR (metformin hydrochloride) Extended-Release Tablets is indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.").

diabetes. While Mr. Vasquez  Cruz' blood tests are borderline and fall in the upper range for pre-diabetes, the diagnosis of diabetes based on the totality of information is correct.

22. As I stated in my Supplemental Declaration (¶ 10), it is important to note that pre-diabetes and diabetes are part of a continuum. By definition, individuals with pre-diabetes already have increased blood sugars, which worsen in the face of viral infections. The increased risk of severe COVID-19 infections among diabetic patients is the result of a compromised immune system. As such, even if he were only prediabetic and not diabetic, which is not accurate for the reasons outlined above, patients labeled as pre-diabetic likely are immunocompromised as well.

23. Furthermore, pre-diabetes can easily cross the threshold to diabetes as a result of viral infections such as COVID-19 According to Mount Sinai School of Medicine:

"Diabetics have a compromised immune system which means that fighting viral infections takes longer and is more taxing on the body. Additionally, a report from the International Diabetes Federation found that viral infections cause fluctuations in blood glucose, making diabetes harder to control. And, viruses may thrive in environments of elevated blood glucose."[9]

24. The conditions of Mr. Vasquez Cruz put him at heightened risk of severe COVID-19 because of his past and present medical history and the conditions of his confinement. That Mr. Vasquez meets diagnostic criteria for Hypertension is clear. This in and of itself is a recognized risk factor for increased vulnerability to COVID-19. Furthermore, it is my professional opinion that Mr. Vasquez Cruz has Type 2 Diabetes and is at substantially greater risk of developing serious complications and possibly death from COVID-19 given this co-morbidity. While one can debate this issue of diabetes vs. pre-diabetes solely based on blood test results, to do so is both incorrect and myopic. Furthermore, regardless of whether one agrees or disagrees about whether Mr. Vasquez suffers from Type 2 Diabetes based on borderline lab results, there is no question, from a clinical perspective, based on the totality of information available that he has an impaired ability to regulate plasma glucose levels which puts him at substantially increased risk of severe COVID-19 and developing serious complications, including death, from an infection.

## JULIO CESAR BUENDIA ALAS

25. I have now reviewed available medical records for Julio Cesar Buendia Alas both from his time in the custody of Los Angeles County, the State of California and federal immigration authorities. Mr. Buendia Alas' blood pressure readings fall within the range for a diagnosis of Stage 1 Hypertension.

---

[9] Mount Sinai School of Medicine, *Diabetes, Infectious Diseases, Your Health* (March 18, 2020), https://inside.mountsinai.org/blog/i-am-diabetic-am-i-at-increased-risk-for-covid-19/.

26. Specifically, the medical records which I have reviewed show nine elevated blood pressure readings of 16 available readings between July 2017 and February 2020, including the three most recent readings.

| Date | Blood Pressure |
|------|----------------|
| 7/25/2017 | 126/87* |
| 7/26/2017 | 122/87* |
| 12/27/2017 | 109/72 |
| 1/1/2018 | 109/72 |
| 5/26/2018 | 128/72 |
| 7/12/2018 | 105/72 |
| 10/29/2018 | 123/85* |
| 1/7/2019 | 130/90* |
| 1/8/2019 | 115/76 |
| 2/15/2019 | 125/84* |
| 8/16/2019 | 136/72* |
| 9/5/2019 | 98/60 |
| 9/20/2019 | 112/66 |
| 12/17/2019 | 128/88* |
| 1/19/2020 | 123/81* |
| 2/19/2020 | 129/83* |

27. For the reasons stated above with respect to Mr. Vasquez Cruz, namely that Mr. Buendia Alas has shown elevated blood pressure readings on more than 50% of the readings available, including his most recent readings, Mr. Buendia Alas meets the diagnostic criteria for Stage 1 Hypertension. His hypertension places him at heightened risk of severe COVID-19 for the reasons elaborated above.

## MARCO MONTOYA AMAYA

28. I have now reviewed the following materials relating to Mr. Marco Montoya Amaya:
    a. the March 17, 2020 psychological evaluation of Dr. Ariel Shidlo concerning Marco Montoya Amaya;
    b. Mr. Montoya Amaya's Mesa Verde medical records[10];
    c. a letter to ICE Field Office Director Erik Bonnar from Disability Rights Advocates concerning Mr. Montoya Amaya; and
    d. an independent evaluation of Mr. Montoya Amaya's case by two independent neurologists, Dr. Altaf Saadi, a neurologist and Clinical Instructor of Medicine at the University of California-Los Angeles, and Dr. Pria Anand, a neurologist and

---

[10] The Mesa Verde medical records have some indicia of unreliability. For instance, on a March 14, 2019 record, he is identified as having attempted suicide and yet also having no psychological history. Medical records on May 25, 2019 also note that Mr. Montoya Amaya has neither psychological history nor a history of headaches even though he has both a complex psychological history and a years-long history of severe headaches.

neuro-infectious disease fellow at Massachusetts General Hospital, attached as Exhibit A.

29. Additionally, I have reviewed the April 4, 2020 "Updated Guidance" from Peter Berg, ICE Assistant Director, Field Operations concerning "COVID-19 Detained Docket Review," attached here as Exhibit B. In this Updated Guidance, ICE acknowledges that "neurological and neurologic and neurodevelopment conditions" are consistent with a heightened risk from serious illness from COVID-19.

30. This is consistent with the understanding of medical experts and the medical literature. Among other sources, the CDC has recognized neurological conditions as risk factors for severe COVID-19. In March 2020 guidance, the CDC identified that "neurological and neurologic and neurodevelopment conditions," including disorders of the brain, seizure disorders, and intellectual disabilities, are underlying medical conditions which increase the risk of severe COVID-19.[11]

31. Neurological disorders are diseases of the central and peripheral nervous system and include seizure disorders, migraine and other headache disorders, and traumatic disorders due to head trauma.[12] Neurodevelopmental disorders (NDDs) are characterized by impairments in cognition, communication, behavior and/or motor skills resulting from abnormal brain development, and include intellectual disabilities and communication disorders.[13]

32. Based on my review of the above materials, relevant scholarly medical literature, and my clinical experience, it is my professional opinion that Mr. Montoya Amaya suffers from neurodevelopmental and neurological conditions putting him at greater risk of developing COVID-19 infection and its more serious complications, including death.

*Traumatic Brain Injury (TBI)*

33. Mr. Montoya Amaya suffers from a Traumatic Brain Injury (TBI). A TBI is a disruption of the brain's normal functioning resulting from a violent blow. A TBI can cause an individual long-term complications. Mr. Montoya Amaya's TBI is well-documented in his medical records (including from a Kern County neurological consultation) and

---

[11] *See, e.g.*, CDC, "Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission," Mar. 12, 2020, 10, at https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf (last visited Apr. 14, 2020) (identifying "neurological and neurologic and neurodevelopment conditions," including disorders of the brain and seizure disorders, as "underlying medical conditions which increase the risk of severe COVID-19.

[12] World Health Organization, "What Are Neurological Disorders?", May 2016, at https://www.who.int/features/qa/55/en/ (last visited Apr. 14, 2020).

[13] AP Mullin et al., "Neurodevelopmental disorders: mechanisms and boundary definitions from genomes, interactomes and proteoes," Translational Psychiatry, Dec. 3, 2013, at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4030327/ (last visited Apr. 14, 2020).

psychological evaluation, as are severe beatings and abuse he suffered while he was a child and teenager.

34. As one example, on September 4, 2019, the Medical Director of the Mesa Verde processing center described Mr. Montoya Amaya's medical history as including persistent headaches and a long history of head trauma:

> 41 yo male detainee called to medical for evaluation of complaints of headache and for not getting medications for the parasite in his brain.
> Patient has been having headaches for the last 8 years while he was still in Honduras. Headaches starts on the right side of the head as tingling and in about a minute intense headache as if his head is pounded by a hammer. Sometimes he smells something bad before the intense headaches begun. Headache is accompanied by loss of vision worse in the right eye which gets better along with the headache in a few hours. He did not take medication then. For the last 6 years, these intense attacks of headaches occur 2-3 times a week. Light bothers him but he did not report light fortification or flashes of light. He denies sleep helping. For about 2 to 3 years he also reported waking up with a headache about 2-3/10 which he experienced on some days, pressure like in character and stays most of the day. While incarcerated in Yuba, he had CT scan of the head w/o contrast on 4/20/18 which demonstrated small punctate calcifications near the gray-white matter junction suggesting end- stage neurocystercosis. He was taking Tylenol or Ibuprofen prn when he was transferred here in Mesa Verde on 3/13/19. He had an MRI of the brain without contrast on 4/19/2019 to f/u 4/2018 brain CT findings. Brain MRI detected no evidence of acute or gross structural abnormality. He was on Topamax since 3/29/19 and presently on 50 mg po at hs, ibuprofen and Tylenol PRN.
> Patient denies having seizures. He reported significant head trauma over the years. Patient stated that as a child in Honduras, his stepmother used to bang his head on the wall when she was upset with him and this went on for 3 years. In 2013, his boss allegedly hit him and he fell hitting his back and his head. Again in 2014 while working as a janitor, he slipped and fell hitting his head hard on the concrete. He did not lose consciousness but it was very hard, he was seeing stars. Denies vomiting but sometimes nausea during intense headache. He is also treated for allergic rhinitis and is on loratadine and fluticasone.

