1   WILLIAM S. FREEMAN (SBN 82002)
    wfreeman@aclunc.org
2   SEAN RIORDAN (SBN 255752)
    sriordan@aclunc.org
3   AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF NORTHERN
4   CALIFORNIA
    39 Drumm Street
5   San Francisco, CA 94111
    Telephone: (415) 621-2493
6   Facsimile: (415) 255-8437
7   *Attorneys for Petitioners-Plaintiffs*
    Additional Counsel Listed on Following Page

    MANOHAR RAJU (SBN 193771)
    Public Defender
    MATT GONZALEZ (SBN 153486)
    Chief Attorney
    GENNA ELLIS BEIER (CA SBN 300505)
    genna.beier@sfgov.org
    EMILOU H. MACLEAN (CA SBN 319071)
    emilou.maclean@sfgov.org
    FRANCISCO UGARTE (CA SBN 241710)
    francisco.ugarte@sfgov.org
    OFFICE OF THE PUBLIC DEFENDER
    SAN FRANCISCO
    555 Seventh Street
    San Francisco, CA 94103
    Direct: 415-553-9319
    Fax:    415-553-9810

10                  UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
11                    SAN FRANCISCO DIVISION

13   ANGEL DE JESUS ZEPEDA RIVAS,          **CASE NO. 3:20-CV-02731-VC**
     BRENDA RUBI RUIZ TOVAR, LAWRENCE
14   KURIA MWAURA, LUCIANO GONZALO
     MENDOZA JERONIMO, CORAIMA            **PETITIONERS-PLAINTIFFS'**
15   YARITZA SANCHEZ NUÑEZ, JAVIER        **NOTICE OF MOTION AND**
     ALFARO, DUNG TUAN DANG, JUAN JOSE    **MOTION FOR TEMPORARY**
16   ERAZO HERRERA, RAJNISH RAJNISH, and  **RESTRAINING ORDER**
     WILLIAN MATIAS RAUDA,
17
           Petitioners-Plaintiffs,        **JUDGE VINCE CHHABRIA**
18
19             v.

20   DAVID JENNINGS, Acting Director of the
     San Francisco Field Office of U.S. Immigration
21   and Customs Enforcement; TONY PHAM,
     Senior Official Performing the Duties of the
22   Director of the U.S. Immigration and Customs
     Enforcement; U.S. IMMIGRATION AND
23   CUSTOMS ENFORCEMENT; GEO GROUP,
     INC.; NATHAN ALLEN, Warden of Mesa
24   Verde Detention Facility,

25             Respondents-Defendants.

1  BREE BERNWANGER* (NY SBN 5036397)    MARTIN S. SCHENKER (SBN 109828)
   bbernwanger@lccrsf.org                mschenker@cooley.com
2  HAYDEN RODARTE (SBN 329432)           COOLEY LLP
   hrodarte@lccrsf.org                   101 California Street, 5th Floor
3  LAWYERS' COMMITTEE FOR                San Francisco, CA  94111
   CIVIL RIGHTS OF                       Telephone: (415) 693-2000
4  SAN FRANCISCO BAY AREA                Facsimile: (415) 693-2222
   131 Steuart St #400
5  San Francisco, CA 94105               TIMOTHY W. COOK (Mass. BBO# 688688)*
   Telephone: (415) 814-7631             tcook@cooley.com
6                                        FRANCISCO M. UNGER (Mass. BBO#
   JUDAH LAKIN (SBN 307740)              698807)*
7  judah@lakinwille.com                  funger@cooley.com
   AMALIA WILLE (SBN 293342)             COOLEY LLP
8  amalia@lakinwille.com                 500 Boylston Street
   LAKIN & WILLE LLP                     Boston, MA 02116
9  1939 Harrison Street, Suite 420       Telephone: (617) 937-2300
   Oakland, CA 94612                     Facsimile: (617) 937-2400
10 Telephone: (510) 379-9216
   Facsimile: (510) 379-9219
11
   JORDAN WELLS (SBN 326491)
12 jwells@aclusocal.org
   STEPHANIE PADILLA (SBN 321568)
13 spadilla@aclusocal.org
   AMERICAN CIVIL LIBERTIES UNION
14 FOUNDATION OF SOUTHERN
   CALIFORNIA
15 1313 West Eighth Street
   Los Angeles, CA 90017
16 Telephone: (213) 977-9500
   Facsimile: (213) 977-5297
17
                    *Attorneys for Petitioners-Plaintiffs*
18                  *Admitted *Pro Hac Vice*

