WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Attorneys for Petitioners-Plaintiffs*
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
GENNA ELLIS BEIER (SBN 300505)
genna.beier@sfgov.org
EMILOU H. MACLEAN (SBN 319071)
emilou.maclean@sfgov.org
FRANCISCO UGARTE (SBN 241710)
francisco.ugarte@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: (415) 553-9319
Facsimile: (415) 553-9810

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUBI RUIZ TOVAR, LAWRENCE KURIA MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG, JUAN JOSE ERAZO HERRERA, RAJNISH RAJNISH, and WILLIAN MATIAS RAUDA,<br><br>          Petitioners-Plaintiffs,<br><br>     v.<br><br>DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; TONY PHAM, Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; NATHAN ALLEN, Warden of Mesa Verde Detention Facility,<br><br>          Respondents-Defendants. | CASE NO. 3:20-CV-02731-VC<br><br>PLAINTIFFS' STATUS REPORT REGARDING IMPLEMENTATION OF THE YUBA COUNTY JAIL PRELIMINARY INJUNCTION AND ISSUANCE OF NEW DEPARTMENT OF HOMELAND SECURITY ENFORCEMENT GUIDANCE<br><br>JUDGE VINCE CHHABRIA |

BREE BERNWANGER (SBN 331731)
bbernwanger@lccrsf.org
HAYDEN RODARTE (SBN 329432)
hrodarte@lccrsf.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA
131 Steuart St #400
San Francisco, CA 94105
Telephone: (415) 814-7631

JUDAH LAKIN (SBN 307740)
judah@lakinwille.com
AMALIA WILLE (SBN 293342)
amalia@lakinwille.com
LAKIN & WILLE LLP
1939 Harrison Street, Suite 420
Oakland, CA 94612
Telephone: (510) 379-9216
Facsimile: (510) 379-9219

JORDAN WELLS (SBN 326491)
jwells@aclusocal.org
STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

MARTIN S. SCHENKER (SBN 109828)
mschenker@cooley.com
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA  94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIMOTHY W. COOK
(Mass. BBO# 688688)*
tcook@cooley.com
FRANCISCO M. UNGER
(Mass. BBO# 698807)*
funger@cooley.com
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

*Attorneys for Petitioners-Plaintiffs*
*\*Admitted Pro Hac Vice*

**STATUS REPORT**

Plaintiffs submit this status report in advance of the case management conference scheduled for February 3, 2021 at 2 p.m. (1) to update the Court as to ongoing deficiencies regarding Federal Defendants' compliance with the preliminary injunction issued on January 6; (2) to request that the Court order Federal Defendants to provide additional information concerning such compliance; and (3) to describe new Department of Homeland Security ("DHS") enforcement guidance that Plaintiffs believe require Federal Defendants to change their practices in ways that will materially affect this case.

### A.  Federal Defendants' Non-Compliance with the Yuba Preliminary Injunction

On January 6, the Court issued a preliminary injunction requiring Federal Defendants to take certain measures with respect to Yuba County Jail ("YCJ") "for the duration of the outbreak." (ECF No. 951.) On January 5, Plaintiffs filed a status report describing the Federal Defendants' failures to comply with the TRO. (ECF No. 948.) Four weeks later, Federal Defendants are still failing to comply with the Court's order in the following four respects:

**1.  Federal Defendants are still not able to provide accurate, complete, and timely information.** Although it appears the Federal Defendants' counsel have attempted to obtain accurate, complete, and timely information from YCJ, they have often failed to do so. For example:

*Example 1*: On December 31, in the midst of the rapidly-growing outbreak at YCJ, Plaintiffs' counsel e-mailed Federal Defendants' counsel with questions regarding eight areas of concern. While Federal Defendants' counsel immediately responded with information concerning one area of concern (the status of Juan José Erazo Herrera, who was then

experiencing symptoms consistent with COVID-19), they were unable to provide responses in the other seven areas until January 8.

