UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DAVID JENNINGS, et al., <br><br> Defendants. | Case No. 20-cv-02731-LB <br><br> **ORDER GRANTING RELEASE OF DETAINEE** <br><br> Re: ECF No. 1266 |

### INTRODUCTION

The plaintiffs in this class-action lawsuit were current and former civil immigration detainees at the Yuba County Jail and the Mesa Verde Processing Facility during the COVID-19 pandemic. They sued U.S. Immigrations and Customs Enforcement (ICE) and its private contractor GEO Group on the ground that the conditions of their detention offered little to no protection from the pandemic, in violation of the U.S. Constitution.

The parties reached a class-action settlement that the trial court approved in June 2022. Under the settlement agreement, the defendants are required to mitigate COVID-19 risks at the facilities, such as by offering vaccination to class members who are still detained and providing them with educational materials, masks, and hand-cleaning supplies. As for class members who are not still detained, the defendants are required for three years to make best efforts not to re-detain them under the immigration laws unless they pose a threat to public safety or national security or a risk

of flight. In the event of a disputed re-detention, the court is to resolve the dispute pursuant to the settlement agreement's dispute-resolution procedures and re-detention criteria.

On December 1, 2022, ICE re-detained class member Juan Bravo Zambrano on the ground that his probation violations — missing scheduled probation-officer contact, testing positive for methamphetamine, failing to report a traffic stop to his probation officer, and having contact with a felon — make him a flight risk from his immigration proceedings. (At the time he was re-detained, Mr. Bravo had just been released from criminal imprisonment for those probation violations, which stemmed from a previous criminal conviction. That conviction resulted in removal proceedings that are still pending.) Mr. Bravo now challenges his re-detention under the settlement agreement. He argues that he is not a flight risk because, among other reasons, he has never missed a court date, has maintained contact with probation, and throughout his removal proceedings has never, without permission, left the judicial district where he and most of his extended family (including his two children) live. The defendants contend that he is a flight risk and that he waived his challenge because he did not timely raise it under the settlement agreement.

The court can decide the matter without oral argument, N.D. Cal. Civ. L.R. 7-1(b), and orders that Mr. Bravo be released.

## STATEMENT

**1. The Litigation and the Settlement Agreement**

The plaintiffs sued on April 20, 2020, alleging that those in civil immigration detention at the Yuba County Jail and the Mesa Verde ICE Processing Facility were being held "under extraordinarily dangerous conditions during the current COVID-19 pandemic."[1] They claimed a violation of their Fifth Amendment right to substantive due process and sought declaratory and injunctive relief.[2] On April 29, 2020, the trial court issued a temporary restraining order for ICE to provide information so that individual bail requests could be considered.[3] That led to a reduction

---

[1] Compl. – ECF No. 1 at 3 (¶ 1). Record citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[2] Am Compl. – ECF No. 780 at 40 (¶ 139 & Prayer for Relief).

[3] TRO – ECF No. 53 at 5–6 (¶ 6).

in detainee numbers so that social distancing could happen, and in June 2020, the trial court issued a preliminary injunction to preserve that status quo.[4] Then, in August and December 2020, the trial court issued a further temporary restraining order and preliminary injunction for the Mesa Verde facility.[5] Similarly, in December 2020 and August 2021, the trial court issued a temporary restraining order and preliminary injunction applicable to the Yuba County Jail.[6]

In December 2021, the parties settled the case.[7] The trial court granted final approval to that settlement under Federal Rule of Civil Procedure 23 in June 2022.[8] The final-approval order vacated the preliminary injunctions.[9] It also provided for the appointment of a magistrate judge to resolve any disputes under the settlement.[10]

Under the settlement agreement, the defendants must take various measures to mitigate COVID-19 risks at the two facilities.[11] They also must, for three years, make best efforts not to re-detain any class member under the immigration laws unless the class member poses a threat to public safety or national security or a risk of flight.[12] The settlement agreement sets forth the following more specific criteria, which are the only criteria ICE may use to re-detain class members during the applicable three-year period:

1. The Class Member has violated any material condition of release in a manner indicating that the Class Member presents a danger to persons or property, is a threat to national security, or poses a risk of flight. A material condition of release includes but is not limited to those conditions prohibiting criminal activity, reporting requirements, and restrictions on movement.
   a. ICE takes the position that serious drug offenses — such as trafficking in or sale of significant amounts — and sex offenses, particularly against children, constitute a risk to public safety.

