WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
EMILOU H. MACLEAN (SBN 319071)
emaclean@aclunc.org
BREE BERNWANGER (SBN 331731)
bernwanger@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437
Attorneys for Petitioners-Plaintiffs
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
GENNA ELLIS BEIER (SBN 300505)
genna.beier@sfgov.org
JENNIFER FRIEDMAN (SBN 314270)
jennifer.friedman@sfgov.org
FRANCISCO UGARTE (SBN 241710)
francisco.ugarte@sfgov.org
KELLY ENGEL WELLS (SBN 338648)
kelly.wells@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: (415) 553-9319
Facsimile: (415) 553-9810

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, BRENDA RUBI RUIZ TOVAR, LAWRENCE KURIA MWAURA, LUCIANO GONZALO MENDOZA JERONIMO, CORAIMA YARITZA SANCHEZ NUÑEZ, JAVIER ALFARO, DUNG TUAN DANG, JUAN JOSE ERAZO HERRERA, RAJNISH RAJNISH, and WILLIAN MATIAS RAUDA,<br><br>Petitioners-Plaintiffs,<br><br>v.<br><br>DAVID JENNINGS, Acting Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; GEO GROUP, INC.; MICHAEL KNIGHT, Acting Warden of Mesa Verde Detention Facility,<br><br>Respondents-Defendants. | CASE NO. 3:20-CV-02731 LB<br><br>**NOTICE OF MOTION AND MOTION FOR LIMITED DISCOVERY CONCERNING IMPLEMENTATION OF THE SETTLEMENT AGREEMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>JUDGE: HON. LAUREL BEELER<br>DATE: SEPTEMBER 21, 2023<br>TIME: 9:30 A.M. |

JORDAN WELLS (SBN 326491)
jwells@lccrsf.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS OF THE
SAN FRANCISCO BAY AREA
131 Steuart St #400
San Francisco, CA 94105
Telephone: (415) 814-7631

JUDAH LAKIN (SBN 307740)
judah@lakinwille.com
AMALIA WILLE (SBN 293342)
amalia@lakinwille.com
LAKIN & WILLE LLP
1939 Harrison Street, Suite 420
Oakland, CA 94612
Telephone: (510) 379-9216
Facsimile: (510) 379-9219

STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

MARTIN S. SCHENKER (SBN 109828)
mschenker@cooley.com
JULIE M. VEROFF
jveroff@cooley.com (SBN 310161) COOLEY
LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIMOTHY W. COOK* (Mass. BBO# 688688)
tcook@cooley.com
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

**TABLE OF CONTENTS**

Page(s)

I.   INTRODUCTION ............................................................................................................. 2

II.  FACTUAL AND PROCEDURAL BACKGROUND............................................................ 3

    A.   Applicable Settlement Provisions ............................................................... 3

    B.   Factual Background ...................................................................................... 4

    C.   Attempts to Resolve this Dispute ................................................................ 8

III. ARGUMENT ..................................................................................................................... 8

    A.   This Dispute Concerns Compliance with Basic Precautions Against the Spread of COVID-19, a Core Requirement of the Settlement Agreement .................. 8

    B.   Discovery is Appropriate When a Party Raises Significant Questions Regarding Noncompliance and the Requested Discovery Could Provide Information Potentially Favorable to the Claim of Noncompliance ............................ 9

    C.   Limited Discovery Concerning Defendants' Actions is Warranted to Demonstrate that the Transfers Were Not Medically Necessary and Instead Served Defendants' Ulterior Motive ........................................................... 9

IV.  CONCLUSION ................................................................................................................ 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*California Dep't of Soc. Servs. v. Leavitt,*
   523 F.3d 1025 (9th Cir. 2008) ................................................................................ *passim*

*Kelly v. Wengler,*
   979 F.Supp.2d 1237 (D. Idaho 2013) ............................................................................3, 9, 11

*Mendez, et al. v. U.S. Immigration & Customs Enforcement, et al.,*
   3:23-cv-00829-TLT (N.D. Cal., filed Feb. 23, 2023) ..................................................................3

**NOTICE OF MOTION AND MOTION**

Please take notice that on September 21, 2023, or as soon thereafter as the Court may hear the matter, Plaintiffs, through undersigned Class Counsel and on behalf of the Settlement Class, will move the Court for an order allowing (1) limited discovery concerning Plaintiffs' allegation that Defendants violated the Settlement Agreement by transferring class members without an adequate justification and (2) an extension of the time to seek further relief from the Court after discovery has concluded. In the alternative, Plaintiffs will move the Court for a determination that Defendants' transfer of the class members violated the Settlement Agreement and an order preventing Defendants from transferring class members except when necessary for medical care.

