WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
EMILOU H. MACLEAN (SBN 319071)
emaclean@aclunc.org
BREE BERNWANGER (SBN 331731)
bernwanger@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

Attorneys for Petitioners-Plaintiffs
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
GENNA ELLIS BEIER (SBN 300505)
genna.beier@sfgov.org
JENNIFER FRIEDMAN (SBN 314270)
jennifer.friedman@sfgov.org
FRANCISCO UGARTE (SBN 241710)
francisco.ugarte@sfgov.org
KELLY ENGEL WELLS (SBN 338648)
kelly.wells@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: (415) 553-9319
Facsimile: (415) 553-9810

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

ANGEL DE JESUS ZEPEDA RIVAS,
BRENDA RUBI RUIZ TOVAR, LAWRENCE
KURIA MWAURA, LUCIANO GONZALO
MENDOZA JERONIMO, CORAIMA
YARITZA SANCHEZ NUÑEZ, JAVIER
ALFARO, DUNG TUAN DANG, JUAN JOSE
ERAZO HERRERA, RAJNISH RAJNISH, and
WILLIAN MATIAS RAUDA,

    Petitioners-Plaintiffs,

    v.

DAVID JENNINGS, Acting Director of the San
Francisco Field Office of U.S. Immigration and
Customs Enforcement; TAE JOHNSON, Acting
Director of U.S. Immigration and Customs
Enforcement; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; GEO GROUP,
INC.; MICHAEL KNIGHT, Acting Warden of
Mesa Verde Detention Facility,

    Respondents-Defendants.

CASE NO. 3:20-CV-02731-LB

**PLAINTIFFS' MOTION TO
ENFORCE THE SETTLEMENT
AGREEMENT**

JUDGE: HON. LAUREL BEELER
DATE: SEPTEMBER 21, 2023
TIME: 9:30 A.M.

1    JORDAN WELLS (SBN 326491)                MARTIN S. SCHENKER (SBN 109828)
     jwells@lccrsf.org                        mschenker@cooley.com
2    LAWYERS' COMMITTEE FOR                   JULIE M. VEROFF
     CIVIL RIGHTS OF THE                      jveroff@cooley.com (SBN 310161)
3    SAN FRANCISCO BAY AREA                   COOLEY LLP
     131 Steuart St #400                      3 Embarcadero Center, 20th Floor
4    San Francisco, CA 94105                  San Francisco, CA 94111-4004
     Telephone: (415) 814-7631                Telephone: (415) 693-2000
5                                             Facsimile: (415) 693-2222

6    JUDAH LAKIN (SBN 307740)
     judah@lakinwille.com                     TIMOTHY W. COOK* (Mass. BBO# 688688)
     AMALIA WILLE (SBN 293342)                tcook@cooley.com
7    amalia@lakinwille.com                    COOLEY LLP
     LAKIN & WILLE LLP                        500 Boylston Street
8    1939 Harrison Street, Suite 420          Boston, MA 02116
     Oakland, CA 94612                        Telephone: (617) 937-2300
9    Telephone: (510) 379-9216                Facsimile: (617) 937-2400
     Facsimile: (510) 379-9219
10
     STEPHANIE PADILLA (SBN 321568)
11   spadilla@aclusocal.org
     AMERICAN CIVIL LIBERTIES UNION
12   FOUNDATION OF SOUTHERN CALIFORNIA
     1313 West Eighth Street
13   Los Angeles, CA 90017
     Telephone: (213) 977-9500
14   Facsimile: (213) 977-5297

15                        *Attorneys for Petitioners-Plaintiffs*
                              *Admitted Pro Hac Vice*

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Notice of Motion and Motion**

2      Please take notice that on September 21, 2023 or as soon thereafter as the Court may hear the

3  matter, Plaintiffs, through undersigned Class Counsel and on behalf of the Settlement Class, will move

4  the Court for an order (1) declaring that Federal Defendants are in breach of the Settlement Agreement

5  in this case; (2) declaring that the Settlement Agreement requires that Federal Defendants immediately

6  release any newly-booked Class Member with Vulnerabilities for whom flight risk and/or danger to

7  the community do not substantially outweigh risk of severe illness or death upon contracting COVID-

8  19, regardless of a class member's underlying detention statute; (3) remedying Federal Defendants'

9  breach by ordering Defendants' promptly comply and report their compliance to the Court; and (4)

10  adopting compliance monitoring provisions.

11      While Plaintiffs have set this motion for hearing on the Court's civil motions calendar, by

12  presentation of this dispute under the terms of the Settlement Agreement, the parties are seeking the

13  Court's "expeditious review." ECF No. 1205-1, Section V.E. The parties may seek leave to file reply

14  briefs under the Agreement, but the parties have no further briefing as of right. *Id.*, Section V.E.2.

15      Plaintiffs' motion is supported by the memorandum of points and authorities included herein,

16  contemporaneously filed declarations and exhibits thereto, any reply brief that Plaintiffs might file,

17  and any other evidence or other materials in the record.

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

| | | | | Page |
|---|---|---|---|---|

I.    INTRODUCTION ............................................................................................. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ...................................... 3

    A.   The Lawsuit and Settlement .................................................................... 3

    B.   Applicable Settlement Provisions ........................................................... 4

    C.   The Detention Statutes at Issue .............................................................. 5

    D.   Attempts to Resolve this Dispute ........................................................... 6

III.  ARGUMENT ................................................................................................... 8

    A.   The Vulnerabilities Provision Applies to All Class Members Regardless of Detention Statute .................................................................................... 8

        1.   The Unambiguous, Plain Language of the Vulnerabilities Provision Creates a Mandatory Presumption of Release for All Class Members with Vulnerabilities ................................................................... 8

        2.   The Settlement Agreement as a Whole Supports a Reading that the Vulnerabilities Provision Applies Regardless of Detention Statute ............. 10

    B.   By Failing to Evaluate Vulnerable Class Members' Individualized Flight Risk, Danger to the Community, and Risk of Severe Illness or Death, ICE Materially Breached the Settlement Agreement ........................................ 11

