1   ISMAIL J. RAMSEY (CABN 189820)
    United States Attorney
2
    MICHELLE LO (NYBN 4325163)
3   Chief, Civil Division

4   ADRIENNE ZACK (CABN 291629)
    SHIWON CHOE (CABN 320041)
5   Assistant United States Attorneys

6        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
7        Telephone: (415) 436-7200
         Facsimile: (415) 436-6748
8        adrienne.zack@usdoj.gov
         shiwon.choe@usdoj.gov
9
    Attorneys for Federal Defendants
10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13               SAN FRANCISCO DIVISION

14
    ANGEL DE JESUS ZEPEDA RIVAS, et al.,    )   Case No. 3:20-cv-02731-LB
15                                          )
              Plaintiffs,                   )   **FEDERAL DEFENDANTS' BRIEF
16                                          )   ADDRESSING CLASS COUNSEL'S CLAIMS
          v.                                )   OF MATERIAL BREACH OF SETTLEMENT
17                                          )   AGREEMENT REGARDING (1) TRANSFERS
    MOISES BECERRA,[1] et al.,              )   OF DETAINEES FOR MEDICAL CARE AND
18                                          )   (2) RELEASE OF DETAINEES SUBJECT TO
              Defendants.                   )   MANDATORY DETENTION**
19  _____)

20

21

22

23

24

25

26

---

[1] On July 17, 2022, Moises Becerra was appointed as Field Office Director ("FOD") for the U.S.
27  Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO") San
    Francisco Field Office.  Pursuant to Federal Rule of Civil Procedure 25(d), FOD Becerra is
28  automatically substituted for former FOD David Jennings as a party in this case.

FED. DEFS.' BR. RE (1) TRANSFERS FOR MED. CARE AND (2) RELEASE OF MANDATORY DETAINEES
No. 3:20-cv-02731-LB

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 3

I.      FOUR CLASS MEMBERS WERE TRANSFERRED TO ANOTHER FACILITY
        THAT COULD PROVIDE THE APPROPRIATE LEVEL OF MEDICAL CARE
        FOR THEIR CONDITION. ........................................................................................... 3

        A.      The applicable PRR provisions. ....................................................................... 3

        B.      The transfers for medical care ......................................................................... 3

II.     CONGRESS'S STATUTORY DECREES REGARDING MANDATORY
        DETENTION OF CRIMINAL NONCITIZENS. ........................................................... 5

ARGUMENT ........................................................................................................................... 6

I.      THE MARCH 2023 TRANSFERS FOR MEDICAL CARE WERE NOT A
        MATERIAL BREACH OF THE SETTLEMENT AGREEMENT ................................... 6

        A.      Transfers for medical evaluation and/or clinical care are not a breach of the
                Settlement Agreement. ..................................................................................... 6

        B.      Counterfactually, any alleged breach regarding the transfers is not material. .... 8

II.     ICE HAS NOT BREACHED THE VULNERABILITIES SCREENING
        PROVISION BECAUSE IT GENERALLY MAY NOT RELEASE THOSE
        SUBJECT TO 8 U.S.C. § 1226(C) .............................................................................. 10

        A.      Settlement Agreement ¶ II.A.10 does not provide for the release of mandatory
                detainees. ....................................................................................................... 10

        B.      The Court may not order the release of mandatory detainees. ......................... 14

III.    ANY REQUEST FOR DISCOVERY IS IMPROPER .................................................. 16

CONCLUSION ....................................................................................................................... 18

# TABLE OF AUTHORITIES

**Federal Cases**                                                                              **Page(s)**

*Alcantara v. Archambeault,*
   No. 20cv0756 DMS (AHG), 2023 WL 3589664, at *2 & n.3 (S.D. Cal. May 222023) ................... 15

*America v. Mills,*
   714 F. Supp. 2d 88 (D.D.C. 2010), aff'd, 643 F.3d 330 (D.C. Cir. 2011) ..................................... 10, 8

*Angel v. United States,*
   165 Fed. Cl. 453 (2023)........................................................................................................... 13

*Arnold v. United States,*
   816 F.2d 1306 (9th Cir. 1987) ................................................................................................. 14

*Bassidji v. Goe,*
   413 F.3d 928 (9th Cir. 2005) ................................................................................................... 14

*Bd. of Cty. Comm'rs v. United States,*
   93 Fed. Cl. 228 (2010) ...................................................................................................... 11, 17

*Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment,*
   477 U.S. 41 (1986) ..................................................................................................... 15, 16, 17

*Burnside-Ott Aviation Training Ctr. v. Dalton,*
   107 F.3d 854 (Fed. Cir. 1997) ................................................................................................. 12

*California v. United States,*
   271 F.3d 1377 (Fed. Cir. 2001) ............................................................................................... 12

*Demore v. Kim,*
   538 U.S. 510 (2003) ................................................................................................................. 5

*EEOC v. Fed. Labor Relations Auth.,*
   476 U.S. 19, (1986) ................................................................................................................. 15

*Four Seasons Tours & Travel, Inc. v. Glancy Binkow and Goldberg L.L.P.,*
   No. CV 15-07105 SJO (AGRx), 2015 WL 13284509 (C.D. Cal. Nov. 6, 2015) ............................... 8

*Fraihat v. ICE,*
   16 F.4th 613 (9th Cir. 2021) .................................................................................................... 13

*Fraihat v. ICE,*
   No. EDCV 19-1546 JGB (SHKx), 2020 WL 6541994 (C.D. Cal. Oct. 7, 2020) ........................... 13

*Franco-Gonzalez v. Holder,*
   No. CV 10-02211 DMG (DTBx), 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013) .......................... 13

*FTC v. Leshin,*
   No. 06-61851-CIV, 2007 WL 9703567 (S.D. Fla. Oct. 9, 2007) ................................................ 15

*Garland v. Aleman Gonzalez,*
   142 S. Ct. 2057 (2022) ...................................................................................................... 13, 15

*Jackson v. Los Lunas Center for Persons with Developmental Disabilities,*
   No. 87-0839 JAP/KBM, 2021 WL 1549655 (D.N.M. Apr. 20, 2021) .................................... 1, 17, 18

*Jackson v. Los Lunas Cmty. Program*,
    880 F.3d 1176 (10th Cir. 2018) ............................................................................. 17

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ............................................................ 10, 11, 12, 14, 2

*Kaiser Steel Corp. v. Mullins*,
    455 U.S. 72 (1982) ............................................................................................ 14

*Klein v. Crawford*,
    No. 3:05-cv-0463-RLH-RAM, 2007 WL 782170 (D. Nev. Mar. 12, 2007) .................... 14

*Lavin v. Marsh*,
    644 F.2d 1378 (9th Cir. 1981) ........................................................................ 13-14

*Mendez v. ICE*,
    No. 3:23-cv-00829-TLT, 2023 WL 2604585 (N.D. Cal. Mar. 15, 2023), ....................... 8

*Murphy v. DirecTV, Inc.*,
    724 F.3d 1218 (9th Cir. 2013) ........................................................................ 11, 17

