WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
SEAN RIORDAN (SBN 255752)
sriordan@aclunc.org
EMILOU H. MACLEAN (SBN 319071)
emaclean@aclunc.org
BREE BERNWANGER (SBN 331731)
bernwanger@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

Attorneys for Petitioners-Plaintiffs
Additional Counsel Listed on Following Page

MANOHAR RAJU (SBN 193771)
Public Defender
MATT GONZALEZ (SBN 153486)
Chief Attorney
GENNA ELLIS BEIER (SBN 300505)
genna.beier@sfgov.org
JENNIFER FRIEDMAN (SBN 314270)
jennifer.friedman@sfgov.org
FRANCISCO UGARTE (SBN 241710)
francisco.ugarte@sfgov.org
KELLY ENGEL WELLS (SBN 338648)
kelly.wells@sfgov.org
OFFICE OF THE PUBLIC DEFENDER
SAN FRANCISCO
555 Seventh Street
San Francisco, CA 94103
Direct: (415) 553-9319
Facsimile: (415) 553-9810

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

ANGEL DE JESUS ZEPEDA RIVAS, et al.,

Petitioners-Plaintiffs,

v.

MOISES BECERRA[1], et al.,

Respondents-Defendants.

CASE NO. 3:20-CV-02731-LB

**PLAINTIFFS' REPLY BRIEF CONCERNING SETTLEMENT IMPLEMENTATION DISPUTES (ECF NOS. 1280, 1281, 1282)**

---

[1] On July 17, 2022, Moises Becerra was appointed as Field Office Director ("FOD") for the U.S. Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO") San Francisco Field Office.  Pursuant to Federal Rule of Civil Procedure 25(d), FOD Becerra is automatically substituted for former FOD David Jennings as a party in this case.

1   JORDAN WELLS (SBN 326491)                MARTIN S. SCHENKER (SBN 109828)
    jwells@lccrsf.org                        mschenker@cooley.com
2   LAWYERS' COMMITTEE FOR                   JULIE M. VEROFF
    CIVIL RIGHTS OF THE                      jveroff@cooley.com (SBN 310161)
3   SAN FRANCISCO BAY AREA                   COOLEY LLP
    131 Steuart St #400                      3 Embarcadero Center, 20th Floor
4   San Francisco, CA 94105                  San Francisco, CA 94111-4004
    Telephone: (415) 543-9444                Telephone: (415) 693-2000
5                                            Facsimile: (415) 693-2222
    JUDAH LAKIN (SBN 307740)
6   judah@lakinwille.com                     TIMOTHY W. COOK* (Mass. BBO# 688688)
    AMALIA WILLE (SBN 293342)                tcook@cooley.com
7   amalia@lakinwille.com                    COOLEY LLP
    LAKIN & WILLE LLP                        500 Boylston Street
8   1939 Harrison Street, Suite 420          Boston, MA 02116
    Oakland, CA 94612                        Telephone: (617) 937-2300
9   Telephone: (510) 379-9216                Facsimile: (617) 937-2400
    Facsimile: (510) 379-9219
10
    STEPHANIE PADILLA (SBN 321568)
11  spadilla@aclusocal.org
    AMERICAN CIVIL LIBERTIES UNION
12  FOUNDATION OF SOUTHERN CALIFORNIA
    1313 West Eighth Street
13  Los Angeles, CA 90017
    Telephone: (213) 977-9500
14  Facsimile: (213) 977-5297

15                    *Attorneys for Petitioners-Plaintiffs*
                          *Admitted *Pro Hac Vice*
16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................... 1

     A.     Transfers Dispute Introduction ................................................................. 1

     B.     Vulnerabilities Dispute Introduction ........................................................ 1

II.    ARGUMENT IN REPLY AS TO THE TRANSFERS DISPUTE ....................... 5

     A.     Defendants' Declarations Allow Plaintiffs to Narrow the Request for
Interrogatories ........................................................................................ 5

     B.     Defendants Have Not Rebutted Plaintiffs' Factual Presentation That Supports
a Finding of Breach ................................................................................. 5

     C.     The Agreement Continues to Impose Limits on Transfers Under
Circumstances that Could Foreseeably Recur ......................................... 8

     D.     Defendants' Breach is Material Because Unnecessary Transfers Risk the
Spread of COVID-19, a Central Issue in the Underlying Litigation and the
Settlement Agreement ............................................................................. 8

     E.     The Law Allows Discovery Necessary to Enforce a Settlement Agreement,
Even When Not Expressly Provided for in the Agreement ..................... 9

III.   ARGUMENT IN REPLY AS TO THE VULNERABILITIES DISPUTE .......... 10

     A.     The Vulnerabilities Provision Cannot be Read to Exclude Class Members
Based on Underlying Detention Statute ................................................. 10

     B.     In the Context of this Constitutional Litigation, the Government Has
Authority to Release Class Members with Vulnerabilities under the Terms of
the Settlement Agreement ..................................................................... 12

     C.     1252(f)(1) Does Not Bar Enforcement of the Vulnerabilities Provision ................. 15

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Alcantara v. Archambault,*
20-cv-0756-DMS, ECF 1 at 41 (S.D. Cal. Apr. 21, 2020). ....................................................15

*America v. Mills,*
714 F. Supp. 2d 88 (D.D.C. 2010), *aff'd*, 643 F.3d 330 (D.C. Cir. 2011)...............................8

*Biden v. Texas,*
142 S.Ct. 2528 (2022)............................................................................................................15

*Burnside-Ott Aviation Training Ctr. v. Dalton,*
107 F.3d 854 (Fed. Cir. 1997)................................................................................................14

*California Dep't of Soc. Servs. v. Leavitt,*
523 F.3d 1025 (9th Cir. 2008) ...........................................................................................1, 10

*California v. United States,*
271 F.3d 1377 (Fed. Cir. 2001)..............................................................................................14

*EEOC v. Fed. Labor Relations Auth.,*
476 U.S. 19 (1986)..................................................................................................................16

*Flores v. Johnson,*
212 F. Supp. 3d 864 (C.D. Cal. 2015) ...................................................................................10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
528 U.S. 167 (2000)..................................................................................................................8

