1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| ANGEL DE JESUS ZEPEDA RIVAS, et al., | Case No. 20-cv-02731-LB |
| Plaintiffs, | |
| | **ORDER RESOLVING SETTLEMENT DISPUTES** |
| v. | |
| DAVID JENNINGS, et al., | Re: ECF Nos. 1280, 1281 |
| Defendants. | |

**INTRODUCTION**

The plaintiffs in this class-action lawsuit are current and former civil immigration detainees at the Yuba County Jail and the Mesa Verde Processing Facility. They sued U.S. Immigrations and Customs Enforcement (ICE) and its private contractor GEO Group on the ground that the lack of protection from COVID-19 during the pandemic was an unconstitutional condition of confinement under the Fifth Amendment to the U.S. Constitution. The parties settled their case, and the trial court approved the settlement in June 2022. Under the settlement agreement, the defendants must mitigate COVID-19 risks at the facilities, there are limits on ICE's detaining and re-detaining class members, and disputes about compliance can be raised with the court.

The parties have two disputes. First, the plaintiffs want discovery about the defendants' transferring four hunger-striking detainees from the Mesa Verde facility to an El Paso facility. The plaintiffs assert that the transfers were medically unnecessary, in violation of the settlement

ORDER – No. 20-cv-02731-LB

agreement's prohibition against transfers that are not necessary for medical evaluation or care that exceeds "facility resources." Alternatively, they contend that even on the existing record, the transfers violated the settlement agreement. Second, the plaintiffs move to enforce the settlement agreement's provision requiring ICE to evaluate all new detainees who are vulnerable to COVID-19 for release. The defendants respond that the provision does not apply to detainees subject to mandatory detention under the relevant statutes.

The court denies relief for the transfers, which were medically necessary, but grants the motion to enforce the settlement agreement and requires ICE to evaluate all vulnerable detainees for release.

## STATEMENT

### 1. The Litigation and the Settlement Agreement

The plaintiffs sued on April 20, 2020, alleging that those in civil immigration detention at the Yuba County Jail and the Mesa Verde ICE Processing Facility were being held "under extraordinarily dangerous conditions during the current COVID-19 pandemic."[1] They claimed a violation of their Fifth Amendment right to substantive due process and sought declaratory and injunctive relief.[2] On April 29, 2020, the trial court issued a temporary restraining order for ICE to provide information so that individual bail requests could be considered.[3] That led to a reduction in detainee numbers to allow for social distancing, and in June 2020, the trial court issued a preliminary injunction to preserve that status quo.[4] Then, in August and December 2020, the trial court issued a further temporary restraining order and preliminary injunction for the Mesa Verde facility.[5] Similarly, in December 2020 and August 2021, the trial court issued a temporary restraining order and preliminary injunction applicable to the Yuba County Jail.[6] Also, during the

---

[1] Compl. – ECF No. 1 at 3 (¶ 1). Record citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[2] Am Compl. – ECF No. 780 at 40 (¶ 139 & Prayer for Relief).

[3] TRO – ECF No. 53 at 5–6 (¶ 6).

[4] Prelim. Inj. – ECF No. 357 at 8–9.

[5] TRO – ECF No. 500 at 2–3; Prelim. Inj. – ECF No. 867 at 23–26.

[6] TRO – ECF No. 922 at 1–3; Prelim. Inj. – ECF No. 951.

United States District Court
Northern District of California

1    course of the case, the trial court released many detainees subject to mandatory detention under the

2    relevant statutes due to the public-health crisis.[7]

3        In December 2021, the parties settled the case.[8] In June 2022, the trial court approved the

4    settlement under Federal Rule of Civil Procedure 23.[9] The final-approval order vacated the

5    preliminary injunctions.[10] The class is "all people who are or have been in ICE custody at the

6    Facilities from April 20, 2020, through the expiration of [the] settlement agreement."[11]

7    (Capitalized terms are those defined in the settlement agreement.)

8        The agreement requires the defendants to mitigate COVID-19 risks at the two facilities.[12] For

9    example, they must "[o]perate the Facilities consistent with applicable CDC Guidance, applicable

10   nationwide orders and injunctions, and the [Pandemic Response Requirements published by ICE]

11   (as updated)."[13] The Pandemic Response Requirements that were in effect until July 12, 2023,

12   provided that "[t]ranfers and transport of ICE detainees are discontinued unless necessary for

13   medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns,

14   release or removal, or to prevent overcrowding."[14] Also, "[i]f a detainee is determined to require

15   health care beyond facility resources, the detainee will be transferred in a timely manner to an

16   appropriate facility."[15] Effective July 13, 2023, the requirements provided only that "[i]f the

17   facility is housing individuals with confirmed COVID-19 as a cohort," then ICE would, "[i]f

18

19

---

20   [7] *See generally* Docket (at least 150 release orders). The government conceded the point at the hearing:
     the majority of cases necessarily involved those subject to mandatory detention. The trial judge
21   released mandatory detainees — after evaluating dangerousness and presumably flight risk — to
     address the public-health concerns posed to those at risk due to COVID-19 and the overcrowding at
22   the facilities. *See, e.g.*, TRO – ECF No. 500.

23   [8] Settlement Agreement – ECF No. 1205-1.

     [9] Final Approval Order – ECF No. 1258.
24
     [10] *Id.* at 5–6 (¶ 12).
25
     [11] Settlement Agreement – ECF No. 1205-1 at 8 (§ I.Y).
26
     [12] *Id.* at 8–13 (§ II).

27   [13] *Id.* at 8 (§ II.A.1).

28   [14] Pandemic Resp. Requirements, Ex. A to Riordan Decl. – ECF No. 1280-2 at 40.