35. For Mr. Montoya Amaya, his TBI meets diagnostic criteria as both a neurodevelopmental disorder as well as a serious neurological condition. A TBI that occurs before the age of 21 is categorized as a neurodevelopmental disorder. While the term "neurodevelopmental disorder" is not specifically stated in any of the above materials, based on the totality of information available, there is no doubt that he suffered from a neurodevelopmental disorder, from which he continues to suffer symptoms up to the present.

36. Mr. Montoya Amaya suffered repeated episodes of head trauma before the age of 21 which are likely the cause of the TBI. The first identified in the records occurred between the ages of 5-7 years old, when Mr. Montoya Amaya was repeatedly abused and beaten. Later as a teenager, he was repeatedly beaten by gang members and suffered head trauma. As a result, Mr. Montoya Amaya continues, up to the present, to suffer from substantial, cognitive difficulties including poor memory.

37. It is my professional opinion that Mr. Montoya Amaya suffered a neurodevelopmental disorder as a child, caused by beatings he suffered at that time, and that many of those

symptoms continue to the present. Given his TBI symptoms have continued into his adulthood and up to the present, his TBI is appropriately classified as a serious neurological condition as well.

38. TBI is also recognized as a serious and debilitating neurological condition. This classification is appropriate in addition to neurodevelopmental, given the neurologic symptoms, including headaches and his cognitive impairment including poor memory, as well as his severe anxiety. As recognized in the ICE Updated Guidance on COVID-19 from April 4 and the CDC guidance, this neurological condition places Mr. Montoya Amaya at heightened risk of severe COVID-19.

*Migraine Disorder and/or Neurocysticercosis*

39. The health care providers at Yuba and Mesa Verde, where Mr. Montoya Amaya has been detained, have consistently reported his chronic headaches, identified as ongoing for eight years and accompanied by a loss of vision. He was seen by Kern County Neurological Medical Group on account of concerns regarding his neurological problems. Health care providers at Mesa Verde and the referred neurologist have diagnosed Mr. Montoya Amaya as having migraines or chronic tension-type headaches. For instance, in Mesa Verde records on September 4, 2019, the Mesa Verde Medical Director diagnosed Mr. Montoya Amaya with "headaches, consistent with migrainous origin, possibly with post concussive component." The Medical Director documented "the frequency of migraine attacks which is 2 to 3 times a week" and, as a result, prescribed Mr. Montoya Amaya topiramate as "migraine prophylaxis," at an increased dose. Health care providers identified that the "long standing migraine" could be the cause of the identified "abnormal brain CT imaging" of April 2018.

> 1. Headaches, consistent with migrainous origin, possibly with post concussive component. Due to the frequency of migraine attacks which is 2 to 3 times a week, the patient needs to be on migraine prophylaxis which he is currently taking topiramate 50 mg po daily, and with intermittent use of ablative treatment such as triptans or a combination of triptans + naproxen
> 2. Allergic Rhinitis

The neurologist at the Kern County Neurological Medical Group who saw Mr. Montoya Amaya on November 4, 2019 documented headaches "associated with tenderness, photophobia, tearing of the right eye and running of mucus from the nose," and pain that is "very intense."

40. Mr. Montoya Amaya was diagnosed with another serious neurological condition, neurocystocercosis, which is likely an important contributing cause of his chronic migraine headaches. Neurocystocercosis is a parasitic infection that affects the central nervous system.

41. Mr. Montoya Amaya was provisionally diagnosed with "end-stage neurocysticercosis,"[14] an invasive parasitic infection in the brain, after he was referred for brain imaging at Rideout Memorial Hospital in Marysville on April 20, 2018, while he was detained in Yuba County. The reviewing physician found that there were "small punctate calcifications . . . in the frontal lobe suggesting end-stage neurocysticercosis."

42. On May 13, 2019, independent neurologists reviewed Mr. Montoya Amaya's medical records, examined the provisional end-stage neurocysticercosis diagnosis, and evaluated his medical care in light of this diagnosis and his medical records. Dr. Altaf Saadi, a neurologist and Clinical Instructor of Medicine at the University of California-Los Angeles, and Dr. Pria Anand, a neurologist and neuro-infectious disease fellow at Massachusetts General Hospital, expressed concern about the lack of appropriate medical care and follow-up in light of the severity of his condition.

> Risks of untreated disease include uncontrolled seizures, which carry the risk of SUDEP (Sudden unexpected death in epilepsy), irreversible neuropsychiatric and cognitive symptoms, loss of vision and hydrocephalus (excess cerebrospinal fluid build-up in the brain resulting in increased pressure in the head), edema (swelling) of the brain and consequent death.

> In summary, Mr. Amaya requires better management of his neurocysticercosis, which thus far has failed to meet standard of care.

Drs. Saadi and Anand also recognized that "the likelihood of neurocysticercosis-associated seizures is high, with seizures as a presenting sign of neurocysticercosis in 70-90% of symptomatic patients."

43. Referred to a neurologist while at Mesa Verde Detention Center, on November 4, 2019, the neurologist diagnosed Mr. Montoya Amaya as having both, or a differential diagnosis of, chronic headaches and cysticercosis of the central nervous system.



**KERN COUNTY NEUROLOGICAL MEDICAL GROUP, INC.**
1705 28TH STREET
BAKERSFIELD, CA 93301-1902
(661) 322-3008   FAX (661) 322-5507

| Discussion: | Differential diagnoses migraines, cluster headaches, cerebral cysticercosis on MRI scan |
|---|---|

---

[14] The CDC describes neurocysticercosis as a parasitic infection which "affects the brain and is the most severe form of the disease, can be fatal. Neurocysticercosis is considered a Neglected Parasitic Infection, one of a group of diseases that results in significant illness among those who are infected and is often poorly understood by health care providers." (https://www.cdc.gov/parasites/resources/pdf/npis_in_us_neurocysticercosis.pdf)

44. While, in all likelihood, the neurocystocercosis infectious process is no longer continuing, the abnormalities noted on CT examination demonstrated that his prior neurocystocercosis infection resulted in scar tissue in his brain. This may be the underlying cause of his chronic headaches, although likely that is multi-factorial, including resulting from the prior beatings noted above.

45. Furthermore, Mr. Montoya Amaya suffers a calcified lesion in his brain, likely resulting from the prior neurocystocercosis infection, which makes him at greater risk of suffering seizures, as noted by Drs. Saadi and Anand. Mr. Montoya Amaya was started on and remains on Topramax, a medication used to both treat migraine headaches and also to prevent seizures which can result from the neurocystocercosis-related scar tissue in the brain.

46. Whether Mr. Montoya Amaya suffers from neurocysticerosis, as a neurologist provisionally identified; or severe migraines, as the health care providers at Yuba and Mesa Verde have recognized consistently for years, either of these qualifies as a neurological disorder. As both ICE and the CDC have recognized, and as is evident in the medical literature, such neurological disorders increase the risk of severe COVID-19. The fact that the CDC does not explicitly identify neurocysticerosis as a risk factor is unsurprising as the number of individuals in the United States suffering from this infectious disease is very low.[15] Neurocysticerosis (like migraine disorder) is, however, a neurological condition, which the CDC does identify as a risk factor for severe COVID.

***Mental Health Diagnoses, Including Neurocognitive Disorder***

47. Additionally, an independent psychologist who evaluated Mr. Montoya Amaya, Dr. Ariel Shidlo, diagnosed Mr. Montoya Amaya with severe post-traumatic stress disorder, major depression with psychotic features, mild neurocognitive disorder (NCD) and substance use disorder, in remission in a controlled environment.

48. In conducting his evaluation, Dr. Shidlo reviewed various psychological and psychiatric records: Correctional Medical Group Companies evaluations from August 7, 2018; California Forensic Medical Group (CFMG) Psychiatrist Progress Note dated August 9, 2018 in which he was prescribed Remeron, an antidepressant. Based on Dr. Shidlo's review of Mr. Montoya's medical records, Mr. Montoya has been prescribed various antidepressants: Remeron, Lexapro, Effexor, and Trazadone. He reports experiencing symptoms such as regular vision blackouts, daily headaches and pains so severe he often cannot stand or walk.