19

20

21

22

23

24

25

26

27

28

PLEASE TAKE NOTICE that, as soon as they may be heard, Plaintiffs will and hereby do move, pursuant to Civil L. R. 7-1 and 65-1, for a temporary restraining order (TRO) directing the Federal Defendants to take specific steps as set forth in the [Proposed] Order submitted herewith: (1) to protect the health and safety of class members detained in the Yuba County Jail (YCJ) and (2) to provide information pertaining to the health and safety of class members detained at YCJ. Pursuant to Civil L.R. 65-1(b), on December 22, 2020 at 5:56 p.m., counsel for Plaintiffs sent an e-mail to counsel for Federal Defendants to advise of the emergency reasons requiring them to seek a TRO.

## INTRODUCTION

After the events at Mesa Verde and the Court's repeated admonitions for them to act proactively, the failure of Federal Defendants ("Defendants") to take basic steps to protect class members during a COVID-19 outbreak that is currently ravaging Yuba County Jail ("YCJ") is unconscionable. Even after the Plaintiffs proposed to Defendants emergency measures to protect class members following the status conference held on Monday, December 21, 2020, hours elapsed before Defendants would even commit to communicating those proposals to the relevant Yuba County officials. While last night the parties reached agreement on a rapid testing protocol for class members, Defendants will not commit to other important measures such as the proper isolation of symptomatic and COVID-positive class members, and Defendants have not stipulated to any enforceable orders. Given the sorry history of Defendants' conduct to date, vague reassurances are not enough. A TRO is necessary to ensure Defendants (1) take basic precautions to protect Class members and stem the outbreak and (2) timely obtain from the County and share with class counsel and the Court information relevant to the health and safety of class members.

Defendants cannot disclaim their constitutional obligation to provide reasonable health and safety to people in their custody whom they have entrusted to a contract facility, or their ability to obtain information necessary to fulfill that obligation. Under the terms of their contract

with Yuba County, Defendants have the right to obtain "any record in [the County's] possession … concerning any detainee held pursuant to this Agreement." Plaintiffs' proposed order, moreover, is narrowly drawn and class-bound; it does not direct any particular action as to people in County custody, leaving that to County authorities. The proposed order is necessary to mitigate unreasonable, avoidable risks to class members' health and lives.

## **FACTS**

YCJ is experiencing a severe and escalating COVID-19 outbreak. One Yuba County inmate tested positive more than two weeks ago. Because of the lack of planning, slow responsiveness, and egregious mismanagement of a volatile situation, the number of people testing positive increased exponentially in a matter of days. In the past two weeks, more than seventy individuals in custody at YCJ have tested positive—thirty percent of the custodial population.[1]

This was predictable. Since the start of this litigation, correctional and public health experts have opined on the inevitability of an outbreak and its likely rapid spread given the conditions at YCJ. *See, e.g.*, ECF 5-2 at ¶ 62 (Greifinger Dec.); ECF 229-19 ¶¶ 59-61 (Greifinger 2d Supp. Dec.); ECF 229-17 at ¶ 20 (Hernandez Supp. Dec.); ECF 229-16 at ¶ 46 (Iwasaki Dec.).

---

[1] This number is more than three days out of date because of the failure of Defendants to proactively provide basic information. Defendants have only confirmed positive COVID-19 tests for thirty-eight individuals in custody—thirty-five County inmates and three ICE detainees. The last updated figure from Defendants concerning cumulative number of positive tests is from December 18, five days ago (and contradicted by their simultaneous email which communicated 34 positive inmates at that time). ECF 893 at 2; Rodarte Dec. Ex. A (ECF 894-1). Defendants subsequently informed class counsel that three additional class members tested positive. Freeman Dec. ¶ 12 and Ex. C. Plaintiffs have independently learned from Professor Carter White at UC-Davis School of Law, class counsel in the *Hedrick v. Grant*, 2:76-cv-162-EFB (N.D. Cal.) ("*Hedrick*") action monitoring conditions in YCJ, that 69 people had tested positive as of December 21. Freeman Dec. Ex. B. Neither Defendants nor the County have provided any subsequent updates on cumulative positive tests.