*Example 2*: On January 20, Plaintiffs' counsel e-mailed Federal Defendants' counsel with concerns that Federal Defendants' daily status reports had not included any details about the timing and results of regular testing at YCJ since January 7 (except to report that there had been no positive tests).[1] Plaintiffs' counsel requested information about: the number of weekly tests administered in that time, when such tests were administered, and when the results of those tests were returned from the lab to the facility. On January 21, pending answers to Plaintiffs' specific questions, Federal Defendants' counsel shared YCJ's "testing protocols," which consisted of a general statement that YCJ follows CDC guidelines and tests on a seven-day cycle, exclusive of inmates or detainees who have tested positive for 90 days. That night, Plaintiffs' counsel e-mailed Federal Defendants' counsel to urge the use of Abbott tests on C-Dorm unless they could verify that class members in that dorm had actually received negative PCR test results. On January 22, Federal Defendants' counsel stated they had followed up with YCJ about Plaintiffs' questions and concerns. Not until the afternoon of January 25 did Federal Defendants' counsel report back answers to Plaintiffs' questions from January 20. The conclusion to be drawn from this back-and-forth is that until pressed by Plaintiffs (and even then only five days later), Defendants had no specific knowledge as to any tests being administered since January 7, despite reporting daily to the Court on the progress of testing. During this time, Plaintiffs' counsel also

---

[1] On January 7, class member Juan José Erazo Herrera was identified as COVIC-19-positive and YCJ reportedly tested all of the other class members in C-Dorm as a result. YCJ had moved Mr. Erazo Herrera *into* C-Dorm approximately three days earlier, despite the fact that he was symptomatic at the time. Mr. Erazo Herrera's movement to various units within YCJ—and Plaintiffs' difficulty obtaining reliable information about his COVID-19 status and the placement decisions concerning him—is detailed in Plaintiffs' January 5 status report.

received questions from several class members regarding the results of tests that had been administered but never reported back to them, raising concerns that individuals infected with COVID-19 may have been left in the dorm commingled with healthy class members due to delays in receiving testing results.

*Example 3*: On January 25 the parties met and conferred by telephone to address Plaintiffs' concerns about non-compliance with the preliminary injunction. On January 26, Plaintiffs' counsel requested additional information on issues discussed during the previous evening's meet and confer, including information concerning (1) the testing of class members, including class-member-by-class-member and test-by-test information similar to what Defendants' report for class members at Mesa Verde, (2) any screening tools used at YCJ to identify people with COVID-19 symptoms, and (3) who is responsible for cleaning cells at YCJ, what protocols they are required to follow in order to ensure that cells have been thoroughly cleaned, and how facility staff determine whether mold is present in a cell or housing unit (in light of class member complaints that they have been moved into cells with filth and mold).[2] Plaintiffs again e-mailed Federal Defendants' counsel on February 1 requesting this information. Federal Defendants have not yet responded.

Plaintiffs accordingly remain concerned that Defendants have failed to comply with the information sharing requirements of the YCJ preliminary injunction (ECF No. 922 at 3, ¶ 12), or to ensure that YCJ is adequately protecting class members from COVID-19.

---

[2] This is not the first time that Plaintiffs' have raised these concerns, which predate the December 23, 2020 TRO. In response to consistent complaints, even after the issuance of the TRO, that class members were transferred into visibly soiled cells and instructed to clean them themselves, Plaintiffs' counsel asked for specific information regarding the cleaning protocols and any due diligence conducted by Federal Defendants to ensure compliance with the cleaning requirement of the TRO via email on December 28, 2020; December 31, 2020; and January 4, 2021. They have never received meaningful information about these issues.

**2. Federal Defendants and YCJ continue to undercount symptomatic people.** A review of class member medical records through January 5 reveals at least three aspects of this problem.[3]

First, YCJ checks class members' vital signs inconsistently. In YCJ's medical records, it appears that COVID-19 symptoms are usually noted with vital signs. Accordingly, taking vital signs is a critical way for YCJ to identify class members (and County detainees) who are symptomatic. And during a January 25 meet-and-confer call, Federal Defendants stated that YCJ checks class members' vital signs twice per day. But for Jose Quintanilla and Rajnish Rajnish—each of whom tested positive on December 25—there were only two days between December 25 and January 4 where vitals were checked twice. On other days in that period, vitals were either checked once or not at all. Similarly, during a fifteen-day period, Bryan Apaza's vitals were only checked once on five of those days. By missing vital checks, YCJ may not be identifying symptoms as quickly or frequently as it would be otherwise.