---

[4] Prelim. Inj. – ECF No. 357 at 8–9.

[5] TRO – ECF No. 500 at 2–3; Prelim. Inj. – ECF No. 867 at 23–26.

[6] TRO – ECF No. 922 at 1–3; Prelim. Inj. – ECF No. 951.

[7] Settlement Agreement – ECF No. 1205-1.

[8] Final Approval Order – ECF No. 1258.

[9] *Id.* at 5–6 (¶ 12).

[10] *Id.* at 6 (¶ 15).

[11] Settlement Agreement – ECF No. 1205-1 at 8–13 (§ II).

[12] *Id.* at 13–17 (§ III).

ORDER – No. 20-cv-02731-LB                3

      b. Reporting within one business day of a scheduled reporting date will not be considered a violation of a material condition of release.
2. The Class Member fails or has failed to appear for an immigration court hearing and was ordered removed by an immigration judge.
    a. If the immigration judge later grants a motion to reopen the in absentia removal order, [ICE Enforcement and Removal Operations] will evaluate whether release is warranted, paying particular attention to the circumstances surrounding the in absentia order and whether the Class Member presents a danger to persons or property, is a threat to national security, or poses a risk of flight.
3. The Class Member has absconded.
    a. Upon locating the Class Member, [ICE Enforcement and Removal Operations] will evaluate whether release is warranted, paying particular attention to the circumstances surrounding the absconding and whether the Class Member presents a danger to persons or property, is a threat to national security, or poses a risk of flight.
4. The Class Member has been arrested by local, state, or federal authorities for new criminal conduct if, based on that conduct, the Class Member presents a danger to persons or property, is a threat to national security, or poses a risk of flight.
5. A local, state, or federal authority finds that the Class Member has failed to comply with the terms of probation or parole, if, based on that conduct, the Class Member presents a danger to persons or property, is a threat to national security, or poses a risk of flight.
6. The Class Member poses a very significant ongoing threat to public safety or national security. A determination that a Class Member poses a very significant ongoing threat to public safety or national security under this subsection only may be based upon criminal convictions and/or ongoing criminal proceedings preceding the Class Member's release pursuant to a bail order issued by the Court and shall include consideration of factors such as [list of factors]. In such limited cases, ICE will conduct an individualized review of the Class Member's record and may re-detain the Class Member only after approval at a senior headquarters level. Only in these circumstances may ICE consider pre-release information or conduct when seeking to re-detain a Class Member under this Section.[13]

After the settlement agreement's three-year period limiting ICE's re-detention of class members, "ICE's re-arrest and re-detention practices for [c]lass [m]embers will occur pursuant to generally applicable law and policy."[14]

---

[13] *Id.* at 13–15 (§ III.B).

[14] *Id.* at 16 (§ III.G).