While Plaintiffs have set this motion for hearing on the Court's civil motions calendar, by presentation of this dispute under the terms of the Settlement Agreement, the parties are seeking the Court's "expeditious review." ECF No. 1205-1, Section V.E. The parties may seek leave to file reply briefs under the Agreement, but the parties have no further briefing as of right. *Id.*, Section V.E.2.

Plaintiffs' motion is supported by the memorandum of points and authorities included herein, contemporaneously filed declarations and exhibits thereto, any reply brief that Plaintiffs might file, and any other evidence or other materials in the record.

## MEMORANDUM OF POINTS AND AUTHORITIES

I. **INTRODUCTION**

It is Plaintiffs' position that on March 7, 2023, Defendants violated the Settlement Agreement (the "Agreement") by unnecessarily and violently transferring four class members (the "Transferred Class Members") from the Mesa Verde Immigrant Processing Center ("MVIPC") to another detention facility across the country. At the time, ICE's COVID-19 protocols, which are incorporated into the Agreement, prohibited transfers except in specified circumstances, including when "necessary" for "clinical care." (The current protocols, last updated in July, limit transfers whenever a facility is housing individuals with COVID-19 as a cohort.) Defendants take the position that sending the Transferred Class Members to the other facility was necessary for "a higher level of medical care" that was supposedly available there. But that higher level of medical care was in fact available from local medical providers near MVIPC and was not provided in any event at the other facility, rendering the cross-county transfers *unnecessary*. Moreover, Defendants effected the transfers in an apparent attempt to stop Transferred Class Members from continuing a hunger strike designed to protest mistreatment at MVIPC, rather than to ensure they received better medical care.

Through this motion, Plaintiffs now seek limited discovery to obtain evidence that will be highly relevant to the resolution of this dispute. Specifically, Plaintiffs seek leave to: (1) serve requests for production seeking communications regarding the transfers and any facility video recordings of the transfers, (2) serve interrogatories concerning steps Defendants took to determine whether the transfers were medically necessary and any medical precautions – including precautions pertaining to COVID-19 – that Defendants took before, during, and after transfers, and (3) take depositions of three witnesses (Defendants' personnel) who have information concerning the reason(s) for the transfers. In the alternative, Plaintiffs request that the Court find, on the existing record, that Defendants violated the Agreement.

A district court has authority to order post-judgment discovery prior to adjudicating a compliance dispute, and "the kind and amount of evidence of noncompliance required to justify discovery is, necessarily, considerably less than that needed to show actual noncompliance." *California Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1034 (9th Cir. 2008) (reversing and

1  remanding for consideration of discovery request where information presented raised questions of
2  noncompliance with a judgment); *see, e.g.*, *Kelly v. Wengler*, 979 F.Supp.2d 1237, 1241 (D. Idaho
3  2013) (citing *Leavitt* and granting plaintiff class's discovery request in conjunction with motion to
4  enforce compliance with settlement agreement). Given the evidence Plaintiffs have assembled without
5  the benefit of any discovery that the Transferred Class Members could have been treated for
6  malnutrition locally, that Defendants employed violence to transfer them, and that Defendant U.S.
7  Immigration and Customs Enforcement ("ICE") offered substandard care to the Transferred Class
8  Members after transfer, including a failure to adhere to basic nutritional protocols, there are at the very
9  least significant questions concerning Defendants' compliance. The discovery that Plaintiffs seek
10 "could [] provide[] potentially favorable information," *Leavitt*, 523 F.3d at 1034, concerning the
11 necessity of the transfers, including evidence of whether Defendants evaluated local treatment options
12 and whether the transfers were for the ulterior purpose of forcing the Transferred Class Members to
13 end their hunger strike rather than for providing them a higher standard of medical care.[1]

14 After completing the requested discovery, if the parties still are unable to resolve this dispute,
15 Plaintiffs request the opportunity to then file a supplemental brief, with supporting evidence,
16 describing information obtained through that discovery and its relevance to this dispute.