    C.   8 U.S.C. § 1252(f) Does Not Bar This Court from Enforcing the Settlement Agreement ............................................................................................. 13

    D.   ICE's Breach Has Harmed the Scores of Class Members Who Likely Meet the Standard for Release .......................................................................... 15

    E.   The Proper Remedy Is Individualized Evaluation under the Vulnerabilities Provision, Immediate Release for Every Eligible Class Member, and Meaningful Oversight ......................................................................... 17

IV.   CONCLUSION .............................................................................................. 18

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Armstrong v. Commissioner or Social Sec. Admin*,
   160 F.3d 587 (9th Cir. 1998) ....................................................................10

*Biden v. Texas*,
   142 S.Ct. 2528 (2022) .......................................................................13, 14

*Damus v. Nielsen*,
   313 F. Supp. 3d 317 (D.D.C. 2018) ............................................................12

*Favela Avendaño v. Bostock*,
   No. 2:20-cv-00700-JLR, ECF No. 648-2 .......................................................9

*Flores v. Johnson*,
   212 F. Supp. 3d 864 (C.D. Cal.) ...........................................................8, 15

*Flores v. Lynch*,
   828 F.3d 898 (9th Cir. 2016) ..............................................................8, 14

*Flores v. Lynch*,
   212 F. Supp. 3d 907 (C.D. Cal. 2015) ...................................................8, 14

*Flores v. Rosen*,
   984 F.3d 720 (9th Cir. 2020) ...................................................................15

*Garland v. Aleman Gonzalez*,
   142 S. Ct. 2057, 213 L. Ed. 2d 102 (2022) ...........................................13, 15

*Nat. Res. Def. Council, Inc. v. Cnty. of Los Angeles*,
   725 F.3d 1194 (9th Cir. 2013) .................................................................11

*Padilla v. ICE*,
   953 F.3d 1134 (9th Cir. 2020) .................................................................15

*Pinel v. Aurora Loan Servs., LLC*,
   814 F.Supp.2d 930 (N.D. Cal. 2011) ...................................................10, 11

*Salimi v. BMW Fin. Servs. NA, LLC*,
   No. 12-CV-01754-JSW, 2017 WL 4570367 (N.D. Cal. Sept. 29, 2017)
   .................................................................................2, 12, 14, 16

*United Commercial Ins. Serv., Inc. v. Paymaster Corp.*,
   962 F.2d 853 (9th Cir. 1992) .....................................................................8

*United States v. Montgomery*,
  462 F.3d 1067 (9th Cir. 2006) ...............................................................................10

*Zepeda Rivas v. Jennings*,
  845 F. App'x 530 (9th Cir. 2021) .............................................................................4

**Statutes**

8 U.S.C. § 1226(a) ...................................................................................................5, 6

8 U.S.C. § 1226(c) ................................................................................................5, 6, 7

8 U.S.C. § 1231(a)(2)..............................................................................................5, 6

8 U.S.C. § 1231(a)(6)...................................................................................................5

8 U.S.C. § 1252(f)...............................................................................................13, 15

**Memorandum of Points and Authorities**

## I.      Introduction

The Settlement Agreement ("Agreement") in this case imposes two requirements on Defendant U.S. Immigration and Customs Enforcement ("ICE") every time it books a new class member into a detention facility the Agreement covers. First, the Agreement requires ICE to promptly screen each new class member for conditions that make them vulnerable to severe illness or death if they contract COVID-19, including co-morbidities to COVID-19 identified by the CDC, age over 55, and medical or religious reasons that prevent them from accepting vaccination (defined in the Agreement as "Vulnerabilities"). Second, the Agreement requires ICE to *immediately* release such class members unless a supervisory ICE officer, in consultation with a medical professional, determines that an individual class member poses a flight risk or danger to the community that "substantially outweighs" their health risks. *See* ECF No. 1205-1, Section II.A.10 (the "Vulnerabilities Provision"). It is undisputed that ICE has not released *a single class member* pursuant to these terms, despite having added 88 class members who have such a vulnerability to the class since the Agreement became effective. It is also undisputed that ICE has not assessed *a single one of those class members'* individualized risk of flight or danger to the community compared to their risk of severe illness or death from COVID-19. ICE's failure to implement the Vulnerabilities Provision is based on its claim that the Vulnerabilities Provision has an unwritten carveout that in practice excludes every class member with defined vulnerabilities from its release terms. Specifically, ICE believes that the Vulnerabilities Provision silently excludes class members subject to a mandatory detention statute and that each class member with a vulnerability who would otherwise be eligible for release is subject to such a statute. For a variety of reasons, described in detail below, this interpretation is legally wrong and renders the Vulnerabilities Provision a nullity for the vast majority of class members to whom it would otherwise apply.

As a starting point, ICE's interpretation of the Vulnerabilities Provision is not credible in light of the course of dealings between the parties, raising sharp questions about whether ICE is operating in good faith. ICE's position is one that it did not articulate to Plaintiffs *for nearly ten months* after the Agreement went into effect. Instead, soon after the Agreement went into effect, ICE represented to

Plaintiffs that it had been assessing vulnerable class members for release and finding each one to be an overwhelming flight risk or danger. Plaintiffs relied on that representation and did not immediately investigate further. In December, when Plaintiffs raised questions about why a particularly vulnerable class member had not been released, ICE again did not even hint at its interpretation of the Vulnerabilities Provision. Months later, ICE finally articulated the position it advances here: that the Vulnerabilities Provision has never applied to the entire class, that it applies *only* to class members detained under certain federal statutes—8 U.S.C. §§ 1226(a) and 1231(a)(6)—and that, because no class members brought into custody since the effective date of the Agreement were detained under those statutes, no class members have been eligible for release under its terms.