*Nielsen v. Preap*,
    139 S. Ct. 954 (2019)................................................................ 14, 2, 3, 4, 6

*Rhinehart v. Hedpeth*,
    No. 15-cv-01699-JST, 2017 WL 1175569 (N.D. Cal. Mar. 30, 2017) ........................ 14

*Sarmiento v. Fresh Harvest, Inc.*,
    573 F. Supp. 3d 1378 (N.D. Cal. 2021) ............................................................... 12

*Schneider v. YouTube, LLC*,
    __ F. Supp. 3d __ , No. 20-cv-04423-JD, 2023 WL 114226 (N.D. Cal. Jan. 5, 2023) ............... 11, 17

*Se. Fed. Power Customers, Inc. v. Geren*,
    514 F.3d 1316 (D.C. Cir. 2008) ......................................................................... 12

*SEC v. Collector's Coffee Inc.*,
    No. 19 Civ. 4355 (VM), 2021 WL 3082209 (S.D.N.Y. July 21, 2021) ....................... 12

*Stone Forest Indus., Inc. v. United States*,
    973 F.2d 1548 (Fed. Cir. 1992) ........................................................................... 9

*United Comm. Serv., Inc. v. Paymaster Corp.*,
    962 F.2d 853 (9th Cir. 1992) .............................................................................. 8

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ......................................................................................... 2

*Zamorano v. Garland*,
    2 F.4th 1213 (9th Cir. 2021) ............................................................................. 15

**Federal Statutes**

8 U.S.C. § 1226 ............................................................................................... 5

8 U.S.C. § 1226(a) ............................................................................................ 3

8 U.S.C. § 1226(c) ....................................................................... 10, 12, 13, 14, 2, 5, 6

8 U.S.C. § 1226(c)(1)(D) ................................................................................................. 2

8 U.S.C. § 1231(a)(2) ....................................................................................................... 2

8 U.S.C. § 1252(f)(1 ....................................................................................................... 15

**Rules**

Federal Rule of Civil Procedure 25(d) ............................................................................ 1

**INTRODUCTION**

Pursuant to Section V.E of the Settlement Agreement, ECF No. 1205-1, Federal Defendants respectfully submit the following brief to address two disputes that Class Counsel have raised regarding the Settlement Agreement.[2]

<u>Transfers for Medical Care:</u>  The first dispute relates to the transfers in March 2023 of four Class Members[3] from the Mesa Verde ICE Processing Facility ("Mesa Verde") for medical care.

The four individuals had been engaged in a hunger strike at Mesa Verde and suffered significant medical effects, including significant losses to their body weight.  ICE and Mesa Verde medical professionals determined in the exercise of their medical judgment that the individuals were in need of a higher level of medical care than could be provided at Mesa Verde.  The individuals consequently were transferred to El Paso Service Processing Center in El Paso, Texas, which has greater medical care capabilities than Mesa Verde.

The Settlement Agreement contains no prohibition on such transfers.  The Settlement Agreement incorporates the "PRR"—"the most recently updated version of the COVID-19 Pandemic Response Requirements published by ICE."  The current version of this document, effective July 13, 2023,[4] also contains no prohibition on such transfer.  *See* Zack Decl. Ex. 1.  In March 2023, the current version of this document was PRR v.10.  *See* Zack Decl. Ex. 2.  PRR v.10 also contained no prohibition on such transfers.  To the contrary, it specifically provided that "[i]f a detainee is determined to require health care beyond facility resources, the detainee will be transferred in a timely manner to an appropriate facility."  *Id.* at 10.

Class Counsel claim that the transfers breached a provision in PRR v.10 that states that "[t]ransfers and transport of ICE detainees are discontinued unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release or removal, or to

---

[2] Pursuant to Settlement Agreement ¶ V.C–D, the parties have (1) met and conferred and (2) presented the disputes to the Ninth Circuit mediation program but have been unable to resolve the disputes.

[3] Capitalized terms not otherwise defined have the meaning given them in the Settlement Agreement.

[4] The current version of this document is no longer titled the "COVID-19 Pandemic Response Requirements" but instead is titled the "Post Pandemic Emergency COVID-19 Guidelines and Protocols," reflecting the end of the COVID national emergency declaration on May 11, 2023.  *See* Pub. L. No. 118-3, 137 Stat. 6 (2023).

prevent overcrowding."  *Id.* at 39.  But by its plain terms, the provision that Class Counsel cite expressly *allows* for transfers for, among other things, medical evaluation and clinical care.  Consequently, the transfers of these individuals did not constitute a breach of PRR v.10 or of any provision in the Settlement Agreement.

Release of Mandatory Detainees:  The second dispute relates to the non-release of Class Members who are subject to mandatory detention under Section 236(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1226(c).[5]

The INA provides that certain noncitizens are subject to mandatory detention while their removal proceedings are pending and may not be released.  The INA section at issue in the instant dispute— § 1226(c)—provides that noncitizens who have committed certain crimes[6] are subject to mandatory detention while their removal proceedings are pending and "are not entitled to be released under any circumstances" (other than under a witness-protection provision, § 1226(c)(2), not at issue here). *Jennings v. Rodriguez*, 138 S. Ct. 830, 846 (2018).  "[T]he statute expressly and unequivocally imposes an affirmative *prohibition* on releasing detained aliens under any other conditions."  *Id.* at 847 (emphasis in original); *see Nielsen v. Preap*, 139 S. Ct. 954, 966 (2019) ("The Secretary [of Homeland Security] may *not* release aliens 'described in' subsection (c)(1)—that is, those guilty of a predicate offense.") (emphasis in original).

Class Counsel claim that the fact that ICE has not released detainees who are subject to § 1226(c) breaches Settlement Agreement ¶ II.A.10, which states that "[a] Class Member with Vulnerabilities should be released unless a Supervising Detention and Deportation Officer—following consultation with a medical professional, who will make the assessment as to the existence and/or

---

[5] Class Counsel also frames this dispute as relating to mandatory detention pursuant to 8 U.S.C. § 1231(a)(2) but no Class Members have been identified to which this provision applies.  Any challenge based on that statute is therefore not ripe.  Moreover, the arguments here and below apply with equal force to Congress's command in § 1231(a)(2) that "[d]uring the removal period, the [Secretary of Homeland Security] shall detain the alien."  *See also Zadvydas v. Davis*, 533 U.S. 678, 683 (2001) ("[D]uring the 90–day removal period, however, aliens must be held in custody.").

[6] In addition to certain criminal noncitizens, § 1226(c) also requires mandatory detention of certain noncitizens with connections to terrorism.  8 U.S.C. § 1226(c)(1)(D).  For simplicity, this brief refers to all § 1226(c) categories collectively as "criminal noncitizens."  *Accord Preap*, 139 S. Ct. at 960 ("[S]ince the vast majority of mandatory-detention cases [] involve convictions, we follow the heading of subsection (c), as well as our cases and the courts below, in referring to aliens who satisfy subparagraphs (A)–(D) collectively as 'criminal aliens.'").