*FTC v. Leshin,*
No. 06-61851-CIV, 2007 WL 9703567 (S.D. Fla. Oct. 9, 2007) ..........................................16

*Hernandez Roman v. Wolf,*
No. 20-55436, 829 Fed.Appx. 165 (9th Cir. Sept. 23, 2020) ................................................12

*Jackson v. Los Lunas Center for Persons with Developmental Disabilities,*
No. 87-0839 ............................................................................................................................10

*Kelly v. Wengler,*
979 F.Supp.2d 1237, 1241 (D. Idaho 2013) ............................................................................9

*Karvaly v. EBay, Inc.,*
245 F.R.D. 71 (E.D.N.Y. Sept. 6, 2007)...................................................................................3

*Murphy v. DirecTV, Inc.,*
724 F.3d 1218 (9th Cir. 2013) ...............................................................................................11

*Nehmer v. U.S. Dep't of Veterans Affs.*,
  494 F.3d 846 (9th Cir. 2007) ..................................................................................11

*Pine v. A Place for Mom, Inc.*,
  No. C17-1826 TSZ, 2020 WL 707793 (W.D. Wash. Feb. 12, 2020) ........................3

*Sarmiento v. Fresh Harvest, Inc.*,
  573 F. Supp. 3d 1378 (N.D. Cal. 2021) ..................................................................14

*Se. Fed. Power Customers, Inc. v. Geren*,
  514 F.3d 1316 (D.C. Cir. 2008) ..............................................................................14

*Sebelius v. Auburn Reg'l Med. Ctr.*,
  568 U.S. 145 (2013) .................................................................................................15

*SEC v. Collector's Coffee Inc.*,
  No. 19 Civ. 4355 (VM), 2021 WL 3082209 (S.D.N.Y. July 21, 2021) ....................14

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
  709 F.3d 1281 (9th Cir. 2013) ...................................................................................8

*Trident Ctr. v. Connecticut General Life Ins. Co.*,
  847 F.2d 564 (9th Cir. 1988) ...................................................................................11

*United States v. May*,
  855 F.3d 271 (4th Cir. 2017) ...................................................................................16

*United States v. Wong*,
  575 U.S. 402 ............................................................................................................16

*Zamarano v. Garland*,
  2 F.4th 1213 (9th Cir. 2021) ....................................................................................16

*Zepeda Rivas v. Jennings*,
  Case No. 20-16276, ECF No. 92 (9th Circuit Nov. 12, 2021).................................14

*Zepeda Rivas v. Jennings*,
  Nos. 20-16276, 20-16690, 845 Fed.Appx. 530 (9th Cir. Feb. 18, 2021)............4, 13

*Zipes v. Trans World Airlines, Inc.*,
  455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)............................................16

**Statutes**

8 U.S.C. § 1226(c)..................................................................................................12, 14

8 U.S.C. § 1252(f)(1)..........................................................................................4, 15, 16

18 U.S.C. § 3582(c)(2).................................................................................................16

28 U.S.C. §§ 516, 519.................................................................................................12

Federal Tort Claims Act (FTCA).............................................................................16

**Other Authorities**

Restatement of Contracts § 74 ..................................................................................14

Robert Moore, *ICE Doctor Defends Force-Feeding Detainees on Hunger Strike as*
  *'Uncomfortable' But Necessary*, TEXAS MONTHLY (Aug. 16, 2009), available at
  https://www.texasmonthly.com/news-politics/ice-doctor-force-feeding-detainees-
  on-hunger-strike/.................................................................................................7

1    **I.    INTRODUCTION**

2          Plaintiffs submit this consolidated brief in reply to Defendants' opposition brief (ECF No.

3    1282) and in support of the relief they seek as to both the transfers dispute (the "Transfers Dispute")

4    (ECF No. 1280) and the vulnerabilities dispute (the "Vulnerabilities Dispute") (ECF 1281).

5          **A.    Transfers Dispute Introduction**

6          As to the discovery that Plaintiffs seek regarding the Transfers Dispute, the medical

7    declarations submitted by Defendants (ECF Nos. 1282-4 & 1282-5) allow Plaintiffs to narrow their

8    requested interrogatories in the manner described below, *infra* Section II.A. Otherwise, Defendants'

9    opposition is without merit for several reasons. First, Defendants do not rebut Plaintiffs' showing

10   that local care would have been adequate for the treatment of the transferred class members (the

11   "Transferred Class Members") or that the care actually provided at the El Paso Service Processing

12   Center ("EPSPC") was grossly inadequate. To the contrary, Defendants' failure to specify what

13   higher level of care was actually available at EPSPC – in combination with other record evidence

14   and other publicly available information – underscores the likelihood that the transfers were

15   undertaken not primarily for appropriate medical care but for unethical force feeding. Second,

16   because ICE's COVID-19 guidance continues to place limitations on transfers under circumstances

17   that could recur at Mesa Verde Immigrant Processing Center ("MVIPC"), the class has an interest in

18   discovery concerning, and adjudication of, this dispute. Third, the breach is material because it goes

19   directly to mitigation against the spread of COVID-19, one of the issues at the heart of this lawsuit

20   and the Settlement Agreement ("Agreement"). ECF 1205-1. Finally, even though the Agreement

21   does not expressly provide for formal discovery, under Ninth Circuit precedent, post-judgment

22   discovery is warranted where, as here, there are "significant questions regarding noncompliance."

23   *California Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1034 (9th Cir. 2008)

24         **B.    Vulnerabilities Dispute Introduction**

25         In its opposition concerning the Vulnerabilities Dispute, Defendant U.S. Immigration and

26   Customs Enforcement ("ICE") advances a raft of arguments in an attempt to discharge itself of

27   obligations it accepted in the Agreement, beginning with an effort to explain why the Court should,

28   in its view, read in an unwritten detention-statute carveout. But ICE fails to address (and thus

concedes) that (1) the Agreement defines "Class Members" as *anyone* in ICE detention at the covered facilities since April 20, 2020, regardless of detention statute, and (2) the plain language of Section II.A.10 of the Agreement (the "Vulnerabilities Provision") applies its protections, including individualized consideration for release, to all class members. Black letter law states that such unambiguous language controls the Agreement's meaning. None of the canons of construction that ICE cites, which apply only to *ambiguous* contract language, can overcome the clear meaning of the Agreement's terms.