     [15] *Id.* at 11.

United States District Court
Northern District of California

1  possible, limit medical transfers to another facility or within the facility to those necessary for

2  care."[16]

3       The settlement agreement also has provisions specific to "Vulnerable Class Members:"

4       Defendants will promptly screen Class Members (within 24 hours of any new
        intake) for Vulnerabilities to severe COVID-19 and identify vulnerable individuals
5       for immediate release. A Class Member with Vulnerabilities should be released
        unless a Supervising Detention and Deportation Officer — following consultation
6       with a medical professional, who will make the assessment as to the existence
        and/or severity of medical risk factors — determines that the risk of flight or
7       danger to the community substantially outweighs the risk of severe illness or death
        to the Class Member. Any assessment will take into account mitigating factors,
8       such as vaccination status.[17]

9

10  A "'Vulnerability' means a particular vulnerability to COVID-19, including (i) older adults (55

11  years or older, subject to change based on any subsequent nationwide order or settlement); (ii)

12  CDC-identified comorbidities to severe COVID-19; and/or (iii) the inability to be vaccinated for

13  medical or religious reasons."[18]

14       Under the settlement agreement and the final-approval order, disputes ultimately are resolved

15  by a magistrate judge, including disputes where the plaintiffs claim that the defendants are in

16  "material breach" of the settlement agreement.[19] The parties later consented to magistrate-judge

17  jurisdiction.[20] The agreement provides a standard of review:

18       In all instances where the magistrate judge is tasked with determining whether a
        material breach has occurred, the inquiry is an objective one. By way of example,
19       whether a Class Member poses a risk to public safety or is a flight risk, whether a
        Class Member has absconded, or whether a Class Member has been medically
20       isolated, is an objective question that will be determined in the first instance by the
        magistrate judge and no deference will be given to a [p]arty's best efforts regarding
21       the alleged breach at issue.[21]

22

23

24  _____

    [16] Updated Pandemic Resp. Requirements, Ex. B to Riordan Decl. – ECF No. 1280-2 at 64–65.
25
    [17] Settlement Agreement – ECF No. 1205-1 at 10 (§ II.A.10).
26
    [18] Id. at 8 (§ I.DD).
27
    [19] Id. at 19 (§§ V.C–V.E); Final Approval Order – ECF No. 1258 at 6 (¶ 15); Order – ECF No. 1267.

    [20] Joint Consent – ECF No. 1273 (consenting specifically to the undersigned's jurisdiction).
28
    [21] Settlement Agreement – ECF No. 1205-1 at 19 (§ V.E.3).

### 2.  Detainee-Transfer Dispute

#### 2.1    The Plaintiffs' Position

In the parties' first dispute, the plaintiffs ask for discovery about March 2023 detainee transfers (and alternatively ask for relief regarding the transfers on the existing record). They allege that the defendants violated the settlement agreement "by unnecessarily and violently transferring four class members" from the Mesa Verde facility.[22] Those class members — Pedro Figueroa-Padilla, Jose Ruben Hernandez Gomez, Raymundo Noe Dominguez Vidal, and Roberto Carlos Franco Guardado — were engaged in a hunger strike.[23] ICE transferred them to ICE's El Paso Service Processing Center on March 7, 2023, and then back to the Mesa Verde facility on March 14, 2023.[24]

One of the transferred detainees, Mr. Hernandez Gomez, submitted a declaration describing what happened. On February 17, 2023, "dozens" of detainees at the Mesa Verde and nearby Golden State Annex ICE facilities began the hunger strike. It was a "peaceful protest against [their] prolonged detention, dehumanizing conditions of confinement, and mistreatment."[25]

Early in the morning on March 7, GEO Group employees and ICE officers entered Mr. Hernandez Gomez's dorm. They were dressed in riot and military gear, and the ICE officers had automatic rifles. The class members were ordered to get on the floor.[26] "Officers [then] dragged [Mr. Hernandez Gomez] out of the dorm by [his] legs, and threw [him] on the ground, striking [his] shoulder and chest against the ground." They "also violently dragged three other class members out of the dorm." Mr. Hernandez Gomez was taken to a holding cell without an opportunity to call anyone.[27] His cell was near that of Mr. Dominguez Vidal, a diabetic and stroke survivor who had lost consciousness. "[I]nstead of providing [Mr. Dominguez Vidal] with medical care, officers held him for several minutes by his arms like a rag doll before putting him in a

---

[22] Mot. for Disc. – ECF No. 1280 at 6.

[23] Hernandez Gomez Decl. – ECF No. 1280-3 at 3 (¶ 2).

[24] *Id.* at 3 (¶ 1), 5 (¶ 18).

[25] *Id.* at 3 (¶ 2).

[26] *Id.* (¶ 3).

[27] *Id.* (¶ 4).

wheelchair."[28]

Before the transfer, the detainees were not given medical tests (including COVID-19 tests) or care, even though two complained of pain from the violent move to the holding cells.[29] The detainees were taken from the cells to two vans as "a group of GEO officers stood outside the facility applauding."[30] They were driven "many hours" to an airstrip. They were shackled during the drive, and the officers turned the van temperature to inappropriately cold and hot temperatures.[31] As they boarded the plane, the detainees told the officers that they felt faint and dizzy and asked to be taken to a hospital, but the officers denied the request.[32]

On arrival at the El Paso facility, a nurse conducted a verbal assessment of Mr. Hernandez Gomez but because ICE officers were present, he declined to answer sensitive medical questions.[33] "Dr. Iglesias," ICE's regional medical director, then saw him. Mr. Hernandez understood from Dr. Iglesias that she "was going to try to provide [the transferees] 'care' without [their] consent." Dr. Iglesias told him that she would get a court order to draw his blood and another court order if a decision was made to force feed. She explained that the force-feeding process involved "put[ting] hoses down [his] nose and pour[ing] liquid down."[34]

At El Paso, the detainees were at first held in separate and solitary cells. Mr. Hernandez Gomez's cell was "filthy" and lacked adequate cleaning supplies or clean drinking water.[35] He asked for electrolytes and vitamins but the request was denied.[36] The detainees were told that "all [they] had to do to be medically cleared to leave [El Paso] was to eat three meals in a row." They were also told that if they continued their hunger strike, they "would continue to be subjected to

---

[28] *Id.* (¶ 5).