---

[15] *See* Jose Serpa & Clinton White Jr., "Neurocysticerosis in the United States," Pathogens and Global Health, Sept. 2012, at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4005108/ (last visited Apr. 14, 2020) ("Neurocysticerosis (NCC) is typically considered a disease of the developing world. . . We estimate that between 1320 and 5050 new cases of NCC occur every year in the USA.").

49. As a result of these significant underlying neuro-developmental and neurological conditions, as well as his psychiatric diagnoses, Mr. Montoya Amaya is at substantially greater risk of developing COVID-19 infection and suffering severe complications including death.

50. Given that he suffers from serious neurological and psychological illnesses, Mr. Montoya Amaya is also at great risk of profoundly decompensating as a result of fear and stress related to COVID-19. This includes worsening depression and increased risk of suicidality. This could suppress Mr. Montoya Amaya's immune response if he contracts COVID-19, leading to a more severe outcome.

### *Hypertension*

51. In addition to the neurological and psychological diagnoses that increase Mr. Montoya Amaya's risk of severe COVID-19, Mr. Montoya Amaya can be diagnosed as suffering from Stage 1 Hypertension based on a series of elevated blood pressure readings in the hypertensive range. For instance, he had the following blood pressure readings:

|              |        |
|--------------|--------|
| Jan. 7, 2019 | 118/84 |
| Oct. 17, 2018 | 110/84 |
| Sept. 18, 2018 | 130/86 |
| Sept. 9, 2018 | 136/80 |
| Aug. 27, 2018 | 136/80 |

\*\*\*

52. There are clear medical vulnerabilities for severe COVID-19 for Ricardo Vasquez Cruz, Julio Cesar Buendia Alas and Marco Montoya Amaya. Each is medically vulnerable – and some in multiple ways – even just considering the CDC standard for heightened vulnerability.

53. Moreover, with all of the medical conditions noted above, our knowledge and understanding of them in the context of COVID-19 are rapidly expanding. As such it is essential to err on the side of caution with regards to assessing risk. This is consistent with the overarching strategy our country is taking toward COVID-19. Not doing so unnecessarily and shortsightedly puts these individuals at greater risk.

Date: April 15, 2020

_____

Allen S. Keller, M.D.

**DECLARATION OF RICARDO VASQUEZ CRUZ
IN SUPPORT OF BOND**

I, Ricardo Vasquez Cruz, swear under penalty of perjury under the laws of the United States that the following declaration is true and correct to the best of my knowledge:

**Background Information**

1.  My full name is Ricardo Vasquez Cruz. I was born on ███████████ in La Union, El Salvador. I am currently detained at the Yuba County Detention Facility in Marysville, California.

2.  I am preparing this declaration in support of my request for release on bond.

3.  I came to the United States around June 1999. I came because I was being harassed and threatened by gangs in El Salvador. The gangs killed my brother, Ever, when he refused to join them. Not long after Ever was killed, members of the MS 13 gang attacked and robbed me.

4.  The next day, we decided to tell the police even though we were very afraid.  A few days later, the police arrested them. The police called us to the police station to give a declaration and identify them, which I did.

5.  We thought they were going to go to jail, but that same afternoon we saw them out on the street. They had been released. I was terrified because we had broken their number one rule by going to the police.

6.  I tried to stay in El Salvador after that, but I was essentially in hiding.  I knew they would come after me if they found me alone, so I made sure to never be alone or be anywhere where they could get me. I did not go out at all. I stayed home for the most part and I was never alone. I was full of fear; I knew they would get me if they had the chance.

7.  The gangs just kept getting stronger. I was very careful to avoid the gang, but it got harder and harder. Despite all my precautions, the gang targeted and threatened me on several occasions. The threats happened frequently after I reported them. They also came to my house looking for me.

8.  I fled El Salvador soon after that. I could not stay in El Salvador anymore. Around June or July 1999, I came to the United States. I crossed the border through Douglas Arizona.

9.  The constant threats I received from gang members and my fear to be killed forced me to come to this country. I was afraid to continue living in El Salvador. The gang members, who my friends and I testified against, were free on the streets. I lived in constant terror. I was afraid they were going to fulfill their promise to kill me just as they killed my brother, so I came to the United States.

10. When I first got here, I felt relieved and safe for the first time in a very long time. I moved in with my mom in Daly City, California. I have not left the US since 1999.

11. I have worked ever since I arrived to the United States. My first job was as a building maintenance in an apartment building. Later, I got a job through a friend running cable for telephones, Internet, and TV. Ever since, I have worked as a sound and communication system installer.

12. I worked for a company called IDT until 2014. There was not a lot of work anymore, so I started working directly for the IBEW union doing the same work that I had done for IDT.

13. I got TPS in 2001 and had work authorization since then. I have paid my taxes from 2001 through 2016. It mattered a lot to me that I was following the immigration laws in the U.S. and that I had status here.

**My Relationship with Ana Portillo**

14. In 2000, I got together with Ana Portillo and we became a family. She had an older daughter, Morena Portillo. Morena was about two and a half years old when her mom and I got together. Then our son, Ricardo Vasquez Portillo, was born in 2002. We were a happy family. We spent time together. On the weekends, we would go out to eat and prepare for the upcoming week. We lived together for about seven years until 2007 when we split.

15. Although my relationship with Ana was not always the best, and we separated for long periods of time, I have always supported my son financially and I have always been very involved in his life.

16. All relationships have their difficulties and my relationship with Ana was not an exception. In 2003, in our apartment, Ana and I had an intense argument that ended with the police arresting me. We were in our room, and I stood blocking the door because I wanted her to listen to what I was saying. On that occasion, the disagreement was only verbal not physical. We were both very angry with each other, and we yelled and said ugly things to each other. I was charged with domestic violence and pleaded guilty, because my lawyer told me that this was the best thing to do. As a result, I was sentenced to 60 days in county jail and probation. I was also ordered to do community service time and to take domestic violence counseling classes.

17. In 2007, I stopped living with Ana and my children and we separated for a while. However, after a while we got back together but did not move in together. I lived on my own, but I would still spend time with Ana and the children. Sometimes, I stayed over at Ana's house and sometimes they would stay with me.

**My Struggles with Alcohol and My Arrests**

18. In 2016, things in my life took a turn for the worse. I hit a rough path in my life; too many bad things happened to me at the same time. I was laid off and I was not able to find a job on my field that would allow me to support my family as I used to.

19. Ana and I were not doing well. We argued more often and said hurtful things to each other. Things that we had been holding inside for a while. I thought she was interested in someone else and that kind of thinking affected me a lot. I loved her and my family. I felt I was losing everything that was important to me. I felt alone and I turned to alcohol to cope with my depression. I started drinking more frequently and alcohol became a big problem for me.

20. In 2015, I was arrested once for driving without a license. Then, in 2016 and 2017 I was arrested three times for DUIs— in May 2016, September 2016, and April 2017. Looking back on my decision at these times to get in my car after drinking, I am filled with regret. At the time, that I made this choice, I did not understand how much my drinking had led me to make bad decisions. Now that I have attended many rehabilitation classes and AA meetings, I see that my history with alcohol means that I cannot drink. Also, because I have more than one DUI, I do not plan to drive again.

21. In June 2017, I pled guilty to driving under the influence of alcohol, misdemeanors, on all three cases and sentenced to probation and two months in jail.  II reported to jail in August 2017 and served time in criminal custody for these offenses.

22. I was released in October 2017 and went to stay with my mom. During that time, I decided to sign up for the DUI classes in Pyramids and was going to classes there in San Bruno for maybe about a month. After that, I didn't have a car and didn't drink and drive again, but unfortunately I did keep drinking. At the time, I did not yet realize that I had a serious problem with alcohol.

23. On November 17, 2017, I was arrested for the last time after an incident involving Ana. Ana and I had an off and on type of relationship. That day, she sent me a text asking me to come over.  I had been drinking that day before I went to see her. We got into an argument; we were both angry, and I lost my temper and I hit her. I recognize that I made a mistake when I hit her. I regret it. I left but came back later that night again after drinking.

24. When I went back to the house, my son came out and talked to me and we were talking, but Ana came out and saw me and saw I was drunk and got mad and told me to leave. I made a mistake and didn't leave, I got angry, I started thinking crazy things like that she was with another person inside and that's why she wanted me to leave. So we got into an argument. She was sitting on the sofa and I went over to talk to her, and I wanted to kiss her, but she insulted me and I grabbed her by the neck for a second. We kept arguing and my son came to separate us.  He tried to pull me away from Ana and I pushed him. He

took a few steps back but didn't fall.  Then Ana started hitting and kicking me and ran out of the house. The police came and arrested me.

25. Thinking about what I did makes me feel terrible. I'm not that person that I was that day. I was drinking too much, and I lost my head in that moment. This has cost me dearly. I am very regretful for how I acted, above all for my son seeing me that way and for pushing him. This was the day I regret most in my life.