Defendants are also well aware of the means to prevent an outbreak from spiraling out of control. The CDC has provided guidance since as early as March concerning appropriate COVID-19 testing, quarantine, isolation, and social distancing protocols for correctional and detention facilities.[2] Yet Defendants appear to have learned nothing from their mismanagement of the July/August 2020 outbreak at Mesa Verde, which should have taught them the need for rapid intervention and diligent adherence to public health guidance. ECF 867 at 2 (2d PI Order) ("From the start of the public health crisis until now, the conduct of the key ICE and GEO officials in charge of operations at Mesa Verde has been appalling."). Yet here Defendants continued to bury their heads in the sand, denying both knowledge and authority to take even basic steps to protect those in their custody.

Defendants have refused to provide Plaintiffs information central to ensuring the health and safety of class members. Since last Friday, Defendants have provided no updates concerning the total number of positive COVID-19 tests at the facility. Since Monday's emergency Status Conference, Defendants have provided no substantive details concerning the policies and practices of housing symptomatic and COVID-positive class members, or of testing those in custody. Despite the Court's inquiry, and repeated inquiries from Plaintiffs, Defendants have failed to provide *any* specific information concerning staff testing. Freeman Dec. Ex. A (Defendants "do not at this time have further specifics regarding staff testing."). As recently as last night, Defendants provided only vague responses to most of Plaintiffs' information requests and proposed measures to mitigate the outbreak: *i.e.*, they "believe that the County is considering various measures that it may take…" *Id.* (Dec. 22 7:36 PM Shiwon Choe Email).

---

[2] *See, e.g.*, CDC, COVID-19 Guidance for Correctional & Detention Facilities, rev'd Dec. 3, 2020, at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

In fact, it has been *Plaintiffs* who have provided *Defendants* with information concerning the ballooning outbreak—upon learning that the number of people who were confirmed COVID-positive had quadrupled since Defendants last provided information to class counsel. *See* Rodarte Dec. at ¶¶ 3-5 (ECF 894-1); White Dec. ¶ 12 (ECF 894-2). Defendants also affirmed on December 18 that there were zero unoccupied cells for individual isolation. *See* Rodarte Dec. at ¶ 8 and Ex. B. Yet they simultaneously failed to identify where symptomatic or COVID-positive class members would be housed if identified. *See* Rodarte Dec. Ex. B (Dec 18 6:45 PM Emilou MacLean Email).

On December 18, Plaintiffs made various requests to Defendants intended to stem the outbreak and limit the exposure of class members to unreasonable risk of harm from COVID-19. Rodarte Dec. ¶ 4 and Ex. A (Dec. 17 8:26 PM Emilou MacLean Email). Plaintiffs renewed these requests following the Court's December 21 status conference. *See* Freeman Dec. Ex. A (Dec. 21 2:26 PM William Freeman Email). Plaintiffs requested, among other things, that Defendants:

- administer rapid antigen tests to all in custody immediately, and thereafter administer weekly laboratory polymerase chain reaction (PCR) tests to those in custody and to staff;

- systematically administer rapid antigen tests to a) all symptomatic people and b) close contacts of people who test positive for COVID-19;

- provide weekly tests to all individuals in custody at YCJ for the duration of the outbreak;

- communicate to class counsel about any class members who refuse testing, and offer to test again after the individual has communicated with class counsel;

- immediately isolate individually all symptomatic individuals, and isolate (individually or in a group) all who test positive;

- professionally clean and disinfect any cell or bunk prior to the introduction of a class member to that cell or bunk;

- adhere to their prior social distancing commitments and ensure that no class members are held in a cell with any other individual or are held in the Old Jail;

- release individuals from custody, prioritizing those medically vulnerable; and

- provide timely disclosure of information central to the outbreak and the response by ICE and YCJ.

Each of these requests is well-supported by expert evidence as essential to stem the growing outbreak. *See* Fifth Supplemental Declaration of Robert Greifinger (*hereinafter* "Greifinger 5th Supp. Dec.") at ¶¶ 4-16, 18-23, 28, 38-39. Yet Defendants have been unable or unwilling to provide satisfactory commitments to these mitigation measures even only as they apply to class members. Freeman Dec. ¶ A (Dec. 22 7:36 PM Shiwon Choe Email).