Second, YCJ and/or Federal Defendants appear not be identifying and/or recording symptoms that occur during weekends. In Defendants' December 24 daily status report for Yuba, Defendants stated that three "ICE detainees" had experienced symptoms. (ECF No. 925.) Medical records indicate three additional class members experienced symptoms for the first time during the outbreak on December 26 and 27: Mr. Erazo Herrera (shortness of breath, dry cough,

---

[3] Plaintiffs' counsel has repeatedly raised questions regarding the protocols employed for identifying symptomatic individuals, and received only general assurances that health officers are following CDC guidelines without any evidence that Federal Defendants have engaged in efforts to ensure that this is true, even when presented with both specific instances of failure to identify symptomatic individuals and concerns about numerically implausible status updates. *See, e.g.*, ECF No. 930 (December 28, 2020 YCJ Status Update) (reporting zero symptomatic individuals among 43 infectious COVID-positive county inmates and four infectious-positive ICE detainees).

loss of taste and smell, unable to eat, feels hot, chest pain, headache), Mr. Rajnish (congestion and runny nose), and Mr. Quintanilla (aches and pain, chest pain, runny nose, coughing up phlegm, no energy/not sleeping well on December 26, and tired, congested, backache, loss of taste, shortness of breath, lightheadedness on December 27). Yet Federal Defendants' December 28 daily status update still reflected that cumulatively *only three* class members had experienced symptoms, when at that point it should have been at least *six*.

Third, YCJ and/or Federal Defendants appear to undercount the aggregate number of detainees who have experienced symptoms. Defendants' January 5 status report indicated that cumulatively five "ICE detainees" had experienced symptoms. (ECF No. 947.) But at that point the medical records of at least seven class members indicated they had experienced symptoms during the outbreak: Mr. Apaza (December 19: cold, runny nose), Roberto Robles (December 21: headache), Mr. Rajnish (December 23: feels warm and dizzy), Ricardo Vasquez Cruz (December 23: sudden onset sore throat), Mr. Erazo Herrera (see above), Mr. Quintanilla (see above), and Jonny Vasquez-Rodriguez (December 29: headache, body ache, sore throat).

Plaintiffs have repeatedly raised questions and concerns with Federal Defendants about the apparent under-identification of symptomatic people at YCJ. Federal Defendants have relayed that YCJ is relying on CDC "Symptomology for Coronavirus, a Coronavirus Supplemental Screening tool, and the Bi-County Public Health Officer's guidance." As indicated above, Plaintiffs have also requested information about any COVID-19 screening tool being used at YCJ and a copy of that tool, but as of yet have not received any information beyond the fact that it exists.

The failure to identify symptomatic people prevents the isolation of potentially infected individuals—a primary source of continued transmission. *See also* ECF 922 at 2, ¶ 5 ("Ensure

5
CASE NO. 3:20-CV-02731-VC
PLAINTIFFS' STATUS REPORT

that any class member who is identified by medical personnel or class counsel as experiencing symptoms of COVID-19 is individually isolated unless he tests positive, satisfies the CDC criteria for release from isolation, or is released from custody.").

**3. Federal Defendants and YCJ are classifying people as "recovered" based on the passage of time, without following their own protocols regarding ongoing symptoms.** As explained in Plaintiffs' status report of January 5, Defendants are reporting that large numbers of people in custody – class members and County inmates – are recovered. *See, e.g.*, ECF 945 at 1-2. The medical records of class members who have tested positive for COVID-19 include the following entry "[h]ouse in medical isolation for at least 10 days since symptoms first appeared, and at least 24 hours have passed since last fever without the use of fever-reducing medications, and symptoms have improved." However, at least three class members were administered a fever suppressant (Tylenol or Aspirin) before 24 hours lapsed, and two of those people were returned to housing pods in the meantime. For example, Mr. Quintanilla was deemed recovered, administered Tylenol, and moved to A-Pod on January 4, ten days after testing positive. Mr. Rajnish saw a similar move to A-Pod with a fever suppressant on day ten after his positive test. YCJ's and Federal Defendants' seemingly mechanical determination of recovery after ten days, and without consistently following their own fever suppressant protocol, risks further outbreak. Further, Federal Defendants began reporting class member Noe Rivera Garcia as recovered starting on December 31, 2020, *see* Dkt. 941, even though he was released from YCJ less than 24 hours after testing positive for COVID-19 and he reported that no one from ICE or YCJ contacted him after his release to ascertain whether or not he remained ill. While Mr. Rivera Garcia's case does not raise the same concerns as those who remained in custody throughout their illness, reporting him as "recovered" is further indication of a lack of due diligence. *See*

*also* ECF 922 at 2, ¶ 6 (ordering class members who test positive to be isolated until they satisfy CDC criteria for release from isolation).