ORDER – No. 20-cv-02731-LB      4

The agreement also has dispute-resolution procedures for when the plaintiffs dispute the re-detention of a class member:

> Counsel for ICE agree to meet and confer with Class Counsel within three business days in response to a claim by Plaintiffs that ICE is in material breach of Section III of the Settlement Agreement (pertaining to redetention of released Class Members). At or before the meet and confer, ICE agrees to provide the basis for the re-detention of the Class Member. If the Parties are unable to resolve the dispute within two business days after Plaintiffs raise a claim, the parties agree that they will present the dispute to the assigned magistrate for resolution. Absent a request for more time from the re-detained Class Member, Class Counsel shall provide Counsel for ICE with a brief of not longer than five pages, and any supporting evidence, within five business days. Counsel for ICE shall have three business days to file a response. Counsel for Plaintiffs shall file a reply, if any, within two business days. The Parties shall then jointly file a request for expedited resolution with the assigned magistrate. . . .[15]

The settlement agreement provides a standard of review for the assigned magistrate judge to apply in resolving disputes:

> In all instances where the magistrate judge is tasked with determining whether a material breach has occurred, the inquiry is an objective one. By way of example, whether a Class Member poses a risk to public safety or is a flight risk, whether a Class Member has absconded, or whether a Class Member has been medically isolated, is an objective question that will be determined in the first instance by the magistrate judge and no deference will be given to a [p]arty's best efforts regarding the alleged breach at issue.[16]

All former detainees released on bail by order in this case are subject to conditions of release. The court may impose additional conditions of release.[17]

## 2. The Disputed Re-Detention

Juan Bravo Zambrano is a Mexican citizen who has been a lawful permanent resident of the United States since 2010.[18] In April 2019, he was convicted of conspiracy to distribute

---

[15] *Id.* at 18–19 (§ V.B.2).

[16] *Id.* at 19 (§ V.E.3).

[17] *Id.* at 14–15 (§ III.F); Third Revised Standard Conditions of Release – ECF No. 543.

[18] Bravo Decl. – ECF No. 1266-3 at 3 (¶ 1).

ORDER – No. 20-cv-02731-LB                    5

methamphetamine, cocaine, heroin, and fentanyl. He was released from his term of imprisonment in October of that year, at which point he was detained by ICE at the Mesa Verde facility.[19]

Because of his criminal conviction, removal proceedings were initiated against Mr. Bravo in October 2019.[20] On May 5, 2020, he was ordered removed from the United States.[21] He appealed that order to the DOJ's Board of Immigration Appeals.[22] In March 2023, the Board of Immigration Appeals remanded the case for reconsideration of Mr. Bravo's claim to protection under the Convention Against Torture.[23]

In late May 2020, while detained at Mesa Verde, Mr. Bravo was granted bail under the first temporary restraining order in this case.[24] At that point, he was still subject to a term of supervised release for his criminal conviction.[25] Also, under the standard conditions of release for non-detained class members in this case, a GPS tracking ankle bracelet was placed on Mr. Bravo when he was released from Mesa Verde.[26]

In April 2021, Mr. Bravo was arrested for alleged harassment and death threats against his wife and sister-in-law.[27] The charges were later dismissed.[28] Before the dismissal, Mr. Bravo was detained from April until July 2021.[29] Later, in January 2022, the U.S. Probation Department

---

[19] Pet. for Warrant, Ex. A to Bernwanger Decl. – ECF No. 1266-2 at 5; Schaefer Decl. – ECF No. 1266-7 at 3 (¶ 6).

[20] Schaefer Decl. – ECF No. 1266-7 at 2–3 (¶¶ 5, 7).

[21] *Id.* at 3 (¶ 9).

[22] *Id.* at 4 (¶ 13).

[23] Notice – ECF No. 1275 at 3.

[24] Bail Order – ECF No. 272.

[25] Pet. for Warrant, Ex. A to Bernwanger Decl. – ECF No. 1266-2 at 5.

[26] Third Revised Standard Conditions of Release – ECF No. 543 at 1 (¶ 4); Schaefer Decl. – ECF No. 1266-7 at 4 (¶ 14).

[27] Pet. for Warrant, *United States v. Bravo Zambrano*, No. 4:15-cr-6049-EFS-19 (E.D. Wash.) – ECF No. 1436. The court can judicially notice public-record court documents. *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001).

[28] Order, *id.* – ECF No. 1458.