17 **II.  FACTUAL AND PROCEDURAL BACKGROUND**

18     **A.  Applicable Settlement Provisions**

19 This dispute concerns the Agreement's requirement that Defendants "[o]perate the Facilities
20 consistent with applicable CDC Guidance, applicable nationwide orders and injunctions, and the PRR

---

[1] Plaintiffs anticipate that Defendants will object to this request in part because it concerns events that were also at issue in another case, *Mendez, et al. v. U.S. Immigration & Customs Enforcement, et al.*, 3:23-cv-00829-TLT (N.D. Cal., filed Feb. 23, 2023). In *Mendez*, a putative class of hunger strikers at MVIPC and another ICE detention center (which is not subject to the Agreement) alleged retaliation by ICE and GEO Group ("GEO") in response to their hunger strike. The court in *Mendez* denied the plaintiffs a temporary restraining order ("TRO") that would have covered, among other issues, the treatment of the Transferred Class Members. However, the denial of TRO relief was initially based on the court's understanding of a service defect, *see id.*, ECF No. 27 (order denying application for TRO), and was later based on procedural and jurisdictional issues, *id.*, ECF No. 44 (order denying second application for TRO). The court in *Mendez* did not decide any of the issues presented in this motion and the plaintiffs in *Mendez* did not conduct discovery before voluntarily dismissing their lawsuit on April 28, 2023, *see Mendez*, ECF No. 53 (notice of voluntary dismissal). Nothing about *Mendez* precludes the relief Plaintiffs seek here.

[Pandemic Response Requirements] (as updated)." ECF No. 1205-1, Section II.A.1. The operative version of the PRR at the time of the disputed transfers provided: "Transfers and transport of ICE detainees *are discontinued unless necessary for* medical evaluation, medical isolation/quarantine, *clinical care*, extenuating security concerns, release or removal, or to prevent overcrowding." ERO Covid-19 PRR (Version 10.0, Nov. 1, 2022) at 39 (emphasis added), attached as Exhibit A to Riordan Declaration.

ICE subsequently issued revised COVID guidance under the title "ERO Post Pandemic Emergency COVID-19 Guidelines and Protocols."[2] The current version of the revised PRR eliminates the broader limitations on transfers that were contained in the earlier version of the PRR, *but maintains a limitation on transfers relevant to this dispute*. Specifically, when a "facility is housing individuals with confirmed COVID-19 as a cohort[,]" ICE is instructed to, "[i]f possible, limit medical transfers to another facility or within the facility to those *necessary for care*." Riordan Dec., Exh. B at 14-15. Since the Agreement became effective in June 2022, Mesa Verde Immigrant Detention Center ("MVIPC") has housed individuals with confirmed COVID-19 as a cohort during two outbreaks at MVIPC, one that occurred in May 2023. Riordan Dec. ¶ 4. The Agreement accordingly continues to prohibit the kinds of transfers at issue in this dispute, albeit only during periods where MVIPC is housing individuals with confirmed COVID-19 as a cohort.

### B. Factual Background

Early on the morning of March 7, 2023, ICE and GEO violently removed class members—Pedro Figueroa-Padilla, Jose Ruben Hernandez, Raymundo Noe Dominguez Vidal, and Roberto Carlos Franco Guardado—from their dorm, put them on a plane, and transferred them to another ICE facility, the El Paso Service Processing Center ("EPSPC"). Hernandez Gomez Dec. ¶ 1, 3-11. ICE's ostensible justification for the transfers was to provide "a higher level of medical care" to the Transferred Class Members, Riordan Dec. ¶ 7 (Exh. C), who had lost significant weight during a

---

[2] That revised guidance is also treated as the PRR for settlement purposes. *See* ERO Post Pandemic Emergency COVID-19 Guidelines and Protocols Version 2.0 (July 13, 2023) at 5 (Exhibit B to Riordan Declaration).

hunger strike calling attention to mistreatment and inhumane conditions of confinement.[3] Hernandez Gomez Dec. ¶¶ 2, 13. However, as described in detail below, the circumstances of the transfer and the sub-standard care provided at EPSPC were inconsistent with a transfer for purposes of heightened medical care.