The plain language of the Agreement squarely refutes ICE's position: the Vulnerabilities Provision applies to "Class Members," who the Agreement defines as "all people who are or have been in ICE custody at the Facilities from April 20, 2020, through the expiration of this settlement agreement," with no mention of detention statutes. *See* ECF No. 1205-1, Sections I.Y. and II.A.10. In fact, unlike other settlement agreements ICE has entered to resolve other lawsuits challenging its detention practices during the COVID-19 pandemic, *nothing* in this Agreement distinguishes between Class Members on the basis of their detention statute.

Plaintiffs anticipate that ICE will argue that (1) this Court should read an implicit carveout into the Vulnerabilities Provision because the plain-language meaning would impede the government's statutory detention authority and (2) that the Vulnerabilities Provision is unenforceable as to class members subject to mandatory detention. But ICE voluntarily entered into the Agreement and subjected itself to enforcement by this Court. ICE cannot escape its obligations by claiming now, despite a lengthy arm's length negotiation, that the very court enforcement it agreed to, which was approved by this Court, would be unlawful.

Even if ICE now regrets that it "failed to negotiate its desired limitation" of the Agreement's terms, "engag[ing] in self-help to narrow the class without disclosing its actions," as it has done here, is sanctionable conduct. *Salimi v. BMW Fin. Servs. NA, LLC*, No. 12-CV-01754-JSW, 2017 WL 4570367, at *10 (N.D. Cal. Sept. 29, 2017). But for ICE's breach, scores of vulnerable class members likely would have been immediately released. Plaintiffs do not, however, currently seek civil contempt

or sanctions. Instead, Plaintiffs ask this Court to (1) hold that ICE has materially breached the Agreement; (2) order that ICE individually assess each Class Member with Vulnerabilities for release and promptly release those who do not pose flight risk or danger to the community substantially outweighs risk of severe illness or death upon contracting COVID-19 (as the Agreement has required all along); and (3) order meaningful oversight to ensure ICE's compliance moving forward.

## II.   Factual and Procedural Background

### A.   The Lawsuit and Settlement

Plaintiffs filed this lawsuit in April 2020, challenging the unconstitutional safety risks that ICE and its contractor, Defendant GEO Group, Inc., subjected them to by continuing to detain them in the Yuba County Jail ("Yuba") and Mesa Verde ICE Processing Facility despite the unmitigated risk that COVID-19 would spread through their congregate settings ("Mesa Verde," and collectively, "the Facilities").[1] The district court preliminarily certified a class comprising all individuals detained at the Facilities and granted a temporary restraining order ("TRO") and preliminary injunction ("PI") agreeing that Plaintiffs had likely proved constitutional violations and, over the course of the litigation, ordered ICE to release hundreds of class members through an individualized bail process. *See* ECF Nos. 53, 357. None of the district court's orders, including its provisional class certification, distinguished between class members on the basis of their underlying detention statute. *Id.* However, based on ICE's representations during the litigation, a significant proportion of the class members the district court ordered released appear to have been subject to mandatory detention.

Defendants collectively appealed the TRO, PI, and release orders to the Ninth Circuit. While the parties briefed the appeal, successive COVID-19 outbreaks ravaged the Facilities despite the significant depopulation the litigation had achieved, causing widespread illness among dozens of class members. In response, the district court issued an additional TRO and PI imposing strict mitigation

---

[1] In December 2022, ICE terminated its contract with Yuba County Jail. *See* 'Waste of Federal Funds': ICE Ends Contract with Northern California Jail After Years of Outrage Over Conditions, Tyche Hendricks, KQED (Dec. 9, 2022), available at https://www.kqed.org/news/11934879/waste-of-federal-funds-ice-ends-contract-with-norcal-jail-after-years-of-outrage-over-conditions. For consistency with the language of the Settlement Agreement, this memorandum continues to use the term "the Facilities," although no class members have been added to Yuba County Jail since ICE terminated the contract. All current class members are detained at Mesa Verde.

measures at Mesa Verde and an additional TRO imposing mitigation measures at Yuba. *See* ECF Nos. 500, 867, 922.[2] On appeal, a Ninth Circuit panel upheld the district court's decision that conditions of confinement had violated the constitution at the time of the TRO and affirmed that the district court had authority to order release as a remedy. *Zepeda Rivas v. Jennings*, 845 F. App'x 530, 535 (9th Cir. 2021). In its appellate arguments, ICE asserted that, in its view, the District Court lacked authority to release *anyone* subject to mandatory detention. Though the panel generally decided that release was an appropriate remedy, it declined to decide "whether the district court was required to *prioritize* releasing detainees who were not subject to mandatory detention" and referred the case to the Ninth Circuit Mediation program. *Id.* (emphasis added).

On December 14, 2021, after about nine months of negotiations aided by the Ninth Circuit Mediation Program, ICE and its co-defendants signed the Agreement to resolve the matter with Plaintiffs without further litigation. ECF No. 1205-1. The Court granted preliminary approval of the Agreement on March 4, 2022, noting that "[t]he Court's scrutiny for the proposed settlement has been as rigorous at this preliminary approval stage as at the final approval stage" and "that the terms of the Agreement are fair, reasonable, and adequate." ECF No. 1229 at 1. The Court granted final approval on June 9, 2022. ECF No. 1258. Concurrently with its preliminary and final approval of the Agreement, the district court certified a settlement class under Rule 23, comprising "all people who are or have been in ICE custody at the Facilities on or after April 20, 2020," explaining that "[t]he alleged constitutional violations [in the case] expose all Class Members to an unnecessary risk of harm." ECF No. 1229 at 1-2 (preliminary approval); *see also* ECF No. 1258 (final approval).

## B.  Applicable Settlement Provisions

The Vulnerabilities Provision of the Agreement imposes a series of obligations on ICE to screen, assess, and release class members who have underlying medical conditions that make them more vulnerable to severe illness or death upon contracting COVID-19 ("Class Members with Vulnerabilities"). It reads:

---

[2] In approving settlement of this case, based on a provision in the Agreement calling for such vacatur and pursuant to the parties' joint motion for the same, the Court vacated its preliminary injunction order at ECF No. 867, as well as an earlier preliminary injunction order at ECF No. 357. See Agreement, ECF No. 1205-1, Section VI.B.