1  severity of medical risk factors—determines that the risk of flight or danger to the community

2  substantially outweighs the risk of severe illness or death to the Class Member." But while ¶ II.A.10

3  allows for the possible release of those detainees who are not subject to statutory mandatory detention,[7]

4  it does not supersede the INA or allow for the release of detainees subject to statutory mandatory

5  detention by Act of Congress. Consequently, the non-release of detainees subject to § 1226(c) does not

6  constitute a breach of the Settlement Agreement.

7       Federal Defendants respectfully request that the Court deny any claims by Class Counsel of

8  breach of the Settlement Agreement and reject any attempts by Class Counsel to impose new

9  requirements beyond the terms of the Settlement Agreement.

10  **STATEMENT OF FACTS**

11  **I.  FOUR CLASS MEMBERS WERE TRANSFERRED TO ANOTHER FACILITY THAT**

12  **COULD PROVIDE THE APPROPRIATE LEVEL OF MEDICAL CARE FOR THEIR CONDITION.**

13       **A.  The applicable PRR provisions.**

14       The ICE COVID-19 Pandemic Response Requirements that were operative at the time of the

15  transfers that are the subject of this dispute were put in place to "set forth expectations and assist[] ICE

16  detention facility operators in sustaining detention operations while mitigating risk to the safety and

17  wellbeing of detainees, staff, contractors, visitors, and stakeholders due to COVID-19." Zack Decl. Ex.

18  2 at 4. To ensure appropriate medical care, facilities were required to transfer detainees "in a timely

19  manner to an appropriate facility" if the detainee was "determined to require health care beyond facility

20  resources." *Id.* at 10. As an element of the provisions of the PRR related to the prevention of the

21  introduction and transmission of COVID-19 to and in detention facilities, ICE discontinued transfers of

22  detainees "unless necessary for medical evaluation, medical isolation/quarantine, clinical care,

23  extenuating security concerns, release or removal, or to prevent overcrowding." *Id.* at 39.

24       **B.  The transfers for medical care.**

25       In March 2023, four Class Members were transferred from Mesa Verde to the El Paso Service

26

27  [7] The INA provides for both non-mandatory and mandatory detention. *See, e.g.*, 8 U.S.C. § 1226(a); *Preap*, 139 S. Ct. at 959–60 (discussing some of the differences between non-mandatory and mandatory

28  detention). The instant dispute does not relate to the question of possible release of any non-mandatory detainee who is not subject to § 1226(c). Nor does the instant question involve whether an individual is appropriately classified as subject to mandatory detention.

1   Processing Center ("El Paso") for medical care.  The four individuals were transferred because it was

2   determined that they required health care beyond Mesa Verde's resources.  Specifically, the four

3   individuals had been engaged in a hunger strike.  *See* Declaration of Dr. Alta Grace Baruiz ("Dr. Baruiz

4   Decl.")  ¶¶ 3, 8, 13, 18.  The doctor employed by GEO at Mesa Verde, Dr. Alta Grace Baruiz, contacted

5   ICE and notified them that, based on the doctor's observations and assessments of these four

6   individuals, her medical opinion was that a higher level of medical care than that available at Mesa

7   Verde was needed for these individuals.  *See id.* ¶¶ 7, 12, 17, 23; Declaration of Dr. Michelle Iglesias

8   ("Dr. Iglesias Decl.") ¶¶ 4, 6.  All four individuals had lost between 5.5 percent and 12.2 percent of their

9   body weight between mid-January and early March.  *See* Dr. Baruiz Decl. ¶¶ 4, 9, 14, 19.  Losing 5

10  percent one's body weight within one month or 7.5 percent of one's body weight within three months is

11  considered the diagnostic for potential severe malnutrition.  *See* Dr. Iglesias Decl. ¶ 13.  One of the

12  individuals also had other significant health concerns.  *See* Dr. Baruiz Decl. ¶ 3.  All four individuals

13  were refusing routine laboratory tests and vital sign monitoring.  *See id.* ¶¶ 5, 10, 15, 20.  Dr. Baruiz

14  determined that these individuals were at risk of refeeding syndrome.  *See id.* ¶¶ 6, 11, 16, 21.  Dr.

15  Baruiz, in consultation with the ICE Health Services Corps ("IHSC"), requested a transfer of these

16  individuals.  *See id.* ¶¶ 7, 12, 17, 23.  The 10-day quarantine period required for those returning from a

17  hospital to Mesa Verde was also discussed.  *See id.* ¶¶ 7, 12, 17, 23; Dr. Iglesais Decl. ¶ 8.

18       The Field Medical Coordinator ("FMC") contacted Dr. Iglesias, the then-Acting Western

19  Regional Clinical Director of IHSC to let her know of Dr. Baruiz's request for a higher level of medical

20  care for four individuals and the status of these individuals.  *See* Dr. Iglesias Decl. ¶¶ 6-7.  After

21  considering the status of the four individuals, Dr. Iglesias determined in her medical opinion that El Paso

22  "was better equipped to provide the higher level of medical care that was needed by these" four

23  individuals.  *Id.* ¶ 14.  El Paso (unlike Mesa Verde) is an IHSC-staffed facility.  *Id.* ¶ 15.  It has a

24  medical housing unit and is equipped to handle detainees who may have complex, chronic, medical, or

25  behavioral health conditions that require frequent clinical contacts to maintain control or stability of

26  their condition to prevent hospitalization or complications.  *See id.*  Mesa Verde does not have a medical

27  housing unit and is equipped to care for persons with limited medical needs that medical staff can

28  manage by clinical evaluations every 3-6 months.  *Id.*  Dr. Iglesias's "decision to transfer these four non-

citizens to [El Paso] was based on [El Paso's] ability to meet their medical needs based on number of medical staff available on site, medical bed space availability, access to constant monitoring." Dr. Iglesias Decl. ¶ 17.

## II.    CONGRESS'S STATUTORY DECREES REGARDING MANDATORY DETENTION OF CRIMINAL NONCITIZENS.

In 1996, Congress amended the INA through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Pub. L. No. 104-208, div. C, 110 Stat. 3009, 3009-546 to -725 (1996). Among other things, the IIRIRA enacted 8 U.S.C. § 1226(c), which requires the mandatory detention of certain criminal noncitizens. *Id.* § 303, 110 Stat. at 3009-585 to -587.

As the Supreme Court explained, in enacting § 1226(c), "Congress [was] justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers[.]" *Demore v. Kim*, 538 U.S. 510, 513 (2003). "Congress adopted [§ 1226(c)] against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens." *Id.* at 518. Congress found that "criminal aliens who remained in the United States often committed more crimes before being removed. One 1986 study showed that, after criminal aliens were identified as deportable, 77% were arrested at least once more and 45%—nearly half—were arrested multiple times before their deportation proceedings even began." *Id.* Congress found that "[o]nce released, more than 20% of deportable criminal aliens failed to appear for their removal hearings." *Id.* at 519. Congress determined that "releasing deportable criminal aliens . . . would lead to an unacceptable rate of flight." *Id.* at 520.