Before turning to ICE's main argument—that, for a variety of reasons, the Vulnerabilities Provision is unenforceable as written—Plaintiffs must address ICE's repeated insinuation that Plaintiffs have brought this motion in bad faith. Knowing that Circuit mediation confidentiality rules bar Plaintiffs from advancing a full-throated rebuttal, ICE takes the position that Plaintiffs "knew" that unwritten carveouts to certain provisions of the Agreement (besides the Vulnerabilities Provision, they don't say which ones) would exclude class members from protections based on their detention statute. ECF No. 1282 at 11-13. This is an outrageous and unfounded accusation. Even without revealing confidential settlement discussions, multiple documents in the public record render Defendants' position completely unsupported.

*Everything* in the public record makes clear that Plaintiffs—not to mention Defendants and the District Court—understood the entire agreement, including the Vulnerabilities Provision, to apply to the entire class. Take the class notice. *See* ECF No. 1222. It says that everyone in ICE custody at the covered facilities since April 20, 2020 through the expiration of the Agreement is a class member. *Id.* It lists the benefits the Agreement affords class members and does not identify exclusions based on detention statute. *Id.* If Class Counsel had known that a subset of the class was categorically barred from receiving any of these benefits, it would have had an obligation to *tell them* in this document. *See* U.S. District Court for the Northern District of California Procedural Guidance for Class Action Settlements, *available at* https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/ (notice must identify "[a]ny differences" between the proposed class and settlement class and the claims they pled and are releasing, "and an explanation as to why the differences are appropriate"). And if the District

Court had understood the Agreement to contain such distinctions between class members' access to its material benefits, it would have rejected a class notice that failed to do so; courts have rejected notices for failing to distinguish between differences in class members on similarly material (and less material) issues.[2] *See, e.g.*, *Pine v. A Place for Mom, Inc.*, No. C17-1826 TSZ, 2020 WL 707793, *2 (W.D. Wash. Feb. 12, 2020) (rejecting class notice and requiring class counsel to clearly distinguish between class members receiving differential treatment); *Karvaly v. EBay, Inc.*, 245 F.R.D. 71, 79-80 (E.D.N.Y. Sept. 6, 2007) (denying preliminary approval where class definition did not match parties' understanding of class scope). It's not just the class notice. *None* of the settlement documents mention differential treatment of class members on the basis of detention statutes. *See* ECF No. 1222, 1229, 1254, 1258.[3] The parties did not bring up the detention statutes during the approval process because they do not bear on the Agreement's protections. ICE's claim to the contrary is unsupported.

ICE also fails to credibly explain its response to Plaintiffs' outreach in July 2022 investigating how it had implemented the Vulnerabilities Provision. ECF No.1282 at n. 10. ICE counsel claims that when Plaintiffs e-mailed them in July 2022 and asked them to explain their process for evaluating class members subject to Section II.A.10 of the Agreement *in this case*, their response referenced ICE's compliance with a district court injunction in *another* case—*Fraihat v. ICE*. *Id.* This purported explanation is totally untethered from the contents of the parties' exchange. *See* Supplemental Declaration of Bree Bernwanger at ¶ 1, Exh. A.[4] Class Counsel did not ask about

---

[2] Indeed, the District Court rejected Class Counsel's first proffered class notice on the basis that it did not meet the Court's standing order for class notice, which incorporates by reference the Northern District's Procedural Guidance for Class Action Settlements. *See* ECF No. 1218. The first proposed Class Notice that Class Counsel submitted also contained *nothing* excluding class members from any of its provisions based on the various detention statutes. Neither class notice mentioned the detention statutes at all—because *no one* understood the Agreement to contemplate such exclusion. ECF No. 1205-2; *see also* ECF No. 1222.

[3] ICE didn't file *anything* to clarify its purported position in response to the class notice or Plaintiffs' multiple unopposed filings seeking approval of the Agreement, which described the Vulnerabilities Provision as requiring ICE to identify class members for "immediate release" without mentioning detention statute. ICE's silence is especially notable because it *did* file such "clarifications" in response to Plaintiffs' characterization of the issues in their unopposed motion for attorneys' fees. ECF No. 1244.

[4] Plaintiffs described and did not attach the parties' emails in its last submission out of an abundance of caution to avoid revealing confidential mediation communications. Because this particular exchange does not reference any such communications, Plaintiffs attach the exchange described

*Fraihat*. *Id.* Class Counsel asked about Section II.A.10 of the Agreement. *Id.* And ICE's response did not reference *Fraihat*; it referenced "the Agreement." *Id.* Because ICE's response comported with Plaintiffs' obvious understanding that Section II.A.10 applied classwide, regardless of detention statute, and turned on *individualized* flight risk, danger, and medical risk, Plaintiffs waited months before following up again. The alternative narrative ICE advances is simply not credible.

To be sure, Plaintiffs are well aware of ICE's *litigation position* that it could not voluntarily release class members subject to mandatory detention. *See* 1282 at 12-13 (citing ICE's legal filings in this case advancing its position). That position led to rulings that, in the unprecedented context of COVID-19, blanket detention of the class without examining individualized flight risk, danger to the community, and medical risk was likely unconstitutional. *See* ECF Nos. 53 (TRO), 357 (PI), 867 (PI); *Zepeda Rivas v. Jennings*, Nos. 20-16276, 20-16690, 845 Fed.Appx. 530, 534 (9th Cir. Feb. 18, 2021) (upholding release from custody as to remedy constitutional violation). Against the backdrop of multiple court rulings that, at a minimum, questioned the constitutionality of mandatory detention as applied to the class, ICE entered a settlement agreement accepting narrow restraints on its detention authority for class members who are vulnerable to severe cases of COVID-19. Presumably, ICE did so to eliminate the risk of further court-ordered constitutional restraints that may have resulted from further litigation, as the District Court had already released scores of class members subject to mandatory detention.