[29] *Id.* at 3–4 (¶ 6).

[30] *Id.* at 4 (¶ 8).

[31] *Id.* (¶ 9).

[32] *Id.* (¶ 10).

[33] *Id.* (¶ 12).

[34] *Id.* at 5–6 (¶ 13).

[35] *Id.* at 6 (¶ 14).

[36] *Id.* (¶ 15).

United States District Court
Northern District of California

solitary confinement" and ICE would obtain a court order to force feed them.[37]

On March 9, the detainees agreed to "pause" their hunger strike, "in hopes of being returned to Mesa Verde and out of fear of being subjected to solitary confinement and force feeding." The first meal they were given "was two cold burgers, fries, and juice." They were not provided any electrolytes, vitamins, or other supplements. This caused Mr. Hernandez Gomez to "feel dizzy and disoriented," but ICE did not hospitalize him and instead continued to give him "heavy" meals.[38]

The detainees were transferred back to Mesa Verde on March 14. Mr. Hernandez Gomez "continued experiencing dizziness, vertigo, and other symptoms, including headache and mental fogginess." Mesa Verde staff sent him to the emergency room at Dignity Health Mercy Hospital, where he was evaluated for refeeding syndrome. (He was not evaluated for this condition while at El Paso, even though he had similar symptoms for several days at El Paso.)[39]

On March 15, Mr. Hernandez Gomez was discharged and returned to Mesa Verde. Immigration detention staff then evaluated him for refeeding syndrome for the first time. The doctor on staff at Mesa Verde noted symptoms of a neurological condition and determined that he required evaluation for refeeding syndrome and Wernicke's Encephalopathy. He was thus returned to Dignity Health Mercy Hospital.[40] The next day, he was admitted to Good Samaritan Hospital, where he "was noted to have a possible pneumonia, acute encephalopathy, nutritional deficiency, and dehydration." He was discharged and returned to Mesa Verde on March 21.[41] Later, he filed a petition for a writ of habeas corpus and was released from immigration custody, but he "continue[s] to experience nausea, dizziness, and vertigo" and he "walk[s] with a cane and occasionally with a walker."[42]

Dr. Mary Cheffers, an emergency-department physician and Clinical Associate Professor of

---

[37] *Id.* (¶ 16).

[38] *Id.* (¶ 17).

[39] *Id.* at 5–6 (¶ 18).

[40] *Id.* at 6 (¶ 19).

[41] *Id.* (¶ 20).

[42] *Id.* (¶ 21); *Hernandez Gomez v. Becerra*, No. 23-cv-01330-WHO (N.D. Cal.) (habeas-corpus case).

Emergency Medicine at USC's Keck School of Medicine, submitted a declaration in support of the plaintiffs' motion. She offers "an expert opinion about the options for treating disorders of malnutrition at local hospitals in California" and about the medical care that the transferees received in El Paso.[43] She is familiar with ICE's standards of care and "regularly diagnose[s] and treat[s] disorders of malnutrition and its possible consequences and [is] familiar with the side effects of the improper initiation of caloric intake."[44] Her declaration is based on, among other things, medical records "pertaining to ICE's transfer of three" of the transferred hunger strikers.[45]

Dr. Cheffers explains that hunger strikers who have gone over fifteen days without a meal are at high risk for refeeding syndrome and should be refed very gradually for the first two to four days.[46] There are other guidelines, such as for repletion of vitamins and electrolytes, and "the proper setting for refeeding [for] a person at high risk for refeeding syndrome is the hospital."[47]

Based mainly on her review of medical records, Dr. Cheffers opines that the medical care the detainees received in El Paso "would have been available from medical providers in or near Bakersfield, California [where the Mesa Verde facility is located], and would have been provided at a higher level of care locally than what they received at El Paso." For example, a local hospital would have a nutritionist available to advise on refeeding.[48] Dr. Cheffers also opines that "Mr. Hernandez [Gomez] should have been hospitalized locally days before his transfer to El Paso." His symptoms at Mesa Verde, such as "skipped heart beats," "should have been given extreme credence with referral to a local emergency department."[49] Similarly, two of the other transferred detainees should have been locally hospitalized, at least for the initial days of refeeding.[50]

Dr. Cheffers "accordingly do[es] not believe a valid medical purpose was served by the

---

[43] Cheffers Decl. – ECF No. 1280-4 at 3 (¶ 1).

[44] *Id.* (¶¶ 3–4).

[45] *Id.* at 4 (¶ 6), 6–8 (¶¶ 20–34).

[46] *Id.* at 4–6 (¶¶ 7–14).

[47] *Id.* at 6 (¶¶ 15–19).

[48] *Id.* at 9 (¶ 35).

[49] *Id.* (¶ 36).