26. I was arrested, charged, and convicted of domestic violence and child abuse. As a result, I was sentenced to 364 days in jail and probation and I was also order to complete counseling and community service. I served six months in Redwood City.

**My Work to Rehabilitate Myself**

27. While I was in jail, I took advantage of every opportunity to improve myself as a person. I took anger management classes, and attended Alcohol Anonymous meetings and English classes. While I was in ICE custody, I participated in an alcohol treatment program. I also went to church every Sunday.

28. Through my experiences and work on myself in criminal and ICE custody, I have committed to my rehabilitation and recovery. I have not had any alcohol in over two years, and I believe that my work in classes and treatment and experience in custody have led me to be rehabilitated today. I feel confident in my sobriety and in my ability to staying sober, and I am committed to making sure that I maintain my sobriety if I am released. For this reason, I have made a plan to first participate in inpatient rehabilitation, and after that to participate in outpatient treatment and to continue to attend Alcoholics Anonymous classes.

29. As a first step, through these experiences, I realized that I had an alcohol problem. I know that the first step is realizing that one has a problem, and I have accepted that I have an alcohol problem. I had not been doing the right thing, and I didn't have control over my feelings or what I was doing.

30. I took anger management classes, in jail in Redwood City jail for six months as well as in ICE custody when I was in Richmond, for about three months. In those classes I learned how to control my anger, how to try to focus on one's self, to think before one acts, try to ignore someone or go away to avoid conflict, or have a calm conversation instead of getting angry. They also taught us strategies like counting to ten, deep breathes, take breaks before answering someone when we are angry. Although I've only lost my temper and physically hurt another person on one occasion, that was one time too many, and I have changed, I would never do that again.  Also I now recognize that the alcohol was a major factor in the incident with my ex-partner and now that I'm sober, it would never happen.

31. Church is also a very important part of my rehabilitation.  I am Catholic but I wasn't putting my faith into practice before.  Now it is a bigger part of my life.  For example, it

impacts my thinking, how I deal with other people, and helps me to visualize things better. My faith also gives me hope that I can make a better future for myself and my son.

32. When I was transferred to ICE custody in May 2018, I was first detained in Richmond, where I did DEUCE alcohol treatment for about three months as well as anger management. In DEUCE I kept learning about my alcohol problem and learning from the experiences that other people share and reflect on my own experiences.

33. In August 2018, I was transferred to Yuba.  In Yuba there aren't the same kinds of classes available. There used to be AA that I would go to, but now its much less frequent but I always go when its offered. I also go to church every weekend.  I don't have any other opportunities to participate in things, but I would if I could.

34. I talk to my social worker at my lawyers' office about once a month and it gives me a chance to talk about my feelings, how I'm doing, when I'm happy or when I'm low, I enjoy having that opportunity.  She encourages me to stay positive.

**My Future Treatment Plans**

35. Now that I've been sober for over two years, and listening to the testimonies of the other people in AA and giving my own testimonies, I accept that I have a problem with alcohol and I have worked to make sure that I am rehabilitated. I plan to continue this hard work if I am released. My drinking led me to make very bad decisions and to risk my relationships with the people I love, and, most painfully, to be unable to be present for important moments in my son's life because I am detained. If I am released, I plan to ensure that I do not drink. I recognize that even drinking casually is not something I can do.

36. I feel completely rehabilitated and I am confident in my sobriety and in that I can stay sober. However, I still think that treatment can be beneficial. For this reason, I plan to complete an inpatient and then an outpatient program, and to continue attending AA meetings.

37. I also understand that I have certain conditions that I must meet to complete probation in San Mateo. I understand that I must report to my probation officer when I am released and that the officer may require me to go to inpatient rehabilitation center. If this happens, I will go to the rehabilitation center that my probation requires. I also must enroll in alcohol and domestic violence classes and pay money to help make up for my offenses. I plan to complete all steps required by my probation.

38. Even if my probation does not require me to go to inpatient rehabilitation, I plan to go to this type of progam. I plan to take steps to protect my rehabilitation, first by going to an inpatient rehabilitation program at the Sun Street Center in Salinas, California. I have already done an intake interview with Sun Street Center, and I understand that they have space for me. My family will have to pay for me complete rehabilitation, which is a big investment in me. After I complete the program at Sun Street Center, I will go to

outpatient rehabilitation and attend AA classes.  I spoke with an alcohol treatment program called Freedom Center, in Redwood City, where I would be able to receive treatment, individual and group, to help me stay on the right path.  I'm already on their schedule to complete my intake after I am released from inpatient treatment. Also, I was sentenced to three years of probation as well in 2017, so if I am released I will still have to check in with probation, and I have to go to the required DUI classes. I would comply with those requirements if released.

39. Through the rehabilitation classes and AA meetings I have attended, I have learned strategies to help me stay sober, and I know I will learn more of these strategies and receive support putting them in action through Sun Street Centers, El Centro and AA. I plan to get a sponsor who I can call once I'm out of inpatient treatment, who I can call when things are hard, since it is important to talk to someone I trust about my problems, instead of drinking when things are hard. This will help me avoid relapse. I also recognize that so-called friends from drinking were not actual friends, they were bad influences, and all that really matters is my family. Once I am released I will not spend time hanging around with people who drink.  I am a new person, and I am committed to doing good and not drinking.

## My Family and My Plans for the Future

40. Hearing from my family about Ana also reminds me the cost that addiction has not just on me, but on our son. Ana visited me in jail a couple of time and talked about what happened, I apologized to her and she wanted to get back together after I was released. Later I learned that she developed a drug problem, I had suspected before but she always denied it. My son was left to deal with her drug problem by himself and in the end her family helped her go to a drug treatment program. My understanding is that she didn't last long in the program, she was kicked out, and I understand that no one knows where she is. She lost her apartment and my son moved in with my mother.

41. My relationship with my son is excellent, but my heart breaks for him. I've apologized to him, but more than anything I want to go back to truly being there for him.  Now we talk on the phone at least once a week and he tells me everything.  We talk about school, how things are in the house. It's been horrible for him to lose his home and when his mom left, but I believe having me to talk to helps. I feel terrible knowing that he now has neither of his parents, and I can hear in voice the pain that this causes him to live with.

42. I have a lot of plans and goals for the future.  Most important to me is being with my son and help him get ahead in life, as well as working to support him, and to give him whatever he needs in life. I think it is very important to my son to have an opportunity to have me come home to be with him, to motivate him in his life, to succeed in school, be polite, think about the future. I want him to have a better future, to have a better life than me. It breaks my heart that now he has neither of his parents.

43. I would not drive at all if I were released on bond. I would live with my mother and get around using public transportation or get rides from my family. My family is very supportive and has agreed to provide me rides when I need them.

44. I have changed a lot over the last two years. I have been reflecting a lot about what happened that brought me to this point. I feel bad and disappointed with myself, and I see life differently from how I was before. I need to make changes. First and most important, I am staying away from alcohol and will keep going to my AA meetings.

45. My whole life is here in the United States. I want to stay so I can remain being part of my son's life. I know I have made mistakes, and I am truly sorry for my past behavior. I understand alcohol is not the solution to my depression. I love and care for my family, and I know that especially now that Ana is not in his life, my son needs me and I want to be there for him.

46. I also want to remain in the United States for my mother and siblings. My mother has been through so much; losing Ever still affects her. Right now, she is very concerned and stressed for my sister and me. My mother and I are very close and she needs me here in the United States. It's hard for her to support herself and my son, with her health problems like diabetes. Physically and emotionally, she has been here for me and I want an opportunity to take care of her, help her, so she can count on me. My other siblings and their families, my nieces and nephews, are all here.

47. I am currently fighting my deportation case, but I don't know what is going to happen with it. If the Ninth Circuit denies my case, I will report for deportation and follow the law and any requirements that are upon me.

48. I have a U visa pending as well, and I want to follow all required immigration procedures because even if I am deported now, I hope to have the opportunity to return in the future with the U visa or through a petition filed by my son once he is older, and I wouldn't put that in jeopardy.

49. I ask for a second chance in this country. I have made a lot of mistakes and I've paid dearly for them. I only want a chance to move forward, do the right thing, be a better member of the community for the well-being of my family and me and the whole country. I want to be a useful person, not a charge on the country. I ask the Judge and God for this second opportunity.

50. Please grant my request for a bond while I wait for the final decision on my case so I can be with my family. Thank you.

I declare under penalty of perjury that the foregoing is true and correct.

Sworn to this 4th day of December, 2019 in San Francisco, CA

Ricardo Vasquez Cruz

## DECLARATION OF INTERPRETATION

I, Jennifer Friedman, declare that the following is true and correct:

1. I am an attorney at the San Francisco Public Defenders Office, 555 7th Street, San Francisco CA 94103.

2. I am fluent in Spanish and English.

3. I certify that Mr. Ricardo Vasquez Cruz relayed the information in the accompanying declaration to me in Spanish and I transcribed the information in English.