Plaintiffs are aware, through *Hedrick* class counsel, of commitments the county has made to respond to the pandemic. Yuba County Sheriff's Department communicated to *Hedrick* counsel on December 22 their desire to avoid having to operate under a court order. *See* Freeman Dec. ¶¶ 2, 5. The County nonetheless asserted the institution of some important mitigation measures, including twice weekly staff testing to continue until two consecutive weeks of negative tests are recorded; weekly facility-wide testing until two consecutive weeks of negative tests are recorded; and segregation of current infectious cases from negative close contacts. *Id.* *Defendants* had not communicated any of these commitments to class counsel until moments before the filing of this motion. *Compare* Freeman Dec. Ex. A (Dec. 22 7:36 PM Shiwon Choe Email) ("We believe that the County is considering various measures that it may take.  As we have said previously and as continues to be the case, we will provide Plaintiffs with further updates when we are able to do so."), *with* Ex. G (Dec. 23 10:38 AM Shiwon Choe Email).

To be clear, for the moment Plaintiffs will rely on the abovementioned representations Yuba County has made to *Hedrick* counsel and abide YCJ's aversion to a court order; thus,

Plaintiffs have not included Yuba County's commitments in the proposed order. But the incomplete and unenforceable commitments made by Defendants fail adequately to protect class members from unreasonable risk of harm, or to provide a mechanism for undersigned class counsel to monitor the outbreak and hold Defendants' accountable for lapses.

Among other things, Defendants have opposed any stipulated order and refused to provide a substantive response to numerous specific requests for actions to protect the health and safety of class members. Freeman Dec. Ex. A. Though they ultimately relented yesterday morning, Defendants initially refused even to commit to *communicating* Plaintiffs' requests to the County, Freeman Dec. ¶ 9 and n.1.

Defendants agreed last night to certain of Plaintiffs' requests: the rapid testing of all symptomatic class members and close contacts, and communication to class counsel about any class members who refuse to be tested. With regard to all other requests, Defendants were either nonresponsive or asserted they lacked authority. Freeman Dec. ¶ 11 and Ex. A (Dec. 22 7:36 PM Shiwon Choe Email).

The refusal of Defendants to enter into a stipulated agreement or to provide substantive responses to numerous requests presented by Plaintiffs is particularly concerning in light of prior actions which exacerbated transmission risks. YCJ knowingly left COVID-positive individuals in dormitories and shared housing arrangements, apparently because of a lack of either a plan or identified space to house those who tested positive. Freeman Dec. Ex. B. at 1-2, 4 ("Over the past 24 hours we have received multiple reports . . . that Defendants are leaving people who have tested positive for the virus and/or who are symptomatic in the same units as people who have not tested positive for the virus."). *See* Greifinger 5th Supp. Dec. ¶¶ 13-14 ("In no circumstances should COVID-positive people be knowingly left in a communal setting with those who are not confirmed positive."). They refused to quarantine close contacts in accordance with CDC

guidelines, and instead moved people around the facility repeatedly; they apparently continue to do so, even when they are close contacts of people who tested positive. Wells Dec., attached to Pls' Dec. 19 status report, ECF 894-3, ¶ 4; Wells Dec. in support of TRO ¶ 2. *Cf.* Greifinger 5th Supp. Dec. ¶ 22 ("To increase social distancing, and avoid COVID transmission, there should be minimal mixing and movement of individuals between different housing units."). They failed to properly clean and disinfect rooms before introducing class members, even where the previous occupants tested positive for COVID. Wells Dec. in support of TRO ¶ 3. *See* Greifinger 5th Supp. Dec. ¶ 28 ("In the event of an outbreak, there should be increased attention and resources devoted to sanitation."). For more than one week after the introduction of COVID-19 into the facility, they failed to administer facility-wide testing, offering testing initially to the one known affected housing unit. *See* White Dec. ¶¶ 10, 18 (ECF 894-2); Rodarte Dec. ¶ 3 and Ex. B (ECF 894-1). *Cf.* Greifinger 5th Supp. Dec. ¶ 6 ("Containment is only possible through quickly identifying those who may be infected and isolating them."). While Defendants last communicated that COVID-positive *class members* are in solid-walled rooms in the medical unit, at that time COVID-positive County inmates were housed in various parts of the facility, some with solid walls and others without. Freeman Dec. Ex. D (Dec. 21 11:18 AM Shiwon Choe Email) (COVID-positive individuals are "being housed in medical and in E, G, H, I, J, and L Pods, and cells Q1 and Q5); White Dec., ECF 894-2, ¶ 3 (E Pod are celled housing units with perforated doors; G, H, I, J and L are "dorms separated from the hallway only by bars"). Class counsel have no updated information concerning where COVID-positive County inmates are now held.