**4. Class members report transfer into filthy cells and Defendants have not provided basic details about who is cleaning the cells and how.** Since Plaintiffs' January 5 status report, there have been relatively few transfers of class members into isolation cells. However, class members have continued to report that the cells they have been moved into do not appear to have been cleaned and have also reported what they believe to be mold. During a January 25 meet-and-confer, Federal Defendants reported only that "facilities" has checked on these complaints and represents that the cells have been cleaned and there is no mold. Federal Defendants have not provided any specific information in response to questions regarding who, specifically, is conducting the cleaning, what protocols they are following, and what efforts Federal Defendants are undertaking to verify compliance with the injunction's cleaning requirements. There is no evidence to contradict class members' specific, detailed reports of cells that have not been cleaned or disinfected. *See* ECF 922 at 2, ¶ 7 ("Ensure that there is cleaning and disinfection by staff of any cell or bunk prior to the introduction of a class member into that cell or bunk.").

    **B.**    **Plaintiff's Request for Additional Court Intervention to Address Non-Compliance**

Plaintiffs request that the Court order Federal Defendants to do the following, on or before February 5 at 5 p.m., to enhance compliance with the preliminary injunction dated January 6:

1. Include in the daily YCJ status reports testing information of a similar detail and quality to the testing information that is filed with respect to Mesa Verde (tracking all tests, the dates of those tests, the dates the results of those tests were returned, and the

> results of those tests) for each class member, with such information going back to the beginning of the YCJ outbreak.

2. Provide Plaintiffs copies of any screening tools, guidelines, logs, or other material that YCJ uses to identify COVID-19 symptoms.

3. Provide Plaintiffs copies of any screening tools, guidelines, logs, or other material that YCJ uses to assess whether a detainee has recovered from COVID-19.

4. Provide Plaintiffs information on who has cleaned the cells at YCJ that class members have been transferred into since December 23, any protocols used for cleaning those cells, and any logs related to cleaning those cells.

5. Ensure that YCJ takes detailed "before" and "after" photos of any cells to which class members will be moved and provide those photos to Plaintiffs.

### C. DHS Immigration Enforcement Guidance and Likely Impact on Federal Defendants' Approach to this Case

Newly issued DHS guidance instructs Federal Defendants to significantly alter their approach to immigration enforcement and COVID-19 protocols in detention. *See* David Pekoske, Memorandum Re: Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities at 2-3 ("Pekoske Memo") (attached hereto as Exhibit A).[4]

As of February 1, under the Pekoske Memo, DHS policy excludes a significant proportion of class members from priority for *any* immigration enforcement action, including detention. The Peksoke Memo also, for the first time, prioritizes COVID-19 protocols *over* enforcement considerations, requiring that "all enforcement and detention decisions shall be

---

[4] This government record is properly subject to judicial notice. *See Daniels–Hall v. Nat'l Educ. Ass'n.*, 629 F.3d 992, 999 (9th Cir. 2010). Although the "100-Day Pause on Removals" at Section C of the memorandum has been enjoined by a temporary restraining order, all other provisions of the memorandum remain in effect. *See Texas v. United States*, --- F.Supp.3d ----, 2021 WL 247877, *8 (S.D. Tex. Jan. 26, 2021).

guided by DHS's ability to conduct operations and maintain custody consistent with applicable COVID-19 protocols." *Id.* at 3. The new policy will remain in force until DHS has conducted an exhaustive review of enforcement policies and further adopted specific revised policies. *Id*. at 2. Plaintiffs alert the Court to the Pekoske Memo because it appears the memo will materially impact the future course of this case, since it contramands many of Federal Defendants' current litigation positions. *Cf. Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (holding, pursuant to *Accardi* doctrine, agencies must follow sub-regulatory procedures affecting individual rights, "even where the internal procedures are possibly more rigorous than otherwise would be required"); *see also Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.") (citing *Morton*); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 324, 337-38 (D.D.C. 2018) (sustaining claim that *Accardi* doctrine required adherence to ICE directive setting out "procedural requirements for assessing asylum-seekers' eligibility for release").

### 1. Under the Pekoske Memo, a Significant Proportion of the Class Should No Longer Be Detained

*First*, DHS' new enforcement priorities exclude a significant proportion of class members from priority from *any* immigration enforcement action, including continued detention. Individuals now qualify as enforcement priorities only when they:

- "have engaged in or are suspected of terrorism or espionage, or [their] apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States";
- were "apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020"; or
- were released from criminal custody *after* January 20, 2021 and "have been convicted of an 'aggravated felony,' as that term is defined in section 101(a) (43)

of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety."