[29] Schaefer Decl. – ECF No. 1266-7 at 4–5 (¶¶ 15–20).

submitted petitions for Mr. Bravo's arrest due to violations of his conditions of release during the period from October 2021 to January 2022.[30]

He did not report to his probation officer as required three times. After a November 19, 2021, telephone call with the probation officer, he missed appointments on November 22 and 29 and did not answer the officer's calls; he and his mother said he was having car trouble. He also missed a January 13, 2022 appointment after not returning the officer's calls; his mother said that the whole family had tested positive for COVID-19 two weeks prior, and on January 14, Mr. Bravo called the officer and said the same. Then, he missed a January 20 appointment without contacting the officer.[31]

He also tested positive for methamphetamine three times.[32] On four other occasions, he did not report for drug testing. On one of those occasions, he called his probation officers two days later; several times, the officer made contact with Mr. Bravo's mother, who variously said that he was unemployed and sleeping at the time and that the family had recently tested positive for COVID-19.[33]

Also during the period from October 2021 to January 2022, Mr. Bravo received a criminal citation for failing to timely transfer a vehicle title, did not report that citation to his probation officer, and communicated with a convicted felon without permission.[34]

After these probation violations, Mr. Bravo reported to his probation office to be taken into custody on January 25, 2022.[35] He was sentenced for the probation violations to three months in

---

[30] Pets. for Warrant, Exs. A–B to Bernwanger Decl. – ECF No. 1266-2 at 4–13; Schaefer Decl. – ECF No. 1266-7 at 5–6 (¶¶ 21, 23).

[31] Pet. for Warrant, Ex. A to *id.* – ECF No. 1266-2 at 6–7 (¶ 1).

[32] *Id.* at 7–8 (¶ 2).

[33] *Id.* at 8–9 (¶ 3).

[34] Pet. for Warrant, Ex. B to Bernwanger Decl. – ECF No. 1266-2 at 12–13 (¶¶ 4–6).

[35] Schaefer Decl. – ECF No. 1266-7 at 5 (¶ 22).

prison followed by a period of supervised release.[36] His conditions of release did not include location monitoring.[37]

After being released, Mr. Bravo violated his conditions of release from April 18 to 22, 2022. He did not report for drug testing twice, did not complete a substance abuse evaluation, and did not report to his probation officer as required twice. On April 20 and 22, he and his probation officer had phone calls.[38] He was sentenced for these probation violations, this time for seventh months followed by supervised release.[39] His conditions of release again did not include location monitoring.[40]

On December 1, 2022, Mr. Bravo was released from criminal custody and detained by ICE at the Northwest ICE Processing Center in Tacoma, Washington, where he remains.[41] He was detained because ICE deemed him to be a flight risk.[42]

Mr. Bravo declares that his only home is in Benton City, Washington.[43] "Most" of his family lives there, including his parents, his children, and several of his siblings.[44] He declares that if he were to be released, he would return to Benton City to live with his family.[45] His mother declares that he has lived near his parents ever since he came to the United States.[46] From his May 2020 release from Mesa Verde until his January 2022 arrest warrant, he lived at his mother's house.[47]

---

[36] Revocation of Supervised Release Hr'g & Judgment, Exs. C–D to id. – ECF No. 1266-2 at 14–22.

[37] Judgment, Ex. D to id. – ECF No. 1266-2 at 20–22.

[38] Pet. for Warrant, Ex. E to id. – ECF No. 1266-2 at 12–13 (¶¶ 4–6); Schaefer Decl. – ECF No. 1266-7 at 6–7 (¶ 22).

[39] Revocation of Supervised Release Hr'g & Judgment, Exs. F–G to Bernwanger Decl. – ECF No. 1266-2 at 27–35.

[40] Judgment, Ex. G to id. – ECF No. 1266-2 at 33–35.

[41] Schaefer Decl. – ECF No. 1266-7 at 7 (¶ 32); Bravo Decl. – ECF No. 1266-3 at 3 (¶ 1).