At the outset, the manner in which ICE and GEO executed the transfer imperiled the health of the Transferred Class Members. ICE and GEO removed the Transferred Class Members—who were already in a weakened state after 20 days of fasting—from their dorms by using violent, militarized tactics. Hernandez Gomez Dec. ¶ 3-4. Mr. Dominguez lost consciousness while the group was still at MVIPC, but instead of taking him to a hospital, ICE and GEO continued his transfer. *Id*. at ¶ 5. Others of the Transferred Class Members were also injured from being thrown to the ground and dragged by ICE and GEO staff. *Id*. ¶ 6. ICE and GEO did not provide care for these injuries. *Id*. To the contrary, staff from MVIPC, including facility leadership, jeeringly cheered the transfer as it was occurring. *Id*. at ¶ 8. ICE and GEO did not even test the group for COVID-19 prior to their transfer. *Id*. at ¶ 6. At the time, the PRR required COVID-19 testing prior to intake at any facility. *See* Riordan Dec., Exh. A at 16.

ICE officers kept the Transferred Class Members shackled for the entirety of the journey to El Paso. Hernandez Gomez Dec. ¶ 9. In their weakened state, ICE officers drove them several hours to an airstrip. They felt faint and dizzy after being loaded on the plane and asked to go to a hospital. Hernandez Gomez Dec. ¶ 10. But the ICE officers refused. *Id*. Once in El Paso, an ICE officer drove so fast over bumps that they hit their heads on the roof of the transport van. *Id*. at ¶ 11. The ICE officer who escorted Mr. Hernandez Gomez through EPSPC painfully twisted his left hand. *Id*. at ¶ 12.

At EPSPC, ICE failed to follow multiple basic protocols for providing medical care to hunger strikers and for treating malnourishment. As Dr. Mary Cheffers, an emergency medicine practitioner and professor at USC's Keck School of Medicine, explains in a declaration accompanying this motion, there is professional consensus on the following aspects of medical care for hunger strikers and others

---

[3] Dozens of detained individuals at the Golden State Annex, a nearby immigration detention center also operated by GEO, also participated in the hunger strike. Golden State Annex is not subject to the Agreement in this case.

who are refusing to eat:

- *A general prohibition against force feeding*: "All guidelines regarding nutritional support initiated after starvation require consent of the patient. Consent requires a discussion of alternatives, education regarding the condition, and full access to appropriate information. Only in grave instances where the person is not competent (i.e. has advanced dementia, meets severe psychosis as determined by psychiatrist, is comatose without advance directives, etc.) is a health professional allowed to refeed malnourished persons without their express consent." Cheffers Dec. ¶ 8.

- Special nutritional protocols to avoid refeeding syndrome: "Refeeding protocols should take great care to provide micronutrients and minerals, and should avoid carbohydrate-heavy meals without balanced macronutrients. Without such care, malnourished individuals are at risk of refeeding syndrome. Refeeding syndrome is the name given to a spectrum of harmful metabolic and biochemical responses, to refeeding." Refeeding syndrome can result in (1) cardiac arrhythmias and sudden death (2) strokes, dementia, psychosis, and (3) organ failure. Id. at ¶ 11.

- Caloric restriction upon refeeding: "[N]utrition support should be introduced at a very restricted proportion of daily nutritional requirements for the first 2 days, accompanied by daily labs and preceded by vitamin supplementation." *Id*. at ¶ 10.
    - "The recommended program for refeeding for any person who has had little to no oral intake for over 15 days includes introduction with 5 kcal/kg/day for the first 2-4 days. … Five kcal/kg/day in an 80kg person is 400 calories total, which may be increased slowly after 4 days while monitoring symptoms and with daily laboratory evaluation." *Id*. at ¶ 14.
    - "Prior to starting caloric intake, and subsequently during the first 10 days of refeeding, 200-300 mg of thiamine along with a vitamin B complex 2-3 times a day should be given, as well as daily complete multivitamins. Use of these supplements does not require any knowledge of the patient's laboratory-measured electrolytes." *Id*. at ¶ 15.