> "Defendants will promptly screen Class Members (within 24 hours of any new intake) for Vulnerabilities to severe COVID-19 and identify vulnerable individuals for immediate release. A Class Member with Vulnerabilities should be released unless a Supervising Detention and Deportation Officer – following consultation with a medical professional, who will make the assessment as to the existence and/or severity of medical risk factors – determines that the risk of flight or danger to the community substantially outweighs the risk of severe illness or death to the Class Member. Any assessment will take into account mitigating factors, such as vaccination status."

ECF No. 1205-1, Section II.A.10. The Agreement also requires that ICE provide weekly disclosures to Class Counsel relevant to monitoring the Vulnerabilities Provision, including the name, medical conditions, criminal history, and ICE's decision whether to release or maintain detention (in other words, the "custody determination") for any Class Member with Vulnerabilities added to the Facilities, along with information about COVID testing, vaccination, and population levels and distribution within the Facilities. ECF No. 1205-1, Section IV.D. Since the effective date of the Agreement, ICE has added 88 Class Members with Vulnerabilities to the Facilities. Declaration of Bree Bernwanger ("Bernwanger Dec.") ¶ 14. Forty-one remain in custody today, comprising over 70% of the 56 total currently-detained Class Members. *Id*.

### C.  The Detention Statutes at Issue

This motion discusses four immigration detention statutes relevant to the dispute: (1) 8 U.S.C. § 1231(a)(2), which states that immigration authorities "shall detain" noncitizens with administratively final orders of removal for a 90-day "removal period; (2) 8 U.S.C. § 1231(a)(6), which states that at the end of the 90-day "removal period," detention becomes discretionary; (3) 8 U.S.C. § 1226(c), which states that immigration authorities "shall take into custody" noncitizens who have certain criminal convictions and imposes restrictions on their release; and (4) 8 U.S.C. § 1226(a), which has no triggering criteria and states that, generally, noncitizens "may be arrested and detained pending a decision on whether the alien is to be removed from the United States."

The different detention statutes have different triggering criteria.

**1231(a)(2) and 1231(a)(6):** Section 1231(a)(2) applies to anyone who has an order of removal that became administratively final within the preceding 90 days. After the 90-day period expires, 1231(a)(6) applies and detention becomes wholly discretionary.

**1226(c):** Section 1226(c) sets forth categories of convictions that will cause an individual to fall within its ambit. Those categories include offenses "covered in" select grounds of inadmissibility and deportability. 8 U.S.C. §§ 1226(c)(1)(A)-(D).

**1226(a):** Section 1226(a) is the generic detention statute—if a person in custody does not meet the conditions for 1231(a)(2), 1231(a)(6), or 1226(c), they are subject to 1226(a).

Amid this statutory thicket, conclusively determining a detained person's detention statute requires a host of factual information, including the status and timeline of any removal order issued to them and their criminal history, including, in many cases, their underlying record of conviction.

### D. Attempts to Resolve this Dispute

Class Counsel began inquiring about ICE's compliance with the Vulnerabilities Provision immediately after the Settlement Agreement became effective. On June 23, 2022, ICE's weekly disclosure indicated that ICE had added four Class Members with Vulnerabilities to the Facilities during the preceding week and determined that all would remain detained. *See* Bernwanger Dec. ¶ 2. Class Counsel e-mailed ICE counsel to inquire about how ICE evaluated the newly-arrived class members for release and why it decided to maintain them in custody, despite their vulnerabilities and the Vulnerabilities Provision's weighty presumption of release. *Id.* ¶ 3. ICE did not, at the time, articulate its current position that the release terms of the Vulnerabilities Provision did not apply to these Class Members. *Id.* Instead, ICE counsel explained that "[t]he [Supervising Detention and Deportation Officer] examined each individual's circumstances and determined that his risk of flight or danger to the community substantially outweighed COVID risks based on his Vulnerability(ies) coupled with his vaccination status." *Id.* ¶ 4.

On December 12, 2022, Class Counsel again emailed ICE counsel to inquire about the application of the release presumption in the Vulnerabilities Provision. Class Counsel noted that ICE had not released a single Class Member with Vulnerabilities during the six months the Settlement Agreement had been in effect, and highlighted a Class Member with multiple, serious vulnerabilities whose sole prior conviction was decades old. Bernwanger Dec. ¶ 5. In its response, ICE did not explain why it had not released any Class Members with Vulnerabilities. ICE also did not inform Class Counsel of its view that the Vulnerabilities Provision did not apply to any Class Members it had added

to the Facilities, leaving Class Counsel to assume that ICE was assessing Class Members for release based on the representation it had made in June. *Id.* ¶ 6.

On March 23, 2023, Class Counsel e-mailed ICE expressing concern that ICE was not implementing the Vulnerabilities Provision in good faith. Bernwanger Dec. ¶ 7. By then, ICE had added 69 total Class Members with Vulnerabilities into the population at the Facilities, but had not released a single Class Member with Vulnerabilities, despite the Vulnerabilities Provision's presumption of release. *Id.* Class Counsel highlighted two Class Members with Vulnerabilities who had accomplished significant rehabilitation since their last convictions—including a Class Members whose sole convictions arose from conduct he engaged in as a teenager, over 25 years ago. *Id.* On March 30, 2023, the parties met and conferred by telephone and ICE for the first time informed Class Counsel that, in its view, the release terms of the Vulnerabilities Provision do not apply to Class Members with Vulnerabilities detained under a mandatory detention statute—in other words, 8 U.S.C. §§ 1226(c) or 1231(a)(2). *Id*. ¶ 8. ICE further represented that, in its view, all 69 Class Members with Vulnerabilities who had been added to the Facilities since June had been subject to mandatory detention and thus not were not entitled to individualized assessment or release under the Vulnerabilities Provision. *Id.*

After further investigation, on April 19, 2023, Class Counsel e-mailed ICE requesting information about its position. Bernwanger Dec. ¶ 9. ICE counsel stated that ICE takes a categorical position on the assessment articulated in the Vulnerabilities Provision: ICE's position is that, regardless of a detained class member's health risks, "if they are identified as subject to mandatory detention, Congress's determination that such individual must be detained based on flight risk and danger outweighs the other factors considered." *Id*. ¶ 10.