"It was following those Reports that Congress enacted 8 U.S.C. § 1226, requiring the Attorney General to detain a subset of deportable criminal aliens pending a determination of their removability." *Id.* at 521. Congress found that "[s]uch detention necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Id.* at 528.

In enacting § 1226(c), Congress further found that one of the major causes of the Immigration and Naturalization Service's ("INS") failure to remove deportable criminal noncitizens had been the fact that INS had been exercising its discretion to release some of these criminal noncitizens. *Id.* at 519

1   (observing that "[t]he Attorney General at the time had broad discretion. . . to release criminal aliens

2   from custody during their removal proceedings when those aliens were determined not to present an

3   excessive flight risk or threat to society" and that the use of this discretion was "one of the major causes

4   of the INS' failure to remove deportable criminal aliens").  Congress designed § 1226(c) specifically to

5   *strip* INS of any ability to release such criminal noncitizens and to make it clear that INS (now DHS)

6   has *no* authority to release them.  *See id.* at 519, 528; *see also Preap*, 139 S. Ct. at 966 ("[S]ubsection

7   (c)'s job is to *subtract* some of [the Secretary's] discretion when it comes to the arrest and release of

8   criminal aliens. . . .  The Secretary may *not* release aliens 'described in' subsection (c)(1)—that is, those

9   guilty of a predicate offense.") (emphasis in original).

10                                                            **ARGUMENT**

11   **I.     THE MARCH 2023 TRANSFERS FOR MEDICAL CARE WERE NOT A MATERIAL
             BREACH OF THE SETTLEMENT AGREEMENT**

12          **A.     Transfers for medical evaluation and/or clinical care are not a breach of the
                    Settlement Agreement.**

13

14          Class Counsel claims that the transfer of four class members from Mesa Verde to El Paso for

15   medical care in March 2023 constitutes a material breach of Settlement Agreement ¶ II.A.1, which

16   provides that ICE shall "[o]perate the Facilities consistent with applicable CDC Guidance, applicable

17   nationwide orders and injunctions, and the PRR (as updated)."  PRR means "the most recently updated

18   version of the COVID-19 Pandemic Response Requirements published by ICE."  In March 2023, the

19   most recently updated version of the PRR was PRR v.10.  *See* Zack Decl. Ex. 2.  Class Counsel base

20   their claim of material breach on a provision in PRR v.10 that provided that "[t]ransfers and transport of

21   ICE detainees are discontinued unless necessary for medical evaluation, medical isolation/quarantine,

22   clinical care, extenuating security concerns, release or removal, or to prevent overcrowding."  *Id.* at 39.

23          By its terms, the PRR provision that Class Counsel cites expressly contemplates and allows for

24   transfers of detainees if necessary for medical evaluation or clinical care.  As set out in Dr. Baruiz and

25   Dr. Iglesias's declarations and summarized above, the decision to seek transfer from Mesa Verde and

26   the decision to transfer the four individuals to El Paso was made in their medical judgment to provide

27   these individuals the medical care that their conditions warranted.  *See* Dr. Iglesias Decl. ¶ 14 ("[I]t was

28   my medical opinion that the El Paso SPC was better equipped to provide the higher level of medical care

1    that was needed by these non-citizens at the time the request for transfer took place."); Dr. Baruiz Decl.

2    ¶ 7 ("Given the associated risks, my medical opinion was that a higher level of care than that available at

3    Mesa Verde would be beneficial to ensure proper refeeding and patient management.").  El Paso, with a

4    medical housing unit, was determined to be the appropriate facility to meet their medical needs.

5           Far from any breach, the PRR provision cited by Class Counsel confirms that transfers for

6    needed medical evaluation and clinical care did not violate the PRR and did not constitute a breach of

7    the Settlement Agreement.  Other provisions in the PRR likewise expressly provide for transfer of

8    detainees for medical care if the facility does not have the appropriate resources.  *See* Zack Dec. Ex. 2 at

9    10 ("If a detainee is determined to require health care beyond facility resources, the detainee will be

10   transferred in a timely manner to an appropriate facility.").  Because the four individuals in question

11   were transferred for a higher level of needed medical care based on the judgment of medical

12   professionals, their transfer did not violate the PRR and thus was not a breach of the Settlement

13   Agreement.

14          Class Counsel claim that the determination to transfer somewhere other than a local hospital or

15   provider, the manner of the transfer, and the allegations of what occurred after the detainees were

16   transferred establish that the transfers were not "necessary" and are therefore not in compliance with the

17   PRR.  This post hoc criticism of decisions made by medical professionals based on the information

18   available at the time of the decision to transfer belies Class Counsel's real objections on this issue.  First,

19   in asserting that transfer should have been to a local hospital or provider, Class Counsel admit that

20   transfer from Mesa Verde was necessary to care for these individuals.  Class Counsel instead objects to

21   *where* these individuals were transferred.  The PRR transfer restriction provision which Class Counsel

22   asserts was violated does not contain any restriction on where a detainee may be transferred once a

23   decision to transfer is made.  *See* Zack Decl. Ex. 2 at 39.  It does not require that the facility be close to

24   the initial facility or that it be to a hospital or other private provider.  It only states that the transfer must

25   be necessary for medical evaluation or clinical care.  Because Class Counsel admits that transfer to a

26   local provider would have been permitted under the PRR, the argument that the transfer to a different

27   facility violated the PRR does not withstand scrutiny.

28          Second, Class Counsel objects to the treatment of the individuals on the way to and at El Paso,

1   not the decision to transfer the individuals there.  However, the manner of transfer and what occurred

2   after the transfer are beyond the scope of the Settlement Agreement that this Court is tasked with

3   enforcing.  The PRR only pertains to the circumstances under which transfers are permitted.  Defendants

4   complied with the PRR requirements here.

5        Class Counsel previously filed a separate lawsuit bringing their allegations regarding the hunger

6   strike transfers and seeking a TRO.  First Amend. Compl., *Mendez v. ICE*, No. 3:23-cv-00829-TLT

7   (Mar. 10, 2023), ECF No. 30.  The court denied Class Counsel's motion for TRO, 2023 WL 2604585

8   (N.D. Cal. Mar. 15, 2023), after which Class Counsel voluntarily dismissed that lawsuit.  This settlement

9   is not an appropriate forum for relitigating those separate claims.

10        Federal Defendants also note that On May 11, 2023, ICE issued its ERO Post Pandemic

11   Emergency COVID-19 Guidelines and Protocols guidance, given the end of the COVID-19 national

12   emergency declaration.  *See* Pub. L. No. 118-3, 137 Stat. 6 (2023).  The current guidance, updated July

13   13, 2023, is attached.  *See* Zack Decl. Ex. 1.  The guidance states that "[f]or facilities subject to court

14   orders or settlement agreements regarding COVID-19, this Guidelines and Protocols document will

15   constitute the PRR."  *Id.* at 5.  This guidance no longer provides that transfers and transport of ICE

16   detainees are discontinued in a blanket manner.  Thus, not only were the March 2023 transfers not a

17   breach to begin with, the provision on which Class Counsel based their claim of material breach has

18   been rescinded.  There is no live dispute regarding detainee transfers when there are not active COVID-

19   19 cases at Mesa Verde and no live basis for Class Counsel to raise a similar dispute going forward.