The Court is also not bound by the caselaw that ICE cites concerning statutory limits on settlement authority, which concerns materially distinguishable situations; ICE does not cite a single case discussing settlement authority over a constitutional claim that has already restrained the application of a federal statute to the plaintiffs. Finally, ICE's arguments that 8 U.S.C. § 1252(f)(1) bars relief do not withstand scrutiny because they presuppose that 1252(f)(1) concerns the courts' subject matter jurisdiction. ECF No. 1282 at 14-15 (citing subject matter jurisdiction cases). As Plaintiffs have already briefed at length, 1252(f)(1) does not concern subject matter jurisdiction. It also does not bar relief here, where the Agreement requires ICE to make individualized—rather than

---

herein for the Court's convenience. *See* Supplemental Declaration of Bree Bernwanger at ¶ 1, Exh. A.

class-wide—determinations. ICE breached the Vulnerabilities Provision. This Court should order the remedial measures Plaintiffs request.

## II.   ARGUMENT IN REPLY AS TO THE TRANSFERS DISPUTE

### A.   Defendants' Declarations Allow Plaintiffs to Narrow the Request for Interrogatories

In opposition to Plaintiffs' motion concerning the Transfers Dispute, Defendants submitted sworn declarations by two medical doctors involved in the care of the Transferred Class Members and in the decision to transfer them. *See* ECF Nos. 1282-4 & 1282-5. Defendants had not previously shared these declarations or any other evidence concerning the purported justification for the transfers, though they present facts consistent with opposing counsel's explanation of the transfers during the parties' meet and confer process. *See* ECF No. 1280-2, Riordan Dec., Exh. C (opposing counsel email of April 11, 2023).[5] In light of these declarations, Plaintiffs' requested interrogatories can be narrowed to exclude questions concerning Defendants' medical justifications for the transfers.

### B.   Defendants Have Not Rebutted Plaintiffs' Factual Presentation That Supports a Finding of Breach

Defendants' evidence does not rebut any of the material facts supporting Plaintiffs' allegations of breach. Defendants do not contend that adequate care was unavailable at local medical facilities. To the contrary, Defendants apparently considered local hospitalization, including the requirement of a ten-day quarantine after hospitalization. See ECF Nos. 1282 at 4:16-17; 1282-4, Iglesias Dec. ¶ 8. Defendants do not explain why they instead chose to subject the Transferred Class Members to an arduous trip across the country for care that featured threats of force feeding and botched refeeding. However, to the extent local hospitalization was ruled out due to the ten-day

---

[5] By contrast, when the plaintiffs in the *Mendez* case challenged the transfers, ICE presented a declaration from the Immigration Health Service Corps Deputy Medical Director, who explained in general terms ICE's policy on the treatment of hunger strikers, but did not attempt to explain the ostensible medical justification for the transfers to El Paso. *See* Case 3:23-cv-00829-TLT, ECF No. 38, Gwathney Dec. (March 13, 2023). The fact that ICE has submitted declarations with variant levels of detail concerning the same incident further underscores the need for the depositions Plaintiffs request.

1   quarantine requirement, that decision would be inexplicable because the Transferred Class Members

2   also had to be quarantined upon return from EPSPC. *See* ECF No. 1282-5, Bariuz Dec. ¶ 27.

3          Defendants also do not contend that the care provided at EPSPC was medically adequate, or

4   even that there was a *plan* to provide the Transferred Class Members a particular type of care there.[6]

5   Dr. Iglesias notes the additional medical staff available at EPSPC relative to MVIPC. But Dr.

6   Iglesias does not explain whether or how any of those staff were in a position to provide a higher

7   level of care when it comes to *refeeding*, which both Dr. Iglesias and Dr. Bariuz properly note was

8   the relevant concern. *See* ECF Nos. 1282-4, Iglesias Dec. ¶ 7; 1282-5, Bariuz Dec. ¶¶ 6, 11, 16, 21.

9   Dr. Iglesias's declaration does not mention a nutritionist being available at EPSPC, even though a

10  nutritionist's involvement in refeeding is a basic standard of care. *See* ECF No. 1280-4, Cheffers

11  Dec. ¶¶ 13, 30, 41. Defendants' declarations effectively confirm that there was no *actual* higher

12  standard of care on offer at EPSPC when it came to medically appropriate refeeding the Transferred

13  Class Members.

14         Defendants' presentation of the supposed need for transfer also conflicts with their own

15  arguments in this case that MVIPC is equipped to provide robust and well-staffed care. As GEO

16  Defendants explained in August 2020, when the population at MVIPC was similar to what it is

17  today, "the population at Mesa Verde is greatly reduced but the level of medical staffing has not

18  been reduced, so there is a greater ratio of medical providers to detainees" meaning "detainees are

19  seen very quickly for any medical issues." ECF No. 581 at 3:11-13. Per GEO Defendants, that

20  staffing includes,

21         1 full time physician, 1 full-time Nurse Practitioner, 1 full time Physician's Assistant, 4 full-
           time Registered Nurses, and 7 full-time Licensed Vocational Nurses. From 7:00 a.m. to 8:00
22         p.m. Mondays – Fridays, there is always a provider on duty at the facility; on weekends and
           evenings, one medical provider is always on call. Nurses are staffed on 12-hour shifts. On
23         day shift, there are 2 LVNs on duty and at night there is 1 RN and 1 LVN on duty. (*Id.*)

24

25

26  _____
    [6] The fact that the parties agree that the Transferred Class Members needed special care did not
27  make their transfer *to EPSPC* "necessary." *See* ECF No. 1282 at 7:18-20. Rather, when a class
    member needs a higher level of medical care, a transfer should not be deemed "necessary" unless the
    care to be provided at the receiving facility is actually higher than care that could be provided at the
28  sending facility or locally.

*Id.* at 2:22-28. As ICE recognized, this generous staffing allows medical staff to "monitor detainees' temperature and vital signs twice a day." ECF No. 585 at 1. Moreover, there are two medical observation cells at MVIPC. ECF No. 867 at 7. On the criteria that Defendants now emphasize as justifying the transfer, there is very little difference between MVIPC and EPSPC.