[50] *Id.* (¶ 37).

transfers . . . to El Paso. Moreover, the violent and forceful removal and shackled plane travel were extremely medically dangerous."[51] As for the medical care provided at the El Paso facility, it was inadequate, "violated accepted guidelines," and put the detainees' health "at great risk."[52] While the transferred detainees were at El Paso, "there were indications for their hospitalization" and "[m]ost egregiously," ICE "never consulted with a nutritionist in developing a plan for renourishment."[53] Mr. Hernandez Gomez's "provisional diagnosis" of Wernicke's Encephalopathy is "a result of [ICE's] inadequate and negligent care" and "is a life-long debilitating condition that could easily have been avoided."[54]

In their motion, the plaintiffs ask to serve discovery requests and take depositions related to the transfers in order to file a motion to enforce the settlement agreement and obtain "an order preventing [the d]efendants from transferring class members except when necessary for medical care." Alternatively, the plaintiffs ask for that relief now, on the existing record.[55]

The plaintiffs characterize the ultimate issue as "whether transferring the class members from [Mesa Verde] to [El Paso] was 'necessary' for medical care." They contend that their requested discovery is to establish three arguments that the transfers were not medically necessary: adequate local care was available, care at El Paso was inadequate, and the transfers were "excessive and/or punitive."[56] They emphasize that the issue is whether transfers *to El Paso* were medically necessary and that the defendants' declarations do not rebut their evidence that the care provided at El Paso was not better than that available at Mesa Verde or a local hospital.[57]

---

[51] *Id.* (¶ 38).

[52] *Id.* at 10 (¶ 39).

[53] *Id.* (¶¶ 40–41).

[54] *Id.* (¶ 42).

[55] Mot. for Disc. – ECF No. 1280 at 5–6, 14–15 & n.7.

[56] *Id.* at 14–15.

[57] Pls.' Reply Br. – ECF No. 1286-1 at 11–16 & n.7.

United States District Court
Northern District of California

1

### 2.2    The Defendants' Position

The defendants contend that the four class members in question were transferred because they had "suffered significant medical effects" from their hunger strike, "including significant losses to their body weight," and the El Paso facility "has greater medical care capabilities than Mesa Verde." In other words, the detainees were transferred because "ICE and Mesa Verde medical professionals determined in the exercise of their medical judgment that the individuals were in need of a higher level of medical care."[58]

Dr. Michelle Iglesias, a board-certified family-medicine physician and the Acting Western Regional Clinical Director at the El Paso facility when the detainees were transferred, submitted a declaration. She explains that Mesa Verde is not an ICE Health Service Corps (IHSC) facility, whereas El Paso "is an IHSC-staffed facility that can provide a higher level of medical care and is equipped to handle detainees who may have complex, chronic, medical, or behavioral health conditions that require frequent clinical contacts to maintain control or stability of their condition to prevent hospitalization or complications."[59] El Paso "has a designated medical housing unit, which allows for close supervision, observation, and monitoring of detainees," and it "has experience treating and caring for hunger striker patients." It also has a substantial nursing and nurse-practitioner staff.[60]

On March 3, 2023, Dr. Iglesias received a request from Dr. Alta Grace Baruiz, a GEO Group employee who provides medical supervision of Mesa Verde detainees, for "a higher level of care for four non-citizens housed at Mesa Verde." Those four were on a hunger strike and, "based on the length of food refusals, weight loss, [and] medical and mental comorbidities," were determined to be "at risk for refeeding syndrome." "Dr. Baruiz further noted that in the event complications might develop for these non-citizens and hospitalization is necessary, the current requirement at Mesa Verde of a mandatory 10-day quarantine upon return to the facility would be problematic."

United States District Court
Northern District of California

---

[58] Fed. Defs.' Br. – ECF No. 1282 at 6.

[59] Iglesias Decl. – ECF No. 1282-4 at 1 (¶ 1), 2 (¶ 4), 4 (¶ 15).

[60] *Id.* at 4 (¶ 16).

Dr. Iglesias then medically accepted the four detainees on the ground that El Paso "was better equipped to provide the higher level of medical care that was needed."[61]

Dr. Baruiz also submitted a declaration. She has been a medical doctor at Mesa Verde since 2016.[62] She declares that the four transferred detainees had been on hunger strikes, were suffering effects such as decreased body weight, had comorbidities (in some cases), and were refusing baseline labs, daily vital signs, vitamins, and electrolytes. She determined that the detainees were at risk for refeeding syndrome and would benefit from a higher level of care than that available at Mesa Verde "to ensure proper refeeding and patient management." She requested the transfers.[63]

In light of these declarations, the defendants contend that they did not breach the settlement agreement (or the incorporated Pandemic Response Requirements published by ICE) because the transfers were necessary for medical care. The plaintiffs' arguments, on the other hand, consist of three points that are distinct from whether transfers were medically necessary: where the detainees should have been transferred, how the transfers should have been executed, and what should have happened after the transfers. These objections, according to the defendants, are "post hoc criticism[s] of decisions made by medical professionals based on the information available at the time" and are outside the scope of the settlement agreement. "Nor did the [Pandemic Response Requirements] promulgate guidelines for the medical care that should be provided to individuals who were not confirmed or suspected to have COVID-19."[64]

Regarding the plaintiffs' requests for discovery, the defendants contend that the settlement agreement sets forth a "an 'expeditious' dispute-resolution process that does not envision discovery." Moreover, the agreement provides for certain information disclosures from ICE to the plaintiffs but does not provide for further discovery.[65]

---

[61] *Id.* at 2–3 (¶¶ 6–10), 4 (¶ 14).

[62] Baruiz Decl. – ECF No. 1282-5 at 1 (¶ 1).

[63] *Id.* at 1–5 (¶¶ 2–23).

[64] Fed. Defs.' Br. – ECF No. 1282 at 11–13; Fed. Defs.' Reply Br. – ECF No. 1288 at 5–8.

[65] Fed. Defs.' Br. – ECF No. 1282 at 21–23; Fed. Defs.' Reply Br. – ECF No. 1288 at 8–9.