4. I orally translated the information contained in this declaration from English to Spanish to Mr. Vasquez in order to confirm its accuracy after he had dictated it in Spanish.

5. Mr. Vasquez indicated that he understood it and verified that everything in it was true and correct.

6. I am competent in both Spanish and English to render and certify such a translation.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.  Executed on December 4, 2019 in San Francisco, California.

Jennifer Friedman

December 22, 2020

Dear Judge,

My name is Ricardo Odair Vasquez Portillo. I am writing this letter to ask that you let my dad out of immigration detention.

I just turned eighteen years old recently. I am living with my grandmother, my dad's mom. I've been here living with her for a year and four months, ever since my mom starting having trouble. She was having trouble with finances and with substances and she didn't have a good situation for me to stay with her, so I came to live with my paternal grandmother.

I really miss my dad and want him to come back home, spend time together, make up for all the time we've lost. Also, I worry about his health. He tells me about his health problems. I worry about what would happen if he were to get coronavirus.

My dad is really important to me. I lived with my dad from when I was little until when him and my mom separated. Even after they separated, we still spent a lot of time together and he was always a big part of my life. We used to hang out together, go play soccer, go to the park, and go to car shows together. He was always a very supportive dad. As I got older, he would help me with school and he's always been there for me.

Before the day he got arrested in November 2017, my dad never did anything to me, he never hit me or pushed me or lay a hand on me at all. On that day, I was fifteen years old. Both my mom and my dad were under the influence of alcohol that day and everything happened just all of a sudden. I was unhappy with both of them for fighting. They got into a heated argument, and my dad held my mom down on the couch and put his hand on her throat. I stepped in to defend her and my dad pushed me and I took several steps back and bumped into the fridge. I didn't fall or anything and I wasn't hurt at all. I also saw my dad hit my mom that day. I'd never seen him do anything like that to my mom before.  Then he got arrested and went to jail.

After he got arrested, it changed everything. It was really hard to lose my father. I felt really sad. He missed a lot. He missed my confirmation, which was really rough. He used to take me to church and he was the reason I was doing my confirmation in the first place. It was also rough not having him around to help with school and homework. I started struggling in school and I almost failed out of school. I think I may have been depressed.

Things also got complicated with my mom, so a year and four months ago, I moved in with my grandmother- my dad's mom. My mom had economic problems and we lost our apartment and didn't have anywhere to live. Also, my mom was struggling with substances. She went to a rehab program for a few months but failed it.  I've seen my mom about four times in the last year and a half, just briefly. She came by to drop something off, said hi, and its less than five minutes.  Other times she texts. She is apparently living in San Mateo. I've never been there and I don't have her address.

Things are going well here with my grandmother, and I'm doing better in school than I was. I just finished my first semester of my senior year of high school. But its still really hard not having my mom or my dad around. Its harder not having my dad around since I stopped living with my mom. I really miss him. It's a big emotional impact on me, not having my dad around. I used to see him daily, but now when I most need my father to help me with my school, my development, and everything going on with my mom, he's not here. With everything going on with my mom, I need my dad more than ever. I try not to think about it, I just play video games to blank out my mind.

That day when my dad got arrested was a bad day, but that wasn't who my dad is. There was a time I was angry at my dad for what he did, but I am over it now. That was a one-time mistake that wasn't like his regular self. He is a nice guy, friendly and gets to know everyone. He's kind, loving, and respectable. He can be fun but was serious and strict around school, which now I see why he was doing it.

I am not afraid of my dad. I know he wouldn't do anything to hurt me. He's made some mistakes, but I one hundred percent know that he has learned from those mistakes. Just seeing him now, he's though a lot about the past and has a really different outlook on the future. He's been locked up for a long time, he's really changed overtime and he views things differently, he can see things correctly now.

That's why I'm so worried about my dad getting sick and am asking that he be allowed to come home where he will be safer from the virus and we can be together.

Thank you,


*/s/ Ricardo Odair Vasquez Portillo*
Ricardo Odair Vasquz Portillo

July 11, 2018

Dear Judge,

My name is Ana Marina Portillo and I am a U.S. citizen. I am writing this letter to support my ex-partner Ricardo Vasquez Cruz. Ricardo and I were together for over 20 years, and we have a son together, Ricky, who is 15 years old. Ricardo also was a father to my daughter Morena, who is 20 years old, who was five years old when Ricardo and I became a couple.

Ricardo has been an attentive and caring father and partner, and a hardworking man supporting our family. He was the kind of man that everyone in the neighborhood knew and liked. When the children were younger, Ricardo often took them to school and looked after them during the day, and he cared for them when they were sick. When Morena was about 8 years old, she became very ill and had to be hospitalized. He spent so much time at the hospital watching over her. The doctors told us that she had a potassium deficit, and after that, he always made sure there were bananas in the house. For Morena he was much more of a father than a stepfather. I felt very lucky to him in our lives.

Almost every Sunday, he took our son to play soccer together, which they both loved and looked forward to all week. After Ricardo was sent to prison, Ricky struggled a lot and didn't want to go out or talk to anyone. His grades also became very bad, and he had to go to summer school. Now he has been able to talk to his father more often, he seems a little happier but I know he still misses him a lot.

Ricardo also supported our home. He brought home money to buy groceries, we shared the rent costs, and he paid our PG&E bills. It has been very hard on me and our family to get by since he was imprisoned, and I have had to take a second job. I work as a teacher's assistant for the San Bruno School District during the day, and as a janitor during the night. If Ricardo were free I know that he would start working to help support our family. Even when we had conflicts and separated, Ricardo gave me money to support our family.

I know that Ricardo isn't dangerous to me or to anyone. During our time together we had conflicts, and we sometimes yelled at each other, he never physically attacked me, apart from November 17, 2017 when our fight turned physical.

On this day he came to the house in the afternoon. At the time he had spent the week staying with his sister, who I do not get along with, but had lied to me and told me that he was staying with his mom. (I found this out from his aunt.) He also had not been responding to my calls. He said he didn't have service, but I do not believe this. Because of this, I was very mad when he arrived at my house. We started yelling at each other, and he took off his belt and hit it against the wall. I think he did this in anger, but it did not touch me. We also both hit each other, about two times. After this, we made up and spent some time together, and then we both left the house.

Later that night he tried to come over again, but he smelled like alcohol so I didn't want to let him into the house. We got in a fight again. I kicked him and hit him and he hit me and grabbed my neck. He also pushed Ricky who tried to keep us separated. When this happened, I was furious and went to the neighbors and asked them to call the police. After the fight I did not need or seek medical attention.

The police arrived, and I spoke with one of the police officers. We spoke only in English, and he didn't ask me if I needed an interpreter. I can speak some English, but I do not understand it or speak it fluently. There are things in the report that I never said. For example, I never said that Ricardo hit me in the past, and that is untrue. I also never told him that Ricardo hit me with his belt, and I told him that we were both hitting each other.

This day was terrible, but it was very different from the way that Ricardo normally treated me and our family, and I am sure that it would never happen again. Even though we broke up after this, I visited him in jail many times, I think about eight times.

Beginning in 2016, Ricardo struggled with drinking too much, and I know that he has tried to get help with this and I hope that he can continue to get help so that he can return to helping our children, who miss him a lot and who need his support.

On May 20, 2018, Ricky had his First Confirmation and he was very excited that his father would be able to come to it to support him, because he would be released from jail by that day. But he did not come, and we were all sad and disappointed. We then learned that ICE had taken him. Now I have heard that if he is not released, Ricardo could be transferred out of state. I know that this would be terrible for Ricky, and I don't plan to tell him about it until it happens because I am afraid that it will make him very depressed. I also know that Ricardo's mother is very sick, and his family is not advising her of everything that is happening because it would harm her heart and her health. I also miss him, and miss seeing him with our children and with our larger family. Ricky and Morena need and want their father in their lives, and, I Ana Marina Portillo beg you from my heart to not force our family apart. We are all humans and commit errors. Sadly, this was his error and Ricardo made a very serious mistake last November, but he has paid for it. Now I am asking that you not make our family pay for it so much more. I hope that you imagine how you would feel if this happened to your family. I beg you to release Ricardo.

I would like to come to Ricardo's court, but I have committed to work this summer caring for a friend's mother who is very old and who needs someone to care for her during the day. I will be caring for her next week, Monday through Friday from 8:30 am to 2:30 pm.

Sincerely,

Ana Marina Portillo

Executed in San Francisco, California.

I, Ana Marina Portillo, declare under penalty of perjury that the above declaration was read back to me in my native language of Spanish and is true and correct to the best of my knowledge.