Prior to the outbreak, Defendants showed a lack of concern for COVID-19 public health precautions. They abandoned social distancing commitments they previously made to the Court—housing people in close quarters in housing units or cells they previously acknowledged as incapable of permitting adequate social distancing. In recent months, Defendants and YCJ have

consistently held significant numbers of class members in the "Old Jail," after asserting to the Court that class members would no longer be held there as a "response to COVID-19." *See* ECF 894 at 4-6; Rodarte Dec. ¶ 13.

They also housed symptomatic individuals in shared housing, despite unambiguous public health guidance – and express commitments – to the contrary. *See* Rodarte Dec. ¶¶ 11-12 and Ex. E. *Contra* ECF 357 (PI Order) at 8 ("detainees who present symptoms are placed in isolation in the medical unit"); ECF 264-2 at ¶ 22 (Declaration of AFOD Dana Fishburn).

The crisis continues to grow. At least one additional class member tested positive since Monday's hearing. Freeman Dec. ¶ 12 and Ex. C. (The newly positive class member is the sole class member who had been housed in the "Old Jail"[3]—in a cell without solid walls, sharing air with others in custody in the same housing unit and without appropriate mitigation measures to prevent the introduction of COVID into the unit. White Dec. ¶ 5; Freeman Dec. Ex. C; (Dec. 21 11:21 Shiwon Choe Email).) Class counsel have no further information from Defendants about the cumulative number of positive individuals in custody at YCJ now, and lack other basic information that would allow an evaluation of the outbreak and Defendants' response. Meanwhile, there are extraordinarily high COVID-19 infection rates in the counties surrounding YCJ, and virtually no hospital capacity should any class member suffer from severe COVID-19 requiring intensive care.

Plaintiffs now seek a narrow TRO with measures which would only apply to class members. Plaintiffs ask the Court to order that Defendants prevent any new intakes for the duration of the outbreak; administer rapid antigen tests to class members identified as symptomatic or close contacts; administer weekly laboratory tests to class members for the

---

[3] The "Old Jail" comprises G-Tank, H-Tank, I-Tank, J-Tank, K-Tank, L-Tank, N-Tank, P-Tank, the Q Cells, R-Dorm, S-Tank, and T-Tank.

duration of the outbreak; isolate properly symptomatic class members (individually) and COVID-positive class members (in individual or shared housing with other COVID-positive individuals); ensure that class members are not housed with COVID-positive individuals or close contacts; clean and disinfect any cell or bunk prior to transfers; and share information with the Court and class counsel to allow adequate monitoring and oversight of the handling of the outbreak. Plaintiffs also ask the Court to order Defendants to adhere to the social distancing commitments Defendants themselves advanced earlier in the litigation—single-celled or group housing with minimal social distancing in the New Jail.

## **LEGAL STANDARD**

Plaintiffs are entitled to a temporary restraining order if they establish that they are "likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that preliminary injunction and temporary restraining order standards are "substantially identical"). A temporary restraining order may likewise issue where "serious questions going to the merits [are] raised and the balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citation omitted). To succeed under the "serious question" test, Plaintiffs must show that they are likely to suffer irreparable injury and that an injunction is in the public's interest. *Id*. at 1132.

## **ARGUMENT**

Consistent with the Court's prior rulings, Plaintiffs are likely to succeed on the merits of their claim that Defendants are failing to provide reasonable health and safety to class members currently detained at YCJ. The Court's first preliminary injunction order included a statement that

unfortunately remains true more than six months later: "ICE's conduct and attitude towards its detainees at Mesa Verde and Yuba County Jail since the pandemic began have shown beyond doubt that ICE cannot currently be trusted to prevent constitutional violations at these particular facilities without judicial intervention." ECF 357 at 5. As Plaintiffs noted in their recent status report, Defendants evidently made no genuine efforts prior to December 18 to stay abreast of positive tests at YCJ or to develop or learn about plans for testing, quarantining, and isolation. ECF 894 at 1. There is little reason to believe they will behave differently in the coming days and weeks absent an order from the Court.