Pekoske Memo at 2.

On their face, DHS's revised enforcement priorities do not apply to *any* current class members, since none of them were released from criminal custody after January 20, 2021. But even if one were to disregard the January 20 cut-off date, these enforcement priorities categorically exclude class members who have been released by ICE *sua sponte* under the pressure of this litigation or who have been released pursuant to this Court's bail orders, because even to the extent that those class members have prior convictions for aggravated felonies, all have already been determined to pose no threat to public safety. *See* Dkt. 90 (standard for bail); Dkt. 357 (preliminary injunction stating that class members who pose a danger to the community will not be released on bail). And even disregarding the cutoff date, they also categorically exclude, at a minimum, all current detainees who have not been convicted of an aggravated felony. Taking a broad view, because the new priorities "shall apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding: … whom to detain or release" and "whether to settle, dismiss, appeal, or join in a motion on a case[,]" Pekoske Memo at 2, they also appear likely to change the enforcement landscape surrounding Mesa Verde and YCJ writ large.

### 2. DHS Now Prohibits ICE from Enforcement Action Inconsistent with COVID-19 Guidance

*Second*, the new DHS policy conditions "*all* enforcement and detention decisions" on compliance with "applicable COVID-19 protocols." *Id.* at 3 (emphasis added). This Court has already identified myriad ways ICE has failed to follow even its generally-applicable COVID-19 protocols in Mesa Verde and YCJ and has remedied them by issuing provisional relief to the Class. *See generally* Dkt. 357 (June 6, 2020 preliminary injunction); Dkt. 867 (Dec. 3, 2020 preliminary injunction); Dkt. 951 (Jan. 6, 2021 preliminary injunction). Recent isolation practices at YCJ, detailed below, make clear that, in addition to failing to fully comply with this

Court's January 6 order as described *supra*, Federal Defendants have proved themselves further unable to comply with their own pandemic response policies. The use of medical isolation at YCJ is an illustrative example.

Applicable guidance requires that medical segregation be "distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and in practice."[5] Recognizing that spaces otherwise used for administrative segregation or solitary confinement often become repurposed for isolation in the pandemic, pandemic response guidance requires that "medical isolation is operationally distinct from solitary confinement" and requires that facilities take proactive measures to prevent medical isolation from becoming punitive, such as:

- "[e]nsur[ing] that individuals under medical isolation receive regular visits from medical staff and have access to menstal health services";
- "[e]nsur[ing] that detainees are provided similar access to radio, television, reading materials, personal property, telephone, recreation and commissary to the fullest extent possible";
- "[i]ncreasing telephone privileges without a cost barrier to maintain mental health and connection with others while isolated";
- "[c]ommunicat[ing] regularly with isolated individuals about the duration and purpose of their medical isolation period."[6]

Defendants have failed to comply with this requirement. Class members sent to medical isolation at Yuba during the outbreak described detention in tiny, filthy, solitary confinement chambers with no access to reading materials, television, or phone calls. Some class members reported lack of access to medical care *while in medical segregation.* Others reported that

---

[5] *See* CDC, COVID-19: Guidance for Correctional & Detention Facilities, *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated Dec. 31, 2020).
[6] *Id*.; *see also* ICE, Pandemic Response Requirements Version 5.0 at 31, *available at* https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (Oct. 27, 2020) (repeating language from CDC guidance).

Defendants and their contractors did not even communicate *why* they were being isolated or whether they had tested positive for COVID-19, let alone the expected duration of their isolation. Pursuant to the new policy, if YCJ cannot comply with ICE's own COVID protocols, it should not be used to house ICE detainees for the remainder of the pandemic. Plaintiffs offer this example as one of many that may significantly alter the course of this litigation.

Date: February 2, 2021

Respectfully submitted,

*/s/ Sean Riordan*
Sean Riordan
William S. Freeman
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA

Bree Bernwanger
Hayden Rodarte
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF
SAN FRANCISCO BAY AREA

Emilou H. MacLean
Manohar Raju
Public Defender
Matt Gonzalez
Chief Attorney
Francisco Ugarte
Genna Ellis Beier
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO

Judah Lakin
Amalia Wille
LAKIN & WILLE LLP

Jordan Wells
Stephanie Padilla
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA

Martin S. Schenker
Timothy W. Cook
Francisco M. Unger
COOLEY LLP

*Attorneys for Plaintiffs-Appellees*