[42] Schaefer Decl. – ECF No. 1266-7 at 7–8 (¶ 32).

[43] Bravo Decl. – ECF No. 1266-3 at 3 (¶ 6).

[44] Id. (¶ 5).

[45] Id. (¶ 7).

[46] Zambrano Decl. – ECF No. 1266-4 at 3 (¶¶ 1–3).

[47] Id. (¶ 5).

He was an "important help" there because his parents have health problems, and he would take them to medical appointments and help with physical tasks around the house.[48]

Mr. Bravo also declares that he has "never missed a court hearing." His family has always helped him get to court when needed.[49] They are "very supportive" of him and will "help [him] comply with all . . . court and ICE rules."[50] His "entire family is willing to provide [their] contact information to the officers in charge of his supervision, communicate with them regularly, and share their messages with [him]."[51]

## ANALYSIS

The parties dispute whether Mr. Bravo, as a noncitizen with a criminal conviction, past conditions-of-release violations, and pending removal proceedings, is a flight risk. The plaintiffs argue generally that the conditions-of-release violations do not show a risk of flight because Mr. Bravo has "been fully compliant with all conditions of release tailored toward flight risk."[52] The defendants counter that the violations show an unwillingness to comply with future instructions.[53] The defendants also argue that Mr. Bravo waived his challenge by not timely providing his opening brief to them.[54]

First, Mr. Bravo did not waive his challenge.

After Mr. Bravo's December 1, 2022 re-detention, the plaintiffs raised his challenge with the defendants on December 6. The parties subsequently met and conferred, which involved a meeting on December 8 and continued email exchanges regarding a potential agreement until December 14. The meet-and-confer process did not resolve the dispute, and the plaintiffs provided their

---

[48] *Id.* at 3–4 (¶¶ 7–15).

[49] Bravo Decl. – ECF No. 1266-3 at 3 (¶ 4).

[50] *Id.* (¶ 7); Zambrano Decl. – ECF No. 1266-4 at 4 (¶¶ 16–18).

[51] Zambrano Decl. – ECF No. 1266-4 at 3 (¶ 6).

[52] Pls.' Challenge to Re-Detention – ECF No. 1266-1; Reply – ECF No. 1266-8.

[53] Opp'n – ECF No. 1266-5.

[54] *Id.* at 3–4.

opening briefing to the defendants on December 19 (nine business days after raising the challenge).[55]

The settlement agreement's provision on the meet-and-confer and subsequent briefing-exchange processes has a fair amount of ambiguity. The plaintiffs' opening briefing is due to ICE counsel "[w]ithin five business days" of some preceding event, but it is unclear which one. The parties have until three business days after the plaintiffs raise a challenge to meet and confer, but they are purportedly committed to submit the dispute to the assigned judge if they haven't resolved the dispute within two days of the plaintiffs' raising the challenge.[56] In this instance, the actual meet-and-confer process lasted until the defendants' email on December 14 — six business days after the plaintiffs raised the challenge. That email was sent three business days after the plaintiffs' email on December 9 — the last of the three business days provided for in the settlement agreement for the meet-and-confer process.

Under the circumstances, the court construes the due date for the plaintiffs' opening brief as five business days after the conclusion of the actual meet-and-confer process. This construction gives meaningful effect to the settlement agreement's meet-and-confer requirement. *See Nat. Res. Def. Council, Inc. v. Cnty. of Los Angeles*, 725 F.3d 1194, 1206 (9th Cir. 2013) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms [in a contract] is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.") (quoting Restatement (Second) of Contracts § 203(a)); *Dairy v. Harry Shelton Livestock, LLC*, No. 18-CV-06357-RMI, 2020 WL 6269541, at *1 (N.D. Cal. Oct. 23, 2020) ("[T]he purpose of a meet and confer requirement is for the parties to engage in a meaningful dialogue about their respective positions on disputed issues to see whether they can resolve (or at least refine) the disputes without court intervention, saving time and money for the litigants as well as the court system."). Here, the December 19 opening brief was within five business days of the December 14 completion of the meet-and-confer process. Thus, the opening brief was timely.