- *Involvement of a nutritionist in the patient's care*: "[A]ny hunger striker whose last meal was 10 days or more before refeeding is considered high risk for refeeding syndrome. If [the patient's] consent is obtained to provide nutritional support … malnourished persons should be cared for by expert professionals who have knowledge of nutritional requirements and nutritional support, and at the very least should include a certified nutritionist." *Id*. at ¶ 13.

- *Hospitalization during refeeding for those at risk of refeeding syndrome*: "It is also considered a best practice to hospitalize individuals at risk for refeeding *syndrome* given the difficulty performing the necessary caloric restriction, macro and micronutrient provision, and laboratory surveillance." *Id*. at ¶ 13.

As Dr. Cheffers notes, "failure to follow" these "guidelines exposes the patient to the risk of significant morbidity and even mortality," with the possibilities including cardiac arrhythmias, as well as "permanent neurological damage[.]" *Id*. at ¶ 18.

As reflected in the experience of the Transferred Class Members and Dr. Cheffers' review of

their medical records,[4] ICE did not provide care at EPSPC consistent with these basic guidelines, risking significant harm to all of the Transferred Class Members and actually causing such harm to Mr. Hernandez Gomez. ICE personnel pressured the Transferred Class Members to end their hunger strike on threat of force feeding. Hernandez Gomez Dec. ¶ 12, 16. One ICE doctor described in detail to Mr. Hernandez Gomez the process of force feeding, including that they would put a hose down his esophagus and pour liquid down my throat. *Id.* At the same time, Mr. Hernandez Gomez requested electrolytes and vitamins. Hernandez Gomez Dec. ¶ 15. But EPSPC medical staff refused, and told him that the electrolytes and vitamins that he was transferred with from MVIPC would be thrown away. *Id*.

Due to the pressure ICE put on the Transferred Class Members to eat, Hernandez Gomez Dec. ¶¶ 13-16, on March 9 they agreed to resume eating, Hernandez Gomez Dec. ¶ 17. However, "there were no nutritionist notes within the medical records, indicating that no specialist in nutrition was consulted regarding the re-initiation of caloric intake." Cheffers Dec. ¶ 30. The first meal that ICE provided the Transferred Class Members to eat was *two cold burgers, fries, and juice*.[5] Cheffers Dec. ¶ 28; Hernandez Gomez Dec. ¶ 17. As Dr. Cheffers notes, ICE's refeeding plan "grossly exceed[ed] the recommended 5 kcal/kg/day for initiation of caloric intake and amounts to gross negligence." Cheffers Dec. ¶ 30. Given the amount of weight the Transferred Hunger Strikers had lost and the length of time they had gone without eating, they met the criteria for precautionary hospitalization during refeeding, yet ICE did not hospitalize them. Cheffers Dec. ¶¶ 36-37, 40.

ICE failed to provide other important care to the Transferred Hunger Strikers after they began to eat. ICE discontinued food intake and monitoring, despite the primary protection against refeeding syndrome being "rooted in detailed monitoring of the quantity and caloric content of food and supplements." Cheffers Dec. ¶ 32. This leads Dr. Cheffers to conclude "that the primary healthcare providers [at EPSPC] were either grossly unaware of the possibility of refeeding syndrome or deliberately negligent of its pathology and sequelae." *Id*. Similarly, despite the possibility of "sudden

---

[4] Dr. Cheffers did not review the medical records of Mr. Padilla, but undersigned counsel proffer that his records demonstrated substantially similar treatment.
[5] Even before that meal, and while at EPSPC, ICE had provided Mr. Franco with a Boost supplemental beverage that was far too high in carbohydrates and calories. Cheffers Dec. ¶ 31.

cardiac death, no continuous cardiac monitoring was attempted," even for Mr. Hernandez Gomez after he began complaining of heart palpitations. *Id*. at ¶ 34. The Transferred Hunger Strikers were also "given inadequate vitamin and mineral supplementation," putting them at further risk of refeeding syndrome. *Id*. at ¶ 42.

On March 14, ICE returned Transferred Class Members to MVIPC. However, ICE's botched refeeding of Mr. Hernandez resulted in his subsequent, repeated hospitalizations based on acute neurological symptoms. Hernandez Gomez Dec. ¶¶ 18-20.