Following this exchange, the Parties entered mediation with the assistance of the Ninth Circuit Mediation Program. On May 31, 2023, the Ninth Circuit's Mediation Office oversaw a live mediation and the dispute concerning transfers out of Mesa Verde that is the subject of a concurrently filed enforcement motion. Subsequent mediation communications between the parties related to these

disputes have not been successful.[3] Bernwanger Dec. ¶¶ 11-12. This dispute remains unresolved and the parties are now presenting them to the Court pursuant to dispute resolution provisions of the Agreement.

## III.   ARGUMENT

### A.   The Vulnerabilities Provision Applies to All Class Members Regardless of Detention Statute

#### 1.   The Unambiguous, Plain Language of the Vulnerabilities Provision Creates a Mandatory Presumption of Release for All Class Members with Vulnerabilities

"A settlement agreement is treated as any other contract for purposes of interpretation." *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992) (citing *Adams v. Johns-Manville Corp.*, 876 F.2d 702, 704 (9th Cir. 1989). "Where the contract is clear"—as it is here— "the plain language of the contract governs." *Flores v. Johnson*, 212 F. Supp. 3d 864, 870 (C.D. Cal.), clarified on denial of reconsideration sub nom. *Flores v. Lynch*, 212 F. Supp. 3d 907 (C.D. Cal. 2015), and aff'd in part, rev'd in part and remanded, 828 F.3d 898 (9th Cir. 2016) (citing *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). Accordingly, the law does not permit courts to read unwritten provisions into a signed agreement after-the-fact, even at a party's insistence. "[T]he true intent of a party is irrelevant if it is unexpressed." *United Commercial Ins. Serv., Inc.* at 856. Nor may such a party rely on extrinsic evidence, which is "relevant only to resolve ambiguity." *Flores v. Lynch*, 828 F.3d 898, 905 (9th Cir. 2016) (internal quotation omitted).

The Vulnerabilities Provision, by its unambiguous terms, applies to all class members. The provision requires that "Defendants will promptly screen Class Members (within 24 hours of any new intake) for Vulnerabilities to severe COVID-19 and identify vulnerable individuals for immediate release." ECF No. 1205-1, Section II.A.10. "Class Member" is a defined term in the Agreement. A "Class Member" is "a member of the Settlement Class," which "means *all people* who are or have

---

[3] The mediation between the parties includes a sub-issue related to the instant dispute which also remains unresolved and which Plaintiffs had prepared to present to the Court in this motion. Plaintiffs believe that the issue has been exhausted, but ICE disagrees and insisted on further mediation of that issue. Because the presentation of that sub-issue is not required for the Court to resolve the dispute described herein, the parties have moved forward with briefing here and agree that this dispute is ripe for adjudication. Should the parties be unable to resolve the remaining sub-issue concerning this dispute, they will submit further briefing pursuant to the Agreement's terms.

been in ICE custody at the Facilities from April 20, 2020 through the expiration of this settlement agreement." ECF No. 1205-1, Section I.D, I.Y (emphasis added). Neither the Settlement Agreement nor the accompanying order certifying the settlement class distinguishes between class members on the basis of their underlying detention statute.

The Vulnerabilities Provision goes on to instruct that, "A Class Member with Vulnerabilities should be released unless a Supervising Detention and Deportation Officer – following consultation with a medical professional, who will make the assessment as to the existence and/or severity of medical risk factors – determines that the risk of flight or danger to the community substantially outweighs the risk of severe illness or death to the Class Member." ECF No. 1205-1, Section II.A.10. A "Class Member with Vulnerabilities" is thus entitled to release unless a supervisory ICE officer determines they meet the limited exception for flight risk or danger expressed in the text of the provision, regardless of their underlying detention statute. There is simply no other way to read this sentence.

When ICE wants to exclude class members from certain settlement terms on the basis of their detention statute, it knows how to do so explicitly. ICE recently settled *Favela Avendaño v. Bostock*, a constitutional lawsuit challenging ICE's response to detention conditions during the COVID-19 pandemic brought by a class of medically-vulnerable individuals detained in the Western District of Washington. The *Favela Avendaño* settlement agreement includes a screening and custody reassessment provision for class members similar to the Vulnerabilities Provision but unambiguously excludes people subject to mandatory detention from the custody reassessment terms, stating "[t]his provision does not apply to class members who are subject to mandatory detention." *Favela Avendaño v. Bostock*, No. 2:20-cv-00700-JLR, ECF No. 648-2, Section III.C.8., (W.D. Wash. Mar. 24, 2023); *see also Id*., SectionIII.C.6. (screening to identify class members). The parties did not agree to such an exemption in this case.

The Vulnerabilities Provision also unambiguously imposes an obligation on ICE to release Class Members with Vulnerabilities unless the weighty standard required to rebut the presumption of release has been met. Class Members with Vulnerabilities "should be released" unless "the risk of flight or danger to the community substantially outweighs the risk of severe illness or death to the

Class Member." ECF No. 1205-1, Section II.A.10. The Ninth Circuit has held that in similar clauses, "'should' means must." *Armstrong v. Commissioner or Social Sec. Admin*, 160 F.3d 587, 589-590 (9th Cir. 1998) (the word "should" created mandatory obligation in regulation stating that "[i]f there is information … indicating that additional [relevant] medical evidence is available, such evidence *should be* secured before inferences are made" (emphasis added)); *see also United States v. Montgomery*, 462 F.3d 1067, 1069 (9th Cir. 2006) (interpreting en banc decision stating that "the 'views of counsel, at least in writing,' *should be* obtained" to impose mandatory obligation (emphasis added) (internal citation omitted)). Context provides further support for such a reading: the stated purpose of screening Class Members for their underlying medical conditions is "[to] identify vulnerable individuals for immediate release." ECF No. 1205-1, Section II.A.10. *See Montgomery*, 462 F.3d at 1070 (the word "should…must be read in context.") ICE cannot make a serious argument that the terms of the Vulnerabilities Provision are unclear. The Court should accordingly reject ICE's request to constrain plain meaning through additional, unwritten terms.