20        **B.**    **Counterfactually, any alleged breach regarding the transfers is not material.**

21        Assuming, counterfactually, the transfers were not proper under the PRR, the transfers were not

22   a material breach of the Settlement Agreement.   "A breach is material only if it 'relates to a matter of

23   vital importance,' or if it 'goes to the essence [of the contract] and frustrates substantially the purpose

24   for which the contract was agreed to by the injured party.'"  *America v. Mills*, 714 F. Supp. 2d 88, 100

25   (D.D.C. 2010), *aff'd*, 643 F.3d 330 (D.C. Cir. 2011) (quoting *Thomas v. Dep't of Hous. & Urb. Dev.*,

26   124 F.3d 1439, 1442 (Fed. Cir. 1997), and *Cuneo Law Grp., P.C. v. Joseph*, 669 F. Supp. 2d 99, 109

27   (D.D.C. 2009)).[8]  A materiality "determination depends on the nature and effect of the violation in light

28

---

[8] "A settlement agreement is treated as any other contract for purposes of interpretation."  *United Comm.*

1    of how the particular contract was viewed, bargained for, entered into, and performed by the parties."

2    *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1551 (Fed. Cir. 1992).

3    Strict compliance with the transfer provision of the PRR in this specific circumstance does not

4    go "to the essence" of the Settlement Agreement.  Plaintiffs brought a class action lawsuit seeking to

5    remedy allegations regarding conditions of confinement related to the COVID-19 pandemic.  *See* ECF

6    No. 1 ¶¶ 1-3; ECF No. 780 ¶ 139 ("Defendants' detention of Plaintiffs and other class members during

7    the COVID- 19 pandemic violates the Due Process Clause of the Fifth Amendment of the United States

8    Constitution.").  The Settlement Agreement was entered into to resolve that action and to "help[ ]

9    mitigate risks associated with the spread of COVID-19."  Settlement Agreement at 2.  The PRR was

10   promulgated to assist ICE with continuing operations "while mitigating risk to the safety and wellbeing

11   of detainees, staff, contractors, visitors, and stakeholders due to COVID-19."  Zack Decl. Ex. 2 at 4.

12   Located in the section of the PRR titled "Prevention," the transfer restriction provision seeks to reduce

13   the movement of people as a means to prevent the spread of COVID-19.

14   By contrast, Class Counsel's objections to the transfers in March 2023 have no relation to

15   COVID-19.  They relate only to a wholly separate issue (a hunger strike) that Class Counsel attempted

16   to litigate in a separate lawsuit and then voluntarily withdrew and are based only on whether care could

17   have been provided at hospitals located closer to Mesa Verde, the manner of transfer, and alleged

18   deficiencies in care wholly unrelated to COVID-19.  Class Counsel has pointed to no actual connection

19   between these transfers and the risks posed by COVID-19.

20   Instead, the transfers were made to a higher level of medical care facility based on the condition

21   of the transferred individuals, as set forth above.  The detainees that were transferred were cohorted

22   upon their return to Mesa Verde.  *See* Dr. Baruiz Decl. ¶ 27.  Even if the Court were to find that the

23   transfers were not "necessary" for medical care, the transfers were handled in a manner that sought to

24   reduce the introduction or spread of COVID-19 at Mesa Verde, the goal and purpose of the Settlement

25   Agreement and the PRR.  ICE has not materially breached the Settlement Agreement because the

26   _____

27   *Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992); *accord, e.g.*, *Four Seasons Tours & Travel, Inc. v. Glancy Binkow and Goldberg L.L.P.*, No. CV 15-07105 SJO (AGRx), 2015 WL 13284509, at *3 (C.D. Cal. Nov. 6, 2015) (same rule applies to class action settlement agreement)

28   (quoting *United Comm.*, 962 F.2d at 856).

1    transfers did not "frustrate[ ] substantially the purpose for which the [Settlement Agreement] was agreed

2    to by the injured party," i.e., the four Class Members.  *America*, 714 F. Supp. 2d at 100.

3    **II.    ICE HAS NOT BREACHED THE VULNERABILITIES SCREENING PROVISION**
      **BECAUSE IT GENERALLY MAY NOT RELEASE THOSE SUBJECT TO 8 U.S.C.**
4     **§ 1226(C)**

5          **A.    Settlement Agreement ¶ II.A.10 does not provide for the release of mandatory**
                 **detainees.**
6
           Class Counsel claim that the fact that ICE has not released Class Members subject to mandatory
7
      detention under 8 U.S.C. § 1226(c) during the Vulnerabilities screening is a breach of the Settlement
8
      Agreement.  This is incorrect.  The Settlement Agreement does not provide for the release of mandatory
9
      detainees subject to § 1226(c), nor could it, in light of Congress's statutory mandate that those criminal
10
      detainees subject to § 1226(c) "are not entitled to be released under any circumstances."  *Jennings*, 138
11
      S. Ct. at 846.
12
           Contrary to Class Counsel's claim, nothing in the Settlement Agreement provides for the release
13
      of general Class Members subject to § 1226(c).  The Settlement Agreement provides for the possible
14
      release of certain Class Members subject to § 1226(c) only in one specific circumstance.  Where a Class
15
      Member was detained by ICE, and then was released from custody prior to the Effective Date of the
16
      Settlement Agreement (June 10, 2022), and then was subsequently re-detained by ICE, the Class
17
      Member will be re-released if such re-detention were in violation of the Settlement Agreement.
18
      Settlement Agreement ¶¶ I.S, III.A–B, V.B.1.  The Settlement Agreement includes express language
19
      that this re-detention and re-release procedure applies to Class Members who are subject to § 1226(c), in
20
      addition to Class Members who are not.  *Id.* ¶ V.B.1 ("This includes individuals described in 8 U.S.C.
21
      §§ 1226(c) and 1231(a)(2).")  Class Members who are subject to § 1226(c) who might fall within the re-
22
      release provision set forth in Settlement Agreement ¶ V.B.1 necessarily would have received a court
23
      order for their release issued before the Effective Date.[9]  In that one limited circumstance, the Settlement
24
      Agreement allows for the release of Class Members who are subject to § 1226(c).  The Settlement
25
      Agreement contains no other provision that mentions § 1226(c) or that provides for the release of Class
26

27    _____
      [9] Because ICE cannot voluntarily release detainees subject to § 1226(c), the only way that a Class
28    Member could have been released prior to the Effective Date (and thus be a "Non-Detained Class
      Member" subject to Settlement Agreement ¶¶ III.A–B and V.B.1) would be pursuant to a court order
      issued before the Effective Date.

1  Members who are subject to mandatory detention under § 1226(c).

2        Class Counsel claim that Settlement Agreement ¶ II.A.10 provides for the release of Class

3  Members subject to § 1226(c).  Not so.  Paragraph II.A.10 cannot provide for the release of general

4  Class Members subject to § 1226(c), in light of Congress's statutory mandate that such criminal

5  noncitizens "are not entitled to be released under any circumstances." *Jennings*, 138 S. Ct. at 846.