Defendants also do not rebut the concerns Plaintiffs' declarants raised about the threat of force feeding at EPSPC and its status as a medically unethical practice. *See* Hernandez Gomez Dec. ¶¶ 9, 16, 17; Cheffers Dec. ¶ 8 ("Only in grave instances where the person is not competent (i.e. has advanced dementia, meets severe psychosis as determined by psychiatrist, is comatose without advance directives, etc.) is a health professional allowed to refeed malnourished persons without their express consent."). Indeed, Dr. Iglesias has been directly involved in obtaining court orders for force feeding at EPSPC, despite apparently understanding that doing so is medically unethical. A reporter described her testimony in one of those cases as follows:

> The doctor said several times during the hearing that force-feeding hunger strikers is widely viewed as medically unethical. 'There wouldn't be anyone in a hospital who would do it,' Iglesias said. But she said ICE regulations required force-feeding if necessary to prevent hunger strikers from starving themselves to death.[7]

If a goal of the transfers was to allow for medically unethical force feeding, that negates the idea that they were "necessary" for a higher standard of medical care. This further warrants discovery.

Finally, Defendants do not rebut the well-supported allegation that they used violent means to effect the transfers, or attempt to explain how such means were consistent with Defendants' other concerns about the well-being of the Transferred Class Members.

While ICE contends that all of this involves a "post hoc" complaint about the outcome of the transfers, ECF No. 1282 at 7:17, each of these uncontroverted facts are relevant to whether transfer to EPSPC was "necessary," either by directly rebutting the necessity of that transfer or by raising an inference that it was not necessary. Accordingly, Defendants' factual presentation does not undermine Plaintiffs' request for discovery (or alternative relief on the merits of the dispute).

---

[7] Robert Moore, *ICE Doctor Defends Force-Feeding Detainees on Hunger Strike as 'Uncomfortable' But Necessary*, TEXAS MONTHLY (Aug. 16, 2009), available at https://www.texasmonthly.com/news-politics/ice-doctor-force-feeding-detainees-on-hunger-strike/

**C.      The Agreement Continues to Impose Limits on Transfers Under Circumstances that Could Foreseeably Recur**

Defendants argue that there is no "live dispute" concerning transfers because of the change in ICE's COVID-19 guidance and the absence of a current COVID-19 outbreak. *See* ECF No. 1282 at 8:10-19. This is essentially a mootness argument, and mootness doctrine shows why this dispute remains live. As a threshold matter, the dispute is live because ICE's current COVID-19 guidance continues to impose a medical necessity limit on transfers, though that limit now applies only when individuals who have COVID-19 are housed in a cohort. *See* ECF No. 1280 at 3-4. This situation evokes the voluntary cessation exception to mootness, under which it would be Defendants' "heavy burden" to show it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Defendants cannot show that a COVID-19 outbreak will not occur in the future and the dispute accordingly remains live.

This situation also evokes the capable of repetition yet evading review exception to mootness. *See Shell Offshore, Inc. v. Greenpeace, Inc.,* 709 F.3d 1281, 1287 (9th Cir. 2013) ("In order for [this] exception to apply, (1) the duration of the challenged action or injury must be too short to be fully litigated; and (2) there must be a reasonable likelihood that the same party will be subject to the action again.") (cleaned up). If the Court were to abstain from adjudicating the current dispute, Defendants would be free to transfer class members unnecessarily during a future COVID-19 outbreak at MVIPC. And because the parties must meet and confer and then pursue mediation before asking the Court to adjudicate an alleged breach, that dispute might not reach the Court until the outbreak has abated, in which case Defendants could again argue that there is no live dispute. Under such circumstances, where the short duration of a dispute might otherwise prevent its review, an issue that would otherwise be moot remains live.

**D.      Defendants' Breach is Material Because Unnecessary Transfers Risk the Spread of COVID-19, a Central Issue in the Underlying Litigation and the Settlement Agreement**

Contrary to Defendants' argument, the transfers "relate[] to a matter of vital importance," or "go[] to the essence [of the Agreement] and frustrates substantially [its] purpose." *America v. Mills*,

714 F. Supp. 2d 88, 100 (D.D.C. 2010), *aff'd*, 643 F.3d 330 (D.C. Cir. 2011) (quotations omitted). For detained class members, the key purpose of the Agreement is to "mitigate risks associated with the spread of COVID-19." ECF No. 1205-1 at 2. Transfer of class members poses a clear risk to them and others of spread of COVID-19, which is why the PRR limited and continues to limit transfers under certain circumstances. *See* ECF No. 1280 at 3-4, 9. That risk is heightened where, as here, the transfers were done without COVID-19 testing. *See* ECF No. 1280-3, Hernandez Gomez Dec. ¶ 6. Moreover, Plaintiffs executed the Agreement against the backdrop of litigation where they had sought and obtained limitations on transfers from the Court. *See, e.g.,* ECF No. 867 at 19, 23. For all these reasons, Defendants' breach was material.

**E.    The Law Allows Discovery Necessary to Enforce a Settlement Agreement, Even When Not Expressly Provided for in the Agreement**

The lack of an express provision in the Agreement for discovery is not definitive, as Ninth Circuit precedent allows for post-judgment discovery, even though such discovery is not provided for in the judgment or in the rules of civil procedure. This principle has been applied to allow discovery in settlement implementation proceedings. See ECF No. 1280 at 9.