United States District Court
Northern District of California

1

United States District Court
Northern District of California

### 3. Vulnerable-Detainees Dispute

#### 3.1 The Plaintiffs' Position

The parties' second dispute relates to the settlement agreement's provision regarding "Vulnerable Class Members." It requires the defendants to screen class members within twenty-four hours of any new intake to identify "for immediate release" individuals who are vulnerable to severe COVID-19. A class member with vulnerabilities "shall be released" unless a supervising officer — after consulting with a medical officer, who makes the assessment about medical risk factors — determines that "the risk of flight or danger to the community substantially outweighs the risk of severe illness or death."[66] Since the settlement agreement took effect, the defendants have detained new class members with vulnerabilities but have not released any of them under this provision, on the ground that the new class members are subject to mandatory detention under the relevant statutes and cannot be released. The plaintiffs assert that this practice of not considering vulnerable class members for release violates the settlement agreement and thus move to enforce the vulnerabilities provision as written.[67]

The plaintiffs describe the parties' post-settlement-approval discussions about the vulnerabilities provision, ostensibly to show that they understood that the provision applied to all class members.

On June 23, 2022 (soon after the approval), the defendants sent the plaintiffs a list of individuals booked into custody at the facilities, included information about four with COVID-19 vulnerabilities, and said that ICE had detained all four.[68] The plaintiffs asked about those decisions.[69] The defendants responded that under the settlement agreement, the four vulnerable class members each posed a risk of flight or danger to the community that substantially outweighed the medical risk.[70]

---

[66] Settlement Agreement – ECF No. 1205-1 at 10 (§ II.A.10).

[67] Mot. to Enforce Settlement Agreement – ECF No. 1281 at 7–9.

[68] Bernwanger Decl. – ECF No. 1281-1 at 3 (¶ 2).

[69] *Id.* (¶ 3).

[70] *Id.* (¶ 4).

In December 2022, the plaintiffs asked the defendants about an especially vulnerable class member. The defendants detained him despite his having only a single, decades-old criminal conviction. The plaintiffs "noted [that] ICE had not released a single Class Member with Vulnerabilities since the effective date of the [settlement] agreement."[71] The defendants responded and asked about the class member's waiver on appeal of his removal order but did not respond to the plaintiffs' discussion of the vulnerabilities-provision question.[72] In March 2023, after the plaintiffs raised the issue again, the defendants said for the first time that in their view, the vulnerabilities provision does not apply to class members subject to mandatory detention under the relevant statutes, 8 U.S.C. §§ 1226(c) and 1231(a)(2).[73]

So far, ICE has detained eighty-eight new class members with vulnerabilities and has not released any under the settlement agreement. As of August 11, 2023, forty-one remain in custody.[74]

The plaintiffs contend that the under ordinary principles of contract interpretation, the vulnerabilities provision (like other provisions in the settlement agreement) applies to all class members and does not exclude class members subject to mandatory detention. By contrast, in other settlement agreements, ICE has excluded persons detained under mandatory-detention statutes. Also, the plaintiffs point out that section V.B.1 — which provides for release of class members re-detained in violation of the agreement — "includes class members subject to [the two mandatory-detention statutes,] 8 U.S.C. §§ 1226(c) and 1231(a)(2)."[75]

The plaintiffs also contend that under the settlement agreement, ICE has the authority to release class members who would otherwise be subject to mandatory detention: the agreement has the force of a court order, and ICE concedes that it can release detainees pursuant to a court order. Furthermore, "the settlement occurred against the backdrop of constitutional rulings limiting the

---

[71] *Id.* at 3–4 (¶ 5).

[72] *Id.* at 4 (¶ 6).

[73] *Id.* at 4–5 (¶ 8).

[74] *Id.* at 6 (¶ 14).

[75] Mot. to Enforce Settlement Agreement – ECF No. 1281 at 14–21; *see* Settlement Agreement – ECF No. 1205-1 at 18 (§ V.B.1).

1  application of [the mandatory-detention] statutes," so ICE should be permitted to settle the case in

2  the ordinary course and in line with those prior rulings.[76]

3      The plaintiffs ask the court to (1) declare that the vulnerabilities provision applies to all class

4  members "regardless of the underlying detention statute," (2) declare that ICE has breached the

5  settlement agreement, (3) order a process for the defendants to determine which (if any) class

6  members should remain detained and for the parties to brief any remaining disputes, and (4) order

7  the defendants to produce monthly compliance reports regarding the vulnerabilities provision.[77]

8  ### 3.2    The Defendants' Position

9      The defendants respond that they cannot release detainees subject to mandatory detention under

10  the relevant statutes. 8 U.S.C. § 1226(c), for example, "makes clear that detention of aliens within

11  its scope *must* continue 'pending a decision on whether the alien is to be removed from the United

12  States.'" *Jennings v. Rodriguez*, 138 S. Ct. 830, 846 (2018). The defendants also point to section

13  V.B.1, which sets forth the remedy of release for the wrongful re-detention of class members,

14  including those subject to mandatory detention under 8 U.S.C. §§ 1226(c) and 1231(a)(2). They

15  assert essentially that this is a carveout that shows that section II.A.10, the vulnerabilities provision,

16  does not apply to those subject to mandatory detention. The defendants also argue that the

17  settlement agreement can't be interpreted to mandate release of those subject to mandatory

18  detention because contract provisions that violate statutes are void. Finally, the defendants contend

19  that the court may not order the release of mandatory detainees, mainly because of 8 U.S.C.