_Ana M Portillo_
Signature

_7 - 11 - 2018_
Date

I, Evelyn Wiese, am competent to translate from Spanish into to English, and certify that the above translation of this declaration is true and correct to the best of my knowledge. This declaration was provided to me by the declarant in Spanish, and I translated it into English. I swear under penalty of perjury that I have recorded the declarant's words faithfully and accurately. This declaration was read back to the declarant in Spanish and she was asked to make any corrections to the document that she felt were necessary before her signature.

_____
Signature

_7/11/18_
Date

## Psycho-Social Evaluation

### Ricardo Cruz-Vasquez, A# █████████

This psycho-social evaluation is a summary of my assessment of Mr. Ricardo Vasquez-Cruz, his trauma response symptoms, and treatment needs. It is my professional opinion that Mr. Vasquez-Cruz has survived significant trauma throughout his life. Notably, in 2008, he was a victim of a physical assault while residing in Daly City, California. He suffered trauma to his head, which caused damage to his ear and jaw, causing intense short-term pain and long-term, lasting physical symptoms. Along with physical injuries, he has endured distressing psychological effects as a result of trauma exposure. Over the next several years, he came to rely on alcohol to self-medicate in the place of seeking therapeutic treatment. His alcohol use became problematic and resulted in several criminal convi1ctions for driving under the influence of alcohol. Over the last few years, he has sought out treatment to get rehabilitated and has increased insight into the impacts of his trauma that led him to drink. He has been sober since November 2017 and has attended anger management and Alcoholics Anonymous (AA) classes. With continued access to treatment services, he is prepared to keep working on the psychological consequences of his trauma exposure and the cycle of alcohol abuse. I am confident that he will continue his sobriety with the support from Sun Street Centers in Salinas, California, a residential substance abuse program, followed by outpatient program at The Freedom Center in Redwood City, California, and refrain from further criminal justice involvement.

### Professional Background and Basis for My Assessment

I am a Social Worker at the San Francisco Public Defenders. In that capacity, I work primarily with individuals with immigration cases on issues related to mental health, substance abuse, trauma, and domestic and community violence. I conduct assessments and provide recommendations to address individuals' presenting emotional, social, and health needs. I have previously done similar assessment and intervention work at the Bronx Defender's in Bronx, NY. I obtained my Master's in Social Work from the Columbia University School of Social Work in May 2018. A complete C.V. is attached to this letter, for reference.

My professional opinion as stated in this letter is based on an in-person assessment of Mr. Vasquez-Cruz conducted over four sessions, two sessions at Yuba County Jail, where he is currently detained in ICE custody, and another two at the San Francisco ICE processing center in San Francisco, CA, where he was produced for an in-person visit for the purpose of this evaluation. In addition, I reviewed his declaration for his application for a U Visa.

### Social History

The undersigned's interviews with Mr. Vasquez-Cruz were consistent with his declaration in support of his U Visa.

1

Mr. Vasquez-Cruz was born and raised in La Union, El Salvador. He was born from the union of Mr. Eufevio Cruz and Mrs. Delia Vasquez. Mr. Vasquez-Cruz has six siblings, and one passed away. Since an early age, Mr. Vasquez-Cruz encountered neglect and exposure to community violence. His biological father abandoned him and his siblings when they were small children. Mr. Vasquez-Cruz's mother did not raise him. She lived near his siblings and him; she would visit them, but she was not a consistent figure in his childhood. Mr. Vasquez-Cruz's maternal grandparents, Mrs. Ricarda Vasquez and Mr. Gusto Lazo, raised him. Mr. Vasquez-Cruz was the eldest child, so his grandparents relied on him a lot to help around the home and do manual labor at his grandparents' farm. He woke up at 4 a.m. to work on the farm before heading to school at 6 a.m., and after school, he would help at the farm.

Mr. Vasquez-Cruz described his town in El Salvador as calm and peaceful when he was a child, but over the years things changed. The Mara Salvatrucha (MS-13)[1] became more prominent in town, so did extortions, assaults, robberies, and murders.

Mr. Vasquez-Cruz was a victim of multiple assaults in his community in La Union, El Salvador; and his brother, Mr. Ever Vasquez, was murdered. The MS-13 gang was responsible for the personal attacks against Mr. Vasquez-Cruz and the murder of his brother. After Mr. Ever Vasquez was murdered, Mr. Vasquez-Cruz was called to identify the corpse. Mr. Vasquez-Cruz stated, "Having to see my brother's body like that broke me down, I cried a lot." Mr. Vasquez-Cruz experiences flashbacks, nightmares, and vivid images of seeing his brother's dead body. He sometimes feels like he is watching a video replay of his brother's dead body in his mind. During our conversation about his brother's death, Mr. Vasquez-Cruz became visibly distressed. After Mr. Ever Vasquez's death, the MS-13 gang members targeted Mr. Vasquez-Cruz more frequently. The MS-13 gang members attacked Mr. Vasquez-Cruz, physically assaulted him, followed him, robbed him, and threatened him. The MS-13 gang members told Mr. Vasquez-Cruz that if he did not join them, they would murder him like his brother, Mr. Vasquez-Cruz recalls that an MS-13 gang member said: "With the Mara (MS-13) you do not play." On another occasion, gang members attacked Mr. Vasquez-Cruz while walking with friends on an isolated road; they forced him to the ground face-down, pushed his face into the ground, robbed him, and then ordered him and his friends to run away; as they ran, the gang members shot at them. Mr. Vasquez-Cruz reported this incident to the police, and the threats against him increased even more. Mr. Vasquez-Cruz feared that if he did not leave La Union, things would turn fatal. As a result, he fled El Salvador and immigrated to the United States in 1999.

Mr. Vasquez-Cruz arrived in the United States when he was around 24 years old. After he arrived, he attended ESL classes for a few months. He worked as a maintenance worker for an

---

[1] Mara Salvatrucha (MS-13) is an international criminal gang that originated from Los Angeles, California, in the 1970s and 1980s.

apartment building for a few months; then, he worked for IDT Telecom Data as a Cable Technician, where he has worked for about 18 years until his arrest.

Mr. Vasquez-Cruz met his former long-term partner Ms. Ana Portillo about 18 years ago at a family friend's party. A few months after they met, they moved in together. Ms. Portillo had a daughter of her own when they met, which Mr. Vasquez-Cruz cared for her as if she were his biological daughter. Mr. Vasquez-Cruz made it a priority to gain the love, acceptance, and trust of Ms. Portillo's daughter and to step into a father role. Ms. Portillo's daughter called Mr. Vasquez-Cruz dad when she was younger and saw him as her father. Mr. Vasquez-Cruz and Ms. Portillo have one child together, Mr. Ricardo Vasquez Portillo (16). Mr. Vasquez-Cruz was the primary breadwinner for the family for most of their relationship, a role he took very seriously.

In addition to the trauma Mr. Vasquez-Cruz survived in El Salvador, he was a victim of a brutal physical assault here in the United States that exacerbated and magnified the impact of his past trauma. On December 13, 2008, a group of five men physically attacked Mr. Vasquez-Cruz and his friend Mr. Juan Carlos Menjivar while they were at Town and Country Billiards in Daly City, CA. After Mr. Menjivar refused to give the men his gold chains he was wearing, the group of men began to assault them physically. Mr. Menjivar attempted to get away from the men, but he tripped and fell, while he was laying on the ground, a few men were hitting him at the same time. Mr. Vasquez-Cruz tried to help Mr. Menjivar by getting the men away from him. However, before he had a chance to help Mr. Menjivar, he saw a man coming behind him to hit him with a chair. Mr. Vasquez-Cruz recalls attempting to get out of the way; however, the man still managed to beat him on the side of his face with the chair. The same man attempted to hit him again, but by this time, he got a chair to block the hits. Unfortunately, while he was attempting to prevent these hits, another man kicked him on his back a few times. He expressed that he felt like he was fighting for his life. He also stated when the fight ended, and he remembers seeing his friend completely bloody. Mr. Vasquez-Cruz reported that after the assault, he did not seek medical attention because he felt he suffered minor injuries in comparison to Mr. Menjivar. However, he suffered many bruises on his body; he had severe pain on the side of his ribs and back; he did not have movement in his jaw for a month. In addition, he had difficulty talking, and he could not consume solid food because of the injury to his jaw. After the fight, the police came, and ultimately the assailants were arrested and prosecuted; Mr. Vasquez-Cruz cooperated with the police through to trial when the men chose to plead guilty.

After the attack in 2008, Mr. Vasquez-Cruz began struggling in a way he hadn't in the past. His extensive trauma history and trauma symptoms were recurrent and magnified, and his personal life was unstable. As time passed, he felt like the life he had built for himself was falling apart. His relationship with his partner began to deteriorate. He started drinking alcohol more frequently. There were periods at work where demand would slow down dramatically, leaving Mr. Vasquez temporarily unemployed. The stress, existing trauma, relationship pressure, and work instability all accumulated, each exacerbating the other.