In June, the Court ordered ICE to "maintain the status quo of safety," described as including that "detainees who present symptoms of Covid-19 are placed in isolation in the medical unit." *Id.* at 8. The Court correctly identified isolation of symptomatic class members as an important basic precaution. Whatever the practice may have been in past months, Defendants now refuse to stipulate to the practice. Defendants have not disputed the *necessity* of this or Plaintiffs' other proposed interim relief to stem COVID-19's spread at YCJ; instead, they base their refusal on the fact that carrying out these practices would require the cooperation of their contractor, YCJ. This premise fails for at least three reasons.

*First*, ICE itself claims to *require* county-jail contractors to implement many of the measures Plaintiffs seek here—including the isolation of individuals with suspected or confirmed COVID-19 and the consideration of release of individuals if there is insufficient bed space for isolation. *See ERO COVID-19 Pandemic Response Requirements* (Version 5.0, Oct. 27, 2020), at https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf, at 30.[4]

---

[4] ICE's current Pandemic Response Requirements provide: "For suspected or confirmed COVID-19 cases: Isolate the individual immediately in a separate environment from other individuals. Facilities should make every possible effort to isolate persons individually….In the event that a facility requires more isolation beds for detainees, ICE must be promptly notified so that transfers

*Second*, ICE already has prevailed upon YCJ to take actions necessary to meet constitutional requirements. For example, in response to requests by Plaintiffs in this case, ICE obtained rapid testing through YCJ and has agreed to do so going forward. Freeman Dec. Ex. A. Similarly, prior to the Court's June PI, ICE compelled YCJ to move class members such that no two class members occupied a single cell and no class members were in the Old Jail. Freeman Dec. Ex. F. This weekend, following Plaintiffs' status report detailing Defendants' failure to maintain the status quo (no two class members in a single cell and no class members in the Old Jail) as required by the Court in the June PI, Dkt. 357, Defendants compelled YCJ to move all but one class member from the Old Jail to the New Jail. Freeman Dec. Ex. D (Dec. 21 11:18 am Shiwon Choe Email). (The one class member who was not moved has since contracted COVID-19. Freeman Dec. Ex. C). In a separate lawsuit where YCJ is not a party, ICE agreed to ensure YCJ would make modifications to telephone access, including ensuring calls were private and could last longer than YCJ previously allowed. *See* Settlement Agreement, *Lyon v. ICE*, No. 13-cv-5878-EMC, ECF # 262-2 (N.D. Cal. June 13, 2016).

*Third*, even allowing that there may be a hypothetical extreme in which it would be too great an imposition for ICE to insist YCJ carry out its detention contract consistently with ICE's constitutional obligations, the temporary relief Plaintiffs request here is not remotely in that ballpark. Other than daily facility-wide reporting—which is necessary to have any real sense of the threat to class members and which draws on ICE's explicit contractual right to obtain "any

---

to other facilities, transfers to hospitals, or releases can be coordinated immediately." The Requirements apply to all facilities housing ICE detainees, including "facilities operated by local government agencies that have mixed populations of which ICE detainees comprise only a small fraction." PRR at 8. According to ICE, for county jails under contract with ICE "that fail to meet the minimum requirements of the ERO PRR, ICE will issue a Notice of Intent indicating that the intergovernmental service agreement is in jeopardy due to non-compliance with the ERO PRR." PRR at 7.

record in [the County's] possession … concerning any detainee held pursuant to this Agreement." Inter-Governmental Services Agreement between DHS and Yuba County, Freeman Dec., Ex. E, at p. 9, § X(D)—the proposed order is addressed only to practices with respect to class members, leaving YCJ to act as it deems best with respect to individuals in County custody.

Turning to other equitable factors bearing on a TRO, Plaintiffs' factual presentation in this motion and their December 19, 2020 status report (ECF 894), viewed against the course of events in this case, demonstrate the likelihood of irreparable harm absent interim relief to ensure Defendants take action to stem the spread of the pandemic. Furthermore, particularly in light of the lack of hospital capacity should the outbreak worsen and require offsite care, the public interest tips sharply in favor of granting the proposed TRO.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Plaintiffs' motion for a TRO.


Dated: December 23, 2020                    /s/ Emilou MacLean
                                           Emilou MacLean
                                           San Francisco Office of the Public Defender
                                           Attorney for Petitioners-Plaintiffs