---

[55] Emails, Ex. A to Zack Decl. – ECF No. 1266-6 at 3–12.

[56] Settlement Agreement – ECF No. 1205-1 at 18–19 (§ V.B.2).

Second, Mr. Bravo is not a flight risk.

In the immigration context, flight risk refers to whether a detainee will appear for immigration-court hearings or removal. *Demore v. Kim*, 538 U.S. 510, 515, 519–21 (2003). The settlement agreement sets forth the exclusive conditions under which ICE may re-detain class members during the agreement's three-year period, after which ICE's re-detentions will again "occur pursuant to generally applicable law and policy."[57] As relevant here, those conditions specify that if the nature of a class member's conditions-of-release violation shows a risk of flight, ICE may re-detain that class member.[58]

Case law also sets forth factors relevant to the issue of whether an immigrant is a flight risk (or a danger to the community). Given the settlement agreement's specification of the relevant criteria, the factors at least illuminate the inquiry about flight risk. The factors are:

> (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States.

*Singh v. Holder*, 638 F.3d 1196, 1206 n.5 (9th Cir. 2011) (quoting *In re Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006)), *abrogated on other grounds as recognized in Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022). The burden is on the noncitizen detainee, at least at an initial bond hearing before an immigration court. *Rodriguez Diaz*, 53 F.4th at 1210–12.

Despite his conditions-of-release violations, Mr. Bravo remained at or near his family home in the Eastern District of Washington while he was on release. From May 2020 until at least April 2021, he had an ankle monitor, and there is no indication that he ever left the Eastern District of Washington without permission. On most of the occasions that he failed to report for a probation-officer appointment or drug test, the probation officer was at least able to get in touch with his

---

[57] *Id.* at 13 (§ III.A–B), 16 (§ III.G).
[58] *Id.* at 13–14 (§ III.B.1, .5).

family (who remain willing to be in close contact with the officers responsible for his supervision) and thereby learn that he had not absconded. When there was a warrant for his arrest in January 2022 after he had been on release for the better part of two years, he voluntarily reported to his probation officer to be taken into custody (despite a pending removal order that was on appeal). There is no dispute that from May 2020 to January 2022 (the period during which Mr. Bravo was on release, except for April 2021 until July 2021), he did not miss hearings for his removal proceedings. He is also a lawful permanent resident and has lived with his family since 2010 in the Eastern District of Washington, where he has two children.

In sum, Mr. Bravo is not a flight risk. The court grants his request for release. *See, e.g.*, *United States v. Spurlock*, No. 322CR00006GFVTMAS1, 2022 WL 1624894, at *3 (E.D. Ky. May 23, 2022) (in criminal pretrial context, flight risk present where the evidence "demonstrate[d] substantial geographic mobility and widespread criminal activity," including a conviction for fleeing police); *In re Martinez*, No. : AXX XX0 636 - SAN, 2008 WL 2079391, at *1–2 (B.I.A. Apr. 21, 2008) (no risk of flight where "[t]he respondent would live with his parents in their large family home" and "[t]here have been no failures to appear" for immigration hearings). The court clarifies that a GPS ankle monitor is an additional condition of his release, to the extent not already required by the settlement agreement.[59]

## CONCLUSION

The court orders that Mr. Bravo be released. This resolves ECF No. 1266.

**IT IS SO ORDERED.**

Dated: March 18, 2023

LAUREL BEELER
United States Magistrate Judge

---

[59] Settlement Agreement – ECF No. 1205-1 at 14–15 (§ III.F); Third Revised Standard Conditions of Release – ECF No. 543 at 1 (¶ 4).