In Dr. Cheffers's opinion, all of the care provided at EPSPC could have been provided at local hospitals near MVIPC and likely would have been provided at a higher level there. Cheffers Dec. ¶ 35. Dr. Cheffers also believes that Mr. Hernandez Gomez, Mr. Dominguez, and Mr. Franco should have been hospitalized locally instead of being transferred to El Paso. Cheffers Dec. ¶ 36.

### C. Attempts to Resolve this Dispute

On March 7, Plaintiffs raised their concern about the transfers as a potential breach of the Agreement with Defendants and requested information about the justification for those transfers. Riordan Dec. ¶ 5. On March 8, after further investigation, Plaintiffs asserted to Defendants that the transfers constituted a material breach of the Agreement. Riordan Dec. ¶ 6. On March 14, Defendants stated their position that the transfers did not constitute a material breach of the agreement because they were made "for a higher level of medical care." Riordan Dec. ¶ 7 (Exh. C). Despite subsequent email communication, in which the parties further detailed their respective positions, the parties have been unable to resolve this dispute.

On May 31, 2023, the Ninth Circuit's Mediation Office oversaw a live mediation of this dispute as well as the dispute concerning class members with vulnerabilities that is the subject of a concurrently filed enforcement motion. Subsequent mediation communications between the parties related to these disputes have not been successful. The disputes remain unresolved, and the parties now present them to the Court pursuant to the dispute resolution provisions of the Agreement. ECF No. 1205-1, Section V.E.

### III. ARGUMENT

**A.     This Dispute Concerns Compliance with Basic Precautions Against the Spread of**

**COVID-19, a Core Requirement of the Settlement Agreement**

The reason for the Agreement, and the underlying litigation that led to it, is to protect class members against the spread of COVID-19. While the governing protocols required by the Agreement have evolved with the pandemic, they continue to impose a necessary-for-care limitation on transfers whenever MVIPC is housing individuals with confirmed COVID-19 cases as a cohort. This is far from a hypothetical possibility, as MVIPC has twice had COVID-19 outbreaks in the past year requiring class members to be housed as a cohort. Riordan Dec. ¶ 4. If Defendants abused their transfer authority in March in violation of the Agreement, absent court enforcement there is nothing to stop them from violating the Agreement again by misusing transfers in ways that unnecessarily risk new outbreaks of COVID-19. Resolving this dispute is important to ensure Defendants' compliance with the necessary-for-care limitation imposed by the PRR and incorporated into the Agreement.

**B.     Discovery is Appropriate When a Party Raises Significant Questions Regarding Noncompliance and the Requested Discovery Could Provide Information Potentially Favorable to the Claim of Noncompliance**

"[T]here are two reasons that this Court has the power to order discovery[.]" *Kelly*, 979 F.Supp.2d at 1241. First, "by the terms of the settlement" and the Court's order assuming jurisdiction over settlement-related disputes, ECF No. 1258, 1273, the Court "has the authority of a District Court Judge to resolve disputes." *Kelly*, 979 F.Supp.2d at 1241. That authority "reasonably include[s] discovery where necessary … to resolve whether the settlement has been breached." *Id*. Second, where, as in this case "it is clear that compliance with the Settlement Agreement is part of the Order for Dismissal," the Court can "order discovery" on contested issues of breach. *Id.* (citing *Leavitt*, 523 F.3d at 1033 (9th Cir. 2008)).

The post-judgment discovery that Plaintiffs request is warranted if "the discovery request could [] provide[] potentially favorable information." *Leavitt*, 523 F.3d at 1034 (internal quotation marks omitted). "[T]he kind and amount of evidence of noncompliance required to justify discovery" in this context is, "necessarily, considerably less than that needed to show actual noncompliance." *Id*. "If significant questions regarding noncompliance have been raised, appropriate discovery should be granted." *Id*.

**C.     Limited Discovery Concerning Defendants' Actions is Warranted to Demonstrate**

**that the Transfers Were Not Medically Necessary and Instead Served Defendants' Ulterior Motive**

This dispute turns on whether transferring the class members from MVIPC to EPSPC was "necessary" for medical care. As Plaintiffs see it, there are primarily three sets of factual questions that pertain to this question of necessity. *First*, was local care available and did ICE and GEO consider the possibility of utilizing that local care prior to shipping the Transferred Hunger Strikers to El Paso? If adequate local care was available, the transfers were not necessary. *Second*, was the care at EPSPC adequate? If it was not adequate, and particularly if ICE and GEO knew or should have known that it was not adequate, the transfers were not necessary. *Third*, were the transfers executed in a manner that was excessive and/or punitive? If they were so executed, there is at least an inference that the transfers were undertaken to end the Transferred Class Members' hunger strike and not to provide them medical care.