### 2. The Settlement Agreement as a Whole Supports a Reading that the Vulnerabilities Provision Applies Regardless of Detention Statute

Courts must read settlement agreements as a whole, "to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Pinel v. Aurora Loan Servs., LLC*, 814 F.Supp.2d 930, 943 (N.D. Cal. 2011). In the context of the entire Agreement, ICE's argument that an unwritten carveout applies to the release protections in the Vulnerabilities Provision appears even more far-fetched. Such an interpretation would make the Agreement internally inconsistent, because the Vulnerabilities Provision is not the only settlement term that requires ICE to release Class Members; Section V.B.1 of the Agreement requires ICE to release *any* class member that it re-detains in violation of the Agreement's terms, and explicitly states that its release mandate *includes* class members subject to 8 U.S.C. §§ 1226(c) and 1231(a)(2). ECF No. 1205-1, Section V.B.1. ICE has not explained how the mandatory detention statutes prohibit it from releasing class members subject to mandatory detention under the Vulnerabilities Provision yet permit it to release the same class members under the re-detention provision. Nor can it.

The information disclosure requirements in the Agreement, which are silent with regard to class members' detention statutes, further undermine ICE's position. *See* ECF No. 1205-1, Section IV. The disclosure requirements are clearly designed to aid Class Counsel in monitoring compliance with the Agreement, including the Vulnerabilities Provision, by requiring that ICE disclose "the name, medical condition(s), and criminal history of any Class Member with Vulnerabilities," their vaccination status, and whether ICE decides to release or detain them after their screening. *See* ECF No. 1205-1, Section IV.D.6-7. However, the disclosure requirements do *not* include the applicable detention statute, or information that would be necessary to determine detention statute, such as the ground of removal alleged in removal proceedings, specific statute of conviction underlying their criminal history, specific charging and plea information from criminal records (which is relevant if the modified categorical approach applies), or removal order status, for *any* class member. If this Court were to accept ICE's newly-articulated interpretation of the Vulnerabilities Provision—that its application to a particular class member depends on their underlying detention statute—Class Counsel would have *no way* to monitor ICE's compliance using the disclosure obligations Plaintiffs bargained for. Such an interpretation would render the series of disclosure requirements tailored to the Vulnerabilities Provision "of no effect." *See Nat. Res. Def. Council, Inc. v. Cnty. of Los Angeles*, 725 F.3d 1194, 1206 (9th Cir. 2013), Reading the Vulnerabilities Provision to apply to all Class Members, regardless of their detention statute, on the other hand, "gives force and effect to every provision." *Pinel,* F.Supp.2d at 943 (N.D. Cal. 2011). As this Court has already recognized, such a reading is preferable. *See* ECF No. 1277 at 10 (*citing Nat. Res. Def. Council, Inc.*).

**B. By Failing to Evaluate Vulnerable Class Members' Individualized Flight Risk, Danger to the Community, and Risk of Severe Illness or Death, ICE Materially Breached the Settlement Agreement**

The Agreement makes plain that ICE cannot continue to detain a Class Member with Vulnerabilities unless an individualized assessment—both by a supervisory ICE officer *and* a medical professional—justifies ongoing detention. ICE's failure to undertake such an assessment for *a single class member* constitutes material breach. Plaintiffs anticipate that ICE will argue that it has met its obligations under the Agreement by relying on what it describes as "Congress's determination" that if an individual is subject to mandatory detention, "such individual must be detained based on flight risk

and danger outweighs the other factors considered." Bernwanger Dec. ¶ 10. But this is just a re-articulation of the unwritten, blanket exclusion that ICE asks the Court to read into the Agreement, cloaked in the language of individualized review. *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 341 (D.D.C. 2018) (holding ICE did not conduct individualized review when it applied categorical characteristics to flight risk determination, justifying flight risk finding solely on a person's status as "a recent entrant"). The Agreement arose out of constitutional litigation successfully challenging the health and safety risks caused by ICE detention practices in light of COVID-19. Through the Vulnerabilities Provision, ICE agreed to continue to mitigate those health risks in part by assessing and releasing Class Members with Vulnerabilities—which it has not done. An assessment that begins and ends by identifying a class member's detention statute and automatically results in detention, regardless of a class member's actual, individual Vulnerabilities to severe illness or death, cannot be squared with the Agreement's instruction that "Class Member with Vulnerabilities should be released unless a Supervising Detention and Deportation Officer – following consultation with a medical professional, who will make the assessment as to the existence and/or severity of medical risk factors – determines that the risk of flight or danger to the community substantially outweighs the risk of severe illness or death to the Class Member." ECF No. 1205-1, Section II.A.10.

This Court should be especially wary of ICE's argument given that it seeks to import their litigation positions as unwritten carveouts to unambiguous Settlement Agreement terms. *See Salimi*, 2017 WL 4570367, at *10 (N.D. Cal. Sept. 29, 2017) (refusing to rescind class settlement on basis of mistake and holding party in civil contempt where its actions aligned with its litigation position from "longstanding dispute" between parties but contravened settlement language). It is an understatement to say that ICE was aware of the mandatory detention statutes throughout the litigation and vigorously litigated to defend them from the as-applied Constitutional interventions that the Court ordered. ICE could have continued to advance its positions in litigation. But it chose not to. Instead, it accepted a settlement agreement that does not distinguish between class members on the basis of their detention statute. By "fail[ing] to read and comply with the plain language … that it had negotiated" and instead applying a "wished-for limitation," ICE breached the Agreement. *Id.* at *11.