6  Rather, what ¶ II.A.10 does is provide for is the possible release of Class Members who are *not* subject

7  to statutory mandatory detention, but not those Class Members who are.  And the fact that the possibility

8  of release under ¶ II.A.10 is limited to non-mandatory detainees, and does not extend to mandatory

9  detainees, was well understood by the parties.

10        *First*, where the parties intended to have the Settlement Agreement provide for the possible

11  release of detainees subject to § 1226(c), they expressly wrote that into the Settlement Agreement.  *See*

12  Settlement Agreement ¶ V.B.1 (providing for the possible release of § 1226(c) detainees who had

13  previously been released prior to the Effective Date).  The fact that they did not write this into ¶ II.A.10

14  shows that ¶ II.A.10 was not intended to provide for the release of such detainees.  *See, e.g.*, *Murphy v.*

15  *DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013) (where agreement expressly extends rights in one

16  circumstance but not in another, extension does not cover second circumstance, because first extension

17  shows that the parties "clearly knew how to provide" for such rights "if [they] wished to do so");

18  *Schneider v. YouTube, LLC*, __ F. Supp. 3d __, No. 20-cv-04423-JD, 2023 WL 114226, at *6 (N.D. Cal.

19  Jan. 5, 2023) ("omission of 'the explicit language of condition' in a clause 'is particularly significant'

20  when the parties 'employed precisely such language . . .' in other clauses" of same agreement, because

21  "[t]he drafters of the [agreement] knew how to use the language . . . when they wanted to, and chose not

22  to do so") (quoting *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297,

23  306 (2d Cir. 2016)); *Bd. of Cty. Comm'rs v. United States*, 93 Fed. Cl. 228, 234 (2010) (where

24  agreement language expressly provides for certain rights with respect to one clause of agreement but not

25  with respect to another, such rights do not apply to second clause, because "the parties clearly knew how

26  to use language" to provide for such rights and declined to do so).

27        *Second*, and more fundamentally, Settlement Agreement ¶ II.A.10 cannot be construed as

28  providing for the release of mandatory detainees who have not previously been released prior to the

Effective Date pursuant to a court order, because Congress by statute "expressly and unequivocally impose[d] an affirmative *prohibition*" on releasing such detainees, *Jennings*, 138 S. Ct. at 847 (emphasis in original), and it is black-letter law that parties (including the Government) may not enter into an agreement (including a settlement agreement) that violates an Act of Congress.  *See, e.g.*, *Se. Fed. Power Customers, Inc. v. Geren*, 514 F.3d 1316, 1321 (D.C. Cir. 2008) (reversing district-court approval of settlement agreement as erroneous because "the district court could hardly approve a settlement that violates a statute") (citing *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990)); *California v. United States*, 271 F.3d 1377, 1383 (Fed. Cir. 2001) ("[w]ithout a doubt, contractual provisions made in contravention of a statute are void and unenforceable") (citing *Fed. Crop. Ins. Co. v. Merrill*, 332 U.S. 380 (1947)); *Burnside-Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854, 858 (Fed. Cir. 1997) ("Generally, a provision in a government contract that violates or conflicts with a federal statute is invalid or void.") (quoting *Am. Airlines, Inc. v. Austin*, 75 F.3d 1535, 1538 (Fed. Cir. 1996)); *Sarmiento v. Fresh Harvest, Inc.*, 573 F. Supp. 3d 1378, 1389–90 (N.D. Cal. 2021) (holding that settlement agreement that violated federal regulation was void and unenforceable, and consequently dismissing with prejudice claim for alleged breach of settlement agreement); *SEC v. Collector's Coffee Inc.*, No. 19 Civ. 4355 (VM), 2021 WL 3082209, at *3 (S.D.N.Y. July 21, 2021) ("[T]he enforceability of a settlement agreement would have to give way to a valid law or regulation forbidding a particular provision of a settlement agreement.").

Plaintiffs and Class Counsel had actual knowledge that Federal Defendants did not and could not agree in Settlement Agreement ¶ II.A.10 to release mandatory detainees subject to § 1226(c).  Federal Defendants made it clear, from the outset and throughout the litigation, that it could not agree to release detainees subject to § 1226(c) on its own.  *See, e.g.*, ECF No. 37-1 at 2 (Bonnar Decl. ¶ 4) ("[A]liens convicted of certain crimes are subject to mandatory custody under INA section 236(c) [8 U.S.C. § 1226(c)] and are ineligible for release from ICE custody pending completion of removal proceedings"); ECF No. 37-14 at 2 (Fishburn Decl. ¶ 3) (same); ECF No. 264-2 at 1 (Fishburn Decl. ¶ 3) ("ICE is required by Congressional statute under section 236(c) of the INA, 8 U.S.C. § 1226(c), to mandatorily detain aliens convicted of certain crimes, and these aliens are ineligible for release from ICE custody pending completion of removal proceedings."); ECF No. 786 at 17–18 (Fed. Defs. Br. 12–

1  13) ("ICE does not have authority to release criminal detainees subject to the mandatory-detention

2  provision of 8 U.S.C. § 1226(c)."); ECF No. 786-8 at 2 (Bonnar Decl. ¶ 5) ("[A]liens convicted of

3  certain crimes are subject to mandatory custody under INA section 236(c) and are ineligible for release

4  from ICE custody pending completion of removal proceedings.").[10]   The Court agreed.   ECF No. 867 at

5  5 n.1 (Prelim. Injunction Order) (agreeing that many detainees "were subject to statutorily mandated

6  detention and the defendants were not authorized to release them absent a court order").   Plaintiffs and

7  Class Counsel were well aware of these limitations when they entered the Settlement Agreement.

8       Additionally, even if they disclaim actual knowledge that Federal Defendants could not agree in

9  Settlement Agreement ¶ II.A.10 to release mandatory detainees subject to § 1226(c), Plaintiffs and Class

10  Counsel had constructive knowledge.   "[T]he scope of a government officer's 'authority may be

11  explicitly defined by Congress or be limited by designated legislation," and "'everyone is charged with

12  knowledge of the United States Statutes at large,'" including the knowledge that "officers of the

13  government have neither the 'power nor the authority to waive or nullify the provisions of the statutes

14  enacted by the Congress.'"   *Angel v. United States*, 165 Fed. Cl. 453, 467–68 (2023) (quoting cases);

15  *accord, e.g.*, *Lavin v. Marsh*, 644 F.2d 1378, 1383 (9th Cir. 1981) ("Persons dealing with the

16  government are charged with knowing government statutes and regulations, and they assume the risk

17

18

_____

[10] This is not to say that ICE has never released a detainee subject to mandatory detention through
19  mistake or human error.   That ICE might have made a mistake in an individual case, however, does not
    mean that it is free to release mandatory detainees generally as a legal matter.