Discovery concerning an alleged breach of a settlement agreement is permitted even when such discovery is not expressly contemplated by the settlement agreement and when the settlement agreement includes other disclosure provisions. For example, in *Kelly v. Wengler*, which like this case was a class action concerning the welfare of incarcerated people, the settlement agreement required the disclosure of certain compliance reports to the plaintiffs' counsel and did not provide for discovery. *See* Case No. 1:11-cv-00185-EJL, ECF No. 25, ¶ 2 (Sept. 20, 2011). The defendants in that case argued that the district court could not order discovery, but the district court disagreed, finding discovery was permissible for two reasons. First, "by the terms of the settlement" and the Court's order assuming jurisdiction over settlement-related disputes, the Court "has the authority of a District Court Judge to resolve disputes." 979 F.Supp.2d 1237, 1241 (D. Idaho 2013). That authority "reasonably include[s] discovery where necessary … to resolve whether the settlement has been breached." *Id*. Second, where "it is clear that compliance with the Settlement Agreement is part

1    of the Order for Dismissal," the Court can "order discovery" on contested issues of breach. *Id.*

2    (citing *Leavitt*, 523 F.3d at 1033). These principles apply to Plaintiffs' request for limited discovery.

3          Defendants rely on *Jackson v. Los Lunas Center for Persons with Developmental*

4    *Disabilities*, No. 87-0839 JAP/KBM, 2021 WL 1549655 (D.N.M. Apr. 20, 2021), to argue that

5    discovery should not be granted. But in that case, the only dispute was whether a settlement

6    agreement provision for a "hearing" to resolve disputes necessarily contemplated formal discovery,

7    including sworn depositions and the presentation of live testimony. The court held that "the term

8    'hearing,' as used in the [settlement agreement], unambiguously means an opportunity for the parties

9    to orally argue the points presented in their briefs with exhibits obtained through informal

10   discovery," and nothing more. *Id.* at *3. The plaintiffs in *Jackson* did not argue and the court did not

11   address a federal court's authority to grant discovery under the principles articulated in *Leavitt* and

12   *Kelly*. In any event, to the extent *Jackson* were read to refute the position Plaintiffs stake out here –

13   that the Court has the authority to grant discovery, and should do so on the record presented – it

14   would be inconsistent with *Leavitt*, which is binding Ninth Circuit precedent, and should be

15   disregarded.

16   **III.    ARGUMENT IN REPLY AS TO THE VULNERABILITIES DISPUTE**

17        **A.    The Vulnerabilities Provision Cannot be Read to Exclude Class Members Based
           on Their Underlying Detention Statute**

18        ICE does not rebut that "Class Members," as defined in the Agreement, means everyone

19   detained at the covered Facilities regardless of detention statute. Instead, ICE argues that because

20   Section V.B.1 of the Agreement explicitly refers to class members subject to the mandatory

21   detention statutes, Section II.A.10 must implicitly exclude them. ECF No. 1282 at 10. But that

22   position cannot be squared with the definition of "Class Members." "Where the contract is clear, the

23   plain language of the contract governs." *Flores v. Johnson*, 212 F. Supp. 3d 864, 870 (C.D. Cal.

24   2015), *clarified on denial of reconsideration sub nom. Flores v. Lynch*, 212 F. Supp. 3d 907 (C.D.

25   Cal. 2015), *aff'd in part, rev'd in part and remanded*, 828 F.3d 898 (9th Cir. 2016). The

26   Vulnerabilities Provision clearly applies to all class members. That is the beginning and the end of

27

28

                                   CASE NO. 3:20-CV-02731
                                   PLAINTIFFS' REPLY BRIEF CONCERNING
                                   SETTLEMENT IMPLEMENTATION DISPUTES

the contractual analysis here.[8]

Even if the Court had more interpretive work to do here—and it does not—it would not be reasonable to accept the reading ICE advances, in which the term "Class Members" has a different meaning depending on where it appears. *See* ECF No. 1282 at 11. ICE's reading would lead to an untenable situation in which the parties (and the Court) would have to guess at which provisions of the Agreement have different *unwritten* carveouts limiting their scope. "The normal rule of construction … is that courts must interpret contracts … to avoid internal conflict." *Trident Ctr. v. Connecticut General Life Ins. Co.*, 847 F.2d 564, 566 (9th Cir. 1988). If ICE's position were correct, it would be impossible for *anyone* reading the Agreement to know who the term "Class Members" refers to in any particular provision of the agreement, and thus impossible to discern the scope of the Agreement's protections. For example, if "Class Members" excludes everyone subject to mandatory detention in the Vulnerabilities Provision, does "Class Members with Vulnerabilities" exclude people subject to mandatory detention in the provision affording them priority when ICE distributes vaccines? *See* ECF No. 1205-1 at II.A.2. Which "Class Members residing in the San Francisco Area of Responsibility" does the Agreement refer to when it prohibits ICE from detaining them for longer than 30 days to effectuate their removal? *Id.* at III.D. This Court must reject an interpretation of the Vulnerabilities Provision that would call the meaning of the *entire* rest of the Agreement into question.

ICE's cases do not alter the analysis. As an initial matter, those cases make clear that the canon of construction ICE relies on, "that mention of one matter implies the exclusion of all others," applies only to resolve *ambiguities* in a contract, which are not present here. *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013) (applying canon to determine whether *non-party* to

---

[8] In addition to being hornbook law, relying on the plain language rather than seeking to discern the unwritten intention of the parties is "particularly appropriate in class action litigation … because a member of the class who was not present at any negotiations would be at a disadvantage in presenting extrinsic evidence of the meaning of the [settlement agreement]." *Nehmer v. U.S. Dep't of Veterans Affs.*, 494 F.3d 846, 861 (9th Cir. 2007) (internal quotations omitted). Furthermore, for the reasons described in detail *supra* at Section I.B, ICE's counternarrative on the parties' supposed mutual understanding of the Vulnerabilities Provision is wrong.

1    contract was agent or third-party beneficiary of contracting party). Here, "Class Member" is a

2    defined term that definitively resolves the scope of all provisions that employ it. Unlike in *Schneider*

3    *v. YouTube*, there is no need to parse the Agreement term by term to discern whether its protections

4    apply to people in mandatory detention; such people are already covered *by the class definition. See*

5    __ F. Supp. 3d __, No. 20-cv-04423-JD, 2023 WL 114226, at *6 (N.D. Cal. Jan. 5, 2023)

6    (comparing contract language across provisions to determine whether particular term was covenant

7    or condition precedent). And *Board of County Com'rs of the County of Bernalillo, NM v. United*

8    *States* cuts *against* ICE's reading; there, the court *refused* to read an implicit term into a contract

9    clause, precisely what ICE, not Plaintiffs, is asking the Court to do. 93 Fed. Cl. 228, 233-234 (2010).