20  § 1252(f)(1), which provides that no court has "jurisdiction or authority to enjoin or restrain the

21  operation of" the mandatory-detention statutes, "other than with respect to the application of such

22  provisions to an individual alien against whom proceedings . . . have been initiated."[78]

23      As for the plaintiffs' requested relief, the defendants assert that it is overbroad and calls for the

24  court to impermissibly rewrite the settlement agreement.[79]

25  ———————————————

26  [76] Pls.' Reply Br. – ECF No. 1286-1 at 18–20.

    [77] Mot. to Enforce Settlement Agreement – ECF No. 1281 at 23–24.

27  [78] Fed. Defs.' Br. – ECF No. 1282 at 15–21; Fed. Defs.' Reply Br. – ECF No. 1288 at 9–15.

28  [79] Fed. Defs.' Reply Br. – ECF No. 1288 at 16–17.

United States District Court
Northern District of California

United States District Court
Northern District of California

**ANALYSIS**

Both disputes — whether the transfers violated the settlement agreement and whether the vulnerabilities provision applies to mandatory detainees — turn on the language of the agreement.

"A settlement agreement is treated as any other contract for purposes of interpretation." *United Com. Ins. Serv. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992). "Federal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999); *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016). That said, "[i]n construing the terms of contracts that are governed by federal common law," courts are often "guided by common-sense canons of contract interpretation." *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 178 (1st Cir. 1995) (cleaned up); *Agnew v. Fed. Deposit Ins. Corp.*, 548 F. Supp. 1234, 1237 (N.D. Cal. 1982) ("[I]n cases governed by federal common law, state law frequently provides the appropriate federal rule of decision.").

A "clause is first read by attributing to each word its ordinary definition." *Le v. Zuffa, LLC*, 108 F. Supp. 3d 768, 775 (N.D. Cal. 2015). "If the meaning of the clause is clear after doing so, then 'the intent of the parties must be ascertained from the contract itself' rather than from anything extrinsic to the document." *Id.* (quoting *Klamath Water Users*, 204 F.3d at 1210).

**1.  Transfers**

The parties first dispute whether the defendants breached the settlement agreement when they transferred the hunger-striking detainees from the Mesa Verde facility to the El Paso facility. The defendants did not breach the settlement agreement (and thus the request for discovery is moot).

The plaintiffs contend that the transfers were not medically "necessary" because the actual care at El Paso was inadequate or inferior compared to that available in a local hospital.[80] Also, the difference in care at El Paso was insignificant even as compared to Mesa Verde: "[o]n the criteria that [the d]efendants now emphasize as justifying the transfer, there is very little difference

---

[80] Mot. for Disc. – ECF No. 1280 at 14–15; Pls.' Reply Br. – ECF No. 1286-1 at 11–13 & n.7.

between [Mesa Verde] and [El Paso]." Mesa Verde has enough medical staff to see detainees "very quickly for any medical issues" and monitor their vital signs, and it has two medical-observation cells.[81] The plaintiffs suggest that the transfer to El Paso was to end the hunger strike by blunt instrument (so to speak), not to provide better medical care.[82] Mr. Hernandez Gomez, for example, suggests that the trip to El Paso was to pressure the detainees to end the hunger strike by isolating them and threatening to force feed them.[83] Dr. Cheffers declares that basic standards of medical care — which were not followed at El Paso — called for hospitalization, electrolytes, vitamins, and gradual refeeding. She also explains that force feeding hunger strikers is medically unethical and that substandard care may have caused lifelong Wernicke's Encephalopathy for Mr. Hernandez Gomez.[84]

The issue turns on the meaning of necessary. "'[N]ecessary' may have one of two meanings: either 'essential' or 'something less than essential.'" *Sierra Club v. Trump*, 977 F.3d 853, 881 n.9 (9th Cir. 2020) (quoting *Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018)), *cert. granted and judgment vacated on other grounds*, *Biden v. Sierra Club*, 142 S. Ct. 56 (2021). The word's meaning "varies with context." *Cellular Telecomms. & Internet Ass'n v. F.C.C.*, 330 F.3d 502, 510 (D.C. Cir. 2003). For example, "in the specific context of the Necessary and Proper Clause, the word necessary does not mean absolutely necessary." *Sierra Club*, 977 F.3d at 880–81 (cleaned up) (quoting *United States v. Comstock*, 560 U.S. 126, 134 (2010)). Similarly, when the word appears in the phrase "ordinary and necessary" or "reasonably necessary," that "suggest[s] that a more relaxed definition . . . may be

---

[81] Pls.' Reply Br. – ECF No. 1286-1 at 12–13 (citing the record in the underlying litigation); Medrano Decl. – ECF No. 581-1 at 3 (¶ 7), 4 (¶ 9).

[82] Mot. for Disc. – ECF No. 1280 at 6.

[83] Hernandez Gomez Decl. – ECF No. 1280-3 at 5 (¶¶ 13 (Dr. Iglesias "explained that the reason we were there in Texas was because we were not eating. She told me that her role was to force us to eat."), 15 (he was denied electrolytes and vitamins), 16 ("ICE personnel told us that all we had to do to be medically cleared to leave [El Paso] was to eat three meals in a row. ICE personnel also informed us that if we continued our hunger strike, we would continue to be subjected to solitary confinement and that ICE would go to court to get an order to force feed us."), 17 ("I and the other transferred class members agreed to pause our hunger strike in hopes of being returned to Mesa Verde and out of fear of being subjected to solitary confinement and force feeding. After we agreed to resume eating, the first meal that ICE gave each of us was two cold burgers, fries, and juice.")).

[84] Cheffers Decl. – ECF No. 1280-4 at 4–6 (¶¶ 7–19), 10 (¶ 42).

appropriate." *Id.* at 881 & n.9 (citing *Comm'r v. Heininger*, 320 U.S. 467, 471 (1943), and *Ayestas*, 138 S. Ct. at 1093).