3

Starting in 2016, the problems in his life all came to ahead. He and his partner Ms. Portillo broke up. He was in a period of unemployment and found himself drinking heavily. The misdirected self-medication led to Mr. Vasquez-Cruz having trouble with the law, specifically three convictions for driving under the influence in 2016 and 2017, and ultimately, an assault conviction resulting in a physical altercation between him and Ms. Portillo. Mr. Vasquez-Cruz reported that he was drunk when he arrived at Ms. Portillo's house to visit their thirteen-year-old son. They started arguing because of his drinking, and the argument escalated into a physical altercation, which Mr. Vasquez admits to hitting Ms. Portillo, putting his hands around her neck, and pushing their son when he tried to get in the middle. He was convicted of spousal battery and sentenced to 364 days in jail.[2] After that, he was detained by ICE and remains there to this day.

Mr. Vasquez Cruz reported that in retrospect, he acknowledges that he had a problem and is determined to get help and stop the cycle of alcohol abuse. He has maintained his sobriety for two years and seeks to continue on this path. Since his arrest, he has received treatment. While he was at Contra Costa County Jail, he participated in a substance abuse dual program: anger management and AA classes. He completed half of the program; he was unable to complete the program since he was transferred to Yuba County Jail for detention. He also attends AA at Yuba County Jail, although the classes are not as consistently offered. He stated that when they are offered, he always attends. "I really like the part where people share their stories in AA meetings. I like learning from others, how to control urges and anger. I also like the advice that we give each other," Mr. Vasquez Cruz stated. He indicated that he has roughly attended 25 AA classes while he has been detained at Yuba County Jail. He plans to keep attending while he is in custody. He has been accepted to Sun Street Centers, where he will enroll in their residential substance abuse program once he is released from custody. He has also been accepted into outpatient treatment at The Freedom Center, for on-going outpatient treatment. He expressed that he is committed to an alcohol-free future and wants to maintain this lifestyle. "Being detained for two years has given me a lot of time to think. It has made me realize what my priorities are, and my top priority is my son. I want to be a positive and supportive influence in his life. I have already lost two years of his life; I do not want to lose more time with him," Mr. Vasquez Cruz expressed.

Mr. Vasquez-Cruz reports that his detention has deeply impacted him. It has exacerbated his trauma symptoms. In addition, the separation from his son that weighs on him heavily. He said, "It really hurts me to be away from him. I have not been there for him when he's needed me." He shared that he needs to be involved and present in Ricardo's life, "I want to be involved in his life; I want to help and guide him." He used to spend an abundant amount of time with his son, going out to eat, amusement parks, and flea markets. They also enjoy bonding over their love for soccer. Spending time with his son is extremely important. Mr. Vasquez-Cruz took him

---

[2] Mr. Vasquez Cruz was also convicted of misdemeanor domestic violence in 2004 from a 2003 incident involving an argument with Ms. Portillo. Both Mr. Vasquez Cruz and Ms. Portillo confirm that there was no physical abuse at that time, only a verbal disagreement.

to practice and was always present at his games when he played on the weekend. While in detention, Mr. Vasquez-Cruz speaks to his son on the phone, and before they hang-up, the phone his son says, "see you later, dad." Mr. Vasquez-Cruz expressed that that is extremely hard for him to hear because he is not sure if he will see him again if he is deported to El Salvador. When he shared this with me, he looked down, and his voice became shaky when he looked up at me, I notice that his eyes were red and teary.

## Ongoing Impact of Trauma

Mr. Vasquez-Cruz's demeanor was markedly different when describing his traumatic events compared to his demeanor at other times throughout the interview, indicative of the distress prompted by remembering these events. His voice would become shaky, he became tearful, and he looked down as he retold these events. In addition, throughout the interview, he shared a constant feeling of helplessness. He felt like he could not do anything to prevent his brother's death and the assault his friend and himself experienced. He stated that ever since the attack at Town and Country Billiards, he frequently feels like he sees a shadow behind him as if someone were coming at him from behind. The aftermath of this event has caused Mr. Vasquez-Cruz to experience heightened fear and anxiety because he feels like someone is going to harm him again. Mr. Vasquez-Cruz also reported suffering from a constant hand tremor since the attack. After the assault, Mr. Vasquez-Cruz avoided the area near where he was attacked because he is terrified of running into the people who attacked him or their family. He avoids talking about what happened, choosing not to share the traumatic history with people who are close to him, including with his long-time ex-partner Ana Portillo. Recalling these memories causes Mr. Vasquez-Cruz a tremendous amount of fear and makes him feel as if he were reliving those experiences. Since he has been in custody at Yuba County Jail, his anxiety has increased, and he has experienced frequent flashbacks of the physical assault. Environmental stimuli in custody, such as witnessing fights and hearing loud noises while in detention, causing him to feel anxious, increased heart rate, and other somatic fear responses that trigger his flashbacks, causing him psychological distress. For example, Mr. Vasquez-Cruz reported that he has consistent nightmares of being followed and being physically assaulted; he wakes up feeling fearful and anxious. Along with psychological effects as a result of the trauma exposure, he also has ongoing physical injuries: damage to his ear, jaw, and a tremor in his hand.

## Description of Mr. Vazquez-Cruz's PTSD Symptoms

Mr. Vasquez-Cruz displays symptoms that are congruent with the criteria for a diagnosis of Post-Traumatic Stress Disorder (PTSD). The criteria for PTSD as set forth by the Diagnostic and Statistical Manual, Fifth Edition[3] is comprised of exposure to one or more qualifying traumatic events and the subsequent onset of: 1) intrusion symptoms, 2) avoidance of stimuli associated with the traumatic event, 3) negative alternations of cognition and mood, and 4)

---

[3] American Psychiatric Association. (2013). Diagnostic and statistical manual of mental disorders (5th ed.) (DSM-5). Arlington, VA: American Psychiatric Publishing.

alternations in arousal and reactivity.  For a PTSD diagnosis to be made, symptoms from these four symptom clusters must be present for one or more months and must rise to the level of causing clinically significant impairment in functioning. [4]

The duration of PTSD varies. For some, PTSD symptoms abate after a year, or a few years, while other symptoms persist throughout their entire life-course. The greater the exposure to risk factors before, during, and after the traumatic qualifying event, the more prominently the PTSD symptoms are likely to be expressed, and the longer the symptoms are likely to persist.[5] Trauma treatment interventions, access to social supports, and reduced exposure to additional traumatic events are key protective factors in minimizing PTSD symptoms and/or shortening the course of PTSD symptoms in an individual's life.

*Qualifying Traumatic Event and Risk Factors for PTSD*

Mr. Vasquez-Cruz has experienced multiple qualifying traumatic events including: 1) direct experience of traumatic events in the forms of abandonment, robbery, physical assault in El Salvador and the United States, and threatened with death, and 2) witnessing traumatic events occurring to others in the forms of his brother's death and multiple assaults.

In addition to experiencing numerous qualifying traumatic events, Mr. Vasquez-Cruz has experienced pre-, peri-, and posttraumatic risk factors that drastically elevated his risk for sustained PTSD. Mr. Vasquez-Cruz's *pretraumatic risk factors* include being abandoned by his father as a child, parental separation, generalized childhood adversity, his brother's death, and exposure to prior trauma in the forms of community violence in El Salvador. Because Mr. Vasquez-Cruz experienced numerous pretraumatic risk factors prior to being physically attacked here in the United States, he was primed, so to speak, for the experience to elicit a high level of enduring PTSD symptoms.

Mr. Vasquez-Cruz's *peritraumatic risk factors* (risk factors experienced during the traumatic event) include the severity of trauma experienced, the perceived threat to life, personal injury, and trauma through interpersonal violence. Mr. Vasquez-Cruz experienced all of these: the trauma was severe and posed a perceived threat to his life.  He also suffered physical injuries, in particular in his back, rib area, and side of his face. The presence of these risk factors again heightened the likelihood that PTSD would onset, that symptoms would be strongly experienced, and that the duration of symptoms would persist for a significant period.

His *posttraumatic risk factors* include the inappropriate coping strategies, such as his alcohol use history, subsequent exposure to repeat and upsetting reminders of the traumatic event as necessitated by defending himself against deportation, which requires repeated detailed conversations about the past trauma with his immigration attorney and the Court, which re-

---

[4] Ibid.
[5] Ibid.

traumatize him, as well as additional adverse life events in the form of detention and separation from his social support networks.

*Presenting Trauma Symptoms*

As described above, Mr. Vasquez-Cruz's symptoms fall across all four of the PTSD symptom clusters. He credibly reports recurrent, involuntary, and intrusive dreams and distressing memories related to the traumatic event of being physically assaulted; intense and prolonged distress at exposure to cues that remind him of the traumatic event; and physiological reactions to trauma cues (intrusion symptoms). He had made efforts to avoid the area where the physical attack in Daly City, which serves as trauma cues (avoidance symptoms). He has experienced feelings of detachment or estrangement from others and a persistent negative emotional state featuring feelings of fear and guilt (alternations in cognition and mood). Finally, he has experienced increased irritability, physical aggression, hypervigilance, and problems with memory and sleep (alternations in arousal and reactivity). The prevalence and duration of these untreated symptoms have been present for many years, causing clinically significant distress and impairment.