The limited discovery that Plaintiffs seek is tailored to bring forth information relevant to each of those factual questions. Plaintiffs' proposed requests for production ("RFP") seek communications regarding the transfers, including any communications to or from local hospitals regarding their ability to treat the Transferred Class Members, and any facility video recordings of the transfers. Those RFPs "could provide potentially favorable information," *Leavitt*, 523 F.3d at 1034 (cleaned up), concerning all three of the factual questions described above. Plaintiffs' proposed interrogatories would request information about steps Defendants took to determine whether the transfers were medically necessary and any medical precautions – including precautions pertaining to COVID-19 – that Defendants took before, during, and after the transfers. Those interrogatories could provide potentially favorable information concerning the first and second of the factual questions described above.

Plaintiffs also seek to take depositions of the following three witnesses: (1) the medical officer most knowledgeable about the medical necessity ostensibly underpinning Defendants' decision to transfer,[6] (2) an ICE officer named Manuel Starr who reportedly oversaw the violent physical transfer of the class members, and (3) the medical officer at EPSPC most knowledgeable about the care provided to the Transferred Class Members in El Paso. Deposition of the medical officer most

---

[6] This will likely be the onsite medical authority who Defendants represented had made the transfer decision "for a higher level of medical care." Riordan Dec. ¶ 7 (Exh. C).

knowledgeable about the transfer decision could provide potentially favorable information concerning the first of the factual questions described above. Deposition of Officer Starr could provide potentially favorable information concerning the third of the factual questions described above. Deposition of the EPSPC medical officer could provide potentially favorable information concerning the second of the factual questions described above. Just as in *Kelly*, where "the allegations appear to be verifiable if Plaintiffs can depose CCA witnesses and examine CCA records[,]" 979 F.Supp.2d at 1242, Plaintiffs' allegations of noncompliance here can be verified through the requested written discovery and depositions.

The limited discovery sought is also warranted by the existing evidence of noncompliance, which easily raises "significant questions regarding noncompliance." *Leavitt*, 523 F.3d at 1034. That evidence demonstrates that ICE and GEO could have avoided the transfers by referring the Transferred Hunger Strikers for care for malnourishment at a local hospital, that ICE's medical providers at EPSPC dangerously and negligently failed to follow basic refeeding protocols, and that ICE and GEO effected the transfers in a manner that was so violent and punitive that it does not plausibly appear that medical care was the purpose of the transfer. *See supra*, Section II.B. Indeed, at earlier stages in this litigation, Defendants have sent class members to local hospitals for care, as opposed to shipping them across the country. *See* ECF No. 486 (declaration describing hospitalization of class member suffering from acute COVID-19 symptoms). This record easily suffices to meet the showing necessary for post-judgment discovery, which is "necessarily, considerably less than that needed to show actual noncompliance."[7] *Leavitt*, 523 F.3d at 1034.

///

///

---

[7] While Plaintiffs are seeking discovery to uncover evidence they believe will be relevant and to make a full record on this dispute, should the court be unwilling to grant that discovery, Plaintiffs seek in the alternative a determination that the existing record shows noncompliance with the Agreement. If the court grants such alternative relief, Plaintiffs would submit a proposed order supporting that alternative relief, including, *inter alia*, a requirement that Defendants (1) utilize MVIPC and local medical services (including local hospitalization, if warranted) prior to seeking authorization for a class member's transfer to another detention facility for medical care and (2) provide notice and medical rationale to a class member prior to ICE seeking medical authorization for their transfer to another detention facility.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant their request for discovery or, in the alternative, determine that Defendants violated the Agreement when it unnecessarily transferred class members on March 7, 2023 and order Defendants to follow protocols to ensure that any future transfers are in fact necessary.

Dated:  August 14, 2023

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA

By

_____
Sean Riordan (SBN 255752)

Attorneys for Petitioners-Plaintiffs