**C.  8 U.S.C. § 1252(f) Does Not Bar This Court from Enforcing the Settlement Agreement**

Plaintiffs anticipate that ICE will argue that 8 U.S.C. § 1252(f)(1) bars this court from holding that the Vulnerabilities Provision applies to Class Members subject to 8 U.S.C. §§ 1226(c) and 1231(a)(2). That statute bars courts from "enjoin[ing] or restrain[ing]" certain immigration statutes, including the detention statutes, except "with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." This means 1252(f)(1) bars classwide relief that falls within its ambit. *See Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2063, 213 L. Ed. 2d 102 (2022). However, any argument that this court cannot enforce the Vulnerabilities Provision on account of 1252(f)(1) is without merit for several reasons.

As an initial matter, an argument that 1252(f)(1) would bar a court order enforcing the Agreement *only* with regard to class members detained under 1226(c) and 1231(a)(2), but *not* 1226(a) or 1231(a)(6), is unsupported by the statute's text. Section 1252(f)(1) applies to *all* immigration detention statutes, not only 1226(c) and 1231(a)(2). Thus, the nature of the detention statute at issue can't logically dictate the applicability of 1252(f)(1). If ICE were correct that 1252(f)(1) barred the release of Class Members with Vulnerabilities detained under 1226(c) or 1231(a)(2), it would necessarily follow that 1252(f)(1) also bars the presumption of release that the Vulnerabilities Provision extends to Class Members subject to 1226(a) and 1231(a)(6), because imposing such a presumption restrains the discretion those statutes otherwise afford to ICE.

Here, 1252(f)(1) does not bar enforcement of the Vulnerabilities Provision for Class Members subject to *any* detention statute for two reasons. First, over a year into the Agreement's three-year term, ICE has waived any 1252(f)(1) defense to its enforcement. Second, even if ICE had not waived 1252(f)(1) to the Agreement (which it has), enforcing the Vulnerabilities Provision would not require the Court to order any relief that 1252(f)(1) prohibits.

First, ICE waived any 1252(f)(1) challenge to the Agreement's terms by *voluntarily* entering into the Agreement, which plainly restricts the operation of the detention statutes that 1252(f)(1) covers, and agreeing to this Court's retention of jurisdiction over its enforcement. In *Biden v. Texas*, the Supreme Court made clear that its 1252(f)(1) holding in *Aleman Gonzalez* did not pertain to subject matter jurisdiction, but rather to a court's "power to issue a specific category of remedies: those that

'enjoin or restrain the operation of' the relevant sections of the statute.' … A limitation on subject matter jurisdiction, by contrast, restricts a court's 'power to adjudicate a case.'" *Biden v. Texas*, 142 S.Ct. 2528, 2539 (2022). As the dissent pointed out, one logical conclusion of the majority's decision is that 1252(f)(1) defenses would be rendered waivable, as are all non-jurisdictional defenses. *Id.* at 2562 (Barrett, J., dissenting).

Even if a wholesale objection to the enforceability of the Vulnerabilities Provision once existed, ICE has waived it here. "[T]he government waive[s] its ability to challenge the [settlement terms] when it settle[s] the case and d[oes] not timely appeal the final judgment." *Flores v. Lynch*, 828 F.3d 898, 908 (9th Cir. 2016). Here, ICE voluntarily entered the Agreement. ICE did not oppose Plaintiffs' motion for final approval of the Agreement or lodge any opposition to its description of the Vulnerabilities Provision as a material term that required ICE to "screen newly arriving Detained Class Members for vulnerabilities to severe COVID-19 and identify vulnerable detainees to be released." ECF No. 1254 at 6.

ICE's anticipated attempt to use 1252(f)(1) to defeat effective court oversight here is materially indistinguishable from a similar effort the Ninth Circuit rejected in *Flores v. Lynch*. There, ICE sought to defend itself from an enforcement action by claiming that terms of underlying agreement—which it had voluntarily entered—ran afoul of a federal statute. *Flores* 828 F.3d at 905-908 (9th Cir. 2016). There, the dispute centered on the definition of the settlement class. *Id.* ICE urged the court to read an implicit, unwritten carveout into the class definition, arguing that accepting the plain language of the class definition would violate Rule 23. *Id.* at 907. The Ninth Circuit held that the government had waived any such defense. *Id.* at 908; *see also Salimi*, 2017 WL 4570367 at *7 (N.D. Cal. Sept. 29, 2017) (where "Defendants failed to negotiate the exclusion of [certain] individuals at the settlement stage of this litigation," they waived any objection to their inclusion in the certified settlement class or challenge to their standing to enforce agreement). The same is true here. ICE cannot now, over a year after final approval, avoid a finding of breach by claiming that the terms it agreed to were unenforceable all along.[4]

---

[4] Nor can ICE prevail on an argument that a "change" to the interpretation of 1252(f)(1) *now* bars enforcement of the Settlement Agreement, as the Ninth Circuit rejected a similar argument in the

1    Second, even assuming for the sake of argument that ICE did not waive 1252(f)(1), the

2    Vulnerabilities Provision does not run afoul of 1252(f)(1) because it does not contemplate a *classwide*

3    restraint on *any* detention statute. Instead, it requires ICE to make individualized custody

4    determinations "with respect to … individual[s] … against whom [removal] proceedings … have been

5    initiated." 8 U.S.C. § 1252(f)(1). A court order requiring ICE to undertake such individual

6    determinations—or enforcing the Vulnerabilities Provision with regard to any individual class

7    member—falls within the relief the statute expressly permits. Further, 1252(f)(1) does not bar

8    declaratory relief. Thus, even if this Court holds that 1252(f)(1)'s prohibitions somehow apply to its

9    enforcement ruling here, there are a variety of ways to fashion relief that would not implicate the

10   statute's prohibitions, such as by requiring case-by-case review or release or by issuing a declaration

11   that ICE is violating the Agreement.

12   **D. ICE's Breach Has Harmed the Scores of Class Members Who Likely Meet the**
     **Standard for Release**

13

14   Instead of taking even minimal steps to comply with the Vulnerabilities Provision, ICE has

15   thwarted Class Counsel's efforts to monitor compliance by offering shifting explanations that smack

16   of bad faith. ICE's actions have delayed this dispute from becoming ripe for over a year, to the

17   immense detriment of the 88 Class Members with Vulnerabilities who have languished in detention at

18   high risk of serious illness or death from COVID-19 as a result.