20       Additionally, Federal Defendants have released detainees subject to mandatory detention when
    ordered to do so by a court.   For example, in *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG
21  (DTBx), 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013), a district court issued an injunction that detainees
    who have a serious mental disorder or defect be given a bond hearing at which they could seek release,
22  even if they were subject to § 1226(c).   *See id.* at *13.   Federal Defendants complied with that
    injunction.

23       More recently, in *Fraihat v. ICE*, No. EDCV 19-1546 JGB (SHKx), 2020 WL 6541994 (C.D.
    Cal. Oct. 7, 2020), a district court issued an injunction that ICE must release certain detainees, including
24  detainees subject to § 1226(c), in response to the COVID pandemic.   *Id.* at *12.   Federal Defendants
    complied with that injunction as well, until the Ninth Circuit reversed and remanded the district court's
25  decision, *see Fraihat v. ICE*, 16 F.4th 613 (9th Cir. 2021), and the district court subsequently vacated its
    injunction in September 2022, *see Fraihat v. ICE*, No. 5:19-CV-01546 (C.D. Cal. Sept. 16, 2022), ECF
26  No. 385.   Indeed, when Class Counsel inquired about the Vulnerabilities Screening in June 2022, the
    *Fraihat* injunction remained in place, and Federal Defendants' response reflected that fact.   That Federal
27  Defendants might have released (or considered for release) mandatory detainees in compliance with
    court-ordered injunctions, however, does not mean that it is free to release such detainees on its own.
28  (Further, as discussed in Section II.B, *infra*, such injunctions are no longer permissible following the
    Supreme Court's decision in *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057 (2022)).

1   that government agents might exceed their authority and provide misinformation.").  The statutes

2   enacted by Congress provide that "[t]he Secretary may *not* release aliens 'described in' subsection

3   [1226](c)(1)[.]"  *Preap*, 139 S. Ct. at 966 (emphasis in original).  What the parties agreed to in

4   Settlement Agreement ¶ II.A.10 is the possible release of detainees who are not subject to mandatory

5   detention, but not the release of mandatory detainees—which is the only possible reading of ¶ II.A.10

6   that does not render it void from the outset.

7          Because ¶ II.A.10 does not provide for the release of mandatory detainees, any alleged failure to

8   release mandatory detainees under ¶ II.A.10 does not constitute a breach of the Settlement Agreement.

9          **B.     The Court may not order the release of mandatory detainees.**

10          To the extent that Class Counsel argue that the Court should order the release of any mandatory

11   detainees, their request should be denied.

12          *First*, "[i]t is [] well established [] that a federal court has a duty to determine whether a contract

13   violates federal law before enforcing it."  *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83 (1982).  "The

14   power of the federal courts to enforce the terms of private agreements is at all times exercised subject to

15   the restrictions and limitations of the public policy of the United States as manifested in federal

16   statutes."  *Id.* at 83–84 (ellipsis omitted).  "Where the enforcement of private agreements would be

17   violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power."

18   *Id.* at 84.  "[C]ourts will not order a party to a contract to perform an act that is in direct violation of a

19   positive law directive, even if that party has agreed, for consideration, to perform that act."  *Bassidji v.*

20   *Goe*, 413 F.3d 928, 936 (9th Cir. 2005).  The release of mandatory detainees subject to 8 U.S.C.

21   § 1226(c) would violate the "affirmative *prohibition* on releasing [such] detained aliens" set forth in the

22   INA.  *Jennings*, 138 S. Ct at 847 (emphasis in original).  The Court may not order release in response to

23   a claim by Class Counsel of alleged breach of the Settlement Agreement, because such release would

24   directly violate a positive law directive set forth in an Act of Congress.[11]

25   ───────────────────────

26   [11] Class Counsel cannot supersede this statutory prohibition on releasing detainees subject to § 1226(c)
     by trying to recast the instant dispute about the Settlement Agreement as a constitutional issue.
     Regardless of whether the claims originally pleaded in this case pre-settlement were constitutional

27   claims, once a party enters a settlement agreement, "the party is precluded from raising the underlying
     claims."  *Arnold v. United States*, 816 F.2d 1306, 1309 (9th Cir. 1987).  Any disputes arising now after

28   the settlement has gone into effect are at most allegations only of a breach of the Settlement Agreement,
     and "[t]he breach of a settlement agreement does not constitute a constitutional violation."  *Rhinehart v.*

FED. DEFS.' BR. RE (1) TRANSFERS FOR MED. CARE AND (2) RELEASE OF MANDATORY DETAINEES

1    *Second*, and separately, another section of the INA—8 U.S.C. § 1252(f)(1)—further prohibits the

2    Court from ordering the release of mandatory detainees through a class order.  This section provides

3    that:

> Regardless of the nature of the action or claim or of the identity of the
> party or parties bringing the action, no court (other than the Supreme
> Court) shall have jurisdiction or authority to enjoin or restrain the
> operation of the provisions of part IV of this subchapter, as amended by
> the Illegal Immigration Reform and Immigrant Responsibility Act of 1996
> [8 U.S.C. §§ 1221–32], other than with respect to the application of such
> provisions to an individual alien against whom proceedings under such
> part have been initiated.

9    In *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057 (2022), the Supreme Court confirmed that

10   "§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to

11   take or refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory

12   provisions."  *Id.* at 2065; *see also id.* at 2065, 2067–68 ("injunctive relief on behalf of an entire class of

13   aliens is not allowed" and even where the class is made up of individuals who all individually face

14   enforcement actions, courts still may not issue injunctions).  An order to release detainees subject to

15   § 1226(c) indisputably would be an order that enjoins or restrains the operation of a provision of the

16   INA, subchapter II, part IV, of which § 1226(c) is part.  Such an order would be "unlawful."  *See id.* at

17   2068; *accord, e.g.*, *Alcantara v. Archambeault*, No. 20cv0756 DMS (AHG), 2023 WL 3589664, at *2 &

18   n.3 (S.D. Cal. May 22, 2023) (*Aleman Gonzalez* renders request for classwide release from detention

19   "legally noncognizable").[12]

20

---

21   *Hedpeth*, No. 15-cv-01699-JST, 2017 WL 1175569, at *16 n.7 (N.D. Cal. Mar. 30, 2017); *accord, e.g.*,
     *Klein v. Crawford*, No. 3:05-cv-0463-RLH-RAM, 2007 WL 782170, at *8 (D. Nev. Mar. 12, 2007)
22   ("Violation of a settlement agreement is a breach of contract, not a constitutional violation.") (citing
     *O'Connor v. Colvin*, 70 F.3d 530, 532 (9th Cir. 1995)).