10   The Court should accordingly reject ICE's reading of the Vulnerabilities Provision.

11         **B.**    **In the Context of this Constitutional Litigation, the Government Has Authority to**
                       **Release Class Members with Vulnerabilities under the Terms of the Settlement**

12                     **Agreement**

13         ICE asserts that Plaintiffs' reading of the agreement would render it unlawful by interfering

14   with 8 U.S.C. § 1226(c)'s application to the Plaintiff Class. But as ICE concedes, it must release

15   class members in response to a court order. ECF No. 1282 at 10, 13, n. 10. Here, the Agreement *has*

16   *the force of a court order* and requires ICE to evaluate class members and, where appropriate,

17   release them. ECF No. 1258 at 3 ("The Agreement … has the full force of an order of this Court.").

18   That the Agreement does not instruct ICE precisely who to release, and instead creates a standard for

19   ICE to apply, does not diminish its force as a binding requirement. *See Hernandez Roman v. Wolf*,

20   No. 20-55436, 829 Fed.Appx. 165, 171-173 (9th Cir. Sept. 23, 2020) (upholding district order

21   requiring that ICE release detained noncitizens while leaving discretion with ICE to determine which

22   class members to release). ICE concedes in its brief that the re-detention provisions reflect its

23   ongoing acceptance, through the Agreement, of the District Court's release orders during the

24   litigation. ECF No. 1282 at 10, n.9. It cannot explain how the Vulnerabilities Provision, which also

25   reflects a continuation of the District Court's bail review system prioritizing for release class

26   members who are at high risk of COVID-19 complications relative to flight risk and danger, *see*

27   ECF No. 53 (order establishing bail review process), is any different. Accordingly, ICE's arguments

28

1   that enforcing the Vulnerabilities provision would be contrary to law or exceed the federal

2   government's settlement authority also fail.

3          Even beyond the fact that the Agreement has the force of a court order, it cannot be true

4   that—as ICE's argument about statutory limits to settlement authority would have this Court hold—

5   the federal government must fully litigate every lawsuit in which lower court orders limit the

6   application of a federal statute on constitutional grounds. If that were the rule, it would deprive

7   federal agencies of any meaningful settlement authority on such claims, even where agency

8   personnel and DOJ attorneys believe that further litigation would lead to further setbacks in courts.

9   Such a rule would be contrary to logic and experience and in derogation of the broad authority the

10  Attorney General holds to supervise litigation on behalf of the United States and its agencies. *See* 28

11  U.S.C. §§ 516, 519.

12         This is just such a case where the settlement occurred against the backdrop of constitutional

13  rulings limiting the application of federal statutes. The District Court and the Ninth Circuit held that

14  ICE's detention of the Plaintiff Class—which included a substantial number of individuals subject to

15  mandatory detention—was likely unconstitutional in the context of this case. *See* ECF No. 53 (TRO)

16  at 3-4, 357 (PI) at 2-6, 867 (PI) at 14-15; *Zepeda Rivas v. Jennings*, Nos. 20-16276, 20-16690, 845

17  Fed.Appx. 530, 534 (9th Cir. Feb. 18, 2021). And the constitutional context of this case is critical to

18  understanding the scope of ICE's authority to settle it. Continuing to litigate this case presented

19  serious risk to ICE—and to the detention statutes it sought to hold inviolate through its litigation

20  positions. The Ninth Circuit largely upheld the district court's decisions and made clear that it would

21  have sought further briefing—and thus, further litigation risk—for the issues it did not reach. *Zepeda*

22  *Rivas*, 845 Fed.Appx. at 535. In settling this case, ICE both avoided future litigation risk *and*

23  successfully relieved the detention statutes from the judicial restraints that had been imposed on

24  them; ICE and its co-defendants bargained for an Agreement provision that required, as a condition

25  precedent to the Agreement's effectiveness, vacatur of the district court orders that held that ongoing

26  detention of the class was unconstitutional, notwithstanding ICE's statutory authority. *See* ECF

27  1205-1 at I.K, VI.B. As part of its bargain, ICE then agreed to far narrower restraints than the district

28  court had ordered (and the Ninth Circuit had approved). Moreover, unlike the court decisions for

which ICE successfully secured vacatur, the Agreement imposed only time-limited restraints on the operation of ICE's detention authority as applies to the class. *See* ECF No. 1205-1 at II.A, III.A (three-year term applies to Vulnerabilities Provision and re-detention provisions). As with all contracts, such bargains are the hallmark of all settlement agreements, which are valid only when the legal claims (and defenses) that a party agrees to forbear are subject to some doubt—as ICE's clearly were here. See Restatement of Contracts (Second) § 74 (1981). This Court should reject ICE's claim that a statute that was held not to bar constitutional relief in this litigation somehow limits ICE's settlement authority in *the same litigation*.[9]

The cases ICE cites in support of its arguments are distinguishable on a critical basis: unlike this case, *none* involve statutes that were held to be subject to constitutional limitations as applied to the settling or contracting parties. *See* ECF 1282 at 12 (citing *Se. Fed. Power Customers, Inc. v. Geren*, 514 F.3d 1316, 132--21 (D.C. Cir. 2008) (granting intervenor's objection to settlement agreement in APA case where statute required congressional approval for regulatory action related to suit's subject matter); *California v. United States*, 271 F.3d 1377, 1383-84 (Fed. Cir. 2001) (holding that federal contract regarding flooding liability *was* enforceable despite conflict with earlier statute); *Burnside-Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854, 858-60 (Fed. Cir. 1997) (invalidating contract dispute resolution provision that conflicted with federal law specifically governing contractual dispute resolution provisions); *Sarmiento v. Fresh Harvest, Inc.*, 573 F. Supp. 3d 1378, 1389-90 (N.D. Cal. 2021) (rejecting exploitative contract between private parties—a noncitizen worker and an employer—as unenforceable for violating regulations intended to protect noncitizen workers' rights); *SEC v. Collector's Coffee Inc.*, No. 19 Civ. 4355 (VM), 2021 WL 3082209, at *3 (S.D.N.Y. July 21, 2021) (SEC enforcement action not involving a contract or settlement agreement)). Nor does this case present a factual backdrop remotely similar to *Angel v. United States* or *Lavin v. Marsh*, where rogue government officials, acting alone, made promises that

---

[9] Further, as Plaintiffs discussed in their opening brief, ICE concedes that the Agreement requires it to voluntarily release class members subject to mandatory detention pursuant to the provisions at V.B.1. ICE fails to explain how releasing people subject to mandatory detention under V.B.1 is within the government's settlement authority and does not contradict 1226(c), but releasing people subject to mandatory detention under the Vulnerabilities Provision—another provision of the same agreement—is somehow barred.