The defendants submitted evidence that El Paso is a medically superior facility (as an ICE Health Service Corps facility) when a hunger strike has reached a critical stage. It has greater capacity for dedicated medical observation than Mesa Verde's two cells. Even if a transfer must be medically essential to comply with the settlement agreement, the transfers here met that standard, especially because of the hunger strike's advanced stage. Of course, ICE cannot transfer a detainee just anywhere: if a detainee has medical needs that require care beyond a facility's resources, then under the settlement agreement, ICE must transfer the detainee to an "appropriate facility."[85] The plaintiffs' argument that the destination matters thus has some force. But depending on the context, "a measure may be 'necessary' even though acceptable alternatives have not been exhausted." *Nat. Res. Def. Council, Inc. v. Thomas*, 838 F.2d 1224, 1236 (D.C. Cir. 1988); *F.T.C. v. Rockefeller*, 591 F.2d 182, 188 (2d Cir. 1979) ("[W]e reject . . . the notion that 'necessary' means that the Commission must pursue all other 'reasonably available alternatives' before engaging in the ancillary investigation."). In the context of a contract provision designed to mitigate COVID-19 risks by limiting detainee transfers, the court does not interpret "necessary" to require consideration of medical alternatives like those the plaintiffs propose.

The remaining issues concern the circumstances of the transfers and the quality of medical care provided in El Paso. The settlement agreement does not cover these issues, however unfortunate they were. Instead, any remedy lies in a separate challenge to the conditions of confinement. This plain-language reading of the settlement agreement makes sense: the lawsuit and the settlement agreement, including the transfer provision, are aimed at limiting the spread of COVID-19. Also, as the court said at the hearing, courts — including the trial court — generally do not wade into the weeds of an agency's discretionary decision-making aimed at a particular problem. The trial court's injunctions mandated processes, including health measures and the release of detainees, to mitigate the public-health issues, but disavowed "intrud[ing] too much on

---

[85] *See supra* Statement.

ICE's function and decision-making authority."[86] And the settlement agreement does not require processes beyond limiting transfers to those necessary for medical treatment. While it may have been better to seek medical treatment at local hospitals (as the plaintiffs suggest), the settlement agreement did not require that approach.

In sum, the court holds that there was no violation of the settlement agreement because medical professionals directed medically necessary transfers to El Paso, an ICE Health Service Corps facility that — unlike Mesa Verde — had a designated medical-housing unit for close supervision, experience with hunger strikers, and greater medical staffing.[87]

### 2.   Screening Class Members with Vulnerabilities

The parties next dispute whether the defendants must release class members subject to mandatory detention if they are vulnerable to severe COVID-19 and the risk of flight or danger to the community does not substantially outweigh the class member's risk of severe illness or death.[88] There are two issues: whether as a matter of contract interpretation this provision applies to all class members (including those subject to mandatory detention under the relevant statutes) and, if so, whether the mandatory-detention statutes nonetheless preclude enforcement of the agreement.

First, under the plain language of the contact, the provision applies to all class members, including mandatory detainees. The class is "all people who are or have been in ICE custody at the Facilities from April 20, 2020, through the expiration of [the] settlement agreement."[89] The defendants must screen class members within twenty-four hours of intake for vulnerabilities to severe COVID-19 and "identify vulnerable individuals for immediate release." If a medical professional determines that the detainee has the requisite vulnerabilities, then the detainee "should

---

[86] Prelim. Inj. – ECF No. 357 at 7; Prelim. Inj. – ECF No. 867 at 23 (limiting transfers absent consent of class counsel or the court "would wade too far into micromanagement of ICE's system").

[87] Iglesias Decl. – ECF No. 1282-4 at 1 (¶ 1), 2 (¶ 4), 4 (¶¶ 15–16).

[88] Settlement Agreement – ECF No. 1205-1 at 10 (§ II.A.10).

[89] *Id.* at 8 (§ I.Y).

United States District Court
Northern District of California

be released unless a Supervising Detention and Deportation Officer . . . determines that the risk of flight or danger to the community substantially outweighs the risk of severe illness or death to the Class Member."[90] These terms are unambiguous: the screening and release process applies to all class members, including mandatory detainees.

The defendants point to section V.B.1, the dispute-resolution process for class members who are re-detained in violation of the settlement agreement. It has remedies for the release of those class members, including those subject to mandatory detention under 8 U.S.C. §§ 1226(c) and 1231(a)(2). The defendants assert that the agreement's identifying mandatory detainees here means that mandatory detainees are not covered in section II.A.10, the vulnerabilities provision.[91] Section V.B.1 does not alter the analysis: it is a dispute-resolution process for persons who are re-detained in violation of the settlement agreement and has specific remedies (including raising the issue before the presiding magistrate judge). By contrast, section II.A.10 mandates the defendants' initial screening process for all class members and has a different remedy: a motion to enforce the settlement agreement to ensure that the defendants follow the mandated process.

Also, the rule of construction relied on by the defendants does not apply here. They cite cases to the effect that where contracting parties "knew how to" use certain language "when they wanted to" (i.e., the parties used that language somewhere in the contract), the absence of such language in a given provision means the language does not apply to that provision.[92] This reasoning applies to the rule of construction that "mention of one matter implies the exclusion of all others." *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013) (cleaned up). But this rule applies only where the contract is ambiguous, *id.*, and section II.A.10 is not ambiguous.

Even if section II.A.10 were ambiguous, the rule that "mention of one matter implies the exclusion of all others" would not help: because section II.A.10 applies to all detainees, it cannot set up an implied exclusion of some detainees. *See Smart*, 70 F.3d at 179 ("[W]hen parties list specific

---

[90] *Id.* at 10 (§ II.A.10).

[91] Fed. Defs.' Reply Br. – ECF No. 1288 at 10.

[92] Fed. Defs.' Br. – ECF No. 1282 at 16 (collecting cases).

items in a document, any item not so listed is typically thought to be excluded."). For example, in the context of statutory interpretation, this rule of construction applies only when "that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference" of an exclusion. *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 169 (2003) (cleaned up). By contrast, section II.A.10 includes all detainees, so there is no omission leading to an implied exclusion.

Second, the defendants contend that even if section II.A.10 applies to all class members, the provision is not enforceable because it requires release of those subject to mandatory detention.[93] They contend that holding otherwise violates 8 U.S.C. § 1252(f)(1), which provides that no court has "jurisdiction or authority to enjoin or restrain the operation of" the mandatory-detention statutes, "other than with respect to the application of such [statutes] to an individual alien against whom proceedings . . . have been initiated."[94] As the plaintiffs point out, the vulnerabilities provision's individualized detainee review falls within § 1252's exception.[95] That is, even when viewed as injunctive relief applicable to the entire class, that injunctive relief is only individualized review.

More broadly, though, the settled lawsuit here — embodied in an approved class-action settlement with the force of a court order that replaced the trial court's earlier injunctions — is an enforceable agreement to mitigate a public-health crisis.

To address the public-health crisis posed by the COVID-19 pandemic in ICE detention facilities, the trial court issued several temporary restraining orders and preliminary injunctions that included individualized consideration of release for particular detainees.[96] For example, in its June 2020 preliminary injunction, the trial court held that it would "continue for now to consider

---

[93] *Id.* at 16–17.

[94] *Id.* at 19–21.

[95] Mot. to Enforce Settlement Agreement – ECF No. 1281 at 21.

[96] Because ICE terminated its contract with the Yuba County Jail in December 2022, "[a]ll current class members are detained at Mesa Verde." *Id.* at 9 n.1.

United States District Court
Northern District of California

1    requests from class counsel for the temporary release of individual detainees."[97] It released scores

2    of mandatory detainees. The parties do not dispute that the defendants can release mandatory

3    detainees in the case of a court order.[98] The injunctions were effectively upheld on appeal. *Zepeda*

4    *Rivas v. Jennings*, 845 F. App'x 530, 534–35 (9th Cir. 2021); *see id.* at 535 ("The government

5    separately argues that the district court did not have authority to release any plaintiffs detained

6    pursuant to the mandatory detention statutes. 8 U.S.C. §§ 1226(c) and 1231(a)(2). Neither party

7    briefed whether the district court was required to prioritize releasing detainees who were not

8    subject to mandatory detention. Rather than decide these questions and the other unresolved

9    issues, . . . we refer this appeal to the Circuit Mediator Program.").

10        Thus, until the parties settled the case, the trial court's injunctions and orders authorized release

11   of class members subject to mandatory detention. The settlement agreement replaced those orders.

12   The trial court approved the class-action settlement, certifying (for settlement purposes) a Rule

13   23(b)(2) class and holding that "final injunctive relief or corresponding declaratory relief is

14   appropriate respecting the Settlement Class as a whole."[99] The settlement agreement was

15   "incorporated by reference in [the final-approval] order and [has] the full force of an Order of the

16   Court."[100] 6 Newberg & Rubenstein on Class Actions § 18:15 (6th ed. 2023) ("The process by

17   which a class action settlement is approved has the effect of turning the private settlement into a

18   judicial ruling, a judgment.").

19        In the face of injunctions mandating public-health responses by the defendants, and during a

20   public-health crisis rendering its detention facilities unsafe for vulnerable class members, the

21   defendants agreed to narrow remedies in a class-action settlement. Those remedies replaced the

22   trial court's earlier orders, provided a substitute process for the court's many orders allowing

23   release, and have the force of a court order. One remedy is section II.A.10's provision for

24   screening all class members. Another is section V.B.1, which allows release of wrongfully re-

25

26   [97] Prelim. Inj. – ECF No. 357 at 9.

     [98] Prelim. Inj. – ECF No. 867 at 5 n.1.

27   [99] Final Approval Order – ECF No. 1258 at 4–5 (¶ 9).

28   [100] *Id.* at 3 (¶ 2).

detained class members, including mandatory detainees, by agreement of the parties or order of the court. Moreover, as the court said at the hearing, the parties signed the agreement in December 2021, during the Omicron surge. At some point, either the parties had to settle on a permanent process or the trial court would impose one. The parties chose a settlement that has the force of a court order.[101] The court thus enforces the agreement and orders the government to comply with it, including section II.A.10. The defendants confirmed at the hearing that they would comply with the court's order.

The final issue is the scope of relief. The plaintiffs ask for, among other things, a briefing process for the forty-one detainees at issue.[102] But the settlement agreement defines the relief: the defendants must comply with section II.A.10 for all class members, including the forty-one detainees and all future new detainees for the duration of the settlement agreement, and they must comply with the relevant information-disclosure requirements.[103] Disputes about individual class members can be raised under the settlement agreement's dispute-resolution procedures.

## CONCLUSION

This resolves ECF Nos. 1280 and 1281.

**IT IS SO ORDERED.**

Dated: August 30, 2023

_____
LAUREL BEELER
United States Magistrate Judge

---

[101] The timeline set forth in the Statement suggests that from June 2022 to March 2023, government counsel may have been unaware of how ICE was applying the agreement.

[102] Mot. to Enforce Settlement Agreement – ECF No. 1281 at 23–24.

[103] Settlement Agreement – ECF No. 1205-1 at 18 (§ IV.D.6–7).

United States District Court
Northern District of California