## Criminal Convictions & Alcohol Use

Mr. Vasquez-Cruz reported that drinking alcohol was a coping mechanism. When he felt anxious or depressed, he used to drink. In 2016, during an adverse time in his life, his untreated trauma symptoms intensified, which elevated his alcohol consumption. During this time, he was facing extended periods of underemployment and relationship problems with Ms. Portillo. He indicated that he felt stressed and pressure since he could not financially support his family. In addition, his debt was mounting. The underemployment and increasing issues with Ms. Portillo elevated his PTSD symptoms; he indicated that he was unable to manage symptoms healthily. According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), individuals who have been impacted by trauma and display PTSD symptoms may engage in reckless or self-destructive behavior such as excessive alcohol abuse and even participate in aggressive behavior.[6] Mr. Vasquez-Cruz stated that he did not access appropriate treatment or services since he was unaware that there were social service providers available to help him. Instead, he attempted to repress the memories and avoid the ongoing PTSD symptoms. Over the years, the untreated PTSD symptoms intensified. He came to abuse alcohol as a substitute for treatment and medication options, using it as self-medication. According to the DSM-5, people who have a history of trauma and display PTSD symptoms have a higher propensity to engage in reckless or self-destructive behavior such as excessive alcohol abuse, which supports Mr. Vasquez-Cruz increased alcohol use in order to cope with trauma symptoms. He has suffered past trauma, both in El Salvador as well as the vicious attack in Daly City, California, in 2008.

---

[6] Ibid.

7

As a result of his self-medicating with alcohol, Mr. Vasquez-Cruz found himself having problems with the law. He was convicted of driving under the influence of alcohol in May 2016, September 2016, and April 2017. In all three cases, he was convicted of misdemeanors and sentenced to probation. Then, on November 17, 2017, in an incident that took place while Mr. Vasquez-Cruz was under the influence of alcohol, he was arrested and ultimately convicted of felony domestic violence and sentenced to 364 days in jail.

Mr. Vasquez-Cruz has been entirely sober since that day, November 17, 2017, which is 24 months ago at the time of this writing. During the time since his arrest, Mr. Vasquez-Cruz has recognized the need to rehabilitate and has proactively sought programs to achieve such an end. He has taken anger management classes, continuously attended AA meetings, recommitted to his faith, and attended church every Sunday. In addition, during the assessment, he genuinely engaged in conversation about the types of treatment modalities available and demonstrated insight in identifying elements of treatment that would work well and elements that would present challenges across the various modalities. This period of incarceration has provided him with a period of deep insight and reflection. He has gained insight into the role that his alcohol use was a maladaptive self-medication technique and has come to understand how destructive his alcohol use was to him and his family. He writes, "I have changed a lot over the last few years. I've been reflecting a lot about what happened that brought me to this point. I feel bad and disappointed in myself, and I see life differently from how I was before. I am determined to make changes. First and most important, stay away from alcohol and enroll in a substance abuse program."

Mr. Vasquez-Cruz expressed interest in receiving treatment if permitted to reside in the United States. The detention environment is highly triggering for Mr. Vasquez-Cruz. The additional trauma he is experiencing in detention compounds the effects of his prior trauma and elevates the likelihood that he will suffer long-lasting psychological damage as a result. In contrast, with access to treatment, he is likely to be able to build upon his resiliency and vocational and social/familial potential.

## Conclusion

Just as the brain is impacted and altered by trauma exposure, it can recover with access to treatment and support and return to functioning much closer to how a "healthy" brain is expected to function. Based on the limited treatment resources available in El Salvador and the conditions of poverty and ongoing exposure to violence that marked Mr. Vasquez-Cruz's life in El Salvador, his return to that environment would further isolate him and cement and perpetuate his trauma symptoms and his alcohol abuse. Being in that environment would make Mr. Vasquez-Cruz increasingly likely to experience a lifetime of adverse health outcomes, including reduced life expectancy. In contrast, with access to a safe living environment with his family in San Bruno, Ca., and enrollment at Sun Street Centers in Salinas, Ca., he will be well-positioned to recover

from his traumatic past and sustain his sobriety and maintain a positive mental, physical, and social functioning.

When Mr. Vazquez-Cruz speaks of his alcohol use, he acknowledges the dangerousness of it not only to himself, his family, but also to the community. During my assessment, he presented as forthcoming, cognizant of the fact that his alcohol use has been problematic, and that the past convictions could have resulted in severe harm to the public. He presented with guilt and shame generally when describing his patterns of prior alcohol use. When we discussed treatment, he genuinely engaged in conversation, he expressed that he wants to maintain his sobriety. He presents as already quite advanced in his rehabilitation process, demonstrates insight into his past use and what is required to remain sober moving forward, and indicates a sincere interest in and a strong commitment to enrolling in a residential substance abuse treatment at Sun Street Centers followed by The Freedom Center to help him ensure his continued sobriety moving forward.

Through the connection to formalized supports, in addition to his family support in San Bruno, Mr. Vazquez-Cruz will be well-positioned to take up his life again and move in a more positive direction to pursue his future goals and be reunited with his son. Mr. Vasquez-Cruz expressed a strong commitment to maintain his sobriety, enroll in treatment, recommence employment, and provide emotional and financial support to his family.

If he is released, I will remain available to Mr. Vazquez-Cruz to ensure his connection to treatment and to assist with addressing any additional needs that might arise following his release to the community.


Thank you for your consideration of this letter.

Sincerely,

Edith Castellon, MSW
Immigration Social Worker
San Francisco Public Defender
555 7th St, San Francisco, CA. 94103
(415) ███████
████████ @sfgov.org

9



**El Centro de Libertad**
**The Freedom Center**

*sobriedad con dignidad*
*recovery with dignity*

December 5, 2019

San Francisco Public Defender Office
Attn: Edith Castellon
555 Seventh Street
San Francisco, CA 94103
P: ▓▓▓▓▓▓▓▓
F: (415) 553-9646

Re: Ricardo Vasquez Cruz

Dear Ms. Castellon:

Mr. Vasquez Cruz completed a brief ASAM assessment with me over the phone on Wednesday, December 4, 2019. This assessment is a tool that we use to help determine the proper level of care for those who are seeking alcohol and drug treatment. It was determined that Mr. Vasquez Cruz is appropriate for our 90-day outpatient treatment. When he is released from jail, he can contact us to set up an intake.

Our 90-day outpatient treatment program is individualized in order to best serve our clients. The minimum requirements for participation are one to two 90-minute groups each week, one 60-minute individual session each week, attendance at two Family Fun Therapy nights (held on the last Friday of each month), three consecutive clean urine tests, and development of a sober support network which is completed in various ways. The counselor will further assess the client to determine additional needs, and work with the client to determine how to best work toward those needs. We can provide up to 9 hours of treatment each week.

El Centro de Libertad a highly respected non-profit serving San Mateo County since 1994. Our mission is to provide profound and life changing programs that help youth and adults who are struggling to break the cycle of substance use and move towards recovery. We accept both MediCal and private pay clients. If a client shows every effort that they applied for MediCal but were only given Emergency MediCal, then treatment is subsidized and in some cases may be $0 based on ability to pay.

Please feel free to contact me at the Redwood City office if you have any questions.

Sincerely,

*[signature]*

Monica Halloran, CATC II
Program Coordinator/Substance Abuse Counselor

| Main Office | Coastside |
|---|---|
| 500 Allerton Street, 2nd Floor | 225 S. Cabrillo Highway 105-D |
| Redwood City, CA 94063 | Half Moon Bay, CA 94019 |
| Office: (650) 599-9955 | Office: (650) 560-9995 |
| Fax (650) 599-9273 | Fax (650) 599-9273 |

www.elcentrodelibertad.org

🌐 ESPAÑOL

EL CENTRO DE LIBERTAD

# The Freedom Center

MENU

# Adult Intervention

Our programs help improve the lives of adults struggling to break the cycle of substance use. We offer highly successful programs that provide Outpatient Treatment and Recovery Services:

## OUTPATIENT TREATMENT SERVICES

A ninety (90) day multicultural Primary Care program that offers evidence-based tools to recovery by combining Cognitive Behavioral Therapy with an Abstinence-Based Model. Outpatient Treatment includes:

- Case Managed Treatment Plans
- Individual and Group Counseling
- Co-Occurring Disorder Groups
- Trauma-Informed Treatment
- Relapse Prevention
- Alcohol and Drug testing.
- Alcohol and Other Drug Assessments for Child Protective Services