19   In the course of investigating ICE's compliance, Class Counsel conducted interviews and

20   reviewed case documents for a sample of about 25% of all currently-detained Class Members with

21   Vulnerabilities. Based even on this survey of their equities, it is clear that many, if not all, Class

22   Members with Vulnerabilities should have been immediately released from custody under the plain

23

24   *Flores* litigation. In *Flores*, "[t]he government contend[ed] that the standards for class certification
     have changed and would preclude certification of the same class today." *See Flores v. Rosen*, 984

25   F.3d 720, 744 (9th Cir. 2020). The Ninth Circuit rejected the argument that such a change in the law
     after certification and settlement mattered, noting that, "[t]he government cites no authority

26   supporting its suggestion that the evolution of Rule 23 standards warrants termination of a consent
     decree concerning a previously certified class, particularly when the government has never moved to
     decertify or modify the class." *Id*.. ICE also cannot credibly claim that it did not anticipate the

27   changed interpretation of 1252(f)(1); it was a change in law that ICE had advanced in litigation
     across the country and that it regularly preserved in the lower courts. *See Garland*, 142 S.Ct. at

28   2065; *Padilla v. ICE*, 953 F.3d 1134, 1151 (9th Cir. 2020).

terms of the Agreement, demonstrating the grave harm of ICE's breach. These Class Members with Vulnerabilities, who all remain detained, include people who (1) were released from life (or decades-long) sentences by the California Parole Board because they did not pose an unreasonable risk to public safety (Bernwanger Dec. ¶¶ 19, 20, 21, 23), or were released early from criminal custody in recognition of their rehabilitation (*Id*. ¶¶ 16, 26, 27, 29); (2) have decades-old criminal convictions that arose from conduct when they were teenagers (*Id*.¶¶ 16, 18, 20, 21, 23, 24); (3) earned their GED, completed college coursework, or earned college degrees in criminal custody (*Id*. ¶¶ 18, 19, 20, 23, 26); (4) earned professional certifications in criminal custody (*Id*. ¶¶ 18, 20, 22); (5) earned formal teaching, mentorship, and leadership positions in rehabilitation programming in criminal custody (*Id*. ¶¶ 19, 22, 23); (6) have lived in the United States since early childhood (*Id*.¶¶ 16, 17, 20, 22, 23, 24, 27); and (7) have strong family and community support in the United States (*Id*. ¶¶ 16-29), among other compelling equities.

Class Counsel was able to obtain this information through interviews with Class Members and/or, when possible, their immigration counsel, and a review of available paperwork from ICE, the California Department of Corrections and Rehabilitation, and the California Parole Board. *All* of this information is equally—if not more—available to ICE, which has simply chosen to ignore it. These Class Members with Vulnerabilities, who are likely a representative sample of the dozens more who remain detained, likely qualified for release after ICE added them to the Facilities and should be released now.

If the Court adopts ICE's unsupported, shifting interpretation of the Vulnerabilities Provision, scores of Class Members with Vulnerabilities, like the fourteen highlighted in the attached declaration and described in this brief, will lose meaningful protections that the class bargained for in good faith. Such a decision would not only harm the class, it would undermine the rigorous class settlement process as a whole: "If the Court and the parties … cannot rely on the language of the class definition in determining the ultimate scope of a class settlement, it would seriously impair the due process interests of the absent class members. Permitting a unilateral and unreasonable misconstruction … to excuse non-compliance also would undermine the Court's ability to manage class action lawsuits fairly." *Salimi*, 2017 WL 4570367, at *10 (N.D. Cal. Sept. 29, 2017) (ordering sanctions).

### E.  The Proper Remedy Is Individualized Evaluation under the Vulnerabilities Provision, Immediate Release for Every Eligible Class Member, and Meaningful Oversight

For the reasons explained above, ICE has materially breached the Agreement and remains in breach of the Agreement unless and until it conducts individualized evaluations of all Class Members with Vulnerabilities and releases each Class Member who does not pose a flight risk or danger to the community that substantially outweighs their risk of severe illness or death if they contract COVID-19. Plaintiffs respectfully request that, to remedy ICE's breach, this Court:

1) Declare that the Vulnerabilities Provision applies to all Class Members regardless of the underlying detention statute;

2) Declare that ICE has breached the Settlement Agreement;

3) Order that within 10 days, Federal Defendants:

   a. Conduct the individualized assessment set forth in the Vulnerabilities Provision for each Class Member with Vulnerabilities who remains detained; and

   b. File a compliance report with the Court, identifying, for each class member who Defendants determine should remain detained, all factors Federal Defendants considered and relied upon in determining that the class member's flight risk or danger to the community substantially outweighs their risk of severe illness or death if they contract COVID-19;

4) Order that within 5 days of Federal Defendants' filing, Plaintiffs may file any objections to Federal Defendants' compliance report;

5) Based on the parties' submissions, issue an order deciding whether Federal Defendants' have cured their breach, and if not, take further remedial action, including, where warranted by the parties' submissions, ordering the release of any individual Class Member with Vulnerabilities. Plaintiffs further respectfully request that, to aid compliance monitoring going forward, this Court:

6) Order Federal Defendants to produce monthly compliance reports to Class Counsel for the duration of the Settlement Agreement, identifying, for each Class Member with Vulnerabilities that ICE decides to detain after their initial screening, all factors Federal Defendants considered

and relied upon in determining that the class member's flight risk or danger to the community substantially outweighs their risk of severe illness or death if they contract COVID-19.

**IV.    Conclusion**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the relief described herein.

Dated:  August 14, 2023                          AMERICAN CIVIL LIBERTIES UNION
                                                 FOUNDATION OF NORTHERN
                                                 CALIFORNIA


                                                 By


                                                 */s/ Bree Bernwanger*
                                                 Bree Bernwanger (SBN 331731)

                                                 Attorneys for Petitioners-Plaintiffs