23   [12] To the extent that Class Counsel argue that Federal Defendants has waived § 1252(f)(1)'s prohibition
     on entry of a classwide order to enjoin or restrain the operations of the INA, subchapter II, part IV, their
24   argument fails.  *First*, nothing in the text of § 1252(f)(1) or the Supreme Court's decision in *Aleman
     Gonzalez* allows for a waiver of § 1252(f)(1), and the Court may not infer the availability of waiver
25   where no such waiver exists under the statute.  Indeed, given that § 1252(f)(1) was intended by Congress
     to limit the power of the *Judiciary*, it is not clear how the Executive could waive § 1252(f)(1)'s
26   operation.  *See, e.g.*, *EEOC v. Fed. Labor Relations Auth.*, 476 U.S. 19, (1986) (statute that "speaks to
     courts, not parties" and limits judicial power of courts "is not 'waived' simply because [a party] fails to
27   invoke it"); *Zamorano v. Garland*, 2 F.4th 1213, 1225 (9th Cir. 2021) ("Federal courts 'must
     scrupulously confine their own jurisdiction to the precise limits which a federal statute has defined,'");
28   *FTC v. Leshin*, No. 06-61851-CIV, 2007 WL 9703567, at *4 (S.D. Fla. Oct. 9, 2007) ("[A] government
     agency . . . 'may not waive the requirement of an act of Congress.'") (quoting *SEC v. Morgan, Lewis &*

1    For the foregoing reasons, the Court may not order the release of mandatory detainees, and any

2  claims by Class Counsel that the Court should order release of mandatory detainees should be denied.

3  **III.    ANY REQUEST FOR DISCOVERY IS IMPROPER**

4    To the extent that Class Counsel argue that the Court should order discovery with respect to their

5  (unfounded) claims of breach of the Settlement Agreement, their request should be denied.

6    The Settlement Agreement does not provide for discovery in connection with an allegation of

7  breach.  To the contrary, the Settlement Agreement expressly provides for an "expeditious" dispute-

8  resolution process that does not envision discovery.  The parties first meet and confer within seven days

9  in response to a claim of breach.  Settlement Agreement ¶ V.C.  If they cannot resolve the dispute, they

10  then will jointly seek "expeditious presentation" of the dispute to the Ninth Circuit mediation program.

11  *Id.* ¶ V.D.  If they still cannot resolve their dispute, they then will jointly seek "expeditious review" by

12  this Court and will submit simultaneous briefs and any other supporting evidence or information within

13  seven days after failure to resolve the dispute before the Ninth Circuit mediation program.  *Id.* ¶¶ V.E,

14  V.E.2.  Any claim by Class Counsel to take affirmative discovery such as document requests,

15  interrogatories, or depositions is inconsistent with the parties' agreement in the Settlement Agreement to

16  an "expeditious" process where the parties amass their own supporting evidence and information on a

17  seven-day turnaround to submit to the Court.  *Id.* ¶ V.E.2.

18    Additionally, the Settlement Agreement states that one of its purposes is to "avoid[] further

19  diversion of private and governmental resources to adversarial action[.]"  Settlement Agreement at 2.

20  Any claim by Class Counsel to take affirmative discovery—which necessarily will require a further

21  diversion of government resources to adversarial action—is inconsistent with the parties' agreement in

22  the Settlement Agreement.

23    Additionally, the Settlement Agreement expressly provides for certain information disclosures

24  from ICE to Class Counsel.  Settlement Agreement ¶ IV.  ICE must provide written notice to Class

25

26  *Bockius*, 209 F.2d 44, 49 (3d Cir. 1954)).  *Second*, even assuming that the Federal Defendants could
    theoretically waive § 1252(f)(1), the Federal Defendants' waiver would have to be "unmistakable" for

27  such waiver to be effective.  *See Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41,
    52 (1986) (Congressional power to legislate controls over contract in which government is a party

28  "unless surrendered in unmistakable terms").  No such unmistakable waiver of § 1252(f)(1) exists
    anywhere in this case.

Counsel, as soon as practically feasible, within three business days, of any changes to plans, protocols, educational materials, and/or Facility Plans. *Id.* ¶ IV.B.  Further, if ICE intends to implement changes to procedures at the Facilities based on changed CDC Guidance, ICE must provide written notice to Class Counsel as soon as practically feasible. *Id.* ¶ IV.C.  Further, ICE must provide disclosures to Class Counsel of a litany of eight enumerated categories of information, every week, for three years. *Id.* ¶ IV.D.  The fact that the Settlement Agreement expressly includes these information disclosures while making no mention of further disclosures or discovery beyond that confirms that further discovery is not allowed. *See, e.g.*, *Murphy*, 724 F.3d at 1234 (parties "clearly know how to provide" for rights "if [they] wished to do so"); *Schneider*, __ F. Supp. 3d __, 2023 WL 114226, at *6 ("[t]he drafters of the [agreement] knew how to use the language . . . when they wanted to, and chose not to do so"); *Bd. of Cty. Comm'rs*, 93 Fed. Cl. at 234 ("the parties clearly knew how to use language" to provide for such rights and declined to do so).  Any claim by Class Counsel to take affirmative discovery is inconsistent with the parties' agreement in the Settlement Agreement.

The court in *Jackson v. Los Lunas Center for Persons with Developmental Disabilities*, No. 87-0839 JAP/KBM, 2021 WL 1549655 (D.N.M. Apr. 20, 2021), was confronted with exactly this situation and denied attempts by the plaintiffs there to take post-settlement discovery.  The parties there entered into a class-action settlement agreement to resolve constitutional and statutory claims relating to developmentally disabled individuals at two state-supported facilities. *Id.* at *1; *see Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1181 (10th Cir. 2018).  Following the settlement agreement, the plaintiffs sought to issue document requests and two deposition notices. *Jackson*, 2021 WL 1549665, at *2.  The court issued protective orders against the plaintiffs' discovery requests. *Id.*  The court first observed that the settlement agreement "does textually delineate procedures for ongoing *informal* discovery" but "contains no mechanism for formal discovery." *Id.* at *3 (emphasis in original).  Given this, the court held that the informal discovery that the settlement agreement textually delineated was permissible, but discovery beyond that was not.  Among other things, the court noted that "the parties stated that the intent behind the SA was to avoid the time and expense of a trial" and that the plaintiffs' attempts to take depositions and evidentiary testimony "would negate the intended savings in expense or time." *Id.* at *3–4.  The court further held that "the fact that the SA's language delineates a very specific

procedure for informal discovery . . . dispels any ambiguity on that point as to what the parties intended." *Id.* at *4. The *Jackson* court's reasoning applies with equal force here. The parties delineated a very specific procedure for informal discovery: the information disclosures textually delineated in Settlement Agreement ¶ IV. Discovery beyond that was not contemplated in the Settlement Agreement and would negate the Settlement Agreement's express intent to avoid further diversion of private and governmental resources to adversarial action.

For the foregoing reasons, any claims by Class Counsel that the Court should allow them to take discovery beyond the disclosures set forth in Settlement Agreement ¶ IV should be denied.

## CONCLUSION

Federal Defendants respectfully request that the Court deny any claims by Class Counsel of breach of the Settlement Agreement and reject any attempts by Class Counsel to impose new requirements beyond the terms of the Settlement Agreement.

//

//

//

//

//

DATED: August 14, 2023        Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

*/s/ Adrienne Zack*
ADRIENNE ZACK
SHIWON CHOE
Assistant United States Attorneys

Attorneys for Federal Defendants