*valid* statutes did not allow.[10] ECF No. 1282 at 13. Also inapposite are *Kaiser Steel Corp. v. Mullins* and *Bassidji v. Goe*, which concern contracts between private parties, not government parties. ECF No. 1282 at 14. And unlike the plaintiffs in *Arnold v. United States*, *Reinhardt v. Hedpeth*, and *Klein v. Crawford* (*see* ECF No. 1282 at 14-5, n. 11), Plaintiffs here do not seek to re-assert their underlying claims or ask this Court to hold that a breach of the Agreement constitutes a constitutional violation. ICE's breach does not stem from a constitutional violation; it results from ICE's failure to comply with the Agreement's terms. But the constitutional backdrop of the case—and the constitutional constraints the underlying litigation imposed on the operation of the detention statutes—define the scope of the government's settlement authority, which permits the Agreement it entered here.

### C.    1252(f)(1) Does Not Bar Enforcement of the Vulnerabilities Provision

ICE's arguments that § 1252(f)(1) bars relief also fail. First, ICE appears to argue that the class structure of the underlying litigation triggers 1252(f)(1)'s bar, citing *Alcantara v. Archambault*. *See* ECF 1282 at 15. But unlike the Agreement here, *Alcantara* sought release of every subclass member, not individualized release. *See Alcantara v. Archambault*, 20-cv-0756-DMS, ECF 1 at 41 (S.D. Cal. Apr. 21, 2020). The threshold question in discerning whether 1252(f)(1) applies is whether the *remedy*, not the scope of the litigation, would restrain the operation of any detention statute. *See Biden v. Texas*, 142 S.Ct. 2528, 2539 (2022). And, as discussed in Plaintiffs' opening brief, the Vulnerabilities Provision contemplates release only on a case-by-case basis; in other words, for "an individual … against whom removal proceedings have been commenced." 8 U.S.C. § 1252(f)(1).

Second, as a restraint on remedy, 1252(f)(1) does not concern subject matter jurisdiction. *Biden*, 142 S.Ct. at 2539; *see also* ECF 1281 at 13-15. Only jurisdictional rules are exempt from waiver. *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) (recognizing that jurisdictional rules are "unique" because, unlike other rules, "[o]bjections to … jurisdiction can be

---

[10] Considering that the Solicitor General's Office and Associate Attorney General reviewed and approved the final writing of the Agreement in this case (*see Zepeda Rivas v. Jennings*, Case No. 20-16276, ECF No. 92 at 2 (9th Cir. Nov. 12, 2021) (explaining government approval process)), *and* that it satisfied rigorous preliminary and final approval processes by the District Court, any argument of mistaken authority would stretch the limits of credulity.

CASE NO. 3:20-CV-02731
PLAINTIFFS' REPLY BRIEF CONCERNING
SETTLEMENT IMPLEMENTATION DISPUTES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

raised at any time"). Section 1252(f)(1) is waivable and has been waived here. ICE's cases offer no contrary authority. *EEOC v. Fed. Labor Relations Authority* and *Zamarano v. Garland* both concern administrative exhaustion requirements that, unless met, bar federal court jurisdiction altogether. *See EEOC v. Fed. Labor Relations Auth.*, 476 U.S. 19, 23-34 (1986) (exhaustion requirement as employment claims); *Zamarano v. Garland*, 2 F.4th 1213, 1225 (9th Cir. 2021) (exhaustion requirement in collateral challenges to immigration proceedings).[11]

The Court can also easily dispense with ICE's argument that a "federal statute" cannot be waived. ECF 1282 at 15, n. 12. The federal code is littered with waivable, non-jurisdictional provisions. *See, e.g., Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 392-393 (1982) (holding that the statutory time limit for filing charges with the Equal Employment Opportunity Commission was "not a jurisdictional prerequisite to suit in federal court, but a requirement that … is subject to waiver, estoppel, and equitable tolling"); *United States v. Wong*, 575 U.S. 402, 420 (FTCA statute of limitations codified at 28 U.S.C. § 2401(b) is non-jurisdictional)*; United States v. May*, 855 F.3d 271, 275 (4th Cir. 2017) (holding that because government "failed to raise" defense under 18 U.S.C. § 3582(c)(2) "it [wa]s waived on appeal.").

ICE voluntarily entered the Agreement, which obviously sets limits on its detention authority. *See* ECF 1205-1 at II.A.10, III (re-detention restrictions); V.B.1 (requiring release when parties agree re-detention violated Agreement). Moreover, ICE did not argue that 1252(f)(1) barred enforcement of the Agreement during the December 2022 settlement dispute between the parties. *See* ECF 1266-5. Even if 1252(f)(1) could be read to bar enforcement of the Vulnerabilities Provision (which it cannot), by any measure, ICE has waived its application here.

Dated: August 18, 2023                    Respectfully submitted,

                                          ACLU of Northern California
                                          */s/ Bree Bernwanger*
                                          Bree Bernwanger
                                          Attorneys for Plaintiffs

---

[11] ICE's other authority, *FTC v. Leshin*, did not concern a settlement agreement at all and its waiver statement was made in the context of "shotgun" pleadings by pro se plaintiffs. *See* No. 06-cv-61851, 2007 WL 9703567, at *4 (S.D. Fla. Oct